#057575

ORIGINAL

# In the United States Court of Federal Claims

ECF

FILED
MAY 2 3 2003
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) |
| **Plaintiff,** | ) |
| v. | ) Case No. 03-1274C |
| **THE UNITED STATES of AMERICA,** | ) |
| **Defendant.** | ) |

## COMPLAINT

This case involves three Department of Defense ("DoD") travel management service contracts that are interrelated. One contract was awarded to TRW, Inc. (formerly BDM and subsequently acquired by Northrop Grumman Inc., but known herein as "TRW" since that is the name on the vast majority of relevant documents) in 1998. The TRW contract was so substantially modified in 2002, that it is the contention of Plaintiff, CW Government Travel, Inc., (hereinafter "Carlson") that the modifications constitute cardinal changes, or new requirements that are required to be competitively procured. Carlson won five long term, travel management service contracts in 2002 under a competitive procurement conducted by the Army. The Government has indicated that a substantial quantity of the travel requirements included in two of the contracts won by Carlson will be transferred to the TRW contract, which had been modified without competition to include these requirements. Carlson contends that such a transfer of requirements would constitute a breach of Carlson's two competitively won contracts and is appealing an adverse Contracting Officer's decision on that issue through this Complaint.

::ODMA\PCDOCS\MC1DOCS1\122773\1

In May of 1998, as part of an effort to completely revise its business travel management process, the DoD awarded a $263.7 million, fixed price contract, number DAMT01-98-D-1005, (known herein as "DTS DTR-6 contract") to TRW to develop and implement a software-based Common User Interface ("CUI") that would link the various components of the DoD's travel management system to create a new, unified Defense Travel System. This computer software product would be installed in individual personal computers ("PCs") used by Government travelers and interfaced with the local area network of each military base/facility. The CUI would enable Government personnel on temporary duty travel assignments ("TDY") to use their PC's to prepare travel orders, obtain necessary approval/authorization, make reservations with commercial airlines and process payment/reimbursement requests upon completion of the travel. The DoD's goal was to eliminate the extensive paper documentation and administrative burden historically involved in the travel process by Government employees, while expediting payment/reimbursement upon conclusion of the travel.

The DTS DTR-6 contract also required TRW to provide limited Commercial Travel Office services within the geographic region included in the contract, utilizing the CUI software. Commercial Travel Offices function essentially as travel agents for DoD travelers. The utilization of the CUI software would eliminate many of the Commercial Travel Office functions (e.g., researching and discussing travel options with the individual traveler) and enable the remaining functions of making airline reservations, purchasing tickets, and quality control to be performed in a single travel office for a multi-state region. Thus, the CUI software would eliminate the need to have individual Commercial Travel Offices, with numerous travel counselors, located at each major military base/facility. Because the TRW contract was essentially a prototype for the new Defense Travel System ("DTS"), it was limited to a specific

region in the Midwest known as Defense Travel Region 6 ("DTS DTR-6"). Traditional travel management service contracts continued to service the military activities within the geographic areas covered by the DTS DTR-6 contract as well as the rest of the country. DoD intended to implement the CUI throughout DTS DTR-6 and terminate the traditional travel service contracts, only after the CUI software was developed and fully tested. Subsequently, TRW would install the CUI software in many thousands of PCs located in other major military bases/facilities throughout the country and worldwide and the existing Commercial Travel Office contractors would utilize the CUI software and be able to close the individual Commercial Travel Offices at those military bases/facilities.

Deployment of the CUI software to approximately 11,000 locations worldwide was supposed to start before the end of 1998. However, contract performance proceeded fitfully, as a result of extensive delays, significant technical difficulties, and cost overruns. As of April 2002, the CUI software was still not ready for deployment and operational use. The major problems experienced under this contract were documented in a July 1, 2002 report by the Department of Defense Office of Inspector General. In April 2002, the Defense Travel System Program Management Office ("DTS PMO") commenced a complete restructuring of the TRW contract. The modifications issued during the course of performance resulted in a restructuring of the contract that substantially exceeded the scope of the original Solicitation.

The out-of-scope changes to the TRW contract included two fundamental changes. The first was a radical change in technology and the second involved adding traditional travel management services to the DTS DTR-6 contact for the several additional years anticipated to be required to develop and deploy the new technology. The original Solicitation proposed a client/server-based software solution in which the CUI software must be physically installed in

every personal computer ("PC") used by Government travelers. Additionally, a "reader" to accommodate the traveler's Public Key Infrastructure ("PKI") certificate was also required for each PC. Moreover, since individual PCs on a military base communicate with each other via a local area network ("LAN"), the CUI software installed on the individual PCs had to be modified to interface or integrate within the LAN. Thus, the performance of the CUI software was heavily dependent on the contractor's ability to interface with numerous other computer software systems already in use at each military base/facility or activity. Moreover, Government travelers could not utilize the CUI unless they had access to an individual PC upon which the CUI had been "loaded" or installed.

The newly restructured contract called for TRW to develop a web-based solution that would permit all Government travelers having access to the internet via individual PCs (and a password) to interact with the Defense Travel System through a web-site hosted by TRW. Access through an internet web-site eliminated the need to physically install software and "readers" on individual PCs and customize software code for the local area network of each military base/facility or activity. This change to a web-based system reflected a dramatically different methodology and technology from that contained in the TRW contract awarded in May 1998. In May 2003, TRW announced that it intended to start testing a web-based CUI in the summer of 2003, and that no previous versions of the CUI had been "web-based." DoD's 2002 modification of TRW's contract to take advantage of new technology ignored the fact that there are currently a number of commercially available, web-based/travel management products, so there would be many competitors for such a contract.

The original DTS DTR-6 Request for Proposals ("RFP") calling for a client/server-based solution attracted only two proposals. In contrast, the General Services Administration's

("GSA") recent bidders' conference for a web-based, end-to-end travel management solution attracted more than 80 potential offerors. In addition, contrary to the original requirement that offerors provide Commercial Travel Office services using the CUI once the Defense Travel System was in place, the restructured DTS DTR-6 contract calls for TRW to perform traditional travel services in this region years before the web-based Defense Travel System is to be implemented. Traditional Commercial Travel Office services are labor-intensive and require extensive use of well-trained travel counselors located on military bases that should be unnecessary if Commercial Travel Office services are performed using a fully functional and operational CUI. The DTS DTR-6 contract modifications were material changes that substantially exceeded the scope of the original competitive procurement and, therefore, should have been subjected to full and open competition.

