ORIGINAL

# In the United States Court of Federal Claims

ECF

FILED
MAY 23 2003
U.S. COURT OF FEDERAL CLAIMS

CW GOVERNMENT TRAVEL, INC., )
)
)
Plaintiff, )
)
v. )
)
THE UNITED STATES of AMERICA, )
)
Defendant. )

Case No. 03-1274C

## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Pursuant to Rule 65(a) of the Rules of the United States Court of Federal Claims, plaintiff CW Government Travel, Inc., ("Carlson") respectfully moves the Court to issue a preliminary injunction enjoining defendant, its officers, agents, and employees, as well as all other persons in active concert or participation with them, from taking any further actions in furtherance of contract number DAMT01-98-D-1005, (known herein as "DTS DTR-6 contract") between the Department of Defense ("DoD") and TRW, Inc. (formerly BDM and subsequently acquired by Northrop Grumman Inc., but known herein as "TRW" since that is the name on the vast majority of relevant documents), including, but not limited to, TRW's work on a Computer User Interface for the Defense Travel System and the traditional travel services being performed by TRW's subcontractor, Sato Travel.

Carlson also moves the Court to issue a preliminary injunction enjoining defendant, its officers, agents, and employees, as well as all other persons in active concert or participation with them, from taking any further actions in furtherance of transferring the requirement to provide traditional travel services to DoD sites contained in Carlson's contracts with the Army to the DTS Defense Travel Region ("DTR") 6.

As discussed further in Carlson's Complaint and Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunctive Relief, Carlson has a substantial likelihood of prevailing on the merits of this action by showing that the DoD improperly modified the DTS DTR-6 contract beyond the scope of the initial Solicitation by switching from a client/server based CUI to a web-based CUI and by adding traditional travel services to the contract. In addition, Carlson has a substantial likelihood of prevailing on the merits of this action by showing that the Army's interpretation of Carlson's rights to retain exclusive performance of travel services under the Army Contracts in the three states until the CUI required by the DTS DTR-6 contract is fully operational and deployed at issue, is incorrect as demonstrated by the plain language of the contracts.

Unless this Motion is granted, Carlson will suffer immediate and irreparable harm from the DoD's actions because it will be deprived of the right to compete for the provision of the web-based CUI described under the modified DTS DTR-6 contract as well as the traditional travel services tacked on to the contract. In addition, Carlson will suffer immediate and irreparable harm from the DoD's actions because it will be deprived of the right to be the exclusive provider of traditional travel services for the DoD sites identified in Carlson's competitively-awarded Army contract. The defendant will not suffer any harm from the requested equitable relief. The public will benefit from the requested preliminary injunction as such an order will prevent the DoD from wasting millions of taxpayer dollars on an inefficient, over-costly CUI. Further, the public interest will gain from the continued benefit of Carlson's lower transaction fee compared to the higher rate charged by Sato Travel under its subcontract with TRW and the DTS

DTR-6 contract. Finally, the public interest demands adherence to applicable procurement statutes and regulations, and thus fully supports issuance of the requested relief.

Carlson understands that the United States Court of Federal Claims normally attempts to schedule a status conference within a few days of receiving a motion for preliminary injunction. While Carlson believes that a motion for preliminary injunction is necessary to adequately protect its rights, it does not assert that the issues raised in its motion and accompanying memorandum must be considered immediately. Rather, Carlson respectfully requests that the court schedule a preliminary status conference to discuss these issues within the next two weeks.

WHEREFORE, Plaintiff respectfully requests that the court issue a preliminary injunction as described above.

Respectfully submitted,

Lars E. Anderson
VENABLE, BAETJER & HOWARD, LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone no.: (703) 760-1600
Telecopier no.: (703) 760-1623

Of Counsel:
J. Scott Hommer, III
Benjamin A. Winter
VENABLE, BAETJER & HOWARD, LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone no.: (703) 760-1600
Telecopier no.: (703) 760-1623

Dated: May 23, 2003

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **THE UNITED STATES of AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Lars E. Anderson
VENABLE, BAETJER & HOWARD, LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone no.: (703) 760-1600
Telecopier no.: (703) 760-1623

Of Counsel:
J. Scott Hommer, III
Benjamin A. Winter
VENABLE, BAETJER & HOWARD, LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182

