No. 03-1274

Judge Baskir

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CW GOVERNMENT TRAVEL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

DAVID A. LEVITT
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 307-0309
Fax: (202) 514-7965

July 23, 2003

Attorneys for Defendants

# TABLE OF CONTENTS

Page(s)

STATEMENT OF THE CASE . . . . . 2

I. Nature Of The Case . . . . . 2

II. Statement Of Facts . . . . . 3

A. The Contract Between DoD and TRW . . . . . 3

B. The Carlson-Army Contracts . . . . . 5

C. The Standards For A Motion To Dismiss . . . . . 5

ARGUMENT . . . . . 6

I. This Court Lacks Jurisdiction To Entertain Carlson's CICA Challenge To The Modification Of The DoD-TRW Contract Because Carlson Was Not A Potential Bidder With Standing To Challenge The Modification . . . . . 6

II. This Court Lacks Jurisdiction To Entertain Carlson's Arguments Regarding The Army's Anticipated Actions Relating To An Unexercised Option Period Of the Army-Carlson Contract Because Carlson Has Not Complied With The Mandatory Administrative Exhaustion Requirements Of The CDA, And Because The Issue Is Not Yet Ripe For Judicial Review . . . . . 12

A. Carlson Has Not Established That The Army Issued A Contracting Officer's Final Decision Regarding The Scope Of Contract Requirements That Would Be Applicable To The Option Period, Should The Option Period Be Exercised . . . . . 12

B. Even If The CDA Prerequisites Have Been Established, The Court Should Dismiss Carlson's CDA Count As Unripe For Judicial Review . . . . . 16

CONCLUSION . . . . . 18

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

Aerolease Long Beach v. United States,
31 Fed. Cl. 342 (1994) ........ 11

Alliant Techsystems, Inc. v. United States,
178 F.3d 1260 (Fed.Cir.1999) ........ 14

Bell v. Hood,
327 U.S. 678 (1946) ........ 6, 10

Bradley v. Chiron Corp,
136 F.3d 1317 (Fed.Cir.1998) ........ 6

Briscoe v. LaHue,
663 F.2d 713 (7th Cir.1981), aff'd, 460 U.S. 325 (1983) ........ 6

CACI Field Services, Inc. v United States,
13 Cl. Ct. 718 (1987), aff'd, 854 F.2d 464 (Fed. Cir. 1988) ........ 11

CCL, Inc. v. United States,
39 Fed. Cl. 780 (1997) ........ 7

CW Government Travel, Inc. v. United States,
46 Fed. Cl. 554 (2000) ........ 17

Cedars-Sinai Medical Ctr. v. Watkins,
11 F.3d 1573 (Fed.Cir. 1993) ........ 5

Clearwater Constructors, Inc. v. United States,
56 Fed. Cl. 303 (2003) ........ 15

Continental Collection & Disposal, Inc. v. United States,
29 Fed. Cl. 644 (1993) ........ 15

Dawco Construction, Inc. v. United States,
930 F.2d 872 (Fed.Cir. 1991) ........ 15

Distributors, Inc. v. United States,
38 Fed. Cl. 771 (1997) ........ 5, 11

GPA-I, LP v. United States,
46 Fed. Cl. 762 (2000) ........ 15

Gould, Inc. v. United States,
935 F.2d 1271 (Fed.Cir.1991) .......... 5

Green Management Corporation v. United States,
42 Fed. Cl. 411 (1998) .......... 15

Lockheed Martin IR Imaging System, Inc. v. West,
108 F.3d 319 (Fed.Cir. 1997) .......... 11

Logan Canyon Cattle Association v. United States,
34 Fed. Cl. 165 (1995) .......... 16

Made In The USA Foundation v. United States,
51 Fed. Cl. 252 (2001) .......... 13

Myers Investigative and Security Service, Inc. v. United States,
275 F.3d 1366 (Fed.Cir. 2002) .......... 5

Northrop Grumman Corp. v. United States,
50 Fed. Cl. 443 (2001) .......... 7

Optimal Data Corp. v. United States,
17 Cl. Ct. 723 (1989), aff'd, 904 F.2d 45 (Fed.Cir. 1990) .......... 15

Phoenix Air Group, Inc. v. United States,
46 Fed. Cl. 90 (2000) .......... 7

Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,
324 U.S. 806 (1945) .......... 12

Reynolds v. Army and Air Force Exch. Service,
846 F.2d 746 (Fed.Cir. 1988) .......... 5

Scheuer v. Rhodes,
416 U.S. 232 (1974) .......... 5

Sharman Company, Inc. v. United States,
2 F.3d 1564 (Fed.Cir. 1993) .......... 14

Thomson v. Gaskill,
315 U.S. 442 (1942) .......... 5

Valley View Enterprises, Inc. v. United States,
35 Fed. Cl. 378 (1996) .......... 13

Vanalco, Inc. v. United States,
48 Fed. Cl. 68 (2000) .......... 6, 13, 16

Zevalkink v. Brown,
102 F.3d 1236 (Fed. Cir. 1996) .......... 17

## FEDERAL STATUTES

48 C.F.R. § 33.201 .......... 14

Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304 .......... 1

Tucker Act, 28 U.S.C. § 1491 .......... 2

Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-611 .......... 1

41 U.S.C. § 605§§a .......... 13

41 U.S.C. § 609(a)(3) .......... 13

## APPENDIX

Letter From Mixon To Spell, 11-8-02 .......... 1

Letter From Spell To Mixon, 11-26-02 .......... 2-5

Letter From Robinson-Burnette To Spell, 1-10-03 .......... 6

Letter From Robinson-Burnette To Spell, 1-31-03 .......... 7

E Mail From Burnette To Thompson, 5-15-03 .......... 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CW GOVERNMENT TRAVEL, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-1274 (Judge Baskir) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court dismiss for lack of subject matter jurisdiction the complaint filed by plaintiff CW Government Travel, Inc. ("Carlson"). In support of our motion, we rely upon the complaint, this brief, and the attached appendix.

DEFENDANT'S BRIEF

QUESTIONS PRESENTED

1. Whether this Court lacks jurisdiction to entertain Carlson's counts relating to alleged violations of the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304, because Carlson has not established that it is an "interested party" with standing to assert a belated challenge to the modification of a contract between the Department of Defense ("DoD") and TRW, Inc.

("TRW").[1]

2. Whether this Court lacks jurisdiction to entertain Carlson's count that seeks a declaratory judgment pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-611, because Carlson has failed to establish that it has complied with the mandatory administrative exhaustion requirements of that Act.

3. Whether, assuming that the Court would otherwise possess jurisdiction to consider Carlson's claim pursuant to the CDA, Carlson's contract claim should be dismissed as unripe for review.

