# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | |
| **Plaintiff,** | |
| **v.** | **No. 03-1274C** |
| | **(Judge Lawrence M. Baskir)** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

## JOINT PRELIMINARY STATUS REPORT

Pursuant to the Rules of the Court of Federal Claims and the Special Procedures Order filed on August 22, 2003, the parties submit this Joint Preliminary Status Report.

The parties ask for an early Initial Status Conference with the Court.

In this Status Report, Plaintiff CW Government Travel, Inc. is referred to as Carlson. The Defendant is referred to as the Government. The Department of Defense is referred to as DoD and the Department of the Army is referred to as the Army.

**1. Does the Court have jurisdiction over this action?**

Carlson invokes this Court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491 to adjudicate Counts I and II. Carlson invokes this Court's jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 601-613 to adjudicate Count III.

The Government contends that the Court lacks jurisdiction to entertain Counts I and II because it alleges Carlson lacks standing to seek relief from the Army's alleged failure to conduct a competitive

procurement for work encompassed in the modification of a contract between DoD and TRW, Inc. As described below, Carlson contends that the contract between DoD and TRW for the development and integration of a computer software product to manage travel for DoD (known and referred to here as the DTS DTR-6 Contract) was so substantially modified in 2002 that the modified contract represents a cardinal change and that a competitive procurement for this new contract was required pursuant to 10 U.S.C. § 2304 and Federal Acquisition Regulations ("FAR"), 48 C.F.R., Chapter 1, Part 6. Carlson contends that the cardinal changes include the requirement for an internet or "web-based" travel management system, plus the additions of a requirement for extensive traditional travel management services to DoD facilities in a 12-state region. The Government denies that the modification of the DTS DTR-6 Contract imposed a web-based or internet requirement or added a requirement for extensive travel management services but, instead, contends, with respect to the alleged internet requirement, that the modification encompassed improved web-based technologies which were already inherent in the performance objectives of the original contract and, with respect to traditional travel management services, altered the pricing provisions for such services to reflect changes within the industry rather than added any requirements not encompassed in the original contract. Further, the Government contends that Carlson lacks standing because it has not shown that it was a potential bidder for work encompassed by the modified contract or that it challenged the modification in a timely fashion after having actual or constructive notice of the modification.

The Government contends that the Court lacks jurisdiction with respect to Count III because it contends that Carlson failed to exhaust administrative remedies prior to filing its complaint and that there is no current dispute concerning the proposed cancellation of three states from the traditional travel management services contracts between the Army and Carlson (Nos. DAMT01-02-0028 and

DAM01-02-0027) for Defense Travel Regions ("DTR") 4 and 5. Carlson contends that the Government misinterpreted the provisions of the two traditional travel management services contracts by seeking to remove three states from the territories serviced by Carlson and transferring those states to the modified DTS DTR-6 Contract. The Government contends that Carlson failed to exhaust administrative remedies and that there is no current dispute concerning the proposed transfer of those areas because it contends that (a) the proposed transfer was rescinded prior to the completion of the base period of the contracts; (b) the Government has not deleted the three states from the Carlson contracts; and, (c) when Carlson was informed that certain facilities would be deleted from the contracts at the completion of the base periods, the Government had not yet exercised the option to renew the contracts beyond the base periods.

**2. Should this case be consolidated with any other case?**

No.

**3. Should trial of liability and damages be bifurcated?**

Carlson seeks injunctive relief, including a competitive procurement of the modified DTS DTR-6 Contract in regard to both the web-based travel management system and traditional travel management services, rather than an award of damages. The Government denies that the equitable relief Carlson seeks would be within the Court's discretion even if Carlson were able to demonstrate that the modification effected a cardinal change in the DTS DTR-6 Contract since the balance of equities and public interest do not support the equitable relief requested in the complaint. The parties do not believe that the remedial phase should be bifurcated from the liability phase of the case.

**4. Should further proceedings be deferred pending consideration of another case?**

No.

**5. Will a remand or suspension be sought in this case?**

No. It should be noted, however, that Carlson does seek issuance of a solicitation and competitive procurement of the DTS DTR-6 Contract, as modified, which the Government contends would be unjustified even if Carlson were to be able to demonstrate that a cardinal change was effected as a result of the modification to the DTS DTR-6 Contract.

**6. Will additional parties be joined?**

The parties are not aware at this time that any additional parties will seek to join the litigation.

