# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-1274C** |
| | ) | **Judge Lawrence M. Baskir** |
| **THE UNITED STATES of AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## AMENDED COMPLAINT

Plaintiff CW Government Travel, Inc. (hereinafter referred to as Carlson), by counsel, submits this Amended Complaint.

### OVERVIEW OF THE CASE

This case involves three interrelated Department of Defense ("DoD") travel management service contracts. One contract was awarded to TRW, Inc. in 1998. That contract is known as the DTS DTR-6 contract. In Counts I and II, Carlson challenges the extensive modifications made to the DTS DTR-6 contract in 2002 because the modifications amount to cardinal changes that required competitive procurement. The other two contacts at issue were awarded to Carlson after competitive procurements. Carlson won five long-term, travel management service contracts in 2002 under a competitive procurement conducted by the Army. The Government has advised Carlson that certain travel management services for which Carlson was awarded the exclusive rights to provide will be transferred to the TRW contract, which had been modified without competition to include these requirements. Any such a transfer of requirements would

constitute a breach of Carlson's two competitively won contracts and Carlson is appealing an adverse Contracting Officer's decision on that issue through this Complaint.

### A. THE GOVERNMENT SOLICITS AND AWARDS A CONTRACT FOR A CLIENT/SERVER-BASED TRAVEL MANAGEMENT SOFTWARE INTEGRATION PROJECT

In 1997, the Department of Defense ("DoD") issued a solicitation seeking an automated travel management system to be known as the Common User Interface ("CUI"). The DoD's goal was to eliminate the extensive paper documentation and administrative burden historically involved in the travel process by Government employees, while expediting payment/ reimbursement upon conclusion of the travel. The CUI was intended to eliminate many of the Commercial Travel Office functions (e.g., researching and discussing travel options with the individual traveler) and enable the remaining functions of making airline reservations, purchasing tickets, and quality control to be performed in a single travel office for a multi-state region. Thus, the CUI software would eliminate the need to have individual Commercial Travel Offices, with numerous travel counselors, located at each major military base/facility.

The Solicitation required that the CUI interface with a number of DoD external Automated Information Systems that would link the various components of the DoD's travel management system to create a new, unified Defense Travel System ("DTS"). The CUI was required to be Commercial-Off-The-Shelf ("COTS") computer software and hardware. The Solicitation required offerors to provide a COTS software product that would function in a client/server mode necessitating integration/interface with thousands of local area networks ("LAN") at individual military bases, plus communicate via the DoD NIPRNET (essentially DoD's internal internet). At the time, there were no web-based COTS products that satisfied the CUI requirements and almost half of DoD travelers had no access to the commercial internet.

The Solicitation required that operational deployment to the first military site commence 120 days after contract award.

The Solicitation required a firm fixed-price contract for five years. The contractor's revenue was contingent upon actual use of the CUI by Government travelers. No payments would be made until the CUI was operationally deployed and payment was based on a fixed-fee formula tied to the number of users and actual transactions using the CUI. Thus, the Solicitation shifted the entire burden for all development and testing costs to the contractor.

Only two offerors responded to the Solicitation and both had extensive experience in performing software systems integration contracts for DoD. In May 1998, the DoD awarded a $263.7 million, fixed-price contract (known herein as "DTS DTR-6 Contract") to TRW, Inc. (formerly BDM, and subsequently acquired by Northrop Grumman Inc., but known herein as "TRW," since that is the name on the vast majority of relevant documents) to develop, test, and deploy a client/server-based CUI using a commercial computer software product known as Travel Manager.

### B. THE GOVERNMENT COMPLETELY RESTRUCTURES THE CONTRACT FINANCIALLY AND TECHNICALLY IN RESPONSE TO TRW'S INABILITY TO PERFORM

TRW was supposed to complete full deployment of the CUI to approximately 11,000 DoD locations worldwide by September 2001. However, contract performance proceeded fitfully. TRW's performance was marked by a series of extensive delays, significant technical difficulties, multiple test failures, and massive cost overruns. On July 1, 2002, the Department of Defense Office of Inspector General issued a scathing report on the major problems experienced under this contract. A subsequent report by the Office of the Director, Program Analysis and Evaluation of DoD also documented the program's extensive problems.

By January 2002, TRW had incurred approximately $43 million in costs and had received no payments from the Government. TRW requested that the Government restructure the contract to pay TRW for the development and testing costs incurred to date, plus pay TRW on a monthly basis to continue development, testing, and ultimately, to deploy and maintain the CUI. TRW also requested that many other tasks be paid on a cost-reimbursable basis.

This led to a series of extensive bilateral contract modifications in 2002 that totally restructured the DTS DTR-6 Contract. When the DTS DTR-6 Contract was restructured, the CUI software was still not ready for deployment and operational use; indeed significant developmental work remained. The changes to the contract that constitute a cardinal change include: (1) a complete restructuring of the financial provisions that resulted in an immediate payment of $43 million to TRW and a complete shift of the financial risk for development, testing, and successful usage from the contractor to the Government; (2) a complete restructuring of the technical requirements that permitted the contractor to avoid the expensive and difficult requirement to provide a client/server-based/NIPRNET system and instead provide only a web-based/internet system; and (3) the addition of traditional travel management services to the DTS DTR-6 Contract for the several additional years anticipated to complete and deploy the new technology.

**1. The Restructuring Resulted In A Different Contract Financially**

The DTS Solicitation and original DTS DTR-6 Contract required the contractor to absorb all development and testing costs. The contractor would receive payment only after the CUI was operationally deployed and payments were based on a fixed fee formula tied to the number of users and actual travel transactions. Thus, all revenue to be earned by the contractor was

contingent on the successful development, testing, operational deployment, and actual utilization by Government travelers.

In contrast, the Restructured Contract required the Government to immediately pay TRW more than $43,000,000 to reimburse TRW for costs incurred between May 1998 and January 2002 trying to develop and test the CUI and required the Government to pay TRW fixed monthly fees for the next five years to develop, test, deploy, and maintain the CUI that totaled more than $142 million, plus additional cost-reimbursable development work. Essentially, under the Restructured Contract, the Government, not the contractor, assumed all risk and cost of developing, testing, deploying, and maintaining the CUI. The contractor was now getting paid up front, and its revenue was no longer contingent upon successful performance and actual utilization of the CUI by Government travelers. In addition to the massive financial restructuring, the contractor's performance schedule was extended by more than four years and TRW was relieved of any liability for failing to meet the original DTS DTR-6 Contract deployment requirements.

**2. The Revisions Resulted In A Different Technical Contract**

The DTS Solicitation and original DTS DTR-6 Contract required a client/server-based software solution in which the CUI software must be physically installed in each computer server used by a DoD activity or on every PC used by Government travelers. The performance of the CUI software was heavily dependent on the contractor's ability to interface with numerous other computer software systems already in use at each military base/facility or activity. Additionally, the contractor had to create computer software interfaces between the CUI and a number of other DoD External Automated Systems such as the DoD accounting and disbursing systems. The original DTS DTR-6 Contract also required that DoD travelers be able to access the CUI via a

DoD communication system known as NIPRNET, which functioned like a DoD only Internet. The original DTS DTR-6 Contract permitted the use of a web-based solution for some CUI functions, in addition to the client/server and NIPRNET solutions.

The 2002 Restructured Contract allowed TRW to abandon a CUI that functioned on a client/server basis or via the NIPRNET. Those requirements (for which the Government had just assumed $43 million of development costs) were deleted. Under the new contract, the Government essentially paid TRW to develop a web-based solution that would permit all Government travelers having access to the internet via individual PCs (and a password) to interact with the Defense Travel System through a web-site hosted by TRW. This eliminated the need to physically install software and "readers" on individual PCs or facility servers and customize software code for the local area network of each military base/facility or activity. This change in 2002 to only a web-based system reflected a dramatically different methodology and technology from that required by the 1997 DTS Solicitation and contained in the DTS DTR-6 Contract awarded to TRW in May 1998. The Restructured Contract thus deleted the major technical requirements in the original DTS DTR-6 Contract that had cost TRW over $43 million in unsuccessful developmental and testing efforts over several years.

