**No. 03-1274C**
**(Judge Baskir)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CW GOVERNMENT TRAVEL, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**FRANKLIN E. WHITE, JR.**
**Assistant Director**

**DAVID A. LEVITT**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**1100 L Street, NW, 8th Floor**
**Washington, D.C. 20530**
**Telephone: (202) 307-0309**
**Attorneys for Defendant**

**December 15, 2003**

---

# TABLE OF CONTENTS

PAGE

DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.. THE DTS CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. THE ARMY-CARLSON CONTRACTS . . . . . . . . . . . . . . . . . . 15

III. THE LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I. THIS COURT LACKS JURISDICTION OVER THE AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A. Carlson Lacks Standing To Challenge The Restructuring Of The DTS Contract . . . . . . . . . . . . . . . . 20

B. This Court Lacks Jurisdiction Over Carlson's Untimely Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. This Court Lacks Jurisdiction Over Carlson's Challenges To The Alleged Transfer Of Facilities From The Army Contracts To The DTS Contract . . . . . . . . . . . . . . . . . . 31

TABLE OF CONTENTS (Contd.)

PAGE

D. Even If The CDA Prerequisites Had Been Satisfied By Carlson, The Court Should Dismiss Carlson's CDA Count As Unripe For Judicial Review . . . . . . . . . . . . . . . . . . . 36

II. ASSUMING THE EXISTENCE OF SUBJECT MATTER JURISDICTION, CARLSON HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE THE INCONTROVERTIBLE MATERIAL FACTS DEMONSTRATE THAT THE MODIFICATIONS TO THE DTS CONTRACT WERE WITHIN SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A. The Web-Based Platform And Traditional Travel Services Were Within The Scope Of The Original Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B. The Other Alleged Modifications Either Did Not Occur Or Were Contemplated By The Scope Of The Original Competition . . . . . . . . . . . . . . . . . . . . . . . 47

III. THE CDA CLAIM SHOULD BE DISMISSED . . . . . . . . . . . . 51

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

# TABLE OF AUTHORITIES

CASES: PAGES

ABF Freight System, Inc. v. The United States,
55 Fed. Cl. 392 (Feb. 26, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*AT & T Communications, Inc. v. Wiltel, Inc.,
1 F.3d 1201 (Fed.Cir. 1993); . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Aerolease Long Beach v. United States,
31 Fed.Cl. 342 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Alfa Laval Separation v. United States,
175 F.3d 1365 (Fed.Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Alliant Techsystems, Inc. v. United States,
178 F.3d 1260 (Fed.Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . **passim**

Am. Fed'n of Gov't Employees v. United States,
258 F.3d 1294 (Fed.Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Bell v. Hood,
327 U.S. 678 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*C.C. Distributors, Inc. v. United States,
38 Fed. Cl. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*CCL, Inc. v. United States,
39 Fed. Cl. 780 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,24

*Cases marked by asterisks are those principally relied upon.

## TABLE OF AUTHORITIES (Contd.)

CASES PAGES

*CESC Plaza Limited Partnership v. United States,
52 Fed. Cl. 91 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Cedars-Sinai Med. Ctr. v. Watkins,
11 F.3d 1573 (Fed.Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Contracting Co. v. United States,
1 CCF ¶ 80,069 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

LaCoste v. United States,
9 Cl. Ct. 313 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Matsushita Elec. Indus. v. Zenith Radio Corp.,
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Myers Investigative and Sec. Serv., Inc. v. United States,
275 F.3d 1366 (Fed.Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Northrop Grumman Corporation v. The United States,
50 Fed. Cl. 443 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,39,45

*Phoenix Air Group, Inc. v. United States,
46 Fed. Cl. 90 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,24,39

Reynolds v. Army and Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cases marked by asterisks are those principally relied upon.

## TABLE OF AUTHORITIES (Contd.)

CASES PAGES

*Sharman Company, Inc. v United States,
2 F.3d 1564 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33,35,36

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed.Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Thomson v. Gaskill,
315 U.S. 442 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Vanalco, Inc. v. United States,
48 Fed. Cl. 68 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23

*Wanlass v. General Electric, Co.,
148 F.3d 1334 (Fed.Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,28

## STATUTES, RULES AND REGULATIONS

48 C.F.R. § 33.207(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

28 U.S.C. § 1491 (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,27

31 U.S.C. § 3551(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

41 U.S.C. §§ 601-613 ("CDA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

41 U.S.C. § 605(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

FAR 52.243-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Cases marked by asterisks are those principally relied upon.

TABLE OF AUTHORITIES (Contd.)

CASES PAGES

MISCELLANEOUS

Al-Zhickrulla Est.,
ASBCA No. 52137, 2003 WL 22430176 (Oct. 17, 2003) . . . . . . . . 27

Astronautics Corp. of Am., Comp. Gen. Dec. B-242, 782 . . . . . . . . . . . 39

Brinkerhoff Realty and Construction,
B-244544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CAD Language Systems, Inc., B-233756 . . . . . . . . . . . . . . . . . . . . . . . 40

Engineering & Professional Services, Inc.,
B-289331, Jan. 28, 2002, 2002 CPD ¶ 24 . . . . . . . . . . . . . . . . 40,41

Handheld Systems, Inc., B-288036 . . . . . . . . . . . . . . . . . . . . . . . . . 30

Instituform East, Inc., B-272399 . . . . . . . . . . . . . . . . . . . . . . . . . . 40

J&J Maintenance Inc., B-223355.2 . . . . . . . . . . . . . . . . . . . . . . . . . 30

MCI Telecomm. Corp.,
GSBCA No. 10540-P (28 Feb. 1990),
90-2 B.C.A. (CCH) ¶ 22,735 . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Paging Network of Washington, Inc., B-274052 . . . . . . . . . . . . . . . . . . 30

Robbins-Gioia, Inc., B-229757 . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

State Machine Products, B-245427.2 . . . . . . . . . . . . . . . . . . . . . . . . 30

Wunderlick Contracting Co. v. United States,
[11 CCF ¶ 80,069], 173 Ct. Cl. 180, 194 (1965) . . . . . . . . . . . . . . . 39

*Cases marked by asterisks are those principally relied upon.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CW GOVERNMENT TRAVEL, INC. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1274 |
| | ) | (Judge Lawrence M. Baskir) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT[1]

Pursuant to Rules 12(b) and 56(a) of Rules of the Court of Federal Claims ("RCFC"), defendant United States, respectfully requests the Court to dismiss the amended complaint of plaintiff, CW Government Travel, Inc. ("Carlson"), or, in the alternative, to award a summary judgment in favor of the United States. The basis for this motion is that this Court lacks subject matter jurisdiction to entertain the claims in the amended complaint, and the

[1] Putative intervenor, Northrop Grumman Space & Mission Systems Corporation ("Northrop Grumman"), has advised the Government that it joins in this motion and intends to file a motion for leave which will seek to file a motion to dismiss or, in the alternative, for summary judgment which will incorporate this motion by reference.

amended complaint fails to state a claim upon which relief can be granted. Alternatively, our motion demonstrates by undisputed facts that we are entitled to judgment as a matter of law upon the claims asserted in the amended complaint.

## MEMORANDUM OF LAW

## INTRODUCTION

This case involves a contract awarded by the Military Traffic Management Command to BDM International, Inc. ("BDM") on May 7, 1998 (the "DTS contract"). This contract required BDM's successor, TRW, Inc., and now Northrop Grumman Space and Mission Systems Corporation ("Northrop Grumman") to develop and deploy a Consumer User Interface ("CUI") to Department of Defense ("DoD") installations in Defense Travel Region 6 ("DTR 6") and provide traditional travel services to DoD travelers. The CUI was to enable members of the DoD community to formulate travel orders, plan trips, and receive reimbursements through a personal computer ("PC").

