**REDACTED VERSION**

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-1274C** |
| | ) | **Judge George W. Miller** |
| **THE UNITED STATES of AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, Plaintiff CW Government Travel, Inc. ("Carlson"), respectfully moves the Court for Summary Judgment on Counts I and II of its Amended Complaint. The record before the Court establishes that the Department of Defense ("DoD") improperly modified Contract Number DAMT01-98-D-1005 (known herein as "DTS DTR-6 Contract"), by materially restructuring the contract's terms in violation of the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304.

The record demonstrates that the DoD reconfigured the pricing structure to completely shift the risk of performance and cost overruns from the contractor to the Government, removed significant technical requirements, and added traditional travel services to the DTS DTR-6 Contract, four years after contract award. These modifications essentially created a new contract that the DoD should have competitively procured. Therefore, the Court should enter summary judgment on the merits of Counts I and II for the Plaintiff and order that the DTS DTR-6 Contract be terminated and the DoD's requirement for a web-based end-to-end travel

**REDACTED VERSION**

management system and traditional travel services for the DTR-6 11-state region be promptly procured under fair and open competition.

To the extent that the Court determines that the record, at this point in the litigation, is insufficient to support Carlson's claim, the Court should determine that there are material facts in dispute, deny the Defendant's Motion to Dismiss Or, In The Alternative, For Summary Judgment, and set forth a schedule for discovery and trial.

Finally, the Court should deny the Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment with regard to Count III of Carlson's Complaint and set forth a schedule for discovery and trial.

Carlson also respectfully requests the opportunity to present its positions on all open motions before the Court at oral argument.

WHEREFORE, Plaintiff respectfully requests that the Court GRANT Plaintiff's Motion For Summary Judgment and DENY Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment.

Respectfully submitted,

/s/

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182

Dated: February 23, 2004

**REDACTED VERSION**

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-1274C** |
| | ) | **Judge George W. Miller** |
| **THE UNITED STATES of AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182

Dated: February 23, 2004

**REDACTED VERSION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................iii

INDEX TO APPENDIX ........................................................................................vii

QUESTIONS PRESENTED.......................................................................................1

INTRODUCTION ....................................................................................................1

FACTS .....................................................................................................................5

ARGUMENT..........................................................................................................11

I. THE COMPETITION IN CONTRACTING ACT REQUIRES COMPETITIVE BIDDING WHEN A CONTRACT IS MODIFIED ............11

II. THE RESTRUCTURING CONSTITUTES A CARDINAL CHANGE THAT REQUIRED COMPETITION..........................................................12

A. The Entire Restructure Of The Contract's Payment Provisions Result In A New Contract In Violation Of CICA................................................14

B. The Restructure Materially Altered The Scope of Work ...........................19

C. The Addition Of Traditional Services Required Competitive Procurement ................................................................................................22

D. The Court Should Not Decide Summary Judgment Based On the Government’s Declarations ..................................................................24

**REDACTED VERSION**

III. CARLSON HAS STANDING TO CHALLENGE THE COMPLETE RESTRUCTURING OF THE DTS CONTRACT ....................................30

A. Defendant's Standing Cannot Be Determined In Isolation From The Merits ....................................31

B. Carlson Has Standing To Challenge The Entire Restructuring Of The Contract ....................................34

C. Carlson Has Standing To Challenge The Addition Of Traditional Travel Services ....................................37

D. Carlson Did Not Waive Its Right to Challenge The Restructuring............38

E. Carlson's Suit Is Not Barred By The Doctrine of Laches ..........................39

IV. THE COURT HAS JURISDICTION TO HEAR COUNT III OF CARLSON'S COMPLAINT REGARDING THE INTERPRETATION OF CARLSON'S ARMY CONTRACTS ....................................42

A. Carlson Submitted A Claim And The Government Responded With A Contracting Officer's Final Decision....................................43

B. Count III of Carlson's Complaint Is Ripe For Review .............................46

**CONCLUSION ....................................48**

**CERTIFICATE OF FILING ....................................49**

**REDACTED VERSION**

**TABLE AUTHORITIES**

**CASES**

*Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260 (Fed. Cir. 1999) ...............43, 45, 46, 47

*American Express Travel Related Services Company, Inc. v. TRW, Inc.*, Civil Action No. 02-593-A (GBL), (U.S. D.C. ED VA) ..........................................................24

*Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294 (Fed. Cir. 2001).............................................................................................30, 34

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................................2, 29

*AT&T v. Wiltel*, 1 F.3d 1201 (1993) ...............................................................12, 13, 19, 21

*A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) .....................40

*Bankers Trust N.Y. Corp. v. United States*, 225 F.3d 1368 (Fed. Cir. 2000)................................39

*Bell v. Hood*, 327 U.S. 678 (1946)..............................................................................................32

*Burnside-Ott Aviation Training Ctr., Inc. v. United States*, 985 F.2d 1574 (Fed. Cir. 1993) .......33

*CCL, Inc. v. United States*, 39 Fed. Cl. 780 (1997) ..................................................12, 13, 30

*Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573 (Fed. Cir. 1993) ............................................31

*CESC Plaza L.P. v. United States*, 52 Fed. Cl. 91, 93 (2002) ..........................................12, 13, 37

*Corel Corp. v. United States*, 165 F. Supp. 2d 12 (D.D.C. 2001) ................................................12

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1988) .........................................................41

*Costello v. United States*, 365 U.S. 265 (1961) ...........................................................................40

*Eastern Trans-Waste v. United States*, 27 Fed. Cl. 146 (1992) ....................................................33

*Emery Worldwide Airlines, Inc. v. United States*, 47 Fed.Cl. 461 (2000) ...................................46

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 120 S. Ct. 693 (2000) .........43

*Neil R. Gross & Co.*, 90-1 CPD ¶ 212 (1990)...............................................................................13

**REDACTED VERSION**

*Jerome B. Grubhart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995) ....................................................................................................33

*Krygoski Const. Co., Inc. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) .........................47

*LaForge & Budd Constr. Co. v. United States*, 48 Fed. Cl. 566 (2001) ................................40, 41

*Land v. Dollar*, 330 U.S. 731 (1947) ........................................................................................31

*Maniere v. United States*, 31 Fed. Cl. 410 (1994) .......................................................................33

*Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366 (Fed. Cir. 2002)........30, 34, 35

*Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001).......................................30, 35

*Phoenix Air Group, Inc. v. United States*, 46 Fed. Cl. 90 (2000) .................................................30

*Placeway Construction Corp. v. United States*, 920 F.2d 903 (Fed. Cir. 1990)......................45, 46

*Reynolds v. Army and Air Force Exchange Serv*., 846 F.2d 746 (Fed. Cir. 1988) .................31, 33

*Sceuer v. Rhodes*, 416 U.S. 232 (1974) .........................................................................................31

*Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl.533 (2003) ..............................38, 39

*Spruill v. Merit Sys. Protection Bd.*, 978 F.2d 679, 686 (Fed. Cir. 1992) ....................................32

*Total Med. Mgmt., Inc. v. United States*, 29 Fed. Cl. 296 (1993) .................................................39

*Trauma Serv. Grp. v. United States*, 33 Fed. Cl. 426 (1993).......................................................32

*Travelers Indemnity Company v. United States*, 16 Cl. Ct. 142 (1988) .......................................39

*Vanalco, Inc. v. United States*, 48 Fed. Cl. 68 (2002) ..................................................................45

**REDACTED VERSION**

**STATUES AND REGULATIONS**

FAR § 33.201 ....................................................43

FAR § 52.232-1(d)(2)(i) ....................................................54

10 U.S.C. § 2304 ....................................................11

28 U.S.C. §1491(a)(2) ....................................................43

28 U.S.C. § 1491(b)(1) ....................................................30, 47

28 U.S.C. § 2501 ....................................................39

31 U.S.C. § 3661(2) ....................................................37

41 U.S.C. § 253(1)(a) ....................................................11

41 U.S.C. § 605(c)(1) ....................................................44

Competition in Contracting Act of 1984 ("CICA"). Pub. L. No. 98-369,
Div. B, Title VII, 98 Stat. 1175 (July 18, 1984) ....................................................11

Contract Disputes Act ("CDA"), 41 U.S.C. §601-612 ....................................................42, 43

H.R. Conf. Rep. No. 861, at 1421 (1984), *reprinted in*
1984 U.S.C.C.A.N. 1445, 2109 ....................................................12

The Tucker Act, 28 U.S.C. § 1491(a)(2) ....................................................30

**OTHER AUTHORITIES**

*11 Moore's Federal Practice, § 56.14[1][a]* ....................................................29

**REDACTED VERSION**

## TABLE OF CONTENTS TO PLAINTIFF'S APPENDIX


| EXHIBIT | DESCRIPTION OF DOCUMENT | DATE | PROTECTED |
|---|---|---|---|
| 1 | Excerpts from Solicitation | | |
| 2 | Source Selection Decision Statement (with Enclosures) | April 1998 | X |
| 3 | Excerpts from Original DTS DTR-6 Contract with Sections B - I, Functional Requirements, Technical Requirements & Process Flow Chart) | May 7, 1998 | |
| 4 | Task Order 0010 and Modifications | May 22, 2001 | |
| 5 | Task Order 0012 and Modifications | June 12, 2001 | |
| 6 | Task Order 0013 and Modifications | July 27, 2001 | |
| 7 | Government Cost Estimate for DTS-PMO Travel Management Services | October 31, 2001 | X |
| 8 | Excerpts from Modification P00025 (inc. Sections B-C and G-I and Functional Requirements) | February 27, 2002 | |
| 9 | Post and Pre-Negotiation Memorandum for DTS Proposals (with attachments) | April 1, 2002 | X |
| 10 | Draft Portion of Post and Pre-Negotiation Memorandum for DTS Proposals | | |
| 11 | Excerpts from Modification P00027 (Sections B-H, DTS Requirements Spec., Verification Cross-Reference & CDRL on Training Materials) | March 29, 2002 | |
| 12 | Pre/Post Negotiation Objective Memorandum -- Task Order 0022 | May 20, 2002 | X |
| 13 | Modification P00029 | May 23, 2002 | |

**REDACTED VERSION**

| EXHIBIT | DESCRIPTION OF DOCUMENT | DATE | PROTECTED |
|---|---|---|---|
| 14 | DoD IG Report: Allegations to the Defense Hotline on the Management of the Defense Travel System | July 1, 2002 | |
| 15 | Analysis of DTS Program by the Office of Program Analysis and Evaluation | | |
| 16 | Defense Travel System Phase 3 Deployment Plan | July 3, 2002 | |
| 17 | J&A for 15-month extension to MTMC DTR-3 Contract | March 17, 1999 | |
| 18 | J&A for 18-month extension to MTMC DTR-3 Contract | April 10, 2000 | |
| 19 | MTMC Memorandum re: Contract DAHC22-91-C-0001, DTR-3, Contact Extension | May 10, 2001 | X |
| 20 | J&A for 6-month extension to MTMC DTR-3 Contract | October 5, 2001 | |
| 21 | J&A for 12-month extension to MTMC DTR-3 Contract | April 3, 2002 | |
| 22 | Carlson Letter re: Draft DTS Request for Proposal | November 20, 1996 | |
| 23 | Excerpt from Updated Q&A file on DTS DTR-6 Solicitation | January 3, 1997 | |
| 24 | Carlson Comments on Sections L and M of Second Draft Solicitation | January 16, 1997 | |
| 25 | Acquisition Plan for the Defense Travel System | June 27, 1997 | X |
| 26 | Attendance Roster and Agenda from DTS Preproposal Conference | July 23, 1997 | |
| 27 | Letter from Donna Casey to John S. Freck | October 27, 1999 | |

