No. 03-1274C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CW GOVERNMENT TRAVEL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II AND REPLY TO OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Tele: (202) 307-6289
Attorneys for Defendant
Telephone: 202-307-0309
Facsimile: 202-514-7965

March 10, 2004

# TABLE OF CONTENTS

**PAGE**

DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II AND REPLY TO OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT . . . . . 1

ARGUMENT . . . . . 3

I. THE DELAYED DEPLOYMENT AND PAYMENT CLAIMS ARE BARRED BY LACHES . . . . . 3

II. THE 2002 MODIFICATIONS WERE WITHIN THE SCOPE OF THE COMPETITION . . . . . 6

A. Traditional Travel Services Were Within The Scope Of The Solicitation . . . . . 8

B. Web-Only Access Was Not A Material Change . . . . . 11

C. The Modification Did Not Materially Shift Financial Risk From Northrop Grumman To The Government . . . . . 17

III. CARLSON LACKS STANDING TO CHALLENGE THE RESTRUCTURE MODIFICATIONS . . . . . 22

IV CARLSON HAS FAILED TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO COUNT III OF THE AMENDED COMPLAINT . . . . . 25

V. CARLSON'S CROSS-MOTION ON COUNTS I AND II LACKS MERIT . . . . . 27

CONCLUSION . . . . . 29

## TABLE OF AUTHORITIES

**CASES** **PAGES**

ABF Freight Sys., Inc. v. United States,
55 Fed.Cl. 392 (2003) . . . . . . . . . . 5

AT& T Communications, Inc. v. Wiltel, Inc.,
1 F.3d 1201 (Fed.Cir. 1993) . . . . . . . . . . 7, 16, 17

Aero Union Corp. v. United States,
47 Fed.Cl. 677 (2000) . . . . . . . . . . 5

Alliant Techsystems, Inc. v. United States,
178 F.3d 1260 (Fed.Cir. 1999) . . . . . . . . . . 27

Ansick v. Hillenbrand Ind., Inc.,
933 F.Supp. 773 . . . . . . . . . . 13, 24, 28

Arizona v. United States,
216 Ct.Cl. 221, 575 F.2d 855 (1978) . . . . . . . . . . 9

Arnett v. Tuthill Corp.,. Fill-Rite Div.,
849 F.Supp. 654 (N.D.Ind. 1944) . . . . . . . . . . 24

Bowen Elec. Co. v. J.D. Hedin Constr. Co.,
316 F.2d 362 (D.C.Cir. 1963) . . . . . . . . . . 13, 28

CESC Plaza Ltd. Partnership v. United States,
52 Fed.Cl. 91 (2002) . . . . . . . . . . 7, 17, 19

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 29

Chas. H. Tompkins Co. v. United States,
43 Fed. Cl. 716 (1999) . . . . . . . . . . 9

Citizens Environmental Council v. Volpe,
484 F.2d 870 (10th Cir. 1973) . . . . . . . . . . 13, 28

Cornetta v. United States,
851 F.2d 1372 (Fed.Cir.1988) . . . . . . . . . . 4

**TABLE OF AUTHORITIES (Contd.)**

**CASES** **PAGES**

Dart Indus., Inc. v. Plunkett Co. of Okla.,
704 F.2d 496 (10th Cir. 1983) . . . . . . . . . . 13, 28

FMC Corp. v. United States,
3 F.3d 424 (Fed.Cir. 1993) . . . . . . . . . . 29

G.D. Searle & Co. v. Chas. Pfizer & Co.,
231 F.2d 316 (7th Cir. 1956) . . . . . . . . . . 14, 28

Hansen Bancorp, Inc. v. United States,
53 Fed.Cl. 92 (2002), aff'd,
2003 WL 21267457 (Fed.Cir., June 2, 2002) . . . . . . . . . . 27

Hermes Consolidated, Inc. v. United States,
58 Fed.Cl. 409 (2003) . . . . . . . . . . 4

JANA, Inc. v. United States,
936 F.2d 1265 (Fed.Cir. 1991) . . . . . . . . . . 4

KMS Fusion, Inc. v. United States,
36 Fed.Cl. 68 (1996) . . . . . . . . . . 10

L, Inc. v. United States,
39 Fed. Cl. 780 (1997) . . . . . . . . . . 7

MVM, Inc. v. United States,
46 Fed. Cl. 137 (1999) . . . . . . . . . . 29

Northrop Grumman Corporation v. United States,
50 Fed. Cl. 443 (2001) . . . . . . . . . . **passim**

Reebok Intern. Ltd. v. Baker,
32 F.3d 1552 (Fed.Cir. 1994) . . . . . . . . . . 29

Saratoga Indus., Inc., Comp. Gen. Dec. B-247,141 (27 Apr. 1992),
92-1 CPD ¶ 397, 1992 WL 94774 . . . . . . . . . . 21

## TABLE OF AUTHORITIES (Contd.)

**CASES** **PAGES**

S.W. Aircraft Inc. v. United States,
213 Ct.Cl. 206, 551 F.2d 1208 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Slyvania Elec. Prods., Inc. v. United States,
198 Ct.Cl. 106, 458 F.2d 994 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Smith v. Shawnee Library Sys.,
60 F.3d 317 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 28

Software Testing Solutions, Inc. v. United States,
58 Fed.Cl. 533 (2003), quoting Cornetta, 851 F.2d at 1377-78) . . . . . . . . . . . . . . . . . 5, 6

U.S. v. Williams,
81 F.3d 1434 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Vehicular Techs. Corp. v. Titan Wheel Int'l,
141 F.3d 1084 (Fed.Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Winstar Corp, v. United States,
64 F.3d 1531 (Fed.Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**STATUTES, RULES AND REGULATIONS**

18 U.S.C. § 207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

41 U.S.C. §§ 601-613 ("CDA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

41 U.S.C. § 605(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

RCFC 7.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RCFC 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CW GOVERNMENT TRAVEL, INC., Plaintiff, | |
| v. | Case No. 03-1274C<br>Judge George W. Miller |
| THE UNITED STATES, Defendant | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II AND REPLY TO OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Rule 7.1(c) of the Rules of the Court of Federal Claims ("RCFC"), the defendant, United States, respectfully submits this brief in reply to "Plaintiff's Cross-Motion For Summary Judgment And Response To Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment."

In our Motion To Dismiss Or, In The Alternative, For Summary Judgment ("Defendant's Motion"), we established by undisputed facts that the complaint is barred by the doctrine of laches. We also established that the web-based Consumer User Interface ("CUI") is simply a technological advance over client-server and telnet applications, that the scope of the competition included traditional travel services as well as CUI-assisted service, and that CW Government Travel, Inc. ("Carlson") lacks standing to challenge the 2002 contract modification.

