**PUBLIC VERSION**

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-1274C** |
| | ) | **Judge George W. Miller** |
| **THE UNITED STATES of AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## **PLAINTIFF'S REPLY AND MEMORANDUM IN SUPPORT THEREOF TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II**

Pursuant to Rule 7.1 of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff, CW Government Travel, Inc. ("Carlson"), submits this Reply and Memorandum in Support Thereof to "Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment on Counts I and II . . ." (the "Opposition").

The Government's Opposition reveals only a passing acquaintance with the relevant facts. Its arguments rely on either intentionally obfuscating or willfully ignoring the evidence before the Court. This approach includes an overview of purported concessions that bears no relationship to Carlson's actual submission or to the evidence submitted to the Court. **The Government does not address the fundamental fact that when it restructured the Defense Travel System ("DTS") DTR-6 Contract in 2002, the only provisions remaining from the original Contract were the Contract number and the Contractor.**

The record before the Court establishes that the Department of Defense ("DoD") improperly modified Contract Number DAMT01-98-D-1005 (known herein as "DTS DTR-6

**PUBLIC VERSION**

Contract"), by materially restructuring the contract's terms in violation of the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304.

The record demonstrates that the DoD reconfigured the pricing structure to completely shift the risk of performance and cost overruns from the contractor to the Government, removed significant technical requirements, and added traditional travel services to the DTS DTR-6 Contract, four years after contract award. These modifications essentially created a new contract that the DoD should have competitively procured. Therefore, the Court should enter summary judgment on the merits of Counts I and II for the Plaintiff. To the extent that the Court determines that the record, at this point in the litigation, is insufficient to support Carlson's claim, the Court should determine that there are material facts in dispute, deny the Defendant's Motion to Dismiss Or, In The Alternative, For Summary Judgment, and set forth a schedule for discovery and trial. Carlson also respectfully requests the opportunity to present its positions on all open motions before the Court at oral argument.

WHEREFORE, Plaintiff respectfully requests that the Court GRANT Plaintiff's Cross Motion For Summary Judgment.

Respectfully submitted,

______________________________

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

Dated: March 24, 2004

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182

**PUBLIC VERSION**

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-1274C** |
| | ) | **Judge George W. Miller** |
| **THE UNITED STATES of AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II**

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182

Dated: March 24, 2004

**PUBLIC VERSION**

## TABLE OF CONTENTS

**ARGUMENT** .......... 1

**I. The Restructure Of The Contract Pricing Provisions Was A Cardinal Change In Violation Of CICA** .......... 4

**II. Deleting The Requirement To Provide Client/Server Connectivity And Requiring Development Of Only A Web-based System Was A Cardinal Change To The Contract That Should Have Been Resolicited** .......... 12

**III. The 1998 Solicitation And Original DTS DTR-6 Contract Did Not Include Traditional Travel Services** .......... 16

**CERTIFICATE OF FILING** .......... 21

**APPENDIX**

**Exhibit 76 – Defense Travel System Passenger Name Record Analysis; March 10, 2004** .......... V 1634

**Exhibit 77 – Excerpts From TRW's Original Proposal** .......... V 1654

**Exhibit 78 – Excerpts From Solicitation DAMT01-97-R-1003** .......... V 1719

**Exhibit 79 – Excerpts From Government's Evaluation of TRW's Best And Final Offer** .......... V 1745

**PUBLIC VERSION**

## TABLE OF AUTHORITIES

### CASES

*AT&T Communications, Inc v. Wiltel, Inc.*, 1 F.3d 1201, (Fed. Cir. 1993) ............................ 4

### STATUTES

Competition in Contracting Act ("CICA") ................................................................ 5

**PUBLIC VERSION**

## ARGUMENT

The Restructure of the DTR DTS-6 Contract *(Plaintiff's Exhibits 8,11 and 13)* resulted in material changes to every contractual requirement, all terms and conditions, and performance scheduling. The Restructure*:*

- Deleted and replaced all Contract pricing provisions (Section B) so that a fixed-price, performance-based Contract became a cost-reimbursable, time and materials contract. *See Pl. Ex. 8 at V 570-571; Ex. 11 at V 834-868.*
- Deleted and replaced in entirety the original performance and technical requirements set forth in the Performance Work Statement (Section C), the Functional Requirements Document, and the Technical Requirements Document. *Id. at V 571.*
- Deleted entirely TRW's original Technical Proposal that had been incorporated into the original Contract. *Id. at V 572.*
- Deleted entirely the Deliveries and Performance Schedules for CUI Deployment contained in Section F. *Id.*
- Deleted and replaced in its entirety the Special Contract Provisions contained in Section H. *Id.*
- Deleted and replaced in its entirety the FAR Contract Clauses set forth in Section I to reflect the new cost-reimbursable, time and materials research, and development provisions. *Id.*
- Deleted and replaced in its entirety the technical and testing requirements or standards contained in the Section J Attachments. *Id.*
- Deleted and replaced in its entirety the Contract Administration Clauses in Section G. *Id.*
- Added an entirely new requirement for traditional travel services. *Pl. Ex. 13.*

