# In the United States Court of Federal Claims

No. 03-1274 C
(Filed July 26, 2004)
(Reissued August 3, 2004)[1]

| | |
|---|---|
| CW GOVERNMENT TRAVEL, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant, and NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION, Defendant-Intervenor. | Injunctive Relief; Contract Disputes Act, Contracting Officer's Final Decision, Judgment on the Administrative Record; Standing; Competition in Contracting Act, 41 U.S.C. § 253(a) |

Lars E. Anderson, Venable LLP, Vienna, Virginia, for plaintiff. Michael W. Robinson, Benjamin A. Winter, Sharon A. Jenks, Venable LLP, Vienna, Virginia, of counsel.

David A. Levitt, Trial Attorney, Franklin E. White, Jr., Assistant Director, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

---

[1] This Opinion was originally filed under seal on July 26, 2004, pursuant to this Court's October 2, 2003 provisional protective order. The parties were given an opportunity to advise the Court of their views with respect to any "protected information" referred to in the opinion that they asserted was required to be redacted under the terms of the protective order. The parties filed a joint report indicating that no redactions were necessary. Accordingly, the Court is reissuing the July 26, 2004 opinion with no redactions. The Court has, in this reissued opinion, corrected errata.

John W. Chierichella, Sheppard, Mullin, Richter & Hampton LLC, Washington, D.C., for defendant-intervenor. Anne B. Perry, Sheppard, Mullin, Richter & Hampton LLC, Washington, D.C., of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This case is before the Court on defendant's and intervenor's motions to dismiss, or in the alternative, for summary judgment, and plaintiff's cross-motion for summary judgment. Plaintiff, CW Government Travel ("Carlson"), filed a complaint in this action on May 23, 2003.[2] On December 15, 2003, Defendant, United States ("Government"), filed its motion to dismiss, or in the alternative, for summary judgment. Defendant's motion, based on Rules of the United States Court of Federal Claims ("RCFC") 12(b)(1) and 12(b)(6), relates to all counts of the amended complaint. Plaintiff filed a cross-motion for partial summary judgment on February 12, 2004. Plaintiff sought summary judgment on Counts I and II only. On April 1, 2004, the Court granted Northrop Grumman Space and Mission Systems Corporation's ("Northrop Grumman") motion to intervene with respect to Counts I and II of plaintiff's amended complaint, and ordered that Northrop Grumman's briefs regarding the cross-motions for summary judgment be filed as of that date. Northrop Grumman, on December 15, 2003, filed a motion to dismiss, or in the alternative, for summary judgment. The cross-motions were fully briefed as of May 10, 2004, and the Court heard oral argument on May 18, 2004. For the reasons discussed below, plaintiff's motion for partial summary judgment is GRANTED in part and DENIED in part, defendant's motion to dismiss, or in the alternative, for summary judgment is GRANTED in part and DENIED in part, and defendant-intervenor's motion to dismiss, or in the alternative, for summary judgment is GRANTED in part and DENIED in part.

## *BACKGROUND*

This case involves several contracts for government travel services. Counts I and II of plaintiff's amended complaint, though not explicitly styled as such, constitute a bid protest of contract number DAMT01-98-D-1005 ("DTS DTR-6 contract")[3] that is currently being

---

[2] Plaintiff filed a motion for leave to file an amended complaint on November 14, 2003. By Order of the Court, plaintiff's amended complaint was filed on April 1, 2004. Despite the delay in plaintiff's amended complaint being filed, the cross-motions for summary judgment, as well as defendant's and intervenor's motions to dismiss, address the allegations contained in the amended complaint, rather than plaintiff's original complaint.

[3] DTS DTR is the acronym for Defense Travel System Defense Travel Region. In addition to DTS travel regions, there are also Army travel regions. These regions are designated separately. Sometimes a DTS travel region will overlap an Army travel region. Transcript of

performed by Northrop Grumman. Count I of the amended complaint alleged that the Government violated the Competition in Contracting Act, 41 U.S.C. § 253(a) (2000), when it modified the DTS DTR-6 contract, because the modifications constituted cardinal changes such that the new work under the DTS DTR-6 contract was required by law to be competed. In Count II of the amended complaint, plaintiff sought a permanent injunction, requesting that the Court enjoin Northrop Grumman's performance of the DTS DTR-6 contract and require the Military Traffic Management Control ("MTMC," "agency," "Government") to issue a new solicitation for the work encompassed in the out-of-scope modifications. Count III of plaintiff's amended complaint is a performance dispute, brought under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-612 (2000), relating to two contracts between Carlson and the Army for traditional travel services.

## I. Counts I and II

On or about June 30, 1997, MTMC issued a solicitation for a seamless, paperless, and complete travel management service both for Defense Travel Region 6 ("DTR 6")[4] and for the development and deployment of a world-wide travel system. The contractor would provide "commercial travel services such as reservations and ticketing for all modes of travel, Government and commercial lodging reservations, rental car arrangements, ticket delivery, and support services."[5] Unlike so-called "traditional travel services," which refers to the provision of such services through conventional means, the complete travel management services contemplated by the DTS DTR-6 contract were to be achieved using an automated travel management system to be known as the Common User Interface ("CUI").

The CUI was to interface with numerous DoD external automated information systems that would link the various components of DoD's travel management system to a new unified

---

Proceedings, CW Gov't Travel, Inc. v. United States, No. 03-1274 at 158 (Fed. Cl. May 18, 2004) ("Tr."). Thus, some states are in DTS DTR-6, but in Army DTR-3, 4, or 5.

[4] DTS DTR-6 consists of military installations in Michigan, Wisconsin, North Dakota, South Dakota, Kentucky, Missouri, Illinois, Nebraska, Minnesota, Iowa, and Indiana. V 88. The parties did not file an administrative record, as such. Rather the Government provided the administrative record to plaintiff in discovery, and the parties represented that the contents of the administrative record were before the Court as appendices to the parties' cross-motions. Tr. at 23-26. Because each party submitted an appendix with its own numbering system, there is no uniform system of citation to the documents in the administrative record. Plaintiff's documents are labeled with a prefix "V," whereas defendant's documents do not appear to contain such a prefix. The Court will identify the documents in the same manner that they were identified by the parties.

[5] DTS DTR-6 contract, Attachment 5 "Terms and Definitions," Pl.'s App. Tab 3, V 2480.

defense travel system ("DTS"). The Solicitation mandated that the contractor develop the CUI using commercial off-the-shelf products ("COTS"). While the Solicitation did not require offerors to propose a specific software or hardware configuration, the technology of the time limited the solutions that contractors could offer. For example, in 1997, there were no COTS items that provided web-based travel management services for Government travelers.[6] It was assumed, at least initially, that the contractor would have to install software on user desktops at each military location in order to achieve connectivity (plaintiff refers to this as a "client/server mode"). To accomplish such connectivity, the contractor would have to create interfaces with numerous other DoD software products and networks. The solicitation did not allow much time for the contractor to achieve this goal–operational deployment was to commence at the first DoD site within 120 days of the contract award. The contractor was expected to complete operational deployment and integration at approximately 11,000 DoD sites worldwide by September 2001.[7]

The solicitation contemplated a fixed-price requirements contract for a base period of five years, with three one-year options for: (1) a new travel management software system; (2) operation and maintenance of the CUI; and (3) DTS travel management services. Only two offerors responded to the solicitation. No provider of traditional travel services, including Carlson, responded. In May 1998, the DTS DTR-6 contract was awarded to TRW, whose successor is Northrop Grumman.[8] The contract was a firm fixed-price, performance-based contract for approximately $263,700,000.[9]

In late 2001, due to a myriad of performance problems, TRW and the Government entered into negotiations to "totally restructure" the contract.[10] Three modifications were entered into in February, March, and May 2002. Modification P00025 was implemented on February 27, 2002. Modification P00027 became effective on March 29, 2002. And Modification P00029 was issued on May 23, 2002. Carlson alleges that these modifications, *inter alia*, deleted all the performance requirements of the original contract relating to the deployment of the CUI (contemplating a client/server mode) and replaced those contract sections with substantially different contract requirements that were easier to achieve (a web-based CUI); restructured the payment CLINs–changing the contract from firm fixed-price to cost reimbursement; and added traditional travel services to the contract.

---

[6] Def.'s Answer to Amended Complaint ("Def.'s Answer") ¶ 22.

