**REDACTED VERSION**
**FOR PUBLIC RELEASE**

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA,**<br><br>**Defendant,**<br><br>**and**<br><br>**NORTHROP GRUMMAN SPACE AND MISSIONS SYSTEM CORPORATION,**<br><br>**Intervenor.** | ) | **Case No. 03-1274C**<br>**Judge George W. Miller** |

**PLAINTIFF'S MOTION FOR RECONSIDERATION**

CW Government Travel, Inc. ("Carlson"), by counsel, moves the Court pursuant to Rule 59(e) to reconsider its Order of July 26, 2004, and alter and amend the judgment granted to Defendant on Counts I and II.

The Court granted Defendant's Motion for Summary Judgment to the extent that those counts challenged the Government's complete restructure of the payment provisions and performance requirements of Contract No. DAMT01-98-D-1005 (the "DTS DTR-6 Contract"). The Court concluded that even if the modifications to the DTS DTR-6 Contract violated the Competition in Contracting Act ("CICA"), Carlson had not established its right to equitable relief and judgment would be entered in favor of the Defendant.

Carlson respectfully submits that the Court should reconsider that portion of its opinion and modify the Order granting the Government's motion. Reconsideration is appropriate for

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

separate, but equally compelling, reasons. First, under Supreme Court precedent, the Court cannot decline to enforce CICA and permit unlawful agency action to continue. Further, under CICA and the standards governing this Court's review, it must, at a minimum, declare the action unlawful and set aside the contract.

Second, the Government's motion did not raise the availability of injunctive relief as a basis for summary judgment. Even if the Court would have ultimately had to examine equitable issues to support injunctive relief, the issue was not properly before the Court. The parties did not brief the issue and Carlson did not have the opportunity to address the facts that formed the basis for the Court's decision. If the issue had been properly raised, Carlson could have pointed to the facts clearly in dispute on the new issue and sought to supplement the record with appropriate evidence directed to issues such as the lack of harm to the Government and the public interest in enjoining further performance.

Third, the issue was not decided on undisputed facts and there has been no proceeding to allow the Court to undertake the requisite factual inquiry and issue findings of fact pursuant to Rule 52, before deciding a case on the basis that injunctive relief is not warranted. Even assuming that the Court would need to undertake the "balancing analysis" associated with the issuance of injunctions, a factual inquiry would disclose that the assumptions urged by the Government (and accepted by the Court) are incorrect. Some of the assumptions by the Court would necessitate substantial supplementation of the record. A proper review of a complete record would prove that the balance between Carlson's irreparable harm, the harm to the Government from an injunction, and the public interest fully supports equitable relief, *e.g.*, to terminate the unlawful DTS DTR-6 Contract and compel the Government to competitively procure DoD's requirements for a web-based, end-to-end travel management system.

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

Carlson invites the Court's attention to the accompanying memorandum in support of this motion and requests the opportunity to orally argue its motion.

Respectfully submitted:

/s/Lars E. Anderson

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Attorneys for Plaintiff*

Dated: August 9, 2004

::ODMA\PCDOCS\MC1DOCS1\168281\1

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

# In the United States Court of Federal Claims

| | |
|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **THE UNITED STATES OF AMERICA,** <br><br> **Defendant,** <br><br> **and** <br><br> **NORTHROP GRUMMAN SPACE AND MISSIONS SYSTEM CORPORATION,** <br><br> **Intervenor.** | **Case No. 03-1274C** <br> **Judge George W. Miller** |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR RECONSIDERATION**

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*

Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182

Dated: August 9, 2004

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT................................................................................................................... 2

I. THE COURT MUST REMEDY A VIOLATION OF CICA AND DECLARE THE AGENCY ACTION INVALID ........................................................................... 2

A. The Court Cannot Allow A Violation Of CICA To Continue Unabated .................. 6

B. Congress Has Circumscribed The Court's Discretion By Directing Specific Action ........................................................................................................... 11

II. THE AVAILABILITY OF INJUNCTIVE RELIEF WAS NOT PROPERLY BEFORE THE COURT AS A BASIS FOR A JUDGMENT.......................................................... 13

A. Rule 56 Does Not Authorize The Entry of Judgment On The New Issue ............... 13

B. The Record Would Have To Be Supplemented To Adequately Address The New Issue ............................................................................................................ 16

C. The Court's Judgment Fails To Comply With Rule 52 And The Record Does Not Permit The Requisite Fact Finding .......................................................................... 18

III. A FULLY DEVELOPED RECORD WOULD ESTABLISH THAT THE EQUITIES FULLY SUPPORT INJUNCTIVE RELIEF .................................................................... 19

CONCLUSION.............................................................................................................. 24

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 16

*AT&T v. Wiltel*, 1 F.3d 1201 (Fed. Cir. 1993) .......... 10

*CCL, Inc. v. United States*, 39 Fed. Cl. 780 (1997) .......... 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 16

*Christopher Village v. Retsinas*, 190 F.3d 310 (5th Cir. 1999) .......... 13

*Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339 (1997) .......... 18

*CW Government Travel, Inc. v. United States*, No. 03-1274C, slip op. (Fed. Cl. July 26, 2004) 21

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) .......... 17, 18

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1998) .......... 12

*Gen. Elec. Co. v. United States*, 189 Ct. Cl. 116 (1969) .......... 2

*Hi-Shear Tech. Corp. v. United States*, 55 Fed. Cl. 418 (2003) .......... 2

*Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167 (10th Cir. 1997) .......... 13

