No. 03-1274C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

CW GOVERNMENT TRAVEL, INC.
Plaintiff,
v.
UNITED STATES
Defendant,

and

NORTHROP GRUMMAN SPACE
& MISSIONS SYSTEMS CORPORATION
Intervenor.

---

# OPPOSITION OF DEFENDANT, UNITED STATES, TO PLAINTIFF'S MOTION FOR RECONSIDERATION

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

DAVID A. LEVITT
Trial Attorney
Civil Division
Department of Justice
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
202-307-0309, Tel.
202-514-7965, Fax

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

OPPOSITION OF DEFENDANT, UNITED STATES
TO PLAINTIFF'S MOTION FOR RECONSIDERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Standards For Reconsideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Issuance Of An Injunction Is, And Has Always Been, Within This Court's Sound Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. This Court Has Always Considered Whether, In Its Discretion, Equitable Relief Is Appropriate . . . . . . . . . . . . . . 4

B. The Tucker Act Explicitly Recognizes This Court's Authority To Exercise Its Discretion In Granting Equitable Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C. The Supreme Court Cases Cited by Carlson Are Readily Distinguishable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. The Court's Factual Conclusions Are Appropriate . . . . . . . . . . . . . . . . . 11

A. RCFC 52 Does Not Require Factual Findings Of The Type Demanded By Carlson . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

B. RCFC 56.1, By Which This Court Entered Judgment for the Government, Does Not Require Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV. The Administrative Record Clearly Supports The Court's Conclusion That The Public Interest Weighs Against Granting Carlson's Requested Relief . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. The Undisputed Issue Of Prejudice Was Fully Before The Court In Conjunction With The Laches and Timeliness Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B. Carlson Clearly Had An Opportunity To Present Evidence On the Balancing Of Interests . . . . . . . . . . . . . . . . . . . . 16

C. The Administrative Record Clearly Supports The Court's Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES

### FEDERAL CASES

ABF Freight System, Inc. v. United States,
55 Fed. Cl. 392 (2003) ..................... 4

Aerolease Long Beach v. United States,
31 Fed. Cl. 342 (1994) ..................... 3

Bishop v. United States, 26 Cl. Ct. 281, 286 (1992) ..................... 3

Black Warrier Electric Membership Cooperative v. Mississippi Power Company,
413 F.2d 1221 (5th Cir. 1969) ..................... 16

CW Government Travel, Inc. v. United States, 2004 WL 1737889 (Ct.Cl.) ..................... 18

Dismas Charities v. United States,
61 Fed. Cl. 191 (2004) ..................... 13

Dubinsky v. United States,
44 Fed. Cl. 509 (1999) ..................... 4

Ellsworth Associate v. United States,
45 Fed. Cl. 388 (1999) ..................... 4

Fifth Third Bank Of Western Ohio v. United States,
52 Fed. Cl. 637 (2002) ..................... 3

Franconia Associates v. United States,
44 Fed. Cl. 315 (1999) ..................... 3

Gentex Corporation v. United States,
58 Fed. Cl. 634 (2004) ..................... 4

Hecht Co. v. Bowles,
321 U.S. 321 (1944) ..................... 4, 5

Hydro Investors, Inc. v. Trafalgar Power Inc.,
227 F.3d 8 (2d Cir. 2000) ..................... 12

National Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc.,
899 F.2d 119 (1st Cir. 1990) ..................... 3

PGBA, LLC, v. United States,

60 Fed. Cl. 196 (2004) .......... 4, 6, 7, 9

Salehpour v. University of Tennessee,
159 F.3d 199 (6th Cir. 1998) .......... 15

Tennessee Valley Water Authority v. Hill,
437 U.S. 153 (1978) .......... 10

United States v. Oakland Cannabis Buyers' Cooperative,
532 U.S. 483 (2001) .......... 9, 10

Van Skiver v. United States,
751 F. Supp. 1522 (D.Kansas 1990) .......... 3

Weinberger v. Romero-Barcelo,
456 U.S. 305 (1982) .......... 2, 5, 6, 11

**FEDERAL STATUTES**

Administrative Procedure Act, 5 U.S.C. § 706 .......... 8

Controlled Substances Act, 21 U.S.C.§ 841(a) .......... 9

Endangered Species Act, 16 U.S.C.§ 1536 .......... 10

Fed. R. Civ. P. 52, Notes .......... 12

Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq .......... 5

Tucker Act, 28 U.S.C. § 1491(b) .......... 7, 8, 9

**MISCELLANEOUS**

9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2574, at 505
(discussing the civil counterpart to RCFC 52, Federal Rule of Civil Procedure 52) .......... 12

