**REDACTED VERSION**
**FOR PUBLIC RELEASE**

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** <br> **Plaintiff,** <br> **v.** <br> **THE UNITED STATES OF AMERICA,** <br> **Defendant,** <br> **and** <br> **NORTHROP GRUMMAN SPACE AND MISSION SYSTEMS CORPORATION,** <br> **Defendant-Intervenor.** | ) | **Case No. 03-1274C** <br> **Judge George W. Miller** |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION**

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Attorneys for Plaintiff*

Dated: October 7, 2004

REDACTED VERSION
FOR PUBLIC RELEASE

## TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

ARGUMENT ..... 1

I. THE COURT CANNOT TURN A BLIND EYE TO A VIOLATION OF THE COMPETITION IN CONTRACTING ACT ..... 2

A. The Court's Decision Creates A Prohibited Exception To CICA's Mandate For Full And Open Competition ..... 3

B. The Tucker Act, The APA, And The CICA Require The Court To Remedy A Violation of the CICA ..... 4

C. The Court Must Act To Enforce The CICA Either By Issuing An Injunction Or Some Other Order Pursuant To The Supreme Court's Ruling In United States v. Oakland Cannabis Buyers Cooperative ..... 5

II. THE RECORD BEFORE THE COURT DID NOT PERMIT ENTRY OF JUDGMENT PURSUANT TO RULE 56 OR 56.1 OR PERMIT REQUISITE FINDINGS PURSUANT TO RULE 52 ..... 8

A. Rule 56.1 Is Not A Vehicle To Decide Whether Injunctive Relief Is Appropriate ..... 9

B. Facts Were In Dispute On The Issue And Summary Judgment Was Not Appropriate. 11

C. Rule 52 Requires Findings Of Fact On Issues of Injunction ..... 11

III. THE RECORD LACKS FACTUAL SUPPORT FOR THE COURT'S DETERMINATION THAT THE BALANCE OF HARDSHIPS AND THE EFFECT ON THE PUBLIC INTEREST FAVORS THE GOVERNMENT ..... 11

A. The Record Fails To Support The Court's Assumption That It Would Take A New Contractor "Considerable Time, Effort, And Resources" To Make Its System Compatible With the Government's Legacy Systems ..... 12

B. The Record Fails To Support The Court's Assumption That "Any New Contractor Would Not Have A System That Could Be Immediately Deployed" ..... 13

C. The Record Fails To Support The Court's Assumptions That Granting An Injunction Would Cause Increased Delays And Costs, Or That The DTS Is "Substantially Complete" ..... 16

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

D. The Record Fails To Support The Court's Assumption That The Increased Need For Military Travel Due To World Events Favors Maintaining The Illegal Contract ......... 19

CONCLUSION ......... 20

APPENDIX

Col. Brandy Johnson, *Defense Travel System: The Way Ahead* (March 2004) ........APPENDIX 1

Program Management Office – Defense Travel System, *Defense Travel System (DTS): Acquisition Strategy* (May 6, 2003) ......... APPENDIX 6

Letter from Butler to Offerors of 9/20/04 ......... APPENDIX 8

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

# TABLE OF AUTHORITIES

**Cases**

*Bank Note Corp. of Amer., Inc. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004) ..................... 10

*Biodiversity Legal Foundation v. Norton*, 309 F.3d 1166 (9th Cir. 2002) ..................................... 4

*Celotex v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 10

*Ctr. for Biological Diversity v. England*, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003) ................. 7

*Ctr. for Biological Diversity v. Pirie*, 201 F. Supp. 2d 113 (D.D.C. 2002) ............................... 7, 8

*CW Gov't. Travel v. United States*, No. 03-1274C (Fed. Cl. July 26, 2004) ........................ passim

*Dismas Charities v. United States*, 61 Fed. Cl. 191 (2004) ........................................................ 11

*Duncan v. Walker*, 531 U.S. 167 (2001) ................................................................................ 5

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) ....................................................................... 12

*Hadley v. United States*, 229 Ct. Cl. 591 (1981) ....................................................................... 7

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ............................................................................. 6

*TVA v. Hill*, 437 U.S. 153 (1978) ........................................................................................ 4

*United States v. Mass. Water Res. Auth.*, 256 F.3d 35 (1st Cir. 2001) ........................................ 4

*United States v. Oakland Cannabis Buyers Cooperative*, 532 U.S. 483 (2001) ............................ 6

*Williams v. Jones*, 11 F.3d 247 (1st Cir. 1993) ........................................................................ 4

**Statutes**

10 U.S.C. § 2304 ........................................................................................................ 2, 3

41 U.S.C. § 253 ............................................................................................................ 2

**Rules**

Rule 52 ...................................................................................................................... 11

Rule 56.1 ................................................................................................................... 11

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

**Treatises**

9 *Moore's Federal Practice*, § 52.10[2][c] .......... 11

## ARGUMENT

CW Government Travel, Inc. ("Carlson") submits this memorandum in response to the Defendant's Opposition and in further support of its Rule 59(e) motion to reconsider, alter and amend the judgment of July 26, 2004. The Court's decision exceeded its authority and rested on issues not properly raised by the Government, not addressed by the parties in their submissions, and on assumptions that are belied by evidence that could have been presented if the issues were properly raised.

The Government's Opposition seeks to perpetuate the error. First, the Government misconstrues Supreme Court precedent in arguing that the Court may turn a blind eye to the Government's illegal procurement activities. The Competition in Contracting Act (the "CICA") mandates competition and exceptions to this mandate are creatures of Congressional action, not judicial discretion. Likewise, the Administrative Procedures Act (the "APA") requires that the illegal conduct be declared invalid and set aside. While the Court may have discretion in fashioning a remedy, that discretion does not extend to the determination of whether the statue will or will not be enforced. Supreme Court precedent makes clear that in balancing the competing interests for entry of an injunction, the Government cannot claim, as it does here, the benefits of the illegal conduct as a basis for refusing an injunction.

Second, whether the Court should issue an injunction was not raised by the Government and was not properly before the Court. Contrary to the Government's new position, this issue was not and could not be decided on the administrative record since the availability of injunctive relief is not an issue that was before or was decided by the agency. Rather, the Court had to consider additional evidence on those key points, but the record was never supplemented to

REDACTED VERSION
FOR PUBLIC RELEASE

address the key assumptions adopted by the Court. Likewise, the issue was not decided on summary judgment since the facts necessary to balance the various factors were not submitted to the Court and certainly were not undisputed.

Third, if the record was supplemented, the assumptions that the Court relied on fall away. Both the assumed hardship to the Government and the assumed inability of the Government to efficiently procure replacement services is overstated. Indeed, the record as it stands established that the Government should have competitively procured the restructured contract in 2001, but instead secretly entered into an unlawful contract modification which it deliberately concealed from the public for almost two years. The Court's opinion that it is beneficial to the Government to allow the unlawful contract to continue rewards prohibited conduct.

## I. THE COURT CANNOT TURN A BLIND EYE TO A VIOLATION OF THE COMPETITION IN CONTRACTING ACT

The CICA prescribes the most fundamental rule in Federal Government contracting: Federal agencies must solicit and procure products and services via "full and open competition through the use of competitive procedures . . . ." 10 U.S.C. § 2304(a)(1); 41 U.S.C. § 253(1)(a). The Government's Opposition ignores the mandate of the CICA and condones the creation of a new exception already rejected by Congress. Congress has limited the Court's discretion to fashion equitable relief in the face of a violation of the CICA. Through the Tucker Act, the APA, and the CICA, Congress has mandated that prohibited procurements must be set aside. Even if Congress did not require the Court to issue an injunction, the Court cannot decline to enforce the statute and it is error as a matter of law for the Court to weigh the benefits of the illegal procurement in fashioning a remedy.

REDACTED VERSION
FOR PUBLIC RELEASE

### A. The Court's Decision Creates A Prohibited Exception To CICA's Mandate For Full And Open Competition

The Court created a prohibited exception to the CICA when it decided that the hardship to the Government and effect on the public interest warranted failing to enforce the CICA mandate for full and open competition. When Congress mandated that the Government procure goods and services under full and open competition, it took the added step of specifying the only permitted exceptions to that mandate. None of the Congressionally authorized exceptions to the CICA mandate are applicable to the facts in this case. Moreover, Congress specifically rejected the reasoning urged by the Government as a basis to refuse to enforce the statute:

> In no case may an executive agency –
>
> (A) Enter into a contract for property or services using procedures other than competitive procedures on the basis of the lack of advance planning or concerns related to the amount of funds available to the agency for procurement functions.

10 U.S.C. § 2304(f)(5). The Agency identified the need to totally restructure the DTS DTR-6 Contract in early 2001, spent a year secretly negotiating the restructure of the Contract, and then hid those contract modifications from the public until November 2003.

The Agency could and should have commenced a competitive procurement for the restructured contract terms and technical requirements in 2001, as required by the CICA. All of the factors urged by the Government and relied upon by the Court as justification for refusing to enjoin the unlawful contract result directly from the delay to timely issue a competitive procurement on the restructured contract terms and technical requirements, a delay caused by the Agency's "lack of advance planning."

REDACTED VERSION
FOR PUBLIC RELEASE

### B. The Tucker Act, The APA, And The CICA Require The Court To Remedy A Violation of the CICA

The Government argues that the Court is not required to "set aside" an illegally modified contract. The Government's argument fails because it is based solely on the Tucker Act and non-binding decisions and ignores the synthesis of the Tucker Act with the APA and the CICA. The Government also relies on inapplicable case law that does not involve a violation of the CICA.

The Tucker Act and the APA, along with the CICA, provide a clear and valid legislative command directing the Court to issue an injunction upon finding that an agency unlawfully modified a contract. The Government focuses entirely on the Tucker Act, an analysis that is too narrow. In determining whether Congress has required a court to issue an injunction to remedy a statutory violation, courts have looked to "not only . . . the 'language, history and structure'" of the statue but also "the 'underlying substantive policy' that the statutory procedures are designed to further." *United States v. Mass. Water Res. Auth.*, 256 F.3d 35, 48 (1st Cir. 2001) (quoting *Williams v. Jones*, 11 F.3d 247, 256 (1st Cir. 1993) and *TVA v. Hill*, 437 U.S. 153, 174 (1978)). Thus, "when federal statutes are violated, the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal Foundation v. Norton*, 309 F.3d 1166, 1177 (9th Cir. 2002) (citing *TVA v. Hill*, 437 U.S. at 194). Consequently, it is appropriate to look at the Congressional goal behind the Tucker Act and the incorporated section of the APA, as well as the CICA, in determining the extent of Congress's direction.

The Tucker Act incorporates Section 706 of the APA (codified at 5 U.S.C. § 706) which directs the court to "declare unlawful and set-aside" illegal agency action. The Government's

REDACTED VERSION
FOR PUBLIC RELEASE

implied argument that Section 706 provides *only* the standard of review eviscerates Section 706 of any meaning. It is a settled rule of statutory interpretation that a court must give meaning and purpose to every clause and word of the statute. *Duncan v. Walker*, 531 U.S. 167, 173-74 (2001) (noting that court's should not treat statutory words as "mere surplusage"). The Government effectively removes the words mandating that the court "shall . . . hold unlawful and set aside agency action" it determines are illegal – rendering Section 706 meaningless.

Furthermore, the Court must also look to the CICA. Congress has specifically defined when an agency may use other than competitive procedures. None of those exceptions apply here and the Court may not create new exceptions. Finally, the Court of Federal Claims cases cited by the Government are inapplicable to the issue before the Court. None of those cases involve violations of the unique and specific provisions of the CICA that bring to bear the full brunt of Congress's authority and limit the discretion of the Court to a degree not generally found in bid protest cases.

### C. The Court Must Act To Enforce The CICA Either By Issuing An Injunction Or Some Other Order Pursuant To The Supreme Court's Ruling In *United States v. Oakland Cannabis Buyers Cooperative*

The Government argues that Carlson interprets *United States v. Oakland Cannabis Buyers Cooperative*, 532 U.S. 483 (2001) to hold that "an underlying statutory violation unvaryingly mandates the issuance of an injunction." That is incorrect. *Oakland* stands for two propositions directly at issue in this case. First, an underlying statutory violation mandates the enforcement of the statute. Second, the Court cannot consider the purported benefits of the continuing prohibited action or the consequences of compliance in weighing the factors to determine the appropriate remedial order.

*Oakland* restated the general rule that when trial courts "are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise" to fashion injunctive relief. *Id.* at 496 (discussing *Hecht Co. v. Bowles*, 321 U.S. 321 (1944) and *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)). *Oakland* further defined the scope of a court's exercise of that discretion: "[The Courts'] choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all." *Oakland*, 532 U.S. at 497-98. Consequently, in weighing the factors of injunctive relief, the Court may not decline to afford relief after finding a violation of the CICA, but may weigh the various means of enforcing the statute.[2] As explained by a court applying the *Oakland* reasoning, "[I]f, after examining a statute to determine whether Congress has restricted the traditional equitable discretion, a court concludes that discretion remains, the court can *not* exercise its discretion to provide no relief." *Ctr. for Biological Diversity v. Pirie*, 201 F. Supp. 2d 113, 120 (D.D.C. 2002) (citing *United States v. Oakland Cannabis Buyers Cooperative*, 532

---

2 The Government argues that Carlson's interpretation of *Oakland* is inconsistent with prior case law and that the Court did not reach the issue related to injunctive relief. That argument was directly refuted by the *Oakland* Court, where it noted how previous cases had compared various methods of enforcing the statute rather than enforcement versus non-enforcement. *Id.* at 498 n.9. The Government's reliance on Justice Stevens' concurring opinion underscores its unwillingness to appreciate the import of the decision. Justice Stevens concurred in the judgment of the Court, but did not concur with the reasoning by the majority of the Court. *Id.* at 485. Indeed, the Opinion of the majority of the Court noted but found unpersuasive Justice Stevens' concerns. *Id.* at 495 n.8.

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

U.S. 483, 497 (2001)), *vacated on other grounds*[3] *sub nom.*, *Ctr. for Biological Diversity v. England*, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003).

Because the Court must enforce the statute it may only balance the range of potential remedies. *Oakland,* 532 U.S. at 498; *Ctr. for Biological Diversity*, 201 F. Supp. 2d at 120. In balancing the equities of the case, the Supreme Court has made clear that this Court may not consider the benefit of the prohibited act should it be allowed to continue, or the harm that could come from enforcement of the statute. *Oakland*, 532 U.S. at 498 (stating that courts of equity "may not consider the advantages and disadvantages of nonenforcement of the statute . . . ."); *Ctr. for Biological Diversity*, 201 F. Supp. 2d at 122 ("The Supreme Court has arguably narrowed the scope of what the Court can consider in balancing the equities to exclude evidence of harm to defendants that will occur" if the statute is enforced). As a result:

> [P]rior to considering the balance of the equities in this case, the Court should determine the scope of the possible remedies available to be considered. Supreme Court precedent is clear that the range of potential remedies considered by a district court must include only remedies aimed at securing prompt compliance with the statute being violated by defendants. . . . Regardless of the balance of the equities at stake here and contrary to defendant's assertions at oral argument, this Court can not decide to offer plaintiff no relief.

*Ctr. for Biological Diversity v. Pirie*, 201 F. Supp. 2d at 120.

In *Oakland*, the Supreme Court found that the Court of Appeals erred by ordering the trial court to consider the advantages or disadvantages of nonenforcement. *Id.* at 497-98. Accord, *Center for Biological Diversity,* 201 F. Supp. 2d at 121-22 (noting that: "This Court

---

3 The Court of Appeals for the D.C. Circuit vacated the opinion of the District Court after Congress passed a statute expressly permitting the violation of law at issue. *Ctr. for Biological Diversity v. England*, 2003 WL 179848, at *1 (D.C. Cir. Jan. 23, 2003). Nevertheless, the reasoning of the court's decision remains valid. *See Hadley v. United States*, 229 Ct. Cl. 591, 594-95 (1981) (noting that a court's reasoning is untouched by vacatur).

REDACTED VERSION
FOR PUBLIC RELEASE

cannot and will not read into the MBTA an exception that Congress has not included in the statute.")

The Court's July 26, 2004 ruling is contrary to the Supreme Court's decision in *Oakland.* First, the Court allowed a statutory violation to continue unabated. Further, the Court's balancing of the equities ranged outside the scope of considerations provided in *Oakland* by considering the advantages and disadvantages of nonenforcement of the statute. As described above, Congress prohibited agencies from procuring products and services without competitive procedures, except in express circumstances. Consequently, the Court could not properly consider the advantages and disadvantages of continued performance of the prohibited modifications to the DTS DTR-6 Contract. Yet, in balancing the hardships, the Court only considered the disadvantages of enforcing the statute, i.e., the assumed harm of delay and added cost to the Government. Further, in considering the effect on the public interest, the Court only considered the benefit should the contract be allowed to continue. The Supreme Court held that to the extent it considered "the public interest and the conveniences of the parties, the court [was] limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement remedies." *Oakland*, 532 U.S. at 498. This Court could not, as it did, consider the advantages and disadvantages of nonenforcement of CICA's mandate for competition.

## II. THE RECORD BEFORE THE COURT DID NOT PERMIT ENTRY OF JUDGMENT PURSUANT TO RULE 56 OR 56.1 OR PERMIT REQUISITE FINDINGS PURSUANT TO RULE 52

The Government's Motion for Summary Judgment raised three issues: (1) Carlson lacked standing to challenge modifications to the DTS-DTR-6 Contract; (2) Carlson's challenge was untimely; and (3) the modifications to the contract did not violate the CICA. Carlson

REDACTED VERSION
FOR PUBLIC RELEASE

prevailed on each of those three issues. The decision to enter judgment in favor of the Government, apparently prompted by positions asserted by the Government for the first time at oral argument, followed a different path; Carlson did not establish a right to injunctive relief. That issue was not, and could not be, decided on the administrative record pursuant to Rule 56.1 since it did not involve review of an agency decision. That issue could not be decided pursuant to Rule 56 because the Government never met its obligation to affirmatively point to the factual and legal basis for judgment, supported by undisputed facts. *Celotex v. Catrett,* 477 U.S. 317 (1986). Third, to the extent that this case was going to be decided on the basis of whether an injunction was appropriate, then additional evidence had to be taken and findings of fact rendered in accordance with Rule 52 of the Rules of the Court of Federal Claims.

### A. Rule 56.1 Is Not A Vehicle To Decide Whether Injunctive Relief Is Appropriate

The Government contends that Rule 56.1 was the appropriate procedural vehicle for the entry of judgment and that the Rule does not require judgment based on undisputed facts. Both contentions are incorrect. First, Rule 56.1 is not the appropriate mechanism to address the issue decided by the Court; namely, that the balance of hardships and public interest did not favor the issuance of an injunction. As noted by the Court, Rule 56.1 is a procedural tool unique to the Court of Federal Claims and "is often an appropriate vehicle to scrutinize an agency's procurement actions because such cases typically involve interpretation of contract documents or regulations, thereby presenting no disputed issues of material fact." *Bank Note Corp. of Amer., Inc. v. United States,* 365 F.3d 1345, 1352 (Fed. Cir. 2004). Significantly, in arguing that the Rule does not require undisputed facts, the Government notes that statements and counterstatements of facts used for Rule 56.1 "argue the significance and weight accorded to the

*facts that were the basis for the agency decision.*" Gov't. Opp. p. 13 (quoting *Dismas Charities v. United States,* 61 Fed. Cl. 191, 198 (2004)) (emphasis added).

Here, the issue raised and decided was not an issue involving the "interpretation of contract documents or regulations." Indeed, the Court had already decided that the administrative record did not allow it to resolve whether a violation had occurred. There was no agency decision to review and no administrative record on the issue of whether an injunction was an appropriate remedy. That is a uniquely judicial activity. Because the issue of whether Carlson was entitled to injunctive relief did not involve the review of an agency decision, Rule 56.1 had no application.

The Government's second argument is that Rule 56.1 does not require undisputed facts. This argument is a tacit admission that the facts were in dispute. Regardless, it is wrong. As this Court noted, "a motion for judgment on the administrative record shall be treated in accordance with the rules governing motions for summary judgment, with the exception that any supplementation of the administrative record shall be by stipulation or by court order only." *CW Gov't. Travel v. United States,* No. 03-1274C, slip op. at 14 (Fed. Cl. July 26, 2004); *see also Bank Note Corp.,* 365 F.3d at 1352-53 (Motion for Judgment on the administrative record is decided "by applying the summary judgment standard.") Thus, judgment can only be rendered when material facts are not in dispute.

If the issue was to be addressed pursuant to either Rule 56 or 56.1, Carlson had to be afforded the opportunity to present the appropriate evidence. Indeed, the Court of Federal Claims has consistently recognized that supplementation of the record is appropriate to address an agency's failure to act or to address issues of appropriate relief. *See Esch v. Yeutter,* 876 F.2d 976 (D.C. Cir. 1989). Significantly, the Court recognized at oral argument that the new issues

REDACTED VERSION
FOR PUBLIC RELEASE

being raised by the Government were issues that would require additional evidence. Trans., pp. 61-63. The procedure utilized to address this point short-circuited the judicial process and did not provide the Court with the requisite opportunity to address the issue on a developed record.

### B. Facts Were In Dispute On The Issue And Summary Judgment Was Not Appropriate

Significantly, in response to Carlson's detailed explanation that the facts regarding the appropriateness of injunctive relief were in dispute, the Government said nothing. The Government's contention that Rule 56.1 does not require undisputed facts is wrong. But it is a tacit admission that facts were in dispute on the critical issue on which the Court based its decision.

### C. Rule 52 Requires Findings Of Fact On Issues of Injunction

The motion by the Government evolved into a de facto argument against an injunction that the Court ultimately accepted. Rule 52 requires that specific factual findings must be made in any action in which the Court grants or refuses an injunction, and while the Rule refers to interlocutory injunctions, its requirement "extends to actions seeking permanent injunctions." 9 *Moore's Federal Practice,* § 52.10[2][c]. The Court decided the entire case on the issue of whether an injunction should issue. It was not able to do so on undisputed facts nor on an administrative record. Accordingly, there was a need for an evidentiary hearing and findings pursuant to Rule 52.

## III. THE RECORD LACKS FACTUAL SUPPORT FOR THE COURT'S DETERMINATION THAT THE BALANCE OF HARDSHIPS AND THE EFFECT ON THE PUBLIC INTEREST FAVORS THE GOVERNMENT

The facts in the record do not support the Court's assumptions regarding hardships and the public interest. To the extent the record contains any facts necessary to balance the equities,

REDACTED VERSION
FOR PUBLIC RELEASE

those facts clearly are in dispute or favor Carlson, as demonstrated by the parties' briefs throughout the proceedings.[4] Otherwise, as the Court expressly acknowledged with regard to several key facts, the record is incomplete and therefore does not contain support for the factual assumptions on which the Court relied.

### A. The Record Fails To Support The Court's Assumption That It Would Take A New Contractor "Considerable Time, Effort, And Resources" To Make Its System Compatible With the Government's Legacy Systems

The Court erroneously assumed that "a new contractor would have to make its system compatible with the Government's existing or so-called 'legacy systems' – *a process that takes considerable time, effort, and resources*." *CW Gov't Travel v. United States*, No. 03-1274C, slip op. at 24 (Fed. Cl. July 26, 2004) (emphasis added). There is no evidence in the record to support the Court's assumption. At no point during these proceedings was evidence – as opposed to argument – submitted regarding the technological requirements to integrate with the Government's legacy systems or, for that matter, whether other existing web-based travel systems could integrate with the Department of Defense's ("DoD") legacy systems without considerable time, effort or resources.

Furthermore, the Court's factual assumption is intertwined with the unresolved question of whether the deletion of the client/server mode technical requirement and shift to only a web-based system constituted a cardinal change. As the Court acknowledged, the "record as it currently stands is incomplete and does not contain sufficient information for the Court to answer" that question. *Id.* at 22. Carlson contends that the technical change was a cardinal change in large measure because it significantly reduced the complexity of the technical

---

4 As set forth below, the Court overlooked evidence in the record that is contrary to the assumptions relied upon, primarily because this issue was not briefed by the parties.

requirements – *particularly in light of the fact that a web-based system is far easier to integrate with legacy systems than a client/server mode system.*[5]

If the Court sought evidence about the impact and effect of this cardinal change, the Court would discover that performing the necessary interface with DoD legacy systems can be accomplished in a matter of months with a web-based system, such as those available under the General Services Administration's ("GSA") eTravel System Contract.[6] Thus, that evidence would directly counter the Court's assumptions.[7]

### B. The Record Fails To Support The Court's Assumption That "Any New Contractor Would Not Have A System That Could Be Immediately Deployed"

The Court acknowledged in its decision that it is unable to determine from the existing record whether Carlson's GSA e-Travel System met the DTS contract requirements or whether Carlson had substantially the same capability as Northrop Grumman possessed in 2002 to fulfill

---

5 Barbie Tarr, the Director of IT Processes of Carlson, stated that Carlson started development of a web-based, end-to-end Government travel management system in 2000 and believed "that a web-based product would be far more efficient and would eliminate the labor-intensive and complex software integration effort required for a client/server-based product." (Tarr Decl., Plaintiff's App. 71, ¶ 5.) William S. Hearne stated that "this change in requirements substantially reduces the complexity and the extent of computer software integration efforts required under the DTS Contract." (Plaintiff's App. 72, ¶ 7.)

6 Task orders issued under the GSA eTravel System Contract generally require Northrop, Carlson or EDS to implement the procured travel system within two to four months after the task order is issued. Such implementation requires integration with each agency's legacy payment and other systems. The technical characteristics of a web-based system greatly facilitate these integration efforts.

7 The Court also assumed (1) that a resolicitation "would send the most challenging and complex aspects of the project back to the drawing board," (2) that "it will likely take years for a new contractor to develop a functioning CUI" and (3) that a new contractor "would be more than five years behind where Northrop Grumman was when Carlson's complaint was filed." Again, not only is there no record to support these assumptions, but available evidence directly contradicts such assumptions.

the CUI requirements. *Id.* at 13 (stating that "[t]here has been only limited discovery on this issue, with the result that the record is incomplete"). The Court nevertheless makes the unsupported assumption that if the DoD is compelled to comply with the CICA and compete the DTS Contract requirements "any new contractor would not have a system that could be immediately deployed." *Id.* The existing record affords the Court no evidence to determine whether or not Carlson's GSA eTravel System – or any other provider's GSA eTravel System or commercially available system – could be immediately deployed within DoD.

Moreover, the only evidence the Government offers to suggest that the GSA e-Travel Systems could not meet DoD requirements is Larry J. Schaefer's disputed December 8, 2003 Declaration in which he references two out-dated internal studies that compared the DTS and the GSA's planned e-Travel Program. These studies have little relevance, however, given that the first study was performed in December 2002 before the GSA's final solicitation was even issued and the second study was performed in June 2003 before the contracts were awarded. In addition, the Court noted that none of the Declarants were ever deposed and "[i]n this complex case, the Court is not inclined to conduct a trial on declarations." *Id.* at 22.

There are a number of additional reasons why the Court should not attach any weight to Mr. Schaefer's Declaration. Mr. Schaefer claims that the GSA eTravel System Contracts do not entail the detailed requirements called for in the DTS Contract. This argument is deceiving. The GSA eTravel System Contract consists of a master contract that is a Government-wide, multiple award contract. However, agencies order travel services off the GSA eTravel System Contract by issuing Task Orders containing the agency's unique specifications. Accordingly, the detailed

requirements Mr. Schaefer is referring to would be laid out in the agency's Task Order, which contains the agency's "customized" requirements.[8]

The only person with first-hand knowledge about both the DTS System and Carlson's eTravel System[9] is Carlson's Director of Information Technology, William S. Hearne, who also provided a declaration in this case. Mr. Hearne opined that the GSA eTravel Program requirements "as reflected in the Contract awarded to CWGT in August 2003 would quite adequately satisfy all of DoD's actual requirements for an end-to-end travel management system." (Hearne Decl., Plaintiff's App. *72* at ¶ 11). Mr. Hearne further stated that "to the extent the features mentioned in Larry J. Schaefer's Declaration represent legitimate requirements of the DoD for travel management services, they could be readily added to the CWGT eTravel System, known as $E^2$ Solutions." *Id.* at ¶ 12.

The declarations of Mr. Hearne and Barbie Tarr, Carlson's Director of IT Processes, are the only evidence in the record about the capabilities of Carlson's eTravel System to satisfy the DoD requirements for a web-based, end-to-end travel management system. Only a more complete hearing would allow the Court to evaluate this factual issue.

---

8 Moreover, the DTS March 2004 presentation entitled, "The Way Ahead," by Colonel Brandy Johnson (Attached as Appendix Exhibit 1 hereto), points out that there are many DoD requirements not included in the present Jefferson version of DTS. Thus, for Mr. Schaefer to declare that in late 2002 and early 2003 the GSA Solicitation did not require certain features is irrelevant as to whether the GSA eTravel System contractors, such as Carlson and EDS, could provide such capability in the same timeframe as Northrop.

9 Mr. Schaefer had no first-hand knowledge about the actual capabilities of Carlson's or EDS's eTravel Systems, or any other commercially-available system.

### C. The Record Fails To Support The Court's Assumptions That Granting An Injunction Would Cause Increased Delays And Costs, Or That The DTS Is "Substantially Complete"

The record is devoid of evidence about the current capabilities of the web-based end-to-end travel management systems available either commercially or under the GSA eTravel System Contract.[10] In the absence of such evidence, there is no reasonable basis for the Court's assumptions that the termination of the unlawful DTS DTR-6 Contract and an order requiring the DoD to competitively procure a web-based system in compliance with the CICA would result in substantial delay or increased costs to the Government.[11] To the contrary, available evidence shows that the DoD would save substantial money by procuring a web-based, end-to-end travel management system off the GSA eTravel System Contract.

The Court opined that "both the delay in bringing the suit and the status of the DTS DTR-6 contract at the time Carlson filed its complaint cut against granting the relief sought by plaintiff." *CW Gov't Travel*, No. 03-1274C at 25. However, that delay was caused by the Government's secret dealings and deliberate efforts to conceal the existence of the restructured contract modifications from the public. The Government made the decision to restructure the

---

10 In her Declaration (*Plaintiff's Exhibit 71*), Barbie Tarr stated (at ¶ 6) "in developing CWGT's web-based travel management product, we essentially worked to satisfy the DTS requirements for its CUI that were contained in the 1998 Contract awarded to BDM (subsequently TRW, and now Northrop Grumman)." She also stated "we are confident that CWGT's $E^2$ Solutions currently satisfies all essential requirements for DoD travel, and that any enhancements or additional features desired by DoD could be developed and implemented by CWGT without difficulty."

11 The only support offered by the Government that termination for the DTS DTR-6 Contract would cause disruption is a cite to a July 2002 response by the DTS PMO (*V 1176-77*) to the DoD IG's recommendation to terminate the Contract. Such an assertion predates, by years, the availability of competing web-based systems under GSA's current eTravel Systems Contract, and is thus irrelevant.

DTS DTR-6 Contract in April 2001 and negotiated the restructured contract in secret for the next year. The Government concealed the restructured contract modifications from Carlson and the public until November 2003.

When Carlson filed its original Complaint in May 2003, it still did not know of the existence or terms of the restructured contract modifications, only that the modifications must have included the unlawful addition of traditional travel services. After the Government finally released copies of Modifications 25 and 27, Carlson promptly filed an Amended Complaint in November 2003. Accordingly, any delay and costs incurred between the time the Government decided to unlawfully restructure the DTS DTR-6 Contract and the time Carlson filed its Complaint in May 2003 was due to the Government's deliberate efforts to conceal the restructured contract modifications.

The record also does not support the Court's unfounded assumption that the DTS DTR-6 Contract is "substantially complete." *Id.* at 24. The Government has introduced no evidence into the record about the status of the DTS DTR-6 Contract as of May 2003 when Carlson filed its Complaint, the expenditures to date, or any estimates of the cost to complete the Contract as of the time Carlson filed its Complaint.

The "DTS Program Schedule" attached to Colonel Brandy Johnson's March 2004 presentation[12] about the status of the DTS reveals that as of May 2003, when Carlson's Complaint was filed, Northrop had not even started the Initial Operational Test & Evaluation ("IOT&E") of the web-based version of the DTS (i.e., the Jefferson version). That DTS document, and information on the DTS PMO web site, also reveals that Initial Operational

---

12 Introduced to the Court by Plaintiff during the May 18, 2004 Oral Argument and attached hereto as Exhibit 1, for the Court's convenience.

Capability ("IOC") was not achieved until December 5, 2003.[13] Colonel Johnson's presentation also discloses that as of May 2003, the DTS was only being tested in "31 Pilot Fielding Activities" and that operational fielding to 250 sites (out of 11,000 total DoD sites) would not be complete until September 30, 2006.[14] Colonel Johnson's presentation further reveals that three more major revisions to the web-based DTS will be necessary before full operational capability ("FOC") is achieved by September 30, 2006.

The information available to the Court (much of it contained in the GAO Protest record that was not briefed for the Court's benefit) conclusively proves that as of May 2003, when Carlson filed its Complaint, the DTS DTR-6 Contract was not even half complete.[15] Conspicuously, the Government has been careful not to disclose to the Court the actual expenditures, to date, on this DTS Program or the estimates to complete the Program and achieve Full Operational Capability by September 30, 2006. Supplementing the record with this evidence likely would reveal that the expenditures to be incurred after Carlson filed its

---

13 This admission contradicts repeated representations made to the Court that no money was paid to Northrop until after they had achieved Initial Operational Capability.

14 The testimony of DTS PMO personnel and Exhibits introduced at the GAO Protest *Air Trak, et al.* reveal that the client/server versions of DTS being tested at the 31 pilot test sites as of May 2003 had numerous problems and deficiencies that were supposed to be corrected by subsequent versions of the web-based DTS. *Plaintiff's App.* at 85, 87, 90-92.

15 The DoD Program Analysis and Evaluation Report (*Plaintiff's App.* at 15) noted that with release of the web-based only Jefferson version of DTS (mid-June 2003) "just over half of the program functionality will be delivered…" *V 1204*.

**REDACTED VERSION
FOR PUBLIC RELEASE**

Complaint in May 2003 will represent the majority of funds spent on the Project.[16]

### D. The Record Fails To Support The Court's Assumption That The Increased Need For Military Travel Due To World Events Favors Maintaining The Illegal Contract

The Court assumed that the increased need for military travel due to world events favors allowing Northrop to continue performing the illegal contract. New evidence reveals, however, that terminating the DTS DTR-6 Contract now would have only a negligible impact on military travel.[17] The Government's most recent statistics show that even in DTR-6, the prime region for the DTS, *the DTS has been used for approximately only 3% of the total travel transactions.*[18] At Rock Island Arsenal, for example, there were 50,188 trips performed using traditional travel services and *only 102 trips performed with DTS.* This *de minimis* usage of the DTS conclusively demonstrates that not only is the DTS Contract substantially **incomplete** but, more importantly, that terminating the illegal contract would have almost no impact on military travel.

---

16 The DTS Acquisition Strategy document dated 6 May 2003, indicated that prior to FY03, the program expenditures were $199.5 million and that estimated costs for FY03 through FY06 equaled $268.7 million. *V 2891* (see Exhibit 2 hereto for convenience). Colonel Schaefer testified at the GAO on June 9, 2003, that the total DTS Program costs for FY 03 through FY 06 were estimated to be $605 million. *V 1910-1912.*

17 Attached for the Court's convenience is Exhibit 3, which consists of an excerpt of an amendment to the Request for Quotations the DTS PMO released to procure traditional travel services in accordance with the Court's August 12, 2004 Order. In a September 20, 2004 letter, the Government responded to questions that potential vendors had submitted. One bidder asked "what is the total number/percentage of traditional travel, DTS and DTS Touched utilization to date at each of the sites that have already implemented DTS?" The Government identified the few locations within the eight states that are currently connected to the DTS and identified all the travel transactions performed from August 30, 2002 through September 15, 2004.

18 Only 9,655 out of at total 288,348 travel transactions were performed using the DTS, representing 3.35% of the total transactions. Even these numbers are misleading in favor of DTS in that it includes 1,195 "DTS-touched" transactions at Ellsworth AFB, e.g., each required the assistance of a travel agent.

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

## CONCLUSION

For the reasons stated above, as well as those set forth in Carlson's opening memorandum, the Court should grant Carlson's Rule 59(E) Motion to Reconsider and alter and amend the judgment of July 26, 2004 Order.

Respectfully submitted:

/s/Lars E. Anderson

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Sharon A. Jenks
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Attorneys for Plaintiff*

Dated: October 7, 2004

**REDACTED VERSION**
**FOR PUBLIC RELEASE**

## CERTIFICATE OF FILING

I hereby certify that on October 25, 2004, a copy of the foregoing public version of PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION and Exhibits, was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Lars E. Anderson
Lars E. Anderson

::ODMA\PCDOCS\MC1DOCS1\172160\1

# APPENDIX

## APPENDIX TABLE OF CONTENTS

Col. Brandy Johnson, Defense Travel System: The Way Ahead (March 2004) .......... APPENDIX 1

Program Management Office – Defense Travel System, Defense Travel System (DTS): Acquisition Strategy (May 6, 2003) .......... APPENDIX 6

Letter from Butler to Offerors of 9/20/04 .......... APPENDIX 8

# Defense Travel System

## "The Way Ahead"

**March 2004**

Colonel Brandy Johnson
Program Director
(703) 607-1498, ext 100

# Briefing Agenda

- Colonel Brandy Johnson
- *Program Overview*

- Paul Joyce
- *System Enhancements*
- *CTO Data Collection*
- *Partnering with GSA on eTravel*
- *Premium Class Travel Task Force*

- Andrea Carlock
- *CTO Procurement*
- *CTO Outreach*

- Joel Ridenour
- *Transportation & Financial Requirements*

# DTS – Three Primary Efforts



## Two large contracting efforts and business process reengineering wrapped into one program

### *DTS Web Portal & Central Data Center*

- User interaction via Web Portal
- Travel transactions executed from central source
- System of record, electronic arrangement of travel, changing travel, completing vouchers, receiving payment, & archive records
- Security software with digital signature & certifying authority

### *Business Process Reengineering and Fielding*

- Documentation of "as-is" business processes
- Development of "to-be" business processes
- Setup of work flow mgt
- Automation of reengineered process
- 250 high-volume TDY sites ~ 80% of TDY travel volume
- Provide on-site training

### *Consolidation of Commercial Travel Service Procurements*

- Consolidate over 80 contracts managed by over 50 organizations
- Standard requirements for DoD travel services
- Integration of travel services into automated DTS process
- Regional contracts with multiple small business set asides


DEFENSE TRAVEL SYSTEM
DTS Program Schedule
FY 2001
FY 2002
FY 2003
FY 2004
FY 2005
FY 2006
FY 2007
Decision Points
ACAT 1AM
IOC
BMMP MS C
IPR
Madison Fielding
IPR
Monroe Fielding
FRD
FOC
Q.Adams Fielding
CTO Contracts
Test for Pilot Site CTOs
CBD
RFPs
Awards
Small Business Set-Aside
CTO Conversion Complete
Operational Test
Washington (1.3) Operational Assessment
Jefferson IOT&E
Madison Delta
Monroe Delta
Q.Adams Delta
Major Software Releases
Adams (1.4)
Enhanced Jefferson
Jefferson (1.5)
RFD
Madison (1.6)
RFD
Monroe (1.7)
RFD
Q. Adams (1.8)
RFD
Fielding
Phase I
31 Pilot Fielding Activities
Extension (4 Additional Pilots approved)
Phase II (250 sites, 80% of DoD TDY volume)
Phase III (Service and Agency Responsibility)

# Defense Travel System

## System Enhancements

Paul Joyce
Chief, Travel Management Division
(703) 607-1498, ext 116

# Evolutionary Development
# DTS Block I

## 2003

**Jefferson (1.5)**

- CBA Reconciliation
- Group Travel Phase 1
- Plot Phase 1
- Read Only
- Deployment Automation Tool
- Pull Down Menus
- Schedule Partial Payment
- Ticketing (Multiple and P&R)
- Cancellation
- Profile Validation
- DTA Maintenance
- TTRA
- 3 Tier Architecture

**Jefferson Enhancements**

- Full Web Functionality
- DTS Reports
- Non-Compliance Reason Codes
- GDS Enhancements
- Operational Enhancements
- CTO Enhancements
- GSA City Pair Enhancements
- Federal Premier Lodging Program Enhancements

## 2004

**Madison [illegible]**

Part A
- User Management
- Multiple Accountable Station
- Positive Acknowledgement
- Local Vouchers
- DGD Interface

Part B
- Deployment Tools

**Part C**
- CBA Part II and Part III Improvements **

**Part D**
- Import/Export Function -Reserve / Guard Travel

**Minor Functionality Capabilities**
- 2nd Central Data Center
- Charge Card Interface
- Operational Enhancements

## 2005

**Monroe (1.7)**

Part E
- Constructive Travel
- PLGT Phase 2

Part F
- Group Travel Phase 2
- MEPS

**Part I**
- Budget Module Redesign
- Fund Certification
- Expenditure Authority FMS

**Part J**
- Reason Codes
- Audit Trail

**Other Monroe Capabilities**
- CTO Initiated Transactions
- CTO Route to Traveler
- Direct Vendor Reservations
- DIA Requirements
- PCS Travel (Computation)
- Operational Enhancements
- Charge Card Controls

## 2006

**Q. Adams (1.8)**

- Transportation Officer Reports
- DIMHRS Interface
- Operational Enhancements
- Debt Management - Interface to Pay Systems

**Other Q. Adams Capabilities**

- Lodging Interface
- GATES Interfaces
- Reserve/Guard Travel

# Defense Travel System (DTS)
# ACQUISITION STRATEGY

FOUO Procurement Sensitive

6 May 2003

This document is controlled by the
PROGRAM MANAGEMENT OFFICE - DEFENSE TRAVEL SYSTEM
A printed copy of this document is an uncontrolled copy.

PROTECTED MATERIAL
[illegible] BE DISCLOSED ONLY IN ACCORDANCE [illegible]
[illegible] ACCOUNTING OFFICE PROTECTIVE [illegible]

V 2867
**Appendix 7**

### 6.2 Funding

The following table portrays program funding for prior years, current year (FY 03), and the program years (FY 04 -09). The Total Funding dollar amounts in the table below are from the 2004 Presidents Budget request. The estimated costs in the table below are from the Joint Reconciliation Document (JRD) and represent the reconciled cost estimate between the 2003 Program Office Estimate and the 2003 Component Cost Analysis. The JRD will be used in the 2003 economic analysis.

**Table 6-1 DTS Cost Estimates and Program Funding (in Millions)**

| | Prior | FY03 | FY04 | FY05 | FY06 | FY07 | FY08 | FY09 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| QUANTITIES | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | | | | | | | | |
| RDT&E (2004 PB) | 28.0 | 29.3 | 31.8 | 28.6 | 20.0 | 12.3 | 20.0 | 11.9 |
| | | | | | | | | |
| O&M (2004 PB) | 171.5 | 58.7 | 38.4 | 26.4 | 23.5 | 12.0 | 11.2 | 9.8 |
| | | | | | | | | |
| TOTAL FUNDING (2004 PB) | 199.5 | 88.0 | 70.2 | 55.0 | 43.5 | 24.3 | 31.2 | 21.7 |
| | | | | | | | | |
| (2003 JRD ESTIMATE | 199.5 | 90.2 | 72.4 | 58.8 | 47.3 | | | |
| | | | | | | | | |
| Delta (Help Desk Costs) - Estimated) | 0 | (2.2) | (2.2) | (3.8) | (3.8) | | | |

The 2004 President's Budget request amounts now in place are sufficient to fund DTS Block I

There are potential Help Desk costs associated with the Joint Reconciliation Document. However, the PMO-DTS believes these costs will be addressed through a combination of efforts with the DTS prime contractor, such as:

- Use of an industry leading Help Desk support tool (Support Magic from Network Associates, Inc.), which was implemented in April 2003, and has commercial experience of significantly improving help desk functions (Automated Help Desk systems normally reduce costs by 30%).
- Significant improvements being delivered with the Enhanced Jefferson software release

**DEPARTMENT OF THE ARMY**
ARMY CONTRACTING AGENCY
INFORMATION TECHNOLOGY, E-COMMERCE
AND COMMERCIAL CONTRACTING CENTER
2461 EISENHOWER AVENUE
ALEXANDRIA, VA 22331-1700

SFCA-IT-B

September 20, 2004

SUBJECT: REQUEST FOR QUOTATION (RFQ) NO. W91QUZ-04-T-0016. CTO TRAVEL SERVICES WITHIN DEFENSE TRAVEL REGION 6 (DTR6). AMENDMENT 02

TO OFFERORS:

Provided at enclosure to this letter is response to vendor questions and associated revisions to applicable RFQ sections.

The proposal due date of 23 September 2004 remains unchanged, however, offerors are allowed to submit a revised proposal based upon the lastest information provided in Amendment 02. The revised proposal must be submitted by close of business on 28 September 04.

Sincerely,

(s)

PEGGY W. BUTLER
Contracting Officer
United States of America

**Appendix 9**

**Q1: Is it possible to bid specifically on the DTS portion of the contract singularly?**

A1: No. Each bid must include all priced CLINs and SLINs. Reference RFQ paragraphs C.4.1; L.5.7; and L.6.3.3.1.

**Q2: It appears that the total life of the contract is one year only, including all extensions. Please confirm that this is correct? If so, is the Government planning to reprocure the service for DTR6 in 2005 or is it planning to use some other means of service as of the end of October 2005?**

A2: The maximum life of the order is 12 months, if all options are exercised. As stated in the RFQ, the Base period is five months, Option 1 is six months, and Option 2 is one month. The Government is not obligated to exercise any of the options. Pursuant to solicitation number W91QUZ-04-R-0007, the Government is currently in the process of competing the DTR-6 MEPS services requirements with an anticipated performance start date no earlier than 1 Apr 05. The Government intends to reprocure the remaining non-MEPS DTR6 services in FY05. A Request for Proposal is being prepared and will be issued in the near future. The Synopsis for this latter action may be viewed at: http://www2.eps.gov/spg/USA/DABL/DABL01/W91QUZ%2D04%2DR%2D0014/listing.html

**Q3: According to Attachment Technical Exhibit A, the Government is looking to implement 13 onsite locations throughout the U.S. Are we correct in our assumptions that the Government will allow only 30 days to any contractor to implement this contract?**

A3: The performance start date for all services is 1 November 2004. The Government intends to award the order on or about 1 October 2004.

**Q4: What is the respective percentages of traditional travel transactions, DTS transactions and DTS Touch Transactions that are assumed for the basic and each option period for purposes of price evaluation?**

A4: This information is provided at Section J, Attachment 9, Technical Exhibit B.

**Q5: Which of the sites included in this contract have already implemented the DTS for travel services?**

A5: The following sites have implemented DTS: Scott AFB, IL, Rock Island Aresenal, DFAS Indianapolis, IN, DLA Battlecreek, Detroit Arsenal, MI, Minot AFB, ND, and Ellsworth AFB, SD.

**Q6: What is the total number/percentage of traditional travel, DTS and DTS Touched utilization to date at each of the sites that have already implemented DTS?**

A6: The following table provides the requested information:

DTR6 Transactions per Booking Method
Date Range: August 30, 2002 thru September 15, 2004
No Refunds, No Exchanges, No Fees

| DTS | Transactions | Percentage |
|---|---|---|
| 14082 - ROCK ISLAND ARSENAL | 101 | |
| 15014 - FORT HARRISON -DFAS | 883 | |
| 23161 - WARREN USATACOM | 1,306 | |
| 52003 - FORT MCCOY AF | 4,825 | |
| Totals for DTS | 7,115 | 2.47% |
| **DTS Touched** | | |
| 14082 - ROCK ISLAND ARSENAL | 1 | |
| 15014 - FORT HARRISON -DFAS | 32 | |
| 23161 - WARREN USATACOM | 694 | |
| 35023 - MINOT AFB | 153 | |
| 43003 - ELLSWORTH AFB TMO | 1,195 | |
| 52003 - FORT MCCOY AF | 465 | |
| Totals for DTS Touched | 2,540 | 0.88% |
| **Traditional** | | |
| 14000 - CHICAGO MEPS | 8,450 | |
| 14077 - USPFO FOR ILLINOIS | 7,755 | |
| 14082 - ROCK ISLAND ARSENAL | 50,188 | |
| 15014 - FORT HARRISON -DFAS | 12,016 | |
| 23136 - SELFRIDGE | 5,330 | |
| 23161 - WARREN USATACOM | 30,729 | |
| 23162 - LANSING MEPS | 23,982 | |
| 24015 - CAMP RIPLEY | 5,539 | |
| 35007 - BISMARCK ARMORY | 2,724 | |
| 35012 - GRAND FORKS AFB | 11,981 | |
| 35023 - MINOT AFB | 9,662 | |
| 52003 - FORT MCCOY AF | 110,337 | |
| Totals for Traditional | 278,693 | 96.65% |
| Grand Totals | 288,348 | |

**Q7: What is the current planned implementation date for DTS at each of the sites included in this contract that have not yet implemented DTS?**

A7: DTS implementation is governed by the Services and Agencies. The DTS implementation approach comprises of three phases. Phase I and II sites are scheduled by the by PMO DTS in concert with the Services and Agencies. The implementation of Phase III sites is conducted using self implementation processes by the Services and Agencies. The PMO DTS cannot provide insight on the implementation of these Phase III sites. PMO DTS plans to implement the following sites in FY05 and FY 06; National

Guard State HQ, Indianapolis, IN, Army Reserve, Ft. Snelling, MN, DFAS Kansas City, MO, Whiteman AFB, MO, Offutt AFB, NE, Grand Forks AFB, ND, Fort McCoy, WI

**Q8: The RFQ provides that all MEPS travel services should be priced as traditional travel. Does that mean that DTS will not be implemented at any MEPS site prior to November 2005?**

A8: Currently DTS functionality for recruit travel is being developed and upon its completion the PMO DTS will negotiate a DTS transactions fee.

**Q9: it is understood that DTS cannot be used for international travel. Should offerors assume that all international travel during this contract will be performed by traditional travel services?**

A9: No, DTS can be used for international travel. However, due to industry practices by foreign carriers between overseas origins and destinations agent intervention may be required.

**Q10: Section C.4.1 of the RFQ provides that if local Business Rules conflict with the requirements of this SOW, the contractor shall perform in accordance with the contract. If local Business Rules require the CTO contractor to guarantee the lowest applicable airfare should the contractor "touch" each DTS transaction to ensure it has booked the lowest airfare or is such a local Business Rule in "conflict" with this contract? In other words, if travel arrangements made via DTS results in airfares that exceed the cost of applicable airfares available should the contractor purchase the higher priced DTS airfare or should the contractor "touch" the DTS transaction to secure a lower airfare?**

A10: DTS currently displays flights and fares in accordance with DoD airlift policy. GSA City Pairs are included in that display. The decision to use something other than the DoD policy is determined by the AO and the contractor is not required to change the approved selection. Future system changes are planned to include the capability to offer Travelers/Approving Officials alternative routes and fares that can assist with making sound transportation decisions, which may include, mission, schedule, and cost.

**Q11. If a DTS transaction results in premium class travel is the contractor required to "touch" the transaction to ensure that premium class travel is properly authorized or should the contractor purchase the premium class travel airfare in the DTS transaction and simply include the transaction in the subsequent quarterly report?**

A11. The contractor's authority to issue airlines tickets for DTS transactions is the Approving Official approval. This may include premium class flights. The contractor should purchase the premium class flights and report the transactions, as required by the Request for Proposal (RFP). All DoD required approvals for this type of travel will be