# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CW GOVERNMENT TRAVEL, INC., Plaintiff, v. THE UNITED STATES, Defendant, and NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION, Intervenor. | Case No. 03-1274C<br>Judge George W. Miller |

## PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT

Pursuant to Rule 60(b) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff, CW Government Travel, Inc. ("Carlson"), moves the Court for relief from a final judgment on the ground of newly discovered evidence which, by due diligence, could not have been discovered in time to move for a new trial under RCFC 59(b), and which establishes a material misrepresentation of an adverse party. Carlson moves for relief from this Court's prior judgment that equitable relief is not warranted even if the Government violated the Competition in Contracting Act ("CICA"). Relief from judgment is warranted because key facts represented to and relied on by this Court have been contradicted by two recent Government representations: testimony before the Senate Homeland Security and Governmental Affairs Committee, Permanent Investigations Subcommittee (entitled, "The Defense Travel System: Boon or

Boondoggle?,") and Appendix I of a Government Accountability Office ("GAO") Report to the Senate Committee (entitled, "Department of Defense Rights to Property in the Defense Travel System"). Those representations are included as Attachments 1 and 2, respectively.

The Court's final judgment was entered on January 18, 2005. Accordingly, this motion is timely.

## ISSUE PRESENTED

Should the Court of Federal Claims grant relief from judgment due to newly discovered evidence in the form of recent sworn testimony and submissions to Congress which are directly contrary to the Government's representations that this Court relied on in granting summary judgment to the United States?

## STATEMENT OF FACTS

This Court entered summary judgment on the basis that it did not believe that the illegal contract should be enjoined due to perceived hardship on the Government and the public. Central to the Court's determination was the understanding that Northrop, not DoD, owned the Defense Travel System ("DTS") developed at Government expense. The Government's counsel represented both that Northrop owned the DTS, and that if the continued performance of the DTS Contract was enjoined, Northrop would "walk away" with the entire system, leaving the Government with nothing and forcing the Government to start from scratch to develop a DTS. After that, according to the Government's counsel, DoD would have nothing to show for five years of efforts and hundreds of millions of dollars, and any new contractor would have to start from scratch to replicate the work performed by Northrop during those five years. The Court expressly relied on

these representations as a basis for denying injunctive relief and entering summary judgment.

The DTS Program continues to struggle and has been the subject of recent Congressional investigative hearings. DoD officials were asked at those hearings about the ownership of the DTS and, specifically, about the Court's reliance on those representations. DoD officials completely reversed course and advised the United States Senate that, notwithstanding the position taken in court, the Government owned the system being developed and could provide the fruits of that work to any new contractor. This position is set forth in sworn testimony before the United States Senate on September 29, 2005 by a senior DoD official responsible for the DTS Program and in Appendix I of a report to the United States Senate by the GAO. This information establishes conclusively that the Government, not Northrop, owns the vital portions of the DTS, including the computer software developed by Northrop to connect the DTS with DoD legacy systems, has perpetual licenses to the remaining minor commercial software involved or no longer needs the commercial software originally used at the start of the 1998 DTS Contract, and could make this technical data and computer software available for use by a successor contractor if the DTS Contract with Northrop were terminated.

This Court, therefore, was misled by the Government's representations at trial. The resulting determination not to issue an injunction to remedy a violation of CICA was premised upon a crucial misunderstanding of fact brought to light by newly discovered evidence, which the Government invited by its repeated, but now recanted, representations.

# I. REPRESENTATION TO THE COURT REGARDING DTS OWNERSHIP

## A. ORAL ARGUMENT BEFORE THIS COURT AND THIS COURT'S OPINION

The Government stated at oral argument on May 18, 2004 that, if the Court granted relief, "Northrup-Grumman could simply walk away with its system, because it owns the system. And the government had already paid for the system, and so the government would forfeit all that money." JA 542-43. The Government later emphasized the dire consequences arising from the fact that the Government would not be able to reap any benefit from the work it had already paid for, contending that if Carlson's case was successful, it "would bring the DTS back to the drawing boards, and deprive many present and future users of the benefits of the system …." JA 544.

In its opinion of July 26, 2004 (reissued with redactions and minor corrections on August 3, 2004), the Court concluded that, after balancing the hardships,

> [t]he harm to the Government if the Court were to enjoin further performance by Northrop Grumman of these aspects of the contract would be significant. This contract is now in its sixth year of performance. The Government and Northrop Grumman have expended a significant amount of time, effort, and resources in the development of the thus far elusive and highly complex CUI. If the injunction is granted, the project will be delayed to an even greater degree than it has been. **Northrop would walk away with the system that it has developed and the Government would have to start over.**

JA 56 (citing JA 542) (emphasis added). In discussing the effect of an injunction on the public interest and the need for a resolicitation, the Court again relied on the information provided by the Government:

> [t]he resolicitation sought by plaintiff would send the most challenging and complex aspects of the project back to the drawing board…. Unlike traditional travel services, where the record reflects that the transition will not be as



::ODMA\PCDOCS\MC1DOCS1\197056\1

> complicated, the record establishes that it will likely take years for a new contractor to develop a functioning CUI.... A new contractor would be faced with this same challenge of making its CUI compatible with the Government's legacy systems—only it would be more than five years behind where Northrop Grumman was when Carlson's complaint was filed.

JA 57.

This understanding was perpetuated by the Government at oral argument on October 14, 2004. There the Government's counsel continued to emphasize that all would be lost if an injunction was entered and that Northrop could "walk away" with the years of work it was paid to develop. Government's counsel argued that, "If the web-based CUI ["Common User Interface"] were subject to a reprocurement, this right to a perpetual license would be lost and a new contractor would have to start from scratch to develop the CUI." JA 717.

## II. GOVERNMENT REPRESENTATIONS DURING THE SENATE SUBCOMMITTEE HEARING ON THE DEFENSE TRAVEL SERVICE

On September 29, 2005, the Senate Homeland Security and Governmental Affairs Committee; Permanent Investigations Subcommittee, held a hearing on the DTS Program entitled, "The Defense Travel System: Boon or Boondoggle?" Committee Chairman Senator Norm Coleman stated in his introductory remarks that the hearing on the DTS "follows from other investigations this Subcommittee has held on Defense Department waste, fraud and abuse." Attachment 1 at 1.

Providing testimony at the hearing, among others, were Mr. Zack Gaddy, Director of the Defense Finance and Accounting Services ("DFAS"), and Mr. McCoy Williams, Director of the GAO Financial Management and Assurance Team. Mr. Williams, in addition to testifying about a number of problems with the DTS Program, provided a

GAO Report that had been prepared at the request of the Senate.[1] He stated, "In addition, our statement for the record provides a description of DoD property rights in DTS, as you requested." Attachment 1 at 29 ("Page 25 of 37"). That GAO Report contained Appendix I entitled, "Department of Defense Rights to Property in the Defense Travel System." Attachment 2. The GAO found that:

> The restructured [DTS] contract incorporates standard DOD intellectual property rights clauses for a system being developed at government expense and it specifically gives DOD perpetual rights to DTS software.

Attachment 2 at 22. The GAO Report specifically found that, with regard to the technical data, computer software and documentation developed for the DTS with Government funds, the Government had "Perpetual Unlimited Rights," a term defined by GAO:

> "Unlimited rights" means the government's rights to use computer software or technical data in any way and to authorize others to do so.

Mr. Gaddy commenced his sworn testimony by stating, "I am providing detailed information on DTS and the scope of the department's travel operations in the statement for the record." Attachment 1 at 30 ("Page 26 of 37"). After the prepared testimony of Messrs. Williams and Gaddy, Senator Coleman stated:

> But one of the questions that has come up – and I think, Mr. Williams, you indicated that there was an answer to it, but I'd like it very clear for the record. **Who owns the system? Who owns the DTS system?** In a court decision, it appeared that Northrop owned it. **In fact, the judge**

---

1 The GAO Report stated: "To describe DoD's property rights in the DTS we reviewed the DTS contract, applicable procurement regulations, DoD intellectual property guidance, key DTS license agreements, and written responses from PMO-DTS to our questions, and we met with PMO-DTS and contracting officials and with their legal counsel."

> **specifically raised concerns, saying one of the reasons we're not going to stop it now is because we'd walk away with nothing**. Was the judge mistaken on that assessment, or is it different today than it was then?

Attachment 1 at 31 ("Page 27 of 37") (emphasis added).

Mr. Gaddy, the Director of DFAS, responded for the Government:

> GADDY: I would like to try to answer your question, Mr. Chairman. **DTS is owned by DOD.** However, when I say that, there are aspects of the program where **there's software code developed by DOD that we own outright.**
>
> **All the interfaces to the accounting and finance systems within the department – we own all of those interfaces and all that software.**[2] The commercially developed software that Northrop Grumman developed – we have an unlimited license to use that software. We don't physically own the software, but **we own unlimited rights to use the software, and we can delegate those rights to any other user as a follow-on contract.**

Senator Coleman pressed the issue:

> COLEMAN: **But hypothetically, if the contract were to be terminated with Northrop, what would DOD be left with? Because that was the concern of the judge, that we can't start from scratch here.**
>
> But again, it goes back to, you know, the nature of our ownership interest on things that have been developed with taxpayer dollars. What do we own? If it were to be terminated, can you divide between what Northrop would have and what we would have?
>
> GADDY: Mr. Chairman, as I said earlier, **I believe the correct answer is we would be able to take the software that has been developed by Northrop and turn it over to a subsequent contractor to use.**
>
> COLEMAN: Very good. Thank you.

---

2 These are the "complex aspects of the project" involving interfaces with DoD's "legacy systems" that this Court was so concerned would be lost if Northrop Grumman's contract was terminated.

Attachment 1 at 31-32 ("Pages 27-28 of 37") (emphasis added).

## III. BRIEF OF DEFENDANT ON APPEAL TO THE FEDERAL CIRCUIT

In its brief to the Court of Appeals for the Federal Circuit, filed before the congressional hearings, the Government again relied on the purported fact that Northrop owned the rights to the DTS System and repeated the arguments made to this Court. See Defendant's Brief at 45. In continuing to press the point on appeal, the Government underscored the critical importance of its representations to this Court.

After the hearings when the Government did a complete about-face on those representations, Carlson moved to supplement the appellate record so that the Court could see how the Government's position changes depending on the audience and objective. The Government responded by arguing, among other things, that activities occurring after the Government convinced the Court to deny any remedy could not be considered by the appellate court. On December 6, 2005, the Court of Appeals for the Federal Circuit issued its opinion in CW Gov't Travel v. United States, No. 05-5051.[3] The Federal Circuit affirmed this Court's exercise of discretion. The new evidence was a significant topic at oral argument, but the Court declined to supplement the record, stating that the issue should be presented first to this Court:

> As judgment was entered on January 18, 2005, Carlson's opportunity to file a Rule 60(b) motion with the Court of Federal Claims has not yet passed. Thus, although we deny Carlson's motion to supplement the record, and we affirm the decision of the Court of Federal Claims on appeal, we do so without prejudice to any right Carlson has to pursue its concern about the effect of the testimony before the Senate on the correctness of the decision of the

---

3 Pursuant to Fed. Cir. R. 47.6, the opinion is not citable as precedent.



::ODMA\PCDOCS\MC1DOCS1\197056\1

> Court of Federal Claims that equitable relief as requested is not warranted.

See CW Gov't Travel v. United States, No. 05-5051, at 14 (Fed. Cir. 2005).

## ARGUMENT

### I. THE COURT SHOULD GRANT PLAINTIFF RELIEF FROM JUDGMENT DUE TO NEWLY DISCOVERED EVIDENCE IN THE FORM OF SENATE SUBCOMMITTEE HEARING TESTIMONY AND A GOVERNMENT ACCOUNTABILITY OFFICE REPORT ON DOD'S PROPERTY RIGHTS IN THE DTS AMOUNTING TO A MISREPRESENTATION TO THE COURT BY DEFENDANT

RCFC 60(b) provides relief from judgment or order due to mistakes, inadvertence, excusable neglect, "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under RCFC 59(b)," fraud, misrepresentation, and "any other reason justifying relief from the operation of the judgment."

"A motion under Rule 60(b) is appropriate to correct substantive errors that are not clerical in nature." Dynacs Eng'g Co., Inc. v. United States, 48 Fed. Cl. 240, 241 (2000) (citing Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure, § 2854, at 240 (2nd ed. 1995)). Further, "the decision to grant equitable relief under Rule 60(b) is addressed to the discretion of the court, and the court may weigh equitable considerations in the exercise of its discretion." Id. (citing Wright et al., supra, § 2854, at 254-55). This discretion, guided by equitable principles, is "liberally construed for the purpose of doing substantial justice." Patton v. Sec'y of the Dep't of Health & Human Servs., 25 F.3d 1021, 1030 (Fed. Cir. 1994) (quoting James W. Moore and Jo Desha Lucas, Moore's Federal Practice, at 60.18[8], 60.19 (2d ed. 1993)).

"Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy." Hormel v. Helvering, 312 U.S. 552, 557 (1941). In that vein, "'Rule 60(b) enables a court to grant a party relief from a judgment in circumstances in which the need for truth outweighs the value of finality in litigation.'" Curtis v. United States, 61 Fed. Cl. 511, 512 (2004) (quoting Moore et al., supra, at 60.02[2] (3d ed. 2003)).

Here, the facts make clear that equity strongly favors relief from judgment. The Government's counsel repeatedly and explicitly represented to this Court — both orally and in writing — that the DTS was owned by Northrop and that the Government would not be able to retain rights to the DTS if the contract was awarded to another party. The consequences of that misrepresentation was that the Court was erroneously led to believe that if it enjoined continued performance of Northrop's contract the Government would lose the use of the DTS and all the computer software that had been developed during the five year term of the contract, disrupting current use by DoD travelers and compelling the start of another multiyear development effort. All the hardships arising from an injunction perceived by this Court arose out of the basic, albeit false, premise that the Government would completely lose the fruits of five years of effort and hundreds of millions of dollars if the Court enforced CICA.

Further, in arguing against any need for an evidentiary hearing, the Government's counsel reiterated what this Court in its opinion also made clear: that Northrop's ownership of the DTS played an immensely influential role in its determination that both

the balance of hardships and the effect on the public interest weighed in the Government's favor. That argument was repeated to this Court in its Rule 59 hearing.

However, all these factual representations to the Court have been proven by the Government itself to be wrong. When the forum changed from the Court to Congress, so did the Government's immediate concerns — as well as the Government's version of the fundamental facts. The United States Senate looked into this contract and was understandably worried about a potential waste of the taxpayers' money that paid for the development of the DTS due to Government ineptitude. At the hearing, DoD made the opposite representation openly and repeatedly when asked by the Senate, "Who owns DTS?" In sworn testimony by a knowledgeable DoD official and in a special GAO Report to Congress, the Government exposed the misrepresentations it had previously made to this Court.

These prior, in-court misrepresentations formed the factual premise for the Government's central argument against injunctive relief. In addition, this Court expressly relied on Government counsel's representation during oral argument. Nonetheless, after the Government made this misrepresentation for the first time during oral argument, it never wavered from its position throughout the remainder of this litigation. That the Government, not Northrop, owns the DTS, including crucial computer software developed to interface the DTS to DoD legacy systems, and could make such technical data available to any successor contactor, dramatically alters this Court's understanding of the potential hardship and public interest involved in the enforcement of CICA via an injunctive remedy. The fact is that DoD would not lose the use of the DTS if the Court issues an injunction against the Northrop contract. A

successor contractor could simply pick up development and deployment of the DTS where Northrop left off. This shift in position is stark, and such double-speak — by the same party with the same facts and after being reminded of its prior representations on the matter — is a compelling basis for relief from a judgment based on such double-speak.[4] As such, it is appropriate for this Court to grant relief from judgment due to this newly discovered evidence of prior misrepresentations. The Court should then hold an evidentiary hearing to allow it to adequately address the factors and hardship that must be balanced before determining whether to grant or deny injunctive relief.

**CONCLUSION**

For the above-stated reasons, Carlson requests that this Court grant relief from its January 18, 2005 judgment.

Dated: January 9, 2006

Respectfully submitted,

s/ Lars E. Anderson
Lars E. Anderson
Michael W. Robinson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Counsel for Plaintiff*

Attachments

---

4 Carlson submits that the carefully prepared report by the GAO after a thorough investigation of documents and testimony of DoD and Northrop personnel not available to this Court and the sworn testimony of a DoD official responsible for the DTS Program (and selected to testify because of his knowledge of the DTS Program), presented to the United States Senate during an investigative hearing, are worth more consideration than representations by the Government's trial counsel.

## CERTIFICATE OF FILING

I hereby certify that on January 9, 2006, a copy of the foregoing PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Lars E. Anderson
Lars E. Anderson

# ATTACHMENT 1

Source: Legal > Legislation & Politics - U.S. & U.K. > U.S. Congress > Committee Hearing Transcripts > **Federal Document Clearing House Congressional Hearings Summaries**
Terms: **boon boondoggle and date is 9/2005** (Edit Search | Suggest Terms for My Search)

Select for FOCUS™ or Delivery

*DEFENSE TRAVEL SYSTEM Federal Document Clearing House Congressional Testimony September 29, 2005 Thursday*

Copyright 2005 Congressional Quarterly, Inc. All Rights Reserved.
Federal Document Clearing House Congressional Testimony

**September** 29, 2005 Thursday

**SECTION:** CAPITOL HILL HEARING TESTIMONY

**LENGTH:** 1366 words

**COMMITTEE:** SENATE HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

**SUBCOMMITTEE:** PERMANENT INVESTIGATIONS

**HEADLINE:** DEFENSE TRAVEL SYSTEM

**TESTIMONY-BY:** NORM COLEMAN, CHAIRMAN

**BODY:**
Statement of Chairman Norm Coleman

Committee on Senate Homeland Security and Governmental Affairs Subcommittee on Permanent Investigations

September 29, 2005

Good morning and thank you for attending today's hearing. Nobel Prize winning economist Milton Friedman once stated that, "Governments never learn. Only people learn." I disagree. My job as Chairman of the Permanent Subcommittee on Investigations is to ensure that our government learns as well. Simply put, that is why we are having this hearing, The Defense Travel System: **Boon or Boondoggle.** It follows from other investigations this Subcommittee has held on Defense Department waste, fraud and abuse.

In November 2003, the Subcommittee conducted a hearing on the Department of Defense's use of first and business class airline travel. At the hearing, it was determined that DOD had not properly authorized or justified 73 percent of the first and business class travel undertaken in fiscal years 2001 and 2002. DOD spent $124 million on over 68,000 tickets during these two years. The improper authorization and justification of these tickets resulted in the improper expenditure of over $60 million in two years.

On February 12, 2004, the Subcommittee held a hearing on DOD Contractors Who Cheat on Their Taxes. The hearing examined the failure to collect unpaid taxes owed by contractors doing business with the Department of Defense and getting paid with taxpayer dollars. The Subcommittee determined that 27,000 DOD contractors owed $3 billion in unpaid taxes. The taxes were not being collected because DOD was not validating contractors' taxpayer identification numbers and was not referring contractor payments to the Financial Management Service to identify unpaid tax debt.

This hearing is designed to determine if DTS is the windfall to DOD travel that it was promised to be or simply a waste of taxpayers' money. I have repeatedly asked DOD about DTS because of credible allegations that DTS has very serious problems. Specifically, I have heard that DTS:

-- is four years behind schedule,

-- is deployed in barely half of the 11,000 DOD travel sites,

-- has grown in cost from $273 million to almost $500 million,

-- does not always identify the lowest available airfare,

-- does not identify all available lodging facilities that offer government rates, and

-- has not generated the projected cost savings for travel agent services and voucher processing.

I am particularly concerned with DOD's failure to realize the projected cost savings for travel agent services. This has occurred because DOD has made the use of DTS voluntary rather than mandatory at those sites where it has been deployed. The current utilization rate for DTS at those sites is about five percent. DOD pays travel agents about $5.00 for a DTS transaction as compared to about $25.00 for a traditional transaction. Thus, ninetyfive percent of DOD's travel transactions are costing DOD $20.00 more for each transaction. This translates into millions of dollars that DOD is wasting in unrealized cost savings.

On three separate occasions over the past two years, I have asked DOD to respond to these allegations. DOD has been unresponsive. For example, I asked if DTS always finds the lowest available airfare. DOD begged the question by stating that DTS displays GSA contracted city pair flights without stating that these are always the lowest cost fares. Finally, on August 11th I sent a Chairman's letter to the Secretary of Defense in which I laid out my concerns with DOD's failure to respond to allegations about DTS. Further, I requested that the Secretary suspend further implementation of DTS until the questions about the system have been fully addressed and resolved.

Let me be specific about that. One year and one day from today the DTS contract will expire. Before DOD renews the DTS contract, the substantive problems and cost and benefit questions about DTS need to be fully resolved. To ensure that DTS is comprehensively and objectively reviewed, I have also asked the Government Accountability Office and the DOD Inspector General to evaluate and report on DTS. I asked GAO to identify the problems that need to be addressed and I asked the Inspector General to conduct a cost benefit analysis and determine if DTS will address DOD's travel needs. Those evaluations and reports are to be concluded before the DTS contract is renewed and will provide the Secretary with the answers he needs to ensure that hundreds of millions of taxpayer dollars are not wasted on an ineffective travel system. DTS was expected to be a boon to DOD's travel needs by cutting costs and red tape for DOD's travelers. However, by 2001, the commercial off the shelf travel software that DOD had planned to use failed its operational tests, and it became clear that DOD would not be able to translate its concept into reality. Rather than terminating and re-bidding the project, however, DOD restructured the DTS contract to develop a web-based travel system. This restructuring increased the projected costs of DTS from $263 to $492 million.

During this time the DOD Inspector General began receiving complaints of DTS fraud and waste on its hotline. After numerous complaints, the Inspector General initiated an audit of DTS. Of the nine complaints the Inspector General received, it was able to substantiate four of them. More importantly, the report concluded there was a substantial risk that DTS would

not deliver a viable, integrated travel management system and initially recommended that funding for the development and deployment of DTS be suspended until a determination was made as to whether DTS was the most cost effective solution to DOD's travel needs.

In response to the Inspector General's report, the Comptroller tasked the Program Analysis and Evaluation Division with conducting a cost benefit study and further agreed to abide by its findings. The study concluded that it could not verify that DTS provides the most cost effective solution to DOD's travel needs because there could be alternative solutions that are less expensive. Despite these findings, DOD decided to push ahead with DTS on October 20, 2003.

While DOD claims that it has fully considered the Inspector General's and the Program Analysis and Evaluation Division's concerns as part of its top level management decisions to go forward with DTS, I have seen no studies or reports that clearly address and resolve those concerns. Instead, I continue to see reports that question DTS' effectiveness or hear allegations that the Inspector General's and the Program Analysis and Evaluation Division's concerns have not been addressed. For example, the Program Analysis and Evaluation Division's study raised the question about who owns DTS, the contractor or DOD. The ownership of DTS has both cost and competitive implications for DOD. Seven months after DOD's decision to move forward, the Department of Justice informed Judge George W. Miller of the U.S. Court of Federal Claims that DTS belonged to the contractor and not to DOD. This is clearly an issue that needs to be resolved. I expect today to get some responsive answers from DOD.

Today we will hear testimony from some of the individuals and organizations that help to administer DTS or who have raised questions about DTS' cost and performance. They will share with us their concerns about DTS.

We will also hear from representatives of the Government Accountability Office, the DOD Inspector General, and the Program Analysis and Evaluation Division who will testify about reports or studies they wrote that have questioned the costs and benefits that DTS offers DOD.

Finally, we will hear from the Comptroller and the Director of the Defense Finance and Accounting Service who are the principal officials responsible for DTS.

Before hundreds of millions of additional taxpayer dollars are unnecessarily wasted, it is imperative that DOD adequately address the many questions that have been raised regarding the cost effectiveness of DTS. I expect DOD to provide answers to these questions during today's hearing.

**LOAD-DATE:** October 1, 2005

Source: Legal > Legislation & Politics - U.S. & U.K. > U.S. Congress > Committee Hearing Transcripts > **Federal Document Clearing House Congressional Hearings Summaries**
Terms: **boon boondoggle and date is 9/2005** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Tuesday, October 18, 2005 - 1:22 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: Legal > Legislation & Politics - U.S. & U.K. > U.S. Congress > Committee Hearing Transcripts > **Federal Document Clearing House Congressional Hearings Summaries**
Terms: **boon boondoggle and date is 9/2005** (Edit Search | Suggest Terms for My Search)

Select for FOCUS™ or Delivery

*U.S. SENATOR NORM COLEMAN (R-MN) HOLDS A HEARING ON DOD'S DEFENSE TRAVEL SYSTEM FDCH Political Transcripts September 29, 2005 Thursday*

Copyright 2005 Congressional Quarterly, Inc. All Rights Reserved.
FDCH Political Transcripts

**September** 29, 2005 Thursday

**TYPE:** COMMITTEE HEARING

**LENGTH:** 18280 words

**COMMITTEE:** SENATE HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS COMMITTEE; PERMANENT INVESTIGATIONS SUBCOMMITTEE

**HEADLINE:** U.S. SENATOR NORM COLEMAN (R-MN) HOLDS A HEARING ON DOD'S DEFENSE TRAVEL SYSTEM

**SPEAKER:**
U.S. SENATOR NORM COLEMAN (R-MN), CHAIR

**LOCATION:** WASHINGTON, D.C.

**WITNESSES:**

THOMAS SCHATZ, PRESIDENT, CITIZENS AGAINST GOVERNMENT WASTE
ROBERT LANGSFELD, PARTNER, THE CORPORATION SOLUTIONS GROUP
THOMAS GIMBLE, ACTING INSPECTOR GENERAL, DEPARTMENT OF DEFENSE
MCCOY WILLIAMS, DIRECTOR, FINANCIAL MANAGEMENT AND INSURANCE TEAM, GOVERNMENT ACCOUNTABILITY OFFICE
SCOTT COMES, DIRECTOR, STRATEGIC AND PROGRAM ANALYSIS AND EVALUATION DIVISION, DEPARTMENT OF DEFENSE
ZACK GADDY, DIRECTOR, FINANCE AND ACCOUNTING SERVICES, DEPARTMENT OF DEFENSE

**BODY:**

U.S. SENATE HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS COMMITTEE: PERMANENT SUBCOMMITTEE ON INVESTIGATIONS HOLDS A HEARING ON THE DEFENSE TRAVEL SYSTEM

SEPTEMBER 29, 2005

SPEAKERS:
U.S. SENATOR NORM COLEMAN (R-MN)
CHAIRMAN
U.S. SENATOR TED STEVENS (R-AK)
U.S. SENATOR TOM COBURN (R-OK)
U.S. SENATOR LINCOLN D. CHAFEE (R-RI)

U.S. SENATOR ROBERT F. BENNETT (R-UT)
U.S. SENATOR PETE W. DOMENICI (R-NM)
U.S. SENATOR JOHN W. WARNER (R-VA)
U.S. SENATOR SUSAN M. COLLINS (R-ME)
EX OFFICIO

U.S. SENATOR CARL LEVIN (D-MI)
RANKING MEMBER
U.S. SENATOR DANIEL K. AKAKA (D-HI)
U.S. SENATOR THOMAS R. CARPER (D-DE)
U.S. SENATOR MARK DAYTON (D-MN)
U.S. SENATOR FRANK LAUTENBERG (D-NJ)
U.S. SENATOR MARK PRYOR (D-AR)
U.S. SENATOR JOSEPH I. LIEBERMAN (D-CT)
EX OFFICIO

*

(AUDIO GAPS THROUGHOUT DUE TO HEARING ROOM AUDIO SYSTEM)

COLEMAN: This hearing of the Permanent Subcommittee on Investigations is called to order. Our first witness will be Senator Grassley, and what I'm going to do is begin my opening statement, but when my colleague comes, we always defer to the chairman of the Finance Committee, and we'll have him give his statement and then move on to the other panels.

I should also note that we have a vote at 11 -- I will have to leave at 11:15. We need to be in our seats by 11:20 and then a vote on the Roberts nomination at 11:30, so I will adjourn the hearing and after that vote we will reconvene and finish up the testimony, so we will be adjourning at 11:15.

Good morning and thank you for attending today's hearing. Nobel Prize-winning economist Milton Friedman once stated governments never learn, only people learn. I disagree. My job as chairman of the Permanent Subcommittee on Investigations is to ensure that our governments learn as well.

Simply put, that is why we are having this hearing, the Defense Travel System: **Boon or Boondoggle.** It follows from other investigations this subcommittee has held on Defense Department waste, fraud and abuse.

In November 2003, the subcommittee conducted a hearing on the Department of Defense's use of first and business class airline travel. At the hearing, it was determined that DOD had not properly authorized or justified 73 percent of the first and business class travel undertaken in the fiscal years 2001, 2002.

DOD spent $124 million on over 68,000 tickets during these two years. The improper authorization and justification of these tickets resulted in the improper expenditure of over $60 million in two years.

On February 12th the subcommittee held a hearing on DOD contractors who cheat on their taxes. The hearing examined the failure to collect unpaid taxes owed by contractors who are doing business with the Department of Defense and getting paid with taxpayer dollars. The subcommittee determined that 27,000 DOD contractors owed $3 billion in unpaid taxes.

The taxes were not collected because DOD was not validating contractors' taxpayer identification numbers and was not referring contractor payments to the Financial Management Service to identify unpaid tax debt.

This hearing is designed to determine if DTS is the windfall to DOD travel that it was promised to be or simply a waste of taxpayers' money. I have repeatedly asked DOD about DTS because of credible allegations that DTS has had very serious problems.

Specifically, I have heard that DTS is four years behind schedule, is deployed in barely one-half of the 11,000 DOD travel sites, has grown in cost from $273 million to $500 million -- and even for government that's a lot of money -- does not identify the lowest available airline fares, does not identify all available lodging facilities that offer government rates, and has not generated the projected cost savings for travel agent services and voucher processing.

I am particularly concerned with DOD's failure to realize the projected cost savings for travel agent services. This has occurred because DOD has made the use of DTS voluntary rather than mandatory at those sites where it has been deployed.

The current utilization rate for DTS at those sites is about five percent. DOD pays travel agents about $5 for a DTS transaction as compared to $25 for a traditional transaction. Thus, 95 percent of DOD's travel transactions are costing DOD $20 more for each transaction. This translates into millions of dollars that DOD is wasting in unrealized cost savings.

On three separate occasions over the past two years, I have asked DOD to respond to these allegations. DOD has been unresponsive. For example, I asked DOD if DTS always finds the lowest available airfare. DOD begged the question by stating that DTS displays GSA-contracted city pair flights without stating that these are always the lowest cost fares.

Finally, on August 11th, I sent a chairman's letter to the secretary of defense in which I laid out my concerns with DOD's failure to respond to allegations about DTS. Further, I requested that the secretary suspend further implementation of DTS until the questions about the system have been fully addressed and resolved.

Let me be specific about that. One year and one day from today the DTS contract will expire. Before DOD renews the DTS contract, the substantive problems and cost-benefit questions about DTS need to be fully resolved.

To ensure that DTS is comprehensively and objectively reviewed, I have asked the Government Accountability Office and the DOD inspector general to evaluate and report on DTS. I have asked GAO to identify the problems that need to be addressed and I have asked the inspector general to conduct a cost-benefit analysis and determine if DTS will address DOD's travel needs.

These evaluations and reports are to be concluded before the DTS contract is renewed and will provide the secretary with the answers he needs to ensure that hundreds of millions of taxpayer dollars are not wasted on an inefficient travel system.

That is a perfect entree to our first witness before this committee. I would like to welcome chairman of the Senate Finance Committee, Senator Charles Grassley.

Senator Grassley testified at our November 2003 hearing, DOD's Improper Use of First and Business Class Airline Travel. This was the first in a series of subcommittee hearings focused on waste, fraud and abuse in the Department of Defense.

Mr. Chairman, I welcome you back to the subcommittee. I know that you have a great interest and expertise in the subject matter of this hearing. You have worked aggressively

over the years to expose waste, fraud and abuse in government, and I thank you for that focus and for that service.

And I thank you for your participation in today's hearing and look forward to hearing your testimony. Senator Grassley, you may proceed.

GRASSLEY: And I want to thank you, too. You're doing a very fine job in the leadership of this committee in this area, and in a lot of other areas as well. And I want to thank you for doing this.

And your committee is a premiere committee for getting to the bottom of a lot of problems that we have in government, and bringing them to light and finding solutions for them. And I'm sure the same sort of end result will come as a result of what we're doing here.

Although as your statement probably made clear, as well as my statement will make clear, it's kind of frustrating that we think we make progress two years or three years ago, and then kind of review it now and you wonder whether you've made any progress.

As you said, I've been looking into waste, fraud and abuse in the Department of Defense travel for several years. I started with charge cards, travel cards and purchase cards, and I think we're all very familiar now with the stories of inappropriate purchases made with government charge cards. That led to concerns about other aspects of Department of Defense travel.

Mr. Chairman, you and I and others have asked the General Accounting Office -- the Government Accounting Office, as it's called now -- to look into improper premium class air travel, and I testified at a hearing before this committee in November 2003.

We also asked the GAO to issue reports on unused airline tickets going to waste as well as fraudulent travel claims. I also testified at a hearing before the full Governmental Affairs Committee on those issues June 2004.

At both of those hearings representatives of the Department of Defense came in here with very embarrassing testimony, promising to do better. They said that there was this new computer system called the Defense Travel System that will fix all of these problems.

It happens that by that time DTS already had problems that we were probably unaware of at that time but we're now very aware of. It was originally supposed to be fully implemented, I think, in the year 2002. And as this deadline approached, the Department of Defense was restructuring the contract, and I assume they were doing it because they saw problems with it at that particular time.

But anyway, it was stalled through the restructuring of the contract. The taxpayers, of course, now are paying for most of the development cost, and the new deadline to have DTS fully implemented -- it's my understanding it's going to be at the end of the year 2006.

In July 2003, the inspector general of Defense issued a report criticizing DTS for being behind schedule and over the projected cost. In 2003, Department of Defense Program Analysis and Evaluation Division completed a report questioning whether DTS was the most cost- effective solution to these problems that you and I have brought forward, but it still survived.

Despite all of its problems, we then have lots of taxpayers' money being sunk into DTS. I want to know, as a result of all this expenditures -- and I don't ask questions like this just of the Department of Defense, but recently I asked them of the Department of Justice and FBI on one of their computer systems -- that we need to know what the taxpayers are getting for their money.

Is there any end to getting to the bottoms of the problems with this program? And will we have something functioning and getting our taxpayers' money or was it a big mistake right from the very beginning? In the case of the FBI, they started all over again.

I think we need to ask DTS really is it a silver bullet that will solve all of the DOD travel problems. Will it prevent improper premium class travel? Will it catch unused airline tickets so that refunds can be obtained? Will it prevent fraudulent travel claims from being processed?

And these are all questions that you and I have asked before, Mr. Chairman. And we still don't have a system in place that's going to answer these, and that's why we have the problems brought to our attention and the waste of taxpayers' money.

I understand now that the Government Accountability Office is going to testify that DTS can be helpful in some of these areas, although it's clearly not a cure-all as advertised. Now, maybe the testimony will say something different, but that's what I understand will be the gist of it.

Moreover, I understand that DTS currently cannot be relied on to find the lowest available airfare consistent with the travel requirements of the Department of Defense.

Now, really, when you get right down to it, if you're going to have a new control system in place, that's a pretty basic function that we ought to expect from a travel system.

Since taxpayers' money went into the development of DTS, I think we should also know what we purchased. Usually when the government pays to have something developed, it owns the final product. That doesn't appear to be the case as you read the DTS contract. So what exactly did the government buy with all of this money?

Finally, we have to ask is DTS the most cost-effective option for DOD travel at this point. So, Mr. Chairman, I, of course, commend you for holding this hearing.

I know that as a result of this hearing you will get answers to these questions, and hopefully enough's been learned from the mistakes of the past that whatever we're told today and the deadlines that are in place to accomplish the goals that we want to accomplish will be met.

And it will take your watch-dogging, as you've done to make sure that that happens. I know and you know that you've got to be ever vigilant when you're doing oversight, and I thank you for being that way. And I've said everything I can say at this point.

I might have something to say after I've heard other testimony, but I won't be able to come back.

COLEMAN: Senator Grassley, first, again, I want to thank you. You've certainly inspired me in the work that we're doing here from your efforts. And you've laid out the questions that I hope that we get some answers to today, or at least begin a process.

You know, my concern on this -- you talked about taxpayers paying for development costs. I don't think that was the original intent when this thing was contracted out. You indicate that we hear now, as I've reviewed the testimony and the reports, that it may be helpful, but if you're spending $500 million on something that originally was a $273 million program, it darn well better be more than helpful.

It should be delivering what you think it should deliver. And you've laid out the questions -- premium class travel, does it deal with unused tickets, does it stop fraudulent travel, does it

provide the lowest available airfares.

So the questions that -- and then ultimately your last comment -- is it most cost-effective. So I am hopeful that we're engaged in a process now that will help us get responses to that and determine whether our taxpayer dollars are being used wisely.

And if they're not, then we have to do something about it, so again, I thank you for your leadership in this area, and I look forward to working with you. And I say this in my opening statement. This is part of a process. This is not simply hearing and we're done. We'll have some responses, but we will continue to look at this issue and move forward on it.

So again, I thank you for your leadership and then for your testimony today.

GRASSLEY: Yes. And if need be, I've got a couple good staff people. If your staff needs any help, I'd be glad to have that involved. But I know you have very good staff, too.

COLEMAN: I look forward to working with you on this issue, Mr. Chairman.

GRASSLEY: Yes. Thank you.

COLEMAN: Thank you so much, Senator Grassley.

GRASSLEY: Thank you.

COLEMAN: Senator Coburn?

COBURN: Senator, I appreciate your holding this hearing. The second week I was a U.S. senator I became involved in this, and I won't be able to stay for the hearing, and I don't have a formal opening statement, other than to say I'm highly concerned about procurement methods, transparency and accountability in our government.

And our subcommittee has been holding hearings -- we've had 14 thus far -- in terms of oversight, and we'll probably have 10 more before year is out on oversight.

And I would just ask unanimous request that I have several -- I have five pages of questions for the witnesses today that I would like to submit and have answers back within two weeks.

COLEMAN: Without objection, that will be done.

COBURN: I thank the chairman and I thank him for holding this hearing.

COLEMAN: Thank you, Senator Coburn. I also appreciate that Chairman Grassley and Senator Coburn are both dogged in their determination to protect taxpayer dollars and deal with fraud and abuse, and so I greatly appreciate your interest and your participation and the leadership that you're providing with your subcommittee.

So I look forward to working with you, and we will get those questions to the witnesses and make sure that we have answers.

COBURN: Thank you very much.

COLEMAN: Thank you.

I'm going to just finish with the rest of my opening statement, and then we'll call the first panel.

DTS was expected to be a boon to DOD travel needs by cutting costs and red tape for DOD travelers. However, by 2001 the commercial off-the-shelf travel software that DOD had planned to use failed its operational tests, and it became clear that DOD would not be able to transfer its concept into reality.

Rather than terminating and re-bidding the project, however, DOD restructured the DTS contract to develop a Web- based travel system. This restructuring increased the projected costs, as I noted before, of DTS from $263 to $492 million.

During this time the DOD inspector general began receiving complaints of DTS fraud and waste on its hotline. After numerous complaints, the I.G. initiated an audit of DTS. Of the nine complaints the inspector general received, it was able to substantiate four of them.

More importantly, the report concluded there was a substantial risk that DTS would not deliver a viable, integrated travel management system and initially recommended that funding for the development and deployment of DTS be suspended until a determination was made as to whether DTS was the most cost-effective solution to DOD travel needs.

In response to the inspector general's report, the comptroller tasked the Program Analysis and Evaluation Division with conducting a cost-benefit study and further agreed to abide by its findings.

The study concluded that it could not verify that DTS provides the most cost effective solution to DOD travel needs because there could be alternative solutions that are less expensive. Despite these findings, DOD decided to push ahead with DTS on October 20, 2003.

While DOD claims that it has fully considered the inspector general's and PAED report as part of its top level management decision to go forward with DTS, I have seen no studies or reports that clearly address and resolve those concerns.

Instead, I continue to see reports that question DTS' effectiveness or hear allegations that the I.G. and the Program Analysis and Evaluation Division's concerns have not been fully addressed.

For example, the PAED study raised the question about who owns the DTS, the contractor or the DOD. The ownership of DTS has both cost and competitive implications for DOD.

Seven months after DOD's decision to move forward, the Department of Justice informed Judge George W. Miller of the U.S. Court of Federal Claims that DTS belonged to the contractor and not to DOD, and that concern was raised by my colleague, Senator Grassley. This clearly is an issue that needs to be resolved. I expect to get some responsive answers from DOD on that issue.

Today we will hear testimony from some of the individuals and organizations that help to administer DTS or who have raised questions about DTS cost and performance. They will share with us their concerns about DTS.

We will also hear from representatives of the GAO, the DOD inspector general and the PAED, who will testify about reports or studies they wrote that have questioned the costs and benefits that DTS offers DOD.

Finally, we will hear from the comptroller and the director of the Defense Finance and Accounting Service, who are the principal officials responsible for DTS.

Before hundreds of millions of additional taxpayer dollars are unnecessarily wasted, it is

imperative that DOD adequately address the many questions that have been raised regarding the cost effectiveness of DTS. I expect DOD to provide answers to these questions during today's hearing. My colleague Senator Coburn and others also have that same expectation.

With that, we will call our first panel and welcome our first witnesses today. And actually, it's technically our second panel, since Senator Grassley was a panel in and of himself.

I would like to welcome Mr. Thomas Schatz, president of the Citizens Against Government Waste located here in Washington, D.C.; Mr. Robert Langsfeld, partner of the Corporate Solutions Group of Menlo Park, California.

I appreciate your attendance, gentlemen, at today's hearing and look forward to your testimony and assessment of the Defense Travel System.

Before we begin, pursuant to Rule 6, all witnesses who testify before this subcommittee are required to be sworn in. At this time, I would ask you to rise, raise your right hand. Do you swear that the testimony you're about to give before this subcommittee will be the truth, the whole truth, and nothing but the truth, so help you God?

SCHATZ: I do.

LANGSFELD: I do.

COLEMAN: Thank you, gentlemen. We'll have a time system here, and a minute before you should be done, before the red light comes in, you'll see the light change from green to yellow.

If you desire, we certainly have your full written testimony entered into the record. But I urge you to try to stay within the time limits. As I said, we have a vote and we'll have to adjourn at a set time today.

Mr. Schatz, we'll have you go first and followed by Mr. Langsfeld, and then after we've heard the testimony we'll turn to questions. Mr. Schatz, you may proceed.

SCHATZ: Thank you very much, Mr. Chairman, and I congratulate you and your staff, and certainly Senator Coburn and his staff, for helping to bring this to this level of a hearing.

We issued a report one year and one day ago, September 28th of last year, on the Defense Travel System, so we very much appreciate the effort that's been made and the information that you have provided. You provided an excellent summary of what has occurred, and why we are where we are today.

So I want to take just a minute or two to talk about our organization, what we've done and what we'd like answers to as well, because the answers do lie with the people that are in charge of this system. And that would be the Department of Defense, the inspector general, the PA&E and others that are the ones that should be providing the information.

We're certainly disappointed that we have not gotten -- or you have not gotten a more prompt response to your questions. Perhaps that might have avoided the ongoing issues that surround DTS.

Citizens Against Government Waste was created 21 years ago following the Grace Commission report. Much of what the Grace Commission and, in turn, CAGW looked at is waste, mismanagement and inefficiency in particular in the Department of Defense and in procurement.

We've been following these issues for many years and we know that you and your subcommittee are quite interested as well.

The original rationale for DTS actually was something the Grace Commission recommended, a more cost-effective way to manage travel at the Department of Defense. But on the way to this Web-based travel system, there were several bumps in the road.

You've already described the original contract which was supposed to provide an end-to-end Web-based travel system. That means a system that could track authorization, produce tickets and vouchers, track expenses and reimburse travelers.

We know that parts of that are being done but not all of that, apparently, is being done. And of course, the effort to take the commercial off-the-shelf system and modify it did not work.

The other part that we find questionable from a taxpayer standpoint is the original intent to have Northrop Grumman be paid following full deployment of the system, meaning installation but not necessarily usage, at 11,000 DOD facilities. Then they would be paid only if a transaction was completed. That cost was supposed to be $263 million. And development was supposed to be paid for by the contractor.

Instead, following the restructuring, which the U.S. Court of Claims said violated the Competition in Contracting Act, everything was changed so that DOD paid Northrop for development. Some have suggested that DOD may end up paying the same amount, $263 million, but there's a difference between development and a per-transaction reimbursement after development.

In other words, there's no guarantee that Northrop ever would have been paid that full amount because that would have required full usage. And we know from what you've said and from what we've heard and certainly other studies that usage is, first of all, not required or mandated and, second of all, many who are using it don't necessarily like using it.

And that's one of the things that we'd like an answer to, is why was this written in a way that didn't require full usage. Why would you spend hundreds of millions of dollars on a system and then not require the Department of Defense to utilize it?

We certainly examined and heard of many other problems with software development at the federal level. Senator Grassley mentioned the Virtual Case File at the FBI. Eventually they pulled the plug on that. That is at least a question to consider here, or certainly what we might do going forward.

The other question, one that you asked, is who owns it, question maybe why the GSA is paying the contractor and not paying DOD, and what's going to go on once it's fully developed. There's also some questions which haven't been addressed about who was involved in the decision making process, some individuals at DOD.

We're not suggesting anything, but we hope that that's part of your investigation, as to who was involved in the final decision and when that occurred. And Senator Coburn's considering an amendment to move this from -- DTS over to the e-Travel system at GSA, another question that should be examined by the committee.

The most recent GAO report issued in March -- and I know they're going to comment -- said that the full cost will be $4.3 billion, or $4.39 billion, so there's lots of numbers being thrown around. We'd like to know which is which.

That report also said the National Guard is having major problems in terms of mobilization vouchers and authorizations, so that also should be further examined by the subcommittee.

Mr. Chairman, the bottom line is whether taxpayers will ever know what they're getting for their money and whether or not we did waste or didn't waste hundreds of millions of dollars now and in the future. Thank you. I'll be happy to answer any questions.

COLEMAN: Thank you very much, Mr. Schatz.

Mr. Langsfeld?

LANGSFELD: Good morning, Mr. Chairman. Thank you for having me here today. I'm the founding partner of the Corporate Solutions Group. We are a consulting firm providing services to the government and corporate organizations. And I also request that a fully copy of the presentation be placed into the record, sir.

COLEMAN: Without objection.

LANGSFELD: Thank you. I am here today because we were awarded a task order by GSA to perform an audit and study the Contract City Pair Program, the DTS program and the three eTS programs. We were asked to determine, among other things, whether DTS actually displayed the best policy-compliant fares that are available at the time of the booking.

The study was intended to provide an accurate, independent assessment of fare presentations for each of the tested systems. First, our team was asked to perform an initial review of the inventory platform. That is, we were asked to make sure that all of the government-city pairs are in the booking systems.

We have prepared a slide that shows how the city pairs make their way into the database, and as you can see from the slide, the GSA conducts procurement and then awards the city pair contracts to the winning airlines. The rates are then sent to a processing group, the Airline Tariff Publishing Company, and then loaded into the respective global distribution systems such as Sabre, Galileo, Worldspan and Amadeus.

Once the fares are in the GDS, the DTS and eTS Web-based travel systems access that information, process it and display it to the federal traveler. During our review of this inventory, we found that 7 percent to 8 percent of all these fares either were not loaded correctly or were not loaded at all into the GDSs. Therefore, they were not available for DTS to capture and display and for the DTS traveler to select.

When this anomaly was disclosed to GSA, they responded that they considered this to be totally acceptable at 8 percent. GSA also refused to provide our company with the source documentation to verify the fares and who was responsible for those issues. We were told to look at the GSA Web site to find the fares. And without that, we are not able to provide an opinion without source documentation.

The next review was a review of the domestic 25 city pairs, and we found a variety of errors, omissions and issues. However, once these problems were reported to DTS and GSA, the project management personnel continued to change and reduce our review and the performance scope of our contract significantly.

These changes to our original assignment had the effect of significantly reducing our ability to report variances on available airfares, commercially available airfares and competitive airfares that might be lower than the state pair program.

What is worse, the GSA and DTS project management officials would not allow our auditors to access the systems to be tested, so therefore all we could look at would be the displays of the systems, not how they functioned or why.

I direct your attention to the charts we have included in our report. And in this first chart over here, of the top 25 domestic city pairs, the YCA code is used to designated unrestricted coach class fares, which are the CPP program, and the Dash C.A.s, as they call them, are used for capacity control for the City Pair Program.

Table 1, right there, shows that the four government systems displayed between 35 percent and 90 percent of all applicable CPP fares in the 25 markets. Specifically in the case of DTS, only 61 of 187 fares, or 33 percent, were listed by DTS. Other systems showed between 35 percent and 90 percent of the fares displayed.

DTS only displayed, therefore, one-third of the itineraries that were available to the federal traveler. Or, put another way, two- thirds of the time the applicable city pair fares were not displayed, which is a major operational deficiency, in our perspective.

Also, all available fares, including the rest of the CPP fares and lower cost fares, are simply not being displayed on a consistent basis; i.e., that is all available fares are not listed, all CPP fares are not listed, and the lowest cost airfares are not listed.

We were very surprised to find that when we presented it, the DTS and GTS sought to downplay the issues and the results. We were asked to change some of our findings to give a better result, and we refused to do that. And they proceeded to terminate our contract on that review.

The overriding concern I have is that when DTS deficiencies were identified, the government chose to change, suppress or modify the results in order to downplay the severity of the issues and to disclaim responsibility.

You will undoubtedly hear government personnel try to make excuses for the findings, but it was their settings. They set the conditions for the audit, and they determined how best to do it.

Our opinion is the government needs to have a continuing quality control audit in place for these programs and systems. It is painfully apparent that such reviews need to be on independent and objective areas outside of the GSA and DTS office. And in these times of budgetary concerns, the constraints of the performance of systems such as these are paramount.

We hope that this committee and these hearings may result in a viable and reliable process for the use of the government and, in this case, the government traveler.

Thank you for allowing me to participate in this hearing. I'm prepared to answer your questions.

COLEMAN: Thank you very much, Mr. Langsfeld. And I will mirror what you said about in times of budgetary concerns, and these are clearly times of budgetary concerns.

I voted for $62 billion in appropriation for funding for Katrina, which was the greatest natural disaster in the history of this country. We'll see how that money is spent. And we need to track that very carefully. But we're in the midst of a war.

The great challenge is deficits rising, economy impacted by disasters, and so I think we have a special responsibility in these times to do what we're doing. I appreciate your work. Can I just ask -- I want to step back first, and can you explain a city pair, what that means?

LANGSFELD: Yes, sir. I'd be glad to. A city pair is a program administered by the General

Services Administration, and that is to have contracts established between the airlines and the U.S. government for use going from Point A to Point B, such as National to Pittsburgh, Dulles to Atlanta and so forth. Those would be considered -- city pairs are one-way fares.

And there are about over 4,000 of those negotiated on an ongoing basis annually with the airlines by GSA, and therefore the government traveler has access to those fares.

COLEMAN: So you're getting access to -- you know how much it costs. You've got to get a set amount to a particular city, and then you can kind of use that as a, you know...

LANGSFELD: As a baseline.

COLEMAN: ... as a baseline.

LANGSFELD: Yes, sir.

COLEMAN: And what I'm hearing from your testimony is that in at least 8 percent of the cases the city pairs weren't even loaded into the program, so there's no baseline.

LANGSFELD: There's no baseline, that is correct, sir.

COLEMAN: So there's no way to...

LANGSFELD: There's no way to get to it.

COLEMAN: ... no way to get to it. And your other testimony is that -- you talked about all fares not displayed and not listed. Why? What's missing here?

LANGSFELD: There is something missing, sir, but we weren't permitted access to find out those answers. Our scope was limited to only taking an audit of those city pair programs, those CPP program rates, those 4,000 we just discussed, and to say were they displayed to the travelers through the various systems -- in this case, DTS, were not.

If there were other lower fares, they might not be displayed. For an example, to clarify and answer your question specifically, in the case of, let's say, Albuquerque to Los Angeles, we found a city pair -- actually, let me pull it out, sir, pardon me. We found a city pair that is $153 one way between Albuquerque and Los Angeles, and that's the negotiated city pair as we discussed.

The DTS system found prices anywhere between $120 and $300, and the GovTrip system pretty much similar, which is another Northrop system provided under GSA contract. And under the E2 Solutions provided by Carlson, they found $87, comparative rates, none restricted, walk-up fares, so in essence, 50 percent less, and it wasn't displayed.

COLEMAN: The other thing I want to understand is you indicated 7 percent or 8 percent of fares are not fully loaded, City Pair Program, but then your Table 1 indicates that only one-third of available government fares are listed.

Can you help me understand the difference between the one-third figure versus the 7 percent to 8 percent?

LANGSFELD: Yes, sir. First of all, the 7 percent to 8 percent means that even out of the 100 percent, if you may, that they could possibly look at, they won't find, based on our sample, 7 percent to 8 percent of those regardless.

So that means that the traveler, if they're going from Point A to Point B, will be paying

commercial fare rather than negotiated fare that's established. That would reduce, by definition, even the amount of fares that the different systems can find. Their population is essentially 92 percent of what's ever out there.

The second part of your question, sir, is that of 187 -- on that chart, as you can note, out of the 187 possible city pairs that were found between Point A and Point B, that only one-third of them were ever displayed by the DTS system. And the other systems, somewhere between 35 percent and 90 percent of them were displayed.

So there is something out there that's editing that result that we weren't permitted to find.

COLEMAN: And I'm trying to get to a solution that. What I'm hearing is that the reaction you're getting from the government folks didn't seem like there was a lot of concern.

LANGSFELD: That would be a correct statement.

COLEMAN: And your testimony is very strong when you sort of say change, suppress, downplay. That was a very serious concern. Do you have any reason to qualify that at all?

LANGSFELD: I have no reason to qualify that statement, sir.

COLEMAN: DOD has some very optimistic projected cost savings on this program. Can you respond to that issue? Can you give me some information? I don't have the numbers in front of me, but I know they have some very optimistic cost savings.

What I'm trying to figure out as I listen to the testimony is how do you get cost savings in a system in which you've got, you know, 33 percent of total fares displayed being used. How do you get there? What's the basis for that?

LANGSFELD: If I may be permitted, I'll answer that in two parts, sir. The first would be a reverse question to you, or a rhetorical question, of course, and that is how can you display 100 percent when you only have 33 percent in front of you.

So you'll never be able to achieve those results regardless of any steps that you take, given the current condition of the system.

The second part of it is all of the assumptions that I've seen on the DTS system and the eTS systems are anywhere between an 80 percent and a 95 percent adoption. Therefore, that's 80 percent to 95 percent of all the federal travelers using that system.

As you provided in your opening statement, 4 percent or 5 percent are where they are today. To get from Point A to Point B in the condition that the systems are in I think is an unrealistic goal, and therefore your return on investment and your analysis has to be adjusted, and possibly significantly.

COLEMAN: And that kind of leads into my questions to Mr. Schatz.

One of my concerns that I'm struggling with her -- on the one hand, it's clear that we're not having full utilization. Mr. Schatz, you talked about that. But then the next question is even if we have full utilization, a system that's fundamentally flawed -- are we going to get the cost savings we're talking about?

Mr. Schatz, you know, you talked about the system being underutilized. Do you have any sense that if it was fully utilized that we'd be achieving the cost savings that have been projected?

SCHATZ: Well, it's certainly not based on what Mr. Langsfeld has just said. There's a lot that remains to be done in order to get to where they originally intended to be and, of course, that intention meant that this system would have been completed about four years ago.

So we're behind schedule. We don't have full utilization. There's no requirement for full utilization. And even if you had, apparently from the study you don't even have all the available information to get the best fare and the greatest amount of information.

And the other point to recall is that this was supposed to be an end-to-end system. Authorizations and vouchers may be what they're doing now, but it's supposed to do a lot more. So you've got cost overrun, lack of information, lack of usage all adding up to some number.

And as I said, GAO in March said it could be $4.39 billion. We've seen $470 million, $491 million, $551 million. I'd like an answer -- I know you'd like an answer as to what the cost is, how do we get greater usage if the system is, in fact, the right system and does perform everything it's supposed to.

And then we might be able to determine how much it's really going to cost or save, if anything.

COLEMAN: And when we say end-to-end system, it's lowest cost airfare, lodging facilities, some of the concerns that Senator Grassley raised, tracking unused tickets -- I mean, there's more than just lowest cost fare involved in this, is that correct?

SCHATZ: That's correct. Right. It would be something that you would have if you were a company trying to come up with a system that you as an organization could produce and track and require your employees to use. In fact, it wouldn't be surprising if -- and I'm sure it's true -- the companies involved in this have their own systems that do that.

And like many other efforts to get the government up to speed in software systems, they need to do more.

COLEMAN: I wonder if you can help me a little on the history here. The report Through the Looking Glass -- was that commissioned or developed by Citizens Against Government Waste?

SCHATZ: Right.

COLEMAN: So just when the -- you're going to go through all the history of this thing. When it was first developed, was it intended to be an end-to-end system? Was that what was, that $263 million figure?

SCHATZ: It's our understanding that is correct, yes.

COLEMAN: And at that time, was the issue of ownership at all at issue, the question of ownership at issue?

SCHATZ: I'm not certain about that. The ownership issue came up in the court case, as you mentioned. The Department of Justice said it's owned by the contractor. We have heard differing views on that. We have not seen anything that confirms it one way or another.

COLEMAN: I believe, as I looked at the -- or as I reflected on the court decision, in part it seems to me that one of the reasons the judge didn't just pull the plug on the system was his belief that, in fact, it was owned by Northrop.

SCHATZ: Right.

COLEMAN: And in doing so, the government would have to start from scratch. Did you get a chance to read the decision?

SCHATZ: Yes, that is our understanding, and that was one of the reasons that even though he found that it violated the Competition in Contracting Act, he said it would cost another $500 million to develop another system, which we would argue is not quite the case, based on systems produced by other companies that would be available.

COLEMAN: And yet development costs are now -- as I understand it, the federal government is paying for the development costs of creating this end-to-end system, is that a...

(AUDIO GAP)

SCHATZ: ... fill the (inaudible) where you have heard that it is, but we'd like independent verification of that from people that are in charge of monitoring the system.

COLEMAN: And, Mr. Langsfeld, did your study touch at all on that? You've looked at some other systems and costs here, and I believe other systems in place in other government agencies.

LANGSFELD: Yes, sir. And your question being?

COLEMAN: Well, the question being the incidence of overpaying, of not paying the lowest available fare, you know, how significant that is, and whether there are other systems that simply do a better job of correcting that or identifying that.

LANGSFELD: Well, I think even some background would help. In our experience, we've worked with hundreds of private sector companies, some very large, some very small, but the bottom line is it's always a challenge to find the lowest fare.

Just focusing on finding the city fare programs, as we talked about, is really -- is not affected. It's a very good baseline, but it's only that. We found that carriers that have city pair fares -- let's say United Airlines -- from Point A to Point B -- they'll even have fares that are lower than the City Pair Program. But in the case of most of these systems, we didn't find that being displayed, for whatever reason.

We also find that there's significant other comparable fares that government travelers could take that are totally compliant with your terms and conditions that would significantly save money to the U.S. taxpayer and to the U.S. government.

COLEMAN: Is the airline pricing system so complicated that we do not have the computer capacity available to actually identify at a touch of a button the lowest available fare? Is it that complicated?

LANGSFELD: It's certainly complex. On the average, about 100,000 to 150,000 changes in the system a day is made. So you have to have a computer system, if you may, to keep up...

(AUDIO GAP)

LANGSFELD: ... that certainly would have been an opportunity then, based on the I.G.'s recommendations, to take a good, hard look and possibly pull the plug and do something else.

In December of 2002 the Program Analysis and Evaluation Office followed up on the I.G.'s

findings, recommended that DOD consider commercial e-travel systems that were now available but were not available at the time of the original contract awarded to Northrop.

So despite these two reports from their own internal offices, DOD and I guess, in this case, the Program Management Office for DTS decided to move forward anyway.

As to whether it's cost-effective now to pull the plug, I honestly could not give you an answer to that, and perhaps your next witnesses can, because now we're many years into this arrangement, and we have certainly seen this occur with virtual case file and others, where it was just such a mess that they decided it was not worth the additional cost to complete it, because they could either do something better or possibly something more effective.

COLEMAN: Last question, follow up, and that is are there alternative off-the-shelf systems -- either to you, Mr. Schatz, Mr. Langsfeld -- are there private side off-the-shelf systems that would be more taxpayer-friendly, more effective, more cost efficient?

LANGSFELD: Well, there certainly has been a discussion about having DOD use the GSA e-Travel systems. There's questions about the interfaces that have already been established. So that is, I think, something that the subcommittee and its experts in DOD should take a good look at.

But certainly, based on what we've seen, there are systems that can provide lower fares.

SCHATZ: In response to your question, Mr. Chairman, I believe that there alternative systems out there. I believe that the design of the DTS system and also the design of the other government systems were precedent -- one of the base points was to go off the shelf, commercial-off-the-shelf, COTS programs.

They are available. They have been proven in the public marketplace. And the idiosyncrasies or the uniqueness of the government travel can readily be adapted to be responsive to the government needs. So yes, there are ways to get to it.

And I think there should be better ways to get and access that information.

COLEMAN: Thank you, gentlemen. My ranking member is here. I know he's in a full Armed Services Committee meeting where he's also the ranking member.

And Senator Levin?

LEVIN: Mr. Chairman, thank you, and thank Senator Carper for allowing me to jump in here out of turn. And I will be very brief because I have to return to the Armed Services Committee.

But first I want to commend you, Mr. Chairman, for digging into this issue with your usual determination and thoroughness. It's a very important issue. You are not only bringing to light the deficiencies in a particular system but this defense travel system is, I'm afraid, too typical of the Department of Defense's efforts to acquire major new business systems.

It's been plagued by poor planning, schedule delays, increasing costs, and the performance deficiencies. So you're not only going to hopefully address the problems in a particularly -- or you are addressing the problems in a particular system, but you're also through this effort of your providing some real insight into the problems with the acquisition system overall inside of the Department of Defense.

I think my entire statement has been made part of the record. If it's not been, I would ask...

COLEMAN: Without objection.

LEVIN: ... that it be made part of the record. Again, I want to just thank you and commend you and your staff and our staffs for working on this together.

COLEMAN: Thank you, Senator Levin, and thank you for all the work you and -- your staff, I should compliment them. I think we have a good bipartisan relationship when it comes to dealing with fraud, abuse and misuse of taxpayer dollars. So I thank you very, very much.

Senator Carper?

CARPER: Mr. Chairman, I just learned during the course of the earlier part of the hearing -- is the audio was coming in and out for our guests here today. This room has been revamped and this whole platform up here has been redone. We were out of commission here for several months.

(UNKNOWN): (OFF-MIKE)

(LAUGHTER)

CARPER: The folks who actually apparently have been working on this Defense Transportation System actually worked on the audio.

(LAUGHTER)

(inaudible) I don't know what to make of that.

On a more serious note, thank our witnesses for being here.

And I, too, have a statement. I ask that it be made a part of the record, Mr. Chairman.

COLEMAN: Without objection.

CARPER: And the first question I'm -- I'm sort of like you. In my old job, I was the governor of a state. I remember any number of technology projects and information projects we got into where we got to the point where we said do we want to continue putting money down this deep, dark hole, or to pull the plug, or just do something else.

And I don't know if we're at that point for this one, but I'm sure it's a question that needs to be asked. Let me just ask the first question I'd ask of our witnesses.

Before I say that, I hope that we'll have an opportunity to hear from -- and maybe it's later today -- from folks within DOD who have been part of overseeing the development of this system who can tell us whether it's worth all the time and the money and the trouble that it's causing or if there's a better option.

But let me just ask the first question I have of our witnesses. If you were in our shoes, a recovering mayor, a recovering governor, if you were in our shoes, what would you do?

SCHATZ: Well, you're dealing with the first step that you need to take, which is to have the hearing. There have been reports -- there have been, as I said a minute ago, opportunities to do something about this earlier, in 2002, so again the question is here we are, three years later, have we spent so much that we have to continue, what's in the contract, what are the penalties.

We have canceled contracts, paid penalties, and kind of moved forward. That's not

unprecedented. But I think your next panel and the further investigations you have requested -- also, the questions that haven't been answered for the last year since Senator Coleman and Senator Coburn have been asking them -- I know you have been involved as well, and we appreciate that very much.

It is at a crucial point, I guess, is the bottom line. Within the next year, in a sense, that's kind of it. So something, if it is going to be done, needs to be done soon, and soon meaning in the next few months, not in the middle of next year.

CARPER: All right.

Mr. Langsfeld?

LANGSFELD: I agree with his comments. I think the process we're going through right now is important. The resolution of this -- if you were in the commercial world, you would have been fired. So in the essence of what you're doing, this is recoverable, certainly. And I think there's some good issues in this good product out of this. I think it's recoverable there.

At a point in time, I think you need to get into beyond the appropriations voucher and authorization side and get into the travel savings. To save $15 in transaction fee and leave $1,000 for the airline ticket on the table is illogical to me, and I can't find a resolution for that.

So I think you need to get a system that's going to be able to do that. I think DTS system, in my definition, is what I call closed architecture. Therefore, they have modified code in such a way that everything has to be changed when -- when one thing is changed, they have to go in and change code.

It's not a COTS drop-in system where you could just bring in a new module and put it in. I think that's one of the solutions that we found in the public sector to be very effective.

CARPER: All right, good. Thanks. Thank you very much for that.

I'm sure the Department of Defense didn't set out to have this kind of problem. They wanted to solve a problem and didn't want to create one, and I'm sure they didn't want to spend all of this money.

I'm also certain that DOD isn't the first large organization, either public or private, that's attempted to find some paperless, more streamlined method of handling employee travel.

Let me just ask what mistakes -- you've spoken to this to some extent, but let me ask again. What mistakes has DOD made here that other departments or private sector businesses have avoided?

SCHATZ: Do you want to answer that?

LANGSFELD: I'll be glad to. I think first of all I mentioned the close system, closed architecture. In this changing era, as Mr. Coleman has referenced...

CARPER: A lot of people call him Coburn.

LANGSFELD: And I just got...

(CROSSTALK)

LANGSFELD: I apologize.

CARPER: When you start calling me Coburn, we'll really worry.

LANGSFELD: I think I'll go back to "sir".

(LAUGHTER)

The reference of what's been expended and where you gotten to at this point in time -- I think the appropriations authorization side, the vouchering system in itself have been a good tool, and I think there's some strong savings in there.

What we have found in the private sector, for example, is -- let's say for that City Pair Program that we talked about, with 7 percent to 8 percent variance, literally a travel manager of a -- probably what I would consider the second-largest private employer in the world said at 1 percent I would have called the person in on the carpet and disciplined them; at 2 percent they would have been released.

I think you need to go in and have some good oversight in what you need to do, and what we have done in the private sector successfully is gone out and dropped in a new module when one module doesn't work.

So in this case, it's the booking system. There are commercially available products that can be adapted and integrated and I think at a much lower cost than where some of your projections could be to correct the existing system.

SCHATZ: Unfortunately, Senator, these problems have existed for some time and continue to exist. There was many acts in the 1990s that were intended to streamline the procurement system and improve it.

In this case, because of the way that the contract was changed -- and it was called a cardinal change by the court, meaning that it did violate the Competition in Contracting Act -- this is a little bit more than just a questionable software system.

There is issues with how this all occurred that really underlie the entire procurement system. So you have obviously a question, what do you do about this.

The other question is how do you prevent that from occurring again, where we go from a system where the contractor was supposed to develop it at its cost and get paid per transaction to where they're getting paid for development, and they end up having been paid more than they would have gotten based on the transactions.

So that's something else to keep a very close eye on. And in terms of the expertise of others as to the better systems, at least obviously Mr. Langsfeld feels that there is something else out there. And from what we've seen, there are systems that work better.

As to whether you could just drop it into DOD is something for the DOD people to answer.

CARPER: Right. One more question. Is DOD travel more complicated or expensive given the scope of their operations, you know, not only around the country but around the world?

But is it more complicated or expensive maybe through regulations that they have or mandates that maybe the Congress has put in place, or is it that the department just hasn't done as good a job with this travel system as they could have?

LANGSFELD: I think it's more the latter than the former. There are complexities in U.S. government travel that are unique -- Fly America Act, City Pair Program -- to try to do it as

efficiently as possible.

Other factors, other accounting issues that are in concern, that you have to appropriate, and you have to escrow your monies for travel, and the vouchering system has unique (inaudible) rules and DOD rules that are there.

But I would say at the end of the day travel is travel, and finding the lowest rate and finding the lowest hotel and finding the lowest car rental is pretty much a very direct issue. It sits out there. All you're doing is looking at the inventory and selecting it.

I think that's a very basic step to do, and the only thing you have to do in the government arena and the government sector is you have to apply a few more rules in than you might have in the public sector.

Other than that, I would facetiously say that probably half your travelers are looking at Orbitz when they call your travel agent at this current time. I do. So, I mean, these people know what's out there. They look at what's available.

I think your travelers are savvy enough to be able to figure that out pretty easily.

LANGSFELD: Senator Carper, I did mention earlier that DOD is essentially at fault for all of this, for changing the nature of the contract, for not requiring the lowest fair, and in general for having so many incompatible financial systems, something that this subcommittee and the full committee have looked at for many years.

That would help resolve a lot of these issues -- again, a broader one, but one that really gets to the basis for a lot of these problems that occur when software systems are introduced into the federal government.

CARPER: All right. Thanks.

Chairman Coleman, back to you, sir.

COLEMAN: Thank you very much, Senator Carper.

Just two quick observations. One is a comment you made, Mr. Langsfeld. I think it was pretty important here. This system does save money on transaction costs. It's $15, right? $5 Web-based...

LANGSFELD: Right.

COLEMAN: ... $15 -- so it does save money on that, but I think your comment's important, that up front we're saving money on a transaction, but if you're going to be spending $1,000 more on a ticket -- I mean, if you don't have the same user system, then something's wrong, and we're not getting bang for the buck.

And the other comment about the 7 percent to 8 percent being acceptable -- I get very frustrated. We make a joke about it's not bad for government work, but we really should expect the best for government work.

LANGSFELD: And you can achieve the best, sir.

CARPER: It's funny you should say that, Mr. Chairman. If I could, in our administration, maybe in yours as well back in St. Paul, whenever people say that's good enough for government work, we'd fire them. And we would replace them with people whose motto was if it isn't perfect, make it better.

COLEMAN: And last, Mr. Schatz, I just want to raise one thing that you made a comment -- and you didn't pursue it, but there was a concern raised at one point -- without casting, you know, aspersions, but I just want to raise the issue about folks who work for the Department of Defense and then went to work for the contractor, the kind of revolving door.

And that was a concern in this contract, is that fair to state?

SCHATZ: Yes. There is a concern. Again, questions, I think, have been asked but not answered. I don't have the answers, but we are certainly happy to ask the question. We did see that in other cases. We're not saying anything like that is occurring here.

But we don't know, I guess is the bottom line, and certainly the I.G. at the very least should be looking into that, and hopefully they'll be conducting another investigation in regard to this contract.

COLEMAN: I just think that this is the issue, Senator Carper, of individuals who are in senior places in Department of Defense and then go work for the contractor that gets the contract or modification to the contract that are not very transparent.

And I actually think there's an extra responsibility where you have that kind of revolving door to be acting in a way that doesn't even raise those issues. I think it undermines public confidence in the systems.

And certainly those questions will be looked at and will have to be responded to. Gentlemen, I thank you. Your testimony has been very, very helpful and I'm very appreciative. Thank you. This panel is excused.

The third panel -- what we're going to do is simply going to swear in the panel members, maybe have testimony from one person. We're going to adjourn at 11:15. We're supposed to be in our seats by 11:20 for a very important historic vote.

CARPER: What vote is that?

COLEMAN: I'll tell you how to vote on the way out.

(LAUGHTER)

CARPER: You already have.

COLEMAN: I'd now like to welcome our final panel of witnesses for today's hearing, Mr. Thomas F. Gimble, acting inspector general at the Department of Defense; Dr. Scott Comes, the director of DOD's Strategic and Program Analysis and Evaluation Division; Mr. McCoy Williams, the director of Government Accountability Office Financial Management and Assurance Team; and finally Mr. Zack Gaddy, the director of DOD's Finance and Accounting Services.

Gentlemen, I appreciate your appearance today and your testimony and your perspective on the Defense Travel System. I do have a letter from Mr. David Chu, the undersecretary of defense for personnel and readiness.

And I'll read the letter here but do want to note that there has been, certainly, an increased level of response from the Department of Defense from the time that we put this hearing together. And I do appreciate that.

"Mr. Chairman, I want to thank you and members of the subcommittee for your interest in

the Defense Travel System. My office will soon assume a new and significant role for this system as part of our continued effort to strengthen management and oversight in a phased plan. As we assume functional oversight of the entire program, our first order of business is to assess the DTS program by ability. Specifically, we will assess whether DTS is delivering increased efficiencies, improved services and achieving cost savings. In doing so, we will study carefully the several reports and evaluations of the system before we take any action, including reviews of the committees of Congress before we proceed. The department clearly understands that we have many challenges ahead in making our travel program more efficient and cost-effective. Indeed, the Defense Travel System represents a whole new way of doing business for government, and we must ensure that promises and goals envisioned are achievable. We will take the necessary steps to resolve problems. I look forward to continuing to work with you and your committee on this important program and we'll provide you with the conclusions of my analysis. David S. Chu, undersecretary of defense for personnel and readiness."

So I am pleased that the Department of Defense has chosen to cooperate with the subcommittee, work with us in resolving these concerns. Clearly, the subcommittee, though, will continue its oversight to ensure that DOD's actions match its promises.

Gentlemen, pursuant to Rule 6 all witnesses who testify before the subcommittee are required to be sworn in. Will you please stand and raise your right hand? Do you swear the testimony you're about to give before the subcommittee is the truth, the whole truth and nothing but the truth, so help you God? Thank you very, very much.

I think you're aware of the timing system. Again, we will begin with the testimony, but we will break at 11:15. We will start with Mr. Gimble and then proceed across.

So, Mr. Gimble, why don't you begin first?

GIMBLE: Mr. Chairman, members of the Subcommittee on Investigations, thank you for the opportunity to appear before the committee today to address the questions regarding our July 2002 audit report, Allegations to the Defense Hotline on the Management of the Defense Travel System.

We concluded in the audit, in response to the allegations made to the hotline -- in summary, we concluded that DOD should have managed the Defense Travel System Program as a major automated information system program and ensured that it met the requirements of the Clinger-Cohen Act, DOD acquisition policies and security policies.

Before I begin discussing the Defense Travel System, I would like to provide information on other acquisition efforts where we identified systemic problems pertaining to the information technology acquisitions during the period of October 1996 to March of 2000.

Those systemic problems included inadequate documentation and validation of system requirements, inadequate life-cycle cost analysis or incomplete cost data, incomplete analysis of alternatives to assure that the programs were the most cost-effective solutions, improper categorization of the systems for oversight purposes, incomplete or nonexistent acquisition program baselines to record cost, schedule and performance goals. Many of these issues were present in the Defense Travel acquisition.

Additionally, we believe that the Defense Travel acquisition also faced significant challenges in using commercial off-the-shelf software that required substantial modifications. We reported similar challenges on the Standard Procurement System and the Defense Integrated Military Human Resources System.

The Defense Travel System was envisioned as a general support system designed to make

business travel quicker and more efficient by providing automated commercial and government travel support services to the DOD travelers.

By early 1999, as indicated in our audit report, it became evident that the commercial off-the shelf software required major development and modification in order to meet the DOD requirements.

In February 2002, the Program Management Office requested approximately $377 million to manage and develop the program for FY 2002 through 2007, of which $186.5 million was for research, development, test and evaluation.

As stated in the 2002 audit report, the Defense Travel System was at risk for not being an effective solution to streamlining the DOD travel management process. Further, the Defense Travel System experienced significant testing and deployment problems which were compounded by the need for significant but unplanned developmental efforts.

The Program Management Office had terminated the November 2002 operational assessment because 72 discrepancies and substantial deployment problems were identified.

By October 2001, the Joint Interoperability Test Command reported the second operational assessment that it did not consider the Defense Travel System to be operationally effective for all DOD Components. In 2002, DOD revised its deployment plan and reduced the number of deployment sites.

The Clinger-Cohen Act of 1996 and the DOD acquisition policy provide an effective framework for the management of information technology investments. Information on cost, schedule, and performance required by the DOD acquisition policy would also be needed by the Chief Information Officer in performing responsibilities under the 1996 act.

However, DOD had not viewed the Defense Travel System as subject to DOD acquisition policy for a program because its capabilities were based on commercial off-the shelf software development, and therefore cost, schedule and performance information had not been obtained.

In 1997, the DOD CIO designated the Defense Travel System as a special interest initiative. DOD did not consider the special interest initiatives subject to DOD acquisition policy.

In January 2001, the undersecretary for acquisition, technology and logistics and the DOD comptroller recommended a reassessment of the system because of the deficiencies identified during acceptance tests.

They required the Army to specify the items needed in the contract based on results of a functional and technical assessment of the system. In April 2001, the Army Communication-Electronics Command became responsible for the contract, to include contract restructuring.

In January of 2001, the undersecretary for acquisition, technology and logistics and the comptroller approved proceeding with the Defense Travel System and identified that they would retain oversight responsibility.

We had recommended the designation of the Defense Travel System as a major automated information system program and also that the comptroller complete the Program Analysis and Evaluation study by October 1, 2002.

The DOD comptroller tasked the director of Program Analysis and Evaluation to undertake the cost effectiveness study of the system that would be used to determine whether to continue or terminate the system.

Additionally, we had recommended, among other things, that the program office comply with the Clinger-Cohen Act -- would ask the undersecretary, acquisition, technology and logistics and the controller and the DOD CIO review the progress made by the Program Management Office in developing acquisition information to determine whether the system should continue or be terminated.

In response to our audit, in May of 2002, the CIO designated the DTS as a major automated information system subject to DOD acquisition policy with himself as the milestone authority.

In response to our recommendation, the results of the Program Analysis and Evaluation study were briefed to the DOD comptroller in December 2002.

COLEMAN: I would ask you, Mr. Gimble, if you can just summarize.

GIMBLE: Summarize? In December of 2003, the CIO issued an acquisition memorandum decision moving the system forward. That concludes my statement.

COLEMAN: OK. We will have your full statement entered into the record.

Gentlemen, we're going to adjourn the hearing right now. We will reconvene when we get back at some time between 11:45 and 12 o'clock. You are sworn in, and we'll just continue when we get back.

At this point, this hearing is adjourned -- recessed, excuse me.

(RECESS)

COLEMAN: The hearing is called to order.

Dr. Comes, please proceed.

COMES: Thank you. Good morning, Chairman Coleman. My name is Dr. Scott Comes. I am the Director for C4 and Information Programs in the Office of Secretary of Defense, Program Analysis and Evaluation.

The Office of Program Analysis & Evaluation conducts independent analysis for and provides independent pre-decisional advice to the secretary and deputy secretary of defense.

In this role, one of PA&E's principal responsibilities is to ensure that the costs, effectiveness and capabilities of DOD programs are presented accurately and completely. My office has primary responsibility in PA&E for conducting such analyses in support of information technology programs such as the Defense Travel System.

In July 2002, PA&E was asked by the USD comptroller to conduct a cost effectiveness review of the Defense Travel System. We conducted that analysis and documented our results in a report entitled "DTS Cost Effectiveness Review" in December 2002.

I am here today to answer your questions regarding that report. Thank you.

COLEMAN: Thank you, Dr. Comes.

Mr. Williams?

WILLIAMS: Thank you. Mr. Chairman, thank you for the opportunity to discuss our preliminary audit results related to DOD's efforts to develop and implement a standard end-

to-end travel system which DOD has been working on for the last 10 years.

This subcommittee has been at the forefront in addressing issues related to DOD's travel management practices, with the hearing today being another example of its oversight efforts.

Our testimony is based on the preliminary results of our audit and focuses on the following three questions. Has DOD effectively tested key functionality in DTS as related to flights and fare information? Will DTS correct the problems related to DOD travel previously identified by GAO and others? And what challenges remain in ensuring that DTS achieves its goal as DOD's standard travel system?

In addition, our statement for the record provides a description of DOD property rights in DTS, as you requested. Subsequent to this testimony, we plan to issue a report that will include recommendations to the secretary of defense aimed at improving the department's implementation of DTS.

Mr. Chairman, DTS development and implementation have been problematic, especially in the area of testing key functionality to ensure that the system will perform as intended. Consequently, critical flaws have been identified after deployment resulting in significant schedule delays.

Our recent analysis of selected requirements disclosed that system testing was ineffective in ensuring that promised capability has been delivered as intended.

For example, we found that DOD did not have reasonable assurance that DTS properly displayed flight and airfare information. This problem was not detected prior to deployment, since DOD failed to properly test system interfaces.

DTS officials have indicated that this problem was fixed in the most recent system upgrade. We are in the process of verifying the effectiveness of these corrective actions.

DTS has corrected some of the previously reported travel problems but others remain. Specifically, DTS has resolved a problem related to duplicate payment for airline tickets purchased with the centrally billed accounts.

However, problems remain related to improper premium class travel, unused tickets that are not refunded and accuracy of travelers' claims. These remaining problems cannot be resolved solely within DTS and will take department-wide action to address.

Mr. Chairman, we have identified two key challenges facing DTS in becoming DOD's standard travel system. One, developing needed interfaces. And two, underutilization of DTS at sites where it has been deployed.

While DTS has developed 32 interfaces with various DOD business systems, it will have to develop interfaces with at least 17 additional systems. And this is not a trivial task.

Furthermore, the continued use of existing legacy travel systems results in underutilization of DTS and affects the savings that DTS was planned to achieve. Components incur additional costs by operating both DTS and legacy systems which have the same functionality and by paying higher processing fees for manual travel vouchers as opposed to processing the travel vouchers electronically through DTS.

Mr. Chairman, overhauling DOD's financial management and business operations, one of the largest and most complex organizations in the world, represents a daunting challenge. DTS, intended to be the department's end-to-end travel system, is a case study of some of the obstacles that must be overcome by DOD's array of transformation efforts.

Successful implementation of standard business systems such as DTS will be the key to achieving billions of dollars of annual savings through DOD transformation. Eliminating stovepipe legacy systems and using cheaper electronic processing are critical to realizing the anticipated savings.

Again, I commend the subcommittee for holding this hearing as a catalyst for improving the department's travel management practices. Mr. Chairman, this concludes my statement. I would be pleased to respond to any questions you may have.

COLEMAN: Thank you very, very much, Mr. Williams.

Mr. Gaddy?

GADDY: Mr. Chairman, distinguished members of the subcommittee, it is a pleasure to be here to discuss the Defense Travel System. I'm Zack Gaddy, director of the Defense Finance and Accounting Service. I am providing detailed information on DTS and the scope of the department's travel operations in the statement for the record.

What I want to do now is give you an overview of the current status of DTS and how we got to where we are today.

The Department of Defense launched DTS in 1995. The goal was to streamline and improve how the department managed travel of DOD personnel and to replace dozens of independent and inefficient travel systems. Initial progress was slower than expected, and the goal of integrating incompatible systems turned out to be more complex than originally envisioned.

After several reviews and reports, the time frame for full usage of DTS by everyone in the department, originally scheduled to be completed in FY 2003, was adjusted to a more realistic time frame of 2009.

In recent years, the department has made important changes to better manage DTS and achieve the ambitious goals for improving travel administration. As a result, today we believe that DTS is proving to be a cost effective solution to our travel needs.

DTS is enabling us to make our travel-related processes faster, less costly and better for DOD personnel. It is strengthening accountability and internal controls, making our data management more accurate and less costly, reducing the likelihood of fraud and waste, and achieving other benefits.

In FY 2006, we expect that DTS will save the department over $35 million. Once fully deployed, DTS will have replaced 31 primary travel systems and eliminated travel processing in another 12 systems where travel is a secondary function of the system.

The management of DTS has been criticized in several reviews and reports over the past few years. In May 2002 the department designated DTS as a major automated information system to get the program on track.

This meant that DTS's progress and problems would be subjected to greater scrutiny by the department's senior leaders. This designation resulted in a comprehensive review of the scope of the program and a thorough analysis as part of the department's acquisition process in its program budget review.

Under rigorous scrutiny, the DTS program has met the cost, performance and schedule goals set forth under its approved program baseline.

Still, we continue to assess how to strengthen the program and hasten progress. To that end, later this fall, we look forward to hearing from the Government Accountability Office, which is expected to complete it DTS program review as a source of additional ideas for improvements.

We know that we need to continue to monitor the DTS program carefully and to make adjustments. Still, we are beginning to see the benefits of the new system. For example, DTS speeds up the travel process and facilitates better customer service, maintains accountability throughout the travel process, meets our requirements for safeguarding information, and allows DOD organizations to monitor their travel budgets more precisely.

Despite the progress to date, we understand that DTS does not currently accommodate all DOD travel requirements. For example, DTS does not process all types of travel for permanent change of station, group or mobilization travel. We expect these requirements to be addressed by the end of FY 2006.

Further, while DTS enhances visibility and auditability for travel, it does not eliminate travelers' or approving officials' erroneous use or approval of premium travel.

We also recognize that the travel industry and emerging technologies are changing how travel should be administered. At the conclusion of this contract, we plan to competitively award a follow- on contract that will address these emerging opportunities.

In closing, I would emphasize that the Department of Defense has acted to correct the previous issues with DTS and is providing proper oversight to make the best use of taxpayer resources to improve our travel process.

We welcome input from the GAO and this committee to help us fulfill our commitment to provide a world-class travel system for DOD travelers. We appreciate your interest in DTS and look forward to working with you in the future. Thank you.

COLEMAN: Thank you very, very much, Mr. Gaddy.

And let me first start -- Mr. Williams, I think it was in your testimony you reflected on the DOD system being one of the most largest and complex in the world, and we understand that. We understand that.

And obviously, if you look at some of the challenges -- but even with that understanding, you know, as you look at the history of this, and where it started, and maybe now we're talking about looking at originally 2003 for a goal of integrating systems. You know, now it's 2009. That's a long time.

Cost started at $263 million -- $500 million. Those are the things that have obviously raised a level of concern of this committee.

I'm not sure who's going to answer it. I'm just going to throw it out. But one of the questions that has come up -- and I think, Mr. Williams, you indicated that there was an answer to it, but I'd like it very clear for the record. Who owns this system? Who owns the DTS system?

In the court decision, it appeared that Northrop owned it. In fact, the judge specifically raised concerns, saying one of the reasons we're not going to stop it now is because we'd walk away with nothing. Was the judge mistaken on that assessment, or is it different today than it was then?

GADDY: I would like to try to answer your question, Mr. Chairman. DTS is owned by DOD. However, when I say that, there are aspects of the program where there's software code

developed by DOD that we own outright.

All the interfaces to the accounting and finance systems within the department -- we own all of those interfaces and all that software. The commercially developed software that Northrop Grumman developed -- we have an unlimited license to use that software. We don't physically own the software, but we own unlimited rights to use that software, and we can delegate those rights to any other user as a follow-on contract.

COLEMAN: But hypothetically, if the contract were to be terminated with Northrop, what would DOD be left with? Because that was the concern of the judge, that we can't start from scratch here.

But again, it goes back to, you know, the nature of our ownership interest on things that have been developed with taxpayer dollars. What do we own? If it were to be terminated, can you divide between what Northrop would have and what we would have?

GADDY: Mr. Chairman, as I said earlier, I believe the correct answer is we would be able to take the software that has been developed by Northrop and turn it over to a subsequent contractor to use.

COLEMAN: Very good. Thank you.

In Mr. Langsfeld's testimony, he said the system is not cost- effective and does not use the best available software. Does anybody want to respond to that? Because my concern is even if we're fully deployed, how are you going to realize full cost savings? And can this fundamental problem be fixed?

First, do you see that's a fundamental problem? Do you agree with the testimony? And then secondly, if so, can it be fixed?

GADDY: I am unable to fully address what Mr. Langsfeld was referring to when he says it is not cost-effective. I do know from his study that he determined the software DTS did not display all city pair contract flights that were available.

We took the information he supplied to us. We actually used that information in my internal review organization, independently looked at the information to determine whether, you know, there was a problem with how we had configured or established the settings on the displays.

We, in fact, went and found -- we have a four-hour display of 12 flights, a limitation in the system at the time Mr. Langsfeld did his study, compared to other displays, which used a 12-hour window and did not have the 12-flight display limitation.

If you widen the aperture and look at it in the same 12-hour window, we changed that. We believe we find at least 92 percent of the flights that are in the city pair contract.

We have since, based on information, revised our program to display a 12-hour window and to display a 25-flight limitation as opposed to a 12-flight limitation, and in November we will start a new change or a new setting that will display city pair flights first, so that way you always know you get all available city pair flights before you look at other available fares.

COLEMAN: We don't have the chart here, but in one of his charts, Table 1, he had top 25 domestic city pairs, and he had total displayed -- for DTS he had 33 percent, whereas for Fed Traveler, GovernmentTrip, E2 Solutions, higher figures.

Is your testimony that you've made corrections there that would change these conclusions?

GADDY: Yes, sir, Mr. Chairman. We have gone back and looked at what they were reviewing. The flights are available in the system. They just were not displayed, and that's what he was asked to look at. We have since opened the time frame to 12 hours versus four hours, and the limits on flights from 12 flights to 25 flights so that we can display all available flights.

COLEMAN: He also indicated that he was told that DTS only displayed one-third of the available fares -- or that was the 8 percent figure -- and then his comment was that the DOD told him that was completely acceptable. Do you agree or disagree with that?

GADDY: I cannot agree that it's acceptable not to display all the flights. The 8 percent limitation I believe he was referring to were not all flights available. All city pair flights are in the global distribution system.

Up to 8 percent, I believe he said, of city pair flights are not currently available in the GDS or Global Distribution System. Therefore, they would not be accessible by any software looking for them.

Within the context of what was available, the 92 percent that are available because of our settings -- and I believe that was buried in a footnote in his actual table in the report -- he said the settings themselves would determine what would be displayed.

And based on those settings, we looked at it and said yes, you're right, a four-hour window does block displaying all available flights. And that's why we went in and changed the setting to 12 hours.

COLEMAN: To a 12-hour window. When you said 8 percent is not in the system, is that in any system? Is there any system that it's capable -- or is it just the DTS system?

GADDY: As I understood his comments, the 8 percent were flights not in the Global Distribution System, which is what any travel system would look to go to to find available flights. It's not DTS per se or eTS. It's not in the Global Distribution System that the systems are querying to find available flights.

COLEMAN: One of the questions that has come up here is utilization of the system, and the testimony -- and Mr. Williams talked about continued use of legacy travel system, higher processing fees, et cetera.

WILLIAMS: That's correct.

COLEMAN: If we know that there are higher processing fees with continued use of legacy systems, can you help me understand the underutilization? Why doesn't the secretary of defense simply mandate that we start using DTS?

WILLIAMS: Mr. Chairman, as currently structured, each of the various components within DOD have funding authority. And until a decision is made at the top level of the organization that we will use DTS once it's implemented, the different components will continue to use those legacy systems to a certain degree.

That is needed, and once that decision is made, if DTS is deployed and it's operational, then that's what you will use, and we'll just cut off the legacy systems. And that's when you'll get the utilization rate to go up.

But there needs to be a decision made at the top, across the organization, that this is going to be the policy.

COLEMAN: And my concern is we don't have that decision, and I'm trying to understand the reason for that decision. If, on the one hand, we talk about system being effective and cost-effective, on the other hand we hear there are continued problems in terms of getting the end-to-end system that we like, is the reason the decision hasn't been made because there isn't a unanimity of agreement that this system is effective and that it's meeting needs?

GADDY: Actually, Mr. Chairman, I'd like to comment further on that. There was a directive signed by the deputy secretary of defense last November directing usage of DTS once deployed to the users' sites. You need to understand that when we talk about the time frame for deploying DTS -- I'll use an example.

Hill Air Force Base in Utah has 16,000 employees. We have recently deployed DTS to that site. It will take probably a year to fully deploy all 16,000 users. So one of the reasons you'll see other systems still in use is it hasn't been fully deployed across all the users at a particular location.

The directive that was signed last November, however, said DTS is the official system for this department. Prior to that time, various organizations, as Mr. Williams indicated, were making investments in alternative systems. Reserve Travel System in the Air Force comes to mind as an example.

There was a decision. DTS is the official DOD system. However, as you well know, the department -- you get a directive on top, and then the execution of that directive sometimes takes a while. One of the factors in it is the deployment of the system itself. It's not fully deployed yet.

Another factor is even where it has been deployed to particular sites, it's not fully at use in those sites quite yet.

And the third factor is what I described a little bit earlier, and that is all types of travel are not currently accommodated in DTS, so they will need to use legacy systems until other types of travel are folded into the DTS capability.

At that time, I do believe Dr. Chu, in my conversations with him and others -- we are pushing very hard that old legacy systems do, in fact, need to be shut down, and a decision has to be made, for example, 60 days post-deployment full usage has been acknowledged.

At some point you have to terminate the old systems, and one of the best ways to do that is just stop funding them.

COLEMAN: Let me then go to the folks on the audit inspection side to see if their perspectives, having looked at this, are as optimistic as Mr. Gaddy's.

Mr. Gimble, if I can just kind of step back, you originally started your evaluation based on hotline complaints, which I found -- is that something that's usual?

GIMBLE: It's fairly usual. We do get a lot of hotline complaints to the DOD I.G. hotline, and it's typical you do get them on systems of various kinds, I.T. systems, weapons systems.

One thing I would just preface -- most of our work on DTS was in the 2002 time frame, and we've just recently started some new work in that system. But for the three years that intervened there, we really hadn't done much work, so we don't have much current knowledge.

We know there were some agreements made of things that were going to be done to bring it into a system managed arena. According to the documentation we have, we think that's been

done. Now, we'll go back and look and really do some assessments.

That's the plan that we just started out with here in the last week or so. In fact, it was at your request. And we're going to address the follow-up actions to see if those original recommendations were appropriately addressed and achieved the results that we think they should have.

Also, we'll be looking at some of the cost-effectiveness analysis, some of the -- how wide the utilization is.

COLEMAN: One of the things that I recall -- I believe that you had an original recommendation that recommended dropping funding for DTS until cost and benefits were determined based -- is that correct?

GIMBLE: In the draft report, we had recommended suspending the funding until the system was determined to be cost-effective.

COLEMAN: And then you dropped that recommendation...

GIMBLE: Well, what we did is we -- I'd like to say we got an alternate solution there. The department agreed to put the system under an acquisition program, which is one part of that recommendation. The other was they agreed to do the cost- effectiveness study, which was done by PA&E.

And subsequent to that, our auditors had been redirected into other programs, and so we didn't really -- we relied on the acquisition memorandum decision that was signed off in December of '03 that said everything was compliant and moving forward in terms of it was a MAIS, or major acquisition information system, versus a special interest initiative.

So we really have been pretty dormant in the oversight of this particular system since the audit report was issued in July of 2002.

COLEMAN: But one of the things you were awaiting was a cost- benefit analysis from PA&E. Did you believe that was done? Did you have a chance to review that?

GIMBLE: We did not review that. This was over on our follow-up side, and there was documentation that indicated it had been performed at the -- when the assistant secretary or the CIO of the department signed off on the acquisition memorandum decision in December of 2003, saying that everything was completed, we didn't go back and follow up. We closed out and redirected assets into other areas.

COLEMAN: Dr. Comes, did you consider your work to be -- at least as I understand it, my review of the record -- is that the inspector general agreed to drop its recommendation that program funding be suspended before costs and benefits were determined. Is your study a cost-benefit analysis?

COMES: We looked at the costs and benefits at the time of the program. The program was rather immature, so the available data to compare on the costs and benefits was rather limited.

So we focused our efforts on what the requirements were for the program and whether there might be alternative solutions.

COLEMAN: So it would be fair to say -- I mean, as I understand it, you didn't have the data to do a cost-benefit -- did you do a cost-benefit analysis?

COMES: The reason you couldn't do a cost-benefit analysis at the time -- it was almost a circular argument. You would need a good travel system to collect all of that data. Lacking a travel system, you had no data.

So we did what we could with the available data that the program office had at the time. They had done some pilot experiments at a few sites, and they had reports for Congress that we reviewed to see what was available at the time.

COLEMAN: I mean, I think it is -- I mean, part of my frustration is we had a recommendation to stop funding till there was a cost- benefit analysis. It's really not possible to do a cost-benefit analysis because we don't have the system in place to do the analysis.

So I won't ask where we're at. I think where we're at -- and we have sent a letter on this this August to the inspector general to perform a cost-benefit analysis. I think it has to be done.

GIMBLE: And we started that work this week.

COLEMAN: OK. Apparently this contract is going to be re-bid some time next year. Can somebody explain what pieces of it -- what's going to be re-bid in -- is it next August, next year?

GADDY: Mr. Chairman, the current contract is set to expire at the end of FY 2006. What will be re-bid is the follow-on contract support to operate and maintain the system. And if there are any additional changes to be made, we call it Phase 2, travel re- engineering kind of things that were talked a little bit about in the earlier panel.

If any of those things lead to changes, emerging changes in the marketplace that we want to adopt within the program through a follow- on contract, we would make those changes to the system.

COLEMAN: Are we confident that the -- we have identified several major problems getting to this end-to-end system that we'd like, and clearly they've been recognized, that there are still some deficiencies in that regard.

Do you believe that we need to resolve those problems at the time it's re-bid? What happens if those problems aren't resolved? I'm trying to understand the process here. If there's still issues out there, how do you effectively re-bid?

GADDY: Mr. Chairman, what normally happens with this program is we have a series of releases that are called presidential releases. The Monroe Release will be deployed in the December time frame. The Quincy Adams Release will be deployed some time in the June '06 time frame. That's the last scheduled release we have for this program.

Each one of these releases -- the intent of it is to improve upon the capabilities of the system, to provide even more functionality so we can address additional types of travel -- for example, Guard and Reserve mobilization travel -- that is an issue for people.

What we're looking for in what we call the Phase 2 follow on would be if there are -- we're looking at re-engineering how permanent DOD travel is even managed. Some of the things that were alluded to here -- if we want to change how travel policies -- right now, the system is configured to comply on fares with the joint federal travel regulation.

If there are changes to how travel should be administered, those would be then part of the follow-on contract. In a basic sense, however, the intent is to manage the current application, operate it, sustain it, and then make any additional changes that might be deemed desirable using cost-benefit analysis, see if it's worth doing or not.

COLEMAN: Mr. Williams, I'd like to have you address the same question of you've got problems identified, and I'm trying to get a sense of the measure of resolution required by the time a contract's re-bid.

WILLIAMS: Well, we're looking at about a 12-month time frame to go through the procurement process. The process will have to be very aggressive, in my opinion. I would say that over the term you would want to make sure you do the things that was just described. You want to make sure you're doing everything that you can to upgrade the system to address those issues along the way.

We believe that because the system has already been implemented at approximately 5,600 out of the 11,000 locations, that Block 1 or Phase 1, depending -- I think it's the same -- should be completed.

Once that's completed, at that point in time, we think that there should be a process in which there's -- a management oversight review board needs to take a look at this whole DTS process and where do we go from here, and look at it from the standpoint of not just DTS but this is just one component within an overall architecture for DOD, and how is it fitting in, and make some decisions on where we should proceed with the system.

COLEMAN: You indicated that it's presently put in 5,600 of 11,000 locations. But my understanding -- it's only used in a small percentage of those, so we're not getting 50 percent usage. That's a 50 percent figure. What's the percent usage right now of DTS?

GADDY: You're correct that it's not fully used or utilized at all of those locations yet. While it's been deployed to 5,600 sites, during FY '05 approximately 8 percent of travel tickets were procured using DTS.

Today the usage of the system is about 80,000 travel vouchers a month. That number is growing at a rate of about 10 percent to 15 percent per month, so we're seeing more and more usage as it goes to more sites.

COLEMAN: What is 80,000 travel -- what percentage of use does that represent?

GADDY: Again, looking at five million or so a year, that's about -- a million out of -- so it's about 20 percent in total.

But the usage is starting to grow, because we're going to more sites and more users are being trained. There's a one-week training program, for example, for initial usage at a site. The usage will expand.

We will finish deploying to all of the major sites during FY 2006. Those major sites where the travel -- and it's kind of interesting if you look at total usage. Eighty percent, roughly, of all travel is performed at those major sites.

We talk 11,000, quite honestly, but there are probably 200 to 300 locations where about 80 percent of all the travel is actually conducted, and those are the targeted sites that we're really trying to take the system to first, to get it fully deployed, fully used, so we can take advantage of the benefits that the system provides.

COLEMAN: And the concern, of course, as I understand it, it's $25 -- is it $20 or $25 per transaction without DTS? What's the figure?

GADDY: If you use DTS for travel, for example -- if you use full DTS, no touch, it's about $5...

COLEMAN: $5.

GADDY: ... for a travel reservation. If you do a commercial vendor or a commercial travel office, you're talking, on average, $25 for the same transaction.

COLEMAN: About a $20 difference.

GADDY: Right.

COLEMAN: You've got five million vouchers. You've got $4.2 million at $20 more per cost.

GADDY: And on the back end there's a big difference between the actual computation of the settlement of the travel transaction. DTS is much cheaper. So we know that there's a lot of potential out there.

And one of the things -- you cited Dr. Chu's letter. As the owner of this area, one of the things -- that same decision that directed the use of DTS was the establishment of a travel management office within the department, because you have each service doing something with its own unique systems, including my own.

As a result, his organization is now standing up a standard travel management office which will assume the responsibility for managing department-wide travel, so that we can get to taking advantage of a common application for all the users and that's something that I very strongly support, that there ought to be one way of doing business within a department.

COLEMAN: I just want to make sure the record is clear. Is your testimony that the department has mandated by order the use of DTS?

GADDY: There was a directive signed last November by the deputy secretary that said DTS is the official travel system for the department.

COLEMAN: And so...

GADDY: It's been the subject of interpretation, I think, on the part of someone that says well, OK, that means I can use what I've got until you replace it, which is true. You have to have something that you use.

But our perspective on it, our program management perspective on it, is as we deploy the system to these sites, once it's fully deployed to those sites, then our expectation is we will start shutting down the old systems.

I'm not sure that we have full agreement of that by the activities that own those systems.

COLEMAN: Well, I would hope -- and it's one of the things that we'd like -- you would think that there would be a common understanding from those who have -- at the highest level, if it's being directed down to -- it is a military organization. People follow orders, don't they?

GADDY: Yes, sir. They normally do. However, what I find interesting about this business is some will claim they've never seen the order.

COLEMAN: OK.

Dr. Comes, on page 13 of your report you state it's our understanding that DOD has not bought the rights to the software developed for the DTS program. This could potentially limit the number of competitors that may support the department's voucher processing in the

future.

Is there anything you've heard today that somehow is contrary to that notion?

COMES: That report was written in December of 2002. I am not aware of what has happened in the ensuing time.

COLEMAN: OK.

And I raise that, Mr. Gaddy, because of your testimony. Is it your testimony that as of today that that statement that DOD has not bought the rights of software developed for DTS; that this could potentially limit the number of competitors that may support the department's voucher processing in the future?

Are there limitations on the opportunity for competitors based on limitations on property rights, software property rights?

GADDY: Mr. Chairman, there are no limitations on subsequent users or contractors who might want to operate this system on behalf of the department.

COLEMAN: And part of my concern here is I don't believe that the department has really bought anything in the interim. You're just simply giving an interpretation that obviously is contrary to a -- because nothing's changed in terms of -- there was no purchase of property rights here, right, of software rights?

GADDY: Actually, what happened when the contract was restructured, and we went from buying a service to buying a service to buying software development, the normal federal acquisition regulation rules kicked in that say if it's commercially developed software, we have rights to the software.

Since then, we have actually gotten a signed letter from the contractor that acknowledges that, and we are in the process of modifying the contract to make sure it specifically clarifies that.

But our understanding and interpretation of the FAR is when we pay the contractor to develop software on our behalf, then we have unlimited usage to that software as long as we wish to do so.

COLEMAN: Mr. Williams, does the GAO have the same assessment of property rights as the DOD has?

WILLIAMS: As stated in Appendix 1 to my testimony, that is consistent with our belief also.

COLEMAN: OK. As we move forward, there's obviously more work to be done. The testimony of the department is certainly more optimistic than some of the assessments, as we heard on the earlier panel.

Can we talk just a little bit about cost savings? We're spending, as I understand it -- I think it's Mr. Comes -- is it $537 million? Is that the figure? I don't know where that came from. Was it your study of this from fiscal year '01 to fiscal year '14? Is that a valid figure?

Does anybody dispute about $537 million as the amount to complete software development in the system?

COMES: Again, that study was done in 2002. I am not aware of what is happening now as far as what the current cost to complete would be.

COLEMAN: Do we have any estimate of the current cost to complete the system?

GADDY: Yes. Currently, the system total acquisition costs for the whole program is $474 million.

COLEMAN: And what's the time frame for that?

GADDY: Through FY 2006. We have currently expended $402.5 million of that amount.

COLEMAN: And how does it -- if I went back to Mr. Schatz's testimony, he talked about the original study that this whole thing, when it was a -- what was it, $260-something million program -- that it was supposed to be kind of looked at as a -- that amount set aside, and it out of a cost per transaction.

Is that simply out the window now and you just -- we're paying for it, this is our obligation, but, what, Northrop runs the system? How does that work?

GADDY: Actually, Mr. Chairman, when the contract was restructured, you're correct, prior to that point it was a purchase of service. After the restructure, we bought software development work, program management support, deployment support, so we have, in fact, paid $229 million of that contract value.

The original estimate -- $264 million. We have expended $229 million of that with Northrop Grumman to date.

COLEMAN: I'll bring this portion of the hearing to a close. My colleague, Senator Coburn, does have a series of questions. I think he indicated five pages. So I'm going to keep the record open for two weeks so that we can get a response to those.

But just an observation. And I also say that we will conduct a follow-up hearing to focus on the later reports that we expect to receive from the inspector general, and I will be working with Mr. Williams, the GAO.

The concern, as I sit here and have reviewed all the material, is -- there's been concern, certainly, about process, Mr. Gaddy, and that was reflected in some court actions, but there have been concerns about process.

There are concerns about evaluation along the way, but many of those evaluations are now dated and so we will certainly get more current ones.

In the end, we want to make sure the system works. That's what this is about. And if it doesn't work, then we need to know that, and we need to have a very honest assessment of that so we're not throwing good money after bad.

You know, there may be a cheaper, better alternative if it doesn't work. But if it does work, let us make sure that we understand what the limitations are, that we then deal with those limitations.

And I appreciate the letter from the undersecretary. And then we'll go from there. And so, as I said, this is simply a step along the road. We have not completed this process. We do appreciate your coming before us, the work you have done. Look forward to working with you in the future.

With that, the record will be kept open for 14 days. Questions will be submitted and responded to.

This hearing is now adjourned.

END

**NOTES:**
[????] - Indicates Speaker Unknown
[--] - Indicates could not make out what was being said.[off mike] - Indicates could not make out what was being said.

**PERSON:** NORM COLEMAN (94%); TED STEVENS (57%); LINCOLN D CHAFEE (56%); JOHN W WARNER (55%); SUSAN M COLLINS (55%); CARL M LEVIN (54%); DANIEL K AKAKA (54%); CRAIG THOMAS (54%); MARK DAYTON (53%); FRANK R LAUTENBERG (53%); MARK PRYOR (53%); CHARLES GRASSLEY (51%);

**LOAD-DATE:** October 7, 2005

Source: Legal > Legislation & Politics - U.S. & U.K. > U.S. Congress > Committee Hearing Transcripts > **Federal Document Clearing House Congressional Hearings Summaries**
Terms: **boon boondoggle and date is 9/2005** (Edit Search | Suggest Terms for My Search)
View: **Full**
Date/Time: **Tuesday, October 18, 2005 - 1:22 PM EDT**

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# ATTACHMENT 2

# Appendix I: Department of Defense Rights to Property in the Defense Travel System

DOD has taken several steps to address its needs for the use of intellectual and tangible property in the DTS, but it has not yet completed the exercise of the rights it determined necessary for long-term development and implementation of the DTS. While the original contract awarded to BDM did not specifically address intellectual property rights, TRW, as the successor to BDM, acquired in 2001 perpetual rights to use three key commercial software programs to accommodate technology decisions that necessitated modifying some software for use in DTS. When DOD and TRW agreed to restructure the DTS contract, they modified the contract to include several key provisions that provided DOD with rights to various categories of intellectual and tangible property. As set out below, DOD officials told us that they have yet to complete the exercise of some of DOD's intellectual property rights and to secure title to hardware necessary to meet its long-term acquisition needs, but those steps are in progress.

## Property Rights Under the Original DTS Contract

The original DTS contract awarded in 1998 did not specifically address the Government's intellectual property rights because the contract was structured primarily as a fixed-priced travel services contact rather than as a government-funded development effort. As such, the contractor was responsible for securing the necessary intellectual property rights in the commercial software and other products being used, except for those pertaining to existing DOD systems or used by DOD under other agreements.[1] The fixed price for the services would include the cost to the contractor to obtain or develop the necessary software, hardware, and technical data[2] in order to provide the required travel services to DOD.

According to DOD officials, DOD and TRW determined in 2001 that three key commercial software programs used in DTS would not meet DOD's requirements without modification.[3] Accordingly, in September 2001, TRW executed a license agreement with the firm holding the copyright to the

[1] Some software and technical data on existing DOD systems to be connected to DTS were provided to the contractor as government-furnished equipment or information.

[2] "Technical data" means recorded information, regardless of the form or method of the recording, of a scientific or technical nature (including computer software documentation). The term does not include computer software or data incidental to contract administration, such as financial and/or management information.

[3] In September 2001, DOD and TRW agreed to Modification No. 4 to Task Order No. 10 to require software development work and, under this modification, TRW was to provide DOD with a perpetual license for DTS software.

software programs[4] for TRW to use in developing and deploying DTS within DOD.[5] The firm charged TRW with a one-time fee for the rights under the agreement.

Under the license agreement, TRW obtained a perpetual and exclusive license to use the three software programs and related software documentation to develop and deploy software and services for use in the DTS. This license includes the authority to modify the source code to one of the software programs. The license agreement authorizes the assignment of TRW's rights under the agreement to DOD for the DTS project. The license agreement does not expressly condition such an assignment on payment of a fee. According to DOD officials, DOD has approached Northrop Grumman Space & Mission Systems Corp. (Northrop Grumman), as the successor to TRW, requesting assignment of those rights to DOD. In a September 22, 2005, letter to the DTS contracting officer, Northrop Grumman represented that they would assign its rights under the license agreement to DOD at the conclusion of the contract, if requested.

The license agreement also provides that Northrop Grumman may sublicense its rights under the agreement to other entities in support of DTS. DOD officials told us that they believe Northrop Grumman's assignment of these rights to DOD would include the authority for DOD to sublicense the rights to other DOD contractors for use in providing services related to DTS. The DOD officials noted that they are in the process of modernizing the DTS application to include a potential complete replacement of the licensed software with custom developed software. The officials stated that they are still evaluating whether an assignment of rights and issuance of any sublicenses actually would be needed in light of these changes.

## Property Rights Under the Restructured Contract

In the restructuring of the DTS contract, DOD and TRW agreed to address a number of intellectual and tangible property categories under the contract that DOD officials told us would satisfy DOD's long-term DTS

[4] The firm represented that it holds the copyright and title to one commercial software program and acted as an authorized licensee with respect to the other software programs and certain related data.

[5] The license agreement also authorized limited use of the software, source code and documentation on similar terms by the U.S. Treasury Department and included terms for use of the software and executable code by non-DOD federal government entities under the authority of "the Economy Act."

development and implementation plans. The restructured contract incorporated several standard DOD intellectual property rights clauses, but DOD is still evaluating ownership rights related to key hardware used in the DTS.

The restructured contract incorporates standard DOD intellectual property rights clauses for a system being developed at government expense and it specifically gives DOD perpetual rights to DTS software. The perpetual rights for different categories of intellectual property generally depend upon the source of the funding of their development. In particular, the contract requires Northrop Grumman to "provide a perpetual license for DOD use worldwide for DTS software" in accordance with certain standard clauses or in accordance with standard commercial terms for commercial software.[6] Also, the contract incorporates a clause that requires Northrop Grumman to grant or obtain for the government royalty free, world-wide, nonexclusive, irrevocable license rights in technical data.[7] Further, these clauses include provisions that permit Northrop Grumman to assert restrictions on the government's use, release or disclosure of technical data and computer software, depending upon the funding of their development.[8] For commercial software used in the DTS, Northrop Grumman has asserted restrictions applicable to commercial software licenses. Some of the licenses Northrop Grumman obtained for use of commercial software may be neither perpetual nor assignable to DOD, but DOD officials told us that this does not cause risk to the project since there are available alternative methods to acquire similar licenses. Table 1 sets out DOD's rights in these categories. Finally, the contract incorporated a standard clause governing restrictions DOD may place on information it provides to Northrop Grumman for use under the contract.[9]

[6] Specifically, these rights must be in accordance with Defense Federal Acquisition Regulation Supplement (DFARS) clauses 252.227-7014, *Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation*, 252.227-7019, *Validation of Asserted Restrictions – Computer Software*, and 252.227-7037, *Validation of Restrictive Markings*, or consistent with publicly available licenses for commercial computer software and documentation.

[7] DFARS clause 252.227-7013, *Rights in Technical Data – Noncommercial Items*.

[8] DFARS clauses 252.227-7013 and 252.227-7014.

[9] DFARS clause 252.227-7025, *Limitations on the Use or Disclosure of Government-Furnished Information Marked with Restrictive Legends*. This clause was added to the contract in June 2002.

**Table 1: DOD Rights to Intellectual Property Under the DTS Contract**

| Category | Intellectual Property in DTS | DOD Rights |
|---|---|---|
| *Noncommercial Technical Data – Government funded* | All technical data delivered to DOD under the DTS contract | Perpetual Unlimited Rights[a] |
| *Computer Software & Documentation* | | |
| Noncommercial – Government Funded | Software developed under Task Order Numbers 10, 18, 20, and 26 | Perpetual Unlimited Rights |
| Commercial – Privately Funded (excluding 3 key programs discussed above) | Several dozen software programs | Northrop Grumman has restricted rights[b] for use in DTS as set out in individual commercial licenses[c] |

Source: GAO analysis based upon information provided by and discussions with the PMO-DTS.

[a]"Unlimited rights" means the government's rights to use computer software or technical data in any way and to authorize others to do so.

[b]"Restricted rights" means, generally, the right to use the software on one computer at a time. TRW has more liberal rights than restricted rights in some of these programs.

[c]According to DOD officials, Northrop Grumman has obtained perpetual and assignable licenses for only some of these programs and DOD intends to assess its needs and alternative acquisition methods available for all commercial software as part of its long-term development and implementation plans.

The restructured contract requires Northrop Grumman to provide all hardware (and other equipment) necessary to deliver services under the contract, but DOD officials told us that they are discussing delivery schedules and ownership rights to hardware items, principally configuration items. In a September 23, 2005, letter to the DTS contracting officer, Northrop Grumman represented that they would assign title to certain hardware at the conclusion of the contract, if requested. Finally, DOD has leased some hardware items necessary to interface with the airline Global Distribution Systems and it will need to evaluate the terms of those leases.