# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CW GOVERNMENT TRAVEL, INC.,**<br><br>**Plaintiff,**<br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant,**<br>**and**<br><br>**NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION,**<br><br>**Intervenor.** | **Case No. 03-1274C**<br><br>**Judge George W. Miller** |

## PLAINTIFF'S REPLY TO GOVERNMENT'S AND INTERVENOR'S OPPOSITIONS TO PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT

Pursuant to Rule 60(b) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff, CW Government Travel, Inc. ("Carlson"), replies to both the Defendant United States' ("Government's") and Northrop Grumman's ("Northrop's") Oppositions to Carlson's Motion for Relief from Final Judgment ("Carlson Motion"). As set forth in the Carlson Motion, new evidence that warranted relief from judgment could not have been discovered in time to move for a new trial under RCFC 59(b) and that new evidence establishes a material misrepresentation by an adverse party at trial.

The Government and Northrop filed their oppositions to Carlson's Motion on January 26, 2006. Accordingly, this reply is timely.

## DISCUSSION

### I. THE SENATE SUBCOMMITTEE HEARING TRANSCRIPT AND ACCOMPANYING GAO REPORT ARE NOT POST HOC EVENTS OR EVIDENCE OF POST HOC EVENTS

Both Northrop's Opposition to Carlson's Motion for Relief from Judgment ("Northrop Opposition") and the Government's Opposition to Plaintiff's Motion for Relief from Judgment ("Government Opposition") argue that Carlson relies on post hoc events in requesting relief from judgment. Neither Opposition addresses the fact that the information provided at the Senate Subcommittee Hearing materially relied on information in existence and available to the Government and Northrop well before the time of trial. No event occurred after the Government's 2004 representations to the Court to change the status of the Government's rights to the Defense Travel System (the "DTS").[1] Further, as discussed in Section III, infra, the Government's representations to the Court were and still are incorrect in all material respects.

First, the Government's rights to DTS technical data and software are not of recent origin. The Government itself makes clear that all the rights to the Government-owned technical data and software are derived from those Defense Federal Acquisition Regulation Supplement ("DFARS") clauses added during the Restructured Contract in 2002, coupled with payments made to Northrop for software development. As recognized in the Government's Opposition: "The Government's 'Perpetual Unlimited Rights' in that technical data and software were at that time [during Oral Argument in May 2004], and remain today, a function of the standard intellectual property clauses incorporated into the [2002] modifications provided to Carlson." Government Opposition at 7. This statement merely reiterates that Carlson submitted in its Motion post hoc summaries or admissions by the Government of what was in existence many

---

1 The only subsequent occurrence was the United States Senate Subcommittee Hearing and a report by the GAO which compelled DoD to finally answer truthfully the issue as to the Government's rights in the DTS under the Restructured Contract.



::ODMA\PCDOCS\MC1DOCS1\198348\1

months prior to the Government's representations to the Court — and not evidence of post hoc events. As the Government Accountability Office ("GAO") Report states, "To describe [the Department of Defense's ("DoD's")] property rights in the DTS we reviewed the DTS contract, applicable acquisition regulations, DOD intellectual property guidance, key DTS license agreements, and written responses from [the Project Management Office of the Defense Travel System ("PMO-DTS")] to our questions, and we met with PMO-DTS and contracting officials and their legal counsel." Attachment 1 at 25. No evidence suggests that any of the information that the GAO or the Director of the Defense Finance and Accounting Service relied on to conclude that DoD had Perpetual Unlimited Rights to the crucial components of the DTS came into existence or was changed by events subsequent to this Court's Decision. In other words, the Government's rights in the DTS did not change, only the accuracy of the Government's representations of those rights after Senator Coleman's statement at the Hearing proceedings that:

> . . . the Department of Justice informed Judge George W. Miller of the U.S. Court of Federal Claims that DTS belonged to the contractor and not to DOD. This is clearly an issue that needs to be resolved. I expect today to get some responsive answers from DOD.

Carlson Motion, Attachment 1 at 3; see also Attachment 1 at 7.

Second, the Government's rights to this intellectual property were never contingent upon the completion of the DTS Contract. The key event was clearly not the completion of the DTS Contract but software developed and the payments made by the Government during the Restructured Contract. As the Director of the Defense Finance and Accounting Service ("DFAS"), Mr. Zack Gaddy, testified before the Senate Subcommittee:

> . . . when we pay the contractor to develop software on our behalf, then we have unlimited usage to that software as long as we wish to do so.



::ODMA\PCDOCS\MC1DOCS1\198348\1

Carlson Motion, Attachment 1 at 35. Thus, neither Northrop nor the Government can argue that, at the time of trial, they did not know what the GAO reported and Mr. Gaddy admitted during the September 29, 2005 Senate Subcommittee Hearings in regard to DoD's unlimited rights to the DTS. Despite efforts by the Government now to characterize the exchange differently, Senator Coleman's question to Mr. Gaddy at the Senate Subcommittee Hearing was not what rights the Government would have after Northrop's Contract was complete. Rather, the issue addressed the specific concern of this Court, which was the Government's rights upon termination, not completion, of the DTS Contract. Senator Coleman specifically asked:

> Coleman: But hypothetically, **if the contract were to be terminated with Northrop,** what would DOD be left with? Because that was the concern of the judge, that we can't start from scratch here.
>
> But again, it goes back to, you know, the nature of our ownership interest on things that have been developed with taxpayer dollars. What do we own? **If it were to be terminated,** can you divide between what Northrop would have and what we would have?
>
> Gaddy: Mr. Chairman, as I said earlier, I believe the correct answer is we would be able to take the software that has been developed by Northrop and turn it over to a subsequent contractor to use.

Carlson Motion, Attachment 1 at 28 (emphasis added). In addition to the above statements, other exchanges indicated that one of the courses of action being considered by Congress was to terminate or "pull the plug" on the DTS Contract before its completion. See, e.g., Carlson Motion, Attachment 1 at 17.

Third, Northrop's letters of September 2005[2] merely confirm, not create, the Government's Perpetual Unlimited Rights in all the technical data and software developed under

---

2 It is worth noting that these letters were both written within a week of the Senate Subcommittee Hearing on September 29, 2005.

the Restructured Contract and paid for by the Government. See Government Opposition, Exhibit 1. Those items not falling under the Government's Perpetual Unlimited Rights in technical data and software are, in a word, irrelevant. No party to this litigation ever considered the rights to the remaining computer hardware and commercial software to be crucial to the performance of the DTS Contract nor were those rights material to the Court's decision not to issue an injunction.

What the GAO Report labels intellectual property Categories I and II[3] include all the intellectual property actually developed by Northrop under the DTS Contract and that the Government now admits it owns or controls rather than Northrop. Categories I and II comprise the crucial interfaces with dozens of DoD legacy systems and the end-to-end DTS System that could not be accomplished using the client/server mode of the original 1998 COTS software, but was able to be accomplished after the 2002 Restructure to a Government-funded development of a web-based DTS. These categories, therefore, represent all the crucial technical data and computer software that was developed by Northrop during the course of the DTS Contract, and they are the aspects of the DTS that had delayed the program for years — and which would take another contractor years to develop from scratch. An evidentiary hearing would establish that the availability to any competent successor contractor of Categories I and II technical data and software would eliminate the need for an extensive or duplicative development effort.

All the other computer software used as part of the DTS is commercial software developed and owned by someone other than Northrop: Categories III and IV[4] comprise

---

3 "Governmentally funded noncommercial technical data" and "Governmentally funded noncommercial software," respectively.

4 "Several dozen privately funded commercial software programs" and "Three key privately funded commercial software programs," respectively.

commercial software that is licensed to, but not owned by, Northrop. Other contractors, such as Carlson and EDS, have their own commercial software that perform all the necessary travel arrangements for Government personnel, as evidenced by the GSA eTravel Service Contract awards. Moreover, any successor contractor would be able to obtain licenses from the owners of the software that Northrop now uses. GAO noted in its Report: "Some of the licenses Northrop Grumman obtained for use of commercial software may be neither perpetual nor assignable to DoD, but DoD officials told us that this does not cause risk to the project since there are available alternative methods to acquire similar licenses." GAO Report at 22. In regard to Category IV commercial software, the GAO Report explained that DoD "officials stated that they are still evaluating whether an assignment of rights and issuance of any sublicenses actually would be needed" because these old commercial programs are being replaced.[5] GAO Report at 21.

The only remaining portion of the DTS System[6] is Category V, the Computer Hardware serving the network. However, this hardware (primarily servers) is readily replaceable, and any competent competitor, such as Carlson, already has such computer hardware serving its eTravel System. Northrop's computer hardware is simply not necessary to enable a successor contractor to maintain and operate a DTS replacement system. In sum, despite heavy emphasis on GAO's Categories and Northrop's post hoc letters, the Government now admits that it, not Northrop,

---

[5] These old commercial software products, such as Gelco's Travel Manager, Northrop has licensed and offered to assign the licenses to the Government. Government Opposition, Exhibit 1. However, these are the 1998 COTS products that started the DTS Contract and have essentially been replaced, making an assignment of the licenses by Northrop unnecessary, according to DoD officials and the GAO.

[6] It appears that Northrop is leasing this commercial hardware and has only offered to assign the leases and the equipment "as is," an unappealing prospect since this hardware is likely out of date.

controls the crucial DTS intellectual property and that such a fact has remained unchanged since Contract Modification 25 was executed in February 2002 and the Government commenced paying Northrop hundreds of millions of dollars for the development of DTS technical data and software.

## II. THE GOVERNMENT KNEW OR SHOULD HAVE KNOWN, BUT CARLSON NEITHER KNEW NOR COULD HAVE KNOWN, THAT THE GOVERNMENT'S 2004 REPRESENTATIONS TO THE COURT REGARDING ITS RIGHTS TO THE DTS WERE MATERIALLY MISLEADING

Carlson did not know and could not have known, based upon the limited documentation voluntarily disclosed by the Government during litigation, which portions of the DTS technical data and software were Government-funded and which were privately funded. In order to determine the respective rights to DTS technical data and software between the Government and Northrop, Carlson would have needed to know the exact technical composition of the DTS. Carlson would have needed discovery to determine when those technical components were developed and who paid for the development, not merely which general DFARS provisions were included in the Contract. Carlson would have needed access to the monthly invoices submitted by TRW/Northrop and the deliverables provided for that Government funding. Carlson would have needed to know which parts of the DTS System were newly developed for the DTS and which were Commercial Off The Shelf ("COTS"). Carlson would have needed to know the identity of the various commercial software products being used to support the DTS and access to the licenses under which Northrop was using such commercial software. Carlson would have needed access to PMO-DTS and Government Contracting personnel and communications between DoD and TRW/Northrop to determine how technical data and software developed at Government expense prior to the inclusion in February 2002 of DFARS technical rights clauses in Contract Modification 25 were being treated under the DTS Contract. In addition, Carlson would have needed to know the source of funding for each major component of the DTS System.

The Government did not provide any of that crucial information regarding technical composition of the DTS or developmental funding in the documents voluntarily disclosed to Carlson in September 2003. Therefore, in order for Carlson to have refuted the misrepresentations of material fact regarding ownership of the DTS by the Government at the time they were made in 2004, Carlson would have needed extensive discovery and depositions.[7]

Carlson only learned on September 29, 2005, when the GAO Report was issued, that the DTS System consisted entirely of technical data and software that the Government had paid to develop and thus acquired Perpetual Unlimited Rights to use and disclose to others (in addition to commercial software and hardware that was not owned by Northrop and could be acquired under other licenses and/or that simply was no longer needed). In contrast, in May 2004, the Government had access to all this information and knew, or should have known, that the Government had Perpetual Unlimited Rights in all the technical data and software developed by TRW/Northrop under this DTS Contract and that such Government property rights included all the crucial interfaces between the travel arrangement portion of the DTS and the dozens of DoD legacy systems involved in the end-to-end travel process, particularly processing and payment of vouchers upon completion of the trip. The Government knew, or should have known, that if the Northrop DTS Contract were terminated by Court injunction, the Government would not be required to start from scratch to replace the DTS.

---

7 By having to rely on a variety of sources, the GAO Report to Congress makes clear that merely having knowledge of the DFARS clauses included in the Restructured Contract Modifications is not sufficient to determine the respective rights of the Government and Northrop to key DTS components. Attachment 1.

## III. THE REPRESENTATIONS MADE BEFORE THE SENATE SUBCOMMITTEE CONTRADICT THE REPRESENTATIONS MADE BEFORE THE COURT

The Court correctly concluded that the interfaces between the DTS System and the DoD legacy computer systems represented the most complex feature of the DTS, had been the cause of years of delays, had necessitated the change from a client/server to a web-based mode of operation, and, to the extent distinguishable, distinguished the DTS Contract from the GSA eTravel System Contracts. However, the Government represented unequivocally in 2004 to this Court that Northrop owned the DTS and that, if the Contract were enjoined, Northrop would walk away with the entire system, leaving the Government with nothing. JA 542. The Government and Northrop emphasized, and the Court based its finding of hardship primarily on, the representation that Northrop controlled the crucial interfaces to the DoD legacy systems and that, if the Northrop Contract were terminated, DoD and any successor contractor would have to "start from scratch" to develop such technical data and software interfaces. JA 56 (citing JA 542). Contrary to the Government's characterizations in its current Opposition, the Government did not represent to the Court in 2004 that the DTS "was still in a critical stage of development," Government Opposition at 9, but rather led the Court to believe that the DTS was substantially complete as of mid-2004. See, e.g., JA 544, 722. The Court accepted and expressly relied on those erroneous representations.

The Government, therefore, misled the Court by failing to disclose that the Government had Perpetual Unlimited Rights in the crucial components of the DTS and that the Government could have made that technical data and software available to any successor contractor. The Government also misled the Court by failing to disclose that the components of the DTS to which the Government did not have Perpetual Unlimited Rights were commercial software products not owned by Northrop, could be otherwise acquired or replaced, and therefore, "does

not cause risk to the project." Quite contrary to the Government's 2004 representations before this Court, the Government would not have had to start over to develop such technical data and software if the Northrop Contract had been terminated due to CICA violations. In sum, the conclusions reached by the GAO, and the admissions made by DoD officials to the United States Senate on September 29, 2005, could and should have been given to this Court by the Government in 2004.

## IV. Carlson's Request For Relief From Judgment Is Not Moot

Northrop argues that Carlson's request for relief from judgment should be considered moot because this "contract is in its eighth and final year of performance" and "the Government is already in the process of re-procuring the DTS requirements." Northrop Opposition at 6. Northrop goes on to state that "there appears to be nothing further that the Court could order." Id. The Government makes a similar argument, citing as evidence "DoD's ongoing re-procurement efforts" and the "great expense to DoD." Government Opposition at 18.

First, both mootness arguments fail to mention the crucial and timely remedial action that may be taken by this Court to prevent further violations of CICA and prevent Northrop from realizing a continuing unfair competitive advantage resulting from the ongoing violation of CICA. Taking remedial action now would prevent the sole-source extension of the DTS Contract beyond September 30, 2006, or the sole-source award of a follow-on DTS Contract to Northrop, in which the Government uses the knowledge gained by Northrop's performance of the DTS Contract in violation of CICA to justify further sole-source contracts related to the DTS. This would avoid allowing either the Government or Northrop to be rewarded by permitting them to keep the fruits of their 2002 violations of CICA and their 2004 misrepresentations of material facts to this Court. Therefore, the Government's argument that Carlson's request for relief from judgment is moot because the Contract has been "substantially completed" fails to

take into account the very practical concern that the DTS Contract will expire on September 30, 2006 in name only.[8] There is absolutely no doubt that DoD's requirement for a DTS-type system will extend well beyond September 30, 2006. Mr. Gaddy testified that:

> . . . the time frame for full usage of DTS by everyone in the department, originally scheduled to be completed in FY 2003, was adjusted to a more realistic time frame of 2009.

Carlson Motion, Attachment 1 at 26.

The Government's quoted language from Forestry Surveys and Data v. United States, Government Opposition at 18-19, is thus unavailing, since this DTS Contract could be extended well beyond September of this year — all the while hamstrung by the fundamental problems that have continued to plague it up to the present. See generally Carlson Motion, Attachment 1. Remedial action to comply with CICA would require the Government to competitively procure any requirements after September 30, 2006 for DTS-type travel services under full, fair, and open competitions. This would entail, in part, a determination as to the full extent of the Government's rights in all DTS components and an order that the Government maximize the disclosure and availability of all DTS technical data and software to potential competitors for follow-on DTS-type requirements. The Government's conduct throughout the DTS Contract and

---

8 To date, the Government has taken no action to conduct a competitive procurement to acquire DTS-type services that would commence on October 1, 2006. Such a procurement — particularly if anyone other than Northrop is to be given reasonable access to DTS Technical Data and Software and a fair opportunity to compete — should have been issued well prior to the present. Mr. Williams of the GAO testified at the Senate Subcommittee Hearing that the reprocurement process would require "about a 12 month time frame." Carlson Motion, Attachment 1 at 33. Given the violations of CICA that have previously occurred with this Contract, the Government's repeated failure to take corrective action when it could have done so at any time after recognizing that a complete restructure of the 1998 Contract was necessary — or any time during this litigation — provides every reason to expect that the Government will continue to ignore CICA after September 30, 2006.

this litigation has conclusively established that this will not happen in the absence of an order by this Court.

Second, Northrop's and the Government's concern that any injunctive relief by the Court will necessarily result in disruption of DoD travel services or cessation in the use of the DTS pending a competitive procurement of a successor or follow-on Contract is without merit. It is noted that Carlson did not previously seek and the Court did not order a cessation in the provision of traditional travel services under the Northrop Contract pending the competitive procurement of a successor Contract during the Fall of 2004 to remedy a CICA violation. Similarly, there would be no need to order DoD to cease using the Northrop-furnished DTS before or during a competitive procurement of a follow-on Contract. The Government's forecasting of disastrous consequences of a Court-ordered compliance with CICA ignores the Court's ability to fashion a remedy that permits the continued use of the DTS where it is already operationally deployed prior to the competitive procurement of a follow-on Contract.[9] Carlson would expect that, pending a Court-ordered competitive procurement of a follow-on DTS Contract, Northrop would be permitted to continue to maintain and operate the DTS where it has already been deployed until commencement of that follow-on DTS Contract. In short, Carlson has not and is not now seeking the kind of disruptive remedy that both the Government and Northrop claim Carlson has sought.

## CONCLUSION

For the above-stated reasons, Carlson requests that this Court grant relief from its January 18, 2005 Judgment, conduct evidentiary hearings on the Government's rights in all DTS

---

9 This is apart from the fact that Mr. Gaddy, the Director of DFAS, testified that in Fiscal Year 2005, the DTS was only used for eight percent of DoD Travel. Carlson Motion, Attachment 1 at 33.

components, and identify and order procedures necessary to ensure compliance with CICA in any continuation of the DTS Program in a manner that minimizes hardship on the Government and the public interest.

Dated: February 8, 2006

Respectfully submitted,

s/ Lars E. Anderson
Lars E. Anderson
Michael W. Robinson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Counsel for Plaintiff*

Attachment

# CERTIFICATE OF FILING

I hereby certify that on February 8, 2006, a copy of the foregoing PLAINTIFF'S REPLY TO GOVERNMENT'S AND INTERVENOR'S OPPOSITIONS TO PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Lars E. Anderson
Lars E. Anderson

# ATTACHMENT 1

# Appendix II: Scope and Methodology

To determine if the Department of Defense (DOD) effectively tested key Defense Travel System (DTS) functionality associated with flights and airfares, we reviewed the applicable requirements and the related testing prior to the August 2005 release to determine if the desired functionality was effectively implemented.

To determine if DTS will correct the problems previously identified with DOD travel, we analyzed past GAO reports and testimonies, selected Defense Finance and Accounting Service (DFAS) reports, and DOD congressional testimonies. In this regard, we focused on how DTS addresses issues related to premium class travel, unused tickets, and centrally billed accounts. We also randomly sampled 170 travel vouchers[1] to ascertain if some of the problems previously reported upon by DFAS have been resolved. To be included within the selected sample, the travel vouchers had to be for trips that were in DTS and for travel started on or after October 1, 2004, and ended on or before December 31, 2004. We have not yet finalized our projections for the sample. To assess the use of premium class travel, we obtained databases from Bank of America and the Project Management Office-Defense Travel System (PMO-DTS), which provided information on the actual travel transactions and traveler information for the period October-December 2004. The Bank of America's database contained all DOD transactions for the first quarter of fiscal year 2005, and the PMO-DTS database contained all vouchers processed by DTS for the same time period. We removed all transactions that were not specifically airline charges, such as rail charges and commercial travel office fees, and then selected all fare codes that corresponded to the potential issuance of a premium class ticket. This resulted in 419 instances in which a premium class ticket could have been issued. We have not finalized our analysis.

To identify some of the challenges confronting the department in making DTS the department's standard travel system, we discussed with PMO-DTS officials their implementation strategy and reviewed past GAO reports and testimonies related to the department's efforts to improve the accuracy and reliability of the information in its business systems.

[1] We randomly selected 173 travel vouchers for detail review, but at the time of our review 3 vouchers had not yet been completed and submitted for review.

We briefed DOD officials on the contents of this testimony. We assessed the reliability of the DOD data we used for our preliminary evaluation by (1) performing electronic testing of required data elements, (2) reviewing existing information about the data and the system that produced them, and (3) interviewing agency officials knowledgeable about the data. We determined that the data were sufficiently reliable for the purpose of this testimony. We performed our audit work from October 2004 through September 2005, in accordance with U.S. generally accepted government auditing standards.

To describe DOD's property rights in the DTS we reviewed the DTS contract, applicable acquisition regulations, DOD intellectual property guidance, key DTS license agreements, and written responses from PMO-DTS to our questions, and we met with PMO-DTS and contracting officials and with their legal counsel.