NO. 03-1274 C

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

CW GOVERNMENT TRAVEL, INC.,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant,
and

NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION,
Defendant-Intervenor.

# GOVERNMENT MEMORANDUM IN RESPONSE TO THE ORDER DATED FEBRUARY 13, 2006

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit 8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

February 27, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

**GOVERNMENT MEMORANDUM IN RESPONSE TO THE ORDER DATED FEBRUARY 13, 2006** . . . . . . . . . . . . . . . . . . . . . . . 1

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

- **I. CARLSON'S CLAIM IS MOOT BECAUSE THE REMEDY CARLSON SEEKS WILL BE PROVIDED BY DOD IN THE PROCUREMENT PROCESS** . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

- **II. THE COURT LACKS THE AUTHORITY TO PROVIDE THE RELIEF CARLSON SEEKS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bannum, Inc. v. United States,
56 Fed. Cl. 453 (Fed. Cl. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

Bowen v. Am. Hosp. Assn.,
476 U.S. 610 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CW Government Travel v. U.S.,
61 Fed. Cl. 559 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Forestry Surveys and Data v. United States,
44 Fed. Cl. 485 ( Fed. Cl. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

Impressa Construgioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Luterbach Construction Company, Inc. v. Adamkus,
781 F.2d 599 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Parcel 49C Ltd P'ship v. United States,
31 F.3d 1147 ( Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Scanwell Labs, Inc. v. Shaffer,
427 F. 2d 859 (D.C. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## FEDERAL STATUTES

10 U.S.C. § 2304(f)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

41 U.S.C. § 253(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CW GOVERNMENT TRAVEL, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. and NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION, Defendant-Intervenor. | ) | No. 03-1274 C (Judge George Miller) |

GOVERNMENT MEMORANDUM IN RESPONSE TO
THE ORDER DATED FEBRUARY 13, 2006

## INTRODUCTION

In an order dated February 13, 2006, this Court requested that the Government describe the current efforts and future intentions of the Department of Defense ("DoD") to procure services currently being performed by Northrop Grumman Space & Mission Systems Corporation ("Northrop Grumman") under the DTS contract (No. DAM01-98-D-1005). The Court deemed this information relevant to the Government's argument that plaintiff CW Government Travel, Inc.'s ("Carlson's") claim for injunctive relief relating to the performance of the contract is now moot because the contract is in its eighth year of performance (it expires September 30, 2006). Carlson seeks to reopen the record under Rule 60(b) to present alleged "newly discovered evidence" concerning the Government's proprietary rights in software programs and technical data for the interface between legacy systems within DoD and the DTS.

It acknowledges that the contract expires on September 30, 2006, and that its claim is moot if there is no practical remedy for alleged violations of the Competition in Contracting Act, 41 U.S.C. § 253(a) (2000) ("CICA"), due to substantial performance of the contract.

Carlson anticipates that DoD will award a sole source follow-on contract or a sole-source extension to Northrop Grumman. Plaintiff's Reply To Government's And Intervenor's Opposition To Plaintiff's Motion For Relief From Judgment ("Pl. Rep.') at 10-11. It contends that either course would extend the alleged illegality of the original procurement because the basis for a sole source procurement would be that only Northrop Grumman is qualified to perform the contract and this would be true only if Northrop Grumman gained specialized expertise while performing the original contract. 10 U.S.C. § 2304(f)(1)(B).

Carlson contends that this Court should enjoin the award of a sole source follow-on contract to Northrop Grumman. It argues this Court should determine the extent of DoD's interests in the software and technical information developed under the contract, order that the follow-on contract be procured in time to replace the current contract, and that DoD "maximize the disclosure and availability of all DTS technical data and software to potential competitors for follow-on DTS-type requirements." Pl. Rep. at 10-11. Carlson assumes that there will be a sole source award of a new contract to Northrop Grumman or that the current contract will be extended and, therefore, it will continue to be deprived of a competitive opportunity. It contends that if the current contract is extended or a new contract is issued upon a sole source basis to Northrop Grumman, its original claim remains viable because the justification for retaining Northrop Grumman will be its experience performing the contract which, it contends, was procured outside the requirements of CICA.

As we demonstrate, there is no basis for Carlson's claim. Because DoD is in the process of reprocuring the DTS contract requirements, there is no basis for the award of injunctive relief to ensure compliance with CICA. As Carlson concedes, the public interest is not served if the procurement for follow-on contracts disrupts DTS. Reply at 12. The anticipated extensions prevent DTS from falling into disuse while the procurement of follow-on contracts is completed. Even if the 2002 modifications violated CICA, as Carlson contends, DoD anticipates procuring the DTS requirements on a competitive basis in 2006 and 2007. Given this Court's observation that contested facts concerning the modifications of the payment structure and consumer user interface ("CUI") may require extra-record fact finding, it is unlikely this Court could award relief prior to the anticipated award of follow-on contracts. CW Government Travel v. U.S., 61 Fed. Cl. 559, 576 (Fed. Cir. 2004). Accordingly, Carlson's claim is moot and its motion should be denied.[1]

STATEMENT OF FACTS

The DTS is "one of the largest financial management and accounting systems in DoD." Declaration of Brenda Sue Johnson ("Johnson Dec."), ¶ 2. Its architecture "currently consists of a complex set of interacting components of about 39 DoD financial and related systems, including DoD's archiving system, the Government charge card vendor's system, and various commercial travel services and systems." Id.

The DTS has evolved from an automated travel reservation system to a business management system having financial and audit interfaces with numerous DoD financial, audit

[1] Consistent with the February 13, 2006 order, we confine our discussion to whether the claim for injunctive relief is moot. However, the motion is invalid for other reasons as well as set forth in our Opposition To Plaintiff's Motion For Relief From Judgment.

and archiving systems. DoD recently created the Business Transformation Agency which will absorb the primary functions of the DTS Program Management Office ("DTS PMO") and assume the responsibility to oversee the information technology development of DTS. DoD anticipates that the requirements of DTS will be advanced and sustained through three separate follow-on contracts which will be procured competitively in accordance with CICA: one for DTS help desk and sustainment training (Johnson Dec., ¶ 5); one for travel management operations and systems (Johnson Dec., ¶ 6); and one for DTS operation and sustainment (Johnson Dec., ¶ 7).

DTS help desk and sustainment training services are currently performed by Northrop Grumman under the DTS contract. Johnson Dec., ¶ 5. The requirements consist primarily of providing help desk support to approximately 3.2 million DTS users and administrators; providing classroom training on new features of DTS functionality; and providing web-based and other classroom training courses. Id. Travel management operations and sustainment primarily involve maintaining the DTS connection to the primary commercial reservation systems such as the Global Distribution System ("GDS") and performing auditing of data within the GDSs and DTS. Johnson Dec., ¶ 6. DTS operations and sustainment primarily focuses upon integrating 38 major DoD systems to allow for the development of a Business Enterprise Architecture which will include financial management functions such as miscellaneous payments or vendor payments not necessarily tied to travel. Johnson Dec., ¶ 7.

After analysis of responses to Requests for Information ("RFI"), and assuming there is adequate funding and concurrence by officials within the successor agencies to the DTS PMO, the DTS Project Manager ("DTS PM") intends to procure the DTS requirements in a manner that

broadens the population of potential bidders and enhances competition. With respect to the help desk and training materials, DoD released an RFI in December 2005 and received responses from 17 different companies. Johnson Dec., at ¶ 5. It then held meetings with 13 companies between January 17 and January 27, 2005. DoD anticipates that a Statement of Work will be prepared and a Request for Proposal ("RFP") for a competitive procurement will be released on or about April 30, 2006. It further anticipates that a contract will be awarded in July 2006. There will be a transition period between the DTS contract and the follow-on contract between August and September 2006 with performance of the follow-on contract to begin in October 2006. The DTS PM states that it is possible the transition period may extend beyond the expiration date of the DTS contract. In that event, she may seek approval for a short term sole source extension of the DTS contract to accommodate this transition period.[2]

DoD has also commenced procurement activities for the contract requirements related to travel management requirements. The DTS PMO released an RFI on January 31, 2006 and conducted meetings with interested parties during the week of February 20, 2006. It anticipates preparing a Statement of Work and issuing an RFP for these requirements by the end of May 2006 and selecting the contractor by the end of August 2006. Johnson Dec., ¶ 6. Assuming Northrop Grumman is not the successful offeror, because it is anticipated that the transition between Northrop Grumman and the follow-on contractor will occur from September to November 2006, with full performance of the follow-on contract to commence in December 2006, the DTS PM may seek approval for a short term sole source extension of the DTS contract

---

[2] As Colonel Johnson notes, there is also the possibility if the multiple contract approach is chosen of a fourth competition for an integration contract "to ensure that all the requirements are properly integrated." Johnson Dec., ¶ 4.

to accommodate this transition period. Id.

The third competition will be for an information technology contract to satisfy the remainder of the requirements presently met under the DTS contract and will also include the development and implementation of future DTS requirements primarily in the areas of financial management, vendor payments and other business enterprise activities as they evolve over time. Johnson Dec.,¶ 7. The newly-formed Business Transformation Agency will have responsibility for this new contract. The DTS PM anticipates that it will be necessary to seek a 12 month sole source extension of the DTS contract in order to transition from Northrop Grumman to the follow-on contractor. This requirement will be based upon the fact that a budget reduction of approximately $8 million in the DTS PMO delayed the completion of requirements in the current contract such as permanent change of station computations, recruit and medical-related travel and other accounting and personnel systems interfaces. Id. This work must be completed to allow the elimination of 27 DoD travel systems and the elimination of contract extension costs. Id. Finally, the DTS PMO requires additional time to "complete analyses and determine whether moving the DTS data center hardware from a contractor facility to a government-owned and operated facility is . . . cost-effective." Id.

The DTS PM anticipates that a draft RFP for the information technology contract will be released by the end of May 2006 with a final RFP released in October 2006, and that a contract will be awarded in April 2007. If Northrop Grumman is not the successful offeror, there will be a transition period between Northrop Grumman and the follow-on contractor between May and September 2007 and full performance will begin in October 2007. It is anticipated that the cost of the sole source extension will be between $18 and $20 million, that it will include only the

operation and sustainment of the current DTS to include completion of current developmental requirements, and that the development or implementation of new DTS requirements will await the follow-on contract. Johnson Dec., ¶ 7.

DoD thus anticipates procuring the DTS contract requirements within 12 months of the expiration of the current contract. Procurement activities have already commenced with respect to the training and help desk functions and the travel management requirements (Global Reservation System). The development of a Statement of Work and RFP for the remaining information technology requirements will proceed during the course of performance of the current contract. Very short extensions of the contract may be required for the help desk and training and travel management requirements of DTS and a 12 month extension may be required for the technology development requirements to support a DoD Business Enterprise Architecture. However, dividing the current contract into three procurements will have the effect of increasing the population of potential bidders and, it is anticipated, enhance competition. The sole source extension will be sought in compliance with CICA, which provides the authority to use other than full and open competition procurement procedures when the property or services are only available from one responsible source. 10 U.S.C. § 2304(f)(1)(B). The anticipated procurements will comply with CICA both with respect to the limited-scope sole source extensions and the competitive procurements of follow-on contracts.

## ARGUMENT

I. Carlson's Claim Is Moot Because The Remedy Carlson Seeks Will Be Provided By DoD In the Procurement Process

Anticipating the possibility of a sole source extension of the DTS contract,[3] Carlson argues that this Court can provide relief for the alleged 2002 CICA violations by ordering the disclosure of all software and technical data developed under the DTS contract and requiring a procurement which will enable the successor contractor to transition prior to the completion of the DTS contract and begin performance at the completion of the DTS contract. Carlson acknowledges that a remedy that disrupts DTS would be contrary to the public interest but speculates that an injunction requiring full disclosure will not disrupt DTS.

As indicated in the Johnson Declaration, DoD anticipates the possibility of short sole source extensions for help desk and sustainment training and travel operations and sustainment, respectively, and a 12 month sole source extension for DTS operations and sustainment. RFIs have already been issued for the help desk and sustainment training and travel operations and sustainment portions of DTS contract requirements. Further, the DTS PM anticipates procurement efforts for the information technology requirements will begin with the release of a draft RFP by the end of May 2006 and a final RFP by October 2006. The follow-on contract is expected to be awarded in April 2007, with performance to begin in October 2007. As noted by the DTS PM, the extensions are necessitated by the need to complete DTS system functionality prior to the award of a follow-on contract, the complexity of preparing an RFP for these requirements and the transfer of responsibility from the DTS PMO to the Business

[3] Carlson's speculations concerning a sole source follow-on contract are inconsistent with the procurement plan of DoD.

Transformation Agency. Johnson Dec., ¶ 7.

Carlson's contentions to the contrary notwithstanding, the procurement planning for the follow-on contracts does not suffer from the "taint" of the alleged 2002 CICA violations: DoD will fully comply with CICA with respect to the anticipated sole source extensions and the procurements. Even assuming for the sake of argument that the justification for the anticipated sole source extensions rests upon Northrop Grumman's experience in designing and operating the DTS system under the current contract, Carlson provides no evidence a limited scope extension would not have been required in the absence of the 2002 modifications or that the justification would not similarly have been based upon Northrop Grumman's experience under the current contract. These conditions may well have existed with or without the 2002 modifications.

Further, apart from Carlson's speculation concerning the alleged "taint" allegedly causing the sole source extensions, there is nothing in the procurement planning that relates to a deviation from CICA but, instead, the division of the DTS contract into three components promises to result in enhanced competition by expanding the universe of available bidders and spreading the workload. The DTS PM "will comply with the requirements of [CICA]" in seeking the sole source extensions (assuming they are necessary) and in the procurement of follow-on contracts. There is no "reward" to either DoD or Northrop Grumman if a limited sole source extension extends the current contract by one to 12 months. To the contrary, there is every reason to believe this would have been necessary with or without the 2002 modifications. Further, as highlighted by the DTS PM, the procurements of DTS requirements in follow-on contracts will comply strictly with CICA.

Carlson concedes that the public interest is not served if DTS is interrupted while the follow-on contracts are procured. However, the procurement planning process avoids disruption and promises enhanced competition for the follow-on contracts. No court order could reasonably accelerate the procurement planning process and obtain the desired results, namely enhanced competition and the avoidance of disruption to DTS users during the transition between the DTS contract and the follow-on contracts. Therefore, even assuming the need for a 12 month extension, performance of the current contract is "substantially complete."

Indeed, the longest anticipated extension (12 months) would mean that instead of being in the eighth year of an eight year contract, Northrop Grumman would be in the eighth year of a 9 year contract. The extension is estimated to cost $18-20 million, which is less than 8 percent of the estimated cost of the entire contract. Therefore, by the modality of either time or expense, the current contract is "substantially complete." Further, whatever relief this Court could authorize for a CICA violation is factored into the procurement planning process. Accordingly, there is no "realistic remedy" for the alleged CICA violations at this stage of performance and Carlson's Rule 60(b) motion should be denied for that reason (among others). See, e.g., Forestry Surveys and Data v. United States, 44 Fed. Cl. 485, 491-92 (Fed. Cl. 1999) (a competitive bidding claim is moot once the contract has been "substantially completed"); Luterbach Construction Company, Inc. v. Adamkus, 781 F.2d 599, 601 (7th Cir. 1986) (where an injunction reversing the procurement could have no practical effect, the case is moot).

## II. The Court Lacks The Authority To Provide The Relief Carlson Seeks

In its amended complaint, Carlson sought to immediately enjoin the performance of the

DTS contract by Northrop Grumman.[4] In its Rule 60(b) motion, however, it now appears to seek an order requiring a timely procurement to enable a successor contractor to commence performance by October 2006, and that the Court require DoD to release the software and technical requirements developed under the current DTS contract to all potential bidders. However, Carlson has cited no authority, and we are aware of none, that would empower this Court to dictate the procurement planning of an executive agency by setting a timetable for the procurement of a follow-on contract. As evidenced by the Johnson Declaration, the procurement planning process is complex and, in the first instance, should be left within the agency's discretion rather than interfered with by this Court.

Indeed, as this Court has observed, "the court's role in ensuring the fair and open government contracting is largely supervisory . . . It is not in the public interest, absent a compelling reason, not present here, for the court to interject itself into an ongoing procurement process." Bannum, Inc. v. United States, 56 Fed. Cl. 453, 460 (Fed. Cl. 2003). This is precisely what Carlson seeks to do, however, by having the Court dictate the precise timing of the award of a follow-on contract. This is similar to seeking an injunction requiring the agency to award the contract to a particular bidder which the courts have dispositively held to be outside the authority of the injunctive power. See, e.g., Parcel 49C Ltd P'ship v. United States, 31 F.3d

[4] Although Carlson sought a preliminary injunction which, if pursued, might have enabled it to seek relief prior to the claim becoming moot, it withdrew its motion and failed to pursue any other remedy except a dispositive motion and an anticipated trial upon the merits. This strategy, in itself, precludes any consideration of injunctive relief at this late stage of contract performance. See Luterbach Construction Company, 781 F.2d at 603 ("this error does not excuse Luterback from failing to take any action at any time during the year and a half when the plant was being built to seek a hearing on preliminary relief"). Carlson's Rule 60(b) contention that it never intended to disrupt DTS services is belied by the fact that it sought an immediate cessation of DTS performance in its amended complaint.

1147, 1153 (Fed. Cir. 1994) (not the courts' job to direct the award of a Government contract to a particular bidder); Scanwell Labs, Inc. v. Shaffer, 427 F. 2d 859, 869 (D.C. Cir. 1970) (same). In short, the order Carlson seeks in its Rule 60(b) motion is contrary to this Court's teaching in Bannum, and violates the principle that the injunctive power cannot be used to dictate the timing of a procurement.

Likewise, the Court cannot dictate that DoD must disclose the software or technical data developed under the current DTS contract to all potential bidders for the follow-on contracts. At least initially, this is a decision for the contracting agency to make. See, e.g., Forestry Surveys and Data, 44 Fed. Cl. at 492 (no jurisdiction to determine whether past performance should be excluded from consideration in the consideration of future procurements). The relief Carlson seeks directly interferes with the procurement process by dictating the nature of the information to be released with the Statement of Work and RFP. While Carlson seeks an order requiring DoD to release interface software and technical data developed under the DTS contract for the follow-on contracts, there is no evidence they will not be released in the absence of an order or that substantially similar performance and technical data may not be adequate for the Statement of Work and RFP. See Bannum, 56 Fed. Cl. at 460 (Courts' role is to review procurement procedures once they are complete).

An order is simply unnecessary to erase a "taint" created by alleged CICA violations because the procurement process is unrelated to the 2002 modifications. Further, an order would be premature because there is no evidence the procurement process will not comply with CICA. To the contrary, DoD represents that it will comply with CICA. These representations must be accepted in the absence of bad faith or fraud in the administration of the contract. See, e.g.,

Impressa Construgioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1337 (2001) (agency decisions are "entitled to a presumption of regularity"); Bowen v. Am. Hosp. Assn., 476 U.S. 610, 626-27 (1986); Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 n. 9 (1983); Bannum, 56 Fed. Cl. At 457-58 ("government officials are presumed to act conscientiously and in good faith discharge of their duties"). In short, Carlson seeks relief that is likely to be mooted during the procurement process, and any order presuming the contrary is premature and inconsistent with the record.

CONCLUSION

The DTS contract is in the eighth and final year of performance and has been "substantially performed" by Northrop Grumman. While the DTS PM anticipates a limited scope 12 month sole-source extension to allow functionality delays to be rectified, this will serve to enhance competition by expanding the population of bidders. In addition, it will permit the elimination of 27 legacy systems within DoD thereby avoiding increased costs to DoD, which would accrue if the contracts for these legacy systems were extended to allow for another contractor to gain the necessary experience to successfully complete the desired functionality. In sum, the relief Carlson seeks is anticipated by the procurement planning process. This Court should not interfere unless or until it appears to deviate from the requirements of CICA. Accordingly, Carlson's motion is moot and should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

/s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0309
Fax: (202) 514-7965

Attorneys for Defendant

February 27, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CW GOVERNMENT TRAVEL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1274C |
| | ) | (Judge Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF BRENDA SUE JOHNSON

1. I am a Colonel in the U.S. Air Force and from September 2003 to the present I have been the Program Director for the Program Management Office-Defense Travel System (PMO-DTS). The PMO-DTS was chartered to conduct four primary activities: a) both conduct and support business process reengineering of the Department of Defense (DoD) travel and travel related financial management processes; b) consolidate the procurement of all DoD Commercial Travel Office services; c) acquire an automated and interactive end-to-end system, the Defense Travel System (DTS), to support the reengineered financial accounting and reservation process for temporary duty travel as well as the permanent change of station computation and financial management for these expenditures; and d) operate DTS and field DTS to the DoD high travel volume sites world wide known as Phase I and Phase II sites. Recently, responsibility for the consolidation of the Commercial Travel Office services was transferred from the PMO-DTS to DoD's newly-created Travel Management Office. The PMO-DTS and the responsibility for the remaining activities are in the process of being transferred to DoD's newly-created Business Transformation Agency. It is not known when this process will be completed. However, it is the continued evolution, operations and sustainment of DTS that is the focus of this declaration.

2. The DTS architecture currently consists of a complex set of interacting components of about 39 DoD financial and related systems, DoD's archiving system, the government charge card vendor's system, and various commercial travel services and systems. Currently DTS is one of the largest financial management and accounting systems in DoD; it also happens to process travel reservations. DTS has over six million source lines of code, with about four million source lines of code in the interfaced DoD financial and related systems. The majority of the remaining two million source lines of code in the DTS central data center at the prime contractor facility is for travel accounting with very little for travel reservation management. However, the reservation module is an integral part of the DTS process and making a travel reservation is not a stand alone, front-end event. The reservation module interfaces not only with external systems for reservations, but also with internal DTS processing to calculate DoD approved travel entitlements, auditing and fund sufficiency in order to create the authorization documents for approval as well as provide the initial voucher generation for the traveler for submittal of travel claims. Therefore, it must be understood that DTS is not just a travel system for the DoD, it is the DoD's primary system for tracking travel expenditures and preventing fraud, waste and abuse of travel dollars.

Under contract number DAMT01-98-D-1005 (DTS contract) Northrop Grumman Mission Systems provides both the operations and sustainment of the DTS. This includes the development of the DTS functionality controlling DoD financial management and accounting of travel expenditures as well as travel authorization, reservation and booking interfaces, voucher computation, auditing, and archiving for temporary duty and permanent change of station

computation (currently in development). It also includes the services described in paragraphs 5 and 6 below. The DTS contract expires on September 30, 2006. By that time, it is expected that DTS will be fielded to approximately 8,000 sites world wide, with over 1 million DoD users. By September 30, 2007, it is expected that DTS will be fielded to approximately 11,000 sites, with approximately 3.2 million potential users.

3. As the Program Manager for the DTS-PMO, it is my intent to compete both the DTS operations and sustainment requirements presently met under the DTS contract as well as any future DTS requirements. DoD fully supports DTS implementation and currently does not plan to rebuild interactive financial interfaces or procure, field or train users on a new system.

4. In order to foster greater competition, it is my intent to conduct three separate competitions, as described in paragraphs 5 through 7 below, for the requirements currently included in the DTS contract. It is possible, however, that the DoD will decide to conduct fewer than three procurements. It is also possible that, if the multiple contract approach is chosen, there may be a need for a 4th competition for an integration contract, to ensure that all the requirements are properly integrated. The procurement strategy chosen will depend, in part, on the following: a) an analysis of responses to the Requests for Information (RFIs) identified below; b) decisions to be made by the newly-created DoD organizations recently given responsibility for these requirements; and c) DoD DTS budget constraints. Discussions within DoD are in progress and options are being reviewed.

If DoD approves the multiple contract strategy, I would further seek approval for using a phased approach in order to allow; a) offerers to have time to fairly compete for all solicitations

without any given solicitation proposal deadlines unduly overlapping the others; b) the DoD to spread out the resources required for source selection and transition; c) appropriate transition times from the current DTS contract to the new contracts, usually 90-180 days depending on the complexity of the requirements.

**DTS Help Desk and Sustainment Training**

5. The DTS PMO has begun the procurement process for obtaining help desk and sustainment training after the expiration of the current DTS contract. These services are currently provided by Northrop Grumman Mission Systems under the DTS contract. The DTS help desk and DTS sustainment training consist of the following general requirements: a) provide help desk support to approximately 3.2 million DTS users and DTS administrators; b) provide any necessary classroom training on new system functionality, usability surveys, documentation to include user guides and quick reference guides; and c) provide web-based, computer-based, and other classroom training courses. For acquisition planning purposes, the Government conducted market research through issuance of an RFI to industry. The RFI was released in December 2005, with responses due from industry on January 13, 2006. The PMO-DTS received written responses from 17 different companies. The PMO-DTS then held meetings with interested companies at which they were afforded the opportunity to present their RFI responses to the Government in more detail. Sessions were conducted with 13 companies between January 17 and January 27, 2006 Responses are being analyzed. If approved by the DoD organizations responsible for these requirements, a Performance Statement of Work will be prepared, and it is

my intent that a Request for Proposal (RFP) for a competitive procurement will be released on or about April 30, 2006. The anticipated timetable for this procurement is set forth below. It is also anticipated that a period of transition, from the current contractor to a new contractor, will be necessary. It is possible that the transition period could extend beyond the expiration of the current contract. In that event, approval will be sought for a short-term, sole source extension of the current contract with the performance under the new contract to begin in suitable time to allow for a transition period to the new contractor:

| | |
|---|---|
| Release of RFP: | End of April 2006 |
| Receipt of Proposals: | End of May 2006 |
| Contract Award: | End of July 2006 |
| Start of Performance under New Contract: | Transition period: Aug -- Sep 2006<br>Full Performance: Oct 2006 |

**<u>Travel Management Operations and Sustainment</u>**

6. The DTS PMO has begun the procurement process for obtaining DTS travel management requirements after the expiration of the DTS prime contract. Travel management may consist of the following general requirements; a) maintaining the DTS connection to the primary commercial reservation systems, such as the Global Distribution Systems (GDS's) and/or other required reservation systems; b) performing audits on loaded data with the GDS's and data retrieved from the GDS's data via the DTS and perhaps other commercial systems; c) provide DTS Help Desk services to both Commercial Travel Offices (CTOs) and DoD users who need assistance with their travel reservations; d) provide an interface to Airlines Reporting

Corporation (ARC) for business intelligence and auditing purposes; and e) potentially sustainment of and changes to DTS travel business rules.

For acquisition planning purposes, the PMO-DTS released a RFI on January 31, 2006. The PMO-DTS is conducting meetings with interested companies during the week of Feburary 20th, 2006, at which the companies have the opportunity to present their RFI responses to the Government. Responses will then be analyzed, and if approved by the DoD organizations responsible for these requirements, it is my intent that a Performance Work Statement will be prepared and included in a RFP for competitive procurement. The anticipated timetable for this procurement is set forth below. It is anticipated that a period of transition, from the current contractor to a new contractor, will be necessary and it is possible that the transition period will extend beyond the expiration of the current contract. In that event, approval will be sought for a short-term, sole source extension of the current contract:

| | |
|---|---|
| Release of RFP: | End of May 2006 |
| Receipt of Proposals: | End of June 2006 |
| Contract Award: | End of Aug 2006 |
| Start of Performance under New Contract: | Transition period: Sep - Nov 2006<br>Full Performance: Dec 2006 |

**<u>DTS Operation and Sustainment</u>**

7. The third competition will be for an information technology contract to satisfy the remainder of the requirements presently met under the DTS contract, the operations and

sustainment of DTS, and will also include development and implementation of other future DTS requirements. DTS is primarily a financial management system, one of the largest in DoD, and this contract will focus on the operations, sustainment, and future development and modernization of the DTS. DTS is a critical component of the DoD Business Enterprise Architecture and is the first system to integrate 38 major DoD systems together in an interactive manner. As directed by the newly-created DoD organizations responsible for DTS, this contract may also contain other requirements for DTS to include new financial management functions such as miscellaneous payments or vendor payments not necessarily tied to travel, and other requirements to support the DoD Business Enterprise Architecture as it evolves over time. In addition, another DoD system, the Global Electronic eXchange (GEX), helps to maintain the DTS interfaces for sending financial transactions to other DoD financial systems. The new DTS operations and sustainment contract may include a requirement for the contractor to function as a systems integrator working with GEX's support contractor to maintain the DTS interfaces in a manner approved by the newly-created DoD organizations responsible for DTS.

However, for the reasons discussed below, it is my intent to seek a 12-month, sole source extension of the current DTS contract. The estimated cost of this contract extension could be between $18M and S20M. It is my intent that this extension will include only the operations, sustainment, and completion of development requirements already on the current DTS contract, and not the development and implementation of future DTS requirements.

My request for an extension will be based on the following: a) the DTS program has sustained $8M in budget cuts so far over the past two years due to higher priority DoD

requirements which have delayed completion of work already required by the DTS contract; b) the contract requirements that have been delayed include the implementation of DTS functionality such as permanent change of station computation, recruit and medical-related travel, and other accounting and personnel system interfaces; c) this work must be completed to allow for the planned elimination of 27 DoD travel systems, known as legacy systems; d) an interruption of this work in-progress to allow for a new contractor to gain the experience needed to successfully complete the work, will impact these other DoD legacy systems' contracts and increase DoD resource costs, in terms of people and dollars, because of the unplanned extension of some or all of these legacy systems; e) the DoD needs time to finish analyses and determine whether moving the DTS data center hardware from a contractor facility to a government-owned and operated facility is more cost-effective; and f) to allow an adequate transition period between the current contractor and another contractor for the complex DTS.

It is my intent to seek approval for the RFP to be developed and issued for a full and open competition for a contract for the DTS operations and support requirements as well as any DTS future requirements. Due to the complexity and size of DTS, and in order to assure a fair full and open competition, potential offerers will need time to fully understand DTS before providing a proposal and this time as been accounted for in the schedule. If approved by the DoD organizations responsible for these requirements, it is my intent to conform to the following approximate schedule:

Release of RFP: Draft – End of May 2006

Final – Oct 2006

| | |
|---|---|
| Receipt of Proposals: | Jan 2006 |
| Contract Award: | April 2007 |
| Start of Performance under New Contract: | Transition period: May – Sep 2007<br>Full Performance: Oct 2007 |

8. In seeking approval for the sole source extension of the DTS contract, the PMO-DTS will comply with the requirements of the Competition in Contracting Act, the Federal Acquisition Regulation, and agency regulations. Specifically, it is my intent to seek approval pursuant to 10 U.S.C. 2304(c)(1) which provides the authority to use other than full and open competition procurement procedures when the property or services needed by the agency are available from only one responsible source and no other type of property or services will satisfy the needs of the agency.

9. Given the estimated value of the sole source extension identified in paragraph 7 above, and in accordance with 10 U.S.C. 2304(f)(1)(B), I understand that approval of such a sole source extension must be granted by the Head of the Contracting Agency, which is the Director of the Army Contracting Agency. I have yet to seek such approval but intend to do so in March or April, 2006. In the event that such approval is not granted, the Department will have to evaluate the best approach to provide appropriate time for contractors to gain the experience and expertise required to allow for the smooth transition of DTS to support its millions of users world wide.

Executed this 24th day of February 2006.

Brenda Sue Johnson

CERTIFICATE OF FILING

I hereby certify that on February 27, 2006, a copy of the foregoing GOVERNMENT MEMORANDUM IN RESPONSE TO THE ORDER DATED FEBRUARY 13, 2006, was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

(s) David A. Levitt