# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** <br> **Plaintiff,** <br> **v.** <br> **THE UNITED STATES,** <br> **Defendant,** <br> **and** <br> **NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION,** <br> **Intervenor.** | **Case No. 03-1274C** <br> **Judge George W. Miller** |

## PLAINTIFF'S RESPONSE TO THE COURT'S REQUEST FOR INFORMATION RELATED TO PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT

In its February 13, 2006 Order, the Court asked CW Government Travel, Inc. ("Carlson"), to address two issues. First, why Carlson did not have sufficient information to advance its current arguments pursuant to Rule 59 since Carlson had both the DFARS and the Restructured DTS Contract. Second, why the Government Accountability Office (the "GAO") Report testimony at the Senate hearing constitutes new evidence and not, as the Government contends, an analysis of evidence already available to Carlson.

Essentially, the Government argues that Carlson should have known at the time that the Government was misrepresenting material facts to the Court regarding the Government's property rights in the Defense Travel System (the "DTS"). As explained in detail below, Carlson could not previously challenge the Government's misrepresentations because (1) the determination of what the Government owned depends not only on the DFARS and Contract, but

on facts establishing the commercial and non-commercial technical components of the DTS and payments for specific development efforts, (2) those crucial facts had not been disclosed to Carlson even though the Restructured Contract had been, and (3) the Government submitted Declarations and arguments expressly misrepresenting that the Government had not paid for the development efforts. Thus, even though Carlson found it remarkable that the Government had not acquired rights to the DTS, and challenged the veracity of the affidavits being submitted on other points, the lack of discovery precluded the challenge to the Government's misrepresentations as to its lack of rights in the DTS. Likewise, the GAO Report and testimony by Department of Defense ("DoD") officials is new evidence, and not merely an analysis of evidence already available, because the crucial evidence reflected in the GAO Report and testimony was not available to Carlson. The litigation record was restricted to the Government's voluntary production of a limited Administrative Record. The truncated proceedings did not allow the development of that record by Carlson. Moreover, all the Court had was the Government's representation/analysis, and thus, subsequent determinations by the GAO and admissions in sworn testimony by DoD officials expressly refuting prior Government representations to the Court is, by definition, new evidence.

Carlson did, of course, promptly move for relief from the Court's judgment pursuant to Rule 59. But Rule 59(a) applies to situations where there has been a trial and new evidence potentially warrants a new trial. Thus, Carlson moved for relief from the judgment arguing that an evidentiary hearing to test the Government's claims regarding the purported hardship and prejudice of relief (of which the Government's parade of horribles included the complete loss of the DTS System already developed). However, the Government's recent admissions that its representations to the Court were false were not available at that time.



::ODMA\PCDOCS\MC1DOCS1\200598\1

## I. THE DETERMINATION OF DOD'S PROPERTY RIGHTS IN THE DTS REQUIRED FACTS NOT DISCLOSED TO AND ACTIVELY CONCEALED FROM CARLSON AND THE COURT

The Government's basic rights to the DTS arise primarily under DFARS clauses 252.227-7014, *Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation* and 252.227-7013, *Rights in Technical Data – Noncommercial Items*, which were added to the DTS DTR 6 Contract with Modification P00025 dated February 27, 2002. Essentially, these clauses provide that the Government acquires perpetual unlimited rights to any *noncommercial* computer software and technical data developed at Government expense. These clauses, however, would not give the Government any rights in commercial technical data and computer software used in the DTS or in noncommercial technical data or computer software that had been developed at private expense by Northrop prior to the 2002 Restructuring Modifications to the DTS DTR 6 Contract. Thus, the mere inclusion of the DFARS clauses in the Restructured Contract was insufficient for Carlson or the Court to make any determination regarding the Government's property rights to the DTS.[1]

As the Court is aware, the original DTS DTR 6 Contract awarded in 1998 did not include any provisions for the Government to acquire property rights in the DTS (then known as the "CUI"). As acknowledged by the parties in the Preamble to February 27, 2002 Contract

---

1 The GAO Report itself is instructive on this point. In Appendix II to the Report *(Plaintiff's Reply to Government Opposition, Exhibit 1)*, the GAO set forth its methodology for preparing the Report and underscoring that the analysis had to extend beyond the mere presence of the DFARS clauses:

"To describe DOD's property rights in the DTS we reviewed the DTS contract, applicable regulations, DOD intellectual property guidance, key DTS license agreements, and written responses from PMO-DTS to our questions, and we met with PMO-DTS and contracting officials and with their legal counsel."

Apparently, GAO investigators had complete access to the DTS Contract files and were able to fully explore the issues with DTS PMO officials — an opportunity denied Carlson and the Court.

Modification P00025 (which added the crucial DFARS clauses), the Original 1998 DTS Contract required that (1) to the maximum extent practicable commercial-off-the-shelf ("COTS") products would be used for DTS and contemplated both the development and integration of COTS products to meet the requirements of DTS, and (2) TRW proposed to develop DTS at its own expense and charge the DoD fixed fees for its deployment. *See Exhibit 8, V568.* Thus, under the DTS DTR 6 Contract terms from 1998 until April 2002, TRW/Northrop, not the Government, was responsible for paying for development costs. Moreover, "to the maximum extent practicable," the DTS would consist of COTS. The Government acquired no property rights in technical data or computer software developed at Northrop's expense, nor did the Government acquire property rights in COTS, even under the 2002 Restructured Contract.

The Restructured Contract provided for payments by the Government for software development efforts and the acquisition of Government rights to such software. However, the analysis of Government property rights to the DTS being used by DoD travelers in 2004 was dependent on knowing what components had been developed at Government expense under the Restructured Contract and what components were COTS and/or paid for by the contractor. The payments to Northrop under the Restructured Contract for development of DTS components did not start until April 1, 2002. *Exhibit 11, V833-868.* Therefore, in order to determine the Government's property rights in the DTS, one would have to know how much of the DTS was developed prior to April 1, 2002, how much was commercial and how much was noncommercial, and the specific portions of the DTS that were noncommercial and developed after April 1, 2002, at Government expense. Those facts were not disclosed. Indeed, throughout the litigation, the Government refused to reveal the amount of money paid to Northrop under the Restructured Contract Modifications and specifically concealed the amounts paid for

development efforts – *e.g.*, CLIN 0010.[2] Moreover, the Record shows that not only was the information not disclosed, but that DoD actively misrepresented the actual state of affairs.

Significantly, when Carlson pointed out that Modification P00027 also provided for payment of $43,745,533.00 to TRW (*Exhibit 8, V569)*,which had been calculated based upon costs incurred by TRW prior to December 19, 2000, the Government denied paying for development costs and characterized the payment of $43.7 million to TRW as "consideration…for the restructure of the contract." *Exhibit 8, V569; Exhibit 9, V663, 680.*[3] When Carlson continued to contend that the payment of $43.7 million covered development costs and represented a shift in responsibility and risk from TRW to the Government, the Government offered a sworn Declaration expressly denying that the Government was paying for development costs that would give the Government ownership rights in the technical data:

> **Contrary to Carlson's claim, the $43.7 million was not compensation for the development effort that was deleted as a contract requirement. To the contrary, the payment of $43.7 million was a negotiated settlement amount for consideration to restructure the DTS Contract.**

*Butler Decl.,* ¶ *2, Government App. IV.*

The Government also introduced a Declaration from Karen A. Williams of Northrop insisting that the payment of $43.7 million was made only after a functioning CUI was delivered and did not reimburse development costs:

---

2 Contract Modification P00025 added CLIN 0010, for cost reimbursement of development efforts. Contract Modification P00027 included an estimated cost for CLIN 0010 of $9,007,343 for only one year and nothing for the remaining four option years. However, the May 2002 Contract Modification P00029 deleted any estimated cost for CLIN 0010 and the Government has never revealed how much has been paid to Northrop for development efforts under the Restructured Contract.

3 Actually, Northrop claimed to have incurred more than $59 million in costs prior to December 18, 2000. *Exhibit 9 at V663, V680.*

> **We also received lump sum payments equaling approximately $43.7 million as "Restructure Consideration" This payment was made as consideration for the modifications and was made after Northrop Grumman had delivered a functional CUI to the United States and deployment in accordance with government direction had begun. This payment did not reimburse the Company for its full development costs.**

*Williams Decl., ¶ 18, Government App. at 023.*

Thus, the Government, which had possession of the facts, chose to argue to this Court that the DTS had been substantially developed and delivered before the Restructure and that the Government had not paid for that development effort. It did so with broad testimonial Declarations and representations without revealing the underlying facts that would have exposed those claims. Carlson advised the Court that those Declarations should be challenged. The Court now knows that all of that evidence was false. But without discovery on the actual underlying information regarding the true status of the DTS and actual Government development funding, Carlson was hamstrung in its ability to expose the true state of affairs before the Court rendered its decision.

## II. CARLSON COULD NOT HAVE KNOWN THE STATUS OR COMPOSITION OF THE DTS AT THE TIME OF THE 2002 RESTRUCTURE CONTRACT MODIFICATIONS

In order to determine what Property Rights the Government acquired in the DTS under the cost-reimbursable provisions of the Restructured Contract, Carlson would have had to know both the technical composition (*e.g.*, commercial versus noncommercial), and the completion status of the DTS before the Government started funding any development work after April 1, 2002. Here again, the Government misrepresented the facts and misled both Carlson and the Court.

The Government not only misrepresented material facts to the Court regarding ownership of the DTS during and after oral argument, but also consistently misrepresented the status and

completeness of the DTS prior to the effectiveness of the Restructuring Contract Modifications with the crucial DFARS clauses. The Government repeatedly represented to the Court and Carlson that the DTS was substantially complete before the 2002 Restructuring Contract Modifications were executed and that the development of a web-based DTS had been part of the original 1998 DTS DTR 6 Contract, as well as the requirement to develop interfaces between the DTS and DoD legacy systems. If such representations had been accurate and Northrop had been developing a web-based DTS and interfaces with legacy systems since 1998, and had substantially completed such development without Government funding that started on April 1, 2002, then the Government counsel's representations to the Court in 2004 would not have been false and misleading or inconsistent with the inclusion of the DFARS clauses in the 2002 Restructuring Contract Modifications.

### A. Government Declarations Misrepresented The Status And Composition Of The DTS Prior To The 2002 Contract Restructure

The Record that was voluntarily produced by the Government during this litigation is essentially devoid of the necessary information concerning the composition and status of the DTS before the Government began paying for development efforts after April 1, 2002. Similar to the tactics used by the Government to mislead the Court in regard to when the requirement to provide traditional travel services became part of the DTS DTR 6 Contract, the Government misled the Court regarding the status of the DTS prior to the Restructure of the Contract.

The Government introduced three Declarations, Karen A. Williams, Director of Finance & Business for Northrop (*Government App., Exhibit II, 016-025),* Colonel Larry J. Schaefer, Director, DTS Program Management Office (*Government App., Exhibit III, 160-164),* and Peggy W. Butler, the ITEC4 Contracting Officer (*Government App., Exhibit IV, 211-215)* that

contained representations as to the status and composition of the DTS prior to the 2002 Restructuring Contract Modifications.

Based upon these self-serving Declarations, the Government repeatedly represented to the Court that Northrop's 1998 proposal and the original DTS DTR 6 Contract included a requirement to develop a web-based DTS plus interfaces with DoD legacy systems, and that prior to the 2002 Contract Restructure, the DTS was substantially complete. If such Declarations had been accurate and the Government representations correct as to the composition and status of the DTS prior to the 2002 Restructured Contract, then the Government would not have acquired Perpetual Unlimited Rights to the bulk of the DTS. In other words, the Government deliberately conveyed the false impression that the post-Restructure development work funded by the Government was insignificant when compared to what had been previously accomplished and probably not severable from the DTS technology owned and controlled by Northrop.

Larry Schaefer and Karen Williams both declared that the Original 1998 DTS DTR 6 Contract required Northrop to develop a web-based system to compliment the client/server mode of operation and to provide integration between the DTS and DoD legacy systems. Larry Schaefer declared that the DTS Contract, both as originally awarded and as restructured, required integration with the DoD legacy systems, plus development of a web-based mode of operation. *Government App., Exhibit III, ¶ 8 at 163, ¶ 11 at 164.* Karen Williams declared that Northrop's original proposal included a web or internet browser as well as a client/server mode *(Government App., Exhibit II, ¶¶ 11-14 at 019-021)* representing that the development of a web-based system was part of TRW's original proposal and 1998 Contract. Ms. Williams also represented in her

Declaration that the provision of traditional travel services was also part of the Original 1998 DTS Contract.[4] *Id., ¶ 14 at 021.*

As noted above, Ms. Williams also declared that prior to receiving the $43.7 million lump sum payment pursuant to Contract Modification P00025, "Northrop Grumman had delivered a functional CUI to the United States and deployment in accordance with the government direction had begun." *Id., ¶ 18 at 023.*

The Contracting Officer, Peggy W. Butler, stated in her Declaration that prior to the payment of $43.7 million under the Restructured Contract Modifications, "Northrop Grumman had delivered a functional CUI and deployment had begun." *Government App., Exhibit IV, ¶ 2 at 211.* In order to justify the Restructuring payments to Northrop, Colonel Larry J. Schaefer, Program Director, Defense Travel System, wrote in August 2001 that the DTS then met 91% of the functional requirements. *Exhibit 9, V666, V697-701.* If such representations had been correct, then the Government could not have acquired property rights in more than nine percent of the DTS under the Restructured Contract DFARS clauses.

**B. Government Briefs To The Court Misrepresented The Status And Composition Of DTS Prior To The 2002 Contract Restructure**

In its December 15, 2003 Motion to Dismiss, or Alternatively for Summary Judgment ("Government Motion"), the Government cited the Declarations of Ms. Williams, Ms. Butler, and Colonel Schaefer as authority to represent that Northrop's development of a web-based DTS was part of the original 1998 Contract. *Government Motion at 8-9, 13-15, 38-45.* The Government also represented that prior to the 2002 Contract Restructure and payment of $43.7 million, Northrop had delivered a functional CUI and deployment had begun, citing Ms.

---

4 Of course, this representation that the Original DTS DTR 6 Contract required traditional travel services proved to be false, and even contrary, to a previous sworn Declaration in Federal Court given by Ms. Williams.

Butler's Declaration. *Id. at 49.* In the Government's March 10, 2004 Opposition to Carlson's Motion for Summary Judgment ("Government Opposition"), the Government repeated the representation that development of a web-based DTS was required by the original DTS Contract. *Government Opposition, at 7, 11-17.* The Government also represented that "Northrop Grumman had achieved 'operational capability'" for the CUI by "November 26, 2000" citing PL App., Tab 9, at *V 688. Id. at 18.* The Government further represented:

> **The $43 million of which Carlson complains was nothing more than a "negotiated settlement amount for consideration to restructure the DTS Contract" that was only paid after "Northrop Grumman had delivered a functional CUI and deployment had begun." [citing Butler Declaration]...The lump sum thus served as consideration for the Government's interest in altering the deployment schedule and restructuring the operational and maintenance fees.**

*Id. at 18.*

In the May 5, 2004 Consolidated Joint Statement of Facts in Support of the respective motions for Summary Judgment and in the May 3, 2004 Joint Response of the Government and Northrop to Plaintiff's Statement of Undisputed Facts ("Government and Northrop Joint Response"), the Government repeated these factual representations regarding the inclusion of a web-based CUI in the original 1998 Contract and that the DTS was substantially complete prior to the 2002 Contract Restructure. In their Joint Response, the Government and Northrop represented that Northrop's DTS had achieved "operational capability" by November 26, 2000 (*Statement #23 citing V688, #136 citing Butler Decl.)* and that the:

> **... fact that based upon a "functional assessment study conducted by a joint team consisting of the PMO and TRW at the request of OSD (Office of the Secretary of Defense)," the PMO concluded that, as of August 2001, the "completion factor for CUI integration...was 91%." V666.**

*Government and Northrop Joint Statement, #23 at 17.* The Government and Northrop also represented that:

> **... the intent of the restructure was not simply or even substantially to add cost reimbursable CLINs for the software development efforts. To the contrary, the CLINs for software development comprise a very small percentage of the estimated value of the restructured contract.**

*Id. #11 at 63.*

In the Government's September 13, 2004 Opposition to Plaintiff's Motion for Reconsideration ("Government's Opposition to Reconsideration"), the Government represented to the Court that "Northrop Grumman's DTS DTR 6 Contract is substantially complete" citing the April 1, 2002 Memorandum by Colonel Schaefer to support the Restructure of the Contract *(V665-666)* and the DTS PMO response to the July 2002 Report of the DoD Inspector General. *Government's Opposition to Reconsideration at 19; V1176-77, 1185.* The Government also represented:

> **If the injunction is granted, the project will be delayed to an even greater degree than it has been ...**
>
> **Northrop Grumman would walk away with the system that it has developed and the Government would have to start over ...**
>
> **The resolution sought by Carlson would send the most challenging and complex aspects of the project back to the drawing board ...**

*Id. at 19.* If the representations repeatedly made by the Government and its self-serving Declarations had been accurate, the end-to-end DTS would have been substantially complete, including the web-based mode and interfaces to DoD legacy systems, before the Contract was restructured and the Government became liable for software development.

What the Record discloses is a consistent, systematic attempt by the Government to use broad testimonial statements and representations to paint a picture regarding the status of the

DTS and its development at private cost and effort. The September 2005 GAO Report and DoD officials' testimony prove that the picture painted for this Court in 2004 was grossly distorted.

The Government's misrepresentation of facts to this Court is further illustrated by the earlier dispute over whether traditional travel services were included in the Original 1998 DTS Contract. The Court may recall that there too the Government submitted Declarations and diligently argued that those travel services were included in the Original 1998 DTS Contract. Carlson had obtained a Declaration from the same witness in other Federal Court proceedings expressly denying that those travel services were included and the Court, of course, previously resolved that issue. But after the Court's ruling, Carlson obtained a Government document that would have been a "smoking gun" which fundamentally contradicted the Government's position that traditional travel services had been part of the original 1998 DTS DTR 6 Contract. *See Attachment 1.* What is significant is that this crucial document, prepared by the DTS PMO, was not produced as part of the Government's Administrative Record in this litigation, despite its obvious relevance. Carlson submits that this example of undisclosed relevant evidence on the traditional travel service issue is consistent with the Government's failure to disclose the evidence necessary to evaluate the Government's property rights in the DTS.

## III. THE GOVERNMENT TESTIMONY AND GAO REPORT CONSTITUTE NEW EVIDENCE

The Court also asked why the GAO Report and testimony by a DoD official constitute new evidence and not just an analysis of evidence already available to Carlson. First, the GAO Report and testimony before the Senate does not represent a mere analysis of known facts. The Government had previously made representations regarding the ownership of the DTS — specifically regarding the rights of Northrop in the DTS technical data. The testimony by a DoD official that the Government, not Northrop, owned the data is not merely an analysis, but a

crucial admission that the Government's representations to the Court were wholly inaccurate. Of course, admissions are a compelling form of evidence. The determination by the GAO in an official report to the United States Senate may be binding on the Government. Just as important, however, is the simple fact that the underlying information reflected in this testimony and the GAO Report was not available to Carlson. It obviously existed within the DTS Program Management Office, but it was not shared with Carlson, was not disclosed as part of the voluntarily produced Administrative Record, and was mischaracterized by the Government in all its submissions to the Court. The Government never revealed how much money had been paid to Northrop for development efforts under the Restructured Contract. Carlson never had an opportunity to depose the Government's Declarants. Moreover, Carlson had no way of determining how much of the DTS consisted of COTS, or who owned the COTS or how much, if any, noncommercial computer software was developed at Northrop's expense.

The GAO Report and Senate testimony addressed these issues. The GAO Report on the DTS Program given to the U.S. Senate Permanent Subcommittee on Investigations and released to the public on September 29, 2005, contained an Appendix I entitled *Department of Defense Rights to Property in the Defense Travel System*. That GAO Report revealed a number of crucial facts that had been concealed from Carlson and the Court during the litigation. Significantly, all the usable interfaces between the DTS and DoD legacy systems were developed after April 1, 2002 at Government expense, thus giving DoD Perpetual Unlimited Rights to that crucial technical data and computer software, which could therefore be given to any successor contractor if Northrop's DTS DTR 6 Contract is terminated or expires. The Director of the Defense Financing and Accounting Service ("DFAS") confirmed in his testimony before the Senate Subcommittee that if the Court had ordered a termination of Northrop's DTS DTR 6 Contract,

DoD could give the DTS System to a successor contractor. Thus, contrary to the representations made by Government Counsel to this Court in 2004, if an injunction had been issued by this Court, the Government would not lose the benefit of five years of effort and expense or have to start from scratch on the most complex aspects of the DTS — the interfaces to the DoD legacy systems.

The GAO Report revealed that, contrary to the earlier suggestions, virtually all the interfaces between the DTS and DoD legacy systems had been developed at Government expense after the Contract was restructured, thus giving the Government Perpetual Unlimited Rights to the most complex components of the DTS. The GAO Report also disclosed for the first time that the commercial components of the DTS (a) were not owned by Northrop and (b) could be replaced or duplicated and "not cause risk to the project," according to knowledgeable DoD officials. *GAO Appendix I at 22.*

The information available to the GAO, which allowed it to determine the Government's property rights to the DTS, was not available to Carlson or the Court in 2004. However, that information was available to the Government and Northrop, but either concealed or obfuscated as part of the litigation strategy. As a result, the United States Senate had to initiate a GAO investigation and call a special hearing to obtain honest answers from DoD in regard to the DTS Program. The GAO Report, after a thorough investigation, plus the sworn testimony of a knowledgeable DoD official, are obviously more accurate than representations made by the Government representatives during this litigation in their efforts to preserve an illegal contract and cover up their failure to comply with CICA.

**CONCLUSION**

The Federal procurement system and the Judicial review of procurements to ensure compliance with the law should not tolerate the cavalier treatment of the law and facts by the Government which has occurred throughout the DTS Program and litigation. The GAO Report and testimony by Government officials at the Senate Hearings warrant careful scrutiny by the Court and warrant relief from the prior judgment.

Dated: February 27, 2006

Respectfully submitted,

s/ Lars E. Anderson
Lars E. Anderson
Michael W. Robinson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Counsel for Plaintiff*

Attachment

# ATTACHMENT 1

VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182-2707
Telephone 703-760-1600
Facsimile 703-821-8949
www.venable.com

**Lars E. Anderson**
**(703) 760-1605**
**leanderson@venable.com**

April 6, 2005

***VIA FACSIMILE @ (202) 514-7965***

David A. Levitt, Esquire
Commercial Litigation Branch
Civil Division
U.S. DEPARTMENT OF JUSTICE
**Attention**: Classification Unit, Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530

***RE:*** ***CW Government Travel, Inc. v. The United States of America — Case No. 03-1274***

Dear David:

During ongoing discovery in another Court of Federal Claims case (*CW Government Travel v. The United States of America* – Case No. 04-718C) involving another attempt by your client to remove travel business from CWGT's contracts, the Government produced the attached document.

The document, entitled "Commercial Travel Office (CTO) Acquisition Strategy" is dated March 1, 2002 and was prepared by the Defense Travel System Program Management Office ("DTS PMO"). As you recall, that was at the time the DTR-6 Contract was being totally restructured. Page 2 of this DTS PMO document, entitled "Defense Travel Region 6 (DTR-6) History," starts with the 1998 award to TRW/American Express and states:

> **No traditional travel services requirements were included (i.e., without using the CUI)**

On page 3, entitled "DTR-6 CTO Changes" it is stated:

> **Traditional Travel Services requirements were added as requirements**

and in bold, highlighted text it is stated:

> **New SOW [statement of work] was provided for sole-source proposal**

On page 7, entitled "Status and Options," it was noted that negotiations between TRW/PMO were in progress and that if agreement on price is reached:

> **Implement traditional and CUI services in DTR 6**

VENABLE LLP



If agreement on price not reached it was stated:

**Terminate for Convenience**

* * *

**Incorporate DTR-6 into the DTS follow-on acquisition**

It is obvious that this DTS PMO document was extremely relevant to several of the major issues in our litigation, and that it is contrary to the position the Government took in the litigation. Since the document was provided in other litigation (where the 2002 inclusion of traditional travel services in the DTR-6 Contract was not an issue), it is obvious that this crucial document was readily available to DTS PMO and ITEC4 officials, and we must presume it was deliberately withheld in our litigation by your clients. We assume, of course, that you had no knowledge as to the existence of such a damaging document, and have no doubt that had you known, the document would have been disclosed and representations to the Court addressed accordingly.

We request that you provide a complete explanation from your client as to why they did not disclose this document. It is further requested that you direct your client to produce any other undisclosed documents which acknowledge (1) that the original DTR-6 Contract did not include traditional travel services, or (2) that traditional travel service requirements were added to this contract in the 2002 changes, or (3) that a new Statement of Work was provided to solicit a sole source proposal from TRW, or (4) but for the agreement on the price of the 2002 changes, the DTR-6 Contract would have been terminated and a follow-on acquisition could have and would have been conducted for the DTS requirements.

We view the withholding of such relevant evidence by your client to be a very serious matter and note that withholding this document, coupled with the submission of a sworn declaration (never retracted) that was directly contradicted by a previous sworn statement by the same witness, reflects a pattern by your client of misrepresentation of a material fact. We trust that the Department of Justice will take appropriate action.

Sincerely yours,

Lars E. Anderson

*LEA/kws*

Attachment

::ODMA\PCDOCS\MC1DOCS1\181131\1

*Defense Travel System*

# Commercial Travel Office (CTO) Acquisition Strategy

O-6 Working Group

1 March 2002

Paul Joyce
(703) 607-1498, ext. 116
joycep@osd.pentagon.mil

Procurement Sensitive

# Defense Travel Region 6 (DTR-6) History





- ✦ Contract awarded to TRW/American Express – 1998
- ✦ DoD to receive point-of-sale discount on airline tickets
- ✦ American Express to provide travel services at all DTR 6 locations when the CUI was deployed to a location (simultaneous CTO and CUI implementation)
- ✦ No traditional travel services requirements were included (i.e., without using the CUI)



**Procurement Sensitive**

# *DTR-6 CTO Changes*



- Airlines reduced commissions causing CTOs to seek fee for service pricing arrangements
- DTS Fielding strategy changed – CUI/CTO services could be implemented separately
- Traditional Travel Services requirements were added as requirements
- Scope change from DoD to Army/Air Force participation

**New SOW was provided for sole-source proposal**

# Proposal History



- Proposal #1 – Sep 01
  - Transaction fee
    - With CUI
    - Without CUI (Traditional)
  - Management fee
    - Government pay all direct operating expenses on a cost-reimbursable basis (Government assumes all risk)
  - Core Services included in fee
  - Value added services priced and charged separately
- Government-requested proposal adjustments
  - Overall cost reduction
  - International rate desk, group travel, and insurance were moved to core services
  - 8 staffed locations moved to value added services in effort to lower overall transaction fees

**Procurement Sensitive**

# Proposal History



- Proposal #2 – Nov 01
  - Transaction fee
    - With CUI
    - Without CUI (Traditional)
  - Management fee
    - Government pay all direct operating expenses on a cost-reimbursable basis (Government assumes all risk)
- Navy recently awarded travel services contract based on management fee (firm fixed price)
- Government-requested proposal adjustments
  - Overall cost reduction
  - Firm fixed price management fee
  - Include emergency travel service support in "core" services

**Procurement Sensitive**

# Proposal History



- Proposal #3 – Dec 01
  - PMO performed requirement comparison among DTR-6, Army and Navy SOWs
  - Navy receiving significant items that were proposed as value added by American Express at a lower overall cost (GDS for Government, staffed locations, satellite ticket printers, CBA)
  - Jan 02 - Government advised TRW/American Express in writing that costs as proposed could not be determined as fair and reasonable
- Feb 02 - Government held discussions with TRW/American Express to discuss lowering price

**Procurement Sensitive**

# *Status and Options*



- Status
  - Negotiations between TRW/PMO in progress
  - Working to reach agreement NLT 12 Mar 02
- Options
  1. If agreement on price is reached
     - Implement traditional and CUI services in DTR 6
  2. If agreement on price is *not* reached
     - Terminate for Convenience
       - DTR-6 locations to be serviced by Service/Agency contracts
       - Incorporate DTR-6 into the DTS follow-on acquisition

**Procurement Sensitive**

# Follow-on CTO Partnership



- Follow-on acquisition will be a joint effort between PMO and Services/Agencies
  - Service/Agency responsibilities
    - Define requirements and quality assurance metrics
    - Determine pricing structure
    - Validate size and configuration of travel regions
    - Participate in source selection evaluation
    - Assist in contract implementation and training
    - Monitor contractor compliance
  - PMO/CECOM responsibilities
    - Serve as single procurement entity

# Follow-on CTO Procurement

- ✦ NO CHANGE TO SOLICITATION STRATEGY
- ✦ One Solicitation (CONUS)
  - 18 Travel Areas plus small business set-asides
  - Firm fixed-price requirements contracts (Task Orders)
  - Multiple Awards - one Contractor per area not including small businesses



# OCONUS CTO Areas




Europe/Greenland/Iceland/Turkey/Africa




Germany

Area 60



Japan




Asia/Australia/New Zealand/Middle East

1 March 2002

**OCONUS Solicitation - TBD**

# Follow-on Contract Timeline



| | |
|---|---|
| ▪ Obtain data on unknowns (Cat B, etc.) | Apr 02 |
| ▪ Analysis from information exchanges | Jul 02 |
| ▪ Draft RFP on WEB | Aug 02 |
| ▪ Pre-solicitation meeting w/industry | Sep 02 |
| ▪ Issue final solicitation | Oct 02 |
| ▪ Pre-proposal conference | Nov 02 |
| ▪ Proposals due | Jan 03 |
| ▪ Award contract | May 03 |
| ▪ Begin implementation | Aug 03 |

* Above dates are for CONUS solicitation - OCONUS TBD.

U.S. Department of Justice

Civil Division
TELEPHONE: 202-307-0309

PDK:DMC:DA LEVITT
DJ NO. 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

*Washington, D.C. 20530*

April 19, 2005

BY FEDERAL EXPRESS

Lars E. Anderson, Esq.
Venable LLP
8010 Towers Crescent Drive
Suite 300
Vienna, Virginia 22182-2707

Re: <u>CW Government Travel, Inc. v. United States, Fed. Cl. No: 03-1274C</u>

Dear Mr. Anderson:

This responds to your letter of April 6, 2005 in which you state that you "presume" that the DTS Project Management Office intentionally withheld the 0-6 Working Group Brief ("Brief") from the administrative record in the above-captioned case because the Brief allegedly demonstrates that CTO services were not included in the DTS-DTR 6 contract.

Because the Court of Federal Claims agreed with your position upon the traditional travel issue (which the Government did not appeal), I find it surprising that you continue to focus upon the scope of travel services issue. Whatever your motives, you are misinterpreting the document which was inadvertently excluded from the mass of records produced in the litigation.

As we previously explained, the DTS-DTR 6 contract contemplated that CTO services would be provided after the implementation of the CUI in DTR 6. The reason these services were not provided prior to the restructuring was that there was an unforeseeable delay in the implementation of the CUI. The Brief was prepared to assist the PMO in determining how it should continue to obtain CTO services in DTR-6 given the delay in implementation of the CUI. While the language you cite in the letter may appear ambiguous out of context, within context it was intended to convey to the Working Group (senior representatives of DTS-PMO client agencies) that the pricing features

of the DTS-DTR 6 contract would be modified to accommodate the CTO revenue changes imposed by the airline industry and the delay in implementing the CUI, with the disaggregation of the separate pricing elements for CTO and CUI-assisted services. In the event the pricing could not be resolved with the current contractor, the Brief notes that CTO services for the region would be procured competitively with CTO services in other regions.

Contrary to the suggestion in your letter, the Brief does not suggest that the DTS-DTR 6 Solicitation did not include CTO services in the region. Indeed, the attendees were representatives of DTS-PMO customer agencies rather than procurement officials and there would have been and was no reason to examine the scope of the Solicitation at the March 1, 2002 session.

Having thoroughly investigated the matter, the Department of Justice concludes, therefore, that the Brief is both consistent with the DTS PMO's position in the litigation and a fair analysis of options for CTO services in the region.

In short, the Department will take no further action on your letter.

Very truly yours,

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch

## **CERTIFICATE OF FILING**

I hereby certify that on February 27, 2006, a copy of the foregoing PLAINTIFF'S RESPONSE TO THE COURT'S REQUEST FOR INFORMATION RELATED TO PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Lars E. Anderson
Lars E. Anderson