IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CW GOVERNMENT TRAVEL, INC., Plaintiff, | ) | |
| v. | ) | No. 03-1274 C (Judge George Miller) |
| THE UNITED STATES, Defendant. | ) | |
| and | ) | |
| NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION, Defendant-Intervenor. | ) | |

GOVERNMENT RESPONSE TO "PLAINTIFF'S RESPONSE TO THE COURT'S REQUEST FOR INFORMATION RELATED TO PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT"

Pursuant to this Court's order dated February 13, 2006 ("Order"), defendant, the United States, respectfully responds to plaintiff, CW Government Travel, Inc.'s ("Carlson's") explanation of why statements presented to the Senate Homeland Security and Governmental Affairs Committee, Permanent Investigations Subcommittee ("Subcommittee") on September 29, 2005 concerning rights to intellectual property developed under the Defense Travel System ("DTS") contract (No. DAM01-98-D-1005), and an appendix to a Government Accountability Office ("GAO") report concerning software programs and hardware used in the DTS Contract, are "newly discovered evidence. . . ." RCFC 60(b); Order at 1. As this Court noted, Carlson's contention is counter-intuitive because those statements and that appendix are based upon intellectual property clauses that were incorporated in the restructured contract long ago, and which the Government had produced to Carlson well prior to the hearing upon the claim for injunctive relief. Order at 1-2.

Carlson contends in its response to the Order that the statements and the appendix are

newly discovered evidence because they purportedly revealed, for the first time, that the software and technical data needed to effectuate the interfaces between the DTS developed by Northrop Grumman Space & Mission Systems Corporation ("Northrop Grumman") and the legacy accounting and auditing systems within the Department of Defense ("DoD") were developed following the restructuring of the contract in April 2002. According to Carlson, it did not know, and could not have known, prior to the Subcommittee hearing, that this intellectual property had been developed at Government expense. Plaintiff's Response To The Court's Request For Information Related To Plaintiff's Motion For Relief From Judgment ("Response") at 3-6.

According to Carlson, since it had been led to believe that all of this software had been developed prior to the restructuring of the contract, it could not have known that the intellectual property clauses in the restructured contract would have any applicability. Therefore, Carlson asserts, it had no basis upon which to challenge the Government's assertion that if the contract were deemed to have been restructured in violation of the Competition in Contracting Act, 41 U.S.C. § 253(a) (2000) ("CICA"), the contract effort may have been required to start anew. Id. at 6-11.

Carlson's argument does not comport with the plain and apparent facts in the record. In fact, Carlson really does not deny that it possessed all of the facts regarding either (a) the software development efforts that were included in the restructured DTS Contract or (b) the contract clauses incorporated as a result of the restructure under which the Government would acquire certain rights in the data and software to be developed during that restructure. Rather, Carlson offers excuses as to why it allegedly was unable to discern the meaning of the facts.
Carlson's entire argument rests, in the end, upon its contention that it did not know the extent of the software development that had been, or was to be, accomplished and, thus, that it lacked the ability to challenge the Government's argument regarding the Government's rights in the developed software.

These contentions smack of litigative revisionism. The record before the Court in advance of the hearing upon the parties' respective cross-motions for summary judgment established, among other things, the following key facts:

1. That a public notice had been issued, informing all potential offerors, including Carlson, that the Government intended to modify the DTS contract to add a cost reimbursement Contract Line Item ("CLIN") for software development for interfaces between the DTS and DoD legacy systems;

2. That the DTS Contract was thereafter modified to include:

   (A) As indicated in the above-referenced public notice, a cost reimbursement CLIN for software development for interfaces between the current version of the DTS and certain legacy DoD systems;

   (B) An estimated value for such software development effort for each year during the period of performance of the DTS Contract; and

   (C) The requisite contract clauses under which certain and specific rights in the software to be so developed under those CLINs would be conferred.

These facts are all that was required for Carlson to raise, when the matter was initially before this Court, the arguments that it now makes concerning the Government's rights in the data and/or software that was and would be developed. Given these incontrovertible facts, it strains credulity to suggest, as Carlson finds itself now compelled to do, that it "lacked the knowledge" needed to question the Government’s assertions concerning the disposition of the software and technical data if the contract were then to have been terminated.

The truth is, Carlson is now asking this Court to excuse Carlson's prior failure to have acted upon those facts and to permit Carlson the opportunity to make now -- post-judgment and post-appeal -- arguments that it may well have failed to perceive and that it clearly failed to make,

but which rest upon facts that were plain and apparent to anyone with access to the pre-decisional record in this case.

STATEMENT OF FACTS

As all parties acknowledge, the original DTS contract required the provision of a service and anticipated that the contractor would be able to use commercial-off-the-shelf ("COTS") software to satisfy the majority of the requirements of the Common User Interface ("CUI"). As such, the DTS Contract, as initially awarded, did not include provisions that would confer rights in the software or technical data needed to perform the contract to the Government. After performance of the contract began, however, both DoD and the contractor (TRW Inc.) came to understand that it was not possible to integrate with DTS, solely using COTS products, the more than 35 DoD legacy systems with which it needed to interoperate in such areas as finance, disbursement and audit. Hence, it became clear that this integration effort would require the development of new software.[1] See Declaration of Larry J. Schaefer, December 8, 2003, ¶ 8 ("Schaefer Dec."), Defendant's Appendix To Support Motion For Summary Judgment ("Def. App.") at 163 (noting that the DTS Contract "requires continuing integration, particularly with the many DoD financial systems and the DoD Archive, to achieve the DoD vision of a seamless end-to-end system").[2]

In 2001, the Defense Travel System Program Management Office ("DTS PMO") issued a public notice in the Commerce Business Daily ("CBD") indicating that it was incorporating a sole source software developmental contract line item into the DTS contract. Declaration of Karen A.

[1] Intervenor-Defendant Northrop Grumman acquired TRW, Inc. in 2002 and succeeded to all the rights and obligations of TRW Inc. in the DTS Contract.

[2] Colonel Schaefer's declaration was filed in support of the Government's motion for summary judgment.

Williams, December 11, 2003, ¶ 15 (“Williams Dec.”), Def. App. at 021-022.[3] The notice stated that the Government:

> intends to award a sole source modification to amend the structure of the current Defense Travel System (DTS) contract No. DAMT01-98-D-1002 . . . to incorporate software development/ engineering pricing features to allow for DTS CUI connectivity to the DoD Disbursing and Accounting (DAD’s). This action will enable the negotiation and inclusion of additional Contract Line Items (CLIN's) with cost reimbursement type pricing features to support PMO DAD’s requirements over the life of the contract.

Id. As Contracting Officer Peggy W. Butler noted, “[Pursuant to the sole source modification] the United States requested, and Northrop Grumman agreed to, a Cost Plus Fixed Fee (“CPFF”) Contract Line Item Number (“CLIN”) for new software development.” Declaration of Peggy W. Butler, December 9, 2003, ¶ 5 (“Butler Dec.”), Def. App. at 213-214.[4]

The software development effort was incorporated into the DTS contract by Amendments P00025 (dated February 27, 2002) and P00027 (dated March 29, 2002). Amendment P00025 added a CLIN for software development (CLIN 0010) (Williams Dec., Attachment 12, Def. App. at 110), as well as the standard Defense Federal Acquisition Regulations Supplement (“DFARS”) clauses providing the Government with intellectual property rights (DFARS 252.227-7013 and 252.227-7014) (Plaintiff’s Appendix To Support Cross-Motion For Summary Judgment (“Plf. App.”) at V644). Amendment P00027 contained an estimated cost for the development of software during the one year period between April 1, 2002 and March 31, 2003 of $9,007,343. Williams Dec., Attachment 11, Def. App. at 072. P00029 included the same CLIN for the remaining years of the contract, noting that the unit costs would be determined as requirements were identified. Plf. App. at V1059. However, the estimates for these out year development

---

[3] Ms. Williams’ declaration was filed in support of the Government’s motion for summary judgment.

[4] Ms. Butler’s declaration was filed in support of the Government’s motion for summary judgment.

costs were $10,360,528, $10,698,724, $11,054,856, and $5,490,650 for 2003 to 2006, respectively.

These estimates were identified in the Combined Post Negotiation Memorandum For DTS Proposal 1 "DTS Costs Incurred From Contract Award Through December 18, 2000" and The Pre Negotiation Objective Memorandum For DTS Proposal 2 Contract Restructure, both of which were included in Carlson's Appendix In Support of Carlson's Cross-Motion For Summary Judgment, Plf. App. at V673-674. Carlson acknowledged these facts in its cross-motion for summary judgment -- the "[t]he cost of developing the CUI was changed to a cost reimbursable plus fixed fee CLIN and a time and materials basis estimated at $9,007,343 annually." Memorandum In Support of Cross Motion For Summary Judgment ("Carlson Memorandum") at 16.

Carlson also knew the DTS was continuing to evolve and that increased integration costs would be incurred as the functionality increased. As Colonel Schaefer noted in his declaration: "DTS must assure that it continues to integrate with the numerous financial systems to maintain the two-way interfaces." Schaefer Dec., ¶ 8, Def. App. at 163. Further, he provided a chart comparing DTS with Carlson's eTravel Service ("eTS"), and noted that DTS anticipated future enhancements such as "interfaces to military air, DoD Human Resources, [and] DFAS corporate data systems." Schaefer Dec., Exhibit 2, Def. App. at 177. Therefore, Carlson was aware, not only that developmental effort was estimated at close to $10,000,000 for each of the next five years, but that even more software development would be required as DTS functionality expanded over time to meet users' needs.

Carlson also was aware that the Government and TRW had negotiated a settlement in which, as consideration for the contract restructure, DoD would pay Northrop Grumman a lump sum of approximately $43.7 million. Williams Dec., ¶ 18, Def. App. at 023. Carlson contended then, as it contends again now, that this payment was compensation for the development of the DTS CUI between September 1998 and the date of the modification in 2002. Carlson Memorandum at 16-18. Carlson was also aware that the contractor's compensation was based upon an assessment that it had delivered a CUI that, judged against the specifications required up

to that time, was 91 percent complete by December 18, 2000 (when the system began to be deployed). Plf. App. at V666. Further, Carlson was aware that the restructure allocated approximately $9.7 million "to purchasing a perpetual license for the source code [to the Gelco Travel Manager Software] under Bridge Task Order 10." Id. at V667.

Carlson also knew that it was at the time of the restructure that DoD included in the contract, for the first time, clauses that would confer rights in the technical data and software developed with Government funds. As noted above, the CLINs to which these changes applied described specific developmental effort to be performed prospectively during specified periods of time. See, e.g., Williams Dec., Attachments 11 and 12, Def. App. at 072, 110.

In short, having been provided with Amendments P00025, P00027, and P00029, as well as the Post Negotiation Memorandum For DTS Proposal 1, Carlson knew that:

(1) The parties anticipated incurring substantial costs for the developmental software in the modified contract between 2002 and 2006;

(2) Approximately $9 million was to be spent between April 1, 2002 and March 2003 for such development, with tens of millions more planned for expenditure over a five year period;

(3) The contract as restructured included the intellectual property rights provisions that would confer upon the Government certain rights; and

(4) The Government had paid approximately $43 million to Northrop Grumman in consideration for the contract restructure.

Notwithstanding these facts, Carlson contends that it was lulled into thinking there was little, if any, developmental work to be done after December 18, 2000. Carlson's contentions are simply contradicted by the record. Every fact necessary to advance the arguments it now makes before the Court was available to it before this Court issued its July 26, 2004 and January 12, 2005 Orders in this action.

Finally, the Court should note the complete inconsistency of the fundamental premise upon which the instant motion resides with the arguments advanced by Carlson in the prior proceedings before this Court. At this point in time, Carlson contends that it could readily have

assumed Northrop Grumman's role as prime contractor -- with little or no impact upon the Government's needs -- if it had just been given by the Government the intellectual property developed by Northrop Grumman to enable working interfaces between DoD's many problematic legacy systems and the DTS developed by Northrop Grumman.

The problem with this argument is that it conflicts with every argument advanced by Carlson when it last appeared before this Court. Prior to the Court's orders upon the Cross-Motions for Summary Judgment, Carlson did not argue that, if the DTS contract were terminated, it intended, or even had the ability, simply to step into the shoes of Northrop Grumman and continue the development of the DTS using whatever portion of the DTS system the Government owned. To the contrary, Carlson argued that it intended to use Carlson's own proprietary travel management system and that it would develop whatever additional features its system lacked, including the critical interfaces, at Government expense. As Mr. Hearne's Declaration stated, in relevant part:

> To the extent the features mentioned in Larry J. Schaefer's Declaration represent legitimate requirements of the DoD for travel management services, they could be readily added to the CWGT eTravel System, known as $E^2$ Solutions. If such features are requested under the GSA Contract, the Government would pay the developmental costs, as I understand DTS is currently doing with TRW/Northrop Grumman.

Hearne Dec. ¶ 12, Plf. App. at V1574. In fact, in reliance upon this statement, the Court noted:

> If the injunction is granted, the project will be delayed to an even greater degree than it has been. Northrop would walk away with the system that it has developed and the Government would have to start over. Any new contractor would not have a system that could be immediately deployed. Like Northrop Grumman, the new contractor would have to make its system compatible with the Government's existing or so-called "legacy systems" – a process that takes considerable time, effort, and resources.

CW Government Travel, Inc. v. United States, 61 Fed. Cl. 559, 578 (2004), aff'd, 2005 WL 3292539 (Fed. Cir. Dec. 6, 2005). Furthermore, the Court found:

> A new contract would be faced with this same challenge of making its CUI compatible with the Government's legacy systems – only it would be more than five years behind where Northrop Grumman was when

Carlson's complaint was filed.

Id., at 579; see also id., at 579, n.51.

Given this backdrop, it is irrelevant, in the end, whether the Government had rights in the software and technical data for the interfaces because, as Carlson apparently concedes, the software interfaces necessary to link Northrop Grumman's CUI to the DoD's legacy systems would not be the same software interfaces that would be required to connect Carlson's $E^2$ Solutions to DoD's legacy systems. Obviously, the integration of any two systems is necessarily dependent upon the particulars of each system being integrated. Hence, even if DoD had rights in the software interfaces between Northrop Grumman's CUI and the DoD legacy systems, such interfaces would have been of no value to connect Carlson's – or any other contractors' systems – to the DoD's legacy systems and, as the Court has already observed, the deployment would be further delayed while the Government waited – and paid – for the new contractor to make "its CUI compatible with the Government's legacy systems."

## ARGUMENT

### I. Carlson Was Aware Prior To Judgment That The Parties Anticipated Incurring Continuing Costs For Software Development

Carlson argues that it only discovered through the Subcommittee hearing that DoD had rights in some of the software and technical data created under the DTS Contract Modifications because it was not previously aware -- and could not have been previously aware -- that DoD had paid the costs for the development of software. This is simply not true and is contradicted by the record.

Carlson was provided P00025, P00027, and P00029 (the restructure modifications) in discovery, as well as internal DoD memoranda concerning the negotiation of the restructure. Likewise, Carlson was provided the Commerce Business Daily notice, which indicated DoD would amend the contract to allow the development of integration software to incorporate various

financial, payment and audit systems into the CUI on a cost reimbursable basis. These materials advised that there would be payments for the development of software as the scope of the functionality demanded by DTS became better defined. Carlson's response to the Court's February 13, 2006 Order, contending that it could not have known until the 2005 Subcommittee hearing that such software would be developed under the contract at DoD expense, is simply not credible.

Under Rule 60(b)(2), a party may be relieved from a final judgment upon the basis of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under RCFC 59(b)." However, evidence "in the possession of the party before the judgment was rendered . . . is not newly discovered and does not entitle the party to relief" under Rule 60(b)(2). Charles A. Wright, Arthur R. Miller & Mary K. Kane, Fed. Prac. & Proc. § 2857; see also Yachts Am. Inc. v. United States, 8 Cl. Ct. 278, 282-83 (1985) (denying motion where evidence was available before judgment). In applying these standards, the Court must bear in mind that "a motion for relief from judgment is one for extraordinary relief entrusted to the discretion of the court, which may be granted only in exceptional circumstances." Id. at 281 (citing United States v. Atkinson, 748 F.2d 659, 660 (Fed. Cir. 1984); Washington Medical Center, Inc. v. United States, 211 Ct. Cl. 379, 380 (1977)).

Carlson does not deny that well prior to judgment it was in possession of P00025 and P00027 which provided for a "perpetual license for DoD use worldwide for DTS software" with rights in accordance with DFARS clauses 252.227-7013, -7014, -7019, and -7037. Plf. App. At V644; see also Plf. App. at V902. Its only claim is that it did not know and could not have known, prior to the Subcommittee hearing, how much software had been developed at Government expense and thus how much software was subject to the data rights provisions incorporated into the DTS Contract.

Carlson's protests to the contrary notwithstanding, it knew or should have known, that

Northrop Grumman was developing software under CLIN 10 and being paid under CLIN 10 for the software and related data. The CLIN itself for 2002 to 2003 notes that approximately $9 million will be paid for developmental software during this period. Williams Dec., Attachment 11, Def. App. at 072. Further, the estimates for later years were set forth in a post-negotiation memorandum, which was also provided as part of the administrative record. Plf. App. at V673-674. Further, Carlson knew from the same memorandum that approximately $10 million had been paid to TRW for the acquisition of a perpetual license to the software code used in the Gelco Travel Manager software. Id. at V667. Therefore, Carlson was, or should have been, aware that some $45 million of development effort had been projected that would be subject to the intellectual property clauses in the restructured contract.

At the hearing upon the cross motions for summary judgment and the motion for reconsideration, the Government argued that, if the DTS contract were determined to be non-compliant with CICA, there was a risk Northrop Grumman could retain the software and DoD would be required to reacquire even those aspects that had already been developed if it desired to develop the system and its integration with the DoD legacy systems through a follow-on contractor. This argument was particularly compelling in light of Carlson's argument that if it were to be the successful offeror on a follow-on procurement, it would substitute its own proprietary system and seek reimbursement for the development of any and all interfaces that were needed. Hearne Dec. ¶ 12, Plf. App. at 1574. Carlson claims the Government misrepresented DoD’s property interest in the software because DoD could have transferred the software to a follow-on contractor if it had been developed at Government expense. There are two fundamental flaws in Carlson's argument.

First, Carlson never argued that it would have used such Government-owned software. To the contrary, it asserted it would substitute its own proprietary system and develop newly required interfaces that would be peculiar to its own underlying system. Second, even the so-called "new

evidence" does not suggest that the Government has title to all of the software and hardware necessary for the system. As set forth in detail in our Opposition to Carlson's 60(b) Motion, the Government has rights in only certain portions of the system and there are significant portions to which it does not have rights. See Government's Opposition to Plaintiff's Motion for Relief from Judgment, at 6-9, 11-13, 16-17. For either or both of these reasons, termination would have caused – and still would cause – significant delays and undermine the DTS program.

Carlson argues that it lacked the facts regarding the extent of the anticipated software development to oppose the position espoused by the Government. However, as set forth above, this is untrue. It knew, or should have known, the restructured contract had conveyed standard DFARS intellectual property rights to DoD and provided DoD with a perpetual license to use the DTS software developed under the restructure effort. Contrary to the position it now advances, Carlson knew, or should have known, that at least $9 million had been spent between 2002 and 2003 for software and data development and that estimates identified similar amounts would be spent during the remainder of the contract. All of the facts that Carlson needed to challenge the impact of a termination upon the Government's ability simply to "hand over" a useable data and software package for the entire DTS system were right there in the record.[5]

Carlson has presented no "new" evidence. The reason Carlson did not dispute the Government's contention relating to the impact of a termination on the Government's travel needs was not the lack of facts; rather, Carlson's silence was a function of Carlson's apparent belief that

---

[5] The materials Carlson has proffered show that the system is comprised of five categories of property (1) Governmentally funded, noncommercial technical data; Carlson's Motion for Relief from Judgment ("Carlson's Motion"), Attachment 2 at 23, Table 1; (2) Governmentally funded noncommercial software (see id.); (3) "Several dozen" privately funded commercial software programs (see id.); (4) "Three key" privately funded commercial software programs; (see id.); and (5) "Hardware (and other equipment) necessary to deliver services under the contract." (see Exhibit 2, at 23). At best, these materials indicate that the Government has rights in only two of the five categories (i.e., the two Governmentally funded categories of noncommercial technical data and computer software). See Government's Opposition to Plaintiff's Motion for Relief from Judgment, at 6-9, 11-13, 16-17.

the intellectual property relating to interfaces peculiar to the Northrop Grumman system would be of no utility to Carlson in attempting to integrate its own very different eTravel system with the legacy DoD operating systems.

## II. The Statements To The Subcommittee And GAO Appendix Were Not Newly Discovered Evidence

Carlson contends that GAO examined the relevant payment records and interviewed DoD officials and determined that the entire integrative software was subject to the DFARS intellectual property clauses of the restructured contract. Carlson also contends the DoD statements to the Subcommittee reflect a similar awareness. In contrast, Carlson contends it was prevented from learning these facts prior to the entry of judgment because it was not allowed to depose DoD officials and was misled by the Government's pleadings and supporting declarations, all of which suggested that the CUI was substantially integrated with DoD legacy systems at the time the contract was restructured.

Carlson’s contention to the contrary notwithstanding, the administrative record provided ample notice that software specifically for the interfaces to the legacy systems would be developed pursuant to the restructured contract. As set forth above, the amendment that provided a cost estimate for the development CLIN (P00027) advised that approximately $9 million would be devoted to software development between April 2002 and April 2003. The post-negotiation memorandum included additional estimates for software development work which suggested that the rate of spending in the remaining years would be approximately the same as in 2002-2003. Carlson acknowledged in its memorandum in support of cross-motion for summary judgment that it was anticipated that approximately $9 million would be spent on development work in 2002-2003 and that this amount would be spent “annually.” Carlson Memorandum, at 16-18. In short, Carlson was, or should have been, aware well prior to this Court’s judgment that substantial sums had been and would be expended under the contract for the development of software.

Further, Carlson's contention that it was misled by the Government's Motion for Summary Judgment and supporting declarations is inconsistent with the record. Given Carlson's statement in its own Cross-Motion that P00027 changed the cost structure for "developing the CUI [from a fixed fee] to a cost reimbursable plus fixed fee CLIN and a time and materials basis estimated at $9,007,343 annually," it was fully aware substantial costs would be incurred between 2002 and 2006 for the development of software. Carlson Memorandum at 16. The contention that – simply because the Government argued that a functional CUI had been demonstrated prior to the lump sum payment – Carlson was misled into believing that the software development was complete prior to the restructuring makes no sense. Carlson was aware that the integration was at best 91 percent complete and that functionality was being added as users obtained experience with the system. More critically, what was it about an admitted expenditure of $45 million from that point forward for software development that justified Carlson's conclusion that no software development would occur under the modified contract? Carlson could not have read the contract, the CBD notice, or the record as a whole, and concluded anything other than that additional expenses would be incurred between 2002 and 2006 for the development of software and related technical data.

Finally, Carlson suggests the Government misrepresented the terms of the contract when it contended the contract included Commercial Travel Office ("CTO") services as well as CUI-assisted services. While the scope of the contract in this regard has already been resolved, it is instructive to point out Carlson's (feigned) confusion between misrepresenting facts and taking a bona fide legal position. The talking points attached to the response do not suggest the contract did not include CTO services, but only that DoD expected to retain the incumbent CTO in the region until the CUI was implemented in the region. There was, and is, nothing in the talking points inconsistent with our legal position on the meaning of any words in the contract. See, e.g., Bannum, Inc. V. United States, 56 Fed. Cl. 453, 457-58 (Fed. Cl. 2003) ("government officials

are presumed to act conscientiously and in good faith discharge of their duties").

In sum, not only does the record reflect that Carlson's entire 60(b) motion is inconsistent with its pre-decisional litigation arguments, but also that Carlson was in possession of every necessary fact during the prior proceedings. Carlson failed to raise these arguments before and it must face the consequences of its failure. The intent of a Rule 60(b) motion is not to accord a "second bite at the apple" for disgruntled litigants. See, e.g., Fifth Third Bank of Western Ohio v. United States, 52 Fed. Cl. 637, 639 (2002) (the purpose of a post trial motion is not "to give an unhappy litigant an additional chance to sway the court"). In short, there is no "newly discovered" or even relevant evidence concerning the Government's rights in software developed under the DTS contract and, thus, Carlson's Motion for Relief from Judgment should be denied.

CONCLUSION

For the foregoing reasons and those set forth in our opposition, Carlson's Motion for Relief from Judgment Pursuant to Rule 60(b) should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

/s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: 202-307-0309
Fax: 202-514-7965

Date: March 13, 2006

CERTIFICATE OF FILING

I hereby certify that on March 13, 2006, a copy of the foregoing GOVERNMENT'S RESPONSE TO "PLAINTIFF'S RESPONSE TO THE COURT'S REQUEST FOR INFORMATION RELATED TO PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt