IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CW GOVERNMENT TRAVEL, INC., Plaintiff, v. THE UNITED STATES, Defendant, and NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION, Defendant-Intervenor. | ) | No. 03-1274 C (Judge George Miller) |

GOVERNMENT RESPONSE TO PLAINTIFF'S RESPONSE
TO THE COURT'S 04/18/06 REQUEST FOR BRIEFING

Pursuant to this Court's order dated April 18, 2006, defendant, United States, respectfully responds to the Court's inquiry concerning "whether and to what extent the equitable relief sought by plaintiff is available at this time . . ." Id. As indicated by Plaintiff's Response To The Court's 04/18/06 Request For Briefing ("Plaintiff's Response"), plaintiff, CW Government Travel, Inc. ("Carlson"), contends this Court possesses jurisdiction to enjoin not only the performance of the existing Defense Travel System ("DTS"), but also any potential procurement of any future contract that might be awarded upon a sole-source basis in connection with the DTS.

Assuming Carlson's Rule 60(b) motion is granted, Carlson seeks a preliminary injunction (1) prohibiting all activity under the current DTS contract (No. DAM01-98-D-1005), now nearing its expiration date, and (2) precluding the award of any potential future sole-source contract relating to DTS. Recognizing that there is less than five months left upon the current eight-year contract, and that any injunction would serve only to deprive the DoD of the use of

the DTS, Carlson includes a purported "carve out" in its proposed order for the injunction regarding the current DTS contract, allowing for some undefined "maintenance and operation" of the DTS at certain sites to which the DTS has already been deployed.

As demonstrated below, even if the Court were to grant Carlson's Rule 60(b) motion, four key factors preclude the relief Carlson has requested.

First, this Court lacks jurisdiction to enjoin a potential sole-source procurement of a new contract once the current DTS contract has expired. Any litigation involving a new sole-source procurement would be required to address the merits of that new procurement, rather than the merits of the 2002 amendments of the DTS contract. The process for a sole-source procurement has not yet begun and this Court is unable to test the legality of such a new procurement until that process is, at a minimum, initiated. Any challenge to that hypothesized sole-source procurement would involve the legality of that new procurement and, accordingly, would not be justiciable within the context of the pending challenge to the 2002 amendments to the current DTS contract (the issue actually raised in Carlson's current Amended Complaint). When and if the Government undertakes to award a future sole-source contract to Northrop Grumman, Carlson may then file a complaint challenging the propriety of such an award. Until that time, there is no case or controversy to be adjudicated and the propriety or legality of such a non-existent procurement action is hardly ripe for review by this Court.

Second, as we explained in our Opposition To Plaintiff's Motion For Relief From Judgment ("Opposition"), Carlson's request for injunctive relief in connection with the 2002 amendments to the one contract that does exist is moot. The DTS contract is now in its final months of performance and the requirements are substantially complete. Nothing would be gained and much would be lost if the current system were frozen pending the completion of a competitive procurement for a follow-on contract. The "carve out" for maintenance effort during the final months of the current DTS contract that Carlson suggests in its proposed order is both ill-defined and inadequate to protect the public interest. Accordingly, the request for injunctive relief does not and cannot satisfy the public interest or the balance of equities.

Third, even if Carlson's proposed injunctive relief relative to the 2002 amendments were not moot and its challenge to future activity speculative, the undisputed facts demonstrate that the public interest and balance of harms do not favor freezing the DTS pending some fully competitive future procurement. Even with the proposed injunction "carve out" for the undefined maintenance and operations at currently deployed sites, Carlson's proposed relief would freeze upcoming deployments and thus preclude the planned continued deployment and expanded use of the system.

Fourth, with the completion of the DTS contract requirements enjoined, the Department of Defense ("DoD") would be required to extend the work of maintaining and operating legacy systems – a process that would add substantial cost to the provision of travel services until the requirements of the DTS contract are fulfilled. Accordingly, even if the request for injunctive relief were justiciable and Carlson could demonstrate that the 2002 amendments violated the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253(a), Carlson is unable to demonstrate that injunctive relief would properly lie. CW Government Travel, Inc. v. United States, 61 Fed. Cl. 559, 579 (2004), aff'd, 163 Fed. Appx. 853 (Fed. Cir. 2005).

In short, the DTS contract is in its eighth and final year and there is no relief available for alleged violations of CICA that occurred in 2002. Moreover, any injunctive relief against a potential contract award not yet initiated is not yet ripe for consideration or properly before this Court. Accordingly, Carlson's Rule 60(b) motion warrants denial.

## ARGUMENT

### I. Carlson's Request For Injunctive Relief Against A Potential And Contingent New Sole-Souce Procurement Is Not Justiciable

It is hornbook law that "Article III, § 2 of the Constitution confines federal courts to the decision of 'Cases' or 'Controversies.'" Landmark Land Company, Inc. v. Federal Deposit Insurance Corporation, 256 F.3d 1365, 1379 (Fed Cir. 2001) (quoting Arizonans for Official English v. Ariz., 520 U.S. 43, 64 (1977)). "It has long been this Court's considered practice not

to decide abstract, hypothetical or contingent questions . . . in advance of the necessity for its decision… ." Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461 (1945); see, e.g., Alma Motor Co. v. Timken-Detroit Axle Co., 329 U.S. 1291 (1946). Instead:

> The Constitution allots the nation's judicial power to the federal courts. Unless these courts respect the limits of that unique authority, they intrude upon powers vested in the legislative or executive branches. Judicial adherence to the doctrine of separation of powers preserves the Courts for the decision of issues, between litigants, capable of effective determination.

United Public Workers of America v. Mitchell, 330 U.S. 75, 89 (1947). It is settled that this Court is subject to the same case or controversy and justiciability restraints as courts established pursuant to Article III of the Constitution. CW Government Travel, Inc. v. United States, 46 Fed. Cl. 554, 557-58 (2000).

Although Carlson argues that the request for injunctive relief against any new potential sole-source contract related to DTS pending a competitive procurement of DTS requirements presents a "case or controversy," it in fact does not. No "case or controversy" is present because there has yet to be a sole-source procurement and, if one is to occur, it is not possible to predict the outcome and/or the legality thereof. Pursuant to CICA and the Federal Acquisition Regulation, if DoD engages in a sole source procurement, it must publish on a "Governmentwide Point Of Entry" website a synopsis of the proposed procurement identifying the intended source and explaining the reasons justifying the lack of competition. 10 U.S.C. § 2304(f)(1)(C); FAR 5.207(c)(14). It must also provide a clear description of the services. FAR 5.207(c). In considering a bid protest, the Government Accountability Office recently described the purpose of the synopsis in the context of a sole source acquisition as follows:

> A synopsis must provide an "accurate description" of the property or services to be purchased and must be sufficient to allow a prospective contractor to make an informed business judgment as to whether to request a copy of the solicitation. In addition, the FAR requires that the description of the supplies or services be "clear and concise." FAR § 5.207(c) and (d). Moreover, as

> directly relevant here, a synopsis must provide prospective alternative sources a meaningful opportunity to demonstrate their ability to provide what the agency seeks to purchase. In short, the fundamental purpose of these notices, including the circumstance where an agency contemplates a sole-source award, is to enhance the possibility of competition.

M.D. Thompson Consulting, LLC; PMTech, Inc., B-297616.2, Feb. 14, 2006, 2006 CPD ¶ 41 (citations omitted). Thus, the agency is required to entertain competitive proposals if responses to the public notice provide viable alternatives to a sole-source procurement. The outcome of the procurement is unknown until responses, if any, are received and evaluated.

In her declaration of February 24, 2006 (attached to the Government's response to the February 13 order ("Government Response")), Colonel Brenda Sue Johnson, the DTS Program Manager, noted that, while she intended to seek a 12 month sole-source contract to complete the deployment and obtain certain additional functional aspects of DTS, "approval of such a sole source extension must be granted by the Head of the Contracting Agency, which is the Director of the Army Contracting Agency." Johnson Declaration, ¶ 9.

Further, Colonel Johnson acknowledged in her declaration that "[i]n the event that such approval is not granted, the Department will have to evaluate the best approach to provide appropriate time for contractors to gain the experience and expertise required to allow for the smooth transition of DTS to support its millions of users world wide." Id. As Carlson acknowledges, DoD has not yet commenced a sole-source procurement. Further, one cannot be commenced without the approval of the head of the contracting agency, and -- even then -- only after the appropriate public notice is provided and companies are given the opportunity to propose alternatives. The outcome of any anticipated sole source procurement is, thus, still unknown. Therefore, there is no case or controversy presently before this Court. See, e.g., United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127 (1985) (there can be no "taking" until the administrative permitting process has been completed); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 801 (Fed. Cir. 1993) (same); Lakewide Associates v. United States,

45 Fed. Cl. 320, 332-34 (1999) (a taking claim is unripe for judicial review where the administrative permitting process is still ongoing).

Precedents from this Court in bid protest and other actions confirm the non-justiciability on ripeness grounds of Carlson's claim for injunctive relief. For example, in Bannum, Inc. v. United States, 56 Fed. Cl. 453, 461-62 (2003), an incumbent bidder for a contract to provide neighborhood-based correction services brought a pre-award bid protest against the Bureau of Prisons ("BOP") contending that BOP intentionally delayed the award in the hope that the incumbent's lease would expire and it would be eliminated from the competitive range. Bannum sought an injunction requiring BOP to award the contract or issue a sole-source procurement allowing the continuation of services pending completion of the procurement. It also sought its bid preparation costs.

This Court ruled that it could not direct BOP to award the contract to a particular bidder or to issue a sole source procurement pending completion of the bidding process. According to the Court, "a court can review the procurement procedure and ensure there have been no irregularities that are prejudicial to plaintiff [but] it is not in the public interest … for the court to interject itself into an ongoing procurement process." 56 Fed. Cl. at 460. As for the claim for bid preparation costs, the Court ruled that it could not know the outcome of the procurement prior to the award and that a claim premised upon "contingent future events that may not occur as anticipated, or indeed may not occur at all," are not ripe for judicial review. Id. at 462 (quoting Texas v. United States, 523 U.S. 296, 300 (1998)).

Bannum is analogous to this case because Carlson seeks a particular form of relief, namely an injunction against the award of a potential DTS contract, even though the procurement process has not yet even begun. As in Bannum, the complaining party anticipates a process that will be inconsistent with CICA and seeks to entangle the Court prior to the initiation or completion of the future procurement process. Like the claim in Bannum, Carlson's claim is based upon surmise concerning "contingent future events that may not occur as anticipated or indeed may not occur at all," Texas v. United States, 523 U.S. at 300, and seeks to interject the

court, at best, "into an ongoing procurement process." Bannum, 56 Fed. Cl. At 460. Thus, for the same reasons articulated in Bannum, Carlson's request for injunctive relief against a contingent, potential sole source contract is unripe for review here.

Further, Carlson's request for injunctive relief is premised on the assumption that the future sole-source procurement, if initiated, will violate CICA. However, Colonel Johnson made clear in her declaration that the proposed 12-month extension of the current DTS contract would "comply with the requirements of the Competition in Contracting Act, the Federal Acquisition Regulation, and agency regulations." Johnson Declaration ¶ 8. Carlson has not rebutted and cannot rebut this testimony because any controverting facts could, per force, only be the product of future decisions not yet made and actions not yet undertaken to implement such future decisions. Simply stated, Carlson's claim for injunctive relief with respect to some future acquisition process is an exercise in rank speculation.

Colonel Johnson's representations are assumed to be truthful in the absence of bad faith or fraud in the administration of the contract. See, e.g., Impressa Construgioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1337 (2001) (agency decisions are "entitled to a presumption of regularity"); Bowen v. Am. Hosp. Assn., 476 U.S. 610, 626-27 (1986); Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 n. 9 (1983); Bannum, 56 Fed. Cl. at 457-58 ("government officials are presumed to act conscientiously and in good faith discharge of their duties"). Carlson has alleged no such bad faith or fraud.

Carlson's sole contention as to why the future procurement would not be consistent with CICA is that Northrop Grumman has gained experience with web-based software as a result of the 2002 amendments to the DTS contract and this experience would be the basis of a sole-source procurement. See 10 U.S.C. § 2304(c)(1). However, this argument assumes that the 2002 amendments were invalidly negotiated, a conclusion that this Court has not embraced. Moreover, as we previously pointed out, there is no reason to believe the same technical expertise would not have existed in the absence of the 2002 amendments. Also, the additional experience gained while performing the last few months of an eight year contract will hardly tip

the scale. See Government Response, at 9. Carlson's contention that the sole-source procurement will suffer from the "taint" of the 2002 amendments is total speculation. As in Bannum, there is no basis to suppose the procurement would not conform to CICA or that it would not result in a potential award to a different contractor who was able to demonstrate the ability to perform. Accordingly, "'[w]ithout a procurement, plaintiff's claim before this court is premature.'" Bannum, 56 Fed. Cl. at 462 (quoting Crawford v. United States, 53 Fed. Cl. 191, 194 (2000)).

Other decisions, as well, demonstrate the lack of ripeness of Carlson's claim pending the anticipated sole source procurement. For example, in Crawford, the plaintiff had been convicted by a military court martial of sexual offenses, sentenced to four years in prison, and ordered to be discharged from the military without retirement benefits. While the court martial judgment was on appeal, the plaintiff submitted a petition for voluntary retirement. The Department of the Navy responded that it would not review the petition until the appeal of the court martial was resolved and the plaintiff filed suit for retirement benefits. This court held that the claim for retirement benefits was "premature . . . for lack of ripeness." Crawford, 53 Fed. Cl. at 195.

As in Crawford, Carlson seeks the Court to establish conditions for a future procurement which has not yet occurred and may never occur. Further, even if it does occur, the result cannot be known in advance. As the Supreme Court explained in Abbott Laboratories v. Gardner, 387 U.S. 136 (1967):

> [The] basic rationale [for the doctrine of ripeness] is to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized…

Id. at 148-49. This rationale applies to Carlson's claim because it seeks to "entangle this court in abstract disagreements over administrative policies" and would involve interference with a procurement prior to "an administrative decision." Id.

Likewise, it is clear that litigation over the justification for the potential sole-source procurement is not justiciable because Carlson's Amended Complaint does not (and could not have) raised the issue of a sole-source procurement. See, e.g., Adams v. United States, 48 Fed. Cl. 602, 611-13 (2001) (issues relating to overtime compensation were not pled and, therefore, outside the scope of the proceeding). Even if the Rule 60(b) motion is granted, therefore, Carlson's request for injunctive relief is outside the scope of the litigation and cannot be entertained. Id.

In short, even if it were to grant the Rule 60(b) motion, this Court lacks jurisdiction to award the relief Carlson seeks relating to the contingent, potential sole-source procurement.

## II. Carlson's Only Claim Before This Court Is Moot

As we pointed out in our opposition to Carlson's Rule 60(b) motion, the DTS contract is now in the final months of an eight year term and the requirements of the contract are substantially completed. Opposition To Carlson's Rule 60(b) Motion ("Opposition") at 18-19. As this Court has noted, "It is well established that when a contract has been substantially completed, it is impossible, or at the least imprudent, for the court to order that the contract be rebid to a more desirable bidder." Forestry Surveys and Data v. The United States, 44 Fed. Cl. 485, 491 (1999); see Gull Airborne Instruments, Inc. V. Weinberger, 694 F.2d 838, 846 (D.C. Cir. 1982) (noting that if a contract has been satisfactorily performed, there is no justification for re-awarding the contract to a more deserving bidder). Because the DTS contract is in its final months of performance, the request for an injunction is simply not viable. See CW Government Travel, Inc. v. United States, 46 Fed. Cl. at 558 ("Dismissal for mootness is warranted here, for prudential reasons, because intervening events have shown that there is no 'reasonable likelihood' the voluntarily ceased activity will recur and the court can grant no 'effectual relief' to prevent the case from becoming moot") (quoting Calderon v. Moore, 518 U.S. 149, 150 (1996) and Mills v. Green, 159 U.S. 651, 653 (1895)).

Carlson argues that the case is not moot because, allegedly, DoD has overstated the completion status of the DTS and Carlson anticipates DoD will claim a need for further sole-

source procurements. Plaintiff's Response at 5-7. But, as set forth above, because: (1) no such sole source procurement has yet to be undertaken, and (2) Carlson's Amended Complaint did not include such anticipated contingent future events, this issue is not relevant to the case at hand or justiciable in its own right. Carlson's contention is not only based upon mere speculation, but it is also inconsistent with the facts.

In short, the DTS contract is in its final months. By definition, the requirements of the contract have been substantially completed. Indeed, Carlson admits that under its proposed timetable, a hearing would not occur until August 2006 – just one month shy of contract completion. Plaintiff's Response, at 8. Therefore, Carlson's challenges to the DTS contract are now moot and Carlson's claim for injunctive relief is stale. See, e.g., James Luterbach Construction Co., Inc. v. Adamkus, 781 F.2d 599, 602 (7th Cir. 1986); Owen of Georgia v. Shelby County, 648 F.2d 1084, 1094 (6th Cir. 1981); Dan Caputo Co. V. Russian River County Sanitation District, 749 F.2d 571, 574 (9th Cir. 1984).

III. The Balance Of Harms And Public Interest Contravene TheRelief Carlson Seeks

While Carlson argues the benefits of ensuring a competitive procurement outweigh the public benefits and balance of harms from enjoining the last four months of a contract and a potential sole-source procurement, this is simply not the case. As Carlson acknowledges, its proposed injunction would: (1) freeze the current use of DTS at the sites to which it is deployed as of the date of the order, (2) preclude their use after September 20, 2006, and (3) terminate all future deployment and use of the DTS for an indefinite period of time. Use of the system has been expanding at the rate of approximately 15 to 20 percent per month since the commencement of deployment in 2002. See Transcript of Hearing of Subcommittee on Permanent Investigations Dated September 29, 2005 at 33 (Attachment I to Carlson's Rule 60(b) motion). Carlson's proposed injunction would freeze the expansion, which consists of approximately 8,000 to 8,500 travel vouchers per month. See Exhibits 1 and 2 to Plaintiff's Response.

According to the Subcommittee Hearing Transcript, DoD saves approximately $20 dollars in travel management fees per voucher generated by DTS instead of traditional travel providers. Accordingly, assuming the competitive procurement of a new DTS contract will take approximately 12 months, the cost of Carlson's proposed injunction is at least $2 million in excess travel management fees alone. Further, as Colonel Johnson has pointed out in her declaration, if the system is frozen and the remaining functionality of the DTS contract is not achieved until a period following a competitive procurement, DoD will be required to extend the contracts of software firms maintaining the non-integrated portions of legacy systems. Johnson Declaration ¶ 7. This will also increase the cost of implementing the system.

Finally, regardless of whether an awardee in a competitive procurement could easily integrate the software developed under the DTS contract to its travel management system, awarding the relief Carlson seeks will result in further delay in completing the system. At minimum, the requirements of the current contract will not be implemented until the completion of the suggested competitive procurement, which is expected to last at least 12 months. During this period, there will be no additional sites at which DTS may be deployed, use will be thwarted if not terminated, and development of software to enhance the system and expand functionality will be held in abeyance. Given that DTS is not just a travel system but is also a financial management and accounting system, this delay will negatively impact large communities within DoD (travelers and non-travelers alike). As this Court observed in its August 3, 2004 decision, "the overwhelming public interest here is in avoiding further delay to this project." CW Government Travel, 61 Fed. Cl. at 559. This condition is no different today than it was in 2004, except that two additional years of development and achievements will be comprised. Today, nearly two years after this Court's 2004 decision, world events have, if anything, increased the need for military travel using a reliable travel management system and an enhanced need to preserve critical resources. Therefore, as this Court noted in 2004, "it is in the public interest that the DTS system be deployed to as many travel regions as possible, as quickly as possible." Id. This continues to be the case.

Finally, Carlson is absolutely unable to identify any credible harm to it as a result of permitting completion of the final months of the DTS contract. Further, the only harm Carlson can identify if a new sole-source procurement is pursued is a 12-month delay in an alleged opportunity to bid upon a new DTS procurement. However, Carlson has presented no evidence to quantify any financial harm if the competitive procurement is delayed or demonstrated that if it were to respond to the public notice of a proposed sole-source procurement, its statement of interest would be unfairly considered. Given the fact that it failed to bid on the DTS contract in 1998, there is little if any reason to believe it has the technological capability to enter the competitive procurement for the follow-on contract. As indicated above, if Carlson has the technical capability, even if a sole-source procurement is pursued, Carlson will still have an opportunity to present the agency with an alternative. Therefore, Carlson will suffer no harm.

CONCLUSION

Even assuming Carlson's Rule 60(b) motion is granted and it is able to demonstrate a violation of CICA, the case is now moot. Further, Carlson's new request for injunctive relief over a new, potential procurement action is non-justiciable absent the commencement of that procurement. Even assuming its Rule 60(b) motion is granted, Carlson will be unable to demonstrate the balance of harms and the public interest in its favor. The equitable relief sought by Carlson requires the Court to review alleged potential future wrongdoings and, thus, is non-justiciable, unripe, and, as to the request for equitable relief for the claim presently before the Court enjoining the final few months of an eight year contract, moot. Accordingly, Carlson's Rule 60(b) motion warrants denial.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

/s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0309
Fax: (202) 514-7965

Attorneys for Defendant

May 22, 2006

CERTIFICATE OF FILING

I hereby certify that on May 22, 2006, a copy of the foregoing GOVERNMENT RESPONSE TO PLAINTIFF'S RESPONSE TO THE COURT'S 04/18/06 REQUEST FOR BRIEFING was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Levitt
David A. Levitt