TRW is not capable of providing traditional travel services, so in mid-2002 it entered into a new subcontract with Sato Travel to perform the traditional travel service requirements added to the restructured DTS DTR-6 contract. Sato Travel had been providing the traditional travel services within the geographical area covered by DTS DTR-6 under an Army contract won after a competitive procurement in 1992. The fees the Government agreed to pay TRW and Sato Travel for traditional travel services under the restructured DTS DTR-6 contract are substantially higher than the fees previously paid to Sato Travel by the Army for traditional travel services in the same geographic area and are substantially higher than the fees paid to Carlson under its current competitively won traditional travel service contracts.

By modifying the DTS DTR-6 contract beyond its original scope, the Government barred potential bidders, such as Carlson, from competing for what was essentially a new contract for traditional travel services. Instead, the Government inserted new requirements onto an existing

contract on a sole source basis in a move that will cost the Government millions, if not tens of millions, of additional dollars.

The Government also misinterpreted related Army contracts (DAMTO01-02-C-0027 and DAMT01-02-C-0028 for DTR-4 and DTR-5 respectively) awarded to Carlson to provide traditional travel services in the Mid-Atlantic and Mid-West regions. These contracts for traditional travel services were awarded to Carlson under a highly competitive procurement. The contracts provide that Carlson is the exclusive provider of travel services to the Army activities within these regions for a firm period of one year, commencing October 1, 2002, with eight six month options. Carlson's Army contracts state that "if DoD implements the Defense Travel System (DTS), and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options under these contracts may not be exercised." Recently, however, the Government has indicated that it intends to transfer the business of providing traditional travel services in several states included in these two Carlson Army contracts to the restructured DTS DTR-6 contract. The Government has unreasonably interpreted the Carlson Army contracts to mean that it can transfer the requirement to provide traditional travel services from Carlson to the DTS DTR-6 contract to be performed by Sato Travel, as a subcontractor to TRW, notwithstanding that the CUI has not been implemented, and will not be capable of providing the required travel services for several more years. Accordingly, the Government's attempt to transfer regions in Carlson's contracts to Sato Travel before implementation of the Defense Travel System CUI would constitute a breach of Carlson's Army contracts. Carlson challenged that interpretation of its contractual rights, but the Contracting Officer issued an adverse decision.

Carlson alleges the following in support of its complaint for damages, declaratory and injunctive relief against the United States of America:

## THE PARTIES

1. Plaintiff, Carlson, is a corporation organized under the laws of the State of Delaware.

2. Defendant is the United States of America.

The cognizant Contracting Officers for the contracts at issue are:

a. Contract No. DAMT01-98-D-1005 (DTS DTR-6):

Ms. Peggy Butler
Contracting Officer
Information Technology, E-Commerce and
Commercial Contracting Center (ITEC4)
2461 Eisenhower Avenue
ATTN: SFCA-IT
Alexandria, Virginia 22304-1700
FACSIMILE: (703) 428-1632

b. Contract Nos. DAMT01-02-0027 & DAMT01-02-0028 (Army DTR-4 & Army DTR-5):

Ms. Ruby Mixon
Contracting Officer
Department of the Army
Military Traffic Management Command
MTAQ-A Acquisition Division
200 Stovall Street, Room 12S67
Alexandria, Virginia 22332-5000
FACSIMILE: (703) 428-3325

## JURISDICTION

3. The United States Court of Federal Claims has jurisdiction over this action pursuant to The Tucker Act, codified at 28 U.S.C. § 1491 (2000) and the Contract Disputes Act codified at 41 U.S.C. §§ 601-613.

## STATEMENT OF FACTS

### I. DoD's Traditional Travel Management System

4. DoD employees, both civilian and military, frequently travel away from their home stations to support DoD missions. This travel, regularly conducted by educational, research, military, and political communities within DoD, is referred to as Temporary Duty ("TDY") travel. TDY travel is, essentially, business travel that is normally conducted through commercial air carriers, car rental companies, and hotels. In Fiscal Year 1993, for example, DoD personnel filed 8.2 million TDY travel vouchers.[1]

5. The DoD's traditional travel management system evolved piecemeal over a number of years. Consequently, the separate components of the travel management system were fragmented and worked in parallel rather than as an integrated system. The traveler was the only actual connection between the separate components of the system.

6. The traditional travel management system was further fragmented as a result of the fact that each branch and defense agency contracted differently for commercial travel services performed by Commercial Travel Offices. For example, the Army and the Navy contracted for travel services by branch-specific travel regions, while the Air Force acquired travel services by installation. In addition, performance work statements for Commercial Travel Offices were not standard, leading to different levels of service and preventing Commercial Travel Offices from providing services across the various DoD activities.

---

1 Because one travel voucher is submitted per trip, the filing of 8.2 million TDY travel vouchers represents 8.2 million trips taken by DoD personnel.

7. A defense travel management system essentially consists of six different elements: (1) authorization to travel, involving the identification of mission requirements, confirmation of available funds, and the authority to provide those funds; (2) travel arrangements, consisting of all aspects relating to scheduling and planning the travel and making the necessary reservations with airlines, hotels, and rental car companies; (3) execution, meaning actual travel, including meals, transportation, and lodging; (4) payment, by the traveler or the Government, for goods and services and reimbursement to the traveler and credit card company; (5) reconciliation, meaning the travel voucher process and reconciliation of payments; and (6) accountability, meaning the internal controls overseeing the entire system.

8. Under the traditional travel system, an individual or supervisor first identifies the need to travel and then prepares a document request for orders, either by typewriter or computer. The individual or supervisor then prepares a cost estimate by calling the Commercial Travel Office, the finance office, and the destination. The individual or supervisor then determines whether funds are available and acquires signatures from the requesting official, the budget office, and the approving official. Finally, the finance office certifies the travel and administrative offices check and publish the orders. The traveler may then make lodging arrangements, air reservations, and car rental reservations through a Commercial Travel Office via transmittal of the travel authorization documents, or on his or her own. The traveler then obtains a travel advance through an ATM with a Government credit card, or through the finance office. Finally, the Commercial Travel Office procures and delivers the tickets and the traveler may leave on his or her trip.

9. The traditional system is equally intensive post-travel. First, the traveler fills out a travel voucher and attaches supporting documents. Next, the approving official reviews and

signs the voucher and the traveler delivers the voucher to finance. Finance then reviews the claim, returning it to the traveler for errors. Subsequently, the accounting system updates its records and auditors review every voucher. Finally, the amount due is sent to the traveler and/or Government credit card company. If the advance results in overpayment to the traveler, the traveler must hand-carry or mail the overpayment to the finance office.

10. In the traditional travel management system, the Commercial Travel Office is responsible for significant and time-intensive duties. For example, Commercial Travel Offices provide travelers with information concerning available transportation, lodging, and rental cars. In addition, Commercial Travel Offices provide travelers with suggested itineraries, including routing, scheduling, and cost information. Moreover, Commercial Travel Offices also provide car rental services to coincide with airline arrival/departure times. Commercial Travel Offices also document and provide to the traveler the itinerary reflecting the least costly commercial transportation fares and are responsible for indicating the appropriate non-use codes for city pair flights in accordance with Defense Travel Regulations. Further, when a traveler makes a reservation, the Commercial Travel Office must advise the traveler about any cancellation or penalty charges, or nonrefundable deposits, including time frames and other conditions. The Commercial Travel Office is also required to assist the Government in reconciling invoices received from charge card vendors. In this regard, the Commercial Travel Office must develop and provide the Government with a user's manual describing the central billing account reconciliation process. Finally, the Commercial Travel Office must produce an electronic file detailing the results of the reconciliation. Perhaps the most time-intensive task of a Commercial Travel Office, however, is communicating to the traveler the available travel arrangements,

"should-cost" estimates and assisting the traveler in making a decision regarding what arrangements to make.

## II. REFORMING THE TRADITIONAL TRAVEL MANAGEMENT SYSTEM

11. As a result of a 1993 National Performance Review, the DoD decided that it needed to streamline the travel management system for TDY. Consequently, DoD formed a task force to study the traditional travel management system from a "clean sheet of paper" approach. The Task Force's report, issued in January of 1995, found that the traditional travel management system was "expensive, not customer-oriented, and indeed not mission-oriented." The Task Force also found that "[c]urrent Department travel practices are outmoded," and that "[t]he current travel system is not integrated." Thus, rather than recommend changes to the existing systems, the Task Force recommended the creation of a new DoD travel management system. The Task Force termed the resulting system the Defense Travel System.

12. To reform the traditional travel management systems into the Defense Travel System, the Task Force recommended that the Government adopt and standardize best business practices from the Government and the private sector. The Task Force recommended redesigning and reengineering the travel delivery system using technology "as an enabler for simplification and better control . . . ." The goal was to automate the process so that paper travel orders, vouchers, etc., would be eliminated and the entire travel process from start to finish, or "end-to-end," could be accomplished via personal computers.

13. The transition to the Defense Travel System was to be accomplished by the development and implementation of a computer software product to be known as the CUI. The CUI was supposed to provide travelers with a seamless, paperless, integrated process that would allow travelers and commanders or supervisors to perform all necessary functions by computer. Under the CUI-enhanced Defense Travel System, a Commercial Travel Office would rarely

come in contact with a traveler or supervisor. As the Task Force recommended, most of the Commercial Travel Office's tasks would be imbedded in the CUI. For example, rather than speak directly with a Commercial Travel Office representative to make travel arrangements, a traveler would use the CUI to view the different travel options (e.g., airline schedules and rates) and would select those options via computer. Essentially, the Commercial Travel Office would only receive the traveler's final itinerary or completed "passenger name record" ("PNR") via computer and purchase tickets without need for direct communication with the traveler, or to process paper travel orders. The Commercial Travel Office would also use the computer-generated PNR to perform quality control (e.g., ensure the trip and fares complied with Government Travel Regulations). Use of the CUI would significantly reduce the need for Commercial Travel Office staffing and eliminate the need for most of the costly on-site Commercial Travel Offices at military bases and facilities. Essentially, the DoD commercial travel management needs for all the bases and facilities within a multi-state region could be serviced from a single Commercial Travel Office staffed with a few computer operators. Thus, the CUI was intended to reduce the time, effort, and cost of the Commercial Travel Office's services, as well as reduce the Government's internal administrative burden and costs.

## III. Procuring the Necessary Services for the DTS

14. According to the Task Force's recommendation, the Defense Travel System would ultimately be the single source of travel management services for the entire DoD. In December of 1995, the Under Secretary of Defense for Acquisition, Technology, and Logistics and the Under Secretary of Defense Comptroller/Chief Financial Officer issued a joint memorandum establishing a Program Management Office to procure the necessary services for the new Defense Travel System.

15. The Under Secretaries' Joint Memorandum envisioned a rolling start for Defense Travel System. A contract would be awarded for the development, testing and implementation of the CUI within a single travel region. Once the CUI was fully operational within that single region, all other DoD regional travel management service contracts would transition to DTS over a period of time. The original CUI contractor would be responsible for implementing the CUI software at DoD bases, installations and facilities worldwide, regardless of the identity of the Commercial Travel Office contractor for such sites.

16. The Military Traffic Management Command, Department of the Army ("MTMC"), which procured travel management services for the Army under the traditional management system, was selected as the procuring activity for the Defense Travel System Program Management Office to competitively award a contract to develop the CUI. The United States was divided into 10 Defense Travel Regions known as DTS DTRs.[2] DTS DTR-6 was selected as the first region to transition to the Defense Travel System. DTS DTR-6 consists of military installations in Michigan, Wisconsin, North Dakota, South Dakota, Kentucky, Missouri, Illinois, Nebraska, Minnesota, Kansas, and Indiana.

17. Traditional travel services were being provided to DoD bases, installations and facilities within most of the DTS DTR-6 region under a previously competitively awarded MTMC contract with Sato Travel , known as Army DTR-3. The DTS DTR-6 contract required the development, testing and implementation of the CUI, with Commercial Travel Office

---

2 As noted above, under the traditional travel management system, the Army had also divided the country into Defense Travel Regions. The Army's DTRs and the DTS DTRs, however, are different. For example, while DTS DTR-6 included military installations in Michigan, Wisconsin, North Dakota, South Dakota, Kentucky, Missouri, Illinois, Nebraska, Minnesota, Kansas, and Indiana, the Army's system includes most of those installations in DTR-3. As is explained below, certain contracts issued under the Army's DTR system are relevant to Carlson's claim. Therefore, to correctly delineate the appropriate DTR, DTRs used by the Army under the traditional travel management system will be referred to as Army DTR _, while DTRs defined for the DoD-wide Defense Travel System will be referred to as DTS DTR _.

services only required in conjunction with the use of the CUI. Sato Travel would continue providing traditional travel services throughout most of the DTS DTR-6 region under the Army DTR-3 contract until the CUI was fully implemented in the region.

18. On June 13, 1997, MTMC released the DTS DTR-6 Solicitation for the procurement of the CUI for the Defense Travel System Program Management Office ("DTS PMO").

19. The DTS DTR-6 Solicitation made it clear that DoD intended the prime contractor for the procurement to be a computer software integrator with the capability to develop, implement, and integrate a CUI, which included creating interfaces with numerous other DoD software products and networks. The DTS DTR-6 contractor also had to implement, maintain and upgrade the CUI computer software on a worldwide basis. The limited Commercial Travel Office services that would be required after the development and implementation of the CUI in the DTS DTR-6 region would be performed by a subcontractor.

20. The Solicitation contemplated award of a fixed-price requirements contract for a base period of five years, with three one-year options for: (1) a new travel management software system, i.e., the CUI; (2) operation and maintenance of the CUI; and (3) DTS travel management services using the Defense Travel System CUI.

21. The Defense Travel System Technical Requirements of the CUI necessitated that the software be loaded onto each individual PC, along with a PKI reader. Access by DoD travelers to the CUI through normal, worldwide web protocols was not possible. Access to the DTS CUI could only be made through the DoD's Unclassified Internet Protocol Router Network ("NIPRNET").

22. In addition, the Solicitation required offerors to propose electronic interfaces to external automated systems based on required interface specifications. For example, offerors were required to propose a system that would process ANSI X12 electronic data interchange transactions through the DoD Electronic Data Interchange Infrastructure.

23. The Solicitation also required offerors to propose a system that would satisfy, at a minimum, a Controlled Access Protection (C2) level of security as defined in DoD 5200.28-STD, Department of Defense Trusted Computer System Evaluation Criteria. At the time of the Solicitation, no completely web-based solution could be designed to meet this level of security.

24. In addition, TRW's proposal indicated that certain functions could not be accessed via the Web. For example, the functions necessary to administer electronic document processing and the integration of the Commercial Travel Office into the pre-trip planning process by automating travel accommodations from original trip requests could only be provided via a client/server or direct connection to the host computer.

25. The DTS DTR-6 Solicitation did not require offerors to propose traditional travel services nor did it provide CLINs to price traditional travel services. Instead, the Solicitation required offerors to propose travel services using the CUI. TRW's proposal indicated that American Express had been selected as a subcontractor to provide Commercial Travel Office services in the DTS DTR-6 region from a single office after the development and implementation of the CUI.

26. In numerous statements to Government officials and during depositions taken for Federal Court litigation between TRW and its former travel services subcontractor, American Express, Government and TRW personnel have admitted that requirements for traditional travel services were not included in the DTS DTR-6 Solicitation or in TRW's original contract.

27. MTMC received only two offers in response to the DTS DTR-6 Solicitation by the closing time. One offer was from BDM International, Inc.[3] The other offer was from Electronic Data Systems Corporation ("EDS"). No traditional travel service contractors submitted offers. On May 7, 1998, MTMC awarded Contract No. DAMT01-98-D-1005 ("DTS DTR-6 contract") to TRW. The contract was a firm-fixed-price, performance-based contract for approximately $263,700,000. Subsequently, EDS filed a protest with the General Accounting office ("GAO"). The GAO denied EDS's protest on September 3, 1998.

28. Because the CUI would not be installed in DTS DTR-6 until 1998, at the earliest, and because the remaining DTS DTRs would be integrated on a rolling basis, the separate branches of DoD continued to competitively procure traditional travel management services from Commercial Travel Offices and extend existing contracts for traditional travel services. DoD intended that these contracts would phase into the DTS as the CUI was implemented across the country.

29. MTMC had awarded a traditional travel services contract to Sato Travel for Army DTR-3 region on January 6, 1992. Army DTR-3 included Army, Air Force, and other DoD locations in the States of Illinois, Indiana, Iowa, Michigan, Minnesota, North Dakota, South Dakota, and Wisconsin. Because these installations were also included in DTS DTR-6, the Army DTR-3 contract would have been the first to transition to the Defense Travel System upon completion of the CUI development, testing and implementation. On July 12, 1997, MTMC issued the first of numerous sole source extensions to the period of performance for Sato

---

[3] Immediately prior to submitting its offer, BDM was purchased by TRW, Inc. ("TRW"). On December 11, 2002, TRW was acquired by Northrop Grumman Corporation ("Northrop"). Because TRW was the contractor during a majority of the performance of the contract and, thus, its name appears on the contract documents, the complaint refers to the contractor performing the DTS CUI/Travel Services contract as TRW.

Travel's Army DTR-3 traditional travel service contract. The justification given for such sole source extensions of Sato Travel's Army DTR-3 contract was that the need for traditional travel services in this region would expire when the CUI was developed and implemented; therefore, it would be impractical to competitively procure a replacement for the Army DTR-3 contract for the then anticipated short time required to develop and implement a CUI.

30. Carlson competitively won one Army traditional regional travel service contact in 1992 and four (4) other Army traditional regional travel service contracts in 1994. The five-year contract periods for each of these contracts was extended several times in six-month increments in anticipation of the development and implementation of the CUI. In early 2001, given the failure to develop a DTS CUI, the Army determined to recompete all five of the Carlson traditional travel service contracts and issued a new Solicitation. However, at the same time, based upon overly optimistic predictions by the DTS PMO on the development and implementation of the CUI within the DTS DTR-6 region, the Army continued to extend Sato Travel's Army DTR-3 contract for traditional travel services without competition.

31. In 2001, responsibility for the procurement activity to support the DTS PMO was transferred from MTMC to what is now known as the Department of Army Information Technology, E-Commerce and Commercial Contracting Center ("ITEC 4").

## IV. PERFORMANCE PROBLEMS WITH THE DTS DTR-6 CONTRACT AND EXTENSIVE MODIFICATIONS BEYOND THE SCOPE OF THE SOLICITATION

32. Although the DTS DTR-6 contract established an aggressive timeline, numerous delays and substantial cost overruns plagued performance. According to a report on the management of the DTS, issued by the Inspector General ("IG") of the DoD on July 1, 2002, the Defense Travel System was projected to cost approximately $491,900,000, or 53% more than the original contract cost of $263,000,000, and would not be fully deployed until Fiscal Year 2006,

approximately four years behind schedule. The report found that the DTS "was being substantially developed without the requisite requirements, cost, performance, and schedule documents and analyses needed as the foundation for assessing the effectiveness of the system and its return on investment."

33. In addition, the DoD IG report found that although the procurement had initially envisioned a commercial-off-the-shelf computer software product, "since the effective date of the contract (September 1998), they have had to do extensive developmental work." Moreover, the report indicates that the Defense Travel System Program Management Office expected further development costs of approximately $185,500,000 from Fiscal Year 2002 through 2007 "to complete development solutions to integrate the [CUI] and the DoD accounting and disbursing systems, and to provide required engineering support to implement the system."

34. The DoD IG report found that the main cause of the problems encountered in the performance of TRW's contract was the fact that, although the procurement was for information technology, DoD had managed the procurement as one for travel services. A major oversight identified in the DTS was that a "Mission Need Statement" ("MNS") and an "Operational Requirements Document" ("ORD") were never prepared. Thus, the IG report suggested that DTS should not be deployed to any site until it was "designated a major automated information system, all acquisition documents have been completed, a program review has been conducted by the Overarching Integrated Product Team, and the Milestone Decision Authority has approved the system to proceed."

35. In December 2002, the DoD's Program Analysis and Evaluation ("PA&E") office recommended that the DTS program be terminated, and that DoD should consider alternative commercial travel management products. The DoD PA&E Report stated that the custom-

designed DTS CUI may no longer be needed. "An end-to-end system to improve operations for travelers and supervisors potentially could be provided by the commercial market faster, more efficiently and cheaper than will be provided from a [DOD] developed solution."

36. On April 25, 2002, shortly before the DoD IG's report was issued, TRW and the DoD entered into bilateral Modification P00028, completely restructuring the DTS DTR-6 contract.

37. The modification added several requirements to the contract that were materially outside of the scope of the Solicitation.

38. For example, contrary to the Solicitation, which provided that the CUI would be integrated via client/server interaction, the modification provided that "Authorized users shall only be able to access DTS using a certified version of either the Netscape or Microsoft Internet explorer web browser." In addition, the modification required that the document preparation, budget, and route and review module of DTS, previously accessible only through a client/server or direct link, must also be accessible via a web browser.

39. Thus, the modification altered the fundamental contract requirements from that of computer software systems integration, requiring client-side installation and integration of computer software on tens of thousands of individual PCs, to that of a true web-based application readily usable by any PC with access to the internet. This represented a cardinal change to produce a new product with significantly different technology.

40. When MTMC issued the 1997 RFP for a CUI based on computer software, client/server applications, it received only two offers. When GSA recently held a bidder's conference for a web-based travel management system, it attracted over 80 potential offerors. In December 2002, the DoD Program Analysis and Evaluation Report specifically noted that

commercially available web-based travel products could perform the requirements that TRW had been unable to perform under the DTS DTR-6 contract.

41. Moreover, the Solicitation and DTS DTR-6 contract awarded to TRW in 1998 only required the contractor to perform travel services through the CUI enhanced Defense Travel System. The DoD continued to procure traditional travel services for most of the military activities located in the DTS DTR-6 region from Sato Travel under the Army DTR-3 contract. The Army extended the Sato Travel DTR-3 contract through October 1, 2002 on a sole source basis for the express purpose of providing traditional travel services until the CUI is developed and implemented. Modification P000028 to the DTS DTR-6 contract added traditional travel services to TRW's contract five years after the DTS DTR-6 Solicitation had been issued.

42. The difference between Commercial Travel Office services under the traditional travel management system and utilizing a fully functional CUI is significant. As described above, Commercial Travel Office services under the traditional travel management system are much more labor-intensive than a CUI, provided the CUI could be developed and implemented in accordance with the original DTS DTR-6 contract requirements. Indeed, a fully automated, end-to-end travel management system could save $10 to $20 per individual trip or transaction, as compared to the cost of traditional Commercial Travel Office services.

43. Because traditional travel services were added to TRW's contract for DTS DTR-6, the Army no longer required travel services through Sato Travel's Army DTR-3 contract. Thus, Sato Travel's Army DTR-3 contract, which had been openly competed originally, and subsequently extended numerous times, was allowed to expire on October 11, 2002. Subsequently, TRW became responsible for performing traditional travel services for DTS DTR-6. Interestingly, prior to the expiration of Sato Travel's Army DTR-3 contract, TRW terminated

its subcontract with American Express and hired Sato Travel as a subcontractor to provide traditional travel services for DTS DTR-6. The traditional travel transaction fees, which the DTS PMO agreed to add to the DTS DTR-6 contract, were substantially higher than the traditional travel transaction fees being paid to Sato Travel under the Army DTR-3 contract for the same work and substantially higher than the fees paid for traditional travel management service contracts awarded in 2002 by the Army and other DoD activities under competitive procurements.

## V. CARLSON'S TRAVEL SERVICES CONTRACT AND THE ARMY'S MISINTERPRETATION

44. Throughout the performance of the DTS DTR-6 contract, the Army, Navy, Air Force and Marines awarded traditional travel services for other regions to other contractors under competitive procurements. On February 27, 2002, following full and open competition, MTMC awarded contracts to Carlson for traditional travel services for Army DTRs 1, 2, 4, 5 and the National Capital Region. Army DTR-1 is comprised of Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, and Wyoming. Army DTR-2 is comprised of Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, Puerto Rico, and the Virgin Islands. Army DTR-4 is comprised of Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, Virginia, and West Virginia. Army DTR-5 is comprised of Arkansas, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma, and Texas. The National Capital Region is comprised of the Washington, D.C. Metropolitan Area, including the Pentagon, Fort Belvoir and Fort Myers.

45. Carlson's five new Army contracts became effective on October 1, 2002, with a firm base period of twelve (12) months and a series of eight (8) six-month option periods, for a

total contract period of five (5) years. Each contract provided: "The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract."

46. Each of Carlson's five new Army contracts also provided: "At a future date a DoD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DoD travel services contract is awarded all DoD sites will transition in accordance with the implementation dates to the DoD travel services contract."

47. Each of Carlson's five new Army contracts provided that the Army or other DoD agencies could exercise the options to extend the contract and stated: "However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation." At the time the contracts were awarded to Carlson it was understood by all parties that "DoD implements the Defense Travel System (DTS)" meant the implementation of a fully functional DTS CUI to perform travel services.

48. Each of Carlson's five new Army contracts stated that "due to projected base closures and realignments" the Government cannot forecast how the revenue for official travel will be affected. The contracts also stated: "In addition, Offerors are hereby notified that upon the implementation of the Defense Travel Region 6 (DTR 6) contract the following locations (Ft. Campbell, KY, Missouri and Nebraska) will be deleted from the respective regions and incorporated into the DTR 6 contract." At the time the contracts were awarded to Carlson it was understood by all parties that "implementation of the Defense Travel Region 6 (DTR 6) contract"

meant the implementation of a fully functional DTS CUI to perform the travel services for DTS DTR-6 region.

49. By letter dated November 8, 2002, MTMC informed Carlson that the DTS DTR-6 contract would be implemented in the States of Kentucky, Missouri, and Nebraska effective February 24, 2003 and that, consequently, those states, in their entirety, would be removed from the Carlson Army contracts that had commenced on October 1, 2002.

50. By letter dated November 26, 2002, Carlson wrote to MTMC requesting that it rescind the order to transfer the DoD sites in these states to the DTS DTR-6 contract. Carlson's letter stated that it had learned that the CUI being developed under the DTS DTR-6 contract would not be implemented by February 2003 in any region, and that no transfer of sites could take place unless and until the CUI was fully implemented. Carlson argued that it would be improper and a violation of the Competition in Contracting Act to include traditional travel services in the DTS DTR-6 contract and transfer the work won by Carlson in a competitive procurement. Carlson argued that, in any event, no work could be transferred to the DTS DTR-6 contract during the first contract year of Carlson's Army contracts. Moreover, Carlson explained to MTMC that, after the CUI was implemented, its contract only required it to relinquish to the DTS DTR-6 contract the requirements from Fort Campbell, Kentucky, not the entire State of Kentucky.

51. In a letter dated January 10, 2003, MTMC's Contracting Officer denied Carlson's request that MTMC rescind the November 8, 2002 order to transfer the work to the DTS DTR-6 contract. MTMC contended that the DTS DTR-6 contract would be implemented in Kentucky, Missouri and Nebraska by February 24, 2003. MTMC also rejected Carlson's interpretation of its Army contracts and asserted that the contracts required Carlson to give up the Army activities

in all three states, including the entire State of Kentucky, in addition to Fort Campbell, Kentucky.

52. In conversations with the MTMC officials during January 2003, Carlson took the position that any attempt to transfer these states to TRW/Sato Travel in February 2003 would compel immediate legal action by Carlson. On January 31, 2003, MTMC's Contracting Officer notified Carlson that the order to transfer the commercial travel services for the States of Kentucky, Missouri, and Nebraska on February 24, 2003, was rescinded and that Carlson could continue to perform such work through September 30, 2003 (the last day of the base period in Carlson's Army contracts). MTMC continued to assert, however, that the entire State of Kentucky would transfer to the DTS DTR-6 contract, along with Missouri and Nebraska, and implied that such a transfer would occur on October 1, 2003.

53. On May 15, 2003, the MTMC Contracting Officer notified Carlson that it was intended that requirements to provide traditional travel services to all sites in Missouri, Nebraska, and Kentucky would be removed from Carlson's Army contracts (and presumably transferred to the DTS DTR-6 contract), effective September 30, 2003.

## COUNT I
## (Violation of the Competition in Contracting Act and Federal Acquisition Regulations)

54. Carlson incorporates each of the allegations in paragraphs 1 through 51 as if fully set forth herein.

55. The Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304, 41 U.S.C. § 253, requires that Government agencies conducting procurements must "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation . . . ." 10 U.S.C. § 2304(a)(1)(A). The

Federal Acquisition Regulations ("FAR"), 48 C.F.R. Chapter 1, Part 6, prescribes policies and procedures to promote full and open competition in the acquisition process and to provide for full and open competition.

56. The Government may not issue modifications beyond the scope of an existing contract because such actions contravene the CICA. The FAR prohibits, except in very limited circumstances not applicable to the DTS DTR-6 contract, modifications to a contract that were not evaluated as part of the initial competition. 48 C.F.R. Chapter 1, Part 6.001. Under CICA and FAR, Government contracting officers have an affirmative duty to promote and provide for full and open competition. 48 C.F.R. Chapter 1, Part 6.101.

57. Certain modifications outside the scope of an original competed contract, such as the DTS DTR-6 contract, fall under the requirements of CICA and FAR and must be competed to prevent the Government from using an established contract to circumvent the requirements of full and open competition.

58. The 1997 Solicitation for the DTS DTR-6 required offerors to propose a CUI based on computer software and a client/server system requiring significant systems integration at each of the 11,000 DoD bases, installations and facilities worldwide. Offerors were required to demonstrate substantial capability and experience in performing such software integration contracts. Thus, the procurement was essentially limited to systems integrators. In the April 2002 Modification P00028 to the DTS DTR-6 contract, however, TRW and the Government modified the contract to require TRW to provide a web-based system. This represented a cardinal change in the requirements of the 1997 Solicitation and 1998 DTS DTR-6 contract awarded to TRW. As found by DoD's Program Analysis and Evaluation Report of December 17, 2002, and further demonstrated by the attendance at a recent pre-proposal conference held by

GSA for a similar web-based, end-to-end travel management system currently being procured for all Government agencies, numerous sources currently provide web-based travel management solutions.

59. The GSA's ongoing procurement of a web-based Government travel management system contemplates implementation of the fully operational system commencing in December 2003. Moreover, unlike the modified DTR DTS-6 contract, the GSA procurement does not require the Government to pay for the development cost of such a web-based travel system.

60. The Government's 2002 modification of TRW's DTS DTR-6 contract exceeded the scope of the original Solicitation. The web-based solution now required by the modified DTS DTR-6 contract was not contemplated by the original Solicitation. The Government cannot now incorporate that requirement into the existing contract. CICA and FAR require that the Government engage in a full and open competition for a web-based solution to accomplish the objectives of the Defense Travel System. The DoD cannot prevent offerors from competing for what is essentially a new contract. Such a competition will garner substantial interest, much more than the original 1997 procurement, and will save the Government tens of millions of dollars.

61. As a provider of web-based end-to-end travel management solutions, Carlson is an interested party because it is a potential bidder for the work described in Modification P00028 to the DTS DTR-6 contract.

62. In addition, the original Solicitation for the DTS DTR-6 contract did not include traditional travel services. Throughout the term of the DTS DTR-6 contract, other DoD agencies continued to procure traditional travel services for the DTS DTR-6 region through other contracts. All other current DoD contracts for traditional travel services have been competitively

procured. Nevertheless, in Modification P00028, the DoD incorporated traditional travel services into the DTS DTR-6 contract, four years after the contract was awarded, thus precluding full and open competition for what was essentially a separate requirement.

63. Sato Travel had been providing traditional travel services throughout most of the DTS DTR-6 region from 1992 until October 2002 under an Army DTR-3 contract that had originally been competitively procured. Modifying the DTS DTR-6 contract to include traditional travel services, and adding Sato Travel to the DTS DTR-6 contract as a subcontractor to perform those traditional travel services, is essentially a sole source procurement in violation of CICA and the FAR.

64. As a provider of traditional travel services, Carlson is an interested party because it was a potential bidder on the traditional travel services incorporated into the DTS DTR-6 contract. Moreover, during 2002, Carlson won five large Army regional travel management contracts in head-to-head competition against Sato Travel. The competition for Army regional travel management contracts won by Carlson in head-to-head competition with Sato Travel included DoD sites in three states, Missouri, Nebraska and Kentucky included in the DTS DTR-6 contract. Carlson's prices in the competitively-won Army contracts to provide traditional travel services to sites in Missouri, Nebraska, and Kentucky are substantially lower than Sato Travel's prices to provide traditional travel services under the DTS DTR-6 contract. Therefore, it is probable that Carlson would win a competition against Sato Travel to provide traditional travel services throughout the DTS DTR-6 region.

65. By modifying the DTS DTR-6 contract to incorporate a web-based solution and traditional travel services, two requirements exceeding the scope of the original Solicitation,

DoD violated the CICA and the Federal Acquisition Regulations by precluding potential bidders, such as Carlson, from bidding on what was essentially a new and different contract.

## COUNT II

**(Request for Preliminary/Permanent Injunction in Relation to Count I)**

66. Carlson incorporates each of the allegations in paragraphs 1 through 63 as if fully set forth herein.

67. Carlson's allegations are well supported in law and fact; Carlson is therefore likely to succeed on the merits of its Protest and request for declaratory judgment on contractual rights and obligations.

68. Carlson will suffer specific irreparable injury if the performance of TRW's DTS DTR-6 contract is not enjoined because of its lost opportunity to fairly compete for, and perform work under, the contract and the loss of profits generated by the contract.

69. The public interest will be best served by the immense savings that result from granting Carlson its requested relief. The transaction fees for traditional travel services that the Government agreed to pay TRW and Sato Travel under the non-competitive modification of the DTS DTR-6 contract exceed the transaction fees for traditional travel services being paid to Carlson under the competitively procured contracts by many millions of dollars annually. The DTS DTR-6 contract modification obligates the Government to pay TRW hundreds of millions of dollars to develop a web-based travel management system that can be procured competitively without the Governing incurring the cost of development.

70. Granting a permanent injunction will also serve the public interest by insuring that the DoD's procurement of travel services for the Defense Travel System is conducted in accordance with all Federal procurement laws, and that all potential bidders have a fair and equal

opportunity to compete for and perform work required by the Government outside the scope of the 1997 Solicitation.

71. There is no harm to the Government or third parties as a result of granting Carlson its requested relief. The DoD's improper conduct in the award of this contract has the adverse effect of undermining the integrity of the entire Federal procurement process. Neither TRW nor Sato Travel is entitled to continue receiving the exorbitant fees being paid as a result of the improper sole source modifications to the DTS DTR-6 contract. Granting Carlson's prayed for relief will preserve public confidence and competition in the Federal procurement process.

**COUNT III**

**(Request for Preliminary/Permanent Injunction and Declaratory Judgment Pursuant to 28 U.S.C. 1491(a)(2))**

72. Carlson incorporates each of the allegations in paragraphs 1 through 69 as if fully set forth herein.

73. 28 U.S.C. 1491 (a) (2) grants the Court of Federal Claims, in any case within its jurisdiction, "the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." In addition to the jurisdiction to render judgment upon any claim founded upon an express or implied contract under 28 U.S.C. 1491 (a) (1), the Court of Federal Claims shall also have jurisdiction to "render judgment upon any [Contract Disputes Act] claim . . . including . . . nonmonetary disputes on which a decision of the contracting officer has been issued . . . ." 28 U.S.C. 1491(a)(2).

74. By letter dated November 8, 2002, the MTMC Contracting Officer informed Carlson that its right to provide traditional travel services to Army and other DoD agencies located in the States of Kentucky, Missouri, and Nebraska would be removed from Carlson's

Army contracts and transferred to the DTS DTR-6 contract to be performed by TRW and Sato Travel, effective February 24, 2003.

75. By letter dated November 26, 2002, Carlson wrote to the MTMC contracting officer arguing that it was a violation of CICA and FAR and a breach of Carlson's contracts to transfer this work to the DTS DTR-6 contract and requested that MTMC rescind the order. Carlson's letter constituted a demand for an interpretation of its contract terms, the applicable law and specifically asserted entitlement to the declaratory relief it sought.

76. In a letter dated January 10, 2003, MTMC's Contracting Officer denied Carlson's request and rejected Carlson's interpretation of its contract terms and applicable law. The MTMC Contracting Officer refused to rescind the November 8, 2002 order and insisted that Carlson was contractually obligated to transfer to the DTS DTR-6 contract the right to provide traditional travel services to Army and other agencies in Kentucky, Missouri, and Nebraska by February 24, 2003. Thus, MTMC's letter constituted a final decision from the contracting officer denying Carlson's interpretation of its contractual rights and obligations under applicable law and regulations.

77. On January 31, 2003, the MTMC Contracting Officer rescinded the order to transfer the travel business for Missouri, Nebraska and Kentucky effective February 24, 2003, but only agreed that Carlson could continue performing such traditional travel services in those states through September 30, 2003. The MTMC Contracting Officer did not rescind her dispute with Carlson's interpretation of its contractual rights under the Army Contracts and applicable law.

78. On May 15, 2003, the MTMC Contracting Officer confirmed the adverse decision on the interpretation of Carlson's contracts by notifying Carlson that, effective September 30,

2003, the DoD sites in Missouri, Nebraska, and Kentucky would be removed from Carlson's contracts. Upon information and belief, it is the Government's intention to have Sato Travel provide traditional travel services to the DoD sites in Missouri, Nebraska, Kentucky under the modified DTS DTR-6 contract commencing on October 1, 2003, in violation of Carlson's contractual rights.

79. MTMC's interpretation of Carlson's rights to retain exclusive performance of travel services under the Army Contracts in the three states until the CUI required by the DTS DTR-6 contract is fully operational and deployed at issue, is incorrect as demonstrated by the plain language of the contracts. Moreover, applicable law and regulation prohibits the Government from transferring work awarded to Carlson under competitive procurements to a contract that has been modified without competition.

80. Transferring the requirement to provide traditional travel services to DoD sites contained in Carlson's contracts to the DTS DTR-6 contract constitutes a material breach of Carlson's contracts, loss of key personnel, disruption of operations, and other substantial damages that may not be adequately compensated by monetary damages.

81. Carlson's allegations are well supported in law and fact; Carlson is likely to succeed on the merits of its appeal and request for declaratory judgment on contractual rights and obligations.

82. Carlson will be irreparably harmed by the transfer of the requirements to provide traditional travel services in Missouri, Nebraska, and Kentucky effective October 1, 2003. The public interest will be best served by the millions of dollars in savings to be realized by having Carlson continue to provide traditional travel services to the Army, and other agencies in these three states.

83. Carlson won the right to provide traditional travel services in Missouri, Nebraska, and Kentucky under a competitive procurement. TRW and its subcontractor, Sato Travel, did not obtain the right to provide such services under a competitive procurement. Granting a permanent injunction will also serve the public interest by preserving the integrity of the Federal procurement system.

## PRAYER FOR RELIEF

**WHEREFORE,** Carlson hereby requests this Court to find that the Army's modification of TRW's contract exceeded the scope of the original Solicitation by altering the contract to require (i) TRW to provide a web-based travel management system and (ii) provide traditional travel services, prior to the implementation of the Defense Travel System. In addition, the Government has improperly interpreted Carlson's contracts to permit the transfer of all travel services for the Army and other agency sites in the States of Missouri, Nebraska, and all of Kentucky to the modified DTS DTR-6 contract, notwithstanding the fact that the CUI to satisfy the Defense Travel System requirements will not have been implemented throughout those states. Even if the Government is permitted to transfer all travel services for the DoD sites in the States of Missouri and Nebraska, it may only transfer the travel services required by Fort Campbell, KY and not other Army activities within the State of Kentucky. As a result of the Army's unlawful conduct, Carlson is rightfully entitled to:

A) A preliminary, permanent injunction ordering the Army to direct TRW to cease performance of the DTS DTR-6 contract and immediately competitively reprocure the requirements for a web-based travel management system and the requirements to provide traditional travel services contained in the currently modified DTS DTR-6 contract;

B) A declaratory judgment finding that Carlson is the exclusive provider of traditional travel services for the DoD sites identified in Carlson's competitively-awarded Army contract;

C) A declaratory judgment finding that Carlson's Army travel services contracts including the DoD sites in the States of Missouri, Nebraska, and Kentucky, do not require it to relinquish this work to TRW and Sato Travel under the DTS DTR-6 contract, unless and until the CUI required to satisfy the DTS requirements is implemented throughout those states.

D) A declaratory judgment finding that in any event Carlson's travel services contract only requires it to relinquish Fort Campbell, Kentucky, as opposed to the entire State of Kentucky, in the event that the Defense Travel System CUI is implemented in the DTS DTR-6 region;

E) A preliminary and permanent injunction ordering the Army not to transfer the requirement to provide traditional travel services under any of Carlson's Army contracts to the DTS DTR-6 contract, unless and until a DTS CUI is implemented and able to provide all required travel services to the Army at those sites.

F) All of its damages and costs;

G) All costs and attorneys fees incurred in pursuing this action; and

H) Such other relief as the Court may deem just and proper.

Respectfully submitted,

Lars E. Anderson
J. Scott Hommer, III
Benjamin A. Winter
VENABLE, LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 821-8949

*Counsel to CW Government Travel, Inc.*

Dated: May 23, 2003

::ODMA\PCDOCS\MC1DOCS1\122773\1