Dated: May 23, 2003

# TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... II

**TABLE OF AUTHORITIES** .......... III

**QUESTION PRESENTED** .......... 1

**STATEMENT OF THE CASE** .......... 1

I. STANDARD FOR INJUNCTIVE RELIEF .......... 7
II. CARLSON HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THE ARMY'S AWARD DECISION WAS ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION .......... 8
*A. Modification P00028 To The DTS DTR-6 Contract Constituted A Cardinal Change To The Contract Such That It Violated The CICA And The FAR And Should Have Been Competed As A Separate Contract* .......... *9*
*B. The Army may not transfer the requirements under Carlson's Army Contracts to DTS DTR 3 until the DTS CUI required to satisfy the DTS requirements is implemented throughout the states covered by the contracts nor may* .......... *12*
III. CARLSON WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT THE PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION .......... 17
IV. THE HARM TO CARLSON OUTWEIGHS ANY POTENTIAL HARM TO THE DEFENDANT .......... 18
V. GRANTING INJUNCTIVE RELIEF IS STRONGLY IN THE PUBLIC INTEREST .......... 18

**CONCLUSION** .......... 20

# TABLE OF AUTHORITIES

## CASES

A.L.K. Corp. v. Columbia Pictures Indus., Inc., 440 F.2d 761 (3d Cir. 1971) ........ 8

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999) ........ 8

AT&T v. Wiltel, 1 F.3d 1201 (1993) ........ 9

CCL, Inc. v. United States, 39 Fed. Cl. 780 (1997) ........ 9

Dairy Maid Dairy, 837 F. Supp. 1370 (E.D. Va. 1993) ........ 18

FMC Corp. v. United States, 3 F.3d 424 (Fed. Cir. 1993) ........ 8

J & H Reinforcing and Structural Erectors v. United States, 50 Fed. Cl. 570 (2001) ........ 17

King v. Saddleback Junior Coll. Dist., 425 F.2d 426, 428 n.2 (9th Cir. 1970) ........ 8

Magnavox Elect. Sys. Co. v. United States, 26 Cl. Ct. 1373 (1992) ........ 17

Minor Metals, Inc. v. United States, 38 Fed. Cl. 16 (1997) ........ 7, 18

MVM, Inc. v. United States, 46 Fed. Cl. 137 (1999) ........ 8, 18

OAO Corp. v. United States, 49 Fed. Cl. 478 (2001) ........ 8

Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728 (2000) ........ 17

Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560 (2000) ........ 17

Stratos Mobile Networks USA, LLC v. United States, 44 Fed. Cl. 633 (1999) ........ 17

Techs. Corp. v. Titan Wheel Int'l, 141 F.3d 1084 (Fed. Cir. 1998) ........ 7

TRW Envt'l. Safety Sys. v. United States, 16 Cl. Ct. 520 (1989) ........ 8

Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841 (D.C. Cir. 1977) ........ 8

## STATUTES

10 U.S.C. § 2304 ........ 9

## OTHER AUTHORITIES

11A Wright & Miller § 2948.3 ........ 8

## QUESTION PRESENTED

Whether plaintiff, CW Government Travel, Inc., ("Carlson") is entitled to a preliminary injunction to enjoin the performance of a contract improperly modified to include the provision of a web-based Computer User Interface ("CUI") and traditional travel services when the Solicitation only required the provision of a client/server based CUI and travel services performed using that CUI. Additionally, whether Carlson is entitled to a preliminary injunction to enjoin the Army from transferring the requirement to provide traditional travel services to DoD sites contained in Carlson's contracts with the Army to the DTS Defense Travel Region ("DTR") 6.

## STATEMENT OF THE CASE

This case involves three Department of Defense ("DoD") travel management service contracts that are interrelated. One contract was awarded to TRW, Inc. (formerly BDM and subsequently acquired by Northrop Grumman Inc., but known herein as "TRW" since that is the name on the vast majority of relevant documents) in 1998. The TRW contract was so substantially modified in 2002, that it is the contention of Plaintiff, CW Government Travel, Inc., (hereinafter "Carlson") that the modifications constitute cardinal changes, or new requirements that are required to be competitively procured. Carlson won five long term, travel management service contracts in 2002 under a competitive procurement conducted by the Army. The Government has indicated that a substantial quantity of the travel requirements included in two of the contracts won by Carlson will be transferred to the TRW contract, which had been modified without competition to include these requirements. Carlson contends that such a transfer of requirements would constitute a breach of Carlson's two competitively won contracts and

is appealing an adverse Contracting Officer's decision on that issue through this Complaint.

In May of 1998, as part of an effort to completely revise its business travel management process, the DoD awarded a $263.7 million, fixed price contract, number DAMT01-98-D-1005, (known herein as "DTS DTR-6 contract") to TRW to develop and implement a software-based Common User Interface ("CUI") that would link the various components of the DoD's travel management system to create a new, unified Defense Travel System. This computer software product would be installed in individual personal computers ("PCs") used by Government travelers and interfaced with the local area network of each military base/facility. The CUI would enable Government personnel on temporary duty travel assignments ("TDY") to use their PC's to prepare travel orders, obtain necessary approval/authorization, make reservations with commercial airlines and process payment/reimbursement requests upon completion of the travel. The DoD's goal was to eliminate the extensive paper documentation and administrative burden historically involved in the travel process by Government employees, while expediting payment/reimbursement upon conclusion of the travel.

The DTS DTR-6 contract also required TRW to provide limited Commercial Travel Office services within the geographic region included in the contract, utilizing the CUI software. Commercial Travel Offices function essentially as travel agents for DoD travelers. The utilization of the CUI software would eliminate many of the Commercial Travel Office functions (e.g., researching and discussing travel options with the individual traveler) and enable the remaining functions of making airline reservations,

purchasing tickets, and quality control to be performed in a single travel office for a multi-state region. Thus, the CUI software would eliminate the need to have individual Commercial Travel Offices, with numerous travel counselors, located at each major military base/facility. Because the TRW contract was essentially a prototype for the new Defense Travel System ("DTS"), it was limited to a specific region in the Midwest known as Defense Travel Region 6 ("DTS DTR-6"). Traditional travel management service contracts continued to service the military activities within the geographic areas covered by the DTS DTR-6 contract as well as the rest of the country. DoD intended to implement the CUI throughout DTS DTR-6 and terminate the traditional travel service contracts, only after the CUI software was developed and fully tested. Subsequently, TRW would install the CUI software in many thousands of PCs located in other major military bases/facilities throughout the country and worldwide and the existing Commercial Travel Office contractors would utilize the CUI software and be able to close the individual Commercial Travel Offices at those military bases/facilities.

Deployment of the CUI software to approximately 11,000 locations worldwide was supposed to start before the end of 1998. However, contract performance proceeded fitfully, as a result of extensive delays, significant technical difficulties, and cost overruns. As of April 2002, the CUI software was still not ready for deployment and operational use. The major problems experienced under this contract were documented in a July 1, 2002 report by the Department of Defense Office of Inspector General. In April 2002, the Defense Travel System Program Management Office ("DTS PMO") commenced a complete restructuring of the TRW contract. The modifications issued

during the course of performance resulted in a restructuring of the contract that substantially exceeded the scope of the original Solicitation.

The out-of-scope changes to the TRW contract included two fundamental changes. The first was a radical change in technology and the second involved adding traditional travel management services to the DTS DTR-6 contact for the several additional years anticipated to be required to develop and deploy the new technology. The original Solicitation proposed a client/server-based software solution in which the CUI software must be physically installed in every personal computer ("PC") used by Government travelers. Additionally, a "reader" to accommodate the traveler's Public Key Infrastructure ("PKI") certificate was also required for each PC. Moreover, since individual PCs on a military base communicate with each other via a local area network ("LAN"), the CUI software installed on the individual PCs had to be modified to interface or integrate within the LAN. Thus, the performance of the CUI software was heavily dependent on the contractor's ability to interface with numerous other computer software systems already in use at each military base/facility or activity. Moreover, Government travelers could not utilize the CUI unless they had access to an individual PC upon which the CUI had been "loaded" or installed.

The newly restructured contract called for TRW to develop a web-based solution that would permit all Government travelers having access to the internet via individual PCs (and a password) to interact with the Defense Travel System through a web-site hosted by TRW. Access through an internet web-site eliminated the need to physically install software and "readers" on individual PCs and customize software code for the local area network of each military base/facility or activity. This change to a web-based

system reflected a dramatically different methodology and technology from that contained in the TRW contract awarded in May 1998. In May 2003, TRW announced that it intended to start testing a web-based CUI in the summer of 2003, and that no previous versions of the CUI had been "web-based." DoD's 2002 modification of TRW's contract to take advantage of new technology ignored the fact that there are currently a number of commercially available, web-based/travel management products, so there would be many competitors for such a contract.

The original DTS DTR-6 Request for Proposals ("RFP") calling for a client/server-based solution attracted only two proposals. In contrast, the General Services Administration's ("GSA") recent bidders' conference for a web-based, end-to-end travel management solution attracted more than 80 potential offerors. In addition, contrary to the original requirement that offerors provide Commercial Travel Office services using the CUI once the Defense Travel System was in place, the restructured DTS DTR-6 contract calls for TRW to perform traditional travel services in this region years before the web-based Defense Travel System is to be implemented. Traditional Commercial Travel Office services are labor-intensive and require extensive use of well-trained travel counselors located on military bases that should be unnecessary if Commercial Travel Office services are performed using a fully functional and operational CUI. The DTS DTR-6 contract modifications were material changes that substantially exceeded the scope of the original competitive procurement and, therefore, should have been subjected to full and open competition.

TRW is not capable of providing traditional travel services, so in mid-2002 it entered into a new subcontract with Sato Travel to perform the traditional travel service

requirements added to the restructured DTS DTR-6 contract. Sato Travel had been providing the traditional travel services within the geographical area covered by DTS DTR-6 under an Army contract won after a competitive procurement in 1992. The fees the Government agreed to pay TRW and Sato Travel for traditional travel services under the restructured DTS DTR-6 contract are substantially higher than the fees previously paid to Sato Travel by the Army for traditional travel services in the same geographic area and are substantially higher than the fees paid to Carlson under its current competitively won traditional travel service contracts.

By modifying the DTS DTR-6 contract beyond its original scope, the Government barred potential bidders, such as Carlson, from competing for what was essentially a new contract for traditional travel services. Instead, the Government inserted new requirements onto an existing contract on a sole source basis in a move that will cost the Government millions, if not tens of millions, of additional dollars.

The Government also misinterpreted related Army contracts (DAMTO01-02-C-0027 and DAMT01-02-C-0028 for DTR-4 and DTR-5 respectively) awarded to Carlson to provide traditional travel services in the Mid-Atlantic and Mid-West regions. These contracts for traditional travel services were awarded to Carlson under a highly competitive procurement. The contracts provide that Carlson is the exclusive provider of travel services to the Army activities within these regions for a firm period of one year, commencing October 1, 2002, with eight six month options. Carlson's Army contracts state that "if DoD implements the Defense Travel System (DTS), and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options under these contracts may not be exercised." Recently, however, the Government

has indicated that it intends to transfer the business of providing traditional travel services in several states included in these two Carlson Army contracts to the restructured DTS DTR-6 contract. The Government has unreasonably interpreted the Carlson Army contracts to mean that it can transfer the requirement to provide traditional travel services from Carlson to the DTS DTR-6 contract to be performed by Sato Travel, as a subcontractor to TRW, notwithstanding that the CUI has not been implemented, and will not be capable of providing the required travel services for several more years. Accordingly, the Government's attempt to transfer regions in Carlson's contracts to Sato Travel before implementation of the Defense Travel System CUI would constitute a breach of Carlson's Army contracts. Carlson challenged that interpretation of its contractual rights, but the Contracting Officer issued an adverse decision.

## ARGUMENT

### I. STANDARD FOR INJUNCTIVE RELIEF

In determining whether to grant the injunctive relief requested by Carlson, this Court must balance the following four factors: (1) the likelihood that Carlson will prevail on the merits; (2) the extent to which Carlson will suffer irreparable injury if the Defendant is not enjoined from having TRW continue with performance on the Contract; (3) the extent to which harm to Carlson outweighs the injury to the Defendant or other interested parties; and (4) the public interest in the requested relief. See, e.g., Vehicular Techs. Corp. v. Titan Wheel Int'l, 141 F.3d 1084, 1087-88 (Fed. Cir. 1998); Minor Metals, Inc. v. United States, 38 Fed. Cl. 16, 19 (1997).

This test is not "wooden" and does not require a finding that "ultimate success by the movant is a mathematical probability . . . ." TRW Envt'l. Safety Sys. v. United

States, 16 Cl. Ct. 520, 526 (1989) (citing Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843-44 (D.C. Cir. 1977). The Court of the Appeals for the Federal Circuit has recognized that "[n]o one factor . . . is necessarily dispositive," so that "the weakness of the showing regarding one factor . . . can be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); MVM, Inc. v. United States, 46 Fed. Cl. 137, 142 (1999) ("Plaintiff does not need to establish all factors to entitle it to an injunction.").

Carlson satisfies each of the elements required for the issuance of a preliminary injunction. Therefore, the United States should be enjoined from allowing TRW to continue with performance of the Contract, pending this Court's resolution of the issues raised in this Protest.

## II. CARLSON HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THE ARMY'S AWARD DECISION WAS ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION

To justify a preliminary injunction, a Plaintiff must generally show a "reasonable probability" of success on the merits. 11A Wright & Miller § 2948.3; A.L.K. Corp. v. Columbia Pictures Indus., Inc., 440 F.2d 761, 763 (3d Cir. 1971); King v. Saddleback Junior Coll. Dist., 425 F.2d 426, 428 n.2 (9th Cir. 1970); cert. denied, 404 U.S. 979 (1971). The degree of likelihood of success considered by itself is not determinative, but instead is weighed against the other factors. OAO Corp. v. United States, 49 Fed. Cl. 478, 481 (2001). To prevail on the merits of this bid Protest action, Carlson must show "a significant prejudicial error in the procurement process." Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

### A. Modification P00028 To The DTS DTR-6 Contract Constituted A Cardinal Change To The Contract Such That It Violated The CICA And The FAR And Should Have Been Competed As A Separate Contract

The Competition in Contracting Act ("CICA") requires that:

> [T]he head of an agency in conducting a procurement for property or services –
>
> shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and
>
> shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

10 U.S.C. § 2304. The Court of Federal Claims and the Court of Appeals for the Federal Circuit have found that certain contract modifications must be competed to allow potential bidders to compete for what is essentially a new and different contract. CCL, Inc. v. United States, 39 Fed. Cl. 780, 791 (1997). In this regard, the Federal Circuit has stated: "In determining whether a modification falls within CICA's competition requirement, this court examines whether the contract as modified materially departs from the scope of the original procurement." AT&T v. Wiltel, 1 F.3d 1201, 1205 (1993).

The Court of Federal Claims has also looked to precedent at the Government Accounting Office ("GAO") for guidance on the issue of improper modifications. More specifically, the Court has looked to GAO decisions for the characteristics of an improper modification. In CCL, Inc. v. United States the court noted:

> In determining whether the modified contract departs from the scope of the original procurement, that agency examines changes in the type of work, performance period, and costs as between the original contract and the modified contract. The GAO also considers whether the solicitation for the original contract adequately advised offerors of the potential for the type of change found in the modification or whether the modification is of

> a nature that potential offerors would reasonably have anticipated at the time of the original award.

Id. at 791-792 (citations omitted). In the instant matter, the facts demonstrate that Modification P00028 to the DTS DTR-6 contract, which changed the requirement from a client/server based CUI to a web-based CUI and added traditional travel services to the contract was improper and should have been competed separately as essentially new contracts.

On April 25, 2002, shortly before the DoD IG's report was issued, TRW and the DoD entered into bilateral Modification P00028, completely restructuring the DTS DTR-6 contract. The modification added several requirements to the contract that were materially outside of the scope of the Solicitation.

For example, contrary to the Solicitation, which provided that the CUI would be integrated via client/server interaction, the modification provided that "Authorized users shall only be able to access DTS using a certified version of either the Netscape or Microsoft Internet explorer web browser." In addition, the modification required that the document preparation, budget, and route and review module of DTS, previously accessible only through a client/server or direct link, must be accessible via a web browser.

Thus, the modification altered the fundamental contract requirements from that of computer software systems integration, requiring client-side installation and integration of computer software on individual PCs, to that of a true web-based application. This represented a cardinal change to a new product with significantly different technology.

When MTMC issued the 1997 RFP for a CUI based on computer software, client/server applications, it received only two offers. When GSA recently held a bidder's conference for a web-based travel management system, it attracted over 80 potential offerors.

Moreover, the Solicitation and DTS DTR-6 contract awarded to TRW in 1998 only required the contractor to perform travel services through the CUI enhanced Defense Travel System. The DoD continued to procure traditional travel services for most of the military activities located in the DTS DTR-6 region from Sato Travel under the Army DTR-3 contract. The Army extended the Sato Travel DTR-3 contract through October 1, 2002 on a sole source basis for the express purpose of providing traditional travel services until the CUI is developed and implemented. Modification P000028 to the DTS DTR-6 contract added traditional travel services to TRW's contract five years after the DTS DTR-6 Solicitation had been issued.

The difference between CTO services under the traditional travel management system and utilizing a fully functional CUI is significant. As described above, CTO services under the traditional travel management system are much more labor-intensive than a CUI, provided the CUI could be developed and implemented in accordance with the original DTS DTR-6 contract requirements. Indeed, the difference in cost to the Government between traditional travel services and a fully automated, end-to-end travel management system could be $10 to $20 per individual trip or transaction.

Because traditional travel services were added to TRW's contract for DTS DTR-6, the Army no longer required travel services through Sato Travel's Army DTR-3 contract. Thus, Sato Travel's Army DTR-3 contract, which had been openly competed

originally, and subsequently extended numerous times, was allowed to expire on October 11, 2002. Subsequently, TRW became responsible for performing traditional travel services for DTS DTR-6. Interestingly, prior to the expiration of Sato Travel's Army DTR-3 contract, TRW terminated its subcontract with American Express and hired Sato Travel as a subcontractor to provide traditional travel services for DTS DTR-6. The traditional travel transaction fees, which the DTS PMO agreed to add to the DTS DTR-6 contract, were substantially higher than the traditional travel transaction fees being paid to Sato Travel under the Army DTR-3 contract for the same work and substantially higher than the fees paid for traditional travel management service contracts awarded in 2002 by the Army and other DoD activities under competitive procurements.

**B. The Army may not transfer the requirements under Carlson's Army Contracts to DTS DTR 3 until the DTS CUI required to satisfy the DTS requirements is implemented throughout the states covered by the contracts nor may**

Throughout the performance of the DTS DTR-6 contract, the Army, Navy, Air Force and Marines awarded traditional travel services for other regions to other contractors under competitive procurements. On February 27, 2002, following full and open competition, MTMC awarded contracts to Carlson for traditional travel services for Army DTRs 1, 2, 4, 5 and the National Capital Region. Army DTR-1 is comprised of Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, and Wyoming. Army DTR-2 is comprised of Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, Puerto Rico, and the Virgin Islands. Army DTR-4 is comprised of Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania,

Rhode Island, Vermont, Virginia, and West Virginia. Army DTR-5 is comprised of Arkansas, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma, and Texas. The National Capital Region is comprised of the Washington, D.C. Metropolitan Area, including the Pentagon, Fort Belvoir and Fort Myers.

Carlson's five new Army contracts became effective on October 1, 2002, with a firm base period of twelve (12) months and a series of eight (8) six-month option periods, for a total contract period of five (5) years. Each contract provided: "The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract."

Each of Carlson's five new Army contracts also provided: "At a future date a DoD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DoD travel services contract is awarded all DoD sites will transition in accordance with the implementation dates to the DoD travel services contract."

Each of Carlson's five new Army contracts provided that the Army or other DoD agencies could exercise the options to extend the contract and stated: "However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation." At the time the contracts were awarded to Carlson it was understood by all parties that "DoD implements the Defense Travel System (DTS)" meant the implementation of a fully functional CUI to perform travel services.

Each of Carlson's five new Army contracts stated that "due to projected base closures and realignments" the Government cannot forecast how the revenue for official travel will be affected. The contracts also stated: "In addition, Offerors are hereby notified that upon the implementation of the Defense Travel Region 6 (DTR 6) contract the following locations (Ft. Campbell, KY, Missouri and Nebraska) will be deleted from the respective regions and incorporated into the DTR 6 contract." At the time the contracts were awarded to Carlson it was understood by all parties that "implementation of the Defense Travel Region 6 (DTR 6) contract" meant the implementation of a fully functional CUI to perform the travel services for DTS DTR-6 region.

By letter dated November 8, 2002, MTMC informed Carlson that the DTS DTR-6 contract would be implemented in the States of Kentucky, Missouri, and Nebraska effective February 24, 2003 and that, consequently, those states, in their entirety, would be removed from the Carlson Army contracts that had commenced on October 1, 2002.

By letter dated November 26, 2002, Carlson wrote to MTMC requesting that it rescind the order to transfer the DoD sites in these states to the DTS DTR-6 contract. Carlson's letter stated that it had learned that the CUI being developed under the DTS DTR-6 contract would not be implemented by February 2003 in any region, and that no transfer of sites could take place unless and until the CUI was fully implemented. Carlson argued that it would be improper and a violation of the Competition in Contracting Act to include traditional travel services in the DTS DTR-6 contract and transfer the work won by Carlson in a competitive procurement. Carlson argued that, in any event, no work could be transferred to the DTS DTR-6 contract during the first contract year of Carlson's Army contracts. Moreover, Carlson explained to MTMC that,

after the CUI was implemented, its contract only required it to relinquish to the DTS DTR-6 contract the requirements from Fort Campbell, Kentucky, not the entire State of Kentucky.

In a letter dated January 10, 2003, MTMC's Contracting Officer denied Carlson's request that MTMC rescind the November 8, 2002 order to transfer the work to the DTS DTR-6 contract. MTMC contended that the DTS DTR-6 contract would be implemented in Kentucky, Missouri and Nebraska by February 24, 2003. MTMC also rejected Carlson's interpretation of its Army contracts and asserted that the contracts required Carlson to give up the Army activities in all three states, including the entire State of Kentucky, in addition to Fort Campbell, Kentucky.

In conversations with the MTMC officials during January 2003, Carlson took the position that any attempt to transfer these states to TRW/Sato Travel in February 2003 would compel immediate legal action by Carlson. On January 31, 2003, MTMC's Contracting Officer notified Carlson that the order to transfer the commercial travel services for the States of Kentucky, Missouri, and Nebraska on February 24, 2003, was rescinded and that Carlson could continue to perform such work through September 30, 2003 (the last day of the base period in Carlson's Army contracts). MTMC continued to assert, however, that the entire State of Kentucky would transfer to the DTS DTR-6 contract, along with Missouri and Nebraska, and implied that such a transfer would occur on October 1, 2003.

On May 15, 2003, the MTMC Contracting Officer notified Carlson that it was intended that requirements to provide traditional travel services to all sites in Missouri,

Nebraska, and Kentucky would be removed from Carlson's Army contracts (and presumably transferred to the DTS DTR-6 contract), effective September 30, 2003.

On January 31, 2003, the MTMC Contracting Officer rescinded the order to transfer the travel business for Missouri, Nebraska and Kentucky effective February 24, 2003, but only agreed that Carlson could continue performing such traditional travel services in those states through September 30, 2003. The MTMC Contracting Officer did not rescind her dispute with Carlson's interpretation of its contractual rights under the Army Contracts and applicable law.

On May 15, 2003, the MTMC Contracting Officer confirmed the adverse decision on the interpretation of Carlson's contracts by notifying Carlson that, effective September 30, 2003, the DoD sites in Missouri, Nebraska, and Kentucky would be removed from Carlson's contracts. Upon information and belief, it is the Government's intention to have Sato Travel provide traditional travel services to the DoD sites in Missouri, Nebraska, Kentucky under the modified DTS DTR-6 contract commencing on October 1, 2003, in violation of Carlson's contractual rights.

MTMC's interpretation of Carlson's rights to retain exclusive performance of travel services under the Army Contracts in the three states until the CUI required by the DTS DTR-6 contract is fully operational and deployed at issue, is incorrect as demonstrated by the plain language of the contracts. Moreover, as described above, applicable law and regulation prohibits the Government from transferring work awarded to Carlson under competitive procurements to a contract that has been modified without competition.

Transferring the requirement to provide traditional travel services to DoD sites contained in Carlson's contracts to the DTS DTR-6 contract constitutes a material breach of Carlson's contracts, loss of key personnel, disruption of operations, and other substantial damages that may not be adequately compensated by monetary damages.

## III. CARLSON WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT THE PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION

Carlson will suffer specific irreparable injury if the performance of TRW's DTS DTR-6 contract is not enjoined because of its lost opportunity to fairly compete for, and perform work under, the contract and the loss of profits generated by the contract. Although this is not a bid protest, many of the same rules regarding irreparable injury apply. As the Court of Federal Claims has stated:

> Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its 'lost opportunity to compete'. This is an irreparable injury.

Magnavox Elect. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1379 (1992). Many opinions in the Court of Federal Claims have recognized that lost profits and lost opportunities to compete may constitute irreparable harm. See J & H Reinforcing and Structural Erectors v. United States, 50 Fed. Cl. 570, 577 (2001); Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 744 (2000); Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 571 (2000); Stratos Mobile Networks USA, LLC v. United States, 44 Fed. Cl. 633, 641 (1999); TRW Envtl. Safety Sys., Inc. v. United States, 18 Cl. Ct. 33, 78 (1989). This is precisely the harm that Carlson will suffer if injunctive relief is not granted.

Carlson has no adequate remedy at law to seek redress of the unlawful actions of the United States. Because an at-law remedy is not available, the harm to Carlson if

TRW is allowed to continue performance is irreparable. The second prong of the injunctive relief test is satisfied.

## IV. THE HARM TO CARLSON OUTWEIGHS ANY POTENTIAL HARM TO THE DEFENDANT

The balance of harm favors injunctive relief because the harm to Carlson far outweighs the harm to the DoD. If injunctive relief is denied, Carlson will suffer lost profits, lost business opportunities, and lost opportunities to compete on a level playing field. If injunctive relief is granted, however, the DoD suffers no harm at all. There is no harm to the Government or third parties as a result of granting Carlson its requested relief. The Army's improper conduct in the award of this contract has the adverse effect of undermining the integrity of the entire Federal procurement process. Neither TRW nor Sato Travel is entitled to continue receiving the exorbitant fees being paid as a result of the improper sole source modifications to the DTS DTR-6 contract. Granting Carlson's prayed for relief will preserve public confidence and competition in the Federal procurement process.

## V. GRANTING INJUNCTIVE RELIEF IS STRONGLY IN THE PUBLIC INTEREST

The public interest is served by granting injunctive relief because the public has a strong interest in protecting the competitive process. See Dairy Maid Dairy, 837 F. Supp. 1370, 1382 (E.D. Va. 1993) ("The public interest is promoted by protecting the integrity of the government procurement process."); MVM, Inc. v. United States, 46 Fed. Cl. 137, 143 (1999) ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system."); Minor Metals, Inc. v. United States, 38 Fed. Cl. 16, 21 (1997). Here, there is a strong public interest in preventing performance

of a contract that was modified in an arbitrary and capricious manner. In addition, The public interest will be best served by the immense savings that result from granting Carlson its requested relief. The transaction fees for traditional travel services that the Government agreed to pay TRW and Sato Travel under the non-competitive modification of the DTS DTR-6 contract, exceed the transaction fees for traditional travel services being paid to Carlson under the competitively procured contracts by many millions of dollars annually. The DTR DTS-6 contract modification obligates the Government to pay TRW hundreds of millions of dollars to develop a web-based travel management system that can be procured competitively without the Governing incurring the cost of development.

Granting a permanent injunction will also serve the public interest by insuring that the DoD's procurement of travel services for the Defense Travel System is conducted in accordance with all Federal procurement laws, and that all potential bidders have a fair and equal opportunity to compete for and perform work required by the Government outside the scope of the 1997 Solicitation.

## CONCLUSION

For the foregoing reasons, Carlson is entitled to preliminary injunctive relief.

Carlson respectfully requests that this Court grant its Motion.

Respectfully submitted,

Lars E. Anderson
VENABLE, BAETJER & HOWARD, LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone no.: (703) 760-1600
Telecopier no.: (703) 760-1623

Of Counsel:
J. Scott Hommer, III
Benjamin A. Winter
VENABLE, BAETJER & HOWARD, LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone no.: (703) 760-1600
Telecopier no.: (703) 760-1623

Dated: May 23, 2003

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of May, 2003, a true copy of the foregoing Plaintiff's Motion for Preliminary Injunctive Relief and Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunctive Relief was served via facsimile to:

The Department of Justice
Commercial Litigation Branch
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Benjamin A. Winter

Counsel for CW Government Travel, Inc.