## STATEMENT OF THE CASE

### I. Nature Of The Case

On May 23, 2003, Carlson filed its complaint in this Court. In its complaint, Carlson alleges that this Court possesses subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491, and the CDA. Complaint ("Compl.") ¶ 3. Carlson's complaint is styled, in part, as a bid protest, in which Carlson seeks declaratory relief and preliminary and permanent injunctive relief relating to the modification of contract no. DAMT01-98-D-1005 (DTS DTR-6), which was awarded by the DoD to TRW, in 1998. In addition, pursuant to the CDA, Carlson's complaint challenges a purported decision of the contracting officer that relates to the interpretation of contracts that the Department of the Army ("Army"), Military Traffic Management Command ("MTMC"), awarded to Carlson in 2002.

---

[1]As the complaint notes, the offer which resulted in the contract was submitted by BDM International, Inc. ("BDM"). Complaint, ¶ 27. Immediately prior to submitting the offer, BDM was purchased by TRW. On December 11, 2002, TRW was acquired by Northrop Grumman Corporation ("Northrop"). Because TRW was the contractor during a majority of the performance of the contract, its name appears on the contract documents. Thus, this motion refers to the contractor performing the DOD-TRW contract as TRW, as does the complaint.

Generally, Carlson alleges that the Government's modification of the DoD-TRW contract in early 2002 so greatly exceeded the scope of the original contract that the Government was required to conduct a competitive procurement. Carlson further alleges that the Government violated CICA when it failed to conduct a competitive procurement, and, in its complaint, requests the Court to enter, among other relief, "a preliminary, permanent injunction ordering the Army to direct TRW to cease performance of the . . . contract and immediately competitively reprocure [certain requirements contained in the modification to the TRW contract]. Compl. Prayer for Relief at p 32. In addition, Carlson alleges that the Army has misinterpreted the requirements of the Army-Carlson contracts relating to traditional travel services in three states (currently performed by Carlson) that the Army has stated may be deleted from Carlson's contracts, and incorporated into the TRW contract, during performance of a future option period that has not yet been exercised by the Army. Carlson requests, among other relief, that the Court enter "a preliminary and permanent injunction ordering the Army not to transfer the [traditional travel services requirements to the TRW contract] . . . unless and until a DTS [common user interface] . . . is implemented and able to provide all required travel services to the Army [in those three states]." Finally, in addition to the declaratory and injunctive relief sought, Carlson seeks an unspecified award for "damages and costs" and "attorneys fees." Id. at page 33.

## II. Statement Of Facts

### A. The Contract Between DoD and TRW

In 1998, DoD entered into a competitively bid contract with TRW providing that TRW would design and implement a consumer user interface to enable travelers to execute official travel without excessive dependence upon commercial travel agents. Instead, travelers would be able to access digital databases through personal computers and thus eliminate much of the

paperwork for planning official travel ("common user interface"). Compl., Introductory Paragraphs, p. 2; ¶¶ 4-31.

In early 2002, due to delays in developing and implementing a common user interface, DoD agreed to restructure the contract. Complaint, ¶¶ 32-43. At this time, Carlson was providing travel services to the Army in 41 states, Puerto Rico, the Virgin Islands and the Washington, D.C. Metropolitan Area, and was well-aware that the contract between TRW and DoD was being restructured. Compl., ¶ 44. Yet, the complaint fails to allege that Carlson sought to have the work subjected to a competitive procurement and the complaint alleging a cardinal change in the contract was not filed until May 23, 2003, approximately 13 months after the alleged modification.

B. The Carlson-Army Contracts

In 2002, Carlson won a competitive bid to provide traditional travel management services for military installations in a number of states, including Kentucky, Missouri and Nebraska. Compl., ¶ 44. The effective date of the contracts was October 1, 2002; they were for an initial one year term with eight six-month renewal options. Comp, ¶ 45. On November 8, 2002, the Army informed Carlson that it would no longer provide traditional travel services in Kentucky, Missouri and Nebraska as of February 24, 2003, because such services would be provided under the DoD-TRW contract. Compl., ¶ 49; see Letter dated Nov. 8, 2002 from Ruby L. Mixon to Erma Spell, Defendant's Appendix ("Def. App.") p.1. On November 26, 2002, Carlson complained that these states only could be deleted once the common user interface was implemented and only after the contract's initial term. Compl., ¶ 50; see Letter dated Nov. 26, 2002 from Erma Spell to Ruby L. Mixon, Def. App., pp. 2-5. On January 10, 2003, the contracting officer affirmed that travel functions in these states would be transferred to the DoD-

TRW contract on February 24, 2003, and, therefore, Carlson should effectuate a smooth transition. Complaint, ¶ 51; see Letter dated Jan. 10, 2003 from Jackie Robinson-Burnette to Erma Spell, Def. App., p. 6.

Following further communications between Carlson and the Army, however, Carlson was advised, on January 31, 2003, that it could continue to provide traditional travel services in Kentucky, Missouri and Nebraska until the end of the initial terms of the contracts (i.e., through September 30, 2003). Complaint, ¶ 52; see Letter dated Jan. 31, 2003 from Jackie Robinson-Burnette to Erma Spell, Defendant's App., p. 7. This position was reiterated by the contracting officer on May 15, 2003. Complaint, ¶ 53; see e-mail communication dated May 15, 2003 from Jackie Burnette to Craig Thompson, Defendant's App., p. 8. At the time the complaint was filed, the Army had taken no action to modify the contracts to delete the installations from the Army-Carlson contracts. Further, the options to extend the contracts beyond September 30, 2003, have not yet been exercised.

## ARGUMENT

### I. The Standards For A Motion To Dismiss

"When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. The court is required to decide any disputed facts which are relevant to the issue of jurisdiction." C C Distributors, Inc. v. United States, 38 Fed. Cl. 771, 774 (1997) (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed.Cir. 1988)). The party asserting jurisdiction "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence . . . ." Reynolds v. Army and Air Force Exch. Serv., 846 F.2d at 748. see also Thomson v. Gaskill, 315 U.S. 442 (1942); Myers Investigative and Sec. Serv., Inc. v. United States, 275 F.3d

1366, 1369 (Fed.Cir. 2002); Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed.Cir. 1993).

Although the Court must accept all well-pled factual allegations as true and construe the facts in the light most favorable to the non-movant, see Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed.Cir.1991), "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir.1981), aff'd, 460 U.S. 325 (1983); see also Bradley v. Chiron Corp, 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim"). Further, in certain situations, "it is appropriate for courts to dismiss a suit for want of jurisdiction even if the decision would involve a discussion of the merits." Vanalco, Inc. v. United States, 48 Fed. Cl. 68, 78 (2000). These include cases "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." Bell v. Hood, 327 U.S. 678, 682-83 (1946).

As we demonstrate, Carlson's complaint, at most, contains conclusory allegations that it would have bid upon the work subject to the modification of the DoD-TRW contract if it had been competitively bid, and the fact that it never bid upon the work in the original contract or complained to DoD that the modification exceeded the scope of the original contract strongly suggests that the CICA claim is simply a litigating strategy to prevent the Army from terminating its services in three states. Further, the assertions in the complaint relating to Carlson's alleged attempt to exhaust administrative remedies under the Army contracts fail to establish upon their face that the jurisdictional prerequisites for bringing an action pursuant to the CDA in this Court have been satisfied. Accordingly, this Court lacks subject matter

jurisdiction to entertain all of Carlson's claims, and the complaint must be dismissed.

## II. This Court Lacks Jurisdiction To Entertain Carlson's CICA Challenge To The Modification Of The DoD-TRW Contract Because Carlson Was Not A Potential Bidder With Standing To Challenge The Modification

In its complaint, Carlson alleges that the Government violated CICA by modifying the DoD-TRW contract in a manner that so exceeded the scope of the original solicitation that the Government was required to conduct a competitive procurement. Because, as we establish below, Carlson lacks standing to maintain this challenge to a contract administration action that occurred more than a year ago, this Court should dismiss Carlson's counts I and II for lack of jurisdiction.

For Carlson to have standing to assert a claim pursuant to CICA for the alleged expanded scope of the restructured contract, it must be able to demonstrate that it would have been an interested party in that work if there had been competitive bidding upon the work. See, e.g., Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 455 (2001) ("The Tucker Act states that interested parties have standing to bring protests in this court . . . ."); see Phoenix Air Group, Inc. v. United States, 46 Fed. Cl. 90, 102 (2000) (the plaintiff must have a "readiness and ability to bid for work which plaintiff argues should be competitively procured by the Air Force"); CCL, Inc. v. United States, 39 Fed. Cl. 780, 788-89 (1997) ("it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals"). "The CICA defines an 'interested party' as 'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'" Northrop Grumann Corp., 50 Fed. Cl. at 443 (citing 31 U.S.C. § 3551(2)).

Carlson contends in the complaint that it was a "potential bidder" for the work defined in the modification because that work involved providing a common user interface through off-the-shelf web based software, and that it could provide "end-to-end" travel services using web-based software as well as TRW. Compl., ¶ 61 ("As a provider of web-based end-to-end travel management solutions, Carlson is an interested party because it is a potential bidder for the work described in Modification P00028 to the DTS DTR-6 contract."). The only facts in the complaint to support the allegation concern GSA's recent solicitation for web-based travel systems which, according to the complaint, enticed a large number of bidders including traditional travel service providers such as Carlson. Compl., ¶¶ 40 and 58-59. According to Carlson, the fact that traditional providers of travel services such as Carlson were able to bid upon the GSA solicitation suggests that it would have bid upon the restructured DoD contract because that contract as well provided for end-to-end, web-based services, as did the GSA's solicitation.

Carlson acknowledges in its complaint that it is a provider of traditional travel services, rather than a computer systems installer or software developer. Although Carlson contends that off-the-shelf products could be used for an internet supported travel management system, it does not allege that it has the experience or expertise to satisfy the requirements it contends apply to the modification of the TRW contract. Carlson alleges that approximately 80 potential bidders participated in a GSA solicitation for internet based travel management systems for various Federal agencies. However, there is no allegation that the GSA specifications are the same as, or similar to, the specifications for travel service management specified in the TRW modification.

The complaint alleges that "[t]he GSA's ongoing procurement of a web-based Government travel management system contemplates implementation of the fully operational

system commencing in December 2003." Compl., ¶ 59. No specific facts are alleged to support this conclusory allegation. Further, the complaint alleges that "[I]n December 2002, the DoD Program Analysis and Evaluation Report specifically noted that commercially available web-based travel products could perform the requirements that TRW had been unable to perform under the DTS DTR 6 contract." Compl., ¶ 40. No specific facts are alleged to support this conclusory allegation and, even if true, no specific facts are alleged concerning whether the report was consistent with other relevant studies, including a GSA study, or accepted or rejected by DoD.

Moreover, assuming the specifications for the GSA solicitation referred to in the complaint are the same as, or similar to, those contained in the TRW contract modification, Carlson does not allege that it had the experience or expertise to bid upon the GSA contract or that it was awarded the contract. The motion for preliminary injunction contains no evidence that Carlson would have been qualified to bid upon the TRW contract modification had it been competitively bid. Therefore, there is no evidence to support the jurisdictional allegation that Carlson would have been a "potential bidder" if the work covered by the TRW contract modification had been competitively bid.

Further, the evidence concerning Carlson's conduct in the marketplace at the time the restructuring occurred strongly suggests that it was not interested in the work covered by the modification to the DoD-TRW contract, but, rather, now uses the allegation that the restructuring of the TRW contract violated CICA, to prevent the Army from excising three states covered by the TRW contract, if it exercises the option to continue to allow Carlson to provide travel services at Army installations in three states. Thus, the complaint notes that, at the time of the modification, Carlson was providing traditional travel services in three states encompassed by

the TRW contract, as well as more than 40 states, including three states encompassed by the DoD-TRW contract. Compl., Introductory Paragraph, p. 1. ¶¶ 44-53. Carlson was, therefore, well aware of the restructuring when it occurred, yet Carlson fails to allege that it contacted DoD to demand that the work be competitively bid. Instead, Carlson allowed the restructuring to occur and did nothing until November 8, 2002 – approximately seven months after it says the scope of the contracts was expanded – when it was informed by the Army that certain states would be deleted from its contracts.

Only in the context of attempting to persuade the Army that it could not terminate Carlson's provisioning of traditional travel services in the states covered by the TRW contract, did Carlson make the allegation that the restructuring exceeded the scope of the original contract. Tellingly, Carlson complained directly to the Army rather than directly to DoD, and not for the purpose of competing upon the work covered by the modification to the TRW contract, but as leverage to persuade the Army not to delete certain installations from Carlson's contracts to provide traditional travel services. Complaint, ¶¶ 50-53. Thus, the cardinal change allegation was an <u>afterthought</u> designed to protect Carlson's interests in the three states subject to the restructured contract, rather than reflective of an effort to persuade DOD to open the work covered by the restructured contract to competitive bidding. This suggests there is a lack of evidence Carlson was, in fact, a "potential bidder" on the work covered by the restructured TRW contract and, therefore, the contention in the complaint that Carlson could provide a common user interface and was a "potential bidder" is "wholly insubstantial" and appears to be directed "solely for the purpose of obtaining jurisdiction." <u>Bell v. Hood</u>, 327 U.S. at 682-83. Compl., ¶ 52.

Carlson now seeks to overturn the contract modification in an apparent effort to retain its

monopoly over traditional travel services in the three states covered by the TRW contract. However, in these circumstances, Carlson waived its right to challenge the restructuring because, according to Carlson, the alleged violation of CICA was obvious upon its face, and it is undisputed that Carlson sat upon its hands rather the confronting DoD with the need to competitively procure the revised requirements, and only questioned the administrative action because it was threatened by the Army with losing the right to provide traditional travel services in three states covered by its contracts with the Army. As this Court recently observed in an analogous context:

> For many years, the courts in this Circuit have recognized a duty on the part of contractors to inquire and seek timely clarification and resolution of problems, inconsistencies, and discrepancies apparent in solicitations. '[W]hen [the contractor] is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government's representatives if he intends to bridge the crevasse in his own favor. Having failed to take that route, plaintiff is now barred from recovering on this demand.'

C C Distributors, Inc., 38 Fed. Cl. at 782 (quoting Beacon Constr. Co. v. United States, 161 Ct. Cl. 1, 7 (1963); see also, Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 358 (1994) (an offeror who recognized an ambiguity in the solicitation but failed to file a protest waives his right to challenge the award upon that basis); Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed.Cir. 1997) (same); CACI Field Servs., Inc. v United States, 13 Cl. Ct. 718, 726-27 (1987), aff'd, 854 F.2d 464 (Fed. Cir. 1988) (same).

Carlson failed to seek the right to bid the restructured contract from DoD. Its apparent objective in raising the issue was to protect its interests in the Army-Carlson contracts rather than to bid upon the restructured work. Moreover, Carlson failed to bid on the work of

providing a common user interface when the contract originally was awarded to TRW in 1998. Therefore, the evidence suggests that Carlson was not a potential bidder for the work and would not have bid on the work even if the contract modification had been competitively bid, as it failed to do in 1998 when the work was competitively bid. Thus, Carlson's interest in the TRW modification fell outside the zone of interests protected by the CICA, and the effort to now maintain an action seeking to overturn the contract modification must fail. See, e.g. C C Distributors, Inc. v. United States, 38 Fed. Cl. at 774-781 (an incumbent who failed to bid upon the restructured contract lacked standing to challenge the award to a competitive bidder); cf., Travelers Indemnity Company v. United States, 16 Cl. Ct. 142, 154 (1988) ("The doctrine of 'unclean hands,' which prevents a wrongdoer from succeeding in a court of equity, has its roots in the maxim: 'He who comes into equity must come with clean hands'); Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814 (1945) (a party who seeks equity in a judicial forum "shall have acted fairly and without fraud or deceit as to the controversy in issue").

## III. This Court Lacks Jurisdiction To Entertain Carlson's Arguments Regarding The Army's Anticipated Actions Relating To An Unexercised Option Period Of the Army-Carlson Contracts Because Carlson Has Not Complied With The Mandatory Administrative Exhaustion Requirements Of The CDA, And Because The Issue Is Not Yet Ripe For Judicial Review

In count III of its complaint, Carlson seeks declaratory and anticipatory injunctive relief related to an apparent contract interpretation dispute between the Army and Carlson regarding whether portions of Carlson's traditional travel services in Kentucky, Missouri and Nebraska could be properly deleted from Carlson's contracts, and incorporated into the TRW contract, during an option period that has not yet been exercised by the Army.

In asserting jurisdiction for this relief, Carlson cannot rely upon the separate

jurisdictional basis it alleges supports its challenge to the contract modification under CICA. See Davis/HRGM Joint Venture v. United States, 50 Fed. Cl. 539, 544-45 (2001) (bidder protesting revised award decision was required to file a claim with the contracting officer pursuant to CDA prior to filing suit to separately challenge termination for convenience of contract initially awarded in the procurement). Rather, jurisdiction depends entirely upon whether Carlson has satisfied the elements of the CDA. Because the Government has not taken action adverse to Carlson under the Army contracts, Carlson has not filed a claim within the meaning of the CDA and the contracting officer has not issued a final decision. Accordingly, this Court lacks jurisdiction to entertain count III.

Moreover, in any event, this Court should dismiss this count as not ripe for judicial review given the uncertainty surrounding future events – most importantly - the uncertainty whether the Army will exercise the option period of Carlson's contracts and, if it does, delete the three states from those contracts.

A. Carlson Has Not Established That It Filed A Claim Or The Army Issued A Contracting Officer's Final Decision Regarding The Scope Of Contract Requirements That Would Be Applicable To The Option Period, Should The Option Period Be Exercised

Carlson has asserted that this Court possesses jurisdiction to entertain its claim regarding the Army-Carlson contracts pursuant to the CDA. Complaint, ¶ 3. However, this Court's jurisdiction pursuant to the CDA is predicated upon the contractor's submission of a written claim to the contracting officer, 41 U.S.C. § 605((a), and the agency's issuance of a final decision, 41 U.S.C. § 609(a)(3). See Vanalco, Inc. v. United States, 48 Fed.Cl. 68 (2000) (jurisdiction lacking because of the failure of the contractor to submit an administrative claim); Made In The USA Foundation v. United States, 51 Fed. Cl. 252 (2001) (contractor failed to

establish either claim or request for a final decision). See also Valley View Enterprises, Inc. v. United States, 35 Fed. Cl. 378, 385 (1996) (the requirements of the CDA must be strictly construed as a waiver of sovereign immunity).

Carlson contends that it presented a written claim by informing the contracting officer on November 26, 2002, that its contracts did not allow traditional travel services to be subsumed under the restructured contract. Compl., ¶¶ 62-65; see Def. App., pp. 2-4. Further, Carlson contends the contracting officer issued a final decision on May 15, 2003, when she informed Carlson that traditional travel services in Kentucky, Missouri and Nebraska would be provided under the DoD-TRW contract as of September 30, 2003. See Def. App., p. 8. As we demonstrate, however, Carlson's November 26 letter was not a written claim, and the May 15 notification was not a final decision of the contracting officer. Therefore, Carlson fails to allege that it has satisfied the mandatory administrative exhaustion requirements of the CDA.

The Federal Acquisition Regulation ("FAR") defines a "claim" as:

> [A] written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising from or relating to the contract . . . .

48 C.F.R. § 33.201; see Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1264-66 (Fed.Cir.1999).

The Carlson letter of November 26 cannot reasonably be construed as a claim. While the letter asserts an interpretation of the contracts, it does not request relief from a contract action because no action had been taken. It instead attempts to persuade the contracting officer to repudiate notification of a contemplated action. Specifically, it requests rescission of a previous

letter notifying Carlson of a proposed transfer of services in three states to the DoD-TRW contract before the end of the base year of Carlson's contracts. In fact, as requested, the contracting officer rescinded the proposed action in her letter of January 31, 2003. Moreover, the Carlson letter does not use the term "claim," nor mention the CDA nor request a final decision. Therefore, the November 26 letter cannot provide a basis for subject matter jurisdiction. See, e.g., Sharman Company, Inc. v. United States, 2 F.3d 1564, 1567-73 (Fed.Cir. 1993) (no jurisdiction in court under the CDA until there has been a final denial of an administrative claim).

Carlson attempts to obviate this result by pointing out that it was notified on May 15, 2003, that all sites then being serviced in Missouri, Nebraska, and Kentucky would be removed as of the completion of the initial term. Compl., ¶ 15; see Def. App., p. 8. However, like the November 8 letter, the May 15 message does not adversely affect Carlson's rights. This notification simply advised that the Army might take certain action in the future, but, at the time the complaint was filed, the three states at issue had not been excised from the contracts. Id. ("I am in the process of preparing the modification to remove Kentucky, Missouri and Nebraska from DTRs 4 and 5 effective September 30 as we agreed earlier this year. I will need go get those modifications completed before exercising the option").

The relevant decisions indicate that a letter concerning possible future activity does not deprive a party of rights under the contract and is insufficient to support jurisdiction pursuant to the CDA. For example, in Alliant Techsystems, Inc. v. United States, 178 F.3d at 1260, the contracting officer had insisted that additional work be accomplished by exercising an option and rejected the contractor's contention that it was too late to exercise the option. Therefore, the contractor allegedly was deprived of a right under the contract not to have to perform the

additional work. Similarly, in Clearwater Constructors, Inc. v. United States, 56 Fed. Cl. 303 (2003), an interpretation of a contract modification required the contractor immediately to undertake additional work which the contractor asserted it was not required to do. Further, in GPA-I, LP v. United States, 46 Fed. Cl. 762 (2000), the contractor objected to the fact that the Government had not made timely payments and therefore had violated rights under the contract.

Unlike the situations in the cases cited above, Carlson has not yet suffered any deprivations under the contracts. All the May 15 notification did was advise that three states might be excised as of September 30 by virtue of a modification to the contracts. See Def. App., p. 8. This might well be irrelevant, however, as the initial term ends on September 30, and Carlson had no right to an automatic extension. See, e.g., Green Management Corporation v. United States, 42 Fed. Cl. 411, 433-34 (1998) ("[A]n option contract generally binds the option giver, not the option holder"); Optimal Data Corp. v. United States, 17 Cl. Ct. 723, 731 (1989), aff'd, 904 F.2d 45 (Fed.Cir. 1990) (same); Continental Collection & Disposal, Inc. v. United States, 29 Fed. Cl. 644, 650 (1993) (same). Therefore, the May 15 notification at most constituted an effort to seek a modification to a potential future contract which would exist after exercise of the option. Therefore, it was legally incapable of triggering the right to judicial review in this Court because the modification had not been imposed and the option had not been exercised. See Dawco Constr., Inc. v. United States, 930 F.2d 872, 878 (Fed.Cir. 1991) ("[A] claim must seek payment of a sum certain as to which a dispute exists at the time of submission."); Logan Canyon Cattle Assoc. v. United States, 34 Fed. Cl. 165, 168 (1995) ("the court . . . lacks subject matter jurisdiction over this suit because the claim is anticipatory").

Moreover, although the May 15 message is like the November 8 letter in that it merely proposes a contractual action, it is not a mere recitation of the action proposed in the earlier letter.

In the November letter, the Army announced an intention to delete the three states during the base period of Carlson's contract. In its letter of November 26, Carlson argued in part that the deletion of those states during the base period violated contract provisions that arguably allowed such deletions only when the base period expires. By contrast, the May 15 message proposes action that will not occur (if it occurs at all) until the base period expires. Carlson has not asserted a claim in response to the May 15 message, nor obviously received a final decision from the contracting officer. Consequently, there plainly is no claim or final decision applicable to the action proposed (but not executed) in the May 15 message.

In short, Carlson has failed to satisfy the prerequisites to this Court's jurisdiction pursuant to the CDA. Therefore, count III of the complaint, asserting a breach of the Army-Carlson contracts, must be dismissed.

B. Even If The CDA Prerequisites Have Been Established, The Court Should Dismiss Carlson's CDA Count As Unripe For Judicial Review

The Court also has refused to entertain claims because they are not ripe for resolution. CW Government Travel, Inc. v. United States, 46 Fed. Cl. 554, 558 (2000) (finding that "many justiciability precepts - including mootness, standing and ripeness - have been invoked by this and other non-Article III courts on prudential grounds" and dismissing the complaint as moot); Massachusetts Bay Transp. Auth. v. United States, 21 Cl. Ct. 252, 257-58 (1990) ("['T]he Claims Court traditionally has applied the case or controversy requirement unless jurisdiction conferred by Congress demands otherwise"); Vanalco, 48 Fed. Cl. at 74 (court does not possess general equitable jurisdiction for anticipatory relief and exercises equitable relief only in certain limited situations).

In finding that the Court of Federal Claims properly exercised jurisdiction over a claim

that the Government improperly had exercised an option, the Federal Circuit rejected a Government argument that "prudential considerations" precluded the Court from entertaining a request for declaratory relief. However, in doing so, the court of appeals did not embrace an unlimited application of declaratory relief to contracts. It furnished the following guidance upon the appropriateness of declaratory judgments:

> This is not to say that the Court of Federal Claims (or an agency board of contract appeals) is required to issue a declaration of rights whenever a contractor raises a question of contract interpretation during the course of contract performance. In responding to such a request, the court or board is free to consider the appropriateness of declaratory relief, including whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests.
>
> While a contractor may want to know ahead of time how a contract issue will be resolved - such as whether the contractor will be entitled to additional compensation under the changes clause for a particular item or work directed by the contracting officer - such cases do not ordinarily put into question whether the contractor is obligated to perform at all. In such a case, the dispute typically concerns whether the government will be obligated to grant an equitable adjustment after the ordered performance is completed. It would normally be appropriate in such cases for the court or board to decline to issue a declaratory judgment and to await a later equitable adjustment claim by the contractor. In refusing a request for declaratory relief in the absence of a need for an early declaration of the parties' rights, the court or board would be applying a principle analogous to the traditional rule that courts will not grant equitable relief when money damages are adequate.

Alliant Techsystems, 173 F.3d at 1271. See also Zevalkink v. Brown, 102 F.3d 1236, 1242 (Fed. Cir. 1996) (approving adoption by United States Court of Veterans Appeals, an Article I court, of

the "case or controversy" limitations upon prudential grounds).

This case is not ripe for review. The Government has not issued a modification to delete requirements for service to the three states at issue from the Carlson contracts. It is unknown when, if ever, the Government will do so. If the Government eventually does delete the requirements, the circumstances of such action, e.g., the state of implementation of the TRW contract, or the means of deleting the requirement, can only be known at that time. Finally, if the Government eventually does delete the requirement, Carlson will have an adequate remedy for money damages in an equitable adjustment for termination costs, or (if appropriate) a breach of contract action. Accordingly, the request that judicial review be accorded at this juncture should be denied.

CONCLUSION

Carlson's complaint has failed to demonstrate standing to challenge the alleged modification of the DOD-TRW contract pursuant to CICA or the jurisdictional prerequisites to an action pursuant to the CDA. Accordingly, the complaint must be dismissed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ David A. Levitt
DAVID A. LEVITT

Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 307-0309
Fax: (202) 514-7965

Attorneys for Defendant

Date: July 23, 2003

.

APPENDIX

DEPARTMENT OF THE ARMY
HEADQUARTERS MILITARY TRAFFIC MANAGEMENT COMMAND
200 STOVALL STREET
ALEXANDRIA, VA 22332-5000

November 8, 2002

Acquisition Division

SUBJECT: Transition of the State of Kentucky from Contract DAMT01-02-C-0027 and the States of Missouri and Nebraska from Contract DAMT01-02-C-0028

Mr. Erma Spell,
President
Carlson Wagonlit Government Travel, Inc. DBA
Carlson Wagonlit Travel
1777 NE Loop 410
Suite 702B
San Antonio, TX 78217

Dear Mrs. Spell:

The purpose of this memorandum is to notify you that travel services support for the following states: Kentucky from Contract DAMT01-02-C-0027 and Missouri and Nebraska from Contract DAMT01-02-C-0028 will transition to Contract DAMT01-98-D-1005 (DTR 6) effective February 24, 2003.

Upon the effective date the states listed above will no longer be serviced under Contracts DAMT01-02-C-0027 and DAMT01-02-C-0028. Please coordinate with the PCO (Ms. Peggy Butler, 703325-4994) administering the DTR 6 contract that will assume this responsibility to ensure no disruption of service to the customer.

If you have questions, please contact the undersigned at (703) 428-2060 or E-mail mixonr@mtmc.army.mil.

Sincerely,

Ruby L. Mixon
Contracting Officer

CF:
1 - PMO-DTS, ATTN: Paul Joyce
2 - AMSEL-AC-WB-B, ATTN: Peggy Butler
3 - MTPP-A, ATTN: Craig McKinley
4 - Contract File

Carlson Wagonlit

November 26, 2002

Ms. Ruby L. Mixon
Contracting Officer
Department of the Army
Headquarters Military Traffic Management Command
200 Stovall Street
Alexandria, Virginia 22332-5000

**Re: Improper Transfer of Work from DAMT01-02-C-0027 and DAMT01-02-C-0028 to TRW, Inc. and Sato Travel under DAMT01-98-D-1005**

Dear Ms. Mixon:

Reference is made to your letter dated November 8, 2002 indicating that requirements for travel services for Army installations in Kentucky, Missouri, and Nebraska would be transferred from the two contracts (DAMT01-02-C-0027/0028) awarded to CW Government Travel, Inc. ("CWGT"), after full and open competition, to a contract that was awarded to TRW, Inc., ("TRW") in 1998 to develop an electronic, end-to-end travel system known as the Common User Interface (the "CUI"). For the reasons set forth below, such a transfer would constitute a breach of CWGT's contracts. Moreover, transferring requirements for traditional travel services to TRW's contract is a violation of the Competition in Contracting Act of 1984 ("CICA") and FAR.

CWGT's contracts provided that, in the event the CUI was successfully developed and deployed and new travel management service contracts were competitively awarded by the Defense Travel System Program Management Office ("DTS PMO"), then the Army may decide not to exercise all the options provided under CWGT's contracts. However, your letter of November 8, 2002 stated that the transfer of the requirements for the three states from CWGT's contracts to TRW's contract would be effective "February 24, 2003." That would be in the middle of the firm base contract year of CWGT's contracts, which commenced on October 1, 2002. In other words, even if it were proper to give these requirements to TRW (which it is not), the earliest the work could be transferred from CWGT's contracts would be October 1, 2003. Moreover, under CWGT's contract for DTR-4, only Fort Campbell, not the entire State of Kentucky, would be transferred to TRW's contract for DTR-6 upon the implementation of the CUI.

It is our understanding that TRW's contract to develop and implement the CUI in DTR-6 has been modified to provide traditional travel services for the vast majority of the travel requirements for a multi-year period, rather than implement the CUI. In effect, this sole source modification of TRW's contract results in Sato Travel, as a subcontractor to TRW, continuing to provide traditional travel services to the facilities it was servicing under the DTR-3 travel service contract. This is a clear violation of CICA and the Government's obligation to conduct full and open competitions for its travel service requirements. Rather than extend Sato Travel's provision of traditional travel services in DTR-3, without competition, under the guise of a sole source modification of TRW's contract, a full and open competition should have been conducted to select a traditional travel service contractor in this region, until TRW's CUI is actually ready to be implemented to accomplish the majority of travel transactions.

The violation of CICA was made worse by your November 8, 2002 notice that travel service requirements won by CWGT in full and open competition, bitterly contested by Sato Travel, will now be taken from CWGT and given to Sato Travel. Moreover, since TRW's DTR-6 contract now includes transaction fees that are substantially higher than the transaction fees under CWGT's competitively-won contracts, **the transfer of these requirements from CWGT to TRW/Sato Travel will double the cost to the Government for traditional travel services.** See enclosure for a comparison of the cost to the Government for traditional travel services in Kentucky, Missouri, and Nebraska under CWGT's contracts, and TRW's modified DTR-6 contract. If the Government had competitively procured traditional travel services in DTR-3, rather than execute a sole source contract with TRW/Sato Travel, the Government could have obtained prices comparable to CWGT's prices for DTR-2 and DTR-4. Thus, the failure of the Government to competitively procure traditional travel services in DTR-3, until the CUI is fully operational,[1] will cost the Government millions of dollars in additional costs.[2]

---

1 It is noted that TRW's modified contract indicates that it will be several more years before the CUI is even scheduled to be operationally capable of handling a significant percentage of the travel transactions in DTR-6.

2 It is also noted that the TRW contract was modified to also provide for a $19.00 transaction fee to Sato Travel, plus an additional 5% "prime contractor's fee" to TRW for transactions using the CUI, when or if it ever becomes fully operational. This fee is much higher than CWGT's fee for online booking and much higher than CWGT would charge for its end-to-end, web-based travel management product. It is incredible that DoD would agree to pay TRW such high transaction fees for using the CUI that the Government has already paid more than $260 million to develop. Thus, even if TRW is successful in finally implementing the CUI, the Government will still pay significantly more per transaction than it would cost to obtain such end-to-end travel services from CWGT. Moreover, CWGT's end-to-end product is web-based, so it would be available to any DoD traveler with access to a personal computer, in contrast to TRW's CUI, which is a monumental software installation/interface/integration project.

It is apparent that the modification of TRW's contract to provide extensive traditional travel services over an extended period is an improper, out-of-scope modification. We understand there are a number of General Accounting Office and Court of Federal Claims' cases which hold that the Government may not materially change the scope of an existing contract, and thus avoid full and open competition. The fact that TRW's original contract did not include extensive traditional travel services over a multi-year period is evidenced by a number of indisputable facts. For example, for years after the award of the DTR-6 contract to TRW, Sato Travel's DTR-3 contract for traditional travel services was extended. Another determinative fact is that no traditional travel service providers, such as CWGT, Sato Travel, Omega Travel, or American Express, submitted proposals as prime contractors in response to the DTR-6 solicitation. However, all would be in a position to submit proposals to provide the traditional travel services recently added to TRW's contract. Thus, the field of competition would be materially changed by the recent modification to TRW's contract. In fact, it is Sato Travel, not TRW, which will perform 100% of the traditional travel services required for DTR-6.

There can be no doubt that the traditional travel services recently added to TRW's DTR-6 contract constitute a material, out-of-scope modification that is required to be competed. We are certain that legal action will be commenced, in the not-too-distant future, to compel the Government to procure such services via a full and open competition. In the meantime, it would be highly improper, and a breach of CWGT's contracts, to transfer requirements from our competitively-won contracts to TRW/Sato Travel.

It is requested that you promptly rescind your letter of November 8, 2002, and permit CWGT to perform the contracts, as awarded. Such action is not only the legally correct course of action, but will save the Government significant amounts by avoiding payment of inflated transaction fees, as well as damages to CWGT.

Sincerely,

Erma Spell

Erma Spell
President

Enclosure

# Cost Analysis for Select DTR 6 Locations

Year 1

| DTR | CWT_Site_Name | City | St. | Air Trx | On-site Staff | CWGT Cost: Cost per Trx | CWGT Cost: Total Transaction Cost | CWGT Cost: On-site Service Cost | CWGT Cost: Installation Total Cost | TRW/SATO Cost: Cost per Trx | TRW/SATO Cost: 5% Chg | TRW/SATO Cost: Total Transaction Cost | TRW/SATO Cost: On-site Service Cost | TRW/SATO Cost: Installation Total Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Ft. Campbell ITO | Fort Campbell | KY | 15,908 | 5 | 15.19 | 241,642.52 | | 241,642.52 | 24.00 | 1.20 | 400,881.60 | 220,500 | 621,381.60 |
| 4 | Ft. Knox Official DOL | Fort Knox | KY | 15,307 | 5 | 15.19 | 232,513.33 | | 232,513.33 | 24.00 | 1.20 | 385,736.40 | 220,500 | 606,236.40 |
| 5 | Def. Enterprise Comput | St. Louis | MO | 363 | | 15.30 | 5,553.90 | | 5,553.90 | 24.00 | 1.20 | 9,147.60 | | 9,147.60 |
| 4 | Blue Grass AD | Richmond | KY | 1,368 | | 15.19 | 20,779.92 | | 20,779.92 | 24.00 | 1.20 | 34,473.60 | | 34,473.60 |
| 4 | Army Recruit Com Hdq | Fort Knox | KY | 13,680 | | 15.19 | 207,799.20 | | 207,799.20 | 24.00 | 1.20 | 344,736.00 | | 344,736.00 |
| 4 | USPFO Frankfort | Frankfort | KY | 403 | | 15.19 | 6,121.57 | | 6,121.57 | 24.00 | 1.20 | 10,155.60 | | 10,155.60 |
| 4 | MEPS Louisville | Louisville | KY | 2,637 | | 15.19 | 40,056.03 | | 40,056.03 | 24.00 | 1.20 | 66,452.40 | | 66,452.4 |
| 5 | 2nd Dist. Coast Guard | St. Louis | MO | 17 | | 15.30 | 260.10 | | 260.10 | 24.00 | 1.20 | 428.40 | | 428. |
| 5 | USA CECOM | St. Louis | MO | 227 | | 15.30 | 3,473.10 | | 3,473.10 | 24.00 | 1.20 | 5,720.40 | | 5,720.40 |
| 5 | DMA St. Louis | St. Louis | MO | 5,756 | | 15.30 | 88,066.80 | | 88,066.80 | 24.00 | 1.20 | 145,051.20 | | 145,051.20 |
| 5 | MEPS St. Louis | St. Louis | MO | 4,033 | | 15.30 | 61,704.90 | | 61,704.90 | 24.00 | 1.20 | 101,631.60 | | 101,631.60 |
| 5 | DCMC | St. Louis | MO | 1,194 | | 15.30 | 18,268.20 | | 18,268.20 | 24.00 | 1.20 | 30,088.80 | | 30,088.80 |
| 5 | DFAS Kansas City | Kansas City | MO | 1,514 | | 15.30 | 23,164.20 | | 23,164.20 | 24.00 | 1.20 | 38,152.80 | | 38,152.80 |
| 5 | Def. Metro Tel. Sys | St. Louis | MO | 32 | | 15.30 | 489.60 | | 489.60 | 24.00 | 1.20 | 806.40 | | 806.40 |
| 5 | Ammo Plant-Lake City | Independence | MO | 11 | | 15.30 | 168.30 | | 168.30 | 24.00 | 1.20 | 277.20 | | 277.20 |
| 5 | Army Audit Agency | St. Louis | MO | 251 | | 15.30 | 3,840.30 | | 3,840.30 | 24.00 | 1.20 | 6,325.20 | | 6,325.20 |
| 5 | MEPS Kansas City | Kansas City | MO | 5,947 | | 15.30 | 90,989.10 | | 90,989.10 | 24.00 | 1.20 | 149,864.40 | | 149,864.40 |
| 5 | MEPS Omaha | Omaha | NE | 1,029 | 0 | 15.30 | 15,743.70 | | 15,743.70 | 24.00 | 1.20 | 25,930.80 | | 25,930.80 |
| 5 | ARPERCEN-St.Louis | St. Louis | MO | 8,022 | | 15.30 | 122,736.60 | | 122,736.60 | 24.00 | 1.20 | 202,154.40 | | 202,154.40 |
| 5 | Ft. Leonardwood | Ft. Leonardwood | MO | 26,360 | 7 | 15.30 | 403,308.00 | | 403,308.00 | 24.00 | 1.20 | 664,272.00 | 308,700 | 972,972.00 |
| 5 | COE Omaha | Omaha | NE | 5,780 | 2 | 15.30 | 88,434.00 | | 88,434.00 | 24.00 | 1.20 | 145,656.00 | 88,200 | 233,856.00 |
| 5 | USPFO Jefferson City | Jefferson City | MO | 4,289 | 1.5 | 15.30 | 65,621.70 | | 65,621.70 | 24.00 | 1.20 | 108,082.80 | 68,040 | 176,122.80 |
| 5 | COE Kansas City | Kansas City | MO | 1,567 | | 15.30 | 23,975.10 | | 23,975.10 | 24.00 | 1.20 | 39,488.40 | | 39,488.40 |
| 5 | COE St. Louis | St. Louis | MO | 1,322 | | 15.30 | 20,226.60 | | 20,226.60 | 24.00 | 1.20 | 33,314.40 | | 33,314.4 |
| 5 | USPFO Lincoln | Lincoln | NE | 2,387 | | 15.30 | 36,521.10 | | 36,521.10 | 24.00 | 1.20 | 60,152.40 | | 60,152. |
| | | | | | | | 1,821,457.87 | | 1,821,457.87 | | | 3,008,980.80 | 905,940 | 3,914,920.80 |



11/26/2002 11:29 AM

**DEPARTMENT OF THE ARMY**
HEADQUARTERS, MILITARY TRAFFIC MANAGEMENT COMMAND
200 STOVALL STREET HOFFMAN BUILDING II
ALEXANDRIA VA 22332-5000

January 10, 2003

MTAQ (Personal Property and Passenger Services Division)

SUBJECT: DAMTO1-02-C-0027 and DAMT01-02-C-0028

Ms. Erma Spell
Carlson Wagonlit
1777 NE Loop 410
Suite 702B
San Antonio, Texas 78217

Dear Ms. Spell:

Reference is made to your letter of November 26, 2002 concerning the performance of work by your company under the subject contracts in the States of Kentucky, Missouri and Nebraska, and your request that MTMC rescind its letter of November 8, 2002.

These contracts contain a provision that ". . . upon implementation of the Defense Travel Region 6 (DTR 6) contract the following locations (Ft. Campbell, Kentucky, Missouri, and Nebraska) will be deleted from the respective regions and incorporated into the DTR 6 contract."

The DTR 6 contract for these states is to be implemented on February 24, 2003, and as agreed by you in the above provision, the requirement for your services in these three locations is therefore ended. As stated in the MTMC letter of November 8, 2002, these locations, will no longer be serviced under your contracts. These locations include the entire state of Kentucky, with specific mention made of Fort Campbell since portions of that installation are located in Tennessee and the Government does not intend to split Fort Campbell services by having partial coverage through Tennessee. The contract coverage of other locations in DTR 1, DTR 2, and NCR is not affected by this result.

In view of the above, our letter of November 8, 2002 remains in effect. We look forward to a continued partnership, and receiving your support on transitioning these locations to DTR 6.

Sincerely,

Jackie Robinson-Burnette
Contracting Officer

Printed on Recycled Paper

DEPARTMENT OF THE ARMY
HEADQUARTERS
MILITARY TRAFFIC MANAGEMENT COMMAND
200 STOVALL STREET
ALEXANDRIA, VA 22332-5000

REPLY TO
ATTENTION
OF

31 January 2003

MTAQ-Personal Property and Passenger Service

SUBJECT: Transition of Kentucky, Missouri, Nebraska and Connectivity to DTS CUI

Ms. Erma Spell
Carlson Wagonlit Travel
1777 NE Loop 410
Suite 702B
San Antonio, TX 78217

Dear Ms. Spell:

The purpose of this letter is to advise Carlson Wagonlit of the Government's decision to rescind transition notification letters. Carlson Wagonlit will continue to provide Commercial Travel Services in the States of Kentucky, Missouri and Nebraska through September 30, 2003.

Additionally, per my conversation with Craig Thompson, Carlson Wagonlit is requested to participate in a meeting at Military Traffic Management Command on February 13, 2003 at 11:00am to discuss issues with the Defense Travel System (DTS) Common User Interface connectivity of pilot sites. At this meeting, the Government intends to provide current DTS Passenger Name Record performance information. We intend to identify and resolve any issues impeding Carlson's ability to connect to the DTS web portal.

Responsive support to Army customers remains this Agency's highest priority. If there are any questions concerning the above, please contact the undersigned at (703) 428-2048.

Sincerely,

Jackie Robinson-Burnette
Contracting Officer

-----Original Message-----
**From:** Robinson-Burnette, Jackie
**Sent:** Thursday, May 15, 2003 1:49 PM
**To:** 'Thompson, Craig CWT SAT'
**Cc:** 'Myers, Lottie CWT SAT'; Dossman, Christina; Frye, COL Jan; Giordano, Frank
**Subject:** DTS Pilot Site Proposal
**Importance:** High

Good Afternoon Mr. Thompson,

I'm sorry that I still do not have a firm response from the PMO regarding acceptance of your 90 day test period proposal. I fully understand that this pushes the start date further away from May 19th. **Cullen Hutchinson feels that he will be able to give me a response on Friday before noon, I just spoke to him again 5 minutes ago.**

There is a struggle with why the price has to increase to $17.00 if the DTS action comes in correct, which he feels will actually mean less work for Carlson - not more. However, everyone recognizes the benefit of this test period is that **Carlson will share with us the processes and what needs to be done to ensure successful connection.** We look forward to the information that is forthcoming after the 90 day test period.

Another issue - I am in the process of preparing the modifications to **remove Kentucky, Missouri, and Nebraska** from DTRs 4 and 5 **effective 30 September 03** as we agreed to earlier this year. I need to get these modifications completed before exercising the options. You will see them before the end of this month.

Jackie Burnette, Contracting Officer



06/23/03 09:17 FAX 703 428 3322 002

Certificate of Filing

I hereby certify that on July 23, 2003, a copy of the foregoing Defendant's Motion To Dismiss was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Levitt