**7. Does either party intend to file a Motion pursuant to R.C.F.C. 12(b), 12(c) or 56?**

Prior to the entry of the Special Procedures Order, the Government filed a Rule 12(b)(1) motion to dismiss asserting that Carlson lacked standing to assert the claims set forth in Counts I and II because it lacked the status of a potential bidder for the work encompassed by the modification and failed to challenge the modification in a timely fashion, and that Carlson failed to exhaust administrative remedies prior to filing suit with respect to Count III because it did not present an administrative claim concerning a dispute under the contract and the contracting officer did not issue a final denial. The Government will file a motion for leave to file a revised motion to dismiss or, in the alternative, for summary judgment, in accordance with the schedule for filing revised dispositive motions to be established at the Initial Status Conference, contending that Carlson's complaint fails to state a claim upon which relief can be granted as well as that it lacks standing and failed to exhaust administrative remedies. The revised motion to dismiss or, in the alternative, for summary judgment will contain certain factual and legal arguments that have only come to light after the original motion to dismiss was filed.

Carlson has not yet responded to the Government's RCFC 12(b)(1) Motion to Dismiss

because of the entry of the Special Procedures Order on August 22, 2003. When it does respond, it will contend that it has standing to challenge the Army's decision to amend the DTS DTR-6 Contract because it is a competitor of the incumbent contractor in the travel services field and because Carlson provides the type of goods and services contemplated in the modified requirements of the DTS DTR-6 Contract and was a potential bidder for the modified contract. With respect to Count III, Carlson will contend that a final adverse decision was rendered by the contracting officer, but that the Government has not implemented that decision because it agreed not to delete facilities until the merits of this litigation were decided in order to resolve Carlson's Motion for Preliminary Injunction.

**8. Relevant legal and factual issues.**

**a. Factual background.**

This case involves three DoD travel management service contracts. One contract was awarded to TRW, Inc. in 1998. That contract is known as the DTS DTR-6 Contract. The fixed-price contract, in the amount of $263.7 million, required TRW to develop and implement a software-based Common User Interface ("CUI") that would link the various components of DoD's travel management system, including automated payment/reimbursement of DoD travel expenses, to create a new, unified Defense Travel System ("DTS"). Carlson contends that the contract provided that the computer software product would be installed in individual PCs used by Government travelers and connected with the local area network of each military facility and therefore it could not be accessed by worldwide web protocols. The Government contends that migration to web-based protocols was envisioned in the Request For Proposal ("RFP") and that the DTS DTR-6 Contract, which is based upon performance standards rather than a prescribed solution, explicitly requires the movement to web-based protocols as a form of technology enhancement.

Carlson contends the DTS DTR-6 Contract also required TRW to provide limited Commercial Travel Office ("CTO") services within the geographic region included in the contract, utilizing the CUI software. CTOs function essentially as travel agents for DoD travelers. According to Carlson, one goal of the contract was to have the CUI software eventually eliminate the need to have individual CTOs, with numerous travel counselors, located at each major military facility. According to Carlson, because the contract was essentially a prototype for a new system, it was limited to a specific 12-state region in the Midwest. Once the system was proven and operable, its use would be expanded to other regions and the CTOs in those facilities closed. According to Carlson, competitively-procured traditional travel management services contracts were in place, and extended several years to provide travel services to the 12 states, pending the development and implementation of the CUI.

The Government disputes this interpretation of the DTS DTR-6 Contract. According to the Government, the plain words of the contract require the contractor to provide "[t]ravel management services for all authorized official travel performed by DoD travelers for organizations located in [the eleven midwestern states]." Also, the Government contends that the contract provides that a "single" contractor provide "official travel services", which are defined as "CUI services as well as travel management services." Thus, according to the Government, the DTS DTR-6 Contract is not limited to the contractor providing CUI-assisted travel management services exclusively, but also includes the provision of all travel management services whether or not fully or partially assisted by the CUI.

Carlson contends that TRW's contract performance proceeded fitfully at best. Carlson contends that the project was marred by extensive delays, significant technical difficulties, and extensive cost overruns and that the DoD Office of Inspector General issued a harshly critical report on the project in July 2002. Carlson contends that, as a result of the significant problems encountered by

TRW, the Government commenced the complete restructuring of the TRW Contract which included fundamental out-of-scope changes. The first out-of-scope change, according to Carlson, was a radical change in technology. According to Carlson, the original solicitation proposed a client/server-based software solution in which the CUI software must be physically installed in each PC used by Government travelers. According to Carlson, the CUI software installed in the individual PCs had to be modified to interface and communicate via a local area network, and had to accommodate other specific requirements for each PC user. In contrast, according to Carlson, the newly-restructured contract called for TRW to develop a web-based solution that would permit all Government travelers having access to the internet to interact with the Defense Travel System through a website hosted by TRW. According to Carlson, this change reflected a dramatically different methodology and technology from that contained in the TRW Contract, and the modification ignored the fact that there are currently a number of commercially available, web-based/travel management products.

The Government disputes this interpretation of the modification to the contract. According to the Government, the modification did not require any new technologies but, instead, the work encompassed by the DTS DTR-6 Contract included a web-based solution to providing access to the CUI and the modification simply upgraded the functions and accessibility of the web-based CUI while eliminating the need to duplicate accessibility through a client-server system. According to the Government, this was a technological enhancement of the originally conceived solution which was fully within the scope of the RFP and subsequent contract rather than a fundamental change in the performance objectives of the DTS DTR-6 Contract.

The second fundamental change, according to Carlson, was an addition of services never contemplated in the original solicitation, namely the addition of traditional travel management services to

the 12-state DTS DTR-6 Contract for the several additional years anticipated to be required to develop and deploy the new technology. Sato Travel, the contractor who had won a competitive procurement for traditional travel services in 1992 for 9 of the 12 states was added to the DTS DTR-6 Contract as a subcontractor to TRW when Sato Travel's competitively-won contract terminated in October 2002.

The Government disagrees that the provision of traditional travel services outside the auspices of the CUI was not encompassed within the scope of the DTS DTR-6 Contract prior to the modification. According to the Government, traditional travel services were required under the DTS DTR-6 Contract, and the modification simply restructured the payment schedule for traditional travel services to reflect changes occurring in the industry with respect to the payment for traditional travel management services. The Government contends that the modification related to paying for traditional travel management services and did not change the scope of the contract in any way. The Government disputes the contention that the modification expanded the scope of the contract by including traditional travel services unassisted or only partially assisted by the CUI. The Government contends the plain words of the contract include the provision of traditional travel services, including CUI assisted and unassisted travel services, and that the purpose of the modification was simply to alter the pricing of such travel services to conform to changes in the industry rather than to alter the nature of services provided under the contract.

Carlson contends that the modifications to this contract are so extensive that the modified contract constitutes a cardinal change and that a competitive procurement for these goods and services was required. The Government contends the modifications simply restructured the payment for traditional travel services and included technological enhancements for the CUI and did not change the products or services offered under the contract.

The other two contracts at issue are contracts between Carlson and the Army relating to the provision of traditional travel services in DTR 4 and 5. In February 2002, Carlson won competitive procurements to provide traditional travel services under five separate regional contracts. These five new Carlson contracts commenced on October 1, 2002. By letter dated November 8, 2002, the contracting officer informed Carlson that its right to provide traditional travel services to Army and other DoD agencies located in the States of Kentucky, Missouri, and Nebraska would be removed from two of the Carlson-Army contracts and transferred to the DTS DTR-6 Contract to be performed by TRW, and its new subcontractor, effective February 24, 2003.

In a letter dated November 26, 2002, Carlson challenged that action and requested that the Government rescind the order. According to Carlson, in a letter dated January 10, 2003, the contracting officer denied Carlson's request and rejected Carlson's interpretation of the contract terms. Carlson contends that this letter constitutes a final adverse decision denying Carlson's interpretation of its contractual rights and obligations under applicable law. On January 31, 2003, the contracting officer rescinded the effective date of the transfer, but, according to Carlson, did not rescind the Government's interpretation of its contractual rights. On May 15, 2003, according to Carlson, the contracting officer confirmed the adverse decision regarding the interpretation of Carlson's contracts by notifying Carlson that, effective September 30, 2003, the DoD sites in those three states would be removed from Carlson's contracts.

The Government disputes this interpretation of the communications between Carlson and the contracting officer with respect to the contracts between Carlson and the Army. According to the Government, the November 8, 2002 letter did not constitute an adverse action but, instead, constituted a proposed adverse action, which was rescinded on January 31, 2003, when Carlson was informed that

the facilities at issue would not be rescinded during the base term of the contracts. Therefore, at the time Carlson submitted its November 26 letter, no present adverse action had been taken and the letter did not constitute a "claim" under the contracts. Even if the letters were to be construed to constitute a "claim," the alleged adverse action was rescinded when Carlson was informed that the facilities would not be rescinded during the base term of the contracts. Although Carlson was informed that the facilities would be rescinded at the end of the base period, this was not a present adverse action because Carlson had no right to have the Army exercise the option to renew the contracts beyond the base terms of the contracts. Further, the Government contends that Carlson never made a claim with respect to the proposed rescission of the facilities since, at the time it was advised that the facilities would be deleted, the option terms had not been exercised. Finally, the Government contends that the Contracting Officer never issued a denial of a claim with respect to the option period since no claim was made with respect to the option period and the option period had not yet been exercised. Accordingly, in the Government's view, Carlson failed to exhaust its administrative remedies prior to filing this litigation as required by the CDA and Count III of the complaint must be dismissed.

Carlson filed this lawsuit challenging the Government’s adverse decision and seeking a preliminary injunction enjoining the Government from removing the three regions from Carlson’s contracts. Carlson withdrew its motion for preliminary Injunction when the Government agreed that it would not remove the three states from Carlson’s contracts while this lawsuit is pending.

**b. Legal issues.**

Counts I and II contend that DoD violated the Competition in Contracting Act, 10 U.S.C. § 2304, and FAR Chapter 1, Part 6, by allowing the Army to impermissibly restructure the DTS DTR-6 Contract to award new work without competitive bidding.

In addition to the issues raised by the Government in its Motion to Dismiss regarding Carlson's standing, the legal issues with respect to the Competition in Contracting Act are: (i) whether the modifications to the DTS DTR-6 Contract, separately or collectively, constitute a cardinal change to the contract; (ii) whether the Army was required to competitively procure the work encompassed by the modified contract; and (iii) whether Carlson waived its right to challenge the restructuring of the contract.

The Government contends that Counts I and II rest upon this Court's bid protest jurisdiction. 28 U.S.C. § 1491(b)(1). Carlson contends that, although the action properly is brought under the Tucker Act, it is not a classic bid protest because there was no solicitation upon which to base a protest. The Government contends that this is a "classic" bid protest case because jurisdiction is asserted to exist pursuant to 28 U.S.C. § 1492(b). Further, the Government contends that Carlson waived its rights to protest the modification by failing to challenge the restructuring at the time the restructuring was accomplished. Carlson submits that there was no public notice detailing the restructuring and that it has been attempting to obtain information regarding the DTS DTR-6 Contract through the Freedom of Information Act, but that its efforts to obtain information have been resisted.

Count III of the Complaint asserts a claim pursuant to the Contract Disputes Act, 41 U.S.C. § 601-611. Carlson contends that the Army has misinterpreted its travel services contracts by deleting certain regions and transferring those travel services to the DTS DTR-6 Contract. The legal issues with respect to Count III include: (i) whether the contracts granted Carlson the exclusive rights to provide traditional travel services to certain specific DoD facilities and prohibited the transfer of such rights to the modified DTS DTR-6 Contract; (ii) whether Carlson exhausted its administrative remedies prior to filing this action; and (iii) whether the claim encompassed by Count III is ripe for judicial review.

**9. What is the likelihood of settlement?**

The parties have engaged in settlement discussions, but the likelihood of reaching an agreement through alternative dispute procedures is unknown at this time.

**10. Do the parties anticipate proceeding to trial and will there be a request for expedited trial scheduling?**

In the event that this matter is not settled, or resolved upon a dispositive motion, the parties anticipate this matter will proceed to trial. Carlson may seek an expedited trial schedule depending upon future developments.

According to Carlson, the Government has announced an intention to issue a solicitation in October 2003 restricted to small business concerns to procure travel services for a number of military bases or facilities. It is anticipated by Carlson that military bases or facilities currently included in Carlson's contracts may be transferred to other contractors as a result of such action. Carlson contends that such action would violate the exclusivity provisions of its existing contracts and points out that Carlson would likely amend the Complaint in this action and seek a preliminary injunction.

**11. Are there special issues regarding electronic case management needs?**

No.

**12. Is there other information of which the Court should aware at this time?**

Yes. In its Complaint, Carlson alleged that the General Services Administration (the "GSA") was currently involved in a procurement for a web-based end-to-end travel management system for all Government agencies, and that the GSA procurement was for similar services as those set forth in the modified DTS DTR-6 Contract. Carlson alleged that the GSA procurement did not require the Government to pay for the development cost of the web-based travel system, and that the procurement

drew a large number of potential bidders, including Carlson. Since the filing of the Complaint, the GSA awarded contracts to both Carlson and the incumbent contractor under the DTS DTR-6 Contract though a protest of the award currently is pending at the General Accounting Office (the "GAO"). Carlson contends that this development is relevant to, and indeed dispositive of, the Government's contention that Carlson lacks standing to challenge the modification to the DTS DTR-6 Contract because it allegedly was not a competitor for any potential procurement for that modified contract. In addition, the Government has exercised its first option rights as to the Carlson contracts at issue in Count III. Therefore, Carlson's contracts, including the three states at issue, have been extended until March 1, 2004.

The Government points out that Carlson never alleged in its complaint that it was a bidder upon the GSA contract and, even if it was, according to the Government, the evidence demonstrates that the performance objectives for the E-Travel contract solicited by GSA differ substantially from the performance requirements for the DTS DTR-6 Contract. Therefore, Carlson's alleged selection as one of two potential providers of E-Travel services under the GSA E-Travel contract in no way suggests it was a potential bidder upon the work encompassed by the modification of the DTS DTR-6 Contract. Indeed, as the Government contends it has demonstrated in the pending Motion to Dismiss, Carlson was not a potential bidder on the modification because it failed to bid upon the DTS DTR-6 Contract when it was competitively bid and the work encompassed by the modification was simply a technical enhancement of the work required by the DTS DTR-6 Contract, rather than a fundamental change.

**13. Discovery plan.**

Rule 26(a) disclosures, if applicable, are due on September 22, 2003. Carlson contends that Rule 26(a) disclosures are required with respect to each of the disputes raised. The Government

contends that it is not obligated to produce Rule 26(a) disclosures as to Counts I and II because bid protest cases are exempted from the disclosure requirements of Rule 26(a). Carlson contends that this is not a classic bid protest and that the Government should promptly produce relevant documents.

The Government proposes to file the Administrative Record concerning the contract modifications to the DTS DTR-6 Contract within 60 days following a ruling upon its anticipated Revised Motion To Dismiss Or, In The Alternative, For Summary Judgment. Carlson submits that there is no reason to delay the production of any record the Government claims constitutes an administrative record. Indeed, to the extent the Government is challenging Carlson's standing because it alleges that Carlson would not have been a potential bidder upon the modified work, the record addressing the full scope of the modified contract must be produced so that Carlson can establish that it was a likely bidder for that modified work.

Carlson anticipates a possible need for expert witness testimony to address the technical aspects of the modifications to the DTS DTR-6 Contract.

<u>Carlson proposes the following schedule</u>:

| | |
|---|---|
| Exchange of Rule 26(a) Disclosures, Witness Lists and Exhibits as required by Rule 26(a) and Production of Record | 9/24/03 |
| Written Discovery and Document Requests | 10/1/03-11/30/03 |
| Depositions and Fact Discovery Completed | 12/21/03 |
| Expert Reports Exchanged | 01/21/04 |
| Rebuttal Reports Exchanged | 02/21/04 |

<u>The Government proposes the following schedule</u>:

The Government will file a Revised Motion To Dismiss Or, In The Alternative, For Summary Judgment pursuant to a schedule to be established at the Initial Status Conference. The Government will file the Administrative Record within 60 days of an adverse ruling, if any, on the anticipated Revised Motion To Dismiss Or, In The Alternative, For Summary Judgment.

The parties will exchange witness lists and relevant exhibits as required by RCFC 26(a), and reports of experts, within 60 days following an adverse ruling, if any, on the anticipated Revised Motion To Dismiss Or, In The Alternative, For Summary Judgment.

Interrogatories and requests for admissions, if any, shall be served within 60 days following an adverse ruling, if any, on the anticipated Revised Motion To Dismiss Or, In The Alternative, For Summary Judgment.

Depositions will be completed within 60 days following the exchange of witness lists and relevant exhibits.

Discovery will be completed within 120 days of the ruling on the anticipated Revised Motion To Dismiss Or, In The Alternative, For Summary Judgment.

**14. Joint Appendix**

The Government has prepared an Appendix to this Status Report. Carlson has not had access to the set of documents from which the Appendix was prepared, and therefore, has not been able to review the Government's designation or to designate documents for inclusion in the Appendix. The Parties have agreed that Carlson should have the right to supplement this Appendix through the filing of an Amended Appendix following Discovery.

Respectfully submitted:

"s/Lars E. Anderson"

Lars E. Anderson
Michael W. Robinson
**VENABLE LLP**
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
(703) 760-1600 (Telephone)
(703) 821-8949 (Facsimile)

*Counsel for Plaintiff*

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

s/ David A. Levitt

David A. Levitt
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0309 (Telephone)
(202) 514-7965 (Facsimile)

*Counsel for Defendant*