**3. The Revisions Added Traditional Travel Services That Should Have been Competitively Procured**

In addition, the DTS DTR-6 Contract was improperly revised in 2002 to add traditional travel services that should have been competitively bid. The original DTS DTR-6 Contract required the contractor to provide Commercial Travel Office services using the CUI only once the Defense Travel System was fully developed, tested, and deployed within military facilities in the DTR-6 geographic region. The Restructured Contract, however, requires TRW to perform traditional travel services years before the CUI is deployed. Traditional Commercial Travel

Office services are labor-intensive and require extensive use of well-trained travel counselors located on military bases. Numerous companies, including Carlson, compete to provide these services. The Restructured Contract awarded millions of dollars of traditional travel services at military bases in an 11-state region to TRW without any competition by the Government.

Significantly, TRW is not capable of providing the traditional travel services required by the Restructured Contract. Therefore, it entered into a subcontract with Sato Travel to perform the traditional travel service requirements added to the Restructured Contract. Sato Travel had been providing the traditional travel services within most of the geographical area covered by DTS DTR-6 under an Army contract won after a competitive procurement in 1992. That Sato Travel contract for traditional travel services had been extended repeatedly from September 1997 until September 30, 2002, in anticipation that the CUI would be deployed and eliminate the need for traditional travel services in that region. The fees the Government agreed to pay TRW for traditional travel services under the Restructured Contract are substantially higher than the fees previously paid to Sato Travel by the Army for traditional travel services in the same geographic area, and are substantially higher than the fees paid to Carlson under its current, competitively-won traditional travel service contracts.

### C. THE RESTRUCTURING VIOLATED THE COMPETITION IN CONTRACTING ACT

The 2002 restructuring resulted in a new contract. The new contract required competitive bidding. The complete restructuring of financial risk and the revised technical requirements presented an opportunity that would have drawn a far different competitive response than the original solicitation. Indeed, there were a number of commercially available, web-based/travel management products that could compete for such a contract. This point is illustrated by the fact that while the original DTS DTR-6 Solicitation calling for a client/server-based solution and

extensive software integration services as the primary CUI attracted only two proposals, a recent General Services Administration's ("GSA") competitive procurement of a web-based, end-to-end travel management system ("eTravel Services") attracted a number of offerors, including Carlson. In August 2003, the GSA awarded the eTravel Services Contracts to Carlson and TRW (e.g., Northrop Grumman). Carlson's price under the GSA eTravel Service Contract is substantially lower than TRW's price. By modifying the DTS DTR-6 Contract beyond its original scope, the Government barred potential bidders, such as Carlson, from competing for a new contract to provide DoD with a web-based, end-to-end travel management system. This lack of competition will cost the Government tens of millions of dollars in additional costs for such a travel management system.

By modifying the DTS DTR-6 Contract beyond its original scope, the Government barred potential bidders, such as Carlson, from competing for what was essentially a new contract for traditional travel services. Instead, the Government inserted new requirements into an existing contract on a sole source basis in a move that will cost the Government millions, if not tens of millions, of additional dollars.

**D. THE GOVERNMENT BREACHES ITS CONTRACTS WITH CARLSON**

As noted, this case also involves two contracts for traditional travel services awarded to Carlson. The Army awarded these contracts to provide traditional travel services in the Mid-Atlantic and Mid-West regions to Carlson in February 2002, under a highly competitive procurement. The contracts provide that Carlson is the exclusive provider of official travel services to the Army activities within these regions for a firm period of one year, commencing October 1, 2002, with eight six-month options. The Army has exercised the first six-month option to extend all of Carlson's Army contracts through March 31, 2004.

Carlson's Army contracts state that "if DoD implements the Defense Travel System (DTS), and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options under these contracts may not be exercised." However, shortly after commencement of Carlson's Army contracts, the Government advised Carlson that it intended to transfer the business of providing traditional travel services in several states included in these two Carlson Army contracts to the Restructured DTS DTR-6 Contract. The Government has unreasonably interpreted the Carlson Army contracts to allow it to transfer the requirement to provide traditional travel services from Carlson to the Restructured DTS DTR-6 Contract notwithstanding the fact that the CUI has not been implemented, and will not be capable of providing the required travel services for several more years. Accordingly, the Government's intended transfer of regions awarded in Carlson's contracts to TRW and Sato Travel before implementation of the CUI constitutes a breach of Carlson's Army contracts. Carlson challenged that interpretation of its contractual rights, but the Contracting Officer issued an adverse decision.

Carlson alleges the following in support of its complaint for damages, declaratory, and injunctive relief against the United States of America.

**THE PARTIES**

1. Plaintiff, Carlson, is a corporation organized under the laws of the State of Delaware.

2. Defendant is the United States of America.

The cognizant Contracting Officers for the contracts at issue are:

a. Contract No. DAMT01-98-D-1005 (DTS DTR-6):

Ms. Peggy W. Butler
Contracting Officer
Information Technology, E-Commerce and

Commercial Contracting Center (ITEC4)
2461 Eisenhower Avenue
ATTN: SFCA-IT
Alexandria, Virginia 22304-1700
Facsimile: (703) 428-1632

b. Contract Nos. DAMT01-02-0027 & DAMT01-02-0028 (Army DTR-4 & Army DTR-5):

Ms. Jackie Robinson-Burnette
Contracting Officer
Department of the Army
Military Traffic Management Command
MTAQ-A Acquisition Division
200 Stovall Street, Room 12S67
Alexandria, Virginia 22332-5000
Facsimile: 703) 428-3325

## JURISDICTION

3. The United States Court of Federal Claims has jurisdiction over this action pursuant to The Tucker Act, codified at 28 U.S.C. § 1491 (2000) and the Contract Disputes Act codified at 41 U.S.C. §§ 601-613.

## STATEMENT OF FACTS

### I. DoD's Traditional Travel Management System

4. DoD employees, both civilian and military, frequently travel away from their home stations to support DoD missions. This travel, regularly conducted by educational, research, military, and political communities within DoD, is referred to as Temporary Duty ("TDY") travel. TDY travel is, essentially, business travel that is normally conducted through commercial air carriers, car rental companies, and hotels. In Fiscal Year 1993, for example, DoD personnel filed 8.2 million TDY travel vouchers.[1]

[1] Because one travel voucher is generally submitted per trip, the filing of 8.2 million TDY travel vouchers represents approximately 8.2 million trips taken by DoD personnel.

5. The DoD's traditional travel management system evolved piecemeal over a number of years. Consequently, the separate components of the travel management system were fragmented and worked in parallel rather than as an integrated system. The traveler was the only actual connection between the separate components of the system.

6. The traditional travel management system was further fragmented as a result of the fact that each branch and defense agency contracted differently for commercial travel services performed by Commercial Travel Offices. For example, the Army and the Navy contracted for travel services by branch-specific travel regions, while the Air Force acquired travel services by installation. In addition, performance work statements for Commercial Travel Offices were not standard, leading to different levels of service and preventing Commercial Travel Offices from providing services across the various DoD activities.

7. A defense travel management system essentially consists of six different elements: (1) authorization to travel, involving the identification of mission requirements, confirmation of available funds, and the authority to provide those funds; (2) travel arrangements, consisting of all aspects relating to scheduling and planning the travel and making the necessary reservations with airlines, hotels, and rental car companies; (3) execution, meaning actual travel, including meals, transportation, and lodging; (4) payment, by the traveler or the Government, for goods and services and reimbursement to the traveler and credit card company; (5) reconciliation, meaning the travel voucher process and reconciliation of payments; and (6) accountability, meaning the internal controls overseeing the entire system.

8. Under the traditional travel system, an individual or supervisor first identifies the need to travel and then prepares a document request for orders, either by typewriter or computer. The individual or supervisor then prepares a cost estimate by calling the Commercial Travel

Office, the finance office, and the destination. The individual or supervisor then determines whether funds are available and acquires signatures from the requesting official, the budget office, and the approving official. Finally, the finance office certifies the travel and administrative offices check and publish the orders. The traveler may then make lodging arrangements, air reservations, and car rental reservations through a Commercial Travel Office via transmittal of the travel authorization documents, or on his or her own. The traveler then obtains a travel advance through an ATM with a Government credit card, or through the finance office. Finally, the Commercial Travel Office procures and delivers the tickets and the traveler may leave on his or her trip.

9. The traditional system is equally intensive post-travel. First, the traveler fills out a travel voucher and attaches supporting documents. Next, the approving official reviews and signs the voucher and the traveler delivers the voucher to finance. Finance then reviews the claim, returning it to the traveler for errors. Subsequently, the accounting system updates its records and auditors review every voucher. Finally, the amount due is sent to the traveler and/or Government credit card company. If the advance results in overpayment to the traveler, the traveler must hand-carry or mail the overpayment to the finance office.

10. In the traditional travel management system, the Commercial Travel Office is responsible for significant and time-intensive duties. For example, Commercial Travel Offices provide travelers with information concerning available transportation, lodging, and rental cars. In addition, Commercial Travel Offices provide travelers with suggested itineraries, including routing, scheduling, and cost information. Moreover, Commercial Travel Offices also provide car rental services to coincide with airline arrival/departure times. Commercial Travel Offices also document and provide to the traveler the itinerary reflecting the least costly commercial

transportation fares and are responsible for indicating the appropriate non-use codes for city pair flights in accordance with Defense Travel Regulations. Further, when a traveler makes a reservation, the Commercial Travel Office must advise the traveler about any cancellation or penalty charges, or nonrefundable deposits, including time frames and other conditions. The Commercial Travel Office is also required to assist the Government in reconciling invoices received from charge card vendors. In this regard, the Commercial Travel Office must develop and provide the Government with a user's manual describing the central billing account reconciliation process. Finally, the Commercial Travel Office must produce an electronic file detailing the results of the reconciliation. Perhaps the most time-intensive task of a Commercial Travel Office, however, is communicating to the traveler the available travel arrangements consistent with Government Travel Regulations and Government rates, "should-cost" estimates and assisting the traveler in making a decision regarding what arrangements to make.

## II. REFORMING THE TRADITIONAL TRAVEL MANAGEMENT SYSTEM

11. As a result of a 1993 National Performance Review, the DoD decided that it needed to streamline the travel management system for TDY. Consequently, DoD formed a task force to study the traditional travel management system from a "clean sheet of paper" approach. The Task Force's report, issued in January of 1995, found that the traditional travel management system was "expensive, not customer-oriented, and indeed not mission-oriented." The Task Force also found that "[c]urrent Department travel practices are outmoded," and that "[t]he current travel system is not integrated." Thus, rather than recommend changes to the existing systems, the Task Force recommended the creation of a new DoD travel management system. The Task Force termed the resulting system the Defense Travel System.

12. To reform the traditional travel management systems into the Defense Travel System, the Task Force recommended that the Government adopt and standardize best business

practices from the Government and the private sector. The Task Force recommended redesigning and reengineering the travel delivery system using technology "as an enabler for simplification and better control . . . ." The goal was to automate the process so that paper travel orders, vouchers, etc., would be eliminated and the entire travel process from start to finish, or "end-to-end," could be accomplished via personal computers.

13. The transition to the Defense Travel System was to be accomplished by the development and implementation of a computer software product to be known as the CUI. The CUI was supposed to provide travelers with a seamless, paperless, integrated process that would allow travelers and commanders or supervisors to perform all necessary functions by computer. Under the CUI-enhanced Defense Travel System, a Commercial Travel Office would rarely come in contact with a traveler or supervisor. As the Task Force recommended, most of the Commercial Travel Office's tasks would be imbedded in the CUI. For example, rather than speak directly with a Commercial Travel Office representative to make travel arrangements, a traveler would use the CUI to view the different travel options (e.g., airline schedules and rates) and would select those options via computer. Essentially, the Commercial Travel Office would only receive the traveler's final itinerary or completed "passenger name record" ("PNR") via computer and purchase tickets without need for direct communication with the traveler, or to process paper travel orders. The Commercial Travel Office would also use the computer-generated PNR to perform quality control (e.g., ensure the trip and fares complied with Government Travel Regulations). Use of the CUI would significantly reduce the need for Commercial Travel Office staffing and eliminate the need for most of the costly on-site Commercial Travel Offices at military bases and facilities. Essentially, the DoD commercial travel management needs for all the bases and facilities within a multi-state region could be

serviced from a single Commercial Travel Office staffed with a few computer operators. Thus, the CUI was intended to reduce the time, effort, and cost of the Commercial Travel Office's services, as well as reduce the Government's internal administrative burden and costs.

## III. PROCURING THE NECESSARY SERVICES FOR THE DTS

14. According to the Task Force's recommendation, the Defense Travel System would ultimately be the single source of travel management services for the entire DoD. In December of 1995, the Under Secretary of Defense for Acquisition, Technology, and Logistics and the Under Secretary of Defense Comptroller/Chief Financial Officer issued a joint memorandum establishing a Program Management Office to procure the necessary services for the new Defense Travel System.

15. The Under Secretaries' Joint Memorandum envisioned a rolling start for Defense Travel System. A contract would be awarded for the development, testing and implementation of the CUI within a single travel region. Once the CUI was fully operational within that single region, all other DoD regional travel management service contracts would transition to DTS over a period of time. The original CUI contractor would be responsible for implementing the CUI software at DoD bases, installations and facilities worldwide, regardless of the identity of the Commercial Travel Office contractor for such sites. The Commercial Travel Office contractors would be competitively procured for DoD activities within a number of geographic regions and each contractor would connect to the CUI.

16. The Military Traffic Management Command, Department of the Army ("MTMC"), which procured travel management services for the Army under the traditional management system, was selected as the procuring activity for the Defense Travel System Program Management Office to competitively award a contract to develop the CUI. The United

States was divided into 10 Defense Travel Regions known as DTS DTRs.[2] DTS DTR-6 was selected as the first region to transition to the Defense Travel System. DTS DTR-6 consists of military installations in Michigan, Wisconsin, North Dakota, South Dakota, Kentucky, Missouri, Illinois, Nebraska, Minnesota, Iowa, and Indiana.

17. Traditional travel services were being provided to DoD bases, installations and facilities within most of the DTS DTR-6 Region under a previously competitively awarded MTMC contract with Sato Travel, known as Army DTR-3. The DTS DTR-6 Contract required the development, testing and implementation of the CUI, with Commercial Travel Office services only required in conjunction with the use of the CUI. Sato Travel would continue providing traditional travel services throughout most of the DTS DTR-6 Region under the Army DTR-3 Contract until the CUI was fully implemented in the region.

18. On June 13, 1997, MTMC released the DTS DTR-6 Solicitation for the procurement of the CUI for the Defense Travel System Program Management Office ("DTS PMO").

19. The DTS DTR-6 Solicitation made it clear that DoD required the prime contractor for the procurement to be a computer software integrator with extensive experience and the capability to develop, implement, and integrate a CUI, which included creating interfaces with numerous other DoD software products and networks. The DTS DTR-6 Contractor also had to implement, maintain and upgrade the CUI computer software on a worldwide basis. The limited

---

[2] As noted above, under the traditional travel management system, the Army had also divided the country into Defense Travel Regions. The Army's DTRs and the DTS DTRs, however, are different. For example, while DTS DTR-6 included military installations in Michigan, Wisconsin, North Dakota, South Dakota, Kentucky, Missouri, Illinois, Nebraska, Minnesota, Iowa, and Indiana, the Army's system includes eight of those states in DTR-3. As is explained below, certain contracts issued under the Army's DTR system are relevant to Carlson's claim. Therefore, to correctly delineate the appropriate DTR, DTRs used by the Army under the traditional travel management system will be referred to as Army DTR _, while DTRs defined for the DoD-wide Defense Travel System will be referred to as DTS DTR _.

Commercial Travel Office services that would be required after the development and implementation of the CUI in the DTS DTR-6 Region would be performed by a subcontractor.

20. The Solicitation contemplated award of a fixed-price requirements contract for a base period of five years, with three one-year options for: (1) a new travel management software system, i.e., the CUI; (2) operation and maintenance of the CUI; and (3) DTS travel management services using the Defense Travel System CUI.

The DTS Solicitation and original DTS DTR-6 Contract required the contractor to absorb all development and testing costs. The Government was not obligated to pay any development or testing costs incurred by the contractor. The contractor could not earn any payments unless and until the CUI was thoroughly tested and operationally deployed. Even then the payments made to the contractor were limited to a fixed deployment fee per connected Government traveler when that Government traveler is able to use a fully functional CUI. There was also fixed maintenance and operational fee that was paid only upon an actual travel transaction using the CUI.

21. The DTS DTR-6 Solicitation required the contractor to develop a CUI using Commercial-Off-the-Shelf products and commence operational deployment at the first DoD site for use by Government travelers within 120 days of contract award. The contractor was required to complete operational deployment and integration at approximately 11,000 DoD sites worldwide by September 2001.

22. The Defense Travel System Technical Requirements necessitated that the CUI be client/server-based software which had to be loaded onto each individual PC or facility server, along with a PKI reader. Access to the DTS CUI could also be made through the DoD's Unclassified Internet Protocol Router Network ("NIPRNET"). However, access by DoD

travelers to the CUI through normal, worldwide web protocols was not possible at the time of contract award or within the scheduled deployment required by the DTS DTR-6 Solicitation. There were no web-based, COTS products that provided end-to-end travel services in 1998. Moreover, in 1998 approximately one half of DoD travelers did not have access to the Internet.

23. The Solicitation required offerors to interface or integrate the CUI with local area computer networks at each military activity and also propose electronic interfaces to external DoD automated systems based on required interface specifications. For example, offerors were required to propose a system that would process ANSI X12 electronic data interchange transactions through the DoD Electronic Data Interchange Infrastructure.

24. The Solicitation also required offerors to propose a system that would satisfy, at a minimum, a Controlled Access Protection (C2) level of security as defined in DoD 5200.28-STD, Department of Defense Trusted Computer System Evaluation Criteria. At the time of the Solicitation, no completely web-based solution could be designed to meet this level of security.

25. TRW's proposal identified other required functions which could not be accessed via the Web. For example, the functions necessary to administer electronic document processing and the integration of the Commercial Travel Office into the pre-trip planning process by automating travel accommodations from original trip requests could only be provided via a client/server or direct connection to the host computer.

26. The Solicitation and original DTS DTR-6 Contract provided that an internet web-site could be used by the contractor to provide general information on the use of the CUI, essentially an electronic "help desk." TRW's proposal indicated that the web could eventually be an alternative source for other required CUI functions.

27. The DTS DTR-6 Solicitation did not include traditional travel services, did not require offerors to propose traditional travel services, and did not provide CLINs to price traditional travel services. Instead, the Solicitation required offerors to propose travel services using the CUI. TRW's proposal indicated that American Express had been selected as a subcontractor to provide Commercial Travel Office services in the DTS DTR-6 Region from centralized facilities after the development and implementation of the CUI.

28. In Federal Court litigation between TRW and its former travel services subcontractor, American Express, Government and TRW personnel have admitted and testified in court proceedings that requirements for traditional travel services were not included in the DTS DTR-6 Solicitation or in TRW's original DTS DTR-6 Contract.

29. MTMC received only two offers in response to the DTS DTR-6 Solicitation by the closing time. One offer was from BDM International, Inc.[3] The other offer was from Electronic Data Systems Corporation ("EDS"). No traditional travel service contractors submitted offers. On May 7, 1998, MTMC awarded Contract No. DAMT01-98-D-1005 ("DTS DTR-6 Contract") to TRW. The contract was a firm-fixed-price, performance-based contract for approximately $263,700,000. Subsequently, EDS filed a Protest with the GAO. The GAO denied EDS's Protest on September 3, 1998.

30. Because the CUI would not be installed in DTS DTR-6 until late 1998, at the earliest, and because the remaining DTS DTRs would be integrated on a rolling basis, the separate branches of DoD continued to competitively procure traditional travel management

[3] Immediately prior to submitting its offer, BDM was purchased by TRW, Inc. ("TRW"). On December 11, 2002, TRW was acquired by Northrop Grumman Corporation ("Northrop"). Because TRW was the contractor during a majority of the performance of the contract and, thus, its name appears on the contract documents, the complaint refers to the contractor performing the DTS DTR-6 Contract as TRW.

services from Commercial Travel Offices and extend existing contracts for traditional travel services. DoD intended that these contracts would phase into the DTS as the CUI was implemented across the country.

31. MTMC had awarded a five year traditional travel services contract to Sato Travel for Army DTR-3 Region on January 6, 1992. Army DTR-3 included Army, Air Force, and other DoD locations in the States of Illinois, Indiana, Iowa, Michigan, Minnesota, North Dakota, South Dakota, and Wisconsin. Because these installations were also included in DTS DTR-6, the Army DTR-3 Contract would have been the first to transition to the Defense Travel System upon completion of the CUI development, testing and operational deployment. On July 12, 1997, MTMC issued the first of numerous sole source extensions to the period of performance for Sato Travel's Army DTR-3 traditional travel service contract. The justification given for such sole source extensions of Sato Travel's Army DTR-3 Contract was that the need for traditional travel services in this region would terminate when the CUI was developed and operationally deployed; therefore, it would be impractical to competitively procure a replacement for the Army DTR-3 Contract for the then anticipated short time required to develop and implement a CUI.

32. Carlson competitively won one Army traditional regional travel service contact in 1992 and four (4) other Army traditional regional travel service contracts in 1994. The five-year contract periods for each of these contracts was extended several times in six-month increments in anticipation of the development and implementation of the CUI. In early 2001, given the failure to develop an operational DTS CUI, the Army determined to recompete all five of the Carlson traditional travel service contracts and issued a new Solicitation. However, at the same time, based upon overly optimistic predictions by the DTS PMO on the development and

operational deployment of the CUI within the DTS DTR-6 Region, the Army continued to extend Sato Travel's Army DTR-3 Contract for traditional travel services without competition.

33. In 2001, responsibility for the procurement activity to support the DTS PMO was transferred from MTMC to what is now known as the Department of Army Information Technology, E-Commerce and Commercial Contracting Center ("ITEC 4").

## IV. PERFORMANCE PROBLEMS PLAGUE THE DTS DTR-6 CONTRACT

34. Although the DTS DTR-6 Contract established an aggressive timeline, numerous delays and substantial cost overruns plagued performance. According to a report on the management of the DTS, issued by the Inspector General ("IG") of the DoD on July 1, 2002, the Defense Travel System was then projected to cost approximately $491,900,000, or 53% more than the original contract cost of $263,000,000, and would not be fully deployed until Fiscal Year 2006, approximately four years behind schedule. The report found that the DTS "was being substantially developed without the requisite requirements, cost, performance, and schedule documents and analyses needed as the foundation for assessing the effectiveness of the system and its return on investment."

35. In addition, the DoD IG Report found that although the procurement had initially envisioned a commercial-off-the-shelf computer software product, "since the effective date of the contract (September 1998), they have had to do extensive developmental work." Moreover, the report indicates that the Defense Travel System Program Management Office expected further development costs of approximately $185,500,000 from Fiscal Year 2002 through 2007 "to complete development solutions to integrate the [CUI] and the DoD accounting and disbursing systems, and to provide required engineering support to implement the system."

36. The DoD IG Report found that the main cause of the problems encountered in the performance of the DTS DTR-6 Contract was the fact that, although the procurement was for

information technology, DoD had managed the procurement as one for travel services. A major oversight identified in the DTS was that a "Mission Need Statement" ("MNS") and an "Operational Requirements Document" ("ORD") were never prepared. Thus, the IG Report suggested that DTS should not be deployed to any site until it was "designated a major automated information system, all acquisition documents have been completed, a program review has been conducted by the Overarching Integrated Product Team, and the Milestone Decision Authority has approved the system to proceed."

37. In December 2002, the DoD's Program Analysis and Evaluation ("PA&E") office recommended that the DTS program be terminated, and that DoD should consider alternative commercial travel management products. The DoD PA&E Report stated that the custom-designed DTS CUI may no longer be needed. "An end-to-end system to improve operations for travelers and supervisors potentially could be provided by the commercial market faster, more efficiently and cheaper than will be provided from a [DOD] developed solution."

38. By the end of 2001, TRW had incurred more than $43,000,000 in costs attempting to develop and test a CUI. However, the CUI was still not satisfactory for operational deployment.

## V. DTS DTR-6 CONTRACT COMPLETELY RESTRUCTURED BY CARDINAL CHANGES

39. In early 2002, shortly before the DoD IG's Report was issued, TRW and the DoD entered into bilateral Modifications P00027, P00028, and P00029, completely restructuring the DTS DTR-6 Contract.

40. The Restructured DTS DTR-6 Contract deleted and completely revised the fundamental contract provisions. Section B (Pricing), Section C (Performance Work Statement), G (Contract Administration Data) and H (Special Contract Provisions) were deleted in entirety

and replaced, while Section J (Technical Attachments) was significantly modified. On April 4, 2002, the Contracting Officer sent an email to DoD personnel advising "my CAC-W team along with the DTS PMO have been involved in the total restructure of the subject contract [DTS DTR-6] since July 01" and that "the final phase of the restructure was completed on 29 March 02." On April 5, 2002, the Contracting Officer forwarded copies of Contract Modifications P00025 and P00027 to DoD personnel with the advice that "these modifications totally replace the original requirements, prices and terms and conditions, with a new baseline."

41. The Restructured Contract required the Government to pay more than $43,000,000 to reimburse TRW for costs incurred between May 1998 and January 2002, in efforts to develop and test the CUI. The Restructured Contract required the Government to pay TRW fixed monthly fees for the next five years to develop, test, deploy, and maintain the CUI that totaled more than $142,000,000. The Restructured Contract included several additional cost-reimbursable CLINs and provided for payment of transaction fees for each travel transaction actually performed using the CUI. Essentially, under the Restructured Contract, the Government, not TRW, assumed the primary risk and cost of developing, testing, deploying, and maintaining the CUI. Under the Restructured Contract, TRW would be paid "up front," so that TRW's revenue was no longer contingent upon the degree and timing of actual use by Government travelers.

42. A business clearance memorandum prepared by the Government during negotiation of the Restructured Contract recommended that TRW's labor rates for the cost reimbursable CLINs should be reduced "due to the sole source environment; the size of the modification (and therefore the size of the award) and the reduced risk TRW is receiving by having the majority of the work up front instead of the out years as originally planned."

43. During the contract restructuring negotiations, TRW offered to permit the Government to use just the Travel Manager software on a limited basis "assuming the current transaction CLIN on the DTS Contract is restructured so that TRW's revenue stream is not contingent on the selling of transactions." Paying TRW "up front," rather than making its revenue contingent on actual utilization by Government travelers to arrange trips (e.g., a "transaction") represented a fundamental or "cardinal" change in the contract requirements.

44. The original DTS DTR-6 Contract required the contractor to commence deployment of the CUI to the first of 11,000 DoD military bases, installations or facilities worldwide within 120 days of contract award (May 1998) and complete deployment by September 2001. The Restructured Contract reduced the deployment requirement from 11,000 sites to only 250 major DoD sites and extended the deployment schedule through September 2006. Thus, the required contract performance schedule was extended by more than four years and TRW was relieved of any liability for failing to meet the original DTS DTR-6 Contract deployment requirements.

45. The DTS Solicitation and original DTS DTR-6 Contract required that the CUI must be based upon Commercial-Off-the-Shelf ("COTS") products. The Restructured Contract deleted the COTS requirement and provided that the Government would now fund tens of millions of dollars in development costs over many years to create a new web-based system to satisfy the DTS CUI requirements.

46. The DTS Solicitation and original DTS DTR-6 Contract required that the CUI would be integrated via client/server interaction, and accessible via the NIPRNET. The Restructured Contract deleted those onerous technical requirements and provided that "Authorized users shall only be able to access DTS using a certified version of either the

Netscape or Microsoft Internet explorer web browser." In addition, the Restructured Contract required that the document preparation, budget, and route and review module of DTS, previously accessible only through a client/server or direct link, must also be accessible via a web browser.

47. Thus, the Restructured Contract altered the fundamental contract requirements from that of computer software systems integration, requiring client-side installation and integration of computer software on tens of thousands of individual PCs and interface with thousands of DoD local area network computer systems, to that of a true web-based application readily usable by any PC with access to the internet. It was primarily the original DTS DTR-6 Contract requirements for a client/server-based solution using COTS software and extensive software integration services that caused TRW (and now the Government) to incur over $43 million in unsuccessful developmental and testing efforts from 1998 through 2001. This modification to the DTS DTR-6 Contract represented a cardinal change to produce a new product with significantly different technology and eliminated a significant technical burden on the contractor.

48. When MTMC issued the 1997 Solicitation for a DTS CUI based on COTS computer software, client/server applications, and extensive computer software interface/integration efforts at thousands of military activities, it received only two offers. When GSA issued Solicitation No. FBGT-CD-030001-N in February 2003 for a web-based travel management system, it received a number of qualified offers. This confirmed the December 2002 DoD Program Analysis and Evaluation Report, which specifically noted that commercially available web-based travel products could perform the requirements that TRW had been unable to perform under the DTS DTR-6 Contract.

49. Carlson did not submit a proposal in response to the 1997 DTS DTR-6 Solicitation for a number of reasons. The Solicitation's technical requirements for software integration at thousands of DoD facilities, coupled with an extremely aggressive deployment schedule, and the requirement that the contractor absorb all development and testing costs combined to make the contract very high risk. The DTS PMO estimated that under the original DTS DTR-6 Contract, at least 50% of the work required was software integration, 25% for developing the required functionality of the CUI, and 25% to connect DoD users. The Solicitation also mandated use of COTS software and TRW had secured the exclusive right to offer the leading COTS computer software for Government travel services at the time, known as Travel Manager.

50. By the time the DTS DTR-6 Contract was restructured in 2002, Carlson had developed a web-based, end-to-end travel management system for Government travelers. Carlson had a provisional patent application pending for its web-based product at the time of the DTS DTR-6 Contract restructuring.

51. If the DTS PMO had issued a competitive solicitation for procurement of a web-based, end-to-end travel management system for DoD travelers instead of restructuring the DTS DTR-6 Contract, Carlson would have submitted a compliant proposal. The competitive status of Carlson's web-based travel management system is demonstrated by the fact that in the GSA competitive procurement for such a system, Carlson was awarded a contract, as well as TRW (e.g., Northrop Grumman) and Electronic Data Systems ("EDS"). Moreover, Carlson was substantially lower in price than TRW for use of a web-based, end-to-end travel management system. TRW has been quoted as publicly stating that it offered the DTS CUI web-based product in response to GSA's competitive solicitation. A GSA spokeswoman has been quoted as

publicly stating that awards were made to both Carlson and TRW "because the two proposals offered were so similar that it would have been very difficult to chose one over the other…" Under the GSA Contract for eTravel services, Carlson and TRW, along with EDS, will continue to compete against each other for the award of task orders by individual Federal Agencies.

52. Carlson, EDS and most likely the other offerors responding to the GSA Solicitation for a web-based, end-to-end travel management system, would have responded to a DoD competitive solicitation, if it had been issued at the time the DTS DTR-6 Contract was restructured. These submissions would have been made even though TRW was provided a significant, if not unfair, competitive advantage in the GSA competition by the fact that DOD had paid well in excess of $43 million dollars to TRW for the development efforts resulting in the web-based, end-to-end travel management system offered to GSA. The other offerors responding to the GSA competition had to fund their own developmental costs.

## VI. THE RESTRUCTURED DTS DTR-6 CONTRACT ADDS EXTENSIVE TRADITIONAL TRAVEL SERVICE REQUIREMENTS

53. The DTS Solicitation and original DTS DTR-6 Contract awarded to TRW in 1998 only required the contractor to perform travel services through the CUI-enhanced Defense Travel System. After the 1998 award to TRW, DoD continued to procure traditional travel services for most of the military activities located in the DTS DTR-6 Region from Sato Travel under the Army DTR-3 Contract. The Army extended the Sato Travel DTR-3 Contract through October 1, 2002, on a sole source basis for the express purpose of providing traditional travel services until the CUI is developed and implemented. The determinations issued by the Army to justify the repeated sole source extensions of Sato Travel's DTR-3 Contract make it clear that traditional travel services were not included in the original DTS DTR-6 Contract.

54. In the summer/fall of 2001, the DTS PMO prepared a Statement of Work for the provision of traditional travel services under the DTS DTR-6 Contract, in addition to the CUI assisted travel services, and directed TRW to negotiate the changed requirements with TRW's subcontractor, American Express. On February 22, 2002, the Contracting Officer sent a letter to TRW complaining about TRW's delay in responding to a request to provide traditional travel services for the DTR-6 Region and stated that "in order to ensure the continuation of CTO services at their respective sites [within DTR-6], current CTO support contracts are in the process of being extended." On March 15, 2002, the Contracting Officer sent TRW "the new DTS PMO requirements for travel services support in DTR6" and instructed TRW to procure a subcontractor to perform the new traditional travel service requirements. In April 2002, Modification P000028 to the DTS DTR-6 Contract added traditional travel services to TRW's contract five years after the DTS DTR-6 Solicitation had been issued.

55. Contract Modification P000029 was executed on May 23, 2002, to provide new pricing CLINs for the traditional travel services and revised pricing CLINs for CUI-assisted travel services. In addition to paying a fixed fee per transaction to the CTO subcontractor, Contract Modification P000029 also provided that TRW would receive a 5% fee on top of the CTO subcontractor transaction fee for each traditional or CUI-assisted travel transaction.

56. The Government did not prepare the justifications for entering into a sole source contract with TRW for traditional travel services required by the Federal Acquisition Regulations Subpart 6.303, nor did it secure the necessary approvals required by Subpart 6.304.

57. After lengthy negotiations, TRW and American Express were unable to agree upon prices for providing traditional travel services without using the CUI that were satisfactory to the Government. With the approval of the Government, TRW terminated its subcontract with

American Express for CUI-assisted travel services, and negotiated a subcontract with Sato Travel to provide traditional travel services throughout the DTR-6 geographic region, without using the CUI. Sato Travel also agreed to provide commercial travel services using the CUI, if and when that system was operationally deployed.

58. On July 29, 2002, the Contracting Officer sent a letter to TRW referring to on-going negotiations between TRW and potential CTO subcontractors. TRW had asked whether the Government objected to having two different subcontractors, one to perform travel services using the DTS CUI, and the second to provide traditional travel services. The Contracting Officer stated "if TRW is unable to negotiate a fair and reasonable price for both types of service, the **Government suggest that TRW only provide travel management services via DTS as originally contracted."** (Emphasis added.)

59. At the time the traditional travel service requirements were added to the Restructured DTR DTS-6 Contract, the Government knew it would be another two or more years before a fully functional CUI could be operationally deployed throughout the DTR-6 Region.

60. The difference between Commercial Travel Office services under the traditional travel management system and utilizing a fully functional CUI is significant. As described above, Commercial Travel Office services under the traditional travel management system are much more labor-intensive than a CUI, provided the CUI could be developed and operationally deployed in accordance with the original DTS DTR-6 Contract requirements. Indeed, a fully automated, end-to-end travel management system could save the Government $10 to $20 in costs per individual trip or transaction, as compared to the internal and external costs of traditional Commercial Travel Office services.

61. Because traditional travel services were added to TRW's Contract for DTS DTR-6, and Sato Travel was added as the subcontractor to provide such services, the Army no longer required travel services through Sato Travel's Army DTR-3 Contract. Thus, Sato Travel's Army DTR-3 Contract, which had been openly competed originally, and subsequently extended numerous times, was allowed to expire on October 1, 2002. The traditional travel transaction fees, which the DTS PMO agreed to add to the DTS DTR-6 Contract, were substantially higher than the traditional travel transaction fees being paid to Sato Travel under the Army DTR-3 Contract for the same work, and substantially higher than the fees paid for traditional travel management service contracts awarded in 2002 by the Army and other DoD activities under competitive procurements.

62. Carlson has been one of the largest DoD travel management service contractors for at least a decade. Carlson competed against Sato Travel for five large Army regional travel service contracts and won with lower prices in February 2002. Carlson's transaction fees on those competitively-won Army travel contracts are substantially lower than the fees the DTS PMO agreed to pay Sato Travel and TRW for traditional travel services under the Restructured DTS DTR-6 Contract. If the traditional travel services for DTR-6 had been competitively procured in 2002, Carlson would have submitted a proposal and probably would have submitted the best value proposal.

## VII. CARLSON'S TRAVEL SERVICES CONTRACT AND THE ARMY'S MISINTERPRETATION

63. Throughout the performance of the DTS DTR-6 Contract, the Army, Navy, Air Force, and Marines awarded traditional travel services for other regions to other contractors under competitive procurements. On February 27, 2002, following full and open competition, MTMC awarded contracts to Carlson for traditional travel services for Army DTRs 1, 2, 4, 5 and the National Capital Region. Army DTR-1 is comprised of Arizona, California, Colorado,

Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, and Wyoming. Army DTR-2 is comprised of Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, Puerto Rico, and the Virgin Islands. Army DTR-4 is comprised of Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, Virginia, and West Virginia. Army DTR-5 is comprised of Arkansas, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma, and Texas. The National Capital Region is comprised of the Washington, D.C. Metropolitan Area, including the Pentagon, Fort Belvoir and Fort Myers.

64. Carlson's five new Army contracts became effective on October 1, 2002, with a firm base period of twelve (12) months and a series of eight (8) six-month option periods, for a total contract period of five (5) years. Each contract provided: "The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract."

65. Each of Carlson's five new Army contracts also provided: "At a future date a DoD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DoD travel services contract is awarded all DoD sites will transition in accordance with the implementation dates to the DoD travel services contract."

66. Each of Carlson's five new Army contracts provided that the Army or other DoD agencies could exercise the options to extend the contract and stated: "However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation." At the time the

contracts were awarded to Carlson it was understood by all parties that "DoD implements the Defense Travel System (DTS)" meant the implementation of a fully functional DTS CUI to perform travel services.

67. Each of Carlson's five new Army contracts stated that "due to projected base closures and realignments" the Government cannot forecast how the revenue for official travel will be affected. The Carlson Army contracts also stated: "In addition, Offerors are hereby notified that upon the implementation of the Defense Travel Region 6 (DTR-6) Contract the following locations (Ft. Campbell, KY, Missouri and Nebraska) will be deleted from the respective regions and incorporated into the DTR 6 contract."

68. By letter dated November 8, 2002, MTMC informed Carlson that the DTS DTR-6 Contract would be "implemented" in the States of Kentucky, Missouri, and Nebraska effective February 24, 2003 and that, consequently, those states, in their entirety, would be removed from the Carlson Army contracts that had commenced on October 1, 2002.

69. By letter dated November 26, 2002, Carlson wrote to MTMC requesting that it rescind the order to transfer the DoD sites in these states to the DTS DTR-6 Contract. Carlson's letter stated that it had learned that the CUI being developed under the DTS DTR-6 Contract would <u>not</u> be implemented by February 2003 in any region, and that no transfer of sites could take place unless and until the CUI was fully implemented. Carlson argued that it would be improper and a violation of the Competition in Contracting Act to include traditional travel services in the DTS DTR-6 Contract and transfer the work won by Carlson in competitive procurements. Carlson argued that, in any event, no work could be transferred to the DTS DTR-6 Contract during the first contract year of Carlson's Army contracts. Moreover, Carlson explained to MTMC that, after the CUI was implemented, its contract only required it to

relinquish to the DTS DTR-6 Contract the requirements from Fort Campbell, Kentucky, not the entire State of Kentucky.

70. In a letter dated January 10, 2003, MTMC's Contracting Officer denied Carlson's request that MTMC rescind the November 8, 2002 order to transfer the work to the DTS DTR-6 Contract. MTMC contended that the DTS DTR-6 Contract would be implemented in Kentucky, Missouri and Nebraska by February 24, 2003. MTMC also rejected Carlson's interpretation of its Army contracts and asserted that the contracts required Carlson to give up the Army activities in all three states, including the entire State of Kentucky, in addition to Fort Campbell, Kentucky.

71. In conversations with the MTMC officials during January 2003, Carlson took the position that any attempt to transfer these states to TRW/Sato Travel in February 2003 would compel immediate legal action by Carlson. On January 31, 2003, MTMC's Contracting Officer notified Carlson that the order to transfer the commercial travel services for the States of Kentucky, Missouri, and Nebraska on February 24, 2003, was rescinded and that Carlson could continue to perform such work through September 30, 2003 (the last day of the base period in Carlson's Army contracts). MTMC continued to assert, however, that the entire State of Kentucky would transfer to the DTS DTR-6 Contract, along with Missouri and Nebraska, and implied that such a transfer would occur on October 1, 2003.

72. On May 15, 2003, the MTMC Contracting Officer notified Carlson that the Government was removing the requirements to provide traditional travel services to all sites in Missouri, Nebraska, and Kentucky from Carlson's Army contracts (and presumably transferring these requirements to the DTS DTR-6 Contract), effective September 30, 2003.

73. The Government exercised its options to extend all five of Carlson's Army contracts from October 1, 2003 until April 1, 2004. In response to Carlson's Motion for Preliminary Injunction, the Government agreed that it will not transfer the travel requirements for the three states to the Restructured DTS DTR-6 Contract being performed by TRW and Sato Travel pending the outcome of this litigation.

**COUNT I**

**(Violation of the Competition in Contracting Act and Federal Acquisition Regulations)**

74. Carlson incorporates each of the allegations in paragraphs 1 through 73 as if fully set forth herein.

75. The Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304, 41 U.S.C. § 253, requires that Government agencies conducting procurements must "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation . . . ." 10 U.S.C. § 2304(a)(1)(A). The Federal Acquisition Regulations ("FAR"), 48 C.F.R. Chapter 1, Part 6, prescribes policies and procedures to promote full and open competition in the acquisition process and to provide for full and open competition.

76. The Government may not issue modifications beyond the scope of an existing contract because such actions contravene the CICA. The FAR prohibits, except in very limited circumstances not applicable to the DTS DTR-6 Contract, modifications to a contract that were not evaluated as part of the initial competition. 48 C.F.R. Chapter 1, Part 6.001. Under CICA and FAR, Government Contracting Officers have an affirmative duty to promote and provide for full and open competition. 48 C.F.R. Chapter 1, Part 6.101.

77. Certain modifications outside the scope of an original competed contract, such as the Restructured DTS DTR-6 Contract, fall under the requirements of CICA and FAR and must be competed to prevent the Government from using an established contract to circumvent the requirements of full and open competition.

78. The 1997 Solicitation for the DTS DTR-6 required offerors to propose a CUI based on COTS computer software and a client/server system requiring significant systems integration at each of the 11,000 DoD bases, installations and facilities worldwide. Offerors were required to demonstrate substantial capability and experience in performing such software integration contracts. Thus, the procurement was essentially limited to systems integrators. Operational deployment of a fully functional CUI was required to commence 120 days after contract award and be completed at all DoD sites worldwide no later than September 30 2001.

79. The 1997 DTS Solicitation required the contractor to absorb all development and testing costs. Moreover, the contractor's revenue stream was entirely contingent upon the actual utilization of the CUI by Government travelers to perform official travel transactions. Thus the contractor assumed all risk for delays in the development, testing and operational deployment of the CUI. The contractor also assume the risk of acceptance and actual utilization by Government travelers after operational deployment.

80. In February/March 2002, the DTS DTR-6 Contract was completely restructured to have the Government assume all costs and risks for development, pay the contractor up front for development and testing efforts, rather than make the contractor's revenue stream contingent on operational deployment and actual utilization by Government travelers. The operational deployment schedule was extended at least four years without penalty to the contractor. The technical requirements were changed to require only a web-based CUI, which substantially

alleviated the majority of software integration requirements. The Restructured DTS DTR-6 Contract also added extensive and extended requirements for the provision of traditional travel services without the assistance of the CUI.

81. The Government's 2002 Restructure of TRW's DTS DTR-6 Contract substantially exceeded the scope of the original Solicitation. The pricing structure, risk allocation, deployment schedule, the use of only a web-based end-to-end travel system, the requirement for extensive traditional travel services now required by the Restructured DTS DTR-6 Contract were not contemplated by the original Solicitation. The Government cannot now incorporate such restructured contract rights, obligations and technical requirements into the existing contract. CICA and FAR require that the Government engage in a full and open competition for a web-based solution under the restructured pricing and risk allocation scheme to accomplish the objectives of the Defense Travel System.

82. DoD cannot prevent offerors from competing for what is essentially a new contract. Such a competition will garner substantial interest, much more than the original 1997 procurement, and will save the Government tens of millions of dollars. Carlson's contract awards under GSA's eTravel Solicitation and multiple Army travel service contracts demonstrate that it can provide both comparable web-based, end-to-end and traditional travel services at substantially less cost than being charged the Government under the Restructured DTS DTR-6 Contract.

83. As a provider of web-based end-to-end travel management solutions, and traditional travel services Carlson is an interested party because it is a potential bidder for the work described in the Restructured DTS DTR-6 Contract.

84. Sato Travel had been providing traditional travel services throughout most of the DTS DTR-6 Region from 1992 until October 2002, under an Army DTR-3 Contract that had originally been competitively procured. In 2001-2002, the CUI was not anticipated to be ready for operational deployment throughout the DTR-6 Region for several more years. Therefore, Sato Travel's DTR-3 Contract should have been competitively reprocured at the same time Carlson's five similar Army regional travel contracts were recompeted. Restructuring the DTS DTR-6 Contract to include traditional travel services, and adding Sato Travel to the DTS DTR-6 Contract as a subcontractor to perform those traditional travel services, is essentially a sole source procurement in violation of CICA and the FAR.

85. As a provider of traditional travel services, Carlson is an interested party because it was a potential bidder on the traditional travel services incorporated into the DTS DTR-6 Contract. Moreover, during 2002, Carlson won five large Army regional travel management contracts in head-to-head competition against Sato Travel. The competition for Army regional travel management contracts won by Carlson in head-to-head competition with Sato Travel included DoD sites in three states, Missouri, Nebraska, and Kentucky, included in the DTS DTR-6 Contract. Carlson's prices in the competitively-won Army contracts to provide traditional travel services to sites in Missouri, Nebraska, and Kentucky are substantially lower than Sato Travel's prices to provide traditional travel services under the DTS DTR-6 Contract. Therefore, it is probable that Carlson would win a competition against Sato Travel to provide traditional travel services throughout the DTS DTR-6 Region.

86. By restructuring the DTS DTR-6 Contract to change the pricing, risk allocation, deployment schedule, technical requirements to include only a web-based CUI and add traditional travel services, the Government substantially exceeded the scope of the original

Solicitation. DoD violated the CICA and the Federal Acquisition Regulations by precluding potential bidders, such as Carlson, from bidding on what was essentially a new and different contract.

**COUNT II**

**(Request for Preliminary/Permanent Injunction in Relation to Count I)**

87. Carlson incorporates each of the allegations in paragraphs 1 through 86 as if fully set forth herein.

88. Carlson's allegations are well supported in law and fact; Carlson is therefore likely to succeed on the merits of its Protest and request for declaratory judgment on contractual rights and obligations.

89. Carlson will suffer specific irreparable injury if the performance of TRW's DTS DTR-6 Contract is not enjoined because of its lost opportunity to fairly compete for, and perform work under, the contract and the loss of profits generated by the contract.

90. The public interest will be best served by the immense savings that result from granting Carlson its requested relief. The transaction fees for traditional travel services that the Government agreed to pay TRW and Sato Travel under the non-competitive modification of the DTS DTR-6 Contract exceed the transaction fees for traditional travel services being paid to Carlson under the competitively procured contracts by many millions of dollars annually. The DTS DTR-6 Contract modification obligates the Government to pay TRW hundreds of millions of dollars to develop a web-based travel management system that can be procured competitively from Carlson or EDS under the GSA eTravel Contract at lower transaction fees and without the Governing incurring further costs of development.

91. Granting a permanent injunction will also serve the public interest by insuring that the DoD's procurement of travel services for the Defense Travel System is conducted in

accordance with all Federal procurement laws, and that all potential bidders have a fair and equal opportunity to compete for and perform work required by the Government outside the scope of the 1997 Solicitation.

92. There is no harm to the Government or third parties as a result of granting Carlson its requested relief. The DoD's improper conduct in the award of this contract has the adverse effect of undermining the integrity of the entire Federal procurement process. Neither TRW nor Sato Travel is entitled to continue receiving the exorbitant fees being paid as a result of the improper sole source restructuring of the DTS DTR-6 Contract. Granting Carlson's prayed for relief will preserve public confidence and competition in the Federal procurement process.

## COUNT III

### (Request for Preliminary/Permanent Injunction and Declaratory Judgment Pursuant to 28 U.S.C. 1491(a)(2))

93. Carlson incorporates each of the allegations in paragraphs 1 through 92 as if fully set forth herein.

94. 28 U.S.C. 1491 (a) (2) grants the Court of Federal Claims, in any case within its jurisdiction, "the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." In addition to the jurisdiction to render judgment upon any claim founded upon an express or implied contract under 28 U.S.C. 1491 (a) (1), the Court of Federal Claims shall also have jurisdiction to "render judgment upon any [Contract Disputes Act] claim . . . including . . . nonmonetary disputes on which a decision of the contracting officer has been issued . . . ." 28 U.S.C. 1491(a)(2).

95. By letter dated November 8, 2002, the MTMC Contracting Officer informed Carlson that its right to provide traditional travel services to Army and other DoD agencies located in the States of Kentucky, Missouri, and Nebraska would be removed from Carlson's

Army contracts and transferred to the DTS DTR-6 Contract to be performed by TRW and Sato Travel, effective February 24, 2003.

96. By letter dated November 26, 2002, Carlson wrote to the MTMC Contracting Officer arguing that it was a violation of CICA and FAR and a breach of Carlson's contracts to transfer this work to the DTS DTR-6 Contract and requested that MTMC rescind the order. Carlson's letter constituted a demand for an interpretation of its contract terms, the applicable law and specifically asserted entitlement to the declaratory relief it sought.

97. In a letter dated January 10, 2003, MTMC's Contracting Officer denied Carlson's request and rejected Carlson's interpretation of its contract terms and applicable law. The MTMC Contracting Officer refused to rescind the November 8, 2002 order and insisted that Carlson was contractually obligated to transfer to the DTS DTR-6 Contract the right to provide traditional travel services to Army and other agencies in Kentucky, Missouri, and Nebraska by February 24, 2003. Thus, MTMC's letter constituted a final decision from the Contracting Officer denying Carlson's interpretation of its contractual rights and obligations under applicable law and regulations.

98. On January 31, 2003, the MTMC Contracting Officer rescinded the order to transfer the travel business for Missouri, Nebraska and Kentucky effective February 24, 2003, but only agreed that Carlson could continue performing such traditional travel services in those states through September 30, 2003. The MTMC Contracting Officer did not rescind her adverse determination in the dispute with Carlson's interpretation of its contractual rights under the Army Contracts and applicable law.

99. On May 15, 2003, the MTMC Contracting Officer confirmed the adverse decision on the interpretation of Carlson's contracts by notifying Carlson that, effective September 30,

2003, the DoD sites in Missouri, Nebraska, and Kentucky would be removed from Carlson's contracts. Upon information and belief, it was the Government's intention to have Sato Travel provide traditional travel services to the DoD sites in Missouri, Nebraska, Kentucky under the modified DTS DTR-6 Contract commencing on October 1, 2003, in violation of Carlson's contractual rights.

100. MTMC's interpretation of Carlson's rights to retain exclusive performance of travel services under the Army contracts in the three states until the CUI required by the DTS DTR-6 Contract is fully operational and deployed at issue, is incorrect as demonstrated by the plain language of the contracts. Moreover, at the time Carlson's Army contracts were competed and awarded, the DTS DTR-6 Contract had not been amended to include a requirement for traditional travel services. Applicable law and regulation prohibits the Government from transferring work awarded to Carlson under competitive procurements to a contract that has been modified without competition.

101. Transferring the requirement to provide traditional travel services to DoD sites contained in Carlson's contracts to the DTS DTR-6 Contract constitutes a material breach of Carlson's contracts, and would result in loss of key personnel, disruption of operations, and other substantial damages that may not be adequately compensated by monetary damages.

102. Carlson's allegations are well supported in law and fact; Carlson is likely to succeed on the merits of its appeal and request for declaratory judgment on contractual rights and obligations.

103. Carlson will be irreparably harmed by the transfer of the requirements to provide traditional travel services in Missouri, Nebraska, and Kentucky at any time during the performance period of Carlson's Army contracts, including option periods. The public interest

will be best served by the millions of dollars in savings to be realized by having Carlson continue to provide traditional travel services to the Army, and other agencies in these three states, unless and until all such travel services may be efficiently performed by a fully functional, operational deployed CUI.

104. Carlson won the right to provide traditional travel services in Missouri, Nebraska, and Kentucky under a competitive procurement. TRW and its subcontractor, Sato Travel, did not obtain the right to provide such services under a competitive procurement. Granting a permanent injunction will also serve the public interest by preserving the integrity of the Federal procurement system.

## PRAYER FOR RELIEF

**WHEREFORE,** Carlson hereby requests this Court to find that the Army's restructure and/or modification of TRW's DTS DTR-6 Contract exceeded the scope of the original Solicitation by altering the contract to require (i ) the Government to pay TRW up front for development, testing, and deployment of a CUI, (ii) TRW to provide only a web-based travel management system and (iii) provide traditional travel services, prior to the implementation of the Defense Travel System CUI. In addition, the Government has improperly interpreted Carlson's contracts to permit the transfer of all traditional travel services for the Army and other agency sites in the States of Missouri, Nebraska, and all of Kentucky to the restructured DTS DTR-6 Contract, notwithstanding the fact that the CUI to satisfy the Defense Travel System requirements will not have been implemented throughout those states. Even if the Government is permitted to transfer all travel services for the DoD sites in the States of Missouri and Nebraska, it may only transfer the travel services required by Fort Campbell, KY and not other

Army activities within the State of Kentucky. As a result of the Army's unlawful conduct, Carlson is rightfully entitled to:

A) A preliminary, permanent injunction ordering the Army to direct TRW to cease performance of the Restructured DTS DTR-6 Contract and immediately competitively reprocure the requirements for a web-based travel management system under similar terms and conditions;

B) Alternatively, a preliminary, permanent injunction ordering the Army to direct TRW to cease performance of the Restructured DTS DTR-6 Contract and immediately competitively reprocure task orders for a web-based, travel management system under the competitively-awarded GSA eTravel Services Contract.

C) A preliminary, permanent injunction ordering the Army to direct TRW to cease performance of the Restructured DTS DTR-6 Contract and immediately competitively reprocure the requirements to provide traditional travel services contained in the currently modified DTS DTR-6 Contract;

D) A declaratory judgment finding that Carlson is the exclusive provider of traditional travel services for all the DoD sites identified in Carlson's competitively-awarded Army contract;

E) A declaratory judgment finding that Carlson's Army travel services contracts including the DoD sites in the States of Missouri, Nebraska, and Kentucky, do not require it to relinquish this work to TRW and Sato Travel under the DTS DTR-6 Contract, unless and until the CUI required to satisfy the DTS requirements is operationally deployed throughout those states.

F) A declaratory judgment finding that in any event Carlson's travel services contract only requires it to relinquish Fort Campbell, Kentucky, as opposed to the entire State of Kentucky, in the event that the Defense Travel System CUI is operationally deployed in the DTS DTR-6 Region;

G) A preliminary and permanent injunction ordering the Army not to transfer the requirement to provide traditional travel services under any of Carlson's Army contracts, unless and until a DTS CUI is operationally deployed and able to provide all required travel services to the Army at those sites.

H) All of its damages and costs;

I) All costs and attorneys fees incurred in pursuing this action; and

J) Such other relief as the Court may deem just and proper.

Respectfully submitted,

"s/Lars E. Anderson"

Lars E. Anderson
Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Counsel to CW Government Travel, Inc.*

Dated: November 14, 2003

**CERTIFICATE OF FILING**

I hereby certify that on November 14, 2003, a copy of the foregoing *Plaintiff's Amended Complaint* was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

"s/Lars E. Anderson"
Lars E. Anderson