Plaintiff, CW Government Travel, Inc. ("Carlson"), contends modifications to the contract, which required the CUI to be accessible only through web-browsers and permitted traditional travel services to be

provided without a fully deployed CUI, exceeded the scope of the original contract. In its amended complaint, Carlson also contends the Government's agreement to reimburse Northrop Grumman for development work on the CUI and to pay a monthly fee for the operation and maintenance of the CUI exceeded the scope of the original contract. Carlson seeks injunctive and declaratory relief requiring DoD to rebid the contract.

Count III involves separate contracts between the Army and Carlson for traditional travel services for Army Regions 4 and 5 ("Army-Carlson contracts"). It contends that the Army committed a breach of these contracts by threatening to transfer facilities from these contracts to the DTS contract and seeks injunctive relief to prevent the transfer until the CUI is fully operational and deployed.

As we demonstrate below, this Court lacks jurisdiction to entertain all counts because:

(a) Carlson has not demonstrated - - and cannot demonstrate - - it was a potential bidder on the browser-connected CUI;

(b) Carlson affirmatively declined to bid on traditional travel services once these services were bid following the issuance of a modified statement of work;

(c) With respect to the facilities transfer claim (Count III), Carlson

failed to exhaust its administrative remedies pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601-613 ("CDA") and has an adequate remedy at law.

Even if jurisdiction exists:

(a) The plain language of the DTS contract as originally awarded provides that a web-browser access to the CUI is not only acceptable but was specifically contemplated;

(b) The contractor is required to provide traditional travel services to travelers with or without access to the CUI;

(c) The adjustment in the payment structure of the DTS contract was nothing more than an equitable adjustment for changes within the scope of the contract, and the Changes clause did not, as Carlson alleges, shift the risk of successful performance from Northrop Grumman to the Government; and

(d) The Army possessed authority under its contracts with Carlson to transfer the facilities at Ft. Campbell and in Kentucky, Missouri and Nebraska to the DTS contract at any time.

Thus, this Court lacks subject matter jurisdiction to entertain this action. Even if jurisdiction exists, our motion to dismiss or, in the alternative, for summary judgment, should be granted.

## QUESTIONS PRESENTED

1. Whether Carlson has demonstrated, or can demonstrate, that it was or could have been a "potential bidder" on a web-based CUI, and whether it waived its right to challenge the solicitation for CUI-assisted and unassisted travel services.

2. Whether Carlson failed to exhaust its administrative remedies concerning the alleged transfer of facilities between the Army contracts and the DTS contract, and whether it has an adequate remedy at law to redress the alleged transfer of facilities.

3. Whether the plain language of the DTS contract includes web-based access to the CUI and the provision of traditional travel services throughout DTR 6.

4. Whether the Army-Carlson contracts authorize the Army to transfer facilities to the DTS contract at any time.

. STATEMENT OF THE FACTS

I. THE DTS CONTRACT

On or about June 30, 1997, the United States Military Traffic Management Command ("MTMC" or the "Agency"), issued Solicitation No. DAMT01-97-R-1003 (the "Solicitation" or the "RFP") for a seamless, paperless, and complete travel management service both for Defense Travel Region 6 ("DTR 6") and for the development and deployment of a world-wide travel system. The RFP's "Performance Work Statement" described the "Objectives" of the acquisition including, among other things,

> Obtains a single official travel service contractor
> to provide official travel management services

> within Defense Travel Region 6 (the states of North Dakota, South Dakota, Nebraska, Minnesota, Iowa Missouri, Wisconsin, Illinois, Michigan, Kentucky, and Indiana, and other designated areas) and to deploy a common user interface ("CUI") to official travel management service contractors and DoD users world-wide, as the DTS is expanded beyond DTR 6.
>
> ***
>
> Provides system flexibility to <u>permit continuous technical refreshments</u> to DTS based on advances in proven information technologies.
>
> ***
>
> Fully sustains the CUI throughout the entire system life cycle satisfying operational performance, system availability, and changing functional requirements.

Declaration of Karen A. Williams, Director of Finance & Business for Northrop Grumman Mission Systems ("NGMS"), ¶ 4 and Attachment 1 (Williams Dec.) (emphasis supplied).[2]

The RFP defined "Travel Services" to encompass "common user interface (CUI) services as well as travel management services." Williams Dec., ¶ 6 and Attachment 2. The required "Travel Management Services"

---

[2]All declarations and other evidentiary records cited in this memorandum can be found in Defendant's Appendix which has been filed simultaneously with this memorandum. The Williams Declaration and Attachments are in Section II of the Appendix.

included, but were not limited to, "Traditional commercial travel services." Williams Dec., ¶ 5 and Attachment 2.

Because the contract contemplated a five-year base period and three one-year options thereafter, the Solicitation required offerors to "Describe how you will identify, evaluate and incorporate new technologies applicable to DTS." Williams Dec., ¶ 7 and Attachment 3. Offerors were specifically advised that they were to propose an approach for the "Application of existing and emerging technologies, e.g., web-based, kiosk, remote self service station via CD ROM or direct computer link, remote reservation center via toll-free telephone, to supplement services available via staffed travel offices." Williams Dec., ¶ 8 and Attachment 4. In other words, the Solicitation explicitly sought a system that could and would evolve technologically over time, as well as provide Travel Management Services not only via a computer, but also from staffed commercial travel offices. Id.

The Solicitation did not require offerors to propose a specific software and hardware configuration. Williams Dec., ¶ 4. Rather offerors were required to propose a system that met the identified "CUI Functional Requirements." Williams Dec., ¶¶ 4 and 9 and Attachment 5. To assure that an offeror's proposed approach would be amenable to the inclusion of

emerging technology as it became available, the Solicitation provided, among other things, the following evaluation criteria:

> - Design Structure. Evaluate the hardware and software components, processing strategy, data strategy, and communication interfaces for their limitations, feasibility, efficiencies, and robustness.
>
> - Openness. Evaluate the degree to which the proposed architecture complies to the DTS Standards Profile and may be adapted to the evolving DoD technical infrastructure.

Williams Dec., ¶ 9 and Attachment 6.

The approach proposed by Northrop Grumman in response to the Solicitation included, as one method, the use of a Travel Management System that was accessible to the DoD user through the Internet. Williams Dec., ¶¶ 10-13 and Attachments 7-9. For example, Northrop Grumman's proposal stated:

> WEB BROWSER. As the DoD infrastructure continues to mature over the next year, <u>we anticipate today's client-server paradigm will shift to a browser model</u>. As that shift occurs, Travel Manager will support DoD users by providing browser access to the Travel Manager Document Preparation module to initiate and modify travel arrangements and to process vouchers following travel. Approving Officials will interact with the Routing & Review and Budget modules to approve travel. Operation in this mode requires a browser interface to the NIPRNET.

Williams Dec., ¶ 12 and Attachment 9 at 1.3-48 (emphasis added).

Similarly, noting that "8 years is a long time" and that "Over the life of this contract, we can be certain that there will be advances in technology," Northrop Grumman's proposal stated:

> WEB CONSIDERATIONS. The BDM Travel XXI Team's solution encourages the rapid migration of the majority of users to the browser modality. The growth in Internet connectivity and the expanding access to the NIPRNET are positive trends for the DTS. As the web-based applications transition to the applet paradigm (spearheaded by JAVA), the browser machine will increase responsiveness to user time constraints. New versions will be downloaded to the users from the WEB server in the RDC.

Williams Dec., ¶ 12 and Attachment 9 at p. 1.3-12.

Northrop Grumman's proposal was incorporated into the DTS contract, thereby contractually requiring Northrop Grumman to perform in accordance with its proposal. Williams Dec., ¶ 14.

On or about May 22, 2001, the Government issued a notice in the Commerce Business Daily stating that the Government "intends to award a sole source modification to amend the structure of the current Defense Travel System (DTS) contract No. DAMTO1-98-D-1002 . . . . This action will enable the negotiation and inclusion of additional Contract Line Items (CLIN's) with cost reimbursement type pricing features to support PMO DAD's requirements over the life of the contract." Williams Dec., ¶ 15 and

Attachment 10.

In modification P00025, the parties agreed that the contract would be restructured to allow Northrop Grumman to proceed with the development and implementation of the CUI including technical insertions and technological advancements to the CUI. Williams Dec. ¶ 18 and Attachment 12. The modifications required precisely the same performance as the original contract. Declaration of Peggy W. Butler, Contracting Officer for Contract No. DAMTO1-98-D-1005, ¶¶ 2-6 and 8 ("Butler Dec.").[3] "Under the DTS Contract as modified, the risk of non-performance and development remained apportioned between the United States and Northrop Grumman in much the same manner as it had prior to the restructure." Butler Dec., ¶1.

Although the modification allowed "certain payments to the contractor due to modifications in the payment methodology, . . . the overall contract value was slightly lower than the estimated price of the contract as awarded, and the Government's payment obligations were . . . capped for essentially the same work." Id., ¶ 8. The modification

---

[3]Ms. Butler's Declaration and Attachments are included in Section IV of the Appendix.

included a provision for the payment of $43.7 million after Northrop Grumman had delivered a functional CUI to the Government and deployment as directed by the Government had begun. Id., ¶ 2. Moreover, Northrop Grumman agreed that the software development would be performed at a reduced fee in consideration of the CLIN for software development. Id, ¶ 5.

Seeking to provide the required travel services through a subcontractor, on or about March 20, 2002, Northrop Grumman sent a solicitation to a number of potential travel service vendors, including Carlson. Williams Dec., ¶ 22. That solicitation sought proposals to provide the traditional travel services required under the DTS contract. Williams Dec., ¶ 23. That solicitation notified Carlson that Northrop Grumman was seeking a subcontractor for Travel Services in DTR 6 as well as "other Government specified areas." Williams Dec., ¶ 23 and Attachment 17. It further specifically advised Carlson that:

> The Contractor shall provide Travel Services facilitated by the Defense Travel System (DTS) as well as Traditional Travel Services in advance of DTS availability at Government designated locations.

Id.

That Northrop Grumman was soliciting both traditional travel services

and travel services in connection with the CUI was made abundantly clear in the solicitation's "Evaluation Factors For Award," where two of the evaluation elements were:

> Element 6 - Travel Management Services Facilitated through DTS. TRW will evaluate the Offeror's ability to provide Travel Services in accordance with DoD travel policies and guidance.
>
> Element 7 - Traditional Travel Management Services. TRW will evaluate the Offeror's ability to provide Travel Services in accordance with DoD travel policies and guidance.

Williams Dec., ¶ 24 and Attachment 18.

While Carlson submitted questions to Northrop Grumman seeking information concerning the solicitation on or about March 22, 2002, Carlson elected not to compete for these travel management services as it conceded. Williams Dec., ¶ 25. In other words, prior to the issuance of the prime contract modifications at issue, Northrop Grumman solicited a bid from Carlson for traditional travel management services under the prime contract - - clearly demonstrating that such services were already required under the DTS contract - and Carlson simply elected not to compete, a fact Carlson does not deny. Id..

On or about March 29, 2002, the Government issued Modification

P00027 to the DTS Contract, the so-called "Restructure Modification." This Modification provided, in relevant part, that, "for the Washington and Adams software releases, DTS shall provide four distinct modes of operation - web browser, client/server, character mode, and telephone/facsimile mode (through the DTR 6 CTO). For the Jefferson and subsequent releases, DTS shall provide the web browser mode only." Williams Dec., ¶ 16 and Attachment 11 at Section J, Att. 3, page 27, ID No 1043.[4] In other words, Modification P00027 removed the requirement for redundant modes of access to the DTS, thereby leaving in place, now as the exclusive access to the system, the web access that was not only required from the outset, but which Northrop Grumman had specifically contemplated in its proposal would become the predominant mode of access. "[W]hile initial use may be relatively low, in the future, the majority of users will transition to operating in the browser [web-based] mode." Williams Dec., ¶ 13. This modification had also eliminated the deployment and per transaction voucher fees and added a monthly operations and maintenance fee. Williams Dec., ¶ 17.

---

[4]The "Washington,""Adams," and "Jefferson" releases were the first three iterative releases of contract software.

On May 23, 2002, as a result of changes in the travel industry concerning the method by which travel agencies were reimbursed for their services, the Government issued modification P00029 to the DTS contract. This reflected an equitable adjustment in the pricing of commercial travel office ("CTO") services in DTR6 due to the fact that airlines had reduced or discontinued paying commissions to CTOs. The Modification substituted the point of sale rebate system with a fee per transaction payment methodology for Travel Management Services. Williams Dec., ¶ 19. In other words, the Modification - in response to changes in the market practices and in accordance with a specific contract provision - changed the pricing provisions for the Travel Management Services portion of the DTS contract, but did not add to or alter the types, amounts, or duration of the Travel Management Services already encompassed under the DTS contract as originally awarded. Id. The modification further provided a separate pricing mechanism for CUI-assisted and traditional travel services in lieu of a bundled price. Id.

As the incontrovertible facts demonstrate, the very services and applications that Carlson alleges were improperly added by the challenged modifications were:

1. Explicitly sought by the original Solicitation for the DTS program (e.g., "continuous technical refreshments," "traditional commercial travel services," and "adapt[ability] to the evolving DoD technical intrastructure");

2. Expressly and specifically offered by Northrop Grumman in its proposal (e.g., "shift to a browser model" and "rapid migration of the majority of users to the browser modality); and

3. Specifically made a part of Northrop Grumman's DTS contract (Williams Dec., ¶ 14).

Moreover, Carlson knew or should have known of some of these requirements more than one year before opting to file the instant action alleging that the modification was beyond the scope of the contract.

## II. THE ARMY-CARLSON CONTRACTS

On October 1, 2002, the Army awarded Carlson contracts to provide traditional travel services in Army Regions 4 and 5 for a one-year base period with eight six-month renewal options. Amended Complaint, ¶ 64. Paragraph 1.1.1 provides that "upon the implementation of the Defense Travel Region 6 (DTR 6) contract . . . Ft. Campbell, KY, Missouri, and Nebraska will be deleted from the respective regions and incorporated into the DTR 6 contract." Paragraph 1.1.1.2 provides that:

> The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/ other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract . . .

Paragraph 1.6.8 provides that:

> At any time after the base period of this contract . . ., the Government may identify any/or all workload in this contract to be deleted.

On November 8, 2002, the contracting officer advised Carlson that "travel services support for Kentucky . . . Missouri and Nebraska . . . will transition to [the DTS contract] effective February 24, 2003." Memorandum dated Nov. 8, 2002 from Ruby L. Mixon to Erma Spell.[5] On November 26, 2002, Carlson's President, Ms. Spell, wrote that the transfer of the facilities "would constitute a breach of [Carlson's Army] contracts . . . [and] is a violation of the Competition in Contracting Act [CICA] . . . and FAR." Letter dated Nov. 26, 2002 from Erma Spell to Ruby L. Mixon. App., Sect. V, Tab. 2. According to Ms. Spell, the facilities could be transferred only after the completion of the base period of the Army contracts and only if the CUI

---

[5]This communication between the Army and Carlson and the other communications between the Army and Carlson referred to in this memorandum are included in Section V of the Appendix.

was deployed. Id.

On January 10, 2003, the contracting officer wrote Carlson that "our letter of November 8, 2002 remains in effect." Letter dated January 10, 2003 from Jackie Robinson-Burnette to Erma Spell. App., Sect. V, Tab. 3. However, on January 31, 2003, she "rescind[ed the] transition notification letters," and stated that "Carlson Wagonlit will continue to provide Commercial Travel Services . . . [to the end of the base term of the contract]." Letter dated Jan. 31, 2003 from Jackie Robinson-Burnette to Erma Spell. App., Sect. V., Tab. 4. On May 15, 2003, she advised Carlson via electronic mail that she was "in the process of preparing the modifications to remove Kentucky, Missouri, and Nebraska from DTRs 4 and 5 effective 30 September 03." E-Mail dated May 15, 2003 from Jackie Burnette to Craig Thompson. App., Sect. V., Tab. 5. Carlson filed its complaint on May 23, 2003 and did not otherwise respond to the contracting officer. The Army has taken no action to transfer facilities from the Carlson contracts to the DTS contract.

## IV. THE LEGAL STANDARDS

As this Court has observed, "When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any

disputes as to the truth of the jurisdictional facts alleged in the complaint." C.C. Distributors, Inc. v. United States, 38 Fed. Cl. 771, 774 (1997) (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988)). Moreover, the party asserting jurisdiction "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence . . . ." Reynolds v. Army & Air Force Exch. Serv., 846 F.2d at 748; see also Thomson v. Gaskill, 315 U.S. 442 (1942); Myers Investigative & Sec. Serv., Inc. v. United States, 275 F.3d 1366, 1369 (Fed.Cir. 2002); Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993). In certain situations, "it is appropriate for courts to dismiss a suit for want of jurisdiction even if the decision would involve a discussion of the merits." Vanalco, Inc. v. United States, 48 Fed. Cl. 68, 78 (2000). These include cases "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." Bell v. Hood, 327 U.S. 678, 682-83 (1946).

Pursuant to RCFC 56, the moving party is entitled to summary judgment when "no genuine issue as to any material fact [exists]." Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 353 (1994). The

initial burden of demonstrating the absence of genuine disputes as to material fact is on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, once this burden is discharged, the opposing party must demonstrate specific facts showing a genuine issue in dispute for trial. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only if there is evidence from which a reasonable jury could return a verdict for the non-movant is there a genuine dispute for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed.Cir. 1987).

As we demonstrate, this Court lacks jurisdiction to entertain the claims in Counts I and II of the amended complaint because Carlson failed to challenge the modifications in a timely fashion and neither bid on nor could have bid on the development and integration effort relating to the CUI. This Court lacks jurisdiction to entertain the CDA claim (Count III) because Carlson failed to exhaust administrative remedies related to the proposed transfer of facilities from the Carlson contracts to the DTS contract.

Assuming the existence of jurisdiction, the modifications to the DTS contract were driven by technology advances and were not beyond the scope of the original contract. Further, the Army possessed the authority

under the Army-Carlson contracts to transfer the facilities in Kentucky, Missouri, and Nebraska (and Ft. Campbell) to the DTS contract regardless of whether the CUI was deployed. Accordingly, our motion to dismiss or for summary judgment should be granted.

## ARGUMENT

### I. THIS COURT LACKS JURISDICTION TO ENTERTAIN THIS ACTION

#### A. Carlson Lacks Standing To Challenge The Restructuring Of The DTS Contract

In its amended complaint, Carlson contends that the Government violated the Competition in Contracting Act ("CICA") when it accepted Northrop Grumman's proposal, contained in Amendment 03 to Task Order 20, to simplify the screens for the web-based CUI and eliminate accessibility to the CUI through server and telnet applications. Carlson contends this Court possesses jurisdiction to entertain this challenge pursuant to the Tucker Act. 28 U.S.C. § 1491 (b)(1).

Under the Tucker Act, "both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed

contract or the award of a contract or an alleged violation of a statute or regulation in connection with a procurement or proposed procurement." Id. The Court of Appeals for the Federal Circuit has adopted the definition of "interested party" located in the CICA which is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001); see 31 U.S.C. § 3551(2).

To establish standing, Carlson must demonstrate that it would have been a prospective bidder if the web-based CUI had been competitively bid. See, e.g., Phoenix Air Group, Inc. v. United States, 46 Fed. Cl. 90, 102 (2000) (the plaintiff must have a "readiness and ability to bid for work which plaintiff argues should be competitively procured by the Air Force"); CCL, Inc. v. United States, 39 Fed. Cl. 780, 788-89 (1997) ("it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals"). This Court has determined that a party has standing only if that party has "a connection with the procurement." CCL, 39 Fed. Cl. at 789. This can be demonstrated if the party "likely would have competed for the

contract had the government publicly invited bids or requested proposals." Id. The party asserting standing, however, must also demonstrate that "it would have [had] a substantial chance of receiving the award" if the procurement had been publicly competed. Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 456 (2001); see Alfa Laval Separation v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (a party has no standing if it suffers no prejudice from the procurement process). Absent the ability to make such a demonstration, any exclusion is harmless error. Id.

Carlson contends that, if the work relating to the migration to a web only system had been competitively bid, it would have competed for the work and won the award. It acknowledges, however, that it never bid on the work in the original contract and has no experience with DTS. Amended Complaint, ¶ 49. It contends, nonetheless, that it would have won the award because it submitted a successful proposal to the General Services Administration ("GSA") to develop an "eTravel" travel system for other federal agencies. Amended Complaint, ¶ 51. It contends eTravel has the same functionality as DTS. Yet, the only evidence it offers is the conclusory allegation that the functionality of eTravel and DTS are coextensive. Id.

As Colonel Schaefer states and the contemporaneous record plainly demonstrates, however, this is simply false: "The DTS Contract, both as originally awarded and as restructured, requires continuing integration, particularly with the many DoD financial systems and the DoD Archive, to achieve the DoD vision of a seamless end-to-end system . . . By contrast, the eTravel model envisions savings from minimizing travel service transaction costs." Declaration of Larry J. Schaefer, former Program Director for the DTS Program Management Office ("DTS-PMO"), ¶¶ 7 and 8 (Schaefer Dec.).[6] In fact, a December 2002 Government review stated "we have determined that the scope of the DoD's DTS requirements far exceeds that of the eTravel service. . . . The eTravel service has only a fraction of the requirements that DTS has defined." Schaefer Dec., ¶ 3 and Exhibit 1. In fact, the study concluded that the DTS requirement "to directly interface with legacy systems of all government agencies via EDI" "would increase the complexity [of the eTravel requirements] significantly." Id.

A later study further confirmed in greater detail that the requirements of DTS and eTravel were not coextensive. As Col. Schaefer noted, the

---

[6]Colonel Schaefer's Declaration and Attachments are included in Section III of the Appendix.

study found the following examples of DTS requirements that either exceeded or differed from those of eTravel:

a) System Security complying with the DoD Global Information Grid architecture.

b) Two-way interface with DoD accounting, disbursing and vendor pay systems.

c) Automated centrally billed account reconciliation.

d) Individually billed charge card interfaces.

e) Specific data archiving, exchange, and interface capabilities.

Schaefer Dec., ¶ 5.

Therefore, the requirements of DTS and eTravel are not coextensive as Carlson alleges. That Carlson bid successfully on eTravel does not demonstrate it could have or would have bid on DTS or would have had a plausible chance to win the award. Therefore, there is no standing to challenge the modification, and this Court lacks jurisdiction to entertain Count I of the amended complaint. See, e.g., CCL, 39 Fed. Cl. at 789 (the party had standing only because "it was performing the very work that it alleges DISA illegally diverted to BDM"); Phoenix Air Group, Inc. v. United States, 46 Fed. Cl. 90, 102 (2000) (the challenger had standing only

because "Phoenix [had] submitted a proposal . . for some government orders of flight services for the MIDPAC and WESTPAC regions").[7]

B This Court Lacks Jurisdiction To Entertain Carlson's Untimely Allegations

As alleged in the amended complaint, the modified DTS contract established that Northrop Grumman would be compensated upon a time and materials basis for development work and upon a per transaction basis for travel services outside the CUI. Carlson contends that the original competition required the contractor to be compensated upon only a fixed price basis for development work and did not include the provision of travel services outside the scope of the CUI. As we have established, however, on or about May 22, 2001, the Government issued a notice in the CBD stating that the Government,

> intends to award a sole source modification to amend the structure of the current Defense Travel System (DTS) . . . to incorporate software development/engineering pricing features to allow for DTS CUI connectivity to the DoD Disbursing and Accounting Systems (DAD's). This action will enable the negotiation and inclusion of additional Contract Line Items (CLINs) with cost reimbursement type pricing features to support PMO DAD's requirements over the life of the contract.

---

[7]Even should this Court conclude that standing exists, moreover, as we demonstrate below, Carlson fails to state a claim upon which relief can be granted related to the restructuring of the DTS contract.

Williams Dec., ¶ 15 and Attachment 10. This announcement placed Carlson on notice that DoD was restructuring the contract to provide the development work for CUI integration and that this work would be reimbursed upon a cost reimbursement type basis. Therefore, Carlson could have challenged the restructuring as early as May 2001. Further, as Ms. Williams explained:

> On March 20, 2002, Northrop Grumman issued to CW [Carlson], as well as to other potential subcontractors, a solicitation to provide traditional travel services . . . as subcontractors under the DTS DTR 6 Contract. . . . Northrop Grumman's solicitation to CW for a potential subcontract clearly stated that it was soliciting proposals for traditional travel services as well as travel services to be provided using the new DTS system.

Williams Dec., ¶¶ 22-23. Thus, Carlson was aware as early as March 20, 2002 that a competitive bid process for traditional travel services under the DTS contract was proceeding among subcontractors responding to Northrop Grumman's solicitation.

Carlson now seeks to challenge the modification incorporating the revised CLINs involving traditional travel services and the development of the CUI. However, despite having the Solicitation and having made inquiry with respect to it, Carlson did not challenge the subcontract solicitation or award. Similarly, while Carlson had notice of the software development

CLIN at the time the modifications occurred, it again stood silently by at the time. Although this Court does not strictly adhere to the timeliness rules for protests that are applied by the U.S. General Accounting Office, it has stated:

> The statute granting this court's jurisdiction to entertain bid protests does not address the time within which a bid protest must be filed. See 28 U.S.C. 1491(b). Nevertheless, this court has adopted, 'in appropriate circumstances,' the GAO bid protest rule.

ABF Freight System, Inc. v. United States, 55 Fed. Cl. 392, 399 (2003) (emphasis supplied).

Moreover, the doctrine of laches bars lawsuits brought in a dilatory manner where a defendant shows that "the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and the delay resulted in material prejudice or injury to the defendant." Wanlass v. Gen.Elec., Co., 148 F.3d 1334, 1337 (Fed.Cir. 1998); see also LaCoste v. United States, 9 Cl. Ct. 313 (1986) (barring a contractor's claim because of unreasonable and prejudicial delay to the Government); Al-Zhickrulla Est., ASBCA No. 52137, 2003 WL 22430176 (Oct. 17, 2003) (barring an appeal based on the defense of laches). The prejudice may be either economic or

evidentiary. Wanlass, 148 F.3d at 1337. In determining prejudice, the Federal Circuit has acknowledged that "economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." Wanlass, 148 F.3d at 1337.

These are clearly "appropriate circumstances" in which to apply the GAO bid protest rule or the equitable doctrine of laches. It is incontestable that Carlson was specifically advised no later than May 2001, that future development work on the CUI would be compensated for on a cost reimbursement type basis. Further, Carlson was aware of the acquisition of traditional travel services under the DTS contract no later than March 2002 because Northrop Grumman asked Carlson to bid for those services -- a requirement that was clearly reviewed by Carlson. Indeed, as the plain language of the original Solicitation clearly encompassed the provision of "traditional travel services," Carlson's challenge in that regard is nothing more than a challenge to the terms of the original Solicitation, which it elected to file approximately five years after the Solicitation was issued. By any standard, Carlson's amended complaint in this regard comes far too late.

Rather than timely and expeditiously challenging the restructuring or the propriety of the separately priced travel services in the contract, Carlson chose to wait until May 2003, approximately two years after the public notice of the restructuring, to allege that these modifications to the DTS contract were improper. To consider these allegations now, after the Government and the contractor have invested millions of dollars, would be a travesty and would encourage would-be protestors to delay filing challenges to contract awards to maximize the damages incurred by the Government and the awardee. As we have established, Carlson's delay in making its claim was both unreasonable and inexcusable. Further, if the Court were to grant the remedies demanded by Carlson, that delay would cause the Government serious continuing economic harm since, over the two years that Carlson sat on its hands, the Government has spent millions of dollars developing and deploying the DTS. These investments would not have been made if Carlson had prevailed in an earlier challenge. Accordingly, the equitable doctrine of laches is properly asserted against Carlson's claims.

Carlson offers no excuse in its amended complaint for this unconscionable delay in the assertion of its "grievance," because it has

none. Under GAO precedent, Carlson's claims with respect to the CUI restructuring and provision of unassisted travel services would be dismissed out of hand. The GAO has long held that a protester has ten days from the time it knew or should have known of the alleged impropriety to levy an objection. E.g., State Machine Prod., B-245427.2, Sept. 24, 1991, 91-2 CPD ¶ 272; Paging Network of Washington, Inc., B-274052, Aug. 13, 1996, 96-2 CPD ¶ 63; Handheld Sys., Inc., B-288036, Aug. 10, 2001, 2001 CPD ¶ 142. Moreover, a protester bears an affirmative duty to pursue diligently the information that underlies its protest allegations. Robbins-Gioia, Inc., B-229757, Dec. 28, 1987, 87-2 CPD ¶ 632 (protest dismissed as untimely where protester delayed three months before seeking information through Freedom of Information Act ("FOIA")); J&J Maintenance Inc., B-223355.2, Aug. 24, 1987, 87-2 CPD ¶ 197 (protest dismissed where protester delayed three weeks to request orally information and four weeks to seek it under FOIA); Brinkerhoff Realty & Const., B-244544, Sept. 27, 1991, 91-2 CPD ¶ 303 (protest dismissed where protester failed to pursue diligently information).

Carlson did none of the things required of a protestor who seeks to interfere with the procurement process. It did not act on the knowledge it

had; it did not seek additional information; it did not advise Northrop Grumman that its bid request was inconsistent with the original DTS contract or with Carlson's existing contracts; and it did not contact the Government concerning the modification for the software development work for the CUI. It did nothing but sit on its hands and watch as the Government and contractor incurred millions of dollars in costs. Having failed to act when action would have been timely, Carlson should not be heard to complain, more than two years after the fact, that what was done was wrong.

### C. This Court Lacks Jurisdiction To Entertain Carlson's Challenges To The Alleged Transfer Of Facilities From The Army Contracts To The DTS Contract

Carlson contends the contracting officer misinterpreted the Army-Carlson contracts by concluding that Ft. Campbell and facilities in Kentucky, Missouri, and Nebraska could be transferred to the DTS contract prior to deployment of the CUI at the respective installations. It contends it presented a written claim to the contracting officer on November 26, 2002 and that the contracting officer issued a final decision rejecting the claim in a letter dated January 10, 2003. Carlson concedes that the contracting officer rescinded the initial decision that facilities be transferred prior to the

completion of the base term of the contracts. It argues, however, that the January 31, 2003 letter merely advanced the date of the transfer but did not alter the rejection of the claim. Carlson seeks a declaration that the contracting officer's "final decision" is invalid and injunctive relief preventing the alleged transfer of the facilities. App., Sect. V., Tab. 4.

Although Carlson contends it presented a written claim to the contracting officer which she rejected, in fact Carlson has not satisfied the jurisdictional requirements of the CDA. First, as Carlson acknowledges, the Army has never issued modifications of its contracts with Carlson which would implement the alleged transfers of the facilities. Although the January 31, 2003 letter stated that the facilities would be transferred at the end of the base terms of the contracts, in fact the contracting officer never modified the contracts to transfer the facilities.

No authority supports Carlson's contention that a notification of a possible future modification of a contract constitutes an "adverse action" under the CDA. For example, although the contracting officer's issuance of a unilateral modification of the contract to exercise an option was held to be an adverse action in Alliant Techsystems, Inc. v. United States, 178 F.3d 1260,1264 (Fed.Cir. 1999), the contracting officer's "advice" to Alliant "that

he planned to exercise the . . . option" was not held to constitute a predicate for a future claim under the CDA. Similarly, the January 31 letter to Carlson, which it now contends constituted a rejection of its "claim," merely notified Carlson that the contracting officer planned to transfer the facilities from the Army contracts to the DTS contract. App., Sect. V, Tab. 4. The notification did not affect Carlson's rights because the contracts were never modified. Indeed, the letter rescinded the planned date of the proposed transfers. Therefore, the contracting officer's notifications were not even final actions under the CDA. See Sharman Company, Inc. v United States, 2 F.3d 1564, 1569 (Fed. Cir. 1993).

Second, to be a "claim" under the CDA, the aggrieved party must assert in a written communication "specific contractual and legal grounds" to support the alleged objection to an "adverse action." Alliant Techsystems, 178 F.3d at 1265. Although Carlson's November 26 letter specifically asserted entitlement to relief from the proposed transfers of the facilities, it did not assert a specific entitlement to relief from any transfer prior to the deployment of the CUI, which is the ground it now contends invalidates the proposed transfers. App., Sect. V, Tab. 2. To the contrary, the letter primarily argues that there could be no transfers prior to the

completion of the base terms of the Army-Carlson contracts rather than that there could be no transfers prior to the deployment of the CUI. Id. Although Carlson stated that "the earliest the work could be transferred from CWGT's contracts would be October 1, 2003," this demand was granted in the January 31, 2003 letter which rescinded the prior transfer notification. Id.

Further, Carlson's November 26 letter is not certified even though, according to the letter, Carlson would risk losing approximately $1.8 million in revenue if it was unable to service the facilities the contracting officer indicated might be transferred to the DTS contract. As this Court has noted, to be ripe for presentment in this Court, a claim must be "certified in accordance with 41 U.S.C. § 605(c)(1) . . ." Vanalco, Inc. v. United States, 48 Fed. Cl. 68, 75 (2000). Carlson's November 26 letter, however, does not contain the language of certification and, accordingly, does not constitute a "claim" under the CDA.[8]

---

[8]To be certified, a claim must represent that it is made "in good faith, that the supporting data are accurate and complete to the best of [the contractor's] knowledge and belief, and the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 605(c); 48 C.F.R. § 33.207(c). Carlson's November 26 letter contains none of these

Moreover, even if Carlson's November 26 letter constituted a claim relating to the alleged invalidity of the transfers prior to the implementation of the CUI, that claim was withdrawn when the contracting officer agreed to stay the transfers until the base terms of the contracts were completed. As the contracting officer noted in her May 15, 2003 e mail to Carlson, Carlson had "agreed . . . earlier this year" to a transfer of the facilities. App., Sect. V, Tab. 5. Therefore, the Army-Carlson contracts did not prevent the transfers prior to the deployment of the CUI.

Third, even assuming Carlson's November 26 letter can be considered a "claim," the contracting officer never issued a "final decision" upon the claim. The January 31, 2003 letter, which delayed the proposed transfers from February to September is not a "final decision" because it does not "inform the contractor of its rights with respect to the decision." Alliant Techsystems, 178 F.3d at 1266. Moreover, it "does not contain the customary designation 'final decision.'" Sharman Comp., 2 F.3d at 1569 . Further, as noted previously, the letter could not have been a "final decision" since "no . . . written demand or assertion of present entitlement to a sum certain had been submitted to or issued by the contracting officer."

---

representations. App., Sect. V, Tab. 2.

Id. Only a modification which implemented the proposed transfers could form a predicate for a demand and a "final decision." Accordingly, the January 31 letter did not constitute a "final decision" under the CDA. Vanalco, Inc., 48 Fed. Cl. at 75. In short, the communications upon which Carlson rely fails to demonstrate that it exhausted administrative remedies under the CDA. Sharman Comp., 2 F.3d at 1569; Vanalco, Inc., 48 Fed. Cl. at 75.

D. Even If The CDA Prerequisites Had Been Satisfied By Carlson, Carlson's CDA Count Would Be Unripe For Judicial Review

The Federal Circuit has recognized that this Court is not "required to intervene "whenever a contractor raises a question of contract interpretation during the course of contract performance." Alliant Techsystems, 178 F.3d at 1270. To the contrary, this Court is required to "consider the appropriateness of declaratory relief, including whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." Id. at 1271.

Assuming that the January 31 letter is considered a "final decision," because it does not modify the contracts and does not indicate the basis upon which the contracts might be modified, it is not ripe under the

prudential standards for judicial review. Under the contracts' termination for convenience clause, the facilities could be deleted for the convenience of the Government and thereafter added to the DTS contract. If the contracts were modified for the convenience of the Government, Carlson would be entitled to termination costs but there would be no dispute concerning whether the Army-Carlson contracts authorized the transfers prior to the deployment of the CUI. Thus, the Army's alleged misinterpretation would not be a "live dispute" and a declaration concerning the authorization to transfer would be inappropriate. Likewise, if the facilities were deleted as a result of the Army misinterpreting the contracts at the completion of the base terms of the contracts, Carlson would have an adequate remedy at law, to wit, a suit for damages. This legal remedy "would be adequate to protect the parties' interests." Alliant Techsystems, 178 F.3d at 1270. Accordingly, the transfer claim is not ripe for judicial review and is outside the Tucker Act jurisdiction of this Court.

## II. ASSUMING THE EXISTENCE OF SUBJECT MATTER JURISDICTION, CARLSON HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE THE CONTROVERTIBLE MATERIAL FACTS DEMONSTRATE THAT THE MODIFICATIONS TO THE DTS CONTRACT WERE WITHIN SCOPE

Carlson contends that the modifications that added CLINs for

traditional travel services, authorized an exclusive web-only access to the CUI, and allowed time and material pricing for upgrades to the CUI were beyond the scope of the original competition. These contentions have no merit.

A. The Web-Based Platform And Traditional Travel Services Were Within The Scope Of The Original Competition

As the plain language of the Solicitation and the DTS contract demonstrate, the requirement for traditional travel management services (both through the DTS and staffed travel offices), as well as the use of a web-based system, were not only anticipated, but required. The DTS contract was not modified to add as a new requirement either the travel services or the use of a web-based system. Rather, these were explicit elements of the DTS contract as originally solicited and awarded.

In determining whether a modification is beyond the scope of the original contract, courts examine whether reasonable participants in the original competition, objectively viewed, would have or could have foreseen the nature of the future modifications. As this Court has stated:

> CICA sets forth no standard for determining when modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement. Wiltel, 1 F.3d at 1205. The question the Federal Circuit has undertaken, therefore, is

whether a contract as modified has materially departed from the scope of that contract as originally procured. Id. '[A] broad original competition may validate a broader range of later modification without further bid procedures.' Id; see Phoenix Air, 46 Fed. Cl. at 105-106 (holding a task order for expanded flight services for the Navy was within the scope because the contract was to cover services 'worldwide'); Astronautics Corp. of Am., Comp. Gen. Dec. B-242, 782 (5 June 1991), 91-1 CPD ¶ 531. When the court finds, applying an objective standard, that potential bidders would have expected a modification to fall within the changes clause of the contract, such a modification will be found to be within the scope of the original procurement. Id.; CCL, 39 Fed. Cl. 780 at 791; Phoenix Air, 46 Fed. Cl. at 104. If a modification is found to be outside the reasonable expectations of the bidders, the government must show that it adequately advised the bidders that such a change might occur. Id. at 1207. The court's analysis takes the entire original procurement into account when comparing its scope to the scope of the modified contract. Id. at 1205; Wunderlich Contracting Co. v. United States, [11 CCF ¶ 80,069], 173 Ct. Cl. 180, 194 (1965).

***

Whether bidders would have anticipated changes in each of these areas of contract performance depends heavily on the language of the solicitation. CIBINIC & NASH, supra, at 389. Changes consisting of technological upgrades have been repeatedly held to be within the scope of the original solicitation where the solicitation included language that expressly anticipated and encouraged the utilization of such advances. See Wiltel, 1 F.3d at 1206; MCI Telecomm. Corp., GSBCA No. 10540-P (28 Feb. 1990), 90-2 B.C.A. (CCH) ¶ 22,735.

Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 465-466

(2001).

The GAO adopts a similar approach. Eng'g. & Prof. Serv., Inc., B-289331, Jan. 28, 2002, 2002 CPD ¶ 24 at 6 (citations omitted); see also, CAD Language Sys., Inc., B-233756, April 10, 1989, 89-1 CPD ¶ 364; Instituform East, Inc., B-272399, Oct. 3, 1996, 96-2 CPD ¶ 134. In Eng'g. & Prof. Serv, Inc., the GAO specifically rejected an argument that modification of a contract to substitute more advanced technology resulted in a modification beyond the scope of the contract. The GAO found that the contract (1) like the DTS contract, included a requirement for Technology Insertion; (2) like the DTS contract, recognized the dynamic nature of technologies; and (3) like the DTS contract, anticipated that such advanced technology would be incorporated as it became available. Given these facts, the GAO held that:

> In our view, the modification at issue in the protest does not alter the fundamental nature and purpose of the contract. Rather, modification No. P00204 merely serves to replace the HUTs acquired under the basic contract with the updated, technologically advanced RHCs with the same basic functionality, as was clearly contemplated by the RFP and the basic contract. The fact that the RHCs acquired under the modified contract incorporate advanced features not found in the original HTUs does not render the RHCs entirely different or new items requiring competition, as EPS maintains. Where, as here, a contractor provides more technologically advanced equipment pursuant to a

> modification within the scope of the basic contract - i.e., the fundamental nature and purpose of the underlying contract remains unchanged - the modification is not improper.

Eng'g & Prof. Serv., Inc., supra at 5-6 (citations omitted).

Here, the DTS contract included a requirement for Technology Insertion; it recognized that over the potential eight year life of the contract advances in technology would become available; and it expected -- in fact required -- the contractor to provide Technology Insertion. Northrop Grumman's proposal (incorporated into the contract) promised to do just that and anticipated migration to the browser modality. Carlson thus essentially complains that the contractor and the Government did precisely what the contract explicitly stated. There can be no reasonable dispute that the essential nature of the contract - to provide a seamless and paperless travel management service - was not altered by the increased use of updated, web-based technology to provide access to those services. In this regard, the total value of the contract did not increase, the period of performance of the contract was not extended, and the functional requirements were not altered. Butler Dec., ¶¶2-6, 8; Schaefer Dec., ¶¶ 8-11. Because the fundamental nature and purpose of the contract remained the same, the modifications were not beyond the scope of the contract.

Specifically, the original solicitation advised that offerors should "describe the planned configuration of hardware and software components, division of processing, data strategy, and communication interfaces." The architecture was required to interconnect with DoD systems. However, the solution to the CUI was left to the creative imagination of the offeror. Williams Dec., ¶ 4. As the Solicitation notes, the Government would "assess the Offeror's proposed solution with respect to how well it meets the requirements as specified in this solicitation . . ." Williams Dec., Attachment 6.

The solution offered by Northrop Grumman and accepted by DoD was stated "to operate across three automated environments so as to be accessible to all DoD personnel today: Web, Client/Server and Character based." Williams Dec., ¶ 10 and Attachment 7. Thus, web-browsers were explicitly provided. Initially, Northrop Grumman anticipated that "initial use may be low [but] in the future the majority of users will transition to operating in the browser mode." Williams Dec., ¶ 13 and Attachment 9. It further anticipated that: "As the DoD infrastructure continues to mature over the next year, we anticipate today's client-server paradigm will shift to a browser model." Williams Dec., ¶ 12 and Attachment 9.

The contract explicitly recognized that the CUI architecture could change as technology advanced. It provided that the solution must "provide . . . system flexibility to permit continuous technical refreshments to DTS based on advances in proven information technologies." Williams Dec., ¶ 4 and Attachment 1. This is precisely what Northrop Grumman envisioned in its proposal, namely movement from client-server to web-based applications as the technology evolved. The modification, which elaborated the web-based solution, did not exceed the scope of the original competition, but, rather, simply eliminated the redundancy of client-server and telnet applications. Accordingly, the browser claim should be dismissed or summary judgment entered in the Government's favor.

Carlson's contention that the web solution eliminated the need to install the CUI on individual PCs and to integrate various local area networks ("LANs") with the CUI is simply untrue. For example, the CUI is located in regional data centers and is not installed on local servers or PCs whether the mode of access be the web or by client-servers. Schaefer Dec., ¶¶ 10-11. Carlson contends web traffic cannot be routed through the NIPRNET, but the DTS contract requires routing through the NIPRNET. Schaefer Dec., ¶ 9.

Carlson contends the CUI must be individually tailored to interact with each LAN in the client server mode but that such interconnection is not required in the browser mode. According to Carlson, to deploy the CUI in client-server mode requires significantly more integration capability than to simply download applications through the internet. This is simply untrue. As Col. Schaefer notes: "DTS must still operate satisfactorily over the NIPRNET and over the local area networks (LANs) resident on military installations. In other words, no requirements for this interoperability were removed when the DTS contract was restructured." Schaefer Dec., ¶ 9. Further, to interact with the public key infrastructure ("PKI") for digital signature, "the DTS contract still requires that the software for integration with DoD PKI be loaded onto the PC . . . The DTS contract must still operate with the full range of PC operating systems, web browsers, CAC middleware readers, and multiple PKI Certificate Authorities used within DoD." Schaefer Dec., ¶ 10.

In short, the migration to the web-only platform eliminated none of the technical requirements of the CUI. Schaefer Dec., ¶ 11. The ultimate product is identical whichever mode of connection is used and the software needed to accommodate DoD information systems to the CUI is the same.

Schaefer Dec., ¶¶9-11. The migration to a web system simply reflects advances in the technology of computing. Accordingly, the web-based product is within the scope of the competition and the web browser claim should be denied.. See, e.g., AT & T Communic., Inc. v. Wiltel, Inc., 1 F.3d 1201,1205 (Fed. Cir. 1993) (alterations to meet the Government's changing needs and the changing technology of telecommunications did not exceed the scope of the competition); Northrop Grumman, 50 Fed. Cl. at 466 ("changes consisting of technological upgrades have been repeatedly held to be within the scope of the original solicitation . . . ").

Likewise, the DTS contract, both as solicited and awarded, required the contractor to provide both computer based travel services and traditional travel services using staffed commercial travel offices ("CTOs"). Indeed, the Solicitation specifically required "Application of existing and emerging technologies, e.g., web-based, kiosk, remote self service station via CD ROM or direct computer link, remote reservation center via toll-free telephone, to supplement services available via staffed travel offices." Williams Dec., ¶ 8 and Attachment 4 (emphasis added).

Further, the DTS contract, both as solicited and awarded, required the contractor to provide both computer based travel services and traditional

travel services using staffed CTOs. Likewise the CBD announcement for the DTS Solicitation explicitly advises that the competition was for "official and leisure travel services" and that some of these services might be "facilitated" by a CUI.

Further still, "travel services" are defined as "All aspects related to the planning, execution, and payment of travel worldwide. That includes consumer user interface (CUI) services as well as travel management services." Williams Dec., ¶ 6 and Attachment 2. Consequently, because the DTS contract as originally solicited and awarded required the contractor to provide traditional travel services, no modification was necessary to procure them and no such "beyond the scope" modification was ever issued.

In sum, the incontrovertible evidence demonstrates that:

1. The DTS Solicitation permitted, and in fact anticipated, that offerors would propose systems that took advantage of available and emerging technology, including the use of the web;

2. Northrop Grumman's proposal and DTS contract, not only anticipated the growing use of the web, but proposed to utilize the web from the very beginning of the contract;

3. Both the initial DTS contract and the DTS contract as modified included the same functionality, integration, and deployment requirements; and

4. The DTS Solicitation and contract required the provision of both CUI-assisted and traditional travel services.

These are the facts, and they are incontrovertible. Accordingly, the motion to dismiss or for summary judgment should be granted in favor of the Government.

B. The Other Alleged Modifications Either Did Not Occur Or Were Contemplated By The Scope Of The Original Competition

In the amended complaint, Carlson alleges that the original contract was modified by: (1) eliminating the requirement that the CUI connect to the regional data centers through the NIPRNET in favor of a web-based system; (2) deleting the technical requirements relating to DoD's public key infrastructure for security; (3) reducing the extent of the deployment of the CUI by limiting deployment to 250 installations; and (4) shifting the financial risk to the Government by allowing Northrop Grumman to receive a lump sum payment of $43.7 million and allowing development work to be paid on a time and materials basis.

Carlson is incorrect factually with respect to all of these issues. With regard to the deployment and the technical requirements of the CUI, as Colonel Schaefer notes:

> The DTS was always, and is still, required to operate via the NIPRNET, regardless of user interface method

> (web, client/server, or Telnet). As such, DTS must still operate satisfactorily over the NIPRNET and over the local area networks (LANs) resident on military installations.

Schaefer Dec., ¶¶ 7 and 8.

Likewise, the modified contract did not reduce the scope of the deployment of the CUI. As Ms. Butler notes:

> The original DTS contract required that the DTS system be deployed to all DoD users, regardless of the number of sites at which they were located. Northrop's proposal agreed to do just what was required, i.e., to deploy the DTS system to all of the approximately 3.2 million users. . . The DTS contract as restructured continues to require that the DTS system be deployed to all of the approximately 3.2 million users.

Butler Dec., ¶ 6. Thus, the restructured contract neither reduces the scope of deployment of the CUI nor the technical requirements for DTS. Id.

While the contract was restructured to cap spending and revise payment methodology, the relative risks of performance between the United States and Northrop Grumman "remained apportioned . . . in much the same manner [in the restructure] as it had prior to the restructure." Butler Dec., ¶ 1. This type of an equitable adjustment is specifically recognized in the Changes clause incorporated into the DTS contract. Federal Acquisition Regulation ("FAR") Regulation 52.243-1. Alternative 1 provides,

among other things,

> (a) The Contracting Officer may, at any time, by written order and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
>
> (1) Description of services to be performed.
>
> (2) Time of performance (i.e., hours of the day, days of the week, etc.);
>
> (3) Place of performance of the services.
>
> (b) If any such change causes an increase in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract. (emphasis supplied)

Here, since the technology had been enhanced and the Government desired a different deployment schedule, it entered into a bilateral modification incorporating an equitable adjustment. For example, Northrop Grumman was paid a lump sum payment of $43.7 million in 2002. However, this payment was made only after the company had delivered a functional CUI and deployment had begun. Id. at ¶ 2. Thus, the lump sum payment to Northrop Grumman was "consistent with the intent of the original contract that required Northrop to deliver a functional CUI and to begin deployment before receiving payment for such effort from the

Government." Id.at ¶ 2.

Further, while the CLIN related to software development upgrades was altered from a fixed fee to a time and materials basis, this did not shift the risk of performance from Northrop Grumman to the Government because payment was still contingent upon the Government's acceptance of the work and Northrop Grumman was subject to a ceiling under the modified contract which had not been imposed under the original contract. Id. at ¶ 4 and 5. The CLIN for operations and maintenance remained based upon a fixed fee and "Northrop Grumman continued to bear the risk of increased costs as it did before [the restructure]." Id. at ¶ 3.

In sum, while some changes were made to the pricing structure of the contract, neither each change considered alone nor as a group materially altered the DTS contract.

1. The total contract value went from an uncapped, estimated value of $263.7 million to a capped $263 million;

2. The payment of $43.7 million was made, just as anticipated under the original contract, only after the company had delivered a functional CUI for which deployment had begun; and

3. In return for the software enhancement development CLIN, the Government obtained a participatory role in the development and the company agreed to a reduced fee.

Thus, the modified contract did not shift the risk of loss from Northrop

Grumman to the Government, and the restructuring was within the scope of the original competition. See, e.g., CESC Plaza Limited Partnership v. United States, 52 Fed. Cl. 91, 96-101 (2002) (changes in the payment methodology "do [not] impermissibly shift the payment/performance obligations [of the Government and contractor]").

## III. THE CDA CLAIM SHOULD BE DISMISSED

As demonstrated previously, Carlson contends Ft. Campbell and facilities in Kentucky, Missouri, and Nebraska cannot be transferred from the Army-Carlson contracts to the DTS contract until the CUI is fully deployed in DTR 6. This assumes that CTO services are not included within the DTS contract. As we demonstrated above, the DTS contract explicitly encompasses unassisted travel services. Accordingly, the facilities can be transferred. Therefore, Count III of the complaint should be dismissed.

## CONCLUSION

For these reasons, our motion to dismiss or for summary judgment should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

s/David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 307-0309
Fax: (202) 514-7965

Attorneys for Defendant

Date: December 15, 2003

.

Certificate Of Filing

I hereby certify that on December 15, 2003, a copy of the foregoing Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment, and Memorandum Of Law were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/David A. Levitt