**REDACTED VERSION**

| EXHIBIT | DESCRIPTION OF DOCUMENT | DATE | PROTECTED |
|---|---|---|---|
| 28 | E-mail from Adam T. Yearwood to other PMO-DTS employees | June 28, 2000 | |
| 29 | E-mail from Sharon Roberts to MTMC and PMO-DTS employees | August 1, 2000 | |
| 30 | Email from Sue Kinsey to Susanna Weart re: DTR-6 Contract Revisions | February 16, 2001 | X |
| 31 | Minutes of DTS Contract Assessment Meeting | February 21-22, 2001 | X |
| 32 | The Defense Travel System: Paths to Additional Success | February 21, 2001 | X |
| 33 | Minutes and notes from Restructure Meeting | March 6, 2001 | X |
| 34 | Minutes and sign-in sheet from Restructure Meeting | March 8, 2001 | X |
| 35 | Comparison of Restructure Visions and Notes from March 16, 2001 Meeting | March 16, 2001 | X |
| 36 | Minutes and Notes from Contract Restructuring Meeting | April 2, 2001 | X |
| 37 | DTS Program Restructuring Actions Required | | X |
| 38 | Letter from Peggy Butler to TRW re: Proposal for Contract Restructure | January 16, 2002 | |
| 39 | Letter from Peggy Butler to TRW re: Proposal for Traditional Travel Services | January 24, 2002 | |
| 40 | Letter from Peggy Butler to TRW re: Additional Changes to Restructure SOW | February 13, 2002 | |
| 41 | Letter from MTMC announcing award of DAMT01-01-R-0175 to CWGT | February 27, 2002 | |
| 42 | Letter from Sue Kinsey to TRW re: on-line | March 5, 2002 | |

**REDACTED VERSION**

| EXHIBIT | DESCRIPTION OF DOCUMENT | DATE | PROTECTED |
|---|---|---|---|
| | booking capability in Army RFP | | |
| 43 | Defense Travel System Technology Refreshment | March 12, 2002 | X |
| 44 | TRW Spreadsheet of CTO Support for Traditional Travel Service for DTR | | X |
| 45 | E-mail from Peggy Butler to Robert McGinnis re: DTS Restructure P2 Eval Report | March 14, 2002 | X |
| 46 | E-mail from Sharon Roberts re: Action Items as of 20 March | March 20, 2002 | X |
| 47 | E-mail from Paul Joyce to Andrea Carlock (MTMC) | March 22, 2002 | |
| 48 | Letter from TRW to Peggy Butler re: DTS Contract Restructure | March 25, 2002 | X |
| 49 | E-mail from Sharon Roberts to Peggy Butler re: Comments on Cost Proposal | March 27, 2002 | X |
| 50 | Letter from TRW to Peggy Butler re: DTS Contract Restructure | March 27, 2002 | X |
| 51 | E-mail from TRW to Peggy Butler with TRW's Comments to Proposed Modification P00027 | March 29, 2002 | X |
| 52 | E-mail from Richard McGinnis to Peggy Butler re: DTS Restructure Post Negotiation Memorandum | March 28, 2002 | X |
| 53 | E-mail from Peggy Butler to William May re: Restructure of DTS Contract | April 5, 2002 | |
| 54 | Letter from Peggy Butler to TRW re: DTR-6 Travel Management Service Requirement | July 29, 2002 | X |
| 55 | Letter from Karen A. Williams to Janet Papp | August 8, 2002 | |

**REDACTED VERSION**

| EXHIBIT | DESCRIPTION OF DOCUMENT | DATE | PROTECTED |
|---|---|---|---|
| 56 | Declaration of Karen A. Williams in American Express v. TRW | August 23, 2002 | |
| 57 | Declaration of Mitchell J. Ross in American Express v. TRW | October 8, 2002 | |
| 58 | Deposition of Rich Fabbre in American Express v. TRW (excerpts) | October 23, 2002 | |
| 59 | E-mail from Jackie Robinson-Burnette to Peggy Butler re: email to Carlson | June 25, 2003 | |
| 60 | Letter from David Levitt to Lars Anderson | July 16, 2003 | |
| 61 | Letter from Lars Anderson to David Levitt | July 23, 2003 | |
| 62 | DTS Program Director's Update by Col. Larry Schaefer | August 2003 | |
| 63 | Excerpt from Draft W91QUZ-04-R-0003 Solicitation | October 9, 2003 | |
| 64 | Letter from Lars Anderson to Charles Morrow re: Protected Material in Protests B-292101, et al. | November 25, 2003 | |
| 65 | FOIA Appeal on ITEC4 FOIA Request for restructuring documents (inc. original request and correspondence) | November 26, 2003 | |
| 66 | Letter from Anissa Parekh to Charles Morrow opposing request for protected material | December 1, 2003 | |
| 67 | Letter from Charles Morrow denying release of protected material | December 5, 2003 | |
| 68 | Northrop Grumman's GovTrip Wins GSA eTravel! | | |
| 69 | Federal Times Article on DTS | January 12, 2004 | |

**REDACTED VERSION**

| EXHIBIT | DESCRIPTION OF DOCUMENT | DATE | PROTECTED |
|---|---|---|---|
| 70 | Declaration of Erma Spell | January 21, 2004 | |
| 71 | Declaration of Barbie Tarr | January 22, 2004 | |
| 72 | Declaration of William S. Hearne | February 10, 2004 | |
| 73 | Demonstrative Exhibit Comparing Peggy Butler's Declaration to Factual Record – also proposed redacted version | | X |
| 74 | Opposition of American Express to TRW's Corrected Motion for Summary Judgment | November 19, 2002 | |
| 75 | Demonstrative Exhibit Comparing DTR-6 Contract Section B to Restructured Section B – also proposed redacted version | | X |

**REDACTED VERSION**

## QUESTIONS PRESENTED

1. Is Carlson, as a provider of both traditional travel services and a web-based Government travel management system, an "interested party" for purposes of challenging the addition of traditional travel services to the DTS DTR-6 Contract and the complete restructuring without competition of that contract to pay for the development of a web-based Government travel management system?

2. Was the complete restructuring of the DTS DTR-6 Contract, including the modification of the contract from a firm fixed-price, performance-based contract to a hybrid cost-plus-fee/time and materials contract to develop a web-based travel management system, a material modification in violation of CICA?

3. Was the 2002 addition of traditional travel services to the DTS DTR-6 Contract a material modification in violation of CICA?

4. Was the Army Contracting Officer's decision interpreting Carlson's contracts to allow the Government to transfer traditional travel services competitively awarded to Carlson to the DTS DTR-6 Contract a decision that this Court can review?

## INTRODUCTION

In 1998, the Government awarded a contract to TRW (now Northrop Grumman) known as the Defense Travel System ("DTS") DTR-6 Contract. It was a firm fixed-price, performance-based contract estimated to cost $263.7 million that involved a significant software integration effort and required TRW to develop and implement a computerized travel management system to connect and streamline the entire cycle of authorization, reservation, and claims processing involved in Department of Defense ("DoD") travel. After years of test failures and massive schedule delays, the Government admits that it "completely restructured" the DTS DTR-6

**REDACTED VERSION**

Contract in 2002. *Exhibit 53*. The Government said at the time that it had renegotiated the "entire DTS functionality" and admitted that the restructured provisions "totally replace the original contract requirements, prices and terms and conditions, with a new [performance time] baseline." *Exhibit 53*.

The Restructured DTS DTR-6 Contract is a new contract. By statute and by regulation, all such new contracts must be competitively procured. This was not done. Instead, the Government essentially issued a sole source contract to TRW for well over $500 million in order to cover up the albatross of a program gone terribly awry.

The DTS Program has been the subject of controversy for years and the DTS Program Management Office ("PMO") staff has been repeatedly forced to deny, explain away, or justify this debacle to avoid termination of the Program. This has led to DTS PMO and TRW taking one position or saying one thing in one forum and then taking a contrary position or saying the opposite in another; all depending on what suits their current position. The Government rightfully worries about a full and open disclosure of the facts that a trial would entail. Thus, the Government's Motion represents an effort to achieve exactly what the Supreme Court has warned against: an improper "trial by affidavit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

The Government's Motion should be denied. First and foremost, the facts alleged by the Government to support its dispositive Motion are either in dispute, demonstrably false, or affirmatively establish Carlson's right to relief. Significantly, the Government's version of facts are set forth in sworn Declarations by individuals who have either given different versions of these facts under oath in different settings, or whose current version differs substantially from the record, including many contemporaneous documents authored by the Declarants. For example:

**REDACTED VERSION**

(1) The Government submits the Declaration of TRW's Karen Williams to support its contention that traditional travel services were expressly included in the original DTS DTR-6 Contract. But Ms. Williams previously submitted a sworn Declaration to another federal court telling that court the exact opposite; explaining that the "provision of traditional travel services was not originally included" in the contract. *Exhibit 56*. At the time, Ms. Peggy Butler, the Government's Contracting Officer, concurred in that view. *Exhibit 54*.

(2) The Government submits the Declaration of its Contracting Officer, Peggy Butler, to represent to this Court that the value of the contract has not changed beyond its original $263.7 million dollars, that the Government has "capped" its payment obligations, that the risk of non-performance and development remain apportioned between the Government and contractor in the same manner as before the restructure, and that the contractor continues to bear the risk of increased costs as it did before. But months after the restructure, the DoD Inspector General reported that the cost of the contract had grown from $263 million to almost $500 million dollars, tens of millions of dollars have been paid to TRW on a cost-plus-fee basis for development and testing work that was originally included in the firm fixed-price and was not earned until, and only to the extent that, a fully operational system was deployed. *See Government Answer to Complaint*, ¶ 21, *Exhibit 73*. The so-called payment "cap" Ms. Butler touts is not a cap on the Government's payment obligation at all, but rather, an illusory cap on the contractor's legal obligation to perform. Moreover, the Restructured

**REDACTED VERSION**

Contract now contains numerous cost-reimbursable items with no ceiling and/or requires payment from funding sources outside the DTS PMO. *Exhibit 75*.

(3) The Government submits the Declarations of Peggy Butler and Larry Schaefer to tell this Court that the technical/functional requirements "were not altered" by the Restructured Contract. But that is not what Ms. Butler said when the contract was restructured. In April 2002, Ms. Butler proudly reported to a DoD official that she and the DTS PMO "have been involved in a total restructure" of the DTS DTR-6 Contract from August 2001 through March 29, 2002. *Exhibit 53*. She bluntly explained that the "entire DTS functionality" was being renegotiated and followed that up by explaining that the restructured provisions "totally replace the original contract requirements, prices and terms and conditions, with a new baseline." *Id.* Schaefer's Declaration is no more helpful to the Court. Schaefer's office was criticized by the IG for providing reports that did not reflect the "true status" of the project. *Exhibit 14, V 1157; see also Hearne Decl., Exhibit 72,* ¶ 8. Schaefer and another DTS PMO official testified to different facts in a June 2003 General Accounting Office ("GAO") Protest, and the Army is now refusing to release that testimony to allow this Court to see it. *Exhibits 64, 66 and 67*. The terms of the modifications and contemporaneous documents prepared by the Government and contractor establish that the technical/functional requirements were substantially changed, with the entire Statement of Work, technical requirements, functional requirements, and even the contractor's technical proposal in the original contract "entirely deleted." *Exhibit 8, V 570-572; Exhibit 11, V 834*. Indeed, even the Government's Declarations submitted in this case

**REDACTED VERSION**

admit that technical requirements that TRW spent over $50 million trying to meet were deleted. *Exhibit 9, Williams Decl.* ¶ 16.

These points underscore the danger of accepting the Government's invitation to trial by affidavit. This Court must review the evidence and, ultimately, evaluate the credibility of these witnesses. Except when facts are not in dispute, that process requires trial.

The Government's Motion must be denied because:

(1) Carlson has standing to challenge the improper modifications or restructure made without competition to the DTS DTR-6 Contract in 2002. Carlson's status as a potential offeror on the requirements for an end-to-end web-based travel management system required by the Restructured Contract is expressly alleged and reaffirmed through Declarations. *Exhibits 70, 71 and 72*.

(2) The 2002 complete restructuring of the DTS DTR-6 Contract's payment and performance provisions was outside the scope of the competition for the original contract. Carlson and other qualified offerors were denied an opportunity to compete for a contract to provide an end-to-end travel management system on the favorable pricing terms and conditions that were negotiated almost four years after award on a sole-source basis. On this issue, the undisputed facts entitle Carlson to summary judgment.

(3) The addition of extensive traditional travel services to the requirements of the DTS DTR-6 Contract four years after it was awarded violates the Competition in Contracting Act and must be competitively procured.

(4) The Government's attempted transfer of traditional travel service requirements from Carlson's competitively won contracts to the Restructured DTS DTR-6 Contract is a breach of Carlson's contracts by the Government, that is properly before this Court pursuant to the Contract Disputes Act.

## FACTS

In 1997, DoD issued a Solicitation seeking an automated travel management system to be known as the Common User Interface ("CUI"). The CUI was intended to eliminate the extensive paper documentation and administrative burden historically involved in the travel process and was to eliminate many of the commercial travel office functions and enable the remaining

**REDACTED VERSION**

functions (reservations, purchasing, and quality control) to be performed in a single travel office for a multi-state region. *Exhibit 14, V 1147-48; Exhibit 9, V 678-79.*

The Solicitation required that the CUI interface with a number of DoD external automated information systems that would link the various components of DoD's travel management system to a new unified defense travel system ("DTS").

The Solicitation required the contractor to develop the CUI using commercial off-the-shelf products (known as "COTS"). The solicitation required that operational deployment commence at the first DoD site within 120 days of the contract award. The contractor was required to complete operational deployment and integration at approximately 11,000 DoD sites worldwide by September 2001. *See Government Answer, ¶ 21; Exhibits 14 and 15.*

At the time of the procurement, there were no web-based COTS products that provided web-based travel management services for Government travelers. *See Government Answer, ¶ 22. Declaration of William Hearne, Exhibit 72,* ¶ 6. The only COTS products available at that time were computer software products that required using a client/server mode of operation. *See Declaration of Barbie Tarr, Exhibit 71,* ¶ 4*; Hearne Declaration, Exhibit 72,* ¶¶ 5-7. Use of a client/server mode would require a contractor with extensive computer integration experience and required the development, implementation, and integration of a CUI, which included creating interfaces with numerous other DoD software products and networks. Indeed, the Solicitation put a premium on the potential bidders experience in software integration. *Exhibit 1, V 7-8 and V 18A-18H.*

The Solicitation contemplated a fixed-price requirements contract for a base period of five years, with three one-year options for: (1) a new travel management system software system, *i.e.*, CUI; (2) operation and maintenance of the CUI; and (3) DTS travel management

**REDACTED VERSION**

services using a Defense Travel System CUI. *See Government Answer ¶ 20. Exhibit 3, V 168-280*. The DTS Solicitation and the original DTS DTR-6 Contract required the contractor to absorb all development and testing costs. The Government was not obligated to pay any development or testing costs incurred by the contractor, and the contractor could not earn any payments until the CUI was successfully tested and operationally deployed. *Exhibit 3, V 80-87; see also Exhibit 75*.

Only two offerors responded to the Solicitation. No provider of traditional travel services responded. *See Government Answer 29* and *Exhibit 2 at V 39*. Carlson did not respond because Carlson understood that the firm fixed-pricing structure required the contractor to assume all costs and risks associated for developing, integrating, and deploying the system and postponed any revenue stream until successful deployment. Carlson also recognized the requirement to use COTS products and to deploy on the tight schedule required by the Solicitation. In light of the extraordinary effort that would be required to integrate the only available COTS products and the tight, mandatory deployment schedule, Carlson declined to participate. *See Declaration of Erma Spell, Exhibit 70,¶¶ 3-5*; *Tarr Declaration, Exhibit 71,¶¶ 3-4*.

In May 1998, the DTS DTR-6 Contract was awarded to TRW. The contract was a firm fixed-price, performance-based contract for approximately $263,700,000. *See Government Answer ¶ 29; Exhibit 14, V 1147-48*.

TRW's performance was plagued by numerous delays and substantial cost overruns. An Air Force representative responsible for monitoring the program reports that in early 2000, the project was years behind schedule and experiencing severe problems addressing the technical requirements. *See Declaration of William Hearne, Exhibit 72,* ¶¶ 3-7. The DTS CUI failed operational tests in 2000 and 2001. *Id.* By late 2001 or early 2002, Mr. Hearne had determined

**REDACTED VERSION**

that that the technical difficulties in developing and maintaining a client/server-based CUI appeared insurmountable. *Id.*

Many of these problems were addressed in a July 1, 2002, DoD Inspector General's Report. *Exhibit 14.* The IG reported that the DTS System was projected to cost approximately $491 million, 53% more than the original contract cost of $263 million, and further noted that it was four years behind schedule. *See Government Answer, ¶ 34; IG Report, Exhibit 14, V 1147-48.* The IG further reported that although the procurement had envisioned an off-the-shelf computer software product, the project had instead involved "extensive developmental work" and noted that *additional* developmental costs of approximately $185 million were anticipated. *Id.*

In late 2001, TRW and the Government entered into negotiations to "completely restructure" the contract. *Exhibits 9 and 53.* A series of modifications were entered into in February, March and May 2002. The Restructured DTS DTR-6 Contract deleted and completely revised the fundamental contract provisions. In forwarding the contract modifications throughout the DoD, the Contracting Officer advised that "these modifications totally replace the original requirements, prices and terms and conditions, with a new baseline." *See Government Answer* ¶ 40; *Exhibit 53 at V 1483*.

The Restructured Contract completely changed the pricing provisions. As discussed in more detail in *Exhibits 73* and *75*, the contract was changed from a firm fixed-price performance-based contract to a cost-plus-fee or time and materials requirements contract. The risk of performance and cost overruns was shifted from the contractor to the Government. Under the Restructured Contract, TRW would be paid "up front" so that TRW's revenue was no longer contingent upon the successful development or deployment, or the degree and timing of actual

**REDACTED VERSION**

use of the DTS CUI by Government travelers. *See Government Answer 41*; *Exhibits 8, 11 and 13*.

As part of the restructuring, the Government paid TRW $43.9 million (plus an additional $9 million in Task Order 0010) to reimburse costs incurred from September 1998 to December 18, 2000. After the restructuring, the DoD Office of the Director, Program Analysis and Evaluation, issued a report addressing the program and the restructuring. Among its conclusions, it reported that:

> The DTS contract was awarded to provide travel services on an aggressive schedule with implementation to start 120 days after the award of the contract and completion within 38 months. Under the original schedule, the DTS program was to be fully implemented at 11,000 sites in the fall of 2001. With the current contract, *implementation has been extended to FY06, a slip of five years*.
>
> The program office estimates that just over half of the program functionality will be delivered with the next release (Jefferson) in the spring of 2003. The Jefferson release is expected to provide enough capability to begin full deployment….
>
> * * *
>
> *It has taken four years to achieve about half the required functionality with an additional three years needed to provide full functionality.*
>
> * * *
>
> The program has experienced significant delays and is not expected to reach FOC [Full Operational Capability] until FY06. (emphasis added) *Exhibit 15, V 1204*.

The modifications also, to use the Government's term, completely replaced the technical requirements. The requirement for a client/server-based system was deleted. *Exhibit 11*. Indeed, the Declaration the Government submitted from TRW personnel specifically admit that the Restructured Contract removed the client/server requirement. *See Williams Declaration,*

**REDACTED VERSION**

¶ 16 and Attachment 11, thereto.

The Government characterizes this action as the "eliminat[ion] [of] the redundancy of client server-and telenet applications." *See Gov't. Motion p. 43.* While the Government now seeks to characterize the requirement for a client/server mode as a "redundancy," there is no dispute that the requirement was in fact deleted. Carlson has alleged facts, produced evidence, and will prove at trial, that those so-called redundancies drove the initial Solicitation and were the principal cause of TRW's performance problems through 2002. The Solicitation required use of COTS products that necessitated a client/server mode of operation in 1998. TRW spent more than $50 million trying to meet those requirements and to develop and integrate such a system. It was not able to do so. The DTS DTR-6 Contract, as modified in 2002, is an information technology, research and development contract to develop a web-based travel management system.

In 2000, Carlson commenced a major program to develop a web-based, end-to-end Government travel management product that would essentially permit a Government traveler, with access to a personal computer and the internet, to complete the entire official travel process via this electronic medium. In developing its web-based travel management product, Carlson worked to satisfy the DTS requirements for its CUI that were contained in the 1998 Contract awarded to TRW. Carlson knew that TRW was still attempting to develop the DTS CUI using a client/server mode and commercial computer software that had been developed and widely available to Government agencies prior to 1998. Carlson believed that a web-based product would be far more efficient and would eliminate the labor-intensive and complex software integration effort required for a client/server-based product. *See Tarr Declaration, Exhibit 71,* ¶¶ 5-6*;Spell Declaration, Exhibit 70,* ¶ 9.

**REDACTED VERSION**

By early 2002, Carlson had developed a fully functional, web-based, end-to-end Government travel product, known as E² Solutions. In March 2002, Carlson filed a provisional application for a United States Patent for this web-based product. Carlson was aware that the General Services Administration ("GSA") was actively working on a program to procure a web-based, end-to-end travel management system for the entire Federal Government. Thus, by March 2002, Carlson anticipated offering its E² Solutions under competitive procurements to provide web-based, end-to-end travel management services to the entire Federal Government, including DoD. *See Tarr Declaration, Exhibit 71,* ¶¶ 5-6*;Spell Declaration, Exhibit 70,* ¶ *10.*

Carlson offers a web-based travel management program (as do other competitors). In a recent GSA competition, Carlson competed against Northrop Grumman (the successor to TRW) and others. Carlson was awarded a contract. As specifically alleged, and as reinforced through the Declarations of Erma Spell and Barbie Tarr, Carlson would have bid for a web-based travel management system if DoD had attempted to procure such services through a competitive procurement, rather than electing to do a sole-source award to TRW. *See Complaint* ¶¶ *82-83; Spell Declaration, Exhibit 70,* ¶¶ *10-12; Tarr Declaration, Exhibit 71,* ¶¶ *6, 13.*

## ARGUMENT

### I. THE COMPETITION IN CONTRACTING ACT REQUIRES COMPETITIVE BIDDING WHEN A CONTRACT IS MODIFIED

There is no more fundamental rule in Government contract law than the general requirement that Federal agencies solicit and procure services via "full and open competition through the use of competitive procedures . . . ." 10 U.S.C. § 2304(a)(1); 41 U.S.C. § 253(1)(a). The Federal procurement system has operated under the paradigm of full and open competition since Congress passed the Competition in Contracting Act of 1984 ("CICA"). Pub. L. No. 98-

**REDACTED VERSION**

369, Div. B, Title VII, 98 Stat. 1175 (July 18, 1984). Congress passed the Act amid concerns that the Government was overspending on goods and purchases through expensive, noncompetitive, sole-source procurements instead of realizing the potential benefits of competition. *See* H.R. Conf. Rep. No. 861, at 1421 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 2109; *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 19 (D.D.C. 2001). CICA "was designed to increase the use of competition in Government contracting and to impose more stringent restrictions on the awarding of noncompetitive – sole-source – contracts." H.R. Conf. Rep. No. 861, 1421.

As this Court has recognized, agencies cannot avoid the requirement for full and open competition "by using the device of a contract modification." *See CESC Plaza L.P. v. United States*, 52 Fed. Cl. 91, 93 (2002). CICA requires agencies to compete contract modifications that materially depart from the scope of the original contract to allow potential bidders to compete for what is essentially a new and different contract. *See CCL, Inc. v. United States*, 39 Fed. Cl. 780, 791 (1997); *AT&T v. Wiltel*, 1 F.3d 1201, 1205 (1993); *CESC Plaza*, 52 Fed. Cl. at 93.

This case presents the very situation that CICA prohibits. The changes to the DTS DTR-6 Contract, characterized by the Government as a "complete restructuring," materially depart from the contract originally solicited and awarded.

## II. THE RESTRUCTURING CONSTITUTES A CARDINAL CHANGE THAT REQUIRED COMPETITION

A contract modification that exceeds the scope of the original contract must be competitively procured. If the modification is simply the addition of new work, then the Court can "carve out" that new work to be competitively bid. *See CESC Plaza*, 52 Fed. Cl. at 93. But when the sum of changes materially alters the contract so that the contract is materially different

**REDACTED VERSION**

from that which was originally bid, the modification impermissibly modifies the contract in violation of CICA, and the entire modified contract must be the subject of competitive bidding. *Id.*; *Wiltel, 1 F.3d at 1205.*

The issue is whether the modified contract was "within the scope of the competition conducted to achieve the original contract." *See AT&T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d at 1205. The inquiry is "primarily an objective one viewed from the perspective of potential bidders for the first procurement." *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 791 (1998); *CESC Plaza*, 53 Fed. Cl. 91, 93 (2002). The overall inquiry is "whether the modification is of a nature which potential offerors would reasonably have anticipated." *Id.* at 1207 (quoting *Neil R. Gross & Co.*, 90-1 CPD ¶ 212 at 3 (1990)). The Court should also consider whether the modified contract substantially changes "the type of work, performance period, and costs as between the original contract and modified contract." *CCL*, 39 Fed. Cl. at 791; *CESC Plaza Limited Partnership*, 53 Fed. Cl. at 93.

Here, the facts necessary to evaluate these prongs are either in dispute or affirmatively establish that the contract was improperly modified. First, the entire payment structure was redone. There is a fundamental difference between a firm fixed-price, performance-based contract and a hybrid cost-plus-fixed fee/time and material contract in which payment is no longer dependent on performance and the Government assumes the risk of cost overruns. Standing alone, the undisputed facts as to this modification clearly entitle Carlson to judgment that the contract was materially altered.

Second, the type of work materially changed. While the initial procurement required bidders to provide a COTS client/server system, the Restructured Contract deleted those requirements and paid the contractor to develop a web-based, end-to-end system. That

**REDACTED VERSION**

modification fundamentally changed the technical effort involved. Indeed, the evidence shows that TRW spent over $50 million trying, unsuccessfully, to implement the original requirements. Likewise, the performance period changed. While performance is still scheduled to continue through 2006, the requirements to begin implementation in May 1998, and to successfully complete implementation at 11,000 DoD sites worldwide by September 2001, were deleted. The combination of these changes, with the fundamental change in payment structure, entitle Carlson to judgment.

Finally, the addition of traditional travel services exceeded the scope of the original contract.

### A. The Entire Restructure Of The Contract's Payment Provisions Result In A New Contract In Violation Of CICA

In the original contract, the contractor would be paid only after an integrated, functional CUI had been successfully deployed. *Contract, Section B, Exhibit 3 at V 80-87*. The amount of payment was dependent on "the user population in a deployment area." *Id. Exhibit 3 at V 80-82*.

The contract set out specific CLINs ("Contract Line Item Numbers") to accomplish payment. CLIN 0001 "Deployment" addressed payments for the CUI deployment and set a fixed-fee of $20.00 multiplied by the user population in a deployment area. *Exhibit 3, V 80-82*. Thus, for example, when the CUI was successfully deployed to an area with a user population of 1,000 personnel, TRW would be paid $20,000. CLIN 0001AK "CUI Operation/Maintenance" then provided that TRW would receive a fixed-fee of $5.27 for each completed transaction using the CUI. *Exhibit 3, V 82-83*. Thus, if DoD travelers then actually used the CUI to make travel arrangements for 100 trips and file for reimbursement, TRW would be paid $527.00

**REDACTED VERSION**

No monies would be paid for development and no payments made to the contractor unless and until the CUI was successfully deployed; further payments depended on the actual successful use of the CUI.

The payment provisions were restructured by three modifications: Modification P00025, dated 2/27/02; P00027, dated 3/29/02; and P00029, dated 5/3/02. *Exhibits 8, 11 and 13*. A full comparison of the provisions and the actual effect on payments is set forth in *Exhibit 75*. This discussion provides an overview that establishes the fundamental change.

The Preamble to Modification P00025 (*Exhibit 8, V 568-70*) are significant because they outline the breadth and scope of the forthcoming changes, reciting that:

- TRW proposed to develop DTS at *its own expense* and charge the DoD *fixed fees* for its deployment."
- "the contract provided for deployment of DTS under requirements-type orders."
- "the contract anticipated that deployment of DTS would commence 120 days after the contract effective date and that TRW would be compensated under the requirements orders for deployment through a fee of $20 per installed user."
- "The Government seeks to restructure the provisions of the contract to include the methodology for compensation for deployment *and development*."
- "the Government and TRW have reached agreement upon a *revised CLIN structure, revised contract type provisions, a revised Statement of Work, and terms and conditions*."

Modification P00025 then provided that "The Government agrees to provide consideration in the amount of $43,745,533.00 for restructure of the contract." (V569). This covered "effort performed prior to December 19, 2000. The Modification then deleted the original Section B pricing CLINs and added new CLINs to:

- provide an additional 516 training sessions at $19,961.24 each for a total of $10,299,999

**REDACTED VERSION**

- pay $6,808,833 for the use of Travel Manager for 1 million vouchers
  pay $650,000 to maintain Travel Manager in year 2 and $500,000 @ in years 3-5.

P00025 left unpriced new CLINs to develop and deploy a CUI. The Statement of Work from the Original Contract, plus Sections E, F, G, H, I and J were deleted in their entirety and replaced. P00025 also deleted in its entirety TRW's original Technical Proposal, which had been incorporated into the original contract.[1] (*Exhibit 8, V 571-72*)

Modification 00027 deleted the fixed-price CLIN 0001 for CUI Deployment. The cost of developing the CUI was changed to a cost reimbursable plus fixed fee CLIN and a time and materials basis estimated at $9,007,343 annually. The Operation and Maintenance of the CUI would be a fixed-fee of $1,215,262.54 monthly for the first year (April 1, 2002 through March 31, 2003), increasing in subsequent periods. A testing CLIN was added for a fixed monthly fee of $521,077.83. Testing support was changed to a Time and Materials basis. Site Fielding Support was priced at $93,655.96 every two weeks for an annual total of $2,435,054.90. Travel expenses were changed to cost-reimbursable. Other fees were modified as well.

Modification P00029 added a payment mechanism to pay for traditional travel services, which had not previously been part of the contract. *Exhibit 13, V 1062-66; V 1093-98.*

The substantial differences between what was bid and awarded in 1998 and what was negotiated on a sole-source basis in 2002 are facially obvious. First and foremost, the change in the payment structure itself is not one that a bidder could have "reasonably anticipated." Putting aside any dispute over the technical requirements, a potential bidder for the original DTS DTR-6 Contract would have understood that the bidder was required to develop the CUI at its own

[1] In this regard, the fact that the Declarants constantly refer to TRW's proposal as being part of the contract is disingenuous since the proposal was deleted as part of the Restructure.

**REDACTED VERSION**

expense. *Exhibit 8, V 568*. *See also Declarations of Erma Spell, Exhibit 70, ¶¶ 4-5; Barbie Tarr, Exhibit 71,* ¶¶ 3-4. It would have understood that all risk and costs associated with that development were to be borne by the contractor. *Id.* It would have understood that no payment for the effort would be received until after successful deployment of the CUI. *Id.* Those are very significant risks and are the reason that Carlson initially refused to participate. *Id.*

In contrast, under the new contract, the contractor is being paid up-front on a time and materials basis. There is little or no cost or performance risk to the contractor. *Exhibit 75.*

TRW's experience is telling in this regard. Under the original contract, it spent more than $50 million in development costs from 1998 through 2000 and had not yet been paid a single cent under the original contract. *Exhibits 7 and 9.* Successful deployment remained unknown — so TRW faced the risk of continuing to spend millions with no revenue stream. In contrast, under the Restructured Contract, TRW is reimbursed those development and deployment costs regardless of success.

While the Government now contends that there was no shift in the financial risk associated with the contract, that is not what the Government witnesses said at the time it restructured the contract. When the contract was originally awarded, the Government noted:

> **"Cost Risk – The proposed contract type is a firm fixed price and therefore, poses more monetary risk to the potential contractor than to the Government. With this type of contract the contractor will be accepting 100% of the cost risk."**

*Exhibit 2*. *Source Selection Decision Statement*, at *V 59*. In contrast, when the DTS PMO Evaluation Team evaluated the Restructured Contract, it noted, among any other things, the change in risk to the contractor:

**REDACTED VERSION**

> the type of CLINs being put in place which reduce the overall risk to the Contractor with the majority of the cost directly relating to labor.
>
> * * *
>
> Recommend the fee for the development effort (CPFF) not exceed [redacted] as this is a low risk effort for the contractor**.** Currently, [redacted] is proposed.

*Exhibit 9, V 737*. This is consistent with what Colonel Schaefer said at the time, when he specifically recognized that the restructure would fundamentally alter the risk allocation. Whereas all risk had previously been borne by the contractor, he proposed a profit factor for TRW consistent with the new allocation:

> **"The fee value [[redacted]] was determined by an analysis of the PMO contracting team and an evaluation of a typical fee associated with a contract where the Government has all the risks of the contract."** *Exhibit 9, V 699.*

The Government's new story that there was no change in the risk allocation is not supported and should be rejected.

Finally, the Government's contention that the modifications kept the value of the original contract and the Restructured Contract the same and that the Restructured Contract included a "cap" on the Government's payment obligation is specious. Significantly, the Government's Declarations do not cite to any contract provision that acts as a cap. That is because there is none. The assertion appears to refer to H-10 (*Exhibit 8, V* 639), which does not provide a cap at all. The provision states:

> The DTS maximum ordering amount is $263,000,000. The dollar amount includes all task orders issued by the Government for DTS. **<u>The maximum establishes the outer limit of the obligation of the contractor; however, the contractor is not barred from performing in excess of this amount if it agrees to do so.</u>** (emphasis added) *Exhibit 13 at V 1075.*

**REDACTED VERSION**

This is no cap on the Government's payment obligation at all -- the only limit is on how much money TRW is willing to accept. Indeed, the evidence suggests that the contractor has already "agreed" to accept far more.

Carlson has submitted evidence that the Government has already paid more than $300 million, far in excess of the so-called "cap." *See Exhibit* 75. Indeed, the IG Report puts the lie to the assertion that it is somehow undisputed that the contract value remains at $263 million. The Report found that as of July 2002, the projected cost of this contract was $491.9 million. *Exhibit 14, V 1147-48.*

This evidence shows a contract that is fundamentally different from that which was bid. From the perspective of potential bidders, a cost-reimbursable contract with the development expenses being funded through up-front payments is far, far different (and more advantageous to the contractors) than the fixed-price, performance-based contract that the Government put out to bid. The Restructured Contract requires competitive procurement. *Wiltel*, 1 F.3d at 1204.

**B. The Restructure Materially Altered The Scope of Work**

The Government tells the Court that the switch to a web-only platform was not a modification at all; merely a natural technological progression expressly contemplated (and required) by the original contract. If that were true, the Government would not have had to "totally replace the original contract requirements" or establish a "new baseline." But Modification 25 deleted and completely replaced the original Statement of Work, the Technical Requirements Document and deleted TRW's technical proposal. *Exhibit 8, V 569*-572. That is hardly indicative of a natural progression contemplated by the contract.

A web-only platform was not an option under the original Solicitation. The Government admits that the CUI procurement required the use of a COTS products with deployment to begin

**REDACTED VERSION**

within 120 days of contract award. *Exhibit 9, V* 678. The Government likewise admits that there were no web-based COTS products for Government travel services. The COTS product selected for the CUI was a client/server application. *Hearne Decl., Exhibit 72,* ¶¶ *5-6.* Moreover, the Government admits that the *requirement* for client/server was *deleted* in the contract restructuring. *Williams Decl.,* ¶ 16.

When the Government began to explore restructuring the contract, it recognized that "if web-based is where we want TRW to go, it's not developed yet. It will take a lot of effort and additional funding." *Exhibit 34, V 1376.* The $50 million already spent went to the effort to develop a client/server system. Obviously, the Government decided to fund this effort. The Office of the Director, Program Analysis and Evaluation for DoD ("PA&E") evaluated the DTS Program and issued a report in December 2002 or early 2003 (well after the contract had been restructured and payments made to TRW). PA&E found:

> After experiencing numerous technical problems that principally involved the lack of an adequate COTS product that could satisfy the current contract requirements without major alterations, a decision was made by DoD to **restructure the TRW contract to address the significant IT development issue**s necessary for the success of the DTS program. (emphasis added) *Exhibit 15, V 1199.*

PA&E went on to note that "[a]ccordingly, the contract was restructured last year from a service effort **to one conducive to developing software**." (emphasis added) *Id.* When the DoD PA&E bluntly recognizes that the contract was being restructured to be "conducive to developing software," it strains credulity for the Government to now suggest that this was merely a natural technical progression already part of the contract.

It is undisputed that the requirement for a client/server system was in the original contract was deleted in the Restructure. The facts are in dispute as to the full extent and effect of the

**REDACTED VERSION**

Government's decision to restructure the contract from a service effort to software development effort. A complete web-based system requires far less computer software integration at the various individual military facilities. *See Hearne Declaration*, ¶ 7. Both TRW and the Government recognized this point while considering the restructuring. *Exhibit 32, V 1338-39.* Likewise, use of only a web-based product is a fundamental change in the system architecture and requirements from the original client-server mode. *See Hearne Declaration, ¶ 7* . The Government realized the magnitude of the change and noted: "We do not have the time and money to complete all things the web-based cannot be completed by 02." *Exhibit 36, V 1399.* At trial, expert testimony may be necessary to explore the full scope and extent of the technical changes. But the fact that TRW spent more than $50 million attempting to develop and integrate the client/server system, and was able only to achieve 50% of the required functionality, sheds light on the true scope of the change. To be blunt, this was no "natural progression" required by the contract, but a fundamental change in scope.

After years of failure and millions of dollars spent by TRW, the Government decided that it wanted to procure a contract for software development, as opposed to the contract that it originally solicited and awarded. That was likely a reasonable decision. But having decided to switch to a software development contract to develop a totally new, web-based system, the Government was required to comply with CICA and seek competition for that new contract. *Wiltel*, 1 F3.d at 1205 (CICA requires competition where "there is a material difference between the modified contract and the contract originally competed").

**REDACTED VERSION**

**C. The Addition Of Traditional Services Required Competitive Procurement**

The Government's decision to include traditional travel services as new work in the DTS DTR-6 Contract was a modification that exceeded the scope of the original contract and required competitive procurement.

The Government contends that since the contract always required certain travel services, the addition of traditional travel services was within the scope of the contract. That position is contradicted by the terms of the Solicitation, the language of the contract, the interpretation of the contract by the Government and its contractor, and by frank admissions that the contract did not include such services. The original contract simply required travel services using the CUI. In contrast, traditional travel services were provided through separately, competitively-procured contracts for all travel regions — including DTR-6.

The Solicitation required the provision of Travel Management Services through the CUI. In essence, the main duty of the Travel Services contractor or subcontractor was to fulfill travel requests through the CUI. The Solicitation did not include, and did not anticipate, the provision of traditional travel services. Indeed, at the time of the Solicitation, contracts for traditional travel services were already in place for all DoD facilities, and the very purpose of the program was to replace traditional travel services and replace those existing contracts as the CUI was deployed to each DTR-6 location as the existing contracts expired. In fact, the Government continued to extend existing or competitively procure new traditional travel service contracts for DoD facilities within the DTR-6 11-state region for at least four years after the DTS DTR-6 Contract was awarded in 1998.

The technical requirements document itself confirmed that "[t]he CUI provides the automation that facilitates the travel services being solicited." *Exhibit 1, V 14; See also*

**REDACTED VERSION**

§ C-2.1.2 at V 89. Likewise, the Defense Travel System Functional Requirements Document attached to the original contract (*Exhibit 3, V 168-171*) provided:

> Requirements for All Official Travel
>
> 2.1 The Contractor shall provide the following travel management services in accordance with DoD travel policies and best industry practices:
>
> 2.1.1 Make confirmed reservations as requested by the traveler or designee and record these arrangements in the CUI. If the traveler does not have automated access to the CUI, the Contractor shall initiate the trip record in the CUI. The Government will be responsible for processing the travel claim information into the CUI . . .

The Government's Declarations asserting that traditional travel services were included are simply false. Indeed, the Government's witness, who now states, under oath, that traditional travel services were included in the contract, previously submitted a sworn Declaration to a Court stating the exact opposite. In her prior Declaration, Ms. Williams explained that TRW had sought a subcontract "to support TRW's efforts by providing certain travel services in DTR-6 utilizing the CUI." *Exhibit 56, V 1492*. Ms. Williams then expressly testified that:

> **"The Government also requested that TRW and its subcontractor submit a proposal to provide traditional travel services in DTR6, while the DTS CUI was being set up and tested. The provision of traditional travel services was not originally included in TRW's prime contract, or AMEX's Subcontract."** *Exhibit 56, V 1491-150, Williams Decl.*

When the Government added the traditional travel services, it likewise recognized that this was a new requirement. It freely acknowledged the traditional travel services were not included. Thus, a DTS-PMO representative bluntly wrote that the modification adds traditional service requirements – it is anticipated that the CUI may not be available at some sites . . . and therefore traditional services capability must be available. Since "there is no provision in the

**REDACTED VERSION**

TRW contract for traditional travel, the contract must be modified to ensure travel services are provided regardless of whether or not CUI is functioning." *Exhibit 28, V 1317.* Other Government personnel likewise acknowledged that the Government had simply added new requirements. *See Exhibit 29, V 1319.*

Likewise, when the Government was in the process of "completely restructuring" the contract, the Contracting Officer wrote to TRW recognizing that traditional travel services were not included in the contract. Ms. Butler explained that "the Government recommends the use of only one subcontractor to perform both types of travel management services, i.e., via DTS and traditional. If TRW is unable to negotiate a fair and reasonable price for both types of service, the Government suggest[s] that **TRW only provide travel management services via DTS as originally contracted**." (emphasis added) *Exhibit 54, V 1487.* This is an explicit recognition that only DTS travel services, not traditional travel services, were originally part of the contract.

### D. The Court Should Not Decide Summary Judgment Based On The Government's Declarations

In accordance with the procedures established at the Preliminary Joint Status Conference, the only discovery to date has been the informal exchange of documents by the Government. No other discovery has been taken. Significantly, depositions of witnesses have not occurred.

Depositions are particularly important in this case in light of the Declarations the Government submitted to support Summary Judgment. For example:

? **Ms. Williams represents to this Court that traditional travel services were included in the original DTS DTR-6 Contract.**

As noted, Ms. Williams submitted a sworn Declaration to another federal court in the case of American Express Travel Related Services Company, Inc. v. TRW, Inc., Civil Action No. 02-593-A (GBL), (U.S. D.C. ED VA). That case involved litigation between

**REDACTED VERSION**

TRW and American Express, TRW's travel service subcontractor under the DTS DTR-6 contractor. As noted above, Ms. Williams' Declaration testified to the exact opposite of what she tells this Court. Her Declaration there is consistent with Ms. Williams' correspondence to American Express at the time (*Exhibit 55, V* 1489) and consistent with Ms. Butler's correspondence to TRW, all indicating that traditional travel services were not included in the contract. *Exhibits 54, V 1487.*

Another TRW official, Rich Fabbre, corroborated that point testifying in a deposition (*Exhibit 58, V 1511-1520*) that the Government's DTS DTR-6 Solicitation required that the travel services be CUI-provided travel services and "the only travel services that American Express would provide would be to travelers who were using the CUI." *Exhibit 58, V 1516.* Use of the CUI to provide travel services is the opposite of traditional services.

? **The Contracting Officer, Ms. Peggy Butler, represents to the Court that the Restructured Contract "capped the Government's payment obligations" and that the new contract has "a ceiling that capped the Government's potential payment obligations" at the original contract estimate of $263 million.**

As demonstrated in *Exhibit 73*, the actual Restructured Contract has no such "cap" or "ceiling" on the Government's payment obligations and the so-called "cap" of $263 million has already been exceeded, even though years of performance (and payment obligations) remain. *Exhibit 75.*

? **Ms. Butler represents to the Court that under the Restructured Contract, the risk of non-performance and development remained apportioned between the Government and TRW "in much the same manner" as it had in the original contract.**

As noted above, the cost and performance risk shifted and the Government expressly recognized that very point at the time. As demonstrated at length in *Exhibits 73*

**REDACTED VERSION**

and *75*, the change was a fundamental alteration of the entire compensation mechanism and risk allocation. The Government recognized it as such. It defies credibility for Ms. Butler to represent to the Court that changing from a fixed-price, performance-based contract, to a Cost-Plus-Fixed-Fee and Time and Materials Contract does not substantially change the risk allocation between TRW and the Government.

? **Ms. Butler states that the $43 million paid was done so only after Northrop Grumman "had delivered a functional CUI and deployment had begun."**

As explained at length in *Exhibit 73*, at the time the commitment to pay TRW's costs was made, and at the time actual payment was made, the CUI had not successfully passed its Initial Operational Capability and was not acceptable for operational deployment. *Hearne Decl., Exhibit 72, ¶¶ 4-5*. The results of CUI tests and operational assessments conducted prior to the payment of the $50 million establish that the CUI was not considered fully functional and was not accepted for operational deployment.

The DoD Inspector General's Report found that the DTS was only going to be fielded to "10 pilot sites during FY 2002." *Exhibit 14, V 1156*. Fielding to a pilot site is not deployment of a fully functional CUI. The DoD IG reported that "as of April 2002, 27 (71 percent) of the approximately 38 DoD accounting and disbursing systems, with which DTS may interface, had not been tested." *Id.* The DoD IG found the allegation that "DTS failed to achieve system functionality"… "was sustained." *Exhibit 14, V 1167*.

? **Ms. Butler asserts that the $43 million payment was not a payment for TRW's costs incurred for the software development effort associated with the client/server CUI that was deleted from the contract.**

As demonstrated at length in *Exhibit 73*, the evidence shows that this so-called "consideration" (plus another $9.7 million paid under Task Order 0010 for costs incurred

**REDACTED VERSION**

prior to December 19, 2000) corresponds with the amount of money TRW spent attempting to develop the CUI on a client/server basis that was, in fact, deleted from the contract requirements as part of the restructure.

? **Ms. Butler represents to this Court that the overall price of the contract was not increased by the restructure and TRW "continued to bear the risk of increased costs as it did before."**

As noted above, and demonstrated in *Exhibit 75*, the restructured pricing removed the fixed-price, performance limitations from the Contract and substituted Cost-Plus-Fixed-Fee and Time and Materials pricing. Moreover, many items that were previously included in the fixed-price, performance restricted CLINs have been renegotiated to cover TRW's costs plus profit, are now being paid on a monthly fee basis, without limitation to reflect the number of actual users or travel transactions performed with the CUI. As indicated by the DoD Inspector General's Report, and the calculations of the restructured pricing in *Exhibit 75*, the overall price of the contract has increased dramatically.

? **Colonel Schaefer's Declaration contends that the change to a web-based system did not eliminate requirements.**

Proclamations from the DTS PMO cannot be simply accepted at face-value. For example, the July 2002 DoD Inspector General's Report noted that information from DTS PMO "did not always appear to report the 'true state' of the DTS program."

Colonel Schaefer testified at length regarding the DTS Program during a GAO Protest proceeding and his testimony there differs from the representations in this Declaration. Plaintiff had requested permission from the GAO to introduce such testimony in this litigation, but the Army objected to making such testimony available to this Court. *Exhibits 64, 66 and 67*. William S. Hearne states: "it should be noted that in my two years experience monitoring the

**REDACTED VERSION**

DTS CUI program for the Air Force, we witnessed numerous examples of the DTS PMO over-optimistically reporting the progress achieved and/or substantially downplaying the problems experienced." *Exhibit 72, ¶ 8.*

Colonel Schaefer's representations are contradicted by the fact that the Restructured Contract modifications issued in February, March, and May 2002, deleted in their entirety the original Statement of Work, Technical Requirements, Functional Requirements and the original TRW technical proposal that had been incorporated into the contract. In fact, Colonel Schaefer specifically refers to TRW's original technical proposal, but fails to inform the Court this document had been deleted from the contract during the restructuring in early 2002.

The PA&E Report again undermines the *ipse dixit* testimony of Colonel Schaeffer and shows that that the changes were real and substantial. *Exhibit 15, V 1199*

**? Colonel Schaefer attempts to convince the Court that the DTS requirements are significantly different from the General Service Administration's eTravel Contract awarded to Carlson in August 2003.**

It is noted that the DoD Office of Program Analysis and Evaluation questioned the validity of many of the requirements developed by the DTS PMO formerly headed by Colonel Schaefer. Again, the PA& E Report is instructive:

> **If DoD unique requirements will not be needed for some time or they "enhance" DoD capabilities at a relatively high cost, it is not clear that development is prudent. The Department may be "chasing" DoD-unique requirements.**
>
> **<u>Finding.</u> A hard scrub of DoD unique capabilities should be completed to assess why they are unique and which ones are truly necessary. (V 1201)**
>
> *** * ***
>
> **The program office stated that about half of the requirements for DTS were derived from the Task Force Recommendations.**

**REDACTED VERSION**

> **The other half of the requirements are not adequately documented or linked to a Mission Needs Statement. PA&E is concerned that the lack of traceability for half of the requirements has or will cause requirements growth leading to further schedule delays.**
>
> **PA&E is also concerned that additional functionality is under consideration without the analysis to support program decisions.** *V 1204.*

Colonel Schaefer's comparison between the DTS requirements and the GSA eTravel Contract is very deceptive in that the additional features desired by an agency using the GSA eTravel System can be included for additional development cost on a time and materials basis – just as they are in the DTS Contract. *Hearne Decl., Exhibit 72, ¶¶ 9-10*. Mr. Hearne also states that the features mentioned by Colonel Schaefer could readily be included in the Carlson eTravel System. *Id.*, ¶¶ 9-13.

As the Supreme Court has made clear, Rule 56 "by no means authorizes trial on affidavits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As Professor Moore notes, Rule 56 "supports the uniform refusal of the Courts to entertain summary judgment litigation which is nothing more than an attempt at trial by affidavits." *11 Moore's Federal Practice, § 56.14[1][a]*. Indeed, an affidavit containing false testimony "raises a genuine dispute of material fact . . . ." *Id.*

The Government's Declarations are simply an attempt to tell its side of the story without subjecting its Declarants to cross-examination and being forced to face contrary evidence. That is not surprising, since, as Professor Moore notes, parties "endeavor to present their positions in the most favorable light" in their Declarations; that is why Summary Judgment should not devolve into an attempt at trial by affidavit.

**REDACTED VERSION**

## III. CARLSON HAS STANDING TO CHALLENGE THE COMPLETE RESTRUCTURING OF THE DTS CONTRACT

This Court has jurisdiction over claims that the modification to a contract required separate competition in the Tucker Act, which provides the Court with the jurisdiction to "render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). A party has standing to assert jurisdiction under the Tucker Act if it is an "interested party."

As discussed below, an "interested party" is "'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or by failure to award the contract.'" *See Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3661(2)). In cases challenging an improper modification of a contract, a plaintiff will have standing if it "would have been a qualified bidder." *See Meyers Investigative and Sec. Servs. v. United States*, 275 F.3d 1366, 1370-71 (Fed. Cir. 2002). In accordance with the Federal Circuit's approach, this Court consistently recognizes that a plaintiff need only establish that it "likely would have competed for the contract had the Government publicly invited bids or requested proposals." *See CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997); *cf. Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 455 (2001) ("The court will determine standing based on whether the protesting contractor could compete for the new contract work and whether it has an economic interest in such work . . ."); *Phoenix Air Group, Inc. v. United States*, 46 Fed. Cl. 90, 102 (2000) (finding standing for contractor that would be a prospective bidder on uncompleted work).

**REDACTED VERSION**

**A. Defendant's Standing Cannot Be Determined In Isolation From The Merits**

The Government's allegations that the Court lacks jurisdiction to review the merits of Carlson's Complaint are based on the contention that Carlson's $E^2$ Solution would not meet the requirements for a DoD travel management system. That contention does not raise an issue that can or should be decided at this time. Indeed, the true requirements for the DoD procurement that would follow this Court's decree are not known. But the factual issue raised by the Defendant's motion is so intertwined with the merits that the proper procedure calls for the Court to assume subject matter jurisdiction and address the merits. Further, regardless of the close association of the jurisdictional issues with the merits, the Court should not rule on the Government's motion until Carlson has had an opportunity to conduct jurisdictional discovery.

If a motion challenges the sufficiency of the Complaint, constituting a "facial attack" on the pleading, the Court assumes that the assertions made in the Complaint are true and construes them in the light most favorable to the Plaintiff. *See Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citing *Sceuer v. Rhodes*, 416 U.S. 232, 236 (1974); 2A James W. Moore et al., *Moore's Federal Practice* ¶ 12.07[2.1], at 12-51 to –52 (1993)). If, however, the Defendant denies or controverts the allegations made in the Complaint, challenging the factual basis for jurisdiction, the controverted allegations in the Complaint are not controlling and the Court may consider relevant evidence to resolve the factual dispute. *See id.* at 1583-84; *Reynolds v. Army and Air Force Exchange Serv*., 846 F.2d 746, 747 (Fed. Cir. 1988) (citing *Land v. Dollar*, 330 U.S. 731, 735 (1947)).

**REDACTED VERSION**

The Government has badly mangled the standard for reviewing a Motion to Dismiss.[2] Specifically, the Government has failed to appreciate the difference between a facial attack and a factual attack on a Complaint. When a Defendant raises a jurisdictional issue in a factual attack, and the jurisdictional issue is intertwined with the merits, the proper procedure is to assume jurisdiction and proceed to the merits. Here, the jurisdictional issues presented in the Defendant's Motion – that Carlson's' product would not be capable of meeting the DoD Restructured Contract – are inextricably bound to the merits of the claim. Thus, the Court should assume that it holds subject matter jurisdiction to review Carlson's Complaint and set forth a schedule for resolution of the merits.

If non-frivolous jurisdictional allegations are intertwined with the merits, however, then black letter law spanning half a century holds that subject matter jurisdiction should be accepted and the case should proceed forward to a resolution of the merits. *See Bell v. Hood*, 327 U.S. 678, 682 (1946); *Spruill v. Merit Systems Protection Bd.*, 978 F.2d 679, 686-87 (Fed. Cir. 1992); *Trauma Serv. Grp. v. United States*, 33 Fed. Cl. 426, 433 n.5 (1993) (if facts are intertwined, "the uniform practice … is to assume jurisdiction and decide the case by summary judgment or trial"), *aff'd*, 104 F.3d 1321 (Fed. Cir. 1997); *Total Med. Mgmt., Inc. v. United States*, 29 Fed. Cl. 296, 301 (1993) ("the existence of a contract is at its core more of a merits than a jurisdictional issue"), *aff'd*, 104 F.3d 1314 (Fed. Cir. 1997). This line of rulings is consonant with the rule that if the Defendant challenges the allegations made in the Complaint with regard to the Court's jurisdiction, the Court need not determine those facts with finality at the threshold

[2] Indeed, it is even unclear whether Defendant pursues a Motion to Dismiss or a Motion for Summary Judgment, as the Government's filing is titled as both. The Defendant's memorandum, however, fails to distinguish which arguments apply to which type of motion.

**REDACTED VERSION**

for litigation. Rather, the Plaintiff may establish jurisdiction at the outset of the case "by means of a nonfrivolous assertion of jurisdictional elements . . . ." *See Jerome B. Grubhart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537-38 (1995).

The Government alleges that Carlson does not have the technical ability to perform the contract. Carlson has alleged, however, that the technical requirements that forestalled it from competing in the initial competition were removed in subsequent modifications and presented evidence that it could, in fact, perform the contract as modified. Thus, the jurisdictional issues and the merits are commingled to such an extent that it would be premature to dismiss this case for lack of jurisdiction.

Even if the disputed facts are not intertwined, however, the Government is not entitled to summary disposition of its factual assertions without allowing Carlson an opportunity for discovery or trial. *See Burnside-Ott Aviation Training Ctr., Inc. v. United States*, 985 F.2d 1574, 1580 (Fed. Cir. 1993); *Reynolds v. Army and Air Force Exch. Serv*., 846 F.2d 746, 748 (Fed. Cir. 1988) (vacating 12(b)(1) dismissal where record did not demonstrate that plaintiff was "afforded an opportunity to establish the jurisdictional facts"); *Maniere v. United States*, 31 Fed. Cl. 410, 412 (1994) (agreeing that factual challenge may involve situations "'where only additional discovery can uncover necessary jurisdictional facts,'" quoting *Eastern Trans-Waste v. United States*, 27 Fed. Cl. 146, 148 n.1 (1992)).

To the extent it has not already been fully established, discovery would support Carlson's standing to bring this suit. For example, the proposal submitted by Northrop Grumman to GSA in the E-Travel procurement, as well as the evaluator's comments in that procurement, may demonstrate that the proposal was based on Northrop's work on the DTS Program and strikingly similar to the product it developed. Similarly, the evaluator's comments from the E-Travel

**REDACTED VERSION**

procurement will illustrate the similarities between Carlson's product and Northrop's product. Further, depositions are necessary to test the veracity of the affidavits submitted by the Government, especially when, as is described above, the veracity of the Declarations is highly suspect. Thus, the Court should not rule on the Defendant's Motion until Carlson has been allowed sufficient opportunity to conduct jurisdictional discovery.

### B. Carlson Has Standing To Challenge The Entire Restructuring Of The Contract

To establish standing, Carlson need only establish that it was an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *See Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001). A plaintiff has standing to challenge an improper modification if it "would have been a qualified bidder." *See Myers Investigative & Sec. Servs. v. United States*, 275 F.3d at 1370-71.

The Government's suggestion that Carlson must establish at this point in the case that it would have had a substantial chance of receiving the award is a misreading of controlling law. Any such inquiry is subsumed within the determination that Carlson would have been a qualified bidder. If a contractor would have been a qualified bidder on the work at issue, it is deemed to have a substantial chance of being awarded the contract for purposes of the standing analysis. In *Meyers Investigative and Security Services*, the Federal Circuit specifically addressed the "substantial chance" requirement as it applies to challenges that modifications to work should have been competitively procured. The Court explained that the proof required of the Plaintiff is different from that required when a Plaintiff challenges that it should have received the award in the first place:

**REDACTED VERSION**

> To have standing, *the plaintiff need only establish that it "could compete for the contract" if the bid process were made competitive. Id.* . . . Although it need not show that it would have received the award in competition with other hypothetical bidders, it must show that it would have been a qualified bidder.

*Id.* at 1370-71 (emphasis added). Indeed, a Plaintiff may establish standing regardless of whether it submitted a proposal or bid on the original contract. *See Northrop Grumman Corp. v. United States*, 50 Fed. Cl. at 455 ("Although Lockheed did not submit a proposal on the original contract work, its protest is not based on wrongdoing by defendant in awarding the original contract to Raytheon.").

The Restructured Contract is for a web-based end-to-end travel management system. Carlson alleged specific facts setting forth its ability and willingness to compete for that project. Carlson specifically alleged that it was a potential bidder for the work described in the restructured contract. *See Complaint, ¶ 83*. Carlson specifically alleged that GSA had awarded to Carlson contracts in other competitive procurements for essentially identical services. These are "non-frivolous" allegations of standing; indeed, Carlson's status as an interested party and a potential bidder for the work cannot be seriously debated.

The specific allegations of standing and its status as a potential bidder are reinforced by the Declarations of Erma Spell and Barbie Tarr. Ms. Tarr explains that in 2000, Carlson commenced a major program to develop the web-based end-to-end Government travel management product to permit a Government traveler to complete the entire travel process via an electronic process. *See Tarr Decl. ¶ 5*.

By early 2002, Carlson had developed a fully functional, web-based end-to-end Government travel product known as $E^2$ Solutions. At that time, Carlson knew that GSA was actively working on a program to procure a web-based end-to-end travel management system for

**REDACTED VERSION**

the entire Federal Government. Thus, by March 2002, Carlson anticipated offering its $E^2$ Solutions under competitive procurements to provide web-based end-to-end travel management services to the entire Federal Government, including DoD. *See Tarr Decl., Exhibit 71, ¶¶ 5, 6; Spell Decl., Exhibit 70, ¶¶ 9-12.* Carlson's $E^2$ Solutions product was developed at private expense. It continued to develop, refine, and add new capabilities to that web-based system throughout 2002-2003, at private expense. Carlson submitted a proposal to GSA for a web-based end-to-end travel system for use by all Federal Government agencies and was awarded a contract in August 2003. *See Spell Decl., Exhibit 70, ¶ 13.* To the extent that DoD required enhancements or additional features, Carlson could develop and implement those features. *See Hearne Decl., Exhibit 72, ¶ 13.* Thus, Carlson is undoubtedly a qualified bidder.

The Government argues that Carlson lacks standing based on Colonel Schaefer's conclusory allegations that Carlson's $E^2$ Solutions product does not meet certain DoD integration requirements. That argument is unavailing.

First, it creates at most a factual dispute that would require this Court to decide the merits of the case as part of the Government's preliminary challenge to standing. As set forth above, the appropriate procedure in those circumstances is to assume jurisdiction and proceed to decide the issues together. But the Government's argument suffers from more fundamental problems. Schaefer's Declaration ignores the fact that the GSA eTravel Contract is available for use by every Federal civilian agency, as well as DoD, and that each agency would require customized features to allow interface with that particular agency's accounting, disbursing, and vendor systems. Because it would be impractical for GSA to provide the necessary detailed information regarding customization for every Federal agency, the GSA required offerors, including Carlson, to provide fixed hourly rates so that the individual agencies could have the contractor develop

**REDACTED VERSION**

the custom interfaces. Accordingly, the eTravel Contract provides that the very types of features that Schaefer contends are not included could be provided to the individual agencies at an additional development cost. *See Hearne Decl., Exhibit 72,* ¶¶ *9-13*. As Mr. Hearne explains, to the extent that the requirements set forth in Schaefer's Declaration are necessary, Carlson could readily add those features to $E^2$ Solutions.

These facts undermine the Government's contention that the purported "undisputed facts" establish that Carlson lacks standing. Rather, Carlson has specifically alleged its status as a potential bidder, has reinforced those with Declarations, and has set forth evidence contrary to the Government's claim that Carlson could not meet the DoD requirements for a web-based end-to-end travel management system.

### C. Carlson Has Standing To Challenge The Addition Of Traditional Travel Services

Carlson challenges the addition of traditional travel services to the DTS DTR-6 Contract. That work was added in Modification P00029, dated May 23, 2002. *Exhibit 13.*

A contract modification can violate CICA in two different analytical means. First, new work can be added that required competitive procurement. In that situation, the Court can "carve out" the new work and require competitive bidding for that work. *See CESC Plaza Limited Partnership*, 53 Fed. Cl. at 93. Alternatively, modifications can so substantially change the contract that the entire contract must be rebid. *Id.* The addition of traditional travel services to the DTS DTR-6 Contract fits both means. First, the addition of this work contributes to the overall "restructuring" of the contract that requires that the entire contract be open to competitive bidding. But it could also be "carved out" as new work.

Carlson has competed for and won numerous DoD contracts for traditional services. *See Spell Decl., Exhibit 70, ¶ 7.* The Government does not, and cannot, challenge Carlson's standing to raise this issue. The fact that Carlson is indisputably a qualified bidder for the work that was added and is a qualified bidder for the restructured contract (to which this new work was added) requires that this case proceed to a determination on the merits.

**D. Carlson Did Not Waive Its Right to Challenge The Restructuring**

The Government's contention that Carlson's Complaint is untimely is without merit. The Government contends that this Court has adopted certain GAO timeliness rules "in appropriate circumstances" and attempts to import GAO regulations requiring a bid protestor to submit a claim within ten days from the time it knew or should have known of the alleged impropriety. *See Def. Mot. to Dismiss* at 30. The GAO rules do not apply to this case. The Court expressly recognized that the use of GAO timeliness rules is inconsistent with the Court's jurisdictional mandate from Congress. *See Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533 (2003). In *Software Testing*, the Court explained that it "fails to see how a GAO rule that self-limits that agency's advisory role constitutes a limit, either legally or prudentially on this court's exercise of jurisdiction." *Id.* at 535. The Court extrapolated further, noting that "28 U.S.C. § 1491(b)(1) (2000) explicitly provides that this court shall have bid protest jurisdiction 'without regard to whether suit is instituted before or after the contract is awarded.'" *Id.* Thus, the Court found that even if there were a delay in filing a Complaint, "such delay does not constitute an independent legal ground for rejecting a request for injunctive relief." *Id.* Finally, the Court noted that if it were to allow one GAO timeliness rule to apply to the Court of Federal Claims, it would have to apply the entire GAO rule, "which includes exceptions to the timeliness requirement for 'good cause shown' or if a protest raises 'issues of significance.'" *Id.* The Court

**REDACTED VERSION**

concluded that such an approach to jurisdiction was unacceptable. *Id.* Therefore, the Court should reject the Government's attempt to import the GAO regulations.

**E. Carlson's Suit Is Not Barred By The Doctrine of Laches**

Carlson's suit is not barred by the doctrine of laches. First, the doctrine of laches cannot apply to a contract claim to which the statute of limitations of 28 U.S.C. § 2501 applies. Second, even if the doctrine could apply to Carlson's claim, the Government has failed to establish undisputed facts that would meet its burden of proof.

Traditionally, the doctrine of laches has not been recognized in Government contract cases. *See, e.g., Travelers Indemnity Co. v. United States*, 16 Cl. Ct. 142, 154-155 (1988). The decision not to apply the doctrine to Government contract cases was due to the fact that where a statute of limitations exists, such as that governing claims brought at the Court of Federal Claims contained in 28 U.S.C. § 2501, laches does not apply. *Id.* (citing numerous cases at the United States Court of Claims[3]). The atmosphere changed, however, with the passage of the Contract Disputes Act. *Id.* The Contract Disputes Act limited a plaintiff's time to submit a claim based on when it obtained a final decision from the contracting officer, not the statute of limitations at 28 U.S.C. § 2501. Therefore, the Court began to apply the doctrine of laches to claims under the CDA. The Government's assertion of laches, however, is aimed at Carlson's claims that the Government improperly modified the contract with Northrop. This claim is not governed by the timeliness rules of the CDA, but, rather the statute of limitations at 28 U.S.C. § 2501. Therefore, the doctrine of laches does not apply.

---

3 Court of Claims Cases are binding on the Court of Federal Claims and the Federal Circuit unless reversed by the Federal Circuit en banc. *Bankers Trust N.Y. Corp v. United States*, 225 F.3d 1368, 1373 (Fed. Cir. 2000).

**REDACTED VERSION**

Furthermore, even if the doctrine of laches did apply, the Government has failed to meet its burden of proof. "To invoke laches a party must show (1) that the delay from the time the claimant knew or reasonably should have known of its claim against the party was unreasonable and inexcusable; and (2) that the delay caused either economic prejudice or injury to the party's ability to mount a defense." *LaForge & Budd Constr. Co. v. United States*, 48 Fed. Cl. 566, 570 (2001) (citing *A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc)). The party asserting the defense of laches has the burden of proving both elements. *Costello v. United States*, 365 U.S. 265, 282 (1961).

More importantly, however, the Government has failed to establish that there was any delay in Carlson's filing of the Complaint. The Government attempts to pin the time at which Carlson knew or should have known of the improper modification of the DTS contract to a notice in *Commerce Business Daily* dated May 22, 2001. *Def. Exhibit 10.* The notice, however, does not address the fact that the Government fundamentally changed the pricing structure and the technical requirements of the contract and added traditional travel services to the contract as well. Moreover, to the extent that the contract discusses the restructuring of the pricing structure, the notice does not even begin to hint at the massive degree of change that occurred.[4] The notice states that the Government added "software and development/engineering pricing features to allow for DTS CUI connectivity to the DoD Disbursing and Accounting Systems." As noted above, the price restructuring was not limited to the connectivity to the DoD accounting system. Indeed, the nine line notice does not even discuss the wholesale changes that occurred in various

[4] Indeed, the degree of change was not discovered by Carlson until the Fall of this year, when the Government finally produced the modifications to the contract, necessitating that Carlson file an Amended Complaint.

**REDACTED VERSION**

levels of the contract, nor the flat payment of over $50 million to Northrop. Further, the notice came several months before the modifications restructuring the control. It is more likely that the CBD notice referred to Task Order 10, issued on the same day s the CBD notice. *See Exhibit 4.* Thus, the CBD notice was insufficient to put Carlson on notice of the Government's failure to comply with CICA. *See Exhibit 73.*

The Government also alleges that Carlson knew, or sho uld have known about the addition of traditional travel services on March 20, 2002. The Government bases this challenge on a declaration from Northrop, alleging that it approached Carlson about providing the traditional travel services that would be added to the contract. *Williams Decl. ¶¶ 22-23.* As stated in the Declaration of Barbie Tarr, Director of IT Processes of CW Government Travel, Inc., TRW, the successor to Northrop Grumman, did not approach Carlson about performing traditional travel services, but, rather, replacing American Express as its subcontractor to provide CTO fulfillment services using the DTS CUI. *Exhibit 71, ¶ 7.*

"Although delay by the plaintiff is the first element needed to establish the defense of laches, it is not enough to show merely a lapse of time from the date a cause of action first accrued." *LaForge & Budd Constr. Co.*, 48 Fed. Cl. at 570 (citing *Cornetta v. United States,* 851 F.2d 1372, 1377 (Fed. Cir. 1988)). The Government must also show that the delay was both unreasonable and unexcused. *Id.* Even if the Government could establish delay, which it cannot, the Government has failed to set forth undisputed facts that establish that the delay was unreasonable or unexcused. Indeed, the complex factual and legal questions involved in the claim required significant research and fact gathering. This fact gathering was stymied by the Government's continued failure to respond to FOIA requests submitted by Carlson. Carlson's attempts to obtain information concerning the modifications began with a letter dated November

**REDACTED VERSION**

15, 2002. The Government did not respond to that letter until November 4, 2003, almost a year later. The history of Carlson's attempts to obtain documents related to the contract is included in the FOIA appeal filed on November 26, 2003. *Exhibit 65*. As evidenced therein, Carlson has diligently, and repeatedly, attempted to discover the facts that form the basis for this suit. Those facts were not uncovered, however, until the Court ordered the Defendant to produce such documents.

Finally, the Government has failed to establish that it has been prejudiced by any alleged delay. The Government implies that its investment of millions of dollars in the Northrop produced CUI would be wasted. The "prejudice" complained of by the Government arose, not because Carlson sat on its hands, but because the Government continued to throw good money after bad, and failed to comply with the law and competitively procure the "Restructured" requirements. In conclusion, the Government has failed to establish the defense of laches.

## IV. THE COURT HAS JURISDICTION TO HEAR COUNT III OF CARLSON'S COMPLAINT REGARDING THE INTERPRETATION OF CARLSON'S ARMY CONTRACTS

The Court has jurisdiction to consider Count III in Carlson's Amended Complaint, challenging the Government's interpretation of Carlson's Army contracts under the Contract Disputes Act ("CDA"), 41 U.S.C. § 601-612. Count III of Carlson's Amended Complaint challenges two facets of the Government's interpretation of its Army contracts relating to the removal of certain services from the contract following the deployment of the DTS CUI. First, Carlson challenges the Army's interpretation that it can remove the entire state of Kentucky from Carlson's Army contract. Second, Carlson challenges the Army's interpretation that it can remove the services prior to a determination that the DTS CUI is fully operational. Both of these challenges were the subject of a claim by Carlson to the Contracting Officer and a Contracting

**REDACTED VERSION**

Officer's final decision. Thus, the Government's allegations that Carlson has failed to comply with the jurisdictional prerequisites of the CDA are without merit.

### A. Carlson Submitted A Claim And The Government Responded With A Contracting Officer's Final Decision

The Tucker Act defines the jurisdiction of the Court of Federal Claims with regard to disputes arising out of the CDA and specifically provides for jurisdiction over "a dispute concerning . . . nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2). A prerequisite to jurisdiction under the Tucker Act is the submission of a claim to the Contracting Officer and a final decision by the Contracting Officer on that claim. *See Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1264 (Fed. Cir. 1999). The FAR defines a "claim" as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising from or relating to the contract . . . ." FAR § 33.201. With regard to a final decision, the Federal Circuit has found that a letter rejecting a contractor's arguments and requiring the contractor to perform as previously directed constitutes a final decision. *See Alliant Techsystems, Inc.*, 178 F.3d at 1267. Based on these definitions, Carlson submitted a claim to the Contracting Officer, and the Contracting Officer issued a final decision.

On November 8, 2002, the Army notified Carlson that travel services provided under its contract for three states, Kentucky, Missouri and Nebraska, would no longer be serviced under Carlson's contract, effective February 24, 2003. *Appendix to Joint Preliminary Status Report (App. to JPSR) at 300.* By letter dated November 26, 2002, Carlson objected to the removal of the three states from its travel services contract. *App. to JPSR at 301.* More specifically,

Carlson claimed: (1) that pursuant to the contract, the Army could not remove the states until "the CUI was successfully deployed <u>and</u> new travel management services were competitively awarded by the Defense Travel System Program Management Office" and; (2) "under CWGT's contract for DTR-4, only Fort Campbell, not the entire State of Kentucky, would be transferred to TRW's contract for DTR-6 upon the implementation of the CUI." *Id.* (emphasis added). Carlson's letter concluded: "[I]t would be highly improper, and a breach of CWGT's contracts, to transfer requirements from our competitively-won contracts to TRW/SATO. It is requested that you promptly rescind your letter of November 8, 2002, and permit CWGT to perform the contracts, as awarded." *Id.*

Carlson's November 26, 2002 letter meets the definition of a claim as defined in the FAR. The letter was a written demand or assertion of Carlson's interpretation of its rights under the contract. The Government makes two challenges that the letter is insufficient. Both of these challenges must fail. First, the Government argues that the claims made by Carlson in this suit are different from the claims made in the November 26, 2002 letter. More specifically, the Government claims that Carlson "did not assert a specific entitlement to relief from any transfer prior to the deployment of the CUI . . . ." *See Def. Mot.* at 33. The Government's assertion is incorrect. In its November 22, 2002 letter, Carlson specifically asserted that the three states could not be removed from its contract until "the CUI was successfully deployed <u>and</u> new travel management services were competitively awarded by the Defense Travel System Program Management Office . . . ." *App. to JPSR at 301.* Thus, Carlson specifically asserted its opinion that the Army could not remove the three states until the CUI was successfully deployed.

The Army also alleges that Carlson did not certify its claim. Certification is necessary, however, only when making a monetary claim in excess of $100,000. See 41 U.S.C. § 605(c)(1),

**REDACTED VERSION**

48 C.F.R. §§ 33.207(a) and 52.232-1(d)(2)(i); and *Alliant Techsystems*, 178 F.3d at 1267. *Vanalco, Inc. v. United States*, 48 Fed. Cl. 68, 75 (2002), cited by the Government, involved a complaint seeking $35 million in damages. As Carlson's claim demand was for "an adjustment or interpretation of contract terms," the certification requirement does not apply.

By letter dated January 10, 2003, the Contracting Officer denied Carlson's claim.[5] *App. to JPSR at 305.* The Contracting Officer's letter referenced Carlson's November 26, 2002 claim and reviewed the contract language. *Id.* Ultimately, the letter stated that the Government would not rescind its earlier position, taken in the November 8, 2002 letter. *Id.* Thus, as in *Alliant*, the Government unequivocally rejected the contractor's request and directed Carlson to continue performing as previously demanded. Consequently, the Contracting Officer's January 10, 2003 letter constituted a final decision by the Contracting Officer.

The Government alleges that the January 10, 2003 letter was not a "final" decision. For example, the Government alleges that the January 10, 2003 letter is insufficient to form a final decision because it does not contain certain boilerplate language advising the contractor of its rights and is not labeled a "final decision." But a Contracting Officer's rejection of a contractor's claim "is no less final because it failed to include boilerplate language usually present for the protection of the contractor." *Placeway Construction Corp. v. United States* 920 F.2d 903, 907 (Fed. Cir. 1990).

---

[5] The Government's Motion to Dismiss incorrectly identified the Contracting Officer's final decision as a January 31, 2003 letter. To the extent that the Government argues that the January 31, 2003 letter rescinded the Government's interpretation, that allegation is incorrect. The letter only stated that the modifications would not be issued in the same time frame. *App. to JPSR at 306.* Indeed, in an e-mail dated May 15, 2003, the Contracting Officer reasserted her rejection of Carlson's interpretation of the contract. *Exhibit 59.*

**REDACTED VERSION**

The Government also alleges that the Contracting Officer's January 10, 2003 letter lacks finality because the letter only notified Carlson of a future modification that, to this date, has not been issued. That a Contracting Officer "might" decide to change his or her interpretation of a contract, however, does not affect the finality of its decision. *See Placeway Constr. Corp.*, 920 F.2d at 907 (finding that a Contracting Officer's letter was a final decision regardless of the fact that the letter implied that the claimed amount might be redetermined in the future). Moreover, "[a] defendant's voluntary cessation of a challenged practice or conduct - in this case contract breaches – does not necessarily deprive a federal court of its power to determine the legality of the practice." *Emery Worldwide Airlines, Inc. v. United States*, 47 Fed.Cl. 461, 469 (2000) (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 120 S. Ct. 693, 708 (2000)). The Government voluntarily postponed the issuance of the modification transferring work to the DTS contract in an effort to avoid litigating Carlson's Request for a Preliminary Injunction; it now seeks to use that same voluntary postponement to avoid judicial review altogether.

Ultimately, whether the January 10, 2003 letter constituted a final decision is irrelevant as Carlson is entitled to consider its claim "deemed denied" after the passage of sixty days following the submission of its claim. *41 U.S.C. § 605(c)(5).*

**B. Count III Of Carlson's Complaint Is Ripe For Judicial Review**

Seizing on language in *Alliant Techsystems*, the Government makes a final, unavailing argument to convince the Court that it should avoid the merits of Carlson's CDA claim due to "prudential considerations." The Government, however, misinterprets the ruling in *Alliant*. In *Alliant*, the Federal Circuit specifically rejected any "prudential" constraint on the Court of

**REDACTED VERSION**

Federal Claims' jurisdiction. Therefore, the Court should reject the Government's motion to dismiss Carlson's CDA claim.

In *Alliant*, the Government pushed the Court to adopt the rule that the Court of Federal Claims could not hold jurisdiction over a contractor's claim for declaratory relief prior to the end of the contract. The Court expressly rejected the Government's argument. 178 F.2d at 1270. That the Government has challenged Carlson's ability to file a claim for declaratory relief prior to the completion of the contract is evident in the "legal remedies" the Government suggests will compensate Carlson. More specifically, the Defendant suggests that Carlson allow the Government to terminate the three states for convenience for the Government.[6] Thus, the Government would rather that Carlson wait until the contract is completed, and any real ability to remedy the damage has slipped away, before filing suit. The Federal Circuit has ruled that there is no such obligation.

Moreover, the language in *Alliant* on which the Government hinges its argument that the claim is unripe is nothing more than the general requirements analyzed in determining the merits of a request for declaratory relief. The Federal Circuit stated that in responding to a request for declaratory relief, the Court should consider "whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." *Alliant Technologies*, 178 F.3d at 1271. Like the Defendant in *Alliant*, however, the Government confuses the

---

6 Such a partial termination for convenience done in order to transfer the same requirements to another contractor, however, would not be a good faith exercise of the termination for convenience clause. An attempt to utilize the termination for convenience clause in this manner would place the Government in breach of contract. *See Krygoski Const. Co., Inc. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996), *Cert. denied*, 520 U.S. 1201 (May 12, 1997).

**REDACTED VERSION**

question whether the Court of Federal Claims has jurisdiction to hear Carlson's Complaint with whether it should grant the relief in question and what form the relief should take. Thus, the Court has jurisdiction to hear Carlson's claim.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's Motion and enter judgment in favor of Carlson or, if the Court concludes that judgment cannot yet be entered in Carlson's favor, set a schedule for discovery and trial.

Respectfully submitted,

/s/

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*

Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

Dated: February 23, 2004

**REDACTED VERSION**

**CERTIFICATE OF FILING**

I hereby certify that on February 23, 2004, a copy of the foregoing REDACTED VERSION OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/
Lars E. Anderson
*Counsel for CW Government Travel, Inc.*