Carlson's opposition and cross motion for summary judgment neither contests nor controverts the key facts underlying our motion. For example:

1. Carlson does not contest -- because it cannot -- that it was aware of many of the challenged modifications as many as three years prior to filing its May 2003 lawsuit;

2. Carlson does not contest – because it cannot -- that the plain language of the DTS Solicitation clearly stated that "traditional travel services" were within the scope of the Solicitation;

3. Carlson does not contest -- because the proposal is clear and unambiguous upon its face -- that Northrop Grumman Space and Mission Systems' ("Northrop Grumman's") DTS proposal specifically offered a web-based system and explicitly noted that the use of this system would increase over the course of the DTS Contract;

4. Carlson does not contest -- because it cannot -- that the total period of performance of the original DTS Contract and of the contract as modified is the same;

5. Carlson does not contest that the DTS Contract as originally awarded had an estimated value of $263.7 million. and the modified DTS Contract has a maximum ordering limitation of $263 million; and

6. Carlson does not contest – because it cannot – that it failed to bid on the DTS Contract and has made no showing that its web-based system satisfies the technical requirements of the DTS Contract.

Given these undisputed material facts, we have established that Carlson waited too long to pursue its claim, the modifications did not effect a cardinal change in the contract and Carlson lacks standing. Accordingly, we are entitled to judgment as a matter of law.

Reduced to its essentials, Carlson's case is premised upon the untenable proposition that a modification is beyond the scope of a contract when the United States (a) accepts something that the contractor had committed to provide from the first day of contract performance; (b) accepts it within the overall schedule established on the first day of the contract; and (c) accepts it for the same price.

Carlson's defenses are unavailing. Its "cardinal change" theory clearly falls of its own

weight because of the plain language of the Solicitation. Even if the Solicitation were not crystal clear, the undisputed facts establish that Carlson was aware at least one to three years before it initiated this action that the contract would be revised. Yet, Carlson was content to sit idly by and allow the United States and Northrop Grumman to expend significant sums in pursuit of the procurements that Carlson now belatedly attacks. The time for Carlson to stand up and voice its objections has long since passed. Further, Carlson failed to bid on the Solicitation and the undisputed facts demonstrate it is not qualified to bid on a web-based CUI.

Finally, as to Count III of the complaint, the record is equally clear - Carlson failed to exhaust its administrative remedies under the Contract Disputes Act, 41 U.S.C. §§ 601-613 ("CDA"). Carlson, of course, argues to the contrary, but it offers no evidence in support of that argument.

For all these reasons, which we demonstrate more fully below and in our motion, Carlson's complaint should be dismissed or, alternatively, summary judgment should be granted in favor of the United States. Additionally, Carlson's cross motion, which does not even purport to comply with the procedural requirements of this Court, should be stricken for what it is - - an attempt to obtain the opportunity to file an otherwise unauthorized surreply brief. The Rules of this Court do not allow a plaintiff unilaterally to make and grant its own self-styled "motion for the last word."

## ARGUMENT

### I. THE DELAYED DEPLOYMENT AND PAYMENT CLAIMS ARE BARRED BY LACHES

The doctrine of laches bars a claim that is pursued after "unreasonable and unexcused delay by the claimant [which involves] . . . either economic prejudice or 'defense prejudice' to the

Government." JANA, Inc. v. United States, 936 F.2d 1265, 1269 (Fed.Cir. 1991); see also Cornetta v. United States, 851 F.2d 1372, 1377-78 (Fed.Cir.1988) (en banc). As this Court has observed in an analogous context: "Simple fairness dictates that a party should not sit on its hands." Hermes Consolidated, Inc. v. United States, 58 Fed.Cl. 409, 415 (2003).

The threshold inquiry here with respect to laches, of course, is "What did Carlson know, and when did it know it?" In its opposition, Carlson admits that it knew:

1. In 2000, that deployment of the CUI was being delayed beyond the original contract date (e.g., Tarr Decl., ¶ 5, Pl. App. at V1568; Spell Decl., ¶ 7, Pl. App. at V1564);

2. In May 2001, of the public Commerce Business Daily notice concerning the addition of a cost reimbursement contract line item ("CLIN") for the software integration development (e.g. Plf. Opp . at 40); and

3. In March 2002, that Northrop Grumman was soliciting a subcontractor to provide traditional travel services, as well as CUI assisted services (e.g., Tarr Decl., ¶ 9).[1]

Rather than challenging these facts, Carlson makes the unsupported assertion that laches does not apply where a statute of limitations exists under the relevant statute. But precedent holds the opposite: "Laches must be applied 'apart from and irrespective of' the statute of limitations.'" Software Testing Solutions, Inc. v. United States, 58 Fed.Cl. 533, 535 (2003),

---

[1]Carlson concedes that it was contacted by Northrop Grumman in early 2002 about bidding on travel services for DTS 6, but that it decided not to bid and did not file a claim challenging the competition until May 2003. It claims it did not bid because it understood that traditional travel services would be required only for a short period while the CUI was being deployed in DTR 6 and that it did not wish to bid for CUI-assisted travel services because it believed Northrop Grumman was interested only in obtaining data concerning its web-based travel system and would not supplant American Express with another company. Tarr Decl., ¶ 10 (Pl. App. at V1569). Carlson, thus does not contest whether the DTS Contract called for traditional travel services, only the extent to which those services were called for. By its own admission, Carlson knew that these services were being procured. It simply underestimated the extent of the services under the Contract and elected to "no bid" the job as too small.

quoting Cornetta, 851 F.2d at 1377-78( (quoting Pepper v. United States, 794 F.2d 1571, 1573 (Fed.Cir. 1986)).

Although "no fixed boundaries define the length of time deemed unreasonable . . . the duration should be viewed in light of the circumstances . . . measured from the time the claimant knew or should have known about his claim to the date of the suit." Aero Union Corp. v. United States, 47 Fed.Cl. 677, 686 (2000). By any rational standard, Carlson was unreasonable to wait until May 2003 to file these claims. See, e.g., ABF Freight Sys., Inc. v. United States, 55 Fed.Cl. 392, 397 (2003) (determining that a delay of approximately one month to file a claim was unacceptable). Carlson knew the Government was continuing development under the Northrop Grumman contract and that efforts would be made to deploy the CUI, yet Carlson stood mute.

Carlson contends the failure to file suit until May 2003 was not unreasonable because it was not aware of the "full extent" of the restructuring until it received responses to its Freedom of Information Act Request relating to the DTS DTR 6 contract in November 2003. Opp.at 39-42. However, Carlson filed its complaint six months before it received the FOIA response. Clearly, therefore, Carlson did not need the response to file this action. Regardless of whether Carlson was aware of the "full" extent of the restructuring prior to November 2003, it was aware of some of the essential elements as early as 2000, and of all of the key essential elements no later than March 2002, that is, the restructured development CLINs, the inclusion of traditional travel services, and the deployment delays. Carlson clearly possessed sufficient information to file a claim at least two years before it filed.[2] See, e.g., Software Testing, 58 Fed.Cl. at 533-534

---

[2]The DoD IG Report, upon which Carlson so heavily (and mistakenly) relies, was issued in July 2002, 11 months before this action was filed.

(knowledge that the specifications in the solicitation were similar to specifications in the competing bidder's web cite was sufficient information to initiate a claim).

"Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." Software Testing, 58 Fed. Cl. at 535. Carlson's inaction would plainly prejudice the Government if Carlson were to prevail. The Government continued to administer the contract and incurred extensive costs which might have been avoided if Carlson had protested the contract at an earlier time. If Carlson is successful in obtaining injunctive relief, the Government may have to forfeit all money paid to Northrop Grumman to develop and deploy the CUI as well as termination fees. Further, given that deployment is proceeding pursuant to the Northrop Grumman contract, if Carlson is chosen to develop and deploy a web-based CUI after a competitive procurement in 2004, all the deployment already in the field will be aborted and continuing deployment will be delayed until Carlson is able to develop a functional CUI.

All of these adverse effects upon the public fisc could have been avoided by the simple expedient of a timely protest. Carlson instead chose silence. It must live with its choice. Its restructuring claim is barred by the doctrine of laches.

## II. THE 2002 MODIFICATIONS WERE WITHIN THE SCOPE OF THE COMPETITION

It is settled that the scope of the original procurement is dispositive in determining whether a modification falls within CICA's competition requirement:

> In determining whether a modification falls within CICA's competition requirement, this court examines whether the contract as modified materially departs from the scope of the original procurement. The analysis thus focuses on the scope of the entire original

> procurement in comparison to the scope of the contract as modified. Thus a broad original competition may validate a broader range of later modifications without further bid procedures.

AT& T Communications, Inc. v. Wiltel, Inc., 1 F.3d 1201, 1204 (Fed.Cir. 1993). Further, when this Court "finds, applying an objective standard, that potential bidders would have expected a modification to fall within the changes clause of the contract, such a modification will be found to be within the scope of the original procurement." Northrop Grumman Corporation v. United States, 50 Fed. Cl. 443, 465 (2001); see CCL, Inc. v. United States, 39 Fed. Cl. 780, 791 (1997). As this Court recently explained:

> The court should look to see 'whether the modification is of a nature which potential offerors would reasonably have anticipated.' Since this inquiry is viewed from the perspective of potential bidders, it is primarily an objective one. Another factor is whether the modification substantially changes 'the type of work, performance period, and costs as between the original contract and modified contract.'

CESC Plaza Ltd. Partnership v. United States, 52 Fed.Cl. 91, 93 (2002) (internal citations omitted).

Carlson offers no evidence to contradict the plain language of the DTS Solicitation or Contract, both of which clearly indicate that both a web-based system and traditional travel services were included in the original competition. Further, although Carlson contends that the financial details of the restructuring materially redistributed financial and performance risks between Northrop Grumman and the Government, it offers nothing more than quotations taken out of context and myriad allegations made upon "information and belief" to support its position. As we demonstrated in our opening motion and below, the 2002 modifications were within the

scope of the competition, and there was no material change in the distribution of financial or performance risks as a result of the restructuring. The DTS Contract still requires the same services, in the same period of performance, and for either the same or a potentially lower cost to the Government. E.g., Def. Mot. at 37-51.

A. Traditional Travel Services Were Within The Scope Of The Solicitation

The DTS Solicitation provided, in unambiguous terms, that the Government was soliciting offers for traditional travel services. E.g., Def. Mot. at 45-46. For example, the Solicitation required offerors to propose "Travel Management Services," which were defined as "Traditional commercial travel services such as reservations and ticketing for all modes of travel, Government and commercial lodging reservations, rental car arrangements, ticket delivery, and support services.' Williams Decl., ¶¶ 5 and 6 (Appendix at 018) (emphasis supplied). It further defined 'Travel Services' as 'All aspects related to the planning, execution, and payment of travel worldwide. That includes common user interface (CUI) services as well as travel management services.'" Id. (emphasis supplied). Because "travel services" were defined to include "CUI services as well as travel management services," the solicitation plainly called for traditional travel services.[3]

[3]Ignoring the plain language of the DTS Solicitation, Carlson instead attacks the individuals who quoted that plain language in their declarations. Carlson claims that statements and e mails from Ms. Williams and Ms. Butler demonstrate that traditional travel services were not part of the DTS Contract. However, none of these statements or e mails suggests that either Ms. Williams or Ms. Butler opined upon or intended to opine upon the scope of the DTS contract. Nor could they. See, e.g., Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed.Cir. 1995) (contract interpretation is a matter of law); S.W. Aircraft Inc. v. United States, 213 Ct.Cl. 206, 212, 551 F.2d 1208 (1977) (contract interpretation begins with the plain meaning of the provision in question). Ms. Williams simply refers to the fact that "the provision of traditional travel services was not originally included in TRW's prime contract . . ." Carlson Ex. 56, ¶ 28. She explained that the pricing had to be unbundled because of a change in airline commissions to

It is well settled that contract interpretation begins with the plain language of the contract. See, e.g., Chas. H. Tompkins Co. v. United States, 43 Fed. Cl. 716, 722 (1999) (citing B.D. Click Co. v. United States, 222 Ct.Cl. 290, 299, 614 F.2d 748 (1980). As this Court has observed: "[A]n interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.'" Northrop, 50 Fed. Cl. at 458 (citations omitted). These settled rules of contract interpretation " apply to interpretation disputes over language found in solicitations for government contract work as well as for executed contracts." Id. It would only be by rendering meaningless the above provisions of the DTS Solicitation that one could interpret the Solicitation to exclude traditional travel services. The solicitation should not be interpreted in such a way as to "leave a portion . . . inoperative . . . " Arizona v. United States, 216 Ct.Cl. 221, 235-36, 575 F.2d 855 (1978).

Carlson's wholly unsupported claim that this language is ambiguous is, in fact, belied by Carlson's own pre-Solicitation declarations. In commenting upon a draft version of the RFP, Carlson argued against the bundling of CUI development with travel management services in a

---

travel agents and did not purport to explain her understanding of the scope of the original competition. Here, Ms. Williams does not offer different testimony or opinions at all. Rather, her declaration merely quotes the DTS solicitation verbatim. Williams' Declaration, ¶ 6. Likewise, Ms. Butler's letter to TRW (Northrop Grumman's predecessor) advising that it could only provide CUI assisted travel services in DTR 6 (Plaintiff's Ex. 54) "as originally contracted" refers only to the original unbundled pricing CLIN as anticipating CUI-assisted travel services. Nothing in the letter suggests Ms. Butler was opining upon the scope of the solicitation. The two e mails referenced by Carlson simply address the authors' view of the scope of the TRW contract rather than the scope of the solicitation. Pl. Exhibits 28 and 29. They do not establish that the bidders could not have anticipated upon the basis of the solicitation that traditional travel services might be added to the contract in the event there was delay in deploying the CUI. Id. Accordingly, Carlson's attack upon Ms. Williams and Ms. Butler are neither fair nor availing.

single solicitation because "The CUI is simply another portion of the Defense Information Infrastructure being developed by DISA and requires the expertise of a DISA contractor [while] the travel management services desired by DoD requires the expertise of a national and international travel company," Defense Travel System - 2nd Draft RFP, Pl. Appendix at V1268, i.e., expertise in the provision of traditional travel services.[4]

Carlson's attempt to create ambiguity through a tortured construction of isolated passages of the Contract taken out of context are equally unavailing. For example, Carlson points to the DTS "Functional Requirements Document"(FRD), which provides that, for all official travel, the contractor shall "make confirmed reservations . . . and record these arrangements in the CUI." Opp. at 23 (quoting Plaintiff's Appendix at V168). Carlson ignores, however, the accompanying caveat that "when capability is available, the Contractor shall make reservations . . . through an automated means." Id. (emphasis added). The Solicitation obviously contemplated some travel services that would not be processed via automated means, that is the traditional travel services specifically incorporated in the definition of "travel management services."[5]

---

[4]Defendant respectfully submits that recourse to extrinsic evidence is unnecessary here given the clarity of the Solicitation. See, e.g., S.W. Aircraft Inc. v. United States, 213 Ct.Cl. 206, 212, 551 F.2d 1208 (1977). However, if extrinsic evidence were to be considered, Carlson's own declarations doom its cause since it admitted in the course of negotiations concerning the Solicitation that the development of the CUI should be unbundled from the provision of traditional travel services.. See, e.g., Sylvania Elec. Prods., Inc. v. United States, 198 Ct.Cl. 106, 126, 458 F.2d 994 (1972) ("[S]tatements of the parties during negotiations. . . [may be utilized] in aid of the interpretation of ambiguous or uncertain clauses in written agreements. Expressions of the parties during negotiations for the contract are . . . a frequent source for interpretation of its text" (internal citation omitted)); KMS Fusion, Inc. v. United States, 36 Fed.Cl. 68, 77 (1996). Accordingly, extrinsic evidence fails to advance Carlson's claim.

[5]Carlson similarly relies on the technical requirements document for the CUI in its quest for ambiguity and purports to find it in the statement that "the CUI provides the automation that facilitates the travel services being solicited." Opp. at 22, quoting Exhibit 1, V 14 (Pl. App. at

In short, the plain language of the original Solicitation encompassed traditional travel services. Carlson wholly fails to establish otherwise.

B. Web-Only Access Was Not A Material Change

As Carlson concedes, Northrop's proposal, which was incorporated into the contract, provided for three types of access to the CUI: web-browsers; client-server applications; and telnet applications. As Ms. Williams states in her declaration, quoting the RFP:

> 10. In the proposal my Company prepared in response to the Solicitation, we proposed a solution that was 'designed to operate across three automated environments so as to be accessible to all DoD personnel today: Web, Client/Server and Character based.' We recognized at the time we submitted the proposal that many DoD users were not able to operate in an automated environment, but we proposed to 'gracefully accept the growth of automation as quickly as the DoD is able to make it occur.'
>
> 11. Our proposal explained that:
>
> Users will interact directly with Travel Manager using any of three distinct modes of user interface:
>
> * Browser mode using any frames-enable Internet browser
>
> * Client-Server Mode using Microsoft Windows, Windows 95, Windows NT or UNIX
>
> * Character Mode (Host-Based) using terminal emulation software.

---

V14). However, as noted above, such "automation" is to be used only when that capability is in fact available, and it is clear from the Solicitation (and from Carlson's own pre-Solicitation comments) that not all travel services are to be solicited via the CUI.

> Providing multiple modes of access to the CUI ensures the flexibility necessary to support early deployment of DTS capability to DoD users worldwide.

Williams Decl, ¶¶ 10 and 11 (Appendix In Support Of Motion To Dismiss Or, In The Alternative, For Summary Judgment ("Def. App.") at 16-25).

Carlson concedes that internet access was within the scope of the original DTS Contract. In fact, Mr. Hearne's declaration explicitly acknowledges that "TRW originally indicated it would eventually provide a 'web access' for use by DoD travelers connecting to the DTS CUI." Hearne Decl., ¶ 13. Carlson contends, however, that the 2002 modification effected a material change in architecture because the software applications under the original contract were primarily in distributed servers while, from the Jefferson iteration of the software forward, distribution would be located exclusively in a central data center. See Opp. at 19-22 ; Hearne Decl., ¶ 7 ; Tarr Decl., ¶ 4. Carlson contends that Northrop Grumman recognized that migration to a web-based system would require different architecture than client-server applications when it notified the Government that, in the client-server mode, "the DTS server send[s] relatively large amounts of data to the PC for local processing . . . [while] the Web mode . . . allows a user to employ his or her standard browser software to interface to DTS." Pl. App. at V 1338. Carlson alleges that this is the difference between the web access originally proposed by Northrop Grumman and the web based system now in place under the DTS Contract. There are two fundamental problems with Carlson's argument. First, it is based upon assumptions in declarations of Carlson employees who concede their lack of firsthand knowledge, and are therefore incompetent to testify with respect to the facts. Second, and not surprisingly, given those employees' lack of firsthand

knowledge, those declarations have it all wrong.[6]

Carlson's arguments regarding material changes are based exclusively upon declarations by two of its employees, neither of whom (1) state personal knowledge as the basis for many of their assertions; and (2) state anything more than conclusory allegations. Mr. Hearne does not state that he ever even read the DTS Solicitation, and Ms. Tarr does not claim to have firsthand knowledge of the Northrop Grumman technical approach. E.g., Hearne Decl., ¶ 6; Tarr Decl., ¶ 5; see, e.g., Ansick v. Hillenbrand Ind., Inc., 933 F.Supp. 773, 776 ("Conclusory allegations by a party opposing a motion for summary judgment cannot defeat the motion"); Dart Indus., Inc. v. Plunkett Co. of Okla., 704 F.2d 496, 498 (10th Cir. 1983) ("A party resisting a summary judgment motion must do more than make conclusory allegations, it 'must set forth specific facts showing a genuine issue for trial'"); Smith v. Shawnee Library Sys., 60 F.3d 317, 320 (7th Cir. 1995); Citizens Environmental Council v. Volpe, 484 F.2d 870, 873 (10th Cir. 1973) (generalized, conclusionary, and unsubstantiated affidavits are insufficient to create a genuine factual dispute; Rule 56(e) requires personalized affidavits to successfully oppose a summary judgment motion); Bowen Elec. Co. v. J.D. Hedin Constr. Co., 316 F.2d 362, 364 (D.C.Cir. 1963) (the affiant's competency must affirmatively appear). Given these witnesses' admitted lack of knowledge, neither one of them can offer evidence that would be admissible at trial, and their declarations, therefore, must be disregarded. G.D. Searle & Co. v. Chas. Pfizer & Co., 231 F.2d 316, 318 (7th Cir. 1956) (the parts of an affidavit which do not meet the requirements of Rule

---

[6]Carlson also argues that Northrop Grumman's proposal has been superceded by the restructure modification. Opp. at 16, n.1. The solace that Carlson seeks is elusive at best - the proposal reflects a bidder's contemporaneous interpretation of the DTS Solicitation and Carlson has not alleged to date that the original award was beyond the scope of the competition.

56(e) must be disregarded).

In any event, the plain language of Northrop Grumman's proposal demonstrates that their basic assumptions concerning the architecture permitted by the DTS Solicitation and proposed and provided by Northrop Grumman are wrong.

The plain language in Northrop Grumman's proposal demonstrates (a) that it provided a solution to the requirements of the Solicitation that maximized the use of Commercial-Off-The-Shelf ("COTS") products, and (b) that it never proposed the "distributed" architecture that Carlson now alleges was the fundamental basis for the system. Fabbre Decl., ¶¶3-7. Instead of proposing a system that would have required the installation-by-installation software integration effort alleged by Carlson's admittedly uninformed declarants, Northrop Grumman proposed the use of "Regional Data Centers," and specifically rejected the very approach that Carlson now assumes to have been proposed:

> In designing the physical architecture, the BDM Team considered both centralized and decentralized (databases and application software at all user sites) approaches. We chose the centralized approach because it dramatically reduces configuration management and administration burdens for both the BDM Team and DoD.

Fabbre Decl., ¶ 5, Attachment 3 at 1.1-2. As evidenced by its proposal, Northrop Grumman chose the use of a centralized approach precisely to avoid the problems associated with the type of software integration effort upon an installation by installation basis which a decentralized approach would have required. The use of client-server architecture and the centralized Regional Data Centers is the same today as it was when the DTS Contract was awarded with enhancements generated by emerging technology. Fabbre Decl., ¶ 7. Simply put, Carlson's

arguments are based upon erroneous assumptions, such as the alleged expenditure of $50 million attempting to develop this phantom approach. Accordingly, these arguments fail.

Carlson contends that the modification implements a shift to a web browser mode. This is incorrect as the Northrop Grumman proposal specifically anticipated that very development:

> As the DoD infrastructure continues to mature over the next year, we anticipate today's client server paradigm will shift to a browser model. As that shift occurs, Travel Manager will support DoD users by providing browser access to the Travel Manager Document Preparation module to initiate and modify travel arrangements and to process vouchers following travel. Approving Officials will interact with the Routing & Review and Budget modules to approve travel. Operation in this mode requires a browser interface to the NIPRNET (or Internet).

Williams Decl., ¶ 12 (Appendix at 021). Accordingly, Carlson's bare allegations concerning the architecture proposed and utilized by Northrop Grumman and the alleged changes that have been incorporated into the DTS Contract are simply at odds with the documented facts. Northrop Grumman's proposal clearly included central servers, which is precisely how it is performing today; nor can one rationally dispute that the DTS Solicitation encompassed a centralized server accessible in the browser mode.

Carlson contends, nevertheless, that the contract was materially changed because the 2002 modification eliminated the telnet and client-server connections to the CUI. The elimination of the two modes of access, however, simply reflected technological advancement in the architecture of DoD telecommunications systems. E.g., Def. Mot. at 41-45. As browser technology advanced and DoD provided internet access to a greater number of users, it made

sense to limit accessibility to the web-based mode. As Northrop Grumman noted in its proposal to DoD: data transfer in client-server mode "takes time, and can impose a significant workload on the DoD Infrastructure. . . . The Web architecture does not involve this extent of data transfer, increasing user satisfaction and efficiency." Pl. Ex. 32 at pp. 5-6 (V1338-1339). Therefore, the modification reflected advances in the science of computing to enhance speed and efficiency rather than material changes in the contract. Indeed, the very changes made were specifically anticipated in Northrop Grumman's proposal. As it stated, "While initial use [of web access] may be relatively low, in the future, the majority of users will transition to operating in the browser mode." Williams Decl., ¶ 13, Att. 9 at page 1.3-45.

As we demonstrated in our motion, the DTS Solicitation explicitly required bidders to propose systems that reflected "flexibility to permit continuous technical refreshments . . . based on advances in proven information technologies." Williams Decl., ¶ 4, quoting "Objectives" set forth in the RFP (Appendix at 017). Also, the solicitation required proposals to plan for "Technical Insertion." Id. at ¶ 7 (Appendix at 018). Further, "under the requirement for Travel Management Services . . . the RFP required [the bidder] to describe [its] approach to 'Application of existing and emerging technologies, e.g., web-based, kiosk, remote self service station via CD ROM or direct computer link, remote reservation center via toll-free telephone, to supplement services available via staffed travel offices.'" Id. ¶8 (Appendix at 018-019) (quoting solicitation with emphasis added). As the Federal Circuit stated in AT&T Communications v. Wiltel, 1 F.3d at 1206:

> In particular, the breadth of the stated objectives, the meaning of the Service Improvements clause, the express language about commercially avail-

> able technology, and the requirement for an annual forecast of new technologies would suggest to potential offerors that the next generation of Dedicated Transmission Service would reasonably fall within the scope of the contract.

The DTS Solicitation expressed the broad objective to "procure a complete, seamless, and paperless process though which [DoD] would obtain travel services," Williams Decl., ¶ 3 (Appendix at 016) and explicitly provided for plans for technical insertions and continuous technical refreshments. Accordingly, there is no reasonable doubt that the solicitation "suggest[ed] to potential offerors that the next generation [of internet connectivity] would reasonably fall within the scope of the contract." AT&T, 1 F.3d at 1206. Accordingly, the plain language of the solicitation establishes that web-based access was within the scope of the solicitation.

C. The Modification Did Not Materially Shift Financial Risk From Northrop Grumman To The Government

None of the arguments advanced by Carlson with respect to the purported reallocation of risk under the 2002 modifications is legally sufficient to preclude summary judgment. To prevail on these arguments, Carlson must prove that "the amount of increased cash flow and the magnitude of the shift in the risk of payment and performance . . . are materially outside the scope of the SFO and that these modifications were not foreseeable to the bidders." Cesc Plaza Ltd. Partnership v. United States, 52 Fed.Cl. 91, 93 (2002). Carlson cannot carry this burden.

Carlson's principal contention is that the Solicitation required Northrop Grumman to develop and deploy a CUI by 2002 with compensation based on the subsequent development of that operational CUI. In other words, payment was contingent upon the successful development

and the ensuing deployment of the system. Carlson contends that this is no longer so. Again, Carlson is wrong.

As the record plainly demonstrates, the contingency that was to trigger initiation of Northrop Grumman's payments was satisfied by Northrop Grumman well before the contested modifications. According to the Prenegotiation Objective Memorandum, which certified and approved the payment and other aspects of the modified contract, Northrop Grumman had achieved "operational capability" for the CUI by "November 26, 2000." Pl. App., Tab 9 at p. V688, and deployment had begun. Further deployment was delayed, however, at Government direction and in the exercise of Governmental discretion. The effect of this decision was to defer the cash flow to which the contractor would otherwise have been entitled under the original terms of the Contract. The $43 million of which Carlson complains was nothing more than a "negotiated settlement amount for consideration to restructure the DTS Contract" that was only paid after "Northrop Grumman had delivered a functional CUI and deployment had begun." Butler Decl., ¶ 2 (Appendix at 211-212). The payment was made, therefore, at precisely the point in time when cash flow to the contractor was originally contemplated. While the lump sum may have resulted, in the aggregate, in payments ahead of those that would have ensued had deployment proceeded at that point in time, the alternative -- deferring payments to the contractor as a result of a Government decision to delay further deployment of an operational CUI - would have been an invitation to a lawsuit. The lump sum thus served as consideration for the Government's interest in altering the deployment schedule and restructuring the operational and maintenance fees. Prenegotiation Objective Memorandum, pp. 2-5 (Pl. App. at V678 to V680).

The uncontested evidence, in conjunction with the relevant case law, demonstrates that

there was no material shift here in the financial risks of the contract. For example, in CESC Plaza, 52 Fed.Cl. at 91, a number of contract modifications enabled the winning bidder to (a) obtain leasehold payments earlier than the original lease contemplated and (b) eliminate certain contingencies relating to those payments. Recognizing the customary give and take of large complex contracts, this Court held that individually and together the modifications "do not improperly change the cash flow in any significant amount, nor do they impermissibly shift the payment/performance obligations." Id. at 100. The Court observed:

> "As with most other changes, this one leaves the contract basically unaffected. What is different is that, in exchange for some predictability in cash flow to [the contractor], GSA extracted some minor concessions. The change, in itself, cannot be considered beyond the scope of the SFO or the original contract."

Id. at 96.

Judged against the standards articulated in CESC Plaza, Carlson's contentions clearly fall short. Here, as there, the contractor obtained some greater "predictability in cash flows," but only after satisfying the major contingency for which it was responsible (i.e., an operational CUI) that would have triggered the initiation of payments. Here, as there, "concessions" were extracted for that "predictability in cash flow." Indeed, the contractor's concessions here were far greater than those extended in CESC Plaza, e.g., a maximum ordering limitation that capped the Government's payment obligations at approximately the original estimated value of the contract, a fixed price for operations and maintenance, and the avoidance of any protracted dispute over the impact of deferred deployment on the contractor's right to compensation.

Carlson belittles the maximum order limitation, contending that it is not a hard and

inalterable cap. Opp. at 8. What Carlson ignores, however, is that -- prior to the modifications at issue -- the Contract was a requirements-type contract, which had no limit of any kind on the Government's ordering or payment obligations and that Government estimates of potential contract costs were as high as $500 million. The cap provided the Government a key financial control it previously lacked, i.e., control over just how much it would expend under the Contract.

Carlson proceeds to link its attack upon the maximum ordering limitation with speculation concerning future changes to the Contract. Unable to mount a successful challenge to what the Government actually did, Carlson thus embarks on the ultimate quixotic battle - tilting at some undefined something that the Government might hypothetically do at some indeterminate point in the future. This argument is so highly attenuated and speculative as to constitute an exercise in soothsaying. The argument, thus, cannot sustain itself.

To buttress its speculation, Carlson relies upon two sources. First, it advances its own comparison of the pre-and post-modifications Contract. This document, Plaintiff's Exhibit 75, lacks a declarant, is unsworn, is replete with assumptions or mistakes,[7] does not meet any

---

[7]For example, in order to make the assertion that the Government's requirements and costs for training have increased five hundred percent from the original contract, the document assumed that the same 516 classes would be ordered five times. Pl. App. at V1617R (Tab75). Obviously, the Government never intended to require the same training to be given to the same personnel five separate times. Rather, it merely included options in the contract that would permit the Government to obtain a total of 516 training sessions during the entire contract period of performance, including options. In other words, the total estimated number of training courses did not, as alleged by Carlson, increase five times a 500 percent increase in cost. Rather, the Government merely obtained the flexibility to order training at any point during contract performance that it chose. As Ms. Butler notes: "The number of estimated courses (516) remains unchanged throughout the total contract period." Suppl. Butler Decl., ¶ 5. This is but one of a myriad number of nonexistent facts for which Carlson was unable to secure anyone's oath. Others, such as misstatements concerning transaction fees for traditional travel services and maintenance and operation fees are noted in Ms. Butler's Supplemental Declaration. Further, Carlson provides no evidence that payments in excess of $300 million have been made and they

minimal standards for admissible or competent evidence, and, in fact, constitutes legal argument far in excess of the page limits on briefs established by this Court.

Second, Carlson cites the DoD's Inspector General Report dated July 1, 2002. That report, however, refers solely to the increased costs associated with the DTS "Program" as a whole. It never addresses any alleged overruns on the DTS Contract, which is but one element of the overall program. In this regard, Plaintiff's Exhibit at Tab 14, page V1176 pointedly betrays the error of Carlson's argument - "Additionally, in the DoDIG Report, the original contract value of $263.7M was erroneously compared to a total Program cost of $491.9M. This comparison would falsely lead a less knowledgeable reader to believe a cost growth of 87% has already occurred in the program." Pl. App. at V1176.

As for the schedule effect of the changes, the overall period of performance was not changed by the modifications. The Contract was originally scheduled for completion in 2006; it is still planned for completion in 2006. While deployment within that period has changed, if that were a basis for re-soliciting requirements, no large, complex contracts would ever achieve completion. Every delay would trigger CICA. Carlson knows full well that this is not the law, and that "additional time spent on performance of a contract is within the scope when it is due to problems with the completion of performance." Northrop Grumman, 50 Fed.Cl. at 465; See, e.g., Saratoga Indus., Inc., Comp. Gen. Dec. B-247,141 (27 Apr. 1992), 92-1 CPD ¶ 397, 1992 WL 94774 (additional time to correct errors in design held within scope).

*****

---

could not have been given the maximum ordering limitation. However, regardless of how Carlson argumentatively attempts to inflate the total cost of the Contract as modified, in the end, the Government has a maximum ordering limit of $263 million.

In sum the Government is buying what was originally promised, at the same price, within the same period of performance. As a matter of law, there was no modification beyond the scope of the contract.

III. CARLSON LACKS STANDING TO CHALLENGE THE RESTRUCTURE MODIFICATIONS

Carlson concedes that its standing is based upon the allegation that its web-based travel system was selected by a different agency -- GSA -- as one of three winning bids to automate travel management services for Federal agencies. It contends, however, that we have "badly mangled" the standards for dismissing a complaint for a lack of standing and that standing cannot be determined on motion where there is an interconnection between the jurisdictional facts and the merits. Opp. at 31-34. Carlson's argument, however, requires an interdependence between the jurisdictional facts and the merits and that interdependence or interconnection simply does not exist here.

Carlson has premised its standing on the fact that its web-based system was acceptable to GSA. However, if GSA's contract requirements materially differed from the DTS requirements, the GSA procurement is totally irrelevant to Carlson's standing here. As the record demonstrates, those requirements are materially different. E.g., Motion at 20-25.

As we demonstrated in our Motion, GSA's solicitation is not comparable to the DTS Contract because DTS requires legacy system integration while the GSA does not. Carlson does not dispute this. Instead, it presents declarations designed to establish that Carlson's web-based product could be further developed to satisfy the requirements of the DTS. Ms. Spell's declaration is based entirely upon hearsay (all substantive assertions are prefaced by the phrase

"The CWGT procurement team . . . informed me," Pl. App. Tab 70 at V 1564). Because it is not based upon personal knowledge and fails to include admissible evidence, it cannot present a genuine issue of material fact, or demonstrate a substantive fact. Rule 56(e), Rules of the Court of Federal Claims ("RCFC") ("Supporting and opposing affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence . . ."). Her declaration should, in fact, be stricken.

Likewise, the declarations of Ms. Tarr and Mr. Hearne fail to present genuine issues or to support Carlson's claims. Ms. Tarr does not allege she has personal knowledge of the requirements of DTS and her statement that "any enhancements or additional features desired by DoD could be developed and implemented by CWGT without difficulty" is impressionistic and conclusory. Tarr Decl., ¶ 13, Pl. App. at V 1570. It admittedly is not based upon personal knowledge and therefore it too fails to satisfy the requirements of RCFC 56 and should be stricken. Mr. Hearne admits that Carlson's web-based product lacks the technical capabilities identified by Colonel Schaefer in his comparative analysis of the DTS/GSA requirements. The best that Mr. Hearne can do is contend - cryptically - that Carlson's web-based product "does provide for the inclusion of features, such as those listed in the [earlier comparative analysis]." Hearne Decl., ¶ 9, Pl. App. at V 1573. He asserts, however, that "in my opinion" Carlson's web-based system "would quite adequately satisfy all of DoD's actual requirements [and to the extent they would not] . . . they could be readily added to the CWGT eTravel System, known as E2Solutions." Hearne Declaration, ¶¶ 11 and 12, Pl. App. at V1573 and 1574. Mr. Hearne is not qualified to offer such opinion evidence.

Under Rule 702 of the Federal Rules of Evidence, only "a witness qualified as an expert

by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion [concerning] scientific, technical, or other specialized knowledge . . ." While Mr. Hearne has supervised transportation programs as an Air Force officer and monitored DTS on behalf of the Air Force, there is no evidence he has the specialized knowledge of information technology to provide opinion testimony that Carlson's web-based product could readily accommodate the integration specifications of the DTS. Accordingly, his declaration fails to raise a genuine issue concerning whether Carlson would have been a plausible bidder in the event the web-based DTS had been subjected to further competitive bidding. Indeed, he has essentially conceded he never reviewed the DTS Solicitation. Hearne Decl., ¶ 6; see, e.g., Ansick v. Hillenbrand Industries, Inc., 933 F.Supp. 773, 780 (D.S.Ind.1996) ("Even if Draper were a lay witness, the opinions and conclusions offered in her affidavit would be inadmissible because they are not based upon personal knowledge or perception"); Arnett v. Tuthill Corp.,. Fill-Rite Div., 849 F.Supp. 654, 662 (N.D.Ind. 1944); U.S. v. Williams, 81 F.3d 1434, 1441 (7th Cir. 1996) ("The difference between an expert witness and an ordinary witness is that the former is allowed to offer an opinion while the latter is confined to testifying from personal knowledge").

Moreover, to the extent that Mr. Hearne is offered as an expert witness, his testimony in this case is incompetent for an additional reason. Pursuant to 18 U.S.C. § 207, a former Government employee (like Mr. Hearne was) who was personally and substantially involved in a matter on behalf of the Government (as Mr. Hearne describes in ¶¶ 2-3 of his declaration), "may not, except pursuant to court order, serve as an expert witness for any other person (except the United States) in that matter." 18 U.S.C. § 207(j)(6). We are aware of no such order authorizing Mr. Hearne to serve as an expert. Upon this basis as well, Mr. Hearne's declaration should be

stricken.

Carlson concedes that only a "qualified" bidder has standing to protest the 2002 modification. As we have demonstrated, however, the opposition presents no admissible evidence to demonstrate Carlson would have been a "qualified bidder" if the 2002 modifications had been competitively bid. Even if the evidence were admissible, moreover, Carlson's standing must be based on a showing that it would "be a serious bidder on the proposed resolicitation, and . . . it would have a substantial chance of receiving the award." Northrop Grumman, 50 Fed. Cl. at 456. Carlson has presented no evidence adequate to meet that test. Carlson would have to start from ground zero to integrate its web-based system into the DoD information infrastructure whereas Northrop Grumman's CUI is being deployed.

## IV CARLSON HAS FAILED TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO COUNT III OF THE AMENDED COMPLAINT

Carlson contends its November 26, 2002 letter to the contracting officer (App.at 253-55) presented a "claim" under the CDA because it asserted a right under the Army contracts not to have facilities transferred to the DTS contract until the CUI was fully operational. As we demonstrated in our Motion, however, this letter simply claims that the facilities cannot be transferred until the base period of the Army contracts are completed and traditional services competitively bid in DTR 6. The contracting officer's January 31 letter rescinded the proposed transfer until the base periods of the Army contracts had been completed. App. at 260. Therefore, even if the uncertified November 26 letter presented a claim, the contracting officer granted the relief Carlson had sought.

Carlson contends, nevertheless, that the January 31 letter merely suggests the facilities

would be transferred after the base periods of the Army contracts were completed and the "final decision" rejecting the claim in the November 26 letter was contained in the contracting officer's letter of January 10. App. at 258. The January 10 letter cannot be a final decision: it was rescinded by the January 31 letter. The January 31 letter does not indicate that it is a final decision. It merely notified Carlson that it "will continue to provide Commercial Travel Services in the States of Kentucky, Missouri, and Nebraska through September 30, 2003," leaving open the status of these states after that date. App. at 260. More to the point, the Army has never modified Carlson's contracts to eliminate the facilities. If it was a "final decision" upon Carlson's purported November 26th "claim," it was a decision that granted all the relief that Carlson requested and rendered moot the underlying "dispute."

Finally, even if the prerequisites of the CDA have been satisfied, this is a classic case in which the Court should abstain from exercising declaratory judgment jurisdiction. As noted, the facilities have not been transferred and the conditions that will exist when and if the facilities are transferred are unknowable as are what contractual provisions will support the transfers when and if they occur. Finally, if there is no support for the transfers when and if they occur, Carlson would be fully compensated either under the equitable adjustment clause or (if the transfers are found improper) through an action for a breach of contract.[8] Accordingly, this Court should decline to intervene in the administration of the continuing Army contracts. See, e.g., Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1271 (Fed.Cir. 1999) (the Court "is not

---

[8]As we noted in our Motion, the November 26 letter presents a claim for monetary recovery as well as for contract interpretation in that it indicates the revenue loss that allegedly will occur if the facilities are transferred. App. at 256. Since the revenue loss allegedly exceeds $1,800,000, the "claim" should have been certified under the CDA. 41 U.S.C. § 605(c). As Carlson concedes, no certification accompanied the November 26 letter.

required to issue a declaration of rights whenever a contractor raises a question of contract interpretation during the course of contract performance" and generally should not issue declaratory judgments in "the absence of a need for an early declaration of the parties rights").

## V. CARLSON'S CROSS-MOTION ON COUNTS I AND II LACKS MERIT

Carlson filed a cross-motion for summary judgment upon counts I and II of the complaint. As this Court has noted:

> Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact. In response to the other's motion, each party must provide evidence that is more than merely colorable.

Hansen Bancorp, Inc. v. United States, 53 Fed.Cl. 92, 96 (2002), aff'd, 2003 WL 21267457 (Fed.Cir., June 2, 2002).

Here, while Carlson titled its opposition as an opposition and cross-motion, it did not fulfill even the most basic requirements for a separate motion. Carlson did not identify the material facts that were allegedly not in dispute, it did not in any way guide this Court as to the basis for its motion, or explain why it is entitled to judgment as a matter of law. In effect, Carlson's cross-motion is nothing more than an apparent attempt to grant Carlson the right to file an unauthorized surreply. Accordingly, it should be stricken.

In any event, Carlson is not entitled to summary judgment. As we demonstrated above, Carlson did not satisfy its burden with regard to providing evidence either to raise a disputed issue of material fact or to support an independent motion for summary judgment. As detailed above, the declarations it submitted are replete with hearsay and conclusory statements, all of

which should be stricken from the record.[9]

Unlike the declarations provided in support of our motion, Carlson's declarations provide no support from the language of the DTS Solicitation and/or the DTS Contract. For example, while both Ms. Spell and Ms. Tarr declare that it was not Carlson's alleged understanding that traditional travel services would be required, neither of these declarants explain what the statements in the RFP explicitly setting forth the requirements for traditional travel services meant. See discussion supra at § II.A.

Further, with regard to the provision of a web-based system, none of Carlson's witnesses provided any evidentiary support for the assertion that the elimination of the redundant modes of access in Northrop Grumman's system was a material change or inconsistent with the technology refreshment provisions of the DTS Contract. See discussion supra at § II.B. Indeed, Mr. Hearne's declaration explicitly acknowledged that "TRW originally indicated it would eventually provide a 'web access' for use by DoD travelers connecting to the DTS CUI . . . " Hearne Declaration at ¶ 13. Thus, Carlson concedes that a web-based platform was contemplated by the original competition.

Further, Carlson offers no evidence to support the argument that the alteration of some of the contract line item pricing, which affected no increase in the contract value, was materially different than the contract as originally awarded. See discussion supra at §II.C. In sum, therefore, Carlson has submitted no evidence upon which this Court could rely for purposes of

---

[9]See, e.g., Ansick v. Hillenbrand Indus., Inc., 933 F.Supp. 773, 776; Dart Indus., Inc. v. Plunkett Co., of Okla., 704 F.2d 496, 498 (10th Cir. 1983); Smith v. Shawnee Library, 60 F.3d 317, 320 (7th Cir. 1995); Citizens Environmental Counsel v. Volpe, 484 F.2d 870, 873 (10th Cir. 1973); Bowen Elec. Co. v. J.D. Hedin Constr. Co., 316 F.2d 362, 364 (D.C.Cir. 1963); G.D. Searle & Co., v. Chas. Pfizer & Co., 231 F.2d 316, 318 (7th Cir. 1956).

granting its cross-motion for summary judgment.

Finally, Carlson fails to present any evidence it is entitled to an injunction which is a necessary condition for its cross-motion. See, MVM, Inc. v. United States, 46 Fed. Cl. 137, 141-143 (1999) ("Although the Plaintiff has prevailed on the merits, it must establish other elements before it is entitled to permanent injunctive relief"); see, e.g., Vehicular Techs. Corp. v. Titan Wheel Int'l, 141 F.3d 1084, 1087-88 (Fed.Cir. 1998); Reebok Intern. Ltd. v. Baker, 32 F.3d 1552, 1555 (Fed.Cir. 1994); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed.Cir. 1993). Instead, Carlson's evidence is addressed primarily to indicating there are genuine issues of material fact with respect to the scope of the solicitation. In these circumstances, its cross-motion is facially inadequate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof"). Accordingly, the cross-motion should be summarily denied.

## CONCLUSION

For those reasons, and for the reasons set forth in Defendant's Motion, and on the entire record herein, judgment should be entered dismissing the Complaint in all respects, granting Defendant's motion for summary judgment and denying Plaintiff's purported "cross motion."

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

s/David A. Levitt

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 307-0309
Fax: (202) 514-7965

Attorneys for Defendant

Date: March 10, 2003

.

Certificate of Filing

I hereby certify that on March 10, 2004, a copy of the foregoing Defendant's Opposition To Plaintiff's Cross-Motion For Summary Judgment On Counts I and II and Reply To Opposition To Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/David A. Levitt