The Contracting Officer was not exaggerating when she reported to Department of Defense ("DoD") officials in April of 2002 that her team had "been involved in a total restructure" of the DTS DTR-6 Contract and "these modifications totally replace the original contract requirements, prices and terms and conditions, with a new baseline [schedule]." *Pl. Ex. 53, V 1483-1484.* Literally, the only features of the original Contract not materially changed in the Restructure was the Contract number and Contractor. There can be no more irrefutable example of a cardinal change of a contract that is required to be competitively procured than the Restructured DTS DTR-6 Contract.

**PUBLIC VERSION**

Rather than address the actual issues and evidence, the Government's response relies on hyperbole and demonstrably false assertions of alleged uncontested key points:

1. The Government asserts that Carlson does not and cannot contest "that it was aware of many of the challenged modifications as many as three years prior to filing its May 2003 lawsuit." *Opposition at 2*. That is simply not true. Carlson challenges modifications made in 2002, just one year before the suit was filed. Moreover, the Government deliberately concealed the scope and extent of these modifications, ignored Carlson's FOIA requests, and refused to release the information regarding both the facts and scope of the modifications, until directed by the Court. *See Pl. Cross-Motion at 40-42; Pl. Exs. 64-67*. When most of the modifications were finally disclosed, Carlson promptly filed its Amended Complaint. The Government's contention that the "adverse effects upon the public fisc could have been avoided" by an earlier Protest smacks of hypocrisy after deliberately concealing its actions.

2. The Government asserts that Carlson does not and cannot contest that the DTS Solicitation clearly included "traditional travel services." *Opposition at 2*. In fact, Carlson put forward overwhelming evidence with respect to both the contract language and Government admissions that establish that the 1998 Solicitation and original DTS DTR-6 Contract did not include traditional travel services. *Pl. Cross-Motion at 22-24*. The requirement that TRW provide Traditional Travel Services without using the Common-User-Interface ("CUI") was not included until the Government issued Contract Modification 0029 in May 2002. *Pl. Ex. 13*.

3. The Government contends that Carlson does not and cannot contest that the originally proposed TRW system was a "web-based system" and that the expected use of the web would increase over time. This is an irrelevant argument since the issue is not the increased use of a web-based mode, but the deletion of the basic client/server system. *Opposition at 2*.

Carlson put forward evidence, including the Government's judicial admissions, that the 1998 Solicitation and original Contract required the use of a client/server-based system (while permitting limited use of a web browser) and that these technical requirements were only deleted in March 2002, after TRW spent more than $50 million unsuccessfully attempting to meet the original Contract requirements. *Pl. Cross-Motion at 19-21*. The 2002 deletion of the requirements for a client/server-based system and switch to only a web-based system (requiring another year and more than $10 million to develop) was a material change in the scope of work that fundamentally changed the technical effort involved, while the Government assumed the entire funding obligation.

4. The Government contends that Carlson does not contest that the original Contract was for $263 million, and that the modified Contract has a so-called "maximum ordering limitation" of $263 million. *Opposition at 2.* This is an irrelevant argument since the issue is that the pricing changes so fundamentally altered TRW's performance and cost risks as to constitute a new contract. Carlson also contends that the $263 million was originally intended to cover the entire cost of the DTS Program, not just the TRW Contract, and there is no current "cap" limiting the Government's payment obligations to $263 million. *Pl. Cross-Motion at 18-19.* Moreover, the evidence in the record, including the DoD Inspector General's ("IG") Report, indicates that the cost of the Restructured Contract will exceed $500 million. *See, e.g., Pl. Ex. 14 at V 1147-1148.* Notably, the Government has refused to disclose to this Court what it actually has spent to date, or what it projects to spend under this contract, harping instead on the tired refrain that the contract value remains the same with no evidence to support the claim.

5. The Government contends that Carlson has made no showing that its web-based system satisfies the technical requirements of the DTS Contract. *Opposition at 2.* That is an

irrelevant and disputed allegation. Carlson has established that it would be a serious competitor for any Solicitation that might be issued for a web-based, end-to-end travel management system for DoD, and that is all that is required for standing. *Pl. Cross-Motion at 34-39.* Moreover, the evidence conclusively establishes that the current version of TRW/Northrop's DTS CUI only meets about half the requirements.

The original Contract attempted to procure an existing commercial product that could be operationally deployed within 120 days, for a fixed-price, with the Contractor assuming all performance and cost risks. Years later, when the Government decided it wanted (or needed) to switch to a software development contract to procure only a web-based end-to-end travel system for DoD travel, under a cost-reimbursable, time and materials contract, these were not revisions that were "within the scope of the competition conducted to achieve the original contract" or "of a nature which potential offerors would reasonably have anticipated." *AT&T Communications, Inc v. Wiltel, Inc.*, 1 F.3d 1201, 1205, 1207 (Fed. Cir. 1993). When the Government decided that the extraordinary delays in developing an operational CUI necessitated extended traditional travel services for the DTR-6 region, it was required to competitively procure such services, rather than add them to the DTS DTR-6 Contract four years after award. The evidence establishes that the Government's effort to totally restructure the DTS Contract constituted improper sole source awards to TRW for work that had never been competitively procured and violated the Competition in Contracting Act of 1984 ("CICA"). These facts establish that the Court should enter summary judgment in favor of Carlson on Counts I and II.

## I. The Restructure Of The Contract Pricing Provisions Was A Cardinal Change In Violation Of CICA

The extensive modifications to the payment provisions of the contract were addressed at pages 14-19 of *Plaintiff's Cross-Motion for Summary Judgment* and in *Plaintiff's Exhibit 75.*

**PUBLIC VERSION**

There is a fundamental difference between a firm fixed-price, performance-based payment structure and a hybrid cost-plus-fixed-fee/time and material structure in which payment is not dependent on successful performance. The Government does not dispute the change in payment structure. That material departure from what was solicited resulted in a new contract that CICA requires the Government to competitively procure.

The Government does not dispute that under the 1998 Solicitation and original Contract:

- TRW had to assume 100% of the CUI development and deployment costs (*Pl. Ex. 8 at V 568*);
- TRW had to assume 100% of the performance risk of developing and deploying a CUI meeting the technical requirements (*Pl. Ex. 3*);
- TRW's revenue was contingent not only upon the successful development and deployment of the CUI, but also on the actual number of DoD travelers connected to the CUI system (*Id.*);
- TRW's recovery of development, testing, and deployment costs, plus profit was dependent on a fixed-fee of $20.00 for each DoD traveler connected to the CUI (*Id.*).
- TRW's entire revenue for the continued operation and maintenance of the CUI worldwide was contingent upon the number of actual trips made by DoD personnel using the CUI (*Id.*).

The 2002 Restructure radically changed the payment structure. Significantly, the preamble to Modification P00025 expressly recognized that while TRW was to bear the entire cost of development under the original Contract, the Government was now going to pay for development costs. *See Pl. Exhibit 8 at V 568-569.* Pursuant to the Restructuring:

- The original fixed-price, performance-based CLINs that were contingent upon successful development, deployment, and extent of actual use of the CUI by Government travelers were deleted (*Id. at V 568, 571*);
- The Government paid TRW a lump sum in excess of $50 million to cover development and testing costs incurred from the Contract award in 1998 until December 18, 2000. *Id. at V 569.*
- The Government paid TRW's development and deployment costs on a cost-reimbursable and time and materials basis.
- Many other costs that were included under the original fixed-price, performance-based CLINs ($20.00 per connected user) or the Operation and Maintenance CLINs ($4.95-$5.48 per travel transaction) were broken out into separate CLINs

**PUBLIC VERSION**

> negotiated to cover TRW's known costs, plus profit, and were no longer contingent upon successful deployment and actually utilization of the CUI. *Id. at V 574-605; Ex. 11 at V 834-868.*

In addition, without changing the original Contract, the Government started issuing Task Orders in 2001, believed to total in excess of $40 million, to pay for TRW's continuing development and testing work from December 19, 2000, until March 31, 2002.[1] *See Exhibit 75* for a detailed demonstrative comparison of the Restructured Pricing to the Contract's original pricing.[2]

The Government's Opposition attempts to obfuscate the magnitude of the pricing structure changes, conceals the actual extent of payments to TRW, and/or misrepresents material facts by arguing that the total cost of the DTS DTR-6 Contract has not increased. This defense lacks merit for two fundamental reasons. First, as discussed further below, the price to be paid to TRW under the Restructured Contract has increased many times over the price that would have been paid under the original Contract. Second, even if the total contract price had not increased, the change from a fixed-price, performance-based contract to a cost-reimbursable, time and

---

1 The Government documents produced to date are inadequate to determine the total paid to TRW for development and testing work performed between December 19, 2000 and April 1, 2002, when the new CLINs under Contract Modifications 0025 and 0027 became effective. What is clear is that such Task Order payments were not in accordance with the CLINs in the 1998 Solicitation and original Contract and were apparently used as a *de facto* restructuring of the Contract.

2 Peggy Butler's Supplemental Declaration of March 4, 2004, quibbles with a few of the individual dollar amounts in certain CLINs discussed in *Exhibit 75*. Most of the alleged errors in *Exhibit 75* amounts stem from the fact that there were Contract Modifications subsequent to the February/March and May 2002 Restructure Modifications 0025, 0027, and 0029. *Exhibit 75* compared the changes between the original Contract and the Restructured Contract. While subsequent Contract Modifications may have changed some of the dollar amounts in a few CLINs, Ms. Butler does not dispute the nature or magnitude of the Restructured Pricing, compared to the original Contract, as described in *Exhibit 75.*

PUBLIC VERSION

materials contract is, in and of itself, a material departure from the 1998 Solicitation and original Contract. Under the Restructured Contract, the Government, not the Contractor, assumes the performance and cost risks of successful development and deployment of a CUI and the Contractor's revenue is no longer contingent upon the extent of actual deployment and utilization of the CUI.

The representations of Peggy Butler and the Government regarding the contract price are misleading in a number of respects.[3] First, the payments to TRW under the original Contract were not estimated to total $263.7 million. The original estimate of $263.7 million in costs was for the entire DTS Program that included not only payments to TRW, but also the salaries for DoD civilians, support contractors, and military support for testing. *Pl. Ex. 14 at V 1151*. The Government has failed to produce documentation to establish what costs were included in the $263.7 million estimated program costs in 1998.

In addition, the plain meaning of the so-called "cap" included in the Restructured Contract reveals that it is not a cap on the total amount that the Government must pay TRW. *Pl. Ex. 11 at V 902*. That clause only benefits TRW by providing it an opportunity to refuse to continue performing beyond earning $263.7 million without renegotiating prices. *Id.*

While the Government now claims the benefit of a so-called cap, it does not challenge the extensive evidence that the "cap" has already been exceeded and that projected costs are double

---

3 Peggy Butler was not the original Contracting Officer and she admits she was not assigned to the DTS DTR-6 Contract until April 13, 2001 – almost three years after the May 1998 Contract award. *Butler Aff. at ¶ 1*. Thus, Ms. Butler has no personal participation in the 1998 Solicitation or the original Contract. It is noted that the original Contracting Officer for the 1998 Solicitation and original Contract is still an Army procurement official working in the Washington, D.C. metropolitan area in a building adjacent to ITEC4 and Ms. Butler. However, the Government has not offered his Declaration.

the purported cap. Indeed, it is extremely telling that whereas Ms. Butler's latest Declaration merely quibbles with a few cost or pricing items contained in *Exhibit 75,* the Government has utterly failed to offer any proof of the total amount already paid to TRW/Northrop Grumman, or to provide documentation as to current Government estimates as to the remaining and/or total cost of the Contract through 2006. Carlson did submit that evidence, the Government has not challenged it, and the Court should draw an adverse inference from the failure of the Government to provide such fundamental information within its possession. The Government's argument that it has maintained the same total contract amount is illusory and disingenuous.

The Government has also failed to provide the Court with documentation or even a representation as to when the DTS CUI was accepted as passing the mandatory Initial Operational Capability test ("IOC"), or how many DoD users were actually connected to the DTS CUI after it passed the IOC, and how many actual official travel transactions have been successfully performed using the DTS CUI. [4] Such information would reveal how much would have been paid to TRW under the original Contract pricing structure.[5] If the Government were then required to reveal how much has actually been paid to TRW/Northrop to date, there is no doubt that such information would prove that TRW/Northrop has been paid tens, if not hundreds of millions of dollars more under the Restructured Contract then it would have been paid to date

---

4 Recent data released by the DTS PMO in an ongoing solicitation for small business travel managers to provide service to Air Force bases using the DTS CUI, reveals that the total trips made using the DTS CUI through 2003 was only about 10,000. *Pl. Ex. 76 at V 1645-1653.*

5 Under the original Contract, the CUI had to pass the IOC before it could be operationally deployed, and then, the payments to TRW were limited to $20.00 per DoD user connected to the CUI and $4.95 – $5.48 per actual travel transaction performed using the CUI. *Pl. Ex.3 at V 80-83.*

**PUBLIC VERSION**

under the original Contract. Such a comparison would conclusively prove that the pricing restructure in 2002 created a fundamentally new contract that is required to be competitively procured.

Aside from the total amount that has or will be paid to TRW/Northrop under the Restructured Contract, there can be no dispute that the Government is paying TRW substantially more money under the Restructured Contract for comparable work. For example, according to information recently released by the DTS PMO, from July 1, 2003 until December 31, 2003, there were only 9,986 travel transactions performed that were assisted by the DTS CUI. *Pl. Ex. 76 at V 1653.* Under the original Contract, TRW would have been paid an Operations and Maintenance fee of $4.95 for each trip, or a total of only $49,430.70. *See Pl. Ex. 3 at V 83.* Under the Restructured Contract,[6] Northrop was paid a minimum of $5,843,101.36 for Operation and Maintenance of the CUI during this period. This illustrates that the difference between the original and the new payment structure is of such a magnitude that it materially departs from what the Government originally procured.

The Government also represents that TRW was not paid the $43.7 million or other amounts for development and deployment under the Restructured Contract until after TRW had achieved "operational capability for the CUI by November 26, 2000." *Opposition at 18.* This is simply not true. The only support the Government cites for this representation is a passing remark in a discussion of the price negotiations in a self-serving pre/post negotiation memorandum used to justify the Restructured Contract prices agreed to by the Government. That self-serving remark is contradicted by all of the evidence before the Court and does not rise

---

6 Using Contract Modification 0039 dated June 5, 2003. *See Attachment 8 to Peggy Butler's Supplemental Declaration of March 4, 2004.*

to a level to make this fact genuinely in dispute. In fact, that same document states: "If DTS had been deployed within 120 days of September 30, 1988, deployment would have started January 28, 1999. **Due to various problems, IOC has still not been declared, and DTS, over 2 1/2 years later, has not been deployed**. *Pl. Ex. at V 679.*

Achieving an acceptable Initial Operational Capability requires formal testing and represents a significant milestone for the DTS Program. The Government did not produce any evidence of when that test or milestone was achieved. That is because it did not happen until late 2003, if then. The Court should draw an adverse inference from the fact that the Government has failed to produce the formal documentation required in the event the CUI did, in fact, successfully achieve Initial Operational Capability.[7]

The existing documentation establishes beyond doubt that at the time the contract was restructured and TRW paid $50 million, the CUI did not meet the functional or technical requirements of the Contract and was not ready for operational deployment. The DoD Inspector General Report, submitted months after the modifications at issue, documents conclusively that the CUI had not met the technical requirements and was not ready for operational deployment. *See Pl. Ex. 14.* The DoD IG reported in July 2002 that the DTS "PMO has requested approximately $377.1 million even though it has yet to provide an automated, paperless travel system that meets all DoD temporary duty requirements." *Id. at V 1154.* The DoD IG further reported that the CUI failed its first operational assessment at Whiteman Air Force Base in

---

[7] As previously cited, DTS PMO officials testified regarding the status of the DTS CUI at a June 2003 hearing during a General Accounting Office Protest. Plaintiff has requested that transcripts of such testimony, along with the Exhibits thereto, be made available to this Court, but the Government has blocked such efforts. *See Pl. Exs. 64, 66 and 67.* Carlson requests that this Court order the production of such transcripts and Exhibits for use in this case.

November 2000 (the time the Government now represents the CUI achieved "operational capability"), and failed its second operational assessment at Ellsworth Air Force Base in August 2001. *Id. at V 1156.* The DoD IG reports that "as of April 2002, the [DTS] PMO had not documented the amount or nature of the development required to implement DTS, but PMO officials stated that the required development was extensive. . . " *Id.* In the Summary of Allegations, the DoD IG Report concluded that the DTS CUI had "failed to achieve system functionality." *Id. at V 1167.*

The fact that the DTS CUI had not achieved "operational capability" by November 26, 2000, as now alleged by the Government, or by the time of the Contract Restructure in February/March 2002, is further proven by the February 2003 Report of DoD's Office of the Director, Program Analysis and Evaluation ("PA&E"). *Pl. Ex. 15.* The PA&E Report noted that when the "Jefferson" version of the DTS CUI was subsequently released (then scheduled for March 2003), only "about half of the required functionality will be delivered." *Id. at V 1195.* The PA&E Report found:

> After experiencing numerous technical problems that principally involved the lack of an adequate COTS product that could satisfy the current contract requirement without major alterations, a decision was made by DoD to restructure the TRW contract to address the significant IT development issues necessary for the success of the DTS program.
>
> *         *         *
>
> It has taken four years to achieve about half the required functionality with an additional three years needed to provide full functionality.

*Id. at V 1203-1204.* Section J, Attachment 2, entitled "DTS Requirements Specification Document" included in the Restructuring Contract Modification 0027 dated March 28, 2002 lists all the contract specifications not even scheduled to be achieved by the CUI until the subsequent release of the Jefferson version (actually released in June 2003) or later versions and indicates

**PUBLIC VERSION**

that the "IOC" (Initial Operational Capability) was not anticipated to be achieved until after the release of the Jefferson version. *Pl. Ex. 11 at V 906-980.*

Given the overwhelming evidence to the contrary, it defies credibility for the Government to represent to this Court that "operational capability" for the CUI was achieved by "November 26, 2000," or that "payment was made, therefore, at precisely the point in time when cash flow to the contractor was originally contemplated." *Opposition at 18.*

## II. Deleting The Requirement To Provide Client/Server Connectivity And Requiring Development Of Only A Web-based System Was A Cardinal Change To The Contract That Should Have Been Resolicited

Carlson demonstrated that the Solicitation required offerors to include a solution that provided client/server connectivity. Carlson also demonstrated, and the Government has conceded, that the Government removed this requirement when it accepted TRW's restructure proposal to provide connectivity only through a web-based solution. *Opposition at 15.* Finally, Carlson demonstrated that this change was material.

The bulk of the Government's response is devoted to attempting to convince the Court that there was no change in the technical requirements for the DTS Contract, because TRW's original proposal included both client/server solutions and web-based solutions. *Opposition at 12-15.*[8] This approach demonstrates a fundamental mischaracterization of Carlson's Complaint. Carlson does not challenge the use of a solution incorporating web-based connectivity. Rather, it is the complete elimination of client/server connectivity, and the complete adoption of web-based only connectivity that is outside the scope of the original proposal.

---

8 The Government ignores the fact that the "Totally Restructured" Contract deleted entirely the original Contract's Performance Work Statement, Functional Requirements Document, Technical Requirements Document and TRW's original technical proposal.

The Solicitation required, and TRW's proposal demonstrates, that an offeror must propose a client/server network solution to satisfy the original Contract's requirements:

- Ensure total connectivity for all DoD travelers. *Pl. Ex. 3 at V 89 (C-2.1.2).*
- Use Commercial-Off-the-Shelf ("COTS") solutions to the maximum extent practicable. *Id. at V 88.*
- Commence operational deployment of a fully functional CUI within 120 days of contract award. *Id. at V 99; Pl. Ex. 8 at V 568.*
- Complete operational deployment to 11,000 DoD sites world wide in two years. *Pl. Ex. 3 at V 80.*
- The Functional Requirements Document
- The Technical Requirements Document

The Government does not deny that in 1998, there were no web-based COTS products for managing Government travel. **As one of the evaluators of BDM's proposal noted, only 32% of DTS sites could connect to the internet at the time of the Solicitation.** *See Pl. Ex. 79 at V 1754* (noting, "If [TRW] encourages the use of the Web browser as the main method of CUI access, most DTR6 sites cannot support it, which constitutes a weakness in [TRW] architecture."). Therefore, a contractor could not propose a web-only solution, but had to offer a client/server solution, as a minimum to satisfy the Solicitation requirements. This fact is further demonstrated by TRW's proposal, which states that the client/server mode will be the "predominant mode of interaction for Travel Administrators and other frequent users . . ." *Pl. Ex. 77 at V 1661.*

Both the Solicitation and TRW's proposal demonstrate that the Agency required offerors to propose client/server connectivity. All attempts at operational testing from 1998 until the release of the web-based Jefferson version of DTS in June 2003, were client/server-based systems. The Government concedes that the client/server requirement was removed in the 2002 restructuring. Therefore, the Government's only remaining defense is to argue that the modification was immaterial. The Government's attempts in this regard, however, ultimately

fail for lack of factual support. A client/server solution is significantly more difficult to deploy than a web-based solution, as evidenced by TRW's failure to develop an operational, deployable client/server CUI. Finally, the Government cannot argue that the removal of the client/server requirement was merely technical evolution, since a web-based system could not possibly have satisfied the original Contract requirements.

The Government's attempts to persuade the Court that the client/server solution is not more difficult to deploy than the web-based solution fail to consider the vast number of admissions by TRW and Government personnel conceding the point. For example, TRW's original proposal pointed out that the client/server applications required installation in Local Area Networks file servers, and installation directly to desktop computers in some instances, while "no local installation of applications software is required for [web] browser or character modes." *Pl. Ex. 77 at V 1662-1663*; *see also Id. at V 1817* (describing software distribution/installation). TRW's proposal also indicates that the preferred method for deploying the client/server connection is "on-site install." *Id. at V 1711.*

TRW's 2002 proposal for restructuring the contract also demonstrates the stark difference in deploying the two solutions:

[redacted]

The Government accepted TRW's conclusion regarding the difficulties inherent with the client/server, as evidenced from the notes from several restructuring meetings held within the Government. For example, at a March 8, 2001 meeting, the minutes reflect the differences between the client/server and web browser solutions were significant, particularly the fact that a web-based system reduced the need to install upgrades at individual DoD sites. *Pl. Ex. 34 at V 1375*. Thus, the contemporaneous documentation evidences the significant difference between deploying and modifying a client/server solution compared to a web-base answer.[9]

The $50 to $100 million and years of effort spent by TRW in unsuccessfully pursuing the client/server solution is also indicative of the significance of the client/server requirement. During the restructuring negotiations, the Government indicated that the web-based solution was not yet developed and recognized that a web-based could not be developed until 2003. *Id. at V 1376*. Thus, TRW's development efforts must have been directed toward developing the client/server solution prior to the March 2002 Contract Modification 0027. As a result, the Government cannot now credibly argue that three years and $50 to $100 million were devoted to a requirement that was immaterial.

Further, the Government's attempt to describe the elimination of the client/server as merely technical evolution also fails. The contract initially required TRW to provide the CUI within 120 days and complete deployment to 11,000 DoD sites worldwide by September 2001. The Government now argues that, because the contract was delayed five years, and because technology changed in five years, its requirements changed and, like the tail wagging the dog,

---

[9] The Declaration submitted by Mr. Fabbre argues that TRW always intended to use Regional Data Centers. That fact is irrelevant since the major difference between client/server and web-based is the intensive deployment effort on the client-side of the system, at the LAN servers of individual user computers. *Pl. Ex. 77 at V 1658-1660.*

**PUBLIC VERSION**

the contract must change as well. The Government, however, cannot modify a contract to materially change its requirements simply because the contract has been delayed five years. The new technical requirements were required to be competitively procured.

### III. The 1998 Solicitation And Original DTS DTR-6 Contract Did Not Include Traditional Travel Services

There can be no reasonable dispute that the 1998 Solicitation and original DTS DTR-6 Contract only required that TRW provide official travel services with the assistance of the automated CUI system to be developed under this contract. There was no requirement under the DTS DTR-6 Contract for TRW to provide traditional travel services for official travel until Modification 0029 was executed on May 23, 2002. *Pl. Ex. 13 at V 1079-1143.*

The 1998 Solicitation actually procured two separate contracts. The first was for the development, deployment, and utilization of the DTS CUI to provide travel services for official travel by DoD personnel throughout the 11 state DTR-6 region. That is the contract awarded to TRW and the subject of this case. The other contract (not awarded to TRW) procured by the 1998 Solicitation was for the provision of leisure (e.g., vacation) travel services to DoD personnel at the military facilities throughout the DTR-6 region. *See Pl. Ex. 78 at V 1719-1728.* Leisure travel requirements necessarily had to be performed using traditional travel services and paid for by the individuals using such leisure travel services. However, some of the references used by the Government to argue that traditional travel services were in the Solicitation refer only to leisure travel. Those references for a different contract have nothing to do with this case and citing to that reference is misleading.

The Government also cites to the "definition" section of the Solicitation to contend that traditional travel services were required. *Id. at V 1729.* But those definitions merely described, in part, the type of services the CUI had to perform; the definition did not require traditional

travel services either in addition to, or in lieu of, the CUI. The Government has not cited to any provision in the 1998 Solicitation or original Contract's (1) Performance Work Statement, Functional Requirements Document, or Technical Requirements that set forth a requirement for TRW to provide official travel services without the use of the CUI, or (2) that provides for the Government to pay TRW for providing traditional travel services for official travel.[10] The Government has not cited to any provision in the TRW 1998 proposal that offers to provide traditional travel services without the use of the CUI.

The Performance Work Statement (Section C) in the 1998 Solicitation and original DTS DTR-6 Contract make it clear that all official travel management services to be provided by TRW under this contract must utilize the automated CUI.[11] *Pl. Ex. 3 at V 88-97.* Section C requires that a CUI had to be provided "which facilitates the official travel management services being solicited." *Id.* The Defense Travel System Functional Requirements Document ("FRD") included in the 1998 Solicitation and original DTS DTR-6 Contract also specifically provided that all travel services were to be provided through the CUI system that was being procured.

---

10 Ms. Butler's Supplemental Declaration attempts to convince the Court that Clause H-6 provided for the changes made in the Restructured Contract Modification 0029 to include payment provisions for traditional travel services. This is another misrepresentation of fact by Ms. Butler. Clause H-6 only allowed for the adjustment of the amount of rebate of airline commissions to be paid by the Contractor, not a change in scope of work required.

11 The original DTS DTR-6 Contract required that the development and testing of the CUI be completed and deployment commence within 120 days after contract award with deployment to all military locations within the DTR-6 region completed no later than February 2000. *Pl. Ex. 3 at V 102-136.* Since in 1998 the DTS CUI was required to be quickly available and rapidly deployed, and there were existing travel management contractors providing traditional travel services to all military locations within the DTR-6 region, there was simply no requirement for TRW to also provide traditional travel services pending the deployment of the DTS CUI.

**PUBLIC VERSION**

*Pl. Ex. 3 at V 168-172.* The Technical Requirements Document attached to the 1998 Solicitation and original DTS DTR-6 Contract also required use of the CUI in providing all official travel services. *Pl. Ex. 3 at V 172-182.* Under the heading: "Purpose and Scope," the Technical Requirements Document stated:

> This attachment documents the requirements for the Common User Interface (CUI). **The CUI provides the automation that facilitates the travel services being solicited.** (Emphasis added.)
> *Id.*

Thus, the 1998 Solicitation and the original DTS DTR-6 Contract make it unambiguous that all the official travel management services required and defined under this contract were to be provided using CUI. Even though it was recognized that some DoD travelers would not have access (be "connected") to the automated CUI, TRW has only required to provide travel services to those travelers after the development and deployment of the DTS CUI and was required to enter the unconnected traveler's trip into the CUI – not provide traditional travel services. This fact was specifically acknowledged in TRW's proposal. *Pl. Ex. 77 at V 1718a.*

The fact that the original Contract did not include traditional travel services is conclusively demonstrated by the actual changes made to the Contract in Modification 0029.[12] That Modification deleted entirely the original Functional Requirements Document which, as noted above, required that all travel management services required under this Contract be performed using the CUI. *Pl. Ex. 13 at V 1058.* Contract Modification 0029 replaced the

---

12 Even as late as the execution of Contract Modification 0027 on March 28, 2002, the Performance Work Statement, at Section C-11 provided that: "the Contractor shall provide official travel management services within the designated DTR-6 locations [11 states] in accordance with the Functional Requirements Document (Attachment 1)." *Pl. Ex. 11 at V 888.* The Functional Requirements Document required the use of the CUI for all travel management services, even if the individual traveler did not have automated access to the CUI.

original Functional Requirements Document with a new document entitled: "DTR-6 Travel Service Requirements Document," dated March 15, 2002. *Pl. Ex. 13 at V 1079-1143.* For the very first time, this document provided that "the Contractor shall provide Travel Services facilitated by the Defense Travel System (DTS) as well as Traditional Travel Services in advance of DTS availability at Government Designated Locations." *Id. at V 1081.* (Emphasis added.) New contract provisions were necessary to incorporate a 50-page requirement for traditional travel services into this contract, which included a number of travel management reports that had to be manually prepared in the absence of the DTS CUI. *Id. at V 1093-1143.*

The fact that the 1998 Solicitation and original DTS DTR-6 Contract did not provide for traditional travel services is confirmed by the prior sworn testimony and contemporaneous correspondence of TRW and Government officials cited in *Plaintiff's Motion* (at 22-29) and *Exhibit 73*.[13] Traditional travel services without CUI assistance for official travel was a new requirement added to the DTS DTR-6 Contract in May 2002. Those services must be competitively procured and Carlson is entitled to Summary Judgment on this issue.

---

13 The Government contends these admissions cannot be used to explain the Contract because the language is unambiguous. That argument misses the point. The statements are admissions and confirmation of the fact that the original Contract did not include Traditional Travel Services – not interpretations of ambiguous language. Moreover, such contradictory statements demonstrate the lack of credibility of the Government's and TRW's Declarants, and the Government's current position.

**PUBLIC VERSION**

Respectfully submitted:

"s/Lars E. Anderson"

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*

Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

Dated: March 24, 2004

## CERTIFICATE OF FILING

I hereby certify that on April 14, 2004, a copy of the foregoing PUBLIC VERSION OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II AND MEMORANDUM IN SUPPORT THEREOF (originally filed under seal on March 24, 2004) was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

"s/Lars E. Anderson"

Lars E. Anderson
*Counsel for CW Government Travel, Inc.*