[7] Def.'s Answer ¶ 21.

[8] Because many of the documents involved in this case refer to "TRW," the Court will use these company names interchangeably.

[9] Def.'s Answer ¶ 29.

[10] Pl.'s App., Tab 53, V 1484.

About a year before the Government issued the modifications, on or about May 22, 2001, the Government issued a notice in the Commerce Business Daily ("CBD") stating that the Government

> intends to award a sole source modification to amend the structure of the current Defense Travel System (DTS) contract No. DAMT01-98-D-1005 with TRW, Fairfax, Va. to incorporate software development/engineering pricing features to allow for DTS CUI systems connectivity to the DOD Disbursing and Accounting Systems (DAD's). This action will enable the negotiation and inclusion of additional Contract Line Items (CLIN's) with cost reimbursement type pricing features to support PMO DAD's requirements over the life of the contract.[11]

The CBD announcement identified an Army employee, Peggy Butler, and provided a hyperlink that allowed subscribers to "click here to contact the Contracting Officer." The parties dispute whether the CBD announcement related to the restructure, or whether it related to a change embodied in Task Order 10, which was also issued on May 22, 2001.[12] There is some indication in the record that the agency made the determination to restructure this contract in April 2001. It is therefore possible that the CBD announcement dated May 22, 2001, related to the restructure, and not Task Order 10. The parties appear to agree, at a minimum, that Carlson, upon seeing the CBD announcement, did not contact the Contracting Officer to inquire about the sole source modification discussed in the announcement.

On March 20, 2002, Northrop Grumman issued to Carlson, among others, a solicitation to act as a subcontractor on the DTS DTR-6 contract. Among the information provided to potential subcontractors was the "DTR 6 Travel Service Requirements Document" from TRW's prime contract, dated March 15, 2002.[13] The Table of Contents of that document clearly lists "DTR 6 Traditional Travel Services." TRW also sent to the prospective subcontractors Section J, Attachment 1, which stated that "[t]he Contractor [TRW] shall provide Travel Services facilitated by the Defense Travel System (DTS) as well as Traditional Travel Services in advance of DTS availability at Government designated locations."[14] Accordingly, Carlson knew or should have know as of March 20, 2002 that TRW, through a subcontractor, would be performing traditional travel services under the DTS DTR-6 contract.

Carlson attempted to obtain information concerning the modifications at issue in this case

---

[11] Def.'s App., Attachment 10, p. 64.

[12] *See* V 281.

[13] Def.'s App., Tab II, 16, p. 127.

[14] *Id.* at Tab II, 17, p. 142

by submitting a Freedom of Information Act ("FOIA") request on November 15, 2002. The Government did not respond to Carlson's request under FOIA until November 4, 2003, after litigation in this case had already commenced. While Carlson did file a FOIA request in November 2002, it admittedly did not make any direct communication with the DoD requesting information about the contemplated modifications, or stating Carlson's view that if the DoD was considering a web-only system, the agency would have to issue a new solicitation and compete the contract.[15]

## II. Count III

On February 27, 2002, MTMC awarded contracts to Carlson to provide traditional travel services in Army Regions 1, 2, 4, 5, and National Capital Region. At issue in this case are the contracts relating to Army Regions 4 (DAMT01-02-C-0027) and 5 (DAMT01-02-C-0028). Army Region 4 is comprised of Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, Virginia, and West Virginia. Army Region 5 is comprised of Arkansas, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma, and Texas.

Carlson's contracts became effective on October 1, 2002, with a firm base period of twelve months and a series of eight six-month option periods, for a total contract period of five years. Each contract provided that "the Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract." Paragraph 1.1.1 provided that "upon the implementation of the Defense Travel Region 6 (DTR 6) contract . . . Ft. Campbell, KY, Missouri, and Nebraska will be deleted from the respective regions and incorporated into the DTR 6 contract." Paragraph 1.1.1.2 provided that:

> The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract . . .

Paragraph 1.6.8 provided that:

> At any time after the base period of this contract . . . , the Government may identify any/or all workload in this contract to be deleted.

On November 8, 2002, Ruby Mixon, Contracting Officer ("CO"), sent a letter to Carlson in which the Government informed Carlson that "travel services support for the following states: Kentucky from Contract DAMT01-02-C-0027 and Missouri and Nebraska from Contract

[15] Tr. at 94-95.

DAMT01-02-C-0028 will transition to Contract DAMT01-98-D-1005 (DTR 6) effective February 24, 2003."[16] On November 26, 2002, Carlson wrote a letter to Ms. Mixon informing her that Carlson viewed any such transfer of work as a breach of contract, and further informed CO Mixon that the addition of traditional travel services to the DTS DTR-6 contract constituted an out-of-scope modification, and the failure to compete that work violated the Competition in Contracting Act.[17] Carlson also asserted that no transfer could occur until the end of the base period of its contract–September 30, 2003. Carlson's letter further stated that work could not be transferred to the DTS DTR-6 contract until the CUI was deployed, and even then, only Fort Campbell, and not all of Kentucky could be transferred.[18] The Government responded in a letter dated January 10, 2003, in which it informed Carlson that "our letter of November 8, 2002 remains in effect."[19] On January 31, 2003, however, CO Jackie Robinson-Burnette informed Carlson of her "decision to rescind transition notification letters," and that "Carlson Wagonlit will continue to provide Commercial Travel Services in the States of Kentucky, Missouri and Nebraska through September 30, 2003."[20] Delaying the transfer date addressed only one of Carlson's concerns–that no work could be transferred during the base period of its contracts. The January 31 letter did not state that the Government agreed with Carlson's interpretation of the DAMT01-02-C-0027 and DAMT01-02-C-0028 contracts.[21] In a May 15, 2003 e-mail, the Government stated that it intended to, and would in fact, issue a modification shortly removing those travel regions from Carlson's contracts effective September 30, 2003.[22]

Shortly after receiving the May 15 e-mail, on May 23, 2002, Carlson filed with this Court a complaint and a motion for preliminary injunction. Count III of Carlson's amended complaint sought a declaratory judgment that it is the exclusive provider of traditional travel services for all the DoD sites identified in Carlson's competitively awarded Army contract, and a declaratory judgment that Carlson's Army travel services contracts, including the DoD sites in the States of Missouri, Nebraska, and Kentucky, do not require it to relinquish this work to Northrop Grumman and SATO Travel (Northrop Grumman's subcontractor for traditional travel services under the DTS DTR-6 contract) under the DTS DTR-6 contract unless and until the CUI is operationally deployed throughout those states. Carlson further requested a declaratory

---

[16] Def.'s App. at 251.

[17] *Id.* at 253-256.

[18] *Id.*

[19] *Id.* at 258. Contracting Officer Jackie Robinson-Burnette drafted the January 10, 2003 letter.

[20] Def.'s App. at 260.

[21] *Id.*

[22] *Id.* at 262.

judgment that Carlson's travel services contract requires it to relinquish only Fort Campbell, Kentucky, as opposed to the entire State of Kentucky in the event that the DTS CUI is operationally deployed in the DTS DTR-6 region. Carlson sought a permanent injunction ordering the Army not to transfer the requirement to provide traditional travel services under any of Carlson's Army contracts until and unless a DTS CUI is operationally deployed and able to provide all required travel services to the Army at those sites. During the course of this litigation, the Government and Carlson agreed that the Government would stay any transfers if Carlson withdrew its request for preliminary injunction, which Carlson did.[23]

## *DISCUSSION*

## I. Counts I and II

### A. Jurisdiction and Standard of Review for Bid Protest Actions

This court's bid protest jurisdiction is set forth in the Tucker Act, which provides, in pertinent part:

> Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or to the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2000);[24] *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 455 (2001). In this case, Carlson is not challenging an award. Rather, it is claiming that there has been a violation of statutory requirements for competition in government procurements. *See id.* Such actions, which ask the court to direct new solicitation of and competition for government contract work due to a cardinal change in a previously awarded contract, are within

[23] Tr. at 160.

[24] As of January 1, 2001, this court assumed sole jurisdiction over bid protest actions. Pub. L. 104-320, § 12(d), 110 Stat. 3870, 3875 (1996) ("(d) SUNSET.– The jurisdiction of the district courts of the United States over the actions described in section 1491(b)(1) of title 28, United States Code (as amended by subsection (a) of this section) shall terminate on January 1, 2001 unless extended by Congress.").

this court's jurisdiction. *Id.*; 41 U.S.C. § 253j(d) (2000) (allowing an action in this court "on the ground that the [delivery] order increases the scope, period, or maximum value of the contract under which the order is issued"); *see also AT&T Comms., Inc. v. Wiltel, Inc.*, 1 F.3d 1201 (Fed. Cir. 1993).

There was extensive discussion during oral argument regarding the proper standard of review.[25] The court reviews challenges to agency actions described in 28 U.S.C. § 1491(b)(1) according to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2000). 28 U.S.C. § 1491(b)(4). Section 706(2) provides that the reviewing court shall: "Hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . or (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A) (2000). These inquiries are in the alternative. The agency's application of the law is not viewed through the prism of one of the other inquiries. *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 791 (1997). The agency's action was either lawful or not. If the action was prejudicially unlawful, it does not matter that the agency's perception that its conduct was lawful is reasonable. *Id.* Thus, when the court is determining whether the agency's actions were "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the standard of review is *de novo*.

### B. Standard of Review for Motion to Dismiss

When considering a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *CC Distributors, Inc. v. United States*, 38 Fed. Cl. 771, 774 (1997) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). The court is required to decide any disputed facts that are relevant to the issue of jurisdiction. *Reynolds*, 846 F.2d at 747. The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction is as follows: "In passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, unchallenged allegations of the complaint should be construed favorably to the pleader." *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989); *CC Distributors,* 38 Fed. Cl. at 774. In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n.2 (1977); *CC Distributors,* 38 Fed. Cl. at 774.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *CC Distributors,* 38 Fed. Cl. at 774. The court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that will entitle it to relief. *CC Distributors,* 38 Fed. Cl. at 774 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). "Conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Id.*

---

[25] Tr. at 20-23, 85, 117-121.

Dismissal under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted is appropriate when the facts as alleged in the complaint do not entitle the plaintiff to a legal remedy. *New York Life Ins. Co. v. United States*, 190 F.3d 1372, 1377 (Fed. Cir. 1999). In reviewing a motion to dismiss, the court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998). The case may be properly dismissed if plaintiff "can prove no set of facts in support of his claim that would entitle him to relief." *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed. Cir. 1998); *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000). RCFC 12(b)(6) specifically instructs, however, that where such a motion is filed and "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by RCFC 56." RCFC 12(b); *see also, Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1250 (Fed. Cir. 2000); *Singleton v. United States*, 54 Fed. Cl. 689, 691 (2002). In the instant case, both plaintiff and defendant rely on matters outside the pleadings. The Court has not excluded those matters and, therefore, will treat defendant's motion to dismiss for failure to state a claim as a motion for summary judgment.

### C. Standard of Review for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that will affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant for summary judgment bears the burden of demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Northrop Grumman*, 50 Fed. Cl. at 457 (citing *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988)). It does not necessarily follow that if one motion is rejected, the other is supported. *Prineville*, 859 F.2d at 911. The court must evaluate each party's motion on its own merits and resolve all reasonable inferences against the party whose motion is under consideration. *Corman v. United States*, 26 Cl. Ct. 1011, 1014 (1992).

### D. Carlson's Action is Timely and Not Barred by Laches

Defendant and intervenor contend that this Court lacks jurisdiction to entertain Carlson's "untimely" claims set forth in Counts I and II of the amended complaint.[26] The Government and Northrop Grumman urge the Court to adopt the 10-day timeliness rule of the Government Accountability Office ("GAO"). 4 C.F.R. § 21.2. The Court of Federal Claims, however, is not bound by the bid protest timeliness rules of the GAO. *See* 28 U.S.C. § 1491(b)(3) ("in exercising jurisdiction under this subsection, the courts shall give due regard to . . . the need for expeditious

[26] Def.'s Mot. at 25.

resolution of the action"). "This court, with all due respect, fails to see how a GAO rule that self-limits that agency's advisory role constitutes a limit, either legally or prudentially, on this court's exercise of jurisdiction." *Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 535 (2003).

Defendant and Northrop Grumman next contend that Counts I and II of Carlson's amended complaint should be barred by laches. Mere passage of time does not constitute laches. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993). To establish the affirmative defense of laches, a party must show unreasonable and inexcusable delay from the time the claimant knew or reasonably should have known of its claim against the party, and that the delay caused either economic prejudice, or injury to the party's ability to mount a defense. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc). No fixed boundaries define the length of time deemed unreasonable, and the duration should be viewed in light of the circumstances. *Aero Union Corp. v. United States*, 47 Fed. Cl. 677, 686 (2000).

The application of laches is committed to the sound discretion of the court and should not be made by reference to "mechanical rules." *Aero Union,* 47 Fed. Cl. at 686 (citing *Aukerman*, 960 F.2d at 1032). The burden of proof is on the party that raises the affirmative defense, here, the Government. *Advanced Cardiovascular Sys.,* 988 F.2d at 1161. When raising the laches defense in the summary judgment context, the defendant must also establish that there are no genuine issues of material fact with respect to either delay or prejudice. *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998).

When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period. *Advanced Cardiovascular Sys.,* 988 F.2d at 11661 (citing *Cornetta v. United States*, 851 F.2d 1372, 1377-78 (Fed. Cir. 1988) (en banc)). Jurisdiction of Counts I and II is based on 28 U.S.C. § 1491(b), which does not limit the time in which a bid protest action may be brought. Had Congress wanted to set a statute of limitations on bid protest actions, it would have done so. Because Congress did not so limit the jurisdiction of this Court to hear such actions, we would be reluctant to invoke laches except under extraordinary circumstances that are not present in this case.

1. Addition of Traditional Travel Services

As discussed above, *supra* at 5, Carlson knew or should have known as of March 20, 2002, that traditional travel services had been added to the DTS DTR-6 contract. Carlson did not file its complaint alleging that such an addition violated CICA until May 23, 2003–14 months later. In the context of a bid protest, 14 months is a lifetime. Having found that there was a delay, the Court must next "consider and weigh any justification offered by the plaintiff for its delay." *Aukerman*, 960 F.2d at 1033. Some excuses that have been considered in the past include: wartime conditions, negotiations between the parties, and other concurrent litigation. *LaForge & Budd Constr. Co. v. United States*, 48 Fed. Cl. 566, 572 (2001) (internal citations

omitted). Carlson has presented no legitimate justification for its unreasonable delay.

The Government and Northrop Grumman have not, however, met their burden of showing that they were prejudiced by plaintiff's delay in bringing a claim regarding the addition of traditional travel services to the DTS DTR-6 contract.[27] A defendant can allege two types of prejudice: economic and evidentiary. Economic prejudice focuses on the financial consequences to defendant, and possibly others, which could have been prevented by an earlier filing, should the plaintiff be successful on its claim. *Id.* (citing *Aukerman*, 960 F.3d at 1033). Evidentiary prejudice is the hardship encountered in mounting a defense due to plaintiff's delay and may include unavailable witnesses, the loss or destruction of evidence, or faded memories. *Id.* (citing *Cornetta*, 851 F.2d at 1378). With respect to traditional travel services, the Government and Northrop Grumman have not provided any factual basis upon which the Court could find that Carlson's delay prejudiced them.

2. <u>Modifications Relating to CUI Requirements and Payment Structure</u>

The Government has not met its burden to pinpoint the time at which plaintiff knew or should have known about the modifications regarding the CUI requirements and alleged payment restructure. It is unclear whether the CBD announcement actually referred to the restructure, or whether it related to a change that occurred earlier (Task Order 10). Carlson, in November 2002, only a few months after the modifications at issue in this case, submitted a FOIA request in order to gather more information about the contract restructure. The Government, however, did not respond until one year later, thereby impeding Carlson's ability to pursue its claim. Given Carlson's attempt to investigate the DTS DTR-6 modifications, and the Government's lack of cooperation in that endeavor, we cannot say that Carlson's delay regarding the CUI requirements and alleged payment restructure was unreasonable.

The Government was unable to show prejudice regarding Carlson's delay in asserting its claim relating to the addition of traditional travel services, and it was unable to establish the date that Carlson should have known the extent of the CUI modification and alleged payment restructure. Thus, the claims set forth in Counts I and II of Carlson's amended complaint are not barred by laches. Despite this finding, however, the passage of time between the DTS DTR-6 contract restructure and Carlson's initiation of this action is not wholly irrelevant in this case. The facts that are the basis of Government's laches defense are significant in determining whether equitable relief is appropriate. *See infra* at 22-25.

**E. Standing to Bring a Bid Protest Action**

In order to maintain a bid protest action, a protestor must be an "interested party." 28 U.S.C. § 1491(b)(1). The Tucker Act, however, does not define the term "interested party." The

---

[27] For a thorough analysis of which party bears the burden to show prejudice, *see LaForge,* 48 Fed. Cl. at 572.

United States Court of Appeals for the Federal Circuit, therefore, has adopted the definition of "interested party" set forth in CICA. *Northrop Grumman*, 50 Fed. Cl. at 455-56 (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001)). CICA defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.*; 31 U.S.C. § 3551(2). Where a claim is made that the Government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it would have competed for the contract had the Government publicly invited bids or requested proposals. *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997).

1. <u>Carlson has Standing to Protest the Failure of MTMC To Compete the Traditional Travel Services Work</u>

Carlson is an interested party with standing to challenge the MTMC's failure to compete the traditional travel services work. Carlson has competed for and won numerous DoD contracts for traditional travel services. *See, e.g.*, Count III of Carlson's amended complaint (a performance dispute regarding two contracts between Carlson and the Army for traditional travel services). The Government has not challenged Carlson's standing to challenge the addition of traditional travel services to the DTS DTR-6 contract.

2. <u>The Record is Unclear Regarding Whether Carlson has Standing To Protest the Change in Payment Structure and the Change in the CUI Requirements</u>

The Government contends that to have standing to protest the modifications to the DTS DTR-6 contract relating to the CUI and the payment restructure, Carlson must prove that it possessed an e-travel system that met the requirements of the contract at the time of the restructure. The standard for being an interested party in these circumstances, however, is whether Carlson would have competed for the contract had the Government issued a solicitation. *CCL,* 39 Fed. Cl. at 790. Thus, the question is not whether Carlson could have provided a finished CUI in 2002. Rather, the inquiry is whether Carlson had substantially the same capability as Northrop Grumman possessed in 2002. Contrary to the Government's position, it is irrelevant whether Carlson's GSA e-travel system met the DTS DTR-6 contract requirements. The test is whether Carlson would have competed with Northrop Grumman to fulfill the CUI requirements.

The Court is unable to answer that question based on the record as it currently stands. The parties have submitted more than 1,600 pages of documents, as well as several declarations. The record, however, leaves a number of questions unanswered. At this time it is unclear what capability each of the two contractors possessed at the time of the restructure in 2002. There has been only limited discovery on this issue, with the result that the record is incomplete. The Government has challenged the sufficiency of Carlson's declarations, but even absent the

declarations, Carlson has demonstrated that it can prove a set of facts that would entitle it to relief, *i.e.*, that in 2002, its ability to provide a CUI to the Government was comparable to Northrop Grumman's ability to do so. Therefore, defendant's and intervenor's motions to dismiss for lack of standing are denied. To the extent that those parties have moved for summary judgment on this issue, there exist genuine issues of material fact that the Court cannot resolve at this stage of the case.

**F. Standard of Review for Judgment on the Administrative Record**

Defendant entitled its motion as a "motion to dismiss, or in the alternative, for summary judgment." At oral argument, however, counsel for the Government correctly represented that the proper procedural method for resolving the merits of the claims set forth in Counts I and II is a review of the administrative record pursuant to RCFC 56.1.[28] RCFC 56.1 provides for judgment on the administrative record, a procedural tool unique to the Court of Federal Claims. *Banknote Corp. of America v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004). Rule 56.1(a) specifies that a motion for judgment on the administrative record shall be treated in accordance with the rules governing motions for summary judgment, with the exception that any supplementation of the administrative record shall be by stipulation or by court order only. *Id.* Thus, judgment on the administrative record is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[29] *Id.*; *see supra* at 10.

**G. Traditional Travel Services**

1. <u>The Addition of Traditional Travel Services to the DTS DTR-6 Contract Was a Cardinal Change, and Failure To Compete That Work Violated CICA</u>

The issues of whether traditional travel services were included in the original contract, and if not, whether the addition of such services constituted a cardinal change present questions of contract interpretation. Interpretation of the terms of a government contract is a question of law to be decided by the court. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985). The intent of the parties controls contract interpretation, and the "primary function of the court is to ascertain the intent of the parties to a contract." *Northrop Grumman*, 50 Fed. Cl. at 458; *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988). The

---

[28] Tr. at 25. The administrative record in this case is comprised of the documents submitted to the Court in the parties' respective appendices. Tr. at 23-24. *See supra* n.4.

[29] For a more comprehensive description of the respective roles of the court and the agency in connection with a motion for judgment on the administrative record, *see Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 726 n.9 (2004); *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 204 n.11 (2004); *Tech Systems, Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001).

contemporaneous interpretation of the parties, during contract performance and before interpretation of the contract became a subject of controversy, is of great, if not controlling, weight. *Max Drill, Inc. v. United States*, 192 Ct. Cl. 608, 619, 427 F.2d 1233, 1240 (1970). An interpretation that "gives a reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Northrop Grumman*, 50 Fed. Cl. at 459. These principles apply to disputes over language found in solicitations for government contract work as well as in executed contracts. *Id.*

In order to determine whether there has been a cardinal change, the Court must first determine if the contract's Performance of Work Statement, found in Section C,[30] required Northrop Grumman to provide "traditional travel services," *i.e.*, travel services not using the CUI. The contract stated: "The Government's objective is to acquire travel services supported by a seamless, paperless, process" and "obtain[ ] a single official travel service contractor to provide official travel management services within Defense Travel Region 6 . . . ."[31]

The contract defined "travel management services" as "traditional commercial travel services such as reservations and ticketing for all modes of travel, Government and commercial lodging reservations, rental car arrangements, ticket delivery, and support services."[32] The contract further required that the "Contractor shall provide personnel, equipment, tools . . . necessary to perform the following for authorized DoD travelers:"

> C-2.1.1 Travel management services for all authorized official travel performed by DoD travelers assigned to organizations in DTR 6.
>
> C-2.1.2 A CUI which facilitates the official travel management services being solicited. Travel management services data shall be maintained in the CUI for *all* arrangements made through DTS, to include those made for travelers not covered by simplified entitlements. (Emphasis in original.)[33]

The Government and Northrop Grumman contend that because travel management services were defined in the contract as "traditional commercial travel services," and the contractor was required to perform travel management services, the contract necessarily included traditional travel services in addition to travel services using the CUI. The Government's

---

[30] V 88.

[31] *Id.*; Contract § C-1.3.

[32] Attachment 5, "Terms and Definitions," V 248 O.

[33] V 88-89.

contention, however, ignores section C-2.1.2, which appears directly after section C-2.1.1 in the contract. C-2.1.2 clearly requires that *all* travel services be conducted using the CUI. When read in context, the definition of travel management services as "traditional commercial travel services" is not intended to require that the contractor provide traditional travel services. Rather, the definition is intended only to describe the type of travel services that the contractor must perform using the CUI, *e.g.*, reservations and ticketing for all modes of travel, Government and commercial lodging reservations, rental car arrangements, ticket delivery, and support services. The definition was an attempt to clarify that the travel services to be provided under the DTS DTR-6 contract would not differ from the services provided under traditional travel services contracts; only the *method* of providing those services would be different.

When Northrop Grumman submitted its proposal, it understood that it was required to use the CUI for all travel services. Recognizing that not all DoD travelers would be connected to the CUI, Northrop Grumman stated that its subcontractor, American Express, would:

> Ensure the full utilization of the Defense Travel System for travelers, travel arrangers, and travel authorizers without automation capability. When an American Express travel counselor receives a request from a traveler or travel arranger by fax, telephone, e-mail, or in person, we will immediately initiate a trip record in the CUI and make the requested reservations in the [Computer Reservation System ("CRS")] using the same Travel Manager/CRS interface described above that connected travelers and AOs will use. Section 1.3.7.1 clarifies how trip records will be initiated in the CUI for Non-Connected Travelers.[34]

Not only does the contract language show that Northrop Grumman and the Government intended at the time of contract formation that traditional travel services would not be required under the DTS DTR-6 contract, the course of dealings during performance confirms this interpretation. Prior to Modification P00029, which added traditional travel services to the DTS DTR-6 contract, the Government did not order, and Northrop Grumman did not provide, any traditional travel services under the DTS DTR-6 contract.[35] During the time period 1998-2002, competitively procured contracts for traditional travel management services were in place for each of the ten defense travel regions. Traditional travel services were being provided to eight of the eleven states in the DTS DTR-6 region under a competitively awarded Army DTR-3 contract with SATO Travel.[36] Traditional travel services were being provided to the other three of the

---

[34] V 1718a.

[35] Tr. at 33-35.

[36] Army DTR-3 includes Army, Air Force and Defense locations in the states of Illinois, Indiana, Iowa, Michigan, Minnesota, North Dakota, South Dakota, and Wisconsin. V 1231. As stated *supra* at n.4, DTS DTR-6 includes Michigan, Wisconsin, North Dakota, South Dakota,

eleven states in the DTS DTR-6 region by Carlson under two competitively awarded contracts, specifically, the two contracts at issue in Count III of Carlson's amended complaint.[37] SATO Travel's contract for traditional travel services was due to expire on January 11, 1999, but was extended repeatedly through October 2002.[38] As part of the March 1999 sole source justification, the Government explained that:

> An extension of the existing contract for a period of 15 months is essential as delaying, suspending, or even temporarily discontinuing travel services of Department of Defense military or civilian employees jeopardizes the accomplishment of their assigned missions.[39]

If Northrop Grumman's DTS DTR-6 contract had provided for traditional travel services, there would have been no need to extend SATO Travel's DTR-3 contract on a sole source basis–the Government could have simply acquired the travel services from Northrop Grumman.

A comparison of the original contract and the contract as altered by Modification P00029 further bolsters Carlson's position. The Modification deleted entirely the original Functional Requirements Document that required that all travel management services be performed using the CUI.[40] Modification P00029 replaced the original Functional Requirements Document with a new document entitled: "DTR-6 Travel Service Requirements Document," dated March 15, 2002.[41] This document provided that "[t]he Contractor shall provide Travel Services facilitated by the Defense Travel System (DTS) *as well as Traditional Travel Services in advance of DTS availability at Government designated locations*."[42] (Emphasis added.) In addition, approximately 50 pages of requirements were added for traditional travel management services.[43] The absence of these 50 pages in the original contract further demonstrates that traditional travel services were not included prior to Modification P00029.

Despite the position of the Government and Northrop Grumman in this litigation, in a

---

Kentucky, Missouri, Illinois, Nebraska, Minnesota, Iowa, and Indiana.

[37] Consolidated Joint Statement of Facts at 76-77.

[38] V 1231-1257.

[39] V 1231-1232.

[40] V 1058.

[41] V 1079-1143.

[42] Pl.'s App., Tab 13, V 1081.

[43] *Id.*, V 1093-1143.

prior declaration, Karen Williams, a TRW employee, stated that:

> The Government also requested that TRW and its subcontractor submit a proposal to provide traditional travel services in DTR 6, while the DTS CUI was being set up and tested. The provision of traditional travel services was not originally included in TRW's prime contract, or AMEX's subcontract.[44]

This contemporaneous statement and the course of conduct described above are strong evidence that the original DTS DTR-6 contract did not contemplate that Northrop Grumman, or a subcontractor, would be providing traditional travel services. *See Max Drill,* 192 Ct. Cl. at 619, 427 F.2d at 1240. Having found that the original contract did not contemplate traditional travel services, we must now determine whether the addition of this requirement constituted a cardinal change such that it should have been separately competed.

CICA demands "full and open competition through the use of competitive procedures." 41 U.S.C. § 253(a)(1)(A). Modifying the contract so that it materially departs from the scope of the original procurement violates CICA by preventing potential bidders from participating or competing for what should be a new procurement. *CESC Plaza Ltd. P'ship v. United States*, 52 Fed. Cl. 91, 93 (2002) (citing *AT&T*, 1 F.3d at 1204). CICA, however, does not prevent modification of a contract by requiring a new bid procedure for every change. *AT&T*, 1 F.3d at 1205. CICA contains no standard for determining whether a modification of an existing contract requires a new competition or falls within the scope of the original procurement. *Id.* The Court of Claims announced the following standard for determining whether a contract modification is within the scope of the underlying contract:

> "[A] cardinal change . . . occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition then, a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach."

*AT&T*, 1 F.3d at 1205 (quoting *Allied Materials & Equip. Co. v. United States*, 215 Ct. Cl. 406, 409, 569 F.2d 562, 563-64 (1978)).

The question in this case is not whether the Government modifications amounted to a breach of contract. Rather, the inquiry focuses on whether the Government modifications changed the contract so profoundly as to circumvent the statutory requirement of competition. *Id.* Related to the cardinal change doctrine, this case poses the question whether the modification is within the scope of the competition conducted prior to award of the original contract. *Id.* A modification generally falls within the scope of the original procurement if potential bidders

---

[44] Pl.'s App., Tab 56, V 1497.

would have expected it to fall within the contract's changes clause. *Id.*; *see also CESC Plaza*, 52 Fed. Cl. at 93 ("Another factor is whether the modification substantially changes 'the type of work, performance period, and costs as between the original contract and modified contract'").

The addition of traditional travel services to the DTS DTR-6 contract was a cardinal change. In view of the facts and contract language set forth above, a potential contractor bidding on the original contract to deploy and provide travel services using a CUI would not have anticipated that it could also be called upon under the changes clause to provide traditional travel services. This is especially true because at the time of contract formation there were already contracts in place for traditional travel services. Furthermore, no provider of traditional travel services bid on the original contract. The industry view, therefore, was that such services were not within the scope of the original procurement. The addition of traditional travel services significantly altered the type of work to be performed under the contract. Accordingly, MTMC's failure to issue a competitive solicitation for the traditional travel services added by Modification P00029 violated CICA.

2. <u>MTMC Must Compete the Traditional Travel Services Work That Was Added by Modification P00029</u>

Having found that failure to compete the traditional travel services work violated CICA, we must determine whether plaintiff is entitled to the equitable relief it seeks. Carlson has requested in Count II of its amended complaint that this Court issue a permanent injunction ordering the Army to direct Northrop Grumman to cease performance of the traditional travel services CLINs under the restructured DTS DTR-6 contract and immediately competitively reprocure the requirements to provide traditional travel services contained in the modified DTS DTR-6 contract. When a modification simply adds work to an existing contract in contravention of CICA, the Court can "carve out" that work to be re-competed. *CESC Plaza*, 52 Fed. Cl. at 93-94.

In a bid protest case, the Court of Federal Claims has jurisdiction to award declaratory and injunctive relief; monetary relief shall be limited to bid preparation and proposal costs. 28 U.S.C. § 1491(b)(2). The Court of Appeals for the Federal Circuit, however, has reiterated that equitable powers "should be exercised in a way [that] best limits judicial interference in contract procurement." *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)). Carlson did not submit a bid related to the DTS DTR-6 contract, so bid and proposal costs are not at issue. The only potential remedy available to Carlson is injunctive relief.

Injunctive relief is an extraordinary remedy. *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983). A court, however, may issue a permanent injunction if plaintiff establishes that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) granting the

injunction serves the public interest. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *Al Ghanim Combined Group v. United States*, 56 Fed. Cl. 502, 519-20 (2003); *Interstate Rock Products, Inc. v. United States*, 50 Fed. Cl. 349, 354 (2001). No one factor, taken individually, is necessarily dispositive. *FMC*, 3 F.3d at 427. Case law in this court has held that a plaintiff must demonstrate its right to injunctive relief by clear and convincing evidence. *MCS Management, Inc. v. United States*, 48 Fed. Cl. 506, 511 (2001) (citing *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 522 (1991)).[45] As discussed above, Carlson has succeeded on the merits of its claim that traditional travel services should have been competed. Accordingly, the Court will address the three remaining factors.

a. Irreparable Harm

A party suffers irreparable harm when there is no adequate remedy at law. *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000). The loss of opportunity to compete for a contract and secure any resulting profit has been recognized as constituting "significant harm." *Red River Serv. Corp. v. United States*, 60 Fed. Cl 532, 549 (2004) (citing *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998)). As a result of MTMC's actions, Carlson was not able to compete for the traditional travel services contract. Carlson has competed for and won numerous DoD contracts for traditional travel services. The fact that Carlson was unable to compete for the traditional travel services added to the DTS DTR-6 contract constitutes irreparable harm.

b. Balance of Hardships

The balance of hardships element "requires a consideration of the harm to the government." *Red River Serv.*, 60 Fed. Cl. at 549 (quoting *Overstreet*, 47 Fed. Cl. at 744). The harm to the Government if the injunction is granted is minimal because there are several providers of traditional travel services that would be able to bid on the contract. *See Bean Dredging Corp. v. United States*, 19 Cl. Ct. 561, 583 (1990) (in granting a permanent injunction "the relative harm to the defendant, if any, is slight, inasmuch as an award to plaintiffs would be

[45] *But see Bannum*, 60 Fed. Cl. at 723-24, for an explanation that the proper standard of proof for establishing the predicates for injunctive relief in a bid protest case is preponderance of the evidence rather than clear and convincing evidence. Because the standard does not affect the outcome of any aspect of this case, we have not considered the question further. *See Sisselman v. Smith*, 432 F.2d 750, 754-55 (3rd Cir. 1970)(with respect to the question whether the applicable scope of review under Section 10(e) of the APA, 5 U.S.C. § 706, was "arbitrary and capricious" or "unsupported by substantial evidence," the court determined that it "need not delineate which is the appropriate test because . . . the evidence supports [defendant] under either"); *Natural Res. Def. Council, Inc. v. United States Envtl. Prot. Agency*, 725 F.2d 761, 767 (D.C. Cir. 1984)("We do not find it necessary in this case to resolve this dispute nor to attempt to harmonize the various precedents. We would affirm the agency's conclusion . . . even if we were to adopt the least deferential standard of review").

at the lowest competitively bid price . . . ."). The Government would acquire the services it needs at the lowest price available. While there will be some loss of productivity and efficiency during the resolicitation and transition, in this situation, that inconvenience does not outweigh the harm to plaintiff if the injunction is not granted.

c. Effect on the Public Interest

It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations. *See, e.g.*, *United Int'l Investigative Servs.,* 41 Fed. Cl. at 323. Requiring MTMC to re-solicit the traditional travel services work will serve the public interest by ensuring fair and open competition in public contracts.

The original DTS DTR-6 contract did not include traditional travel services, and the addition of such services pursuant to Modification P00029 amounted to a cardinal change. MTMC violated CICA by failing to compete the traditional travel services work. Carlson has shown, by clear and convincing evidence,[46] that it is entitled to injunctive relief to remedy MTMC's CICA violation.

Accordingly, the Court will grant plaintiff's motion for summary judgment on Counts I and II of plaintiff's amended complaint to the extent plaintiff seeks an order enjoining Northrop Grumman, and/or its subcontractor, from continuing performance of those portions of the DTS DTR-6 contract relating to the provision of traditional travel services and directing defendant to terminate those portions of the DTS DTR-6 contract and to recompete that work. In so doing, the Court, in order to ensure that it gives "due regard to the interests of national defense and national security and the need for expeditious resolution of the action," 28 U.S.C. § 1491 (b)(2), will direct the parties to file by August 6, 2004, a proposed timetable and description of the activities necessary to effect the orderly implementation of the Court's Orders as described above. The Court will schedule a status conference for August 11, 2004 at 10:00 a.m. to consider the parties' proposed timetable as well as the course of further proceedings in the case. The Court's Order will provide that in the event the parties are unable to agree upon a joint proposed timetable they shall file separate proposals on or before August 6.

**H. CUI and Payment Structure**

1. There are Genuine Issues of Material Fact Regarding Whether the Changes to the Payment Structure of the DTS DTR-6 Contract and the Changes in the Requirements of the CUI Constituted Cardinal Changes

There are two main changes at issue with respect to theses aspects of Carlson's claim: 1)

[46] As indicated earlier, because Carlson has met the clear and convincing evidence standard, it has, *a fortiori*, met the preponderance of the evidence standard. *See supra* n.45.

the alleged changes to the payment structure from a firm fixed-price contract to a cost reimbursement contract; and 2) the change from a client/server mode CUI to a web-based CUI. These issues are fact intensive and there are several questions that the Court must answer in order to determine whether Carlson should prevail:

1) Was the Government's payment to Northrop Grumman at the time of the restructure a change in the payment structure, or was it simply payment for work completed and consideration for Northrop Grumman agreeing to the restructure?

2) If the payment was a change in the payment structure–from firm fixed-price to cost reimbursement–did the change impermissibly shift the risk of contract performance from the contractor to the Government?

3) If there was an impermissible shift of risk, did it constitute a cardinal change?

4) Did the original DTS DTR-6 contract permit Northrop Grumman to provide a web-based CUI instead of a client/server mode CUI?

5) If it did not, did the deletion of the client/server mode requirement and the shift to a web-based system constitute a cardinal change?

The record as it currently stands is incomplete and does not contain sufficient information for the Court to answer the above questions. The parties filed a Consolidated Joint Statement of Facts on May 10, 2004. That document is approximately 175 pages long, and almost every fact is contested. Both parties have submitted declarations, but the declarants have not been deposed. In this complex case, the Court is not inclined to conduct a trial on declarations. *See Anderson*, 477 U.S. at 455. Neither party has demonstrated an absence of genuine issues of material fact, and neither party is entitled to judgment as a matter of law on these aspects of plaintiff's claims.

2. <u>Even if the Changes to the Payment Structure and CUI Were Cardinal Changes, Carlson is Not Entitled to Injunctive Relief</u>

Notwithstanding the existence of genuine issues of material fact with respect to the merits of these aspects of plaintiff's claims, the Court has concluded that even if Carlson has standing and were to succeed on the merits, Carlson would not be entitled to a remedy under these aspects of its claims set forth in Counts I and II. Accordingly, in granting in part defendant's and Northrop Grumman's motions for summary judgment, and denying in part plaintiff's motion for summary judgment, we need not reach a decision on the merits of plaintiff's claims that the changes to the payment restructure and the CUI requirements constituted cardinal changes. *See Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed. Cir. 1994).

In *Reebok*, the Court of Appeals for the Federal Circuit considered an appeal of a district court's denial of a motion for preliminary injunction. The district court held that plaintiff had failed to establish irreparable harm. In so finding, the district court made no determination regarding plaintiff's likelihood of success on the merits. *Id.* at 1555. The Court of Appeals determined that the district court erred. A movant that clearly establishes likelihood of success on the merits receives the benefit of a presumption of irreparable harm. *Id.* at 1556. In the absence of a finding regarding likelihood of success on the merits, it was improper for the district court to not give plaintiff the benefit of the presumption of irreparable harm. *Id.* This error was ultimately found to be harmless because even presuming irreparable harm to plaintiff, defendant presented sufficient evidence to rebut the presumption. *Id.* at 1559.

Despite the finding of error, however, the Court of Appeals stated that "[t]his is not to say, however, that a trial court, before denying a preliminary injunction motion, must always make a finding on a movant's likelihood of success to avoid vacatur . . . ." *Id.* at 1557. The Federal Circuit recognized that:

> District judges are overburdened and need flexibility to operate efficiently. They deserve tolerance by reviewing courts so they can tailor procedures of adjudication to the case at hand. We do hold, however, that if, in adjudicating irreparable harm, the district court has declined to make findings on likelihood of success, the court must give the movant the benefit of the presumption before denying a motion requesting a preliminary injunction.

*Id.*

While we have determined that genuine issues of material fact exist as to whether the changes to the payment structure and CUI requirements were cardinal changes, we have, for purposes of this analysis, assumed that Carlson has succeeded on the merits of those aspects of its claims as set forth in Counts I and II. Additionally, as set forth below, we have assumed that Carlson has suffered irreparable harm.

a. <u>Irreparable Harm</u>

A party suffers irreparable harm when there is no adequate remedy at law. *Overstreet Elec.*, 47 Fed. Cl. at 744. The loss of opportunity to compete for a contract and secure any resulting profit has been recognized as constituting "significant harm." *Red River Serv.*, 60 Fed. Cl. at 549 (citing *United Int'l Investigative Servs.,* 41 Fed. Cl. at 323). Thus, assuming that Carlson would have bid on the restructured DTS DTR-6 Contract had the agency competed it, Carlson has suffered irreparable harm as a result of the agency's failure to compete the restructured contract.

b. Balance of Hardships

The balance of hardships element requires "a consideration of the harm to the government." *Red River Serv.*, 60 Fed. Cl. at 549 (quoting *Overstreet Elec.*, 47 Fed. Cl. at 744). This is where Carlson's claim for injunctive relief regarding the payment restructure and the changes to the CUI requirements fails.[47] The harm to the Government if the Court were to enjoin further performance by Northrop Grumman of these aspects of the contract would be significant. This contract is now in its sixth year of performance. The Government and Northrop Grumman have expended a significant amount of time, effort, and resources in the development of the thus far elusive and highly complex CUI. If the injunction is granted, the project will be delayed to an even greater degree than it has been. Northrop would walk away with the system that it has developed and the Government would have to start over.[48] Any new contractor would not have a system that could be immediately deployed. Like Northrop Grumman, the new contractor would have to make its system compatible with the Government's existing or so-called "legacy systems"–a process that takes considerable time, effort, and resources. This significant delay and cost to the Government outweigh the injury to Carlson.

c. Effect on the Public Interest

Carlson also fails on this factor. It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations. *See, e.g.*, *United Int'l Investigative Servs.,* 41 Fed. Cl. at 323. "'It is equally clear, however, that a procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion.'" *Software Testing*, 58 Fed. Cl. at 538 (quoting *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997)). In *Software Testing*, the Court denied plaintiff's motion for preliminary injunction, in part, because the public interest would not be served by granting the injunction:

> Except in the most extraordinary circumstances, judicial infringement on the procurement process in the form of preliminary relief would be inappropriate where, as here, the plaintiff urging that a contract be suspended and an apparent awardee deposed waits an inordinate period of time–here nearly until the contract is completed–before pressing its claim.

*Id.* Like the contract in *Software Testing*, Northrop Grumman's DTS DTR-6 contract is substantially complete. At the time that Carlson filed its complaint, the contract was in the fifth

---

[47] Carlson has failed to prove its entitlement to injunctive relief on these aspects of its claims set forth in Counts I and II under either the preponderance of evidence standard or the clear and convincing evidence standard. *See supra* n.45.

[48] Tr. at 60.

year of performance of an eight-year contract. Furthermore, Carlson did not file its complaint until 14 months after the Government issued the modifications that are the subject of this dispute. In fact, it appears from the record that the precipitating event that led Carlson to initiate this action had nothing to do with Counts I and II. Rather, it was the May 15 e-mail regarding the Carlson's Army contracts that prompted Carlson to file its complaint in May 2003.[49] Both the delay in bringing suit and the status of the DTS DTR-6 contract at the time Carlson filed its complaint cut against granting the injunctive relief sought by plaintiff.

The overwhelming public interest here is in avoiding further delay to this project. *See CESC Plaza*, 52 Fed. Cl. at 101. Operational deployment was to have occurred worldwide by September 2001. It is now July 2004, and that goal has not yet been achieved. The resolicitation sought by plaintiff would send the most challenging and complex aspects of the project back to the drawing board. If these aspects of the contract are terminated, the services currently being provided by the CUI will be suspended until a new contractor can deploy a functioning CUI.[50] Unlike traditional travel services, where the record reflects that the transition will not be as complicated, the record establishes that it will likely take years for a new contractor to develop a functioning CUI.[51] A large part of the delay in deploying the CUI was caused by "the difficulties of accommodating new systems to the legacy systems that were within the [Government] infrastructure[,] . . . which is not . . . all that atypical on these large and complex IT-type contracts, where you are automating an old-fashioned system."[52] A new contractor would be faced with this same challenge of making its CUI compatible with the Government's legacy systems–only it would be more than five years behind where Northrop Grumman was when Carlson's complaint was filed. With the increased need for military travel due to recent world events, it is in the public interest that the DTS system be deployed to as many travel regions as possible, as quickly as possible. Thus, granting the injunction sought by plaintiff and preventing further performance by Northrop Grumman of those aspects of the contract other than the provision of traditional travel services would not best serve the public interest. Rather, the public interest would be best served by permitting Northrop Grumman to continue performance of the non-traditional travel services aspects of the DTS DTR-6 contract.

Having found that, even assuming standing, success on the merits, and irreparable harm, Carlson is not entitled to equitable relief regarding the payment restructure and the changes to the

---

[49] *See* Tr. at 160, 212, 228.

[50] Tr. at 61.

[51] *See, e.g.*, Tr. at 108-09 (prospective offerors would have to customize their products to meet the specific needs of the DTS DTR-6 contract; even contractors with the capability to provide a CUI would not develop agency-specific systems until they were awarded a contract for a particular agency).

[52] Tr. at 33; *see also* Pl.'s App. at V 1155, 1168.

CUI requirements, this Court need not conduct a trial on the issue of whether the payment restructure and changes to the CUI requirements constituted cardinal changes such that the work should have been competed pursuant to CICA. *See Reebok*, 32 F.3d 1552.

## II. Count III

The Court has jurisdiction to consider Count III of Carlson's amended complaint, challenging the Government's interpretation of Carlson's Army contracts under the CDA. Count III of Carlson's amended complaint challenges two facets of the Government's interpretation of its Army contracts relating to the removal of certain services from the contracts following deployment of the DTS CUI. First, Carlson challenges the Army's interpretation that it can remove the entire state of Kentucky from the contract. Second, Carlson challenges the Army's interpretation that it can remove the services prior to a determination that the DTS CUI is fully operational. Both of these challenges were the subject of a claim by Carlson to the Contracting Officer and a final decision by the Contracting Officer.

### A. The Court has Jurisdiction Over the Claim Set Forth in Count III

The Tucker Act defines the jurisdiction of the Court of Federal Claims to hear disputes arising under the CDA. The Act specifically provides for jurisdiction over "a dispute concerning . . . nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of [the CDA]." 28 U.S.C. § 1491(a)(2). A prerequisite to jurisdiction under the Tucker Act is the submission of a claim to the Contracting Officer and a final decision by the Contracting Officer on that claim. *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1264 (Fed. Cir. 1999). The Federal Acquisition Regulation ("FAR") defines a "claim" as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising from or relating to the contract . . . ." 48 C.F.R. § 33.201.

As recited above, *supra* at 6-7, on November 8, 2002, the Army notified Carlson that travel services for three states, Kentucky, Missouri, and Nebraska, under contract Nos. DAMT01-02-C-0027 and DAMT01-02-C-0028 would be transferred to the DTS DTR-6 contract effective February 24, 2003. By letter dated November 26, 2002, Carlson objected to the removal of the three states from its travel services contracts. Carlson specifically claimed that (1) pursuant to the contracts, the Army could not remove the states until the CUI was successfully deployed *and* new travel management services were competitively awarded by the DTS Program Management Office, and (2) under Carlson's contract for DTR-4, only Fort Campbell, and not the entire state of Kentucky, would be transferred to Northrop Grumman's contract for DTR-6 upon the implementation of the CUI. Carlson's letter concluded that it would be highly improper, and a breach of Carlson's contracts, to transfer requirements from Carlson's competitively-won contract to Northrop Grumman/SATO. Carlson requested that the agency promptly rescind its letter of November 8, 2002, and permit Carlson to perform its contracts as awarded.

Carlson's November 26 letter meets the definition of a claim as set forth in the FAR. The letter is a written demand or assertion of Carlson's interpretation of its rights under the contract. The Government contends that the assertions made by Carlson in Count III of its amended complaint are different from those made in the November 26 letter. The Government claims that Carlson "did not assert a specific entitlement to relief from any transfer prior to the deployment of the CUI . . . ."[53] The Government is incorrect. Carlson's November 26 letter specifically stated Carlson's contention that work may be transferred only in "the event the CUI was successfully developed and deployed . . . ." While the crux of Carlson's letter related to traditional travel services, Carlson explicitly stated its view that one of the prerequisites to transferring work from its Army contracts was that the CUI be successfully deployed. Carlson reiterated its belief that CUI deployment was a prerequisite to any transfer when it stated, "Moreover, under [Carlson's] contract for DTR-4, only Fort Campbell, not the entire State of Kentucky, would be transferred to TRW's contract for DTR-6 *upon implementation of the CUI*." (Emphasis added.)

The Government further alleges that Carlson did not certify the claim. Certification is necessary, however, only when a contractor is making a monetary claim in excess of $100,000. 41 U.S.C. § 605(c)(1); 48 C.F.R. §§ 33.207(a) and 52.233-1(d)(2)(I); *see also Alliant Techsystems*, 178 F.3d at 1267. Because Carlson's claim is for an interpretation of contract terms, the certification requirement does not apply.

The Government also challenges the Court's jurisdiction on the ground that the Contracting Officer did not issue a final decision. The Government cites *Alliant Techsystems* for the proposition that the January 10, 2003 letter is not a final decision because it does not state that it is a final decision, nor does it inform the contractor of its right to appeal the decision. 178 F.3d at 1266. The Court in *Alliant Techsystems*, stated, however:

> the absence of a statement in the contracting officer's letter acknowledging that the letter constituted a final decision from which Alliant was entitled to appeal is not fatal to Alliant's action. A letter can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision.

*Id.* at 1267 (citing *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990)). The January 10, 2003 letter was a final decision. There was no indication in that letter that the Contracting Officer intended to enter into discussions with Carlson about this issue. Additionally, the May 15, 2003 e-mail reiterated the finality of the Government's decision to transfer the contracts after September 30, 2003.

The Government contends that when the Contracting Officer delayed the transfer date until September 30, 2003, Carlson's CDA claim became moot. "The burden of demonstrating

[53] Def.'s Mot. at 33.

mootness 'is a heavy one.'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631-34 (1979). A voluntary cessation of illegal or breaching conduct does not necessarily moot a plaintiff's claim unless it is clear that the alleged improper behavior cannot reasonably be expected to recur. *Id.; Emery Worldwide Airplanes, Inc. v. United States*, 47 Fed. Cl. 461, 469 (2000) ("In this connection, a case becomes moot when there is no reasonable expectation that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation") (internal quotations omitted). The heavy burden of establishing that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness. *Emery Worldwide Airplanes*, 47 Fed. Cl. at 469.

The Contracting Officer never stated that she agreed with Carlson's interpretation of the contract terms. To the extent that the agency decided on January 31, 2003, to defer the transfer until September 30, 2003,[54] that decision was entirely voluntary. There was no assurance that the agency would not change its mind again and choose a transfer date earlier than September 30. Aside from the fact that the "voluntary cessation" is not sufficient to render Carlson's claim moot, the decision to delay the transfer did not remedy all of the concerns raised in Carlson's claim. Specifically, the agency's January 31 letter asserted that the entire state of Kentucky would be transferred, despite Carlson's contention that only Ft. Campbell could properly be transferred. Additionally, the January 31 letter did not address the prerequisite that the CUI be operationally deployed prior to the transfer. There exists a live dispute that the Court has jurisdiction to consider.

### B. Carlson's CDA Claim is Ripe for Judicial Review

The Government next contends that Carlson's CDA claim is not ripe for judicial review because the Government has not yet transferred the contract work. The Government asserts that if, at a later date, the Government improperly transferred the work, Carlson would have an adequate remedy at law, such as termination for convenience remedies or money damages for breach of contract.[55]

The fact that the Army has not yet transferred the work does not prevent this Court from determining under what circumstances it may do so. The plain language of the CDA anticipates that parties will challenge the Government's interpretation of a contract *during* contract performance. Both the CDA and the Disputes Clause in the FAR provide that pending a final decision of an appeal, action, or final settlement, a contractor shall proceed diligently with performance of the contract in accordance with the contracting officer's decision. 41 U.S.C. §

---

[54] In exchange for Carlson withdrawing its motion for a preliminary injunction, the Government agreed to stay the transfer of work under Carlson's contracts pending resolution of Count III of plaintiff's amended complaint.

[55] Def.'s Mot. at 37.

605(b); 48 C.F.R. § 52.233-1. By referring to the requirement that performance be continued, "pending" a final resolution of the contractor's rights, the statute and the disputes clause contemplate that, while performance is ongoing, the contractor may seek a final resolution of its rights by an action in the Court of Federal Claims. *Alliant Techsystems*, 178 F.3d at 1266-67.[56]

The CDA recognizes that contractors do not have to wait for the actual contract violation to occur. The disputes clause "does not impose [a] . . . requirement on the contractor to wait until performance is complete before filing a claim for relief from the contracting officer." *Alliant Techsystems*, 178 F.3d at 1266. In fact, to "hold that the disputes clause bars any pre-performance claim seeking an interpretation of contract terms would render largely meaningless those portions of the definition of claim that refer to requests for nonmonetary relief." *Id.* (holding that contractor could bring claim, prior to performance, asserting that it was not required under the terms of its contract to perform an option improperly exercised by the Government). A pre-performance claim is improper in cases where "the question to be resolved is not whether the contractor will perform the work at issue now but who will bear its cost in the future." *Valley View Enters. v. United States*, 35 Fed. Cl. 378, 384 (1996). Carlson's CDA claim, however, presents the sole issue of which contractor will perform the work at issue–in this case, travel management services for Kentucky, Missouri, and Nebraska. Accordingly, this Court may issue a decision interpreting the terms of Carlson's Army contracts prior to the Government's transferring any work from those contracts to the DTS DTR-6 contract.

In summary, Carlson's CDA claim is properly before this Court. Carlson submitted a claim to the Contracting Officer. Because it was a claim for contract interpretation, there was no requirement that it be certified. Carlson's claim addressed the same issues that are before the Court in this case. The Contracting Officer issued a final decision. The Contracting Officer's voluntary decision to delay the transfer date of the work does not render Carlson's claim moot. Finally, the claim is ripe for judicial review.

### C. The Government is Not Entitled to Summary Judgment on Count III

The Government, almost as an aside, requests that the Court dismiss Count III on the merits. The Government premises its entitlement to such relief on the fact that the DTS DTR-6 contract "explicitly encompasses unassisted travel services. Accordingly, the facilities can be transferred."[57] It appears that by unassisted travel services, the Government is referring in its motion to traditional travel services. We have found above, however, that such travel services were not part of the original DTS DTR-6 contract, and Modification P00029 violated CICA. Regardless of what the Government meant by "unassisted travel services," to the extent that the

---

[56] For a more extensive discussion of *Alliant Techsystems* and the effect of "prudential" concerns on the consideration of nonmonetary CDA claims, *see Tiger Natural Gas, Inc. v. United States*, __ Fed. Cl. __, 2004 WL 1570152, * 5-6 (2004).

[57] Def.'s Mot. at 51.

Government's motion purports to be a motion for summary judgment on the merits of Count III, the Government has failed to support its motion. The Government is not entitled to judgment as a matter of law.

***CONCLUSION***

For the reasons discussed above, the Court ORDERS that plaintiff's motion for summary judgment shall be, and hereby is, GRANTED with respect to plaintiff's claim set forth in Counts I and II, relating to the addition of traditional travel services to the DTS DTR-6 contract. Subject to the provisions of the following paragraph, defendant, Northrop Grumman, and/or its subcontractor, are enjoined from continuing performance of the traditional travel services CLINs under the restructured DTS DTR-6 contract. The Government shall terminate those portions of the DTS DTR-6 contract and recompete that work.

The parties shall file by August 6, 2004, a proposed timetable and description of the actions necessary to effect the orderly implementation of the Court's orders as described in the preceding paragraph. The Court ORDERS that the parties shall appear for a status conference on Wednesday, August 11, 2004 at 10:00 a.m. to consider the parties' proposed timetable as well as the course of further proceedings in the case. In the event the parties are unable to agree upon a joint proposed timetable, they shall file separate proposals on or before August 6.

The Court ORDERS that defendant's and defendant-intervenor's motions to dismiss, or in the alternative, for summary judgment, shall be, and hereby are, DENIED with respect to plaintiff's claim set forth in Counts I and II, relating to the addition of traditional travel services to the DTS DTR-6 contract.

The Court ORDERS that plaintiff's motion for summary judgment shall be, and hereby is, DENIED with respect to plaintiff's claims, set forth in Counts I and II, relating to the payment restructure and changes to the requirements of the CUI.

The Court ORDERS that defendant's and defendant-intervenor's motions for summary judgment shall be, and hereby are, GRANTED, with respect to plaintiff's claims, set forth in Counts I and II, relating to the payment restructure and changes to the requirements of the CUI.

The Court ORDERS that defendant's motion to dismiss Count III, or in the alternative, for summary judgment on Count III shall be, and hereby is, DENIED.

IT IS SO ORDERED.

/s/ George W. Miller
GEORGE W. MILLER
Judge