*Myers Investigative & Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 288 (2000) .......... 18

*PGBA LLC v. United States*, 60 Fed. Cl. 196 (2004) .......... 18, 20

*PGBA LLC v. United States*, 60 Fed. Cl. 567 (2004) .......... 18

*Precision Instr. Mfg. Co. v. Automotive Maint. Machining Co.*, 324 U.S. 806 (1945) .......... 25

*Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978) .......... 3, 5

*Triax Co. v. United States*, 20 Cl. Ct. 507 (1990) .......... 2

*United States v. Mass. Water Res. Auth.*, 256 F.3d 36 (1st Cir. 2001) .......... 5

*United States v. Monsanto*, 491 U.S. 600 (1980) .......... 12

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) .......... 3, 4, 5, 11

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .................... 5

*Yakusas v. United States*, 321 U.S. 414 (1944) .................... 5

**Statutes**

10 U.S.C. § 2304.................... 7

10 U.S.C. § 253(f) .................... 8

41 U.S.C. § 2304.................... 8

5 U.S.C. § 706.................... 11, 12

**Treatises**

*11 Moore's Federal Practice,* § 56.13[1] .................... 15

*9 Moore's Federal Practice,* § 52.10[2][c].................... 18

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

## INTRODUCTION

On July 26, 2004, the Court granted summary judgment to the Defendant on Counts II and III to the extent that those counts challenge the complete restructure of the payment provisions and performance requirements of the DTS DTR-6 Contract. The Court concluded that even if the extensive modifications violated the Competition in Contracting Act ("CICA"), Carlson had not established a right to equitable relief. That decision should be reconsidered to avoid a manifest error of law and to prevent manifest injustice.

The Government's Motion for Summary Judgment on those counts contended that Carlson lacked standing, that the claim was untimely, and that the modifications did not violate CICA. Only at oral argument did the Government suggest that equitable relief was unwarranted based on the traditional "balancing" test for issuing injunctions. The matter was not before the Court, however, either for preliminary injunctive relief or for summary judgment on that basis. The Government's invitation to decide the case in its entirety on this new basis (without the benefit of briefing or argument) led the Court to legal and procedural error.

The decision should be reconsidered and vacated because:

1. In addressing a violation of CICA, the Court is not free to decline to enforce the statute. Regardless of whether Carlson is entitled to all of the equitable relief sought, the Court is not permitted to enter judgment in favor of the Government in the face of a violation of CICA.

2. Congress has circumscribed the Court's traditional discretion in equity. Under the Administrative Procedures Act ("APA"), the Court must declare unlawful and set aside action that violates CICA.

3. The basis for the Court's decision was not raised by the Government in its motion or briefed by the parties. The parties did not submit proposed findings of fact on the issue,

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

material facts are in dispute, and the record is incomplete with respect to the analysis undertaken to decide that equitable relief was unavailable.

4. The Court's judgment fails to comply with the requirements of Rule 56 that material facts be undisputed and fails to meet the requirement of Rule 52 that judgments based on a trial before the Court or denying injunctive relief include detailed findings of fact based on an adequate evidentiary record.

## ARGUMENT

This motion does not attempt to reargue points already briefed. That is not, of course, the purpose for a motion to reconsider. Reconsideration is appropriate to address and correct an erroneous opinion "based on manifest error of law, or mistake of fact." *Hi-Shear Tech. Corp. v. United States*, 55 Fed. Cl. 418 (2003). Moreover, motions for reconsideration are particularly appropriate "when a new and separate issue is raised for the first time in the Court's opinion and there decided." *Triax Co. v. United States*, 20 Cl. Ct. 507, 509 (1990). In such circumstances, "a petition for reconsideration . . . will be approached hospitably because the parties may not have had a fair opportunity to argue or litigate that point." *Triax*, 20 Cl. Ct. at 509 (quoting *Gen. Elec. Co. v. United States*, 189 Ct. Cl. 116 (1969)). Both factors support reconsideration and warrant a modification to the Court's opinion. Having decided that the matter raised genuine issues of material fact as to whether the Government violated CICA, the matter should proceed to trial to resolve those disputed issues of fact.

## I. THE COURT MUST REMEDY A VIOLATION OF CICA AND DECLARE THE AGENCY ACTION INVALID

The Court's decision to enter judgment for the Defendant by concluding that, even assuming a statutory violation, it could not issue an injunction, was incorrect as a matter of law.

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

Once the Court assumed that the modifications to the DTS DTR-6 Contract violated the CICA, it was required to ensure the agency's observance of the statute. Regardless of whether Carlson was entitled to all of the injunctive relief requested, the Court could not decline to enforce the statute by entering judgment for the defendant. Moreover, Congress has circumscribed the Court's discretion to exercise its equitable powers. Under the APA, upon finding a violation of CICA, the Court must declare the action unlawful and set aside the unlawful contract modifications.

Recent Supreme Court case law affirms that the Court may not ignore a statutory violation. Congress, in exercising its delegated powers, determines what behavior by an agency is prohibited. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). "'Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought.'" *Id.* (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)). A court, acting in equity, cannot reject the balance that Congress has struck and cannot "override Congress's policy choice, articulated in a statute, as to what behavior should be prohibited." *Id*.

While the Court has discretion to chose "whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all." *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497. "Consequently, when a court of equity exercises its discretion, it may not consider the advantages and disadvantages of non-enforcement of the statute, but only the advantages and disadvantages of 'employing the extraordinary remedy of injunction,' over the other available methods of enforcement." *Id.* at 498 (citations omitted).

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

*Oakland Cannabis Buyers' Cooperative* involved the federal prosecution of a not-for-profit organization that dispensed marijuana for medicinal purposes under California law. 532 U.S. at 486-87. The District Court issued a preliminary injunction enjoining the Cooperative from dispensing marijuana. *Id.* The Cooperative continued to dispense marijuana despite the injunction and the Government initiated contempt proceedings. *Id.* The Cooperative responded by asserting a "medical necessity defense" and moved to modify the injunction to permit distributions that were medically necessary. *Id.* at 487-88. Although acknowledging that "human suffering" could result, the court found that its "equitable powers [do] not permit it to ignore federal law." *Id.*

The Ninth Circuit reversed, finding, in part, that the District Court should have considered the public interest in fashioning injunctive relief and weighed factors such as the injury caused by depriving patients of marijuana. The Supreme Court reversed the Ninth Circuit. At the Supreme Court, the Cooperative argued that the District Court had the discretion to issue an injunction and to weigh the various factors in making its decision. The Supreme Court agreed that Congress had not restricted the Court's discretion in this area, but found that the Court could not consider an uncodified exception to the statute and had no choice but to enforce the statute. *Id.* at 496-97.

In certain situations, Congress has not only defined what actions are prohibited, but also prescribed necessary remedial steps. In this regard, Congress may specifically circumscribe the Court's discretion to decline to issue an injunction. "The role a court plays in deciding whether to grant a statutory injunction is different than the one it plays when it weighs the equitable claims of two private parties in a suit seeking injunctive relief." *United States v. Mass. Water Res. Auth.*, 256 F.3d 36, 32 (1st Cir. 2001) (citing *Yakusas v. United States*, 321 U.S. 414, 441

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

(1944)). "In the context of statutory injunctions, the court's freedom to make an independent assessment of the equities and the public interest is circumscribed to the extent that Congress has already made such assessments with respect to the type of case before the court." *Id.*; *accord Oakland Cannabis Buyers' Coop.*, 532 U.S. at 496 ("[W]hen district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise."). Consequently, under a clear and valid legislative command, a Court must issue an injunction upon finding a violation of a statute. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

The Supreme Court emphatically applied this rule in *Tennessee Valley Authority v. Hill.* In that case, the Supreme Court considered a challenge to the opening of a dam that would eradicate an endangered species. 437 U.S. at 122-23. The Government began construction of the dam in 1967. At the time of the suit, more than 10 years later, approximately 80% of the dam was complete and the Government had expended $78 million in its construction. *Id.* at 166. The District Court refused to enjoin further performance concluding that "[a]t some point in time a federal project becomes so near completion and so incapable of modification that a court of equity should not apply a statute enacted long after inception of the project to produce an unreasonable result." 419 F. Supp. 753, 760 (E.D. Tenn. 1976). The Sixth Circuit reversed the trial court, and the Supreme Court affirmed.

Recognizing the general principles that a Federal judge sitting in equity is not "mechanically obligated" to grant an injunction for every violation of law, and that the balancing of equities and hardships was appropriate in almost every case, the Court explained:

> But these principles take a court only so far. Our system of government is, after all, a tripartite one, with each branch having certain defined functions delegated to it by the Constitution. While "[it] is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177 (1803), it is equally – and emphatically – the exclusive province of the

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

> Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought.

*Id.* at 194. Thus, the Court questioned whether it was within its function to weigh the balance between the equities in this situation. "[W]e have no expert knowledge on the subject of endangered species, much less do we have a mandate from the people to strike a balance of equities on the side of the Tellico Dam." *Id.* As a result, the Court ceded to Congress's judgment, explaining: "Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end." *Id.* Ultimately, the Court found that Congress had struck the balance in favor of the endangered species and the Court was not free to alter that balance.

Two conclusions flow from these rules to this case. First, if a Court determines that a modification to a contract violates the CICA, it is the Court's responsibility to ensure compliance with the statute. Second, because Congress has limited the Court's discretion to chose a remedy through CICA and the APA, the Court must hold the modified DTS DTR-6 Contract unlawful and issue an injunction setting it aside if it finds a violation of CICA. Both of these conclusions demonstrate that the Court's decision to grant Defendant's Motion for Summary Judgment because the Court believed it should not issue an injunction was in error.

**A. <u>The Court Cannot Allow A Violation Of CICA To Continue Unabated</u>**

In passing CICA, Congress defined the scope of an agency's authority to procure goods and services and the Court must ensure compliance with that statute. When the Court assumed that the Government had violated the CICA by improperly modifying the DTS DTR-6 Contract,

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

yet granted the defendant's motion for summary judgment, the Court declined to enforce the statute. The Court, however, did not have that option. It may not allow a statutory violation to continue unabated.

In CICA, Congress exercised its delegated powers in setting out the priorities for the Government's procurement of goods and services. The paramount requirement in this regard is full and open competition. Thus, CICA provides:

> 1) Except as provided in subsections (b), (c), and (g) of this section and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for property or services –
>
> (A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this subchapter . . . .

10 U.S.C. § 2304. As noted in the statute, Congress excepted certain instances in which an agency does not need to obtain full and open competition in procuring goods and services. In this regard, 10 U.S.C. § 2304 allows an agency to "exclude a particular source in order to establish or maintain any alternative source or sources

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

of supply for that property or service." Section 2304 provides for seven exceptions, but none is applicable here.[1]

CICA further restricts the agency's use of noncompetitive procedures by requiring the contracting officer to justify the use of noncompetitive procedures in writing and to certify the accuracy and completeness of the justification. 10 U.S.C. § 253(f). Thus, Congress has expressly required agencies to use full and open competition and has specifically delineated

---

[1] Those exceptions are:

1) the property or services needed by the executive agency are available from only one responsible source and no other type of property or services will satisfy the needs of the executive agency;
2) the executive agency's need for the property or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the executive agency is permitted to limit the number of sources from which it solicits bids or proposals;
3) it is necessary to award the contract to a particular source or sources in order (A) to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services in case of a national emergency or to achieve industrial mobilization, or (B) to establish or maintain an essential engineering, research, or developmental capability to be provided by an educational or other nonprofit institution or a Federally-funded research and development center;
4) the terms of an international agreement or treaty between the United States Government and a foreign government or international organization, or the written directions of a foreign government reimbursing the executive agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures;
5) a statute expressly authorizes or requires that the procurement be made through another executive agency or from a specified source, or the agency's need is for a brand-name commercial item for authorized resale;
6) the disclosure of the executive agency's needs would compromise the national security unless the agency is permitted to limit the number of sources from which it solicits bids or proposals; or
7) the head of the executive agency – (A) determines that it is necessary in the public interest to use procedures other than competitive procedures in the particular procurement concerned; and (B) notifies the Congress in writing of such determination not less than 30 days before the award of the contract.

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

those areas when it may use noncompetitive procedures. The Court may not create further exceptions to CICA.

In CICA, Congress specifically rejected the reasoning used by this Court in refusing to enforce the statute:

> In no case may an executive agency –
>
> (A) Enter into a contract for property or services using procedures other than competitive procedures on the basis of the lack of advance planning or concerns related to the amount of funds available to the agency for procurement functions.

41 U.S.C. § 2304(f)(5). The record reveals that the agency identified the need to restructure the DTS DTR-6 Contract in early 2001. *Exhibit 9, V 661-826.* It then spent almost a year secretly negotiating a total restructure of the Contract, which resulted in the execution of Contract Modifications Numbers. 25 and 27 in February/March 2002. *Id.* The agency then proceeded to hide those Contract Modifications from the public until November 2003.

The agency could have, and should have, commenced a competitive procurement for the restructured contract terms and restructured technical requirements in 2001 as required by CICA. The fact that it has delayed doing so to this day represents a "lack of advance planning" which Congress has said cannot justify the use of "other than competitive procedures." All the factors cited by the Court as justification for refusing to enjoin the unlawful contract result directly from the delay caused by the agency's lack of advance planning to timely issue a competitive procurement on the restructured contract terms and technical requirements.

As this Court noted, and as the Federal Circuit has found, a modification beyond the scope of the original contract violates the CICA because it is, in essence, a new contract that should have been procured through competitive procedures. *See, e.g., AT&T v. Wiltel,* 1 F.3d 1201 (Fed. Cir. 1993). If the Court were to find that the modifications to the DTS DTR-6

**REDACTED VERSION
FOR PUBLIC RELEASE**

Contract, which changed all the contract payment provisions, risk allocation, performance schedule, and technical requirements violated CICA, the Court would be duty bound to enforce the statute. The Court's decision granting summary judgment to defendant upon a finding that it could not issue an injunction due to the hardship on the Government would permit the violations of CICA to continue unabated.[2]

The Court's decision is based on the assumption that it had only two choices: either require the Government to resolicit the contract, or grant the defendant's motion for summary judgment and allow the Government to continue the violation of CICA. It chose to allow the violation. In this regard, the Court "rejected the balance that Congress has struck" in CICA deciding when an agency must use full and open competition and when it may use non-competitive procedures. *See Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497. The Court's proper choice was "not whether enforcement is preferable to no enforcement at all" but, rather, "whether a particular means of enforcing the statute should be chosen over another permissible means." *See id.* If this were the end of Congress's restriction of the Court's equitable powers, the Court could choose among additional remedies directing how the agency should proceed. In this case, the Court could order the agency to issue a new solicitation or acquire the required services under the General Services Administration ("GSA") eTS Master Contract, or leave it up to the agency on how to cease its unlawful activities.

---

[2] Essentially, the Court's decision has added another exception to CICA – *e.g.*, if an agency's violation of CICA is not discovered for a period of time and the Government expends substantial effort and money on its unlawful contract. This Court does not have such discretion to change CICA and the APA.

**REDACTED VERSION
FOR PUBLIC RELEASE**

**B. Congress Has Circumscribed The Court's Discretion By Directing Specific Action**

In drafting CICA, the Tucker Act Amendments and the APA, Congress has gone further than merely describing prohibited actions; it has explicitly circumscribed the court's discretion by directing specific action. While the Court may order broader equitable relief, the Court is directed through the APA to set aside the unlawful modification, at a minimum.

In reviewing a bid protest, the Court is directed by 28 U.S.C. § 1491 (b)(4) to apply the standards set forth in Section 706 of the APA. Section 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of agency action. The reviewing court shall –
>
> 1) compel agency action unlawfully withheld or unreasonably delayed; and
> 2) hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law.

5 U.S.C. § 706. (Emphasis added.) The language of the statute is unequivocal. It states that the reviewing court "shall – compel agency action unlawfully withheld . . . [and] shall set aside agency action found to be . . . without observance of procedure required by law . . . ". *Id.* The directive through the command "shall" is unambiguous. *See., e.g., United States v. Monsanto*, 491 U.S. 600, 607 (1980). Thus, the APA requires a court to issue an injunction to remedy a statutory violation.

Two Circuit Courts have found that Section 706 of the APA provides a clear and valid legislative command circumscribing a court's discretion to use its equitable powers and requiring the court to issue an injunction upon finding a statutory violation. In *Forest Guardians v.*

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

*Babbitt*, 174 F.3d 1178, 1192 (10th Cir. 1998), the United States Court of Appeals for the Tenth Circuit held that "Congress, through 5 U.S.C. § 706, has explicitly removed from the courts the traditional equity balancing that ordinarily attends decisions whether to issue injunctions." In *Forest Guardians*, the Court considered a claim that the Secretary of the Environmental Protection Agency ("EPA") had failed to designate a critical habitat for the silvery minnow within a statutorily prescribed time. *Id.* at 1181. The Secretary admitted the failure to meet the deadline, claiming that it lacked the funds to do so because of a Congressional moratorium on EPA spending. Although the district court recognized the statutory violation, it deferred to the Secretary's argument that it lacked the resources to comply with the statute. *Id.* at 1184.

The Tenth Circuit reversed, holding that, in light of the APA's standard of review, resource limitations could not justify the Secretary's failure to comply with the statute. *Id.* at 1184. The Circuit Court focused on the portion of 5 U.S.C. § 706(1) requiring that the "'reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed.'" *Id.* at 1187 (quoting 5 U.S.C. § 706(1) and citing *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997)). After acknowledging the high standard for determining that Congress had limited a court's discretion to provide equitable relief, the court found: "Through § 706 Congress has stated unequivocally that courts must compel agency action unlawfully withheld or unreasonably delayed." *Id* at 1187; *see also Christopher Village v. Retsinas*, 190 F.3d 310, 316 n.8 (5th Cir. 1999) (adopting the *Forest Guardians* reasoning). Thus, upon finding a violation of CICA, the Court must, under the APA, set aside the unlawful modifications.

In this case, the agency has unlawfully modified a contract and spent hundreds of millions of dollars without the procedures required by law. While the Court has some discretion

in choosing among various means of enforcing the statute, at a minimum, under the APA and the Tucker Act, it may not allow the violation to continue and must declare the action unlawful and set it aside. The Court may, in its discretion, afford broader relief. It may direct the agency on the specific remedial action required or simply order the agency to competitively procure its web-based travel management requirements and leave the details to the discretion of the agency. But the Court erred when it assumed a violation of CICA, but failed to enforce the statute. If CICA was violated, the Court had to set aside the modified DTS DTR-6 Contract.

## II. THE AVAILABILITY OF INJUNCTIVE RELIEF WAS NOT PROPERLY BEFORE THE COURT AS A BASIS FOR A JUDGMENT

Even if the Court concluded that it had to "balance the equities" before setting aside the contract modifications, the judgment in favor of the Government should be reconsidered and modified. The record before the Court did not permit resolution pursuant to summary judgment. Further procedures and fact-finding would be required, and a more fully developed record would establish that the equities fully support an injunction against further performance of the unlawful contract.

### A. Rule 56 Does Not Authorize The Entry of Judgment On The New Issue

The Government's Motion for Summary Judgment raised three specific issues: (1) Carlson lacked standing to challenge the extensive modifications to the DTS DTR-6 Contract; (2) Carlson's challenge was untimely; and (3) the modifications to the Contract did not violate CICA. In raising these issues, the Government did not confine itself to the record of the DTS DTR-6 Contract award and performance. It also submitted witness declarations on the issues it sought to have the Court address.

In briefing the issues raised in its motion, the Government did not address whether an

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

equitable remedy was appropriate, nor did it address whether the Court should balance equities and decline to enter an injunction if it found a CICA violation. The Government submitted approximately 175 proposed undisputed facts to support its motion, but did not submit any proposed facts on the factors to be considered in fashioning a remedy. The Government did not suggest in its papers that the record would allow the Court to evaluate the appropriate remedy, nor did it seek to supplement the record to address the factors now relied upon as a basis for judgment.

Carlson fully addressed the issues raised by the Government's motion. It submitted detailed responses to the Government's proposed undisputed facts and submitted detailed additional facts both to establish that the Government was not entitled to judgment on any of the issues raised and that the contract modifications violated the mandates of CICA[3]. Because the issue was never raised, Carlson did not submit any proposed facts with respect to the factors that the Court might need to address in fashioning remedies. Carlson did not seek to supplement the record to address those factors because the issue was not before the Court (and the issues already raised created a substantial record). Nor did Carlson have the opportunity to brief the issue belatedly raised by the Government and relied upon by the Court.

At oral argument, the Government suggested that the Government would be prejudiced if Carlson prevailed and further performance enjoined. The Court then noted:

THE COURT: Isn't that an argument though against equity relief?

The Government agreed, and continued to argue that an injunction was not warranted, prompting

---

[3] The Court ruled that the Government violated CICA with the addition of traditional travel services to the DTS DTR-6 Contract and that facts were in dispute as to whether other extensive modifications violated CICA.

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

the Court to recognize:

> THE COURT: There again, that is something which I would assume the government would agree can't be dealt with solely by reference to the administrative record. We would have to have some evidence on the disruption and other disadvantages to the government in the event that equitable relief were granted.

The Government agreed that the Court could hear new evidence, but suggested that there was "enough" evidence in undisclosed portions of the record.

To seize upon this new issue, undeveloped in the record, violates the well-established procedure for addressing summary judgment. Summary judgment is appropriate only when material facts are not in dispute and the movant is entitled to judgment as a matter of law.

The Government bore the burden to demonstrate that the standard for summary judgment was met. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *11 Moore's Federal Practice,* § 56.13[1]. It was required to "direct the court's attention to the appropriate legal and factual contentions and the material relied on in support of the motion." *11 Moore's Federal Practice,* § 56.13[1], p. 56-136; *see also Celotex Corp.,* 477 U.S. at 322. The Government was, of course, required to "inform the court of the basis of its motion and identify the part of the record which shows that there is no genuine issue of material fact." *Id.; see also Celotex Corp.* 477 U.S. at 323 (party seeking summary judgment must identify portion of the record that supports contention). Only if it met its burden to establish that there were no genuine issues of material fact, did the burden shift to Carlson to establish that there are material issues for trial. *11 Moore's Federal Practice,* § 56.13[2]; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

Here, the Government never met its initial burden of establishing undisputed facts that would entitle it to summary judgment. It did not inform the Court of the appropriate legal and

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

factual contentions or point to a record that established it was entitled to judgment. Indeed, when the issue was raised at oral argument, the Government was unable to point to particular facts, but simply stated that it "advocate[d] that there is enough in this record that you can decide the way we want you to decide." Transcript at p. 63. Such an approach hardly provides Carlson the opportunity to come forward to establish material facts that would preclude summary judgment on that issue. But, Carlson was not required to do so. Because the issue had never been raised, and because such an approach does not comply with the mandates that the Government established undisputed facts and point to the record that would support judgment, Carlson was unfairly denied the opportunity to address the issue.

### B. The Record Would Have To Be Supplemented To Adequately Address The New Issue

At oral argument, the Court recognized the likely need to supplement the record to address the new issue raised by the Government (*i.e.*, that the Court should decline to issue an injunction after balancing the appropriate factors). Transcript at p. 63. The Court was correct; supplementation and additional evidence would be required before any appropriate analysis could be undertaken.[4]

Assuming that the Administrative Record procedures apply to this case, supplementation is authorized and appropriate. The Court of Federal Claims has adopted the eight distinct circumstances described in *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), which augur for supplementation of the Administrative Record. *See, e.g., Cubic Applications, Inc. v. United*

---

4 The parties disagreed on whether the Court's Administrative Record procedures applied to the CICA violation issues. The Court's opinion appears to accept the Government's position that this case is governed by Appendix C of the Rules of the Court of Federal Claims concerning bid protests.

**REDACTED VERSION
FOR PUBLIC RELEASE**

*States*, 37 Fed. Cl. 339 (1997). In *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790-91 (1997), the Court noted that of the eight distinct circumstances, several are appropriate to claims that the Government improperly modified an existing contract. The Court noted that often, such circumstances involved inadequate explanation in the record of agency action, agency consideration of evidence not in the record, or the need for additional evidence to facilitate the Court's understanding of the issues. *Id.* at 91. The Court observed that: "the exception especially pertinent here, however, is that the government is being sued for inaction - - failing to use the competitive process." *Id.* Further supplementation is appropriate to address, among other matters, issues of appropriate relief. *See Esch v. Yeutter*, 876 F.2d 976; *accord Myers Investigative & Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 288, 294 (2000). When addressing a claim for potential injunctive relief, "it is the responsibility of [the] Court, not the administrative agency, to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive relief." *PGBA LLC v. United States*, 60 Fed. Cl. 567, 568 n.1 (2004) (*citing PGBA LLC v. United States*, 60 Fed. Cl. 196, 204, n.11 (2004)).

Here, there were no factual proceedings directed towards the issue of harm, prejudice, and the public interest.[5] Likewise, because it was not raised as an issue, there was no input from Carlson as to what the existing record actually showed and what additional evidence was

---

5 The rhetoric of counsel during oral argument does not establish an administrative record or factual basis for a Court's issuance of summary judgment.

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

available or might establish.[6] As set forth in Section III**,** the assumptions relied on by the Court are belied by other evidence and only through additional proceedings could the Court undertake the analysis as to whether additional injunctive relief was warranted.

### C. The Court's Judgment Fails To Comply With Rule 52 And The Record Does Not Permit The Requisite Fact Finding

Rule 52 requires that in any action in which the Court grants or refuses an injunction, specific factual findings must be made. While Rule 52 expressly refers to interlocutory injunctions, its requirement "extends to actions seeking permanent injunctions." *9 Moore's Federal Practice*, § 52.10[2][c]. The findings must be sufficient to allow for meaningful appellate review.

Here, the procedure invited by the Government has resulted in an anomaly. First, there has been no appropriate judgment pursuant to Rule 56 because there was never a determination (or even an opportunity to address) whether undisputed facts could properly form the basis for the Court's decision. However, there has not been a trial to the Court and the Court has not provided for proceedings to undertake the factual determination on the issue it decided. *See PGBA*, 60 Fed Cl. at 204 (Court must provide for proceedings directed at relevant factors). Finally, without either undisputed facts or the appropriate proceedings, there has been no, and can be no, compliance with the requirement for findings of fact that would support the judgment. Thus, the decision to enter judgment in favor of the Government should be reconsidered and

---

6 The Court erroneously assumed that a termination of the DTS DTR-6 Contract would unavoidably result in the Government starting over and years of further delay. The Court never allowed evidence in regard to the scope and status of the GSA eTravel Service Contract, which, Carlson contends, would allow DoD to competitively procure its requirements for a web-based travel management system in a few months and at substantially less cost than the DTS DTR-6 Contract.

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

appropriate proceedings scheduled.

## III. A FULLY DEVELOPED RECORD WOULD ESTABLISH THAT THE EQUITIES FULLY SUPPORT INJUNCTIVE RELIEF

The Administrative Record before the Court is completely devoid of facts relevant to the consequences of a decision that the DTS DTR-6 Contract is unlawful and must be set aside. The Administrative Record before the Court is completely devoid as to the consequences, hardships, or public interest resulting from a Court order compelling the Government to competitively procure DoD's requirements for a web-based travel management system. The Court should have found both that the record was incomplete with regard to the factors for considering injunctive relief and that material facts were at issue as well.[7] In addition, however, the facts relied on by the Court either have no support, or are belied by, the record. If the Court had allowed Carlson to supplement the Administrative Record, Carlson believes that the evidence would have demonstrated that the factual assumptions the Court relied on in denying injunctive relief were incorrect.

In holding that the balance of hardships tipped in the Government's favor, the Court found that the "significant delay and cost to the Government" in finding a new contractor for the DTS Program would outweigh the injury to Carlson. *CW Government Travel, Inc. v. United States*, No. 03-1274C, slip op. at 23-24 (Fed. Cl. July 26, 2004). There is no evidence in the record, however, regarding current alternatives to the DTS Contract. There is no evidence in the record as to the cost of obtaining a web-based travel management system competitively today.

---

[7] As set forth above, the Court must enforce a statute in the face of a violation. The discretionary aspect of injunctive relief to be considered by the Court should be focused upon the extent of additional remedial action and whether it is appropriate to fully rectify

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

There is no evidence in the record as to the time required to competitively procure one of the web-based travel management systems currently available. Supplementation of the Administrative Record would provide this evidence and demonstrate that the degree of delay would be insignificant. More specifically, additional evidence related to the GSA eTravel Contract would demonstrate that the Department of Defense ("DoD") could readily acquire a replacement to the DTS Contract. *See, e.g., Exhibit 72 (Hearne Declaration).*

In 2003, GSA awarded three contracts for web-based, end-to end travel management systems to three different contractors. The eTravel Contracts are Government-Wide Acquisition Contracts ("GWACs"), under which all Federal agencies, including DoD, may issue task orders. By supplementing the record with evidence regarding the GSA eTravel Procurement and respective current capabilities of the available eTravel Systems, the Court would learn that the process of providing a web-based end-to-end travel management system to the DoD would begin in a matter of months – not years – and that it would save the Government considerable amounts of money, as compared to the cost of continuing the DTS DTR-6 Contract.[8]

In assessing the impact of issuing injunctive relief, the Court also assumed that because the DTS Contract had gone on for five years, much of that effort would be lost if the Court were to order a resolicitation. As described above, however, there are at least three web-based end-to-

---

the unlawful conduct that has occurred and compel the Government to take action unlawfully withheld for years.

8 The Government introduced a declaration from a Colonel Schaefer in an attempt to create the erroneous impression that the eTravel Systems available under the GSA Contract did not satisfy DoD's requirements. The Court recognized that summary judgments should not be based upon unchallenged declarations. Colonel Schaefer referenced 2002 documents for his biased conclusions, rather than address the GSA contracts actually awarded in late 2003. Moreover, no evidence was introduced by the Government

end travel management systems currently available for operational deployment that have been thoroughly tested by GSA as satisfying the vast majority of Government travel management requirements. In fact, the DTS developed by Northrop is also available under the GSA eTravel Contract, but under terms, conditions, and pricing much more favorable to the Government than the DTS DTR-6 Contract. Thus, the termination of the current DTS Contract would not force DoD to start over and cause years of delay in the operational deployment of a system.

The Court also assumed that for a new contractor, such as Carlson or EDS, to make its eTravel System compatible with the Government's legacy systems would involve "a process that takes considerable time, effort and resources." *Id.* at 24. This is another factual issue that is not addressed in the record.[9] Supplementation of the Administrative Record with appropriate evidence, including expert testimony, would demonstrate that the GSA eTravel System Contract would provide several suitable web-based end-to-end travel systems to DoD that could commence deployment in a matter of months.

Further, the Court also assumed that the DTS Contract is now substantially complete. This is contradicted by the record. The presentation by the DTS Program Director, Colonel Brandy Johnson, in March 2004, that was provided to the Court during the May 18, 2004 Oral Argument, reveals that three additional major revisions are required to the current DTS to

---

regarding the actual capabilities of the eTravel Systems currently available under the GSA Contract.

9 The Court recognized a need to supplement the record in regard to the magnitude and impact of the change to only a web-based system. If that evidence is introduced, it will show that the change to only the web-based system substantially alleviated the complexity of the communicating with the Government's legacy systems. Moreover, there is absolutely no evidence in the record regarding the capabilities of Carlson's and EDS's eTravel Systems that are available under the GSA eTravel Contract. If the record

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

achieve full operational capability by October 2006. Further review of the requirements discussed in the presentation that have not yet been included in the DTS demonstrates conclusively that the Contract is not substantially complete. The fact is further confirmed by the report of the DoD Director, Program Analysis & Evaluation, that revealed that the release of the current Jefferson version of the DTS only provided half the required functionality. *Exhibit 15, V 1204*. Moreover, supplementation of the Administrative Record regarding the current status of the DTS would reveal that it has a number of major deficiencies that significantly impact its utilization. These deficiencies are acknowledged in the record of the GAO Bid Protest submitted to the Court (but not briefed). The DTS PMO has admitted publicly, during pre-proposal conferences and to the press, that the DTS often fails to provide the lowest applicable airfare available for Government travelers. Pending solicitations for commercial travel management services using the DTS reveal that DTS is currently incapable of electronically providing the information required for the reconciliation reports of travel expenditures. On July 7, 2004, the DTS PMO issued a notice advising that DTS could not be used for international travel. DTS also experiences significant problems in regard to hotel reservations. Thus, there is no factual basis for the Court's assumption that DTS is substantially complete.

The Court also incorrectly assumed that canceling the DTS Contract would result in the loss of several years of work and expenditures. In fact, the first four years of the contract are already a loss. The record demonstrates that during those four years, the Government and the contractor focused on providing a client/server based CUI. *See, e.g., Exhibit 94, V 2263* (noting that not all DTS operational modes could be observed during testing). That requirement has

---

is supplemented, Carlson would demonstrate that its eTravel System does not suffer the defects currently plaguing the DTS.

been deleted from the contract. Therefore, any money and time spent towards that end is already gone. To the extent the current DTS web-based system benefited from those years of test failures and expenditures, those benefits would still be available if the DTS is purchased from Northrop off the GSA eTravel Contract. Thus, a current competitive procurement would not send the contract back to the drawing board.

The existing record also contradicts the Court's assumption that resoliciting the DTS Contract would cause disruption in the provision of travel services. The existing record indicates that the DTS is only being used for a very small percentage of DoD travel transactions – even where it has been operationally deployed. The Government estimates that DoD has approximately 5.9 million travel transactions annually. *V 678-679.* The record *(Exhibit 76, V 1645-1653)* reveals that in the six-month period from July 1, 2003 through December 31, 2003, **only 9,986 DoD travel transactions were performed using the DTS, out of a total of almost three million travel transactions during the same period.** Evidence on actual usage would reveal that even where DTS has been operationally deployed, utilization averages less than 6% of total travel transactions at those locations. Thus, there is no basis for the Court's assumption that the DTS Contract is substantially complete, nor the assumption that, currently, there is a significant utilization of the DTS that might be disrupted if the Court ordered DoD to comply with CICA.

Finally, the Court found that the delay between the modifications to the contract and the complaint further balanced the hardships in the Government's favor. The Court also found, however, that the delay was due, at least in part, to the Government's failure to publicly disclose Contract Modifications Numbers 25 and 27 and the Government's failure to respond to FOIA requests from the Plaintiff for such contract modifications for another year. Furthermore, it was

**REDACTED VERSION
FOR PUBLIC RELEASE**

the Defendant that deliberately chose to continue performance of the unlawful DTS DTR-6 Contract, rather than take corrective action after Carlson filed this action. The Defendant may not benefit from its actions to conceal the unlawful modifications from the Plaintiff or continuing efforts to avoid compliance with CICA. It is established law that equity does not stand on the side of those with unclean hands. *Precision Instr. Mfg. Co. v. Automotive Maint. Machining Co.*, 324 U.S. 806, 814 (1945). Here, the Government has benefited from first, secretly restructuring the DTS DTR-6 Contract in violation of CICA, and second, from its failure to disclose, in accordance with the FOIA, the contract modifications that constituted a violation of CICA, and third, the continuing attempts to circumvent the mandate of CICA. If this were to be the case, the Government could violate CICA, yet avoid any consequences, as long as it kept the unlawful action hidden from the public for an extended period. Such a practice cannot look to equity for defense.

## CONCLUSION

For the reasons stated above, the Court should grant Carlson's Motion and rescind that portion of its July 26, 2004 Order that granted summary judgment in favor of Defendant on Counts I and II.

Respectfully submitted:

/s/Lars E. Anderson

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

*Of Counsel:*

Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Attorneys for Plaintiff*

Dated: August 9, 2004

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

## CERTIFICATE OF FILING

I hereby certify that on August 12, 2004, a copy of the foregoing public version of PLAINTIFF'S MOTION FOR RECONSIDERATION AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Lars E. Anderson
Lars E. Anderson

::ODMA\PCDOCS\MC1DOCS1\168281\1