Moore's Federal Practice, ¶ 56.12 at 56-334 (2002 Ed) .......... 16, 17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CW GOVERNMENT TRAVEL, INC., Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, Defendant, | ) | Case No. 03-1274C<br>Judge George W. Miller |
| and | ) | |
| NORTHROP GRUMMAN SPACE & MISSIONS SYSTEMS CORPORATION, Intervenor. | ) | |

OPPOSITION OF DEFENDANT, UNITED STATES,
TO PLAINTIFF'S MOTION FOR RECONSIDERATION

INTRODUCTION

Carlson's Motion for Reconsideration is based upon a series of suppositions, none of which can withstand legal scrutiny:

First, Carlson suggests that the four-part analysis customarily used by this Court in assessing the propriety of injunctive relief in a bid protest case is wrong, that a violation of the Competition in Contracting Act ("CICA") compels the issuance of an injunction in all cases, and that the "public interest" is irrelevant and may not be considered by the Court in fashioning a remedy. In other words, Carlson flatly rejects the post-CICA bid protest jurisprudence of this Court.

Second, to "support" this novel thesis, Carlson advances a number of cases, most of which expressly contradict Carlson's argument. Rather, they hold, among other things, that "a

federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982). Far from supporting Carlson's contentions, the precedent Carlson cites flatly refutes them.

Third, not one of the cases upon which Carlson relies is a bid protest case, brought under CICA. While some statutory schemes might leave a court no alternative to an injunction in the fashioning of relief, CICA creates no such scheme. Indeed, the Tucker Act specifically empowers this Court, in a bid protest case, to award "any relief the court considers proper," and, in so doing, that the Court "shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the matter." In reality, thus, Carlson complains that the Court did precisely that which Congress directed it to do.

Fourth, Carlson's complaint with respect to the Court's allegedly insufficient findings of fact is baseless. In fact, Rule 52 of the Rules of the Court of Federal Claims ("RCFC") does not even require factual findings under the circumstances of this case.

Fifth, the suggestion that the record does not support the Court's public interest determination simply does not square with the facts. Rather, the record is replete with facts that more than corroborate the Court's conclusion that the post hoc cancellation of five years of contractual effort would effect an undue hardship upon the United States. Nothing can change that self-evident proposition.

For these reasons, and for others demonstrated below, and upon the entire record of this action, we respectfully request the Court to deny Carlson's motion.

## ARGUMENT

### I. Standards For Reconsideration

As Carlson acknowledges, a party is not entitled to reconsideration absent a manifest error of law or mistake of fact with respect to the original order. See e.g., Franconia Assocs. v. United States, 44 Fed. Cl. 315, 316 (1999); Bishop v. United States, 26 Cl. Ct. 281, 286 (1992). A motion for reconsideration is not an appropriate vehicle in which to present old evidence or revisit issues that have already been decided. See Van Skiver v. United States, 751 F. Supp. 1522, 1523 (D. Kan. 1990); National Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990). The purpose of a motion for reconsideration is not "to give an unhappy litigant an additional chance to sway the court . . . " Fifth Third Bank Of Western Ohio v. United States, 52 Fed. Cl. 637, 639 (2002). To sustain its burden on a motion for reconsideration, a party must show (1) an intervening change in controlling law; (2) new evidence previously unavailable; or (3) a need to prevent manifest injustice. Id.; see Aerolease Long Beach v. United States, 31 Fed.Cl. 342, 376 (1994); Bishop, 26 Cl. Ct. at 286.

Carlson's motion cites no intervening change in controlling law, provides no evidence that was unavailable prior to the decision on the cross-motions, and fails to demonstrate why a reconsideration of the order is "necessary to prevent manifest injustice." Accordingly, the motion for reconsideration fails.

### II. Issuance Of An Injunction Is, And Has Always Been, Within This Court's Sound Discretion

Years of jurisprudence, as well as the specific powers granted to this Court by statute, confirm that this Court has always possessed discretion to deny a party's request for injunctive

relief notwithstanding that party's likelihood of success upon the underlying merits of its case. Carlson tacitly admits this principle. Count II of Carlson's Amended Complaint, for example, does not identify a statutory basis for the injunctive relief it requests, wholly relying instead upon this Court's inherent equitable powers. Carlson's argument to the contrary - that this Court lacks discretion to exercise its traditional equitable powers - attempts to rewrite history and ignore the plain language of the Tucker Act.

### A. This Court Has Always Considered Whether, In Its Discretion, Equitable Relief Is Appropriate

This Court has long recognized that injunctive relief is "extraordinary in nature," and that granting such relief in the context of a bid protest is "within the sound discretion of the trial court." ABF Freight Sys., Inc. v. United States, 55 Fed. Cl. 392, 395-96 (2003). The Court has frequently declined to grant injunctive relief, even when a protestor has been successful upon the merits of a case and has demonstrated that it was prejudiced. See e.g., PGBA, LLC, v. United States, 60 Fed. Cl. 196, 222-23 (2004) (appeal pending); Gentex Corporation v. United States, 58 Fed. Cl. 634, 653-56 (2004). In Gentex and PGBA (in which the court of appeals recently heard argument upon interlocutory review), for example, this Court declined - as it has done here - to enter injunctive relief where the harm to the public interest outweighed the harm claimed by the plaintiff. See PGBA, 60 Fed. Cl. at 220-22; Gentex, 58 Fed. Cl. at 655-56; see also Ellsworth Assoc. v. United States, 45 Fed. Cl. 388, 398-99 (1999); Dubinsky v. United States, 44 Fed. Cl. 509, 512-13 (1999).

In adopting this approach, the Court has hardly acted in a vacuum. Rather, it has relied upon plain instruction from the United States Supreme Court. In Hecht Co. v. Bowles, 321 U.S.

321, 329 (1944), for example, the Supreme Court refused to compel an injunction, despite the fact that the statute appeared on its face to require an injunctive remedy (an "injunction . . . shall be granted"). The Court firmly stated that injunctive relief was not compulsory - "the essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." Hecht, 321 U.S. at 329.

Thirty-eight years later, the Supreme Court reiterated this principle. Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982), involved a Navy targeting range in Puerto Rico, where off-target ordnance landed in the sea. Plaintiffs sought to enjoin this poor marksmanship as a violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. On appeal, the Supreme Court considered whether the Act required "a district court to enjoin immediately all discharges of pollutants that do not comply with the Act's permit requirements or whether the district court retain[ed] discretion to order other relief to achieve compliance." Weinberger, 456 U.S. at 306-307. The answer was clear and unambiguous:

> The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of the law.

Id. at 313. The Court emphasized that it is the "purpose and language of the statute under consideration . . . not the bare fact of a statutory violation," that compels a conclusion as to whether an injunction is required for a statutory violation. See id. at 314.

In holding that a court was not required to grant a request for injunctive relief, the Court emphasized that a balancing of interests must occur:

> Where plaintiff and defendant present competing claims of injury, the

> traditional function of equity has been to arrive at a "nice adjustment and reconciliation" between the competing claims. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction.

Weinberger, 456 U.S. at 312.

These clear legal rules requiring a court to balance competing interests have been, and continue to be, applied by this Court. Earlier this year, in PGBA, this Court articulated these very same principles in the specific context of bid protest cases:

> In fulfilling its responsibility to sit as a court of equity in this bid protest case, the Court [is] guided by long standing precepts:
>
> In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. The grant of jurisdiction to ensure compliance with the statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law.
>
> In short, as a jurisprudential matter, this Court [is] not obliged to grant equitable relief for every violation of the law, and consideration of the public interest indicated that no such grant was appropriate in this case.

PGBA, 60 Fed. Cl. at 222-23 (emphasis and internal citations omitted).

Although it had specifically found both a procurement irregularity and injury to the plaintiff, see id. at 198, the Court in PGBA declined to grant equitable relief, utilizing the same, long-standing, four-part test considered by this Court in its July 26, 2004 Order. See Order at 22-25. This four-part test requires the Court to consider:

1. Whether the protestor would be successful on the merits (a fact that the Court assumed arguendo, without deciding, in its Order);
2. Whether the protestor would suffer irreparable harm if the relief were not

awarded (a fact that the Court, assuming an underlying violation, concluded affirmatively in Carlson's favor);

3. Whether granting the injunction would serve the public interest (a fact that the Court definitively rejected by concluding that the "overwhelming public interest [was] in avoiding further delay"); and

4. Whether the harm the protestor would suffer outweighs the harm that the Government and any third-parties would suffer (a fact that the Court, again, definitively rejected by concluding that granting Carlson's request for relief would result in "significant" "harm to the government").

See PGBA, 60 Fed. Cl. at 220; Order at 23-25.

In sum, the Court in PGBA employed the same test as did the Court in this case to reach the same conclusion, i.e., that injunctive relief was neither compelled nor warranted. Accordingly, Carlson's reliance on PGBA - and Weinberger - is woefully misplaced. Far from supporting Carlson's position, both cases directly refute Carlson's principal legal thesis.

B. The Tucker Act Explicitly Recognizes This Court's Authority To Exercise Its Discretion In Granting Equitable Relief

This Court's consideration of the traditional four-part test for entry of an injunction is consistent, not only with its inherent equitable powers, but also with its congressional charter to entertain bid protest cases as set forth in the Tucker Act, 28 U.S.C. § 1491(b). The Tucker Act specifically recognizes that this Court possesses discretion in fashioning relief in bid protest cases:

> (2) To afford relief in [a bid protest], the courts may award any relief that the court considers proper,

including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

28 U.S.C. § 1491(b) (emphasis added). Carlson ignores this statutory language, which could not be clearer. This Court did, in its Order, precisely what the Tucker Act authorizes it to do - it considered the type of relief that may be appropriate and gave due regard to the interests of national defense and security. Carlson's argument, thus, devolves into the absurd proposition that the Tucker Act does not mean what it so plainly says. Congress clearly recognized that Governmental need could override the individual competitive interests of any one aggrieved bidder.

Not surprisingly, Carlson is unable to point to any statute mandating an injunction against a CICA violation. The reason for this failure is simple - no such statute exists. Carlson's argument that CICA mandates an injunctive remedy is plainly wrong upon its face.

Inherently recognizing that no such statute exists, Carlson attempts to conflate a CICA violation with a violation of the Administrative Procedure Act, 5 U.S.C. § 706, which prohibits agency conduct that is otherwise "contrary to law." Carlson's argument, while creative, has already been considered and rejected by this Court:

> [The protestor] argues that Section 706 of the Administrative Procedure Act ("APA") requires certain action on the procurement when the Court finds that

> the agency was arbitrary and capricious in its award. This argument fails on statutory grounds. In bid-protest cases in this Court, Section 706 of the APA supplies only the standard of review. The governing remedial provision is not that of the APA but rather that specified in 28 U.S.C. §1491(b)(2), . . . which provision incorporates traditional equitable principles plus authority to grant a limited award of money damages where appropriate.

PGBA, 60 Fed. Cl. at 223 (emphasis in original, internal citations omitted). As the Court noted in PGBA, this reasoning is consistent with the plain language of the Tucker Act.

C. The Supreme Court Cases Cited by Carlson Are Readily Distinguishable

The two principal cases upon which Carlson relies are clearly inapposite.

United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483 (2001), held only that a "medical necessity exception" was not a defense to the manufacture and distribution of marijuana in contravention of the Controlled Substances Act, 21 U.S.C.§ 841(a). See Oakland Cannabis Buyers' Cooperative, 532 U.S. at 499 (Stevens, J., concurring). Looking to the Controlled Substances Act, the Supreme Court held that there was no "medical necessity exception" in its language. The Court did not reach the issue for which Carlson advances that decision in its brief, i.e., whether an underlying statutory violation unvaryingly mandates the issuance of an injunction. In fact, the Supreme Court emphasized precisely the contrary, namely that a "'grant of jurisdiction to issue [equitable relief] hardly suggests an absolute duty to do so under any and all circumstances,'" and that a court is required to enjoin a statutory violation only when "required by [a] 'clear and valid legislative command.'" Oakland Cannabis Buyers' Cooperative, 532 U.S. at 495 (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329-330). The

Supreme Court held that the district court's injunction was based upon a false reading of the Controlled Substances Act. As the Court observed, "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute." Oakland Cannabis Buyers' Cooperative, 532 U.S. at 497.[1]

Similarly, Tennessee Valley Water Authority v. Hill, 437 U.S. 153 (1978), simply held that an unambiguous congressional mandate requires judicial enforcement. In concluding that the Tennessee Valley Authority violated the Endangered Species Act, 16 U.S.C.§ 1536, by continuing with a dam project that might eradicate an endangered species, the Court held that the statute was absolute and allowed for no exceptions in the vigilant protection of endangered species. TVWA, 437 U.S. at 173. Because there was no provision in the Endangered Species Act empowering the court to balance the need for the dam with the need to protect an endangered species, the Court enjoined further construction of the dam until it could be satisfied that the endangered fish was adequately protected. TVWA, 437 U.S. at 193-195. The dam was ultimately completed in the late 1970s. Here, by contrast, the Tucker Act specifically directs the Court, in imperative terms, to consider the public interest and weigh that interest against that of the plaintiff. That is what the statute requires this Court to do; that is what this Court, in fact, did.

The key point that the Supreme Court has repeatedly emphasized is that the "purpose and language of a statute[,] . . . not the bare fact of a statutory violation," determines whether an

[1]Notably, in his concurring opinion in United States v. Oakland Cannabis Buyers' Corp., 532 U.S. 483, 502-503, Justice Stevens observed that whether an injunction must be issued in the face of a statutory violation "should be decided on the authority of cases such as Hecht Co. v. Bowles, 321 U.S. 321, and Weinberger v. Romero-Barcelo, 456 U.S. 305." These authorities are discussed in Section II.B.1, supra, and fully support the Order now under consideration.

injunction must issue to remedy a statutory violation. See Weinberger, 456 U.S. at 314. Clearly, neither the Tucker Act nor CICA includes such mandatory statutory language. To the contrary, both the Tucker Act and CICA demonstrate clearly that entry of an injunction is within the sound discretion of the trial court. Carlson's argument to the contrary is unfounded.

III. The Court's Factual Conclusions Are Appropriate

A. RCFC 52 Does Not Require Factual Findings Of The Type Demanded By Carlson

Carlson next argues that this Court was required, under RCFC 52 to make "specific factual findings," Motion at 18, and that the Court's failure to do so was in error. In making this argument, Carlson cites to no authority. Carlson's omission is telling, because the plain language of RCFC 52 not only does not require the type of factual findings Carlson now demands, it specifically disclaims any need for such findings.

RCFC 52(a) provides as follows:

> In all actions tried upon the facts, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to RCFC 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court. Findings of fact and conclusions of law are unnecessary on decision of motions under RCFC 12 or 56 or any other motion except as provided in subdivision (c) of this rule.

(emphasis added). RCFC 52 does not require findings of fact here for four key reasons:

1. This matter was not "tried upon the facts," with judgment entered under RCFC 58; nor did this matter consider "an interlocutory injunction." By

its terms, therefore, RCFC 52 does not require specific factual findings.

2. The United States, Northrop Grumman, and Carlson all moved for judgment under RCFC 12 and 56. The express language of Rule 52 states that, in such contexts, "findings of fact and conclusions of law are unnecessary." Cf. 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2574, at 505 (discussing the civil counterpart to RCFC 52, Federal Rule of Civil Procedure 52).

3. It is not the common practice in this Court, when considering bid protests cases, to prepare formal "findings of fact." Clearly, the Court's common practice under Rule 52 is instructive with respect to the import of Rule 52.

4. In any event, the Court reached its factual conclusions in sufficient detail to allow a meaningful review. Cf. Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (indicating that the purpose of Federal Rule of Civil Procedure 52 is to provide a basis for reviewing the court's decision); cf. also Fed. R. Civ. P. 52, Notes to the 1946 Amendments ("the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts").

B. RCFC 56.1, By Which This Court Entered Judgment for the Government, Does Not Require Undisputed Facts

Carlson further argues that the Court's allegedly non-specific and imprecise, factual conclusions are also disputed. See Motion at 19-24. But again, Carlson's argument is misplaced because RCFC 56.1, see Order at 14, does not require undisputed facts:

> [t]he standards applicable to a motion for judgment on the administrative record differ from a RCFC 56 motion for summary judgment. The statements and counter-statements of facts prepared pursuant to RCFC 56.1 argue the significance and weight accorded to the facts that were the basis for the agency decision.

Dismas Charities v. United States, 61 Fed. Cl. 191, 198 (2004) (Miller, J.) (internal citations omitted).
In essence, Carlson's argument ignores the governing standard of review.

IV. The Administrative Record Clearly Supports The Court's Conclusion That The Public Interest Weighs Against Granting Carlson's Requested Relief

Carlson's final argument is that, because the issue of a remedy was not before the Court upon our motion for summary judgment, the Court overstepped its bounds. Carlson's argument fails for a variety of reasons.

A. The Undisputed Issue Of Prejudice Was Fully Before The Court In Conjunction With The Laches and Timeliness Arguments

Contrary to Carlson's argument, the propriety of injunctive relief was plainly before the Court: (a) the Government's Motion for Summary Judgment was for Counts I and II of Carlson's Amended Complaint, with Count II specifically asking for equitable relief; while (b) Carlson simultaneously also asked for Summary Judgment on Counts I and II. It is disingenuous for Carlson to argue "surprise" that the Court might rule that Carlson would not be entitled to injunctive relief upon some of its claims. Carlson was plainly on notice of that possibility, (1) having put the issue before the Court in its own Motion, and (2) having had the opportunity to

present its argument as to why injunctive relief was appropriate.

It is beyond question that the issues of prejudice to the Government and of the effect of an injunction upon the public interest were clearly framed, presented, and supported in conjunction with the Government's argument that Carlson's action should be dismissed as untimely or, in the alternative, on the basis of laches:

> [I]f the Court were to grant the remedies demanded by Carlson, that delay would cause the Government serious continuing economic harm since, over the two years that Carlson sat on its hands, the Government has spent millions of dollars developing and deploying the DTS.

Defendant's Motion to Dismiss, Or, In The Alternative, Motion for Summary Judgment, at 26-31 (filed Dec. 15, 2003).

> If Carlson is successful in obtaining injunctive relief, the Government may have to forfeit all money paid to Northrop Grumman to develop and deploy the CUI as well as termination fees. Further, given that deployment is proceeding pursuant to the Northrop Grumman contract, if Carlson is chosen to develop and deploy a web-based CUI after a competitive procurement in 2004 [or 2005], all the deployment already in the field will be aborted and continuing deployment will be delayed until Carlson is able to develop a functional CUI.

Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment, at 2-6 (filed Mar. 10, 2004). There was no "surprise."[2]

---

[2]As Carlson concedes in its motion, the balance of hardships and public interest was explicitly discussed by the United States and Northrop Grumman at the hearing on the cross-motions. Rather than seeking leave at that time to supplement the record if it considered itself prejudiced by a "new argument," Carlson stood moot. By its own admission, Carlson had notice of the precise issues decided by the Court's July 26 Order more than two months prior to its issuance. Given this amount of time and its failure to have sought leave to supplement the record on this issue, Carlson cannot be heard to complaint that it lacked "notice." See Salehpour v. University of Tennessee, 159 F.3d 199, 204 (6th Cir. 1998) (given the time plaintiff had to respond to the motion, the contention it lacked notice of the issues "flies in the face of logic and reason"). Accordingly, procedural fairness does not require the reopening of the record.

To the contrary, having been put on notice by the Government's motion and its proposed statement of undisputed facts, Carlson opted not to controvert the facts, instead arguing that these facts were "immaterial." Defendant's Proposed Undisputed Fact No. 42 went directly to this issue of prejudice: "From the date of the challenged modifications, the Government and Northrop Grumman have been incurring costs and continuing performance." Carlson's evasive and argumentative response is telling:

> The fact that the Government makes cardinal changes to a contract that result in excessive costs to the Government cannot prevent Carlson from challenging such conduct or this Court from providing an appropriate remedy. Moreover, the Government could have ceased such expenditures and taken proper corrective action to competitively procure the DTS requirements under the terms and conditions of the 2002 Modifications at any time. It is also noted that the Government has avoided disclosing how much money has been paid to TRW/Northrop Grumman under the Contract, to date.

Consolidated Joint Statement of Facts in Support of Defendant's and Intervenor's Motion to Dismiss Or, In The Alternative For Summary Judgment and Plaintiff's Response Thereto ("Statement of Facts") ¶ 42, at 59 (filed May 5, 2004).

Carlson simply cannot feign surprise that the Court would consider this issue. The foregoing citations to the record make it abundantly clear that Carlson not only should have known, but did know that the effect of an injunction upon the public interest was squarely before the Court. That is all that is necessary for the Court to decide the issue. <u>See</u>, <u>e.g.</u>, <u>Salehpour v. University of Tennessee</u>, 159 F.3d 199, 203-204 (6th Cir. 1998); <u>Black Warrier Electric Membership Cooperative v. Mississippi Power Company</u>, 413 F.2d 1221, 1225 (5th Cir. 1969); <u>Moore's Federal Practice</u>, ¶ 56.12 at 56-334 (2002 Ed).

B. <u>Carlson Clearly Had An Opportunity To Present Evidence On the Balancing Of Interests</u>

Carlson's contention that it was deprived of an opportunity to present evidence on the balancing of interests is patently incorrect.

This point is perhaps best illustrated by Carlson's continued touting of its "eSolutions" product, a product that it proposed in response to the requirements of a different agency (i.e., GSA), under a different program (i.e., "eTravel"), with different requirements. Carlson asks this Court to withdraw its July 26 Order in part upon Carlson's assertion that eSolutions can perform the DTS job, when Carlson's own witness not only declined to so state but, in fact, affirmatively admitted that eSolutions does not satisfy the DTS requirements. As Carlson well knows, the former DTS PMO (Colonel Larry J. Schaefer) analyzed two comparative studies of DTS and GSA's eTravel solicitation in a declaration supporting the United States' and Northrop Grumman's motion.[3] The first analysis, which was completed by GSA in December 2002, concluded that "the scope of the DoD's DTS requirements far exceeds that of the e Travel service," with numerous technical differences found to exist, many of which deal directly with integration with DOD legacy systems. Schaefer Declaration, ¶ 5, Defendant's Appendix at 161. The second analysis also identified numerous critical requirements of DTS which were not requirements of eTravel, including:

(a) System Security complying with the DoD Global Information Grid architecture,

(b) Two-way interface with DoD accounting, disbursing and vendor pay systems,

(c) Automated centrally billed account reconciliation,

---

[3]Defendant's Appendix In Support Of Motion To Dismiss Or, In The Alternative, For Summary Judgment (Defendant's Appendix), Tab III.

(d) Individually billed charge card interfaces,

(e) Military Human Resources and pay system outputs, and

(f) Specific data archiving, exchange, and interface capabilities.

Carlson was not precluded from attempting to rebut this evidence, To the contrary, it attempted to do so - - unavailingly.[4]

In fact, William S. Hearne, a key Carlson declarant, candidly conceded that eSolutions cannot satisfy DTS. Hearne Declaration, ¶ 1, Plaintiff's Appendix at V 1571. Mr. Hearne stated that he worked on DTS for the Air Force for two years and is familiar with the requirements of DTS. Hearne Declaration, ¶¶ 3-5, Plaintiff's Appendix at V 1571-1572. Mr. Hearne conceded that "each agency using the GSA eTravel system will undoubtedly require an interface with the particular agency's accounting, disbursing, and vendor pay systems . . . In other words, GSA's eTravel Contract with CWGT did not include such features in the fixed transaction fee pricing, but provided that such features could be added by individual agencies at an additional cost for development." Id. These requirements, however, are precisely what have made DTS so difficult to achieve. While Mr. Hearne believes that "legitimate requirements of the DoD for travel management services . . . could be readily added to the CWGT eTravel System, known as E2 Solutions," no support is provided for that opinion, his declaration admits that eSolutions is not yet "there," and, although he concedes it would be at Government expense, he offers no suggestion with respect to the time and money that will need to be consumed to get "there." Hearne Declaration, ¶ 12, Plaintiff's Appendix at V 1574.

[4]Plaintiff's Appendix In Support Of Plaintiff's Cross-Motion For Summary Judgment And Response To Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment (Plaintiff's Appendix), Tabs 70-72.

As this Court observed in its July 26 ruling:

> A large part of the delay in deploying the CUI was caused by 'the difficulties of accommodating new systems to the legacy systems that were within the [Government] infrastructure[,] . . . which is not . . . all that atypical on these large and complex IT-type contracts, where you are automating an old-fashioned system.' A new contractor would be faced with this same challenge of making its CUI compatible with the Government's legacy systems - only it would be more than five years behind where Northrop Grumman was when Carlson's complaint was filed.

CW Government Travel, Inc. v. United States, 2004 WL 1737889 at * 18.

As the above summary reflects, Carlson clearly had - and seized - the opportunity to rebut the relevant facts. The Court, however, properly concluded that an injunction would not advance the public interest. Carlson offers nothing new, no previously unavailable facts - - just the same old hash.

C. The Administrative Record Clearly Supports The Court's Conclusions

The factual conclusions rendered by the Court upon the issue of the public interest are clearly supported by the record. The following facts (including citations from the administrative record) support the Court's factual conclusions (see Order at 24-25):

* The contract is now in its sixth year of performance. See Statement of Facts ¶¶ 14, 35, at pp. 18, 90.
* At the time Carlson filed its complaint, the contract was in the fifth year of performance of an eight-year contract. See the record herein; cf. Statement of Facts ¶¶ 14, 35, at pp. 18, 90.
* Carlson did not file its complaint until 14 months after the Government issued the modifications that are the subject of this dispute. See the record herein; cf.

Statement of Facts ¶¶ 23, 25-26, 41, at pp. 33, 35-36, 58-59.

* Northrop Grumman's DTS DTR-6 contract is substantially complete. See Plf. App. at V665-66, V1176-77, 1185.

* The Government and Northrop Grumman have expended a significant amount of time, effort, and resources in the development of the highly complex CUI. See Plf. App. at V665-66, V1176-77, 1185.

* If the injunction is granted, the project will be delayed to an even greater degree than it has been. See Plf. App. at V1176-77.

* Northrop Grumman would walk away with the system that it has developed and the Government would have to start over. See Plf. App. at V1176-77.

* The resolicitation sought by Carlson would send the most challenging and complex aspects of the project back to the drawing board. Cf. Plf. App., Declaration of Erma Spell ("Spell Decl.") ¶ 5, at V1564 (admitting that the technical provisions are highly complex and time-intensive); Plf. App. at V1176-77.

* If the contract is terminated, the services currently being provided by the CUI will be suspended until a new contractor can deploy a functioning CUI. See Plf. App. at V1176-77, 1185.

* Any new contractor would not have a system that could be immediately deployed. See Dft. App., Declaration of Larry J. Schaefer ("Schaefer Decl.") ¶¶ 2-11, at 160-64; Plf. App., Declaration of William S. Hearne ("Hearne Decl.") ¶ 10, at V1573 (admitting that the Carlson eTravel system would have

to be modified to satisfy DTS requirements); Statement of Facts ¶¶ 38-40, at 52-57.[5]

* It will likely take years for a new contractor to develop a functioning CUI. Cf. Dft. App., Schaefer Decl. ¶¶ 2-11, at pp. 160-64; Plf. App., Hearne Decl. ¶ 10, at V1573.
* Like Northrop Grumman, the new contractor would have to make its system compatible with the Government's existing or so-called "legacy systems." See Dft. App., Schaefer Decl. && 3-6, 8, at pp. 160-63, 169-84; Statement of Facts ¶¶ 39-40, at pp. 55-57.[6]
* The process of integrating the new contractor's system with the "legacy systems" takes considerable time, effort, and resources. See Plf. App. at V1176; Dft. App., Schaefer Decl. ¶¶ 3-8, at 160-63, 172-198, 350-373.

In the end, this Court rationally concluded that:

* The overwhelming public interest in this matter is in avoiding further delay in this project.

---

[5]See also Dft. App., Schaefer Decl. ¶¶ 3-5, at 160-62, 169-84 (indicating that the scope of the DoD's DTS requirements far exceeds that of the eTravel service); Dft. App., Schaefer Decl. ¶ 7, at 162, 196 (stating that DTS encompasses standard business processes across DoD for authentication (integrating with the DoD public key infrastructure) and for electronic interface to the DoD financial systems).

[6]See also Deft. App. Schaefer Dec., ¶ 7, at 162, 173 ("The DoD financial systems' electronic interfaces (which include those to accounting, disbursing, and vendor pay systems) account for the vast majority of the projected savings from DTS."); Dft. App., Schaefer Decl. ¶ 8, at 163, 173, 351-56 ("The DTS Contract, both as originally awarded and as restructured, requires continuing integration, particularly with the many DoD financial systems and the DoD Archive, to achieve the DoD vision of a seamless end-to-end system.)

* The significant delay and cost to the Government outweighs any injury to Carlson.

* Both the delay in bringing suit and the status of the DTS DTR-6 contract at the time Carlson filed its Complaint weigh against the injunctive relief sought by plaintiff.

See Order at 24-25. That these conclusions are clearly supported by the administrative record is underscored by one of the principal exhibits submitted and relied upon by Carlson in this action - the Inspector General's Report and its attachments.[7] As this exhibit states:

* "Suspension would be tantamount to termination for the Program." Plf. App. at V1176-77.

* "An order to suspend funding would immediately cease all work under existing government contracts, which would then lead to termination costs and contractual liabilities to DoD." Id.

* "Funding and support for military and civilian personnel would also cease." Id.

* "In addition, thousands of existing DTS users would be forced to revert to the old, inefficient travel processes." Id.

* "A determination would then have to be made as to whether or not the program was on track to effectively re-engineer the DoD travel process." Id.

* "If a continuation decision were reached, the restart impacts to all facets of the program would be significant." Id.

---

[7]Notably, the bulk of the documents that support the Court's public interest conclusion were placed in the record by Carlson. Carlson has already sufficiently created a record on this issue.

This Court was well justified in concluding in its July 26, 2004 Order that the public interest in this case weighed in favor of denying Carlson's request for equitable relief, regardless of whether the Government violated CICA (which the Court did not determine). The record clearly and sufficiently supports this Court's conclusions, and Carlson's request to supplement the record should be denied as the wasteful and desperate act that it so obviously is.[8]

CONCLUSION

Carlson has presented no credible argument that this Court overstepped its bounds, abused its discretion, or acted contrary to the facts or the law of this case in entering judgment for the United States on Counts I and II of Carlson's Amended Complaint. Because Carlson simply tries to prolong its fight, and rehash issues that were already before this Court, this Court should exercise its sound discretion and deny Carlson's Motion for Reconsideration.

For those reasons, defendant, the United States, respectfully requests that this Court deny Carlson's motion for reconsideration.

Respectfully submitted,

[8]Carlson's contention that the March 2004 DTS PMO handout provided at the May 18 hearing suggests deficiencies in DTS lacks merit. So interpreted, the handout contradicts Carlson's acknowledgment at the May 18 hearing that IOC has been declared as of the first quarter of FY 2004. All the handout shows is the activity of DTS to issue progressively more sophisticated versions of the CUI. The addition of incremental functions to subsequent versions of the software hardly indicates functional omissions and Carlson has not explained the nature of any functional omissions. Likewise, Carlson's contention that the public interest determination in the July 26 Opinion and Order should not consider Carlson's delay in filing suit misses the mark. Even if the delay could not have been avoided (which the record establishes is simply not the case), it clearly bears upon the public interest in issuing an injunction.

Peter D. Keisler
Assistant Attorney General

David M. Cohen
Director

/s/ Franklin E. White, Jr. by Patricia M. McCarthy
Franklin E. White, Jr.
Assistant Director

/s/ David A. Levitt
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
202-307-0309
202-514-7965, fax

CERTIFICATE OF FILING

I hereby certify that on September 23, 2004, a copy of the foregoing Opposition Of Defendant, United States, To Plaintiff's Motion For Reconsideration was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt