# IN THE UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CW GOVERNMENT TRAVEL, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant,**<br><br>**And**<br><br>**NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORPORATION**<br><br>**Defendant-Intervenor.** | No. 03-1274C<br><br>Judge George W. Miller |

## NORTHROP GRUMMAN'S OPPOSITION TO CARLSON'S REQUEST FOR FURTHER DISCOVERY

On the day that this Court ordered discovery to be "completed," Plaintiff CW Government Travel ("Carlson") chose to file a "request" for additional, extensive documentary discovery. For a variety of reasons, this blunderbuss submission should be dismissed out of hand by this Court.

**1. Carlson's motion is not timely.** According to the scheduling order issued by this Court on June 6, 2006, discovery closed in this matter on July 5, 2006. July 5th therefore was

not the date by which Carlson was to have sought additional discovery – it was the date by which "the parties shall complete discovery" (June 6, 2006 Order, at 2) (emphasis added).[1]

**2. This case is moot.** Northrop Grumman respectfully submits that Carlson's latest stratagem only serves to underscore, in a very real and increasingly obvious sense, the mootness of this case. By the time this discovery issue is decided and any documents actually produced, the preliminary evidentiary hearing on the issues of whether Carlson can advance a plausible argument on the balancing of hardships and the public interest will have been concluded and the underlying DTS contract will have nearly expired.[2] Nothing can or will change the fact that even without the Court's intervention, the DTS contract will be completed in less than 90 days.

There is no more telling indictment of Carlson's conduct in this regard than the schedule – this matter is scheduled for a full evidentiary hearing on July 26, 2006; the United States has until July 24th to respond to Carlson's request; Carlson's reply will be due August 7th.[3] At that point, after the matter has been fully briefed, the Court presumably will rule and – assuming

---

1 See, e.g., Rule of the U.S. Court of Federal Claims 16(b) (stating that the Court may enter scheduling orders that limit the time "to complete discovery") (emphasis added); cf. Finwall v. City of Chicago, 04-C-4663, 2006 WL 1491316, at *3-4 (N.D. Ill. May 31, 2006) (noting that a local rule requires "with exacting specificity" that a deadline for discovery "means that discovery must be completed by that date," and that it would be untimely to serve a discovery request on the eve of a discovery deadline "because there would not be adequate time in which to complete discovery") (emphasis in original); Beller v. Credit Alliance Corp., 106 F.R.D. 557, 560 (N.D. Ga. 1985) (observing that the rules of procedure dictate that discovery requests be filed before the discovery cutoff so that discovery can be completed on the date identified by the Court).

2 Carlson can, of course, contend that the hearing currently scheduled for July 26th should be postponed pending the completion of discovery, but the impact of that suggestion on the mootness of its claims would be embarrassingly self-evident.

3 See U.S. Court of Federal Claims Rule 7.2; Rule 5(b)(2)(D); Rule 6; see also Docketing Notice of Carlson's Request for Further Discovery, July 5, 2006.

arguendo the Court were to grant any portion of Carlson's untimely request – a reasonable period would, per force, be needed to collect and produce the documents. The return against Carlson's discovery (for which expedited treatment was not requested) would be due, thus, sometime in the latter half of August, at the earliest,[4] some two weeks following the currently scheduled hearing date, and a mere four to six weeks before the expiration of the Contract.

**3. The record clearly demonstrates that Carlson is not entitled to any injunctive relief – let alone additional time consuming and expensive discovery**. Testimony offered by Carlson's own witness, R. Craig Thompson on June 14, 2006, demonstrates that the burdensome discovery belatedly sought by Carlson is needless for the simple, admitted reason that Carlson will be unable to carry its burden of proof at the evidentiary hearing currently scheduled for July 26th. In fact, Mr. Thompson's testimony makes clear that the balancing of the interests cannot conceivably favor Carlson, since Carlson has admitted an injunction would actually reduce Carlson's revenue under its existing CTO contracts pending expiration of the DTS contract on September 30th. The facts in this regard are clear, as established by the testimony of Mr. Thompson, an executive clearly empowered to speak on Carlson's behalf:

(1) Carlson's existing CTO contracts provide for three tiers of reservation and ticketing service – (i) DTS transactions; in which DTS performs the reservation function without intervention by a Carlson representative; (ii) a DTS "touch" transaction, in which Carlson's representative performs some work to finalize the DTS-initiated reservation function; and (iii) "traditional" transactions, in which DTS is not involved

4 While the burden associated with responding to the Carlson request seems to be obvious and self-evident on its face, we leave to the United States any detailed estimate of the time and cost required actually to collect, review, and process from far flung Government repositories such of the information sought by Carlson that might actually exist.

at all, and the reservation and ticketing transaction is processed completely by a Carlson agent. See, e.g., Deposition Transcript of R. Craig Thompson, June 14, 2006 ("Thompson Tr.") at 133-34;

(2) Carlson's pricing of those three types of transactions was set by Carlson to make a DTS "touch transaction" more expensive for the Government than a "traditional" transaction. See, e.g., Thompson Tr. at 134;

(3) The elimination of the DTS system as an available booking mechanism would require all bookings to be processed as "traditional" transactions, at the lower price. See Thompson Tr. at 138-139.

(4) Thus an injunction would actually have a negative impact on Carlson's cash flow between now and September 30th. As Mr. Thompson testified:

> Q: If the DTS system disappeared on July 31 of this year, just went away, what impact would that have on the revenue of CWG between August 1 and September 30? …. Of this year.
>
> A: Okay. That would essentially mean that all previous or potentially new DTS transactions would be converted to a traditional transaction. At those locations where the touch transaction fee exceeds the traditional fee for the across the board then 15 percent of our total ticketing, then that delta of the difference between the [traditional] fee and the higher touched fee would be **lost revenue** based {POFPB} [sic] the number of transactions.

Thompson Tr. at 138-139 (emphasis added).

Thus, Carlson's contention in this matter must be that the continued use of DTS between now and September 30, 2006 will irreparably harm it by increasing its cash flow, and that reduced cash flow is a benefit for Carlson that Carlson insists the Court should thrust upon it. Increased cash flow is not "irreparable injury;" in fact, it is not "injury" at all.

**4. Carlson's motion contravenes the clear directions already issued by this Court**. At the June 5, 2006 scheduling conference, this Court was absolutely clear that the scope of the discovery for the purposes of the impending hearing was extremely limited. Of the many various types of additional discovery Carlson seeks in its latest filing, few, if any, touch on the limited issues before this Court at the present time: (1) the balance of harms to the parties; and (2) whether the entry of an injunction prohibiting the continuation of the DTS contract would be in the public interest. Carlson's attempt to obtain discovery regarding such issues as:

- "Whether DFAS will substantially reduce personnel in the DTS **in Fiscal Year 2007…"** (emphasis added); and
- "The Government's contemplation of issuing a sole source contract or task order to replace the current DTS contract for period [sic] **after** September 30, 2006" (emphasis added)

are clearly outside the contemplated scope of this Court's June 6th Order.

Other examples of overreaching abound. For example, Carlson seeks documents relating solely to performance of the DTS contract that has occurred in the ***past*** – not performance that is anticipated to be accomplished in the next 90 days. Examples of such requests are:

- "Evaluations of Northrop's eTravel System, including, but not limited to, an analysis of the extent to which it meets Department of Defense ("DoD") requirements."
- "Project management plan documents identifying problems or defects requiring correction or enhancements needed by the DTS."

- "Agenda prepared for periodic meetings between the DTS PMO and military service representatives at the 06 level to discuss the DTS and documents reflecting the results of such meetings for 2005 and 2006."
- "Reports generated by the Army Test and Evaluation Command in evaluating DTS performance since January 1, 2005."
- "Formal or informal responses by the DTS PMO to the above tests generated by the Army Test and Evaluation Command."
- "Monthly maintenance and/or enhancement releases for the DTS from the past six months."
- "Task orders issued to Northrop pertaining to the above-mentioned maintenance and/or enhancement releases."
- "Help Desk tickets issued as a result of Help Desk calls."
- "System problem reports and/or spreadsheets, including, but not limited to, those generated as a result of Help Desk calls."
- "Reports generated by the DTS PMO or any support contractors that indicated the improvements needed in the system which led to the selection of OpenJaw to satisfy those improvements to the DTS reservation module."
- "Reports that evaluated other commercial products (e.g., SABRE's Get There) to satisfy the improvements needed in the DTS Reservation System."
- "Communications or reports regarding whether the DTS had been deployed without adequate testing."

Any such documents have absolutely no relevance to the balancing of hardships or the public interest that would arise if the Department of Defense were enjoined from permitting Northrop Grumman to perform the last 60 to 90 days of its eight-year DTS contract. Clearly, such requests are aimed at issues unrelated to and for time periods vastly different from the final three months of the DTS contract performance.

Another example of Carlson's overreaching is its request for documents regarding "Whether DFAS will substantially reduce personnel in the DTS in Fiscal Year 2007 or thereafter and actually realize a net savings for DoD resulting from the processing of travel vouchers via the DTS." As an initial matter, the request is inarticulate insofar as it is completely unclear what, if any, DFAS personnel are employed "in the DTS." However, to the extent that Carlson is seeking DFAS human resource plans for fiscal year **2007**, this request has absolutely no relevance to the balance of harms or to the public interest attendant to an injunction against performance of the final three months of the DTS contract. Indeed, not only does the request seek data that is outside of the relevant timeframe (since the DTS contract is completed at the end of fiscal year **2006**), it seeks documents about an Agency's personnel when that Agency is without responsibility over the DTS system.

Yet another striking example of Carlson's overreaching is its request for documents regarding "The Government's contemplation of issuing a sole source contract or task order to replace the current DTS Contract for period **after September 30, 2006**." This specific request has already been rejected by the Court and the Court has specifically ruled that it will not

entertain any requested relief against a contract action that has not yet occurred and is not before this Court.[5]

Additionally, some requests have absolutely nothing to do with Northrop Grumman's DTS contract itself. For example, the requests for documents relating to: "The decision whether or not to test the Tech Refresh System **after it is delivered by Northrop** and before deployment;" and "Documents related to the periodic meetings of the DTS PMO with representatives of the military services regarding the DTS."

There are also requests that seek documents about cancelled solicitations for services that are not part of the current DTS contract, but relate instead to other activities. Examples of such requests are those such as:

- "DTMO's identification of issues to be discussed with the military services regarding DTS issues made after the March 28, 2006 Industry Conference."[6]

---

5 Of the fifty-two types of documents requested by Carlson in its latest filing, virtually all overlap with classes of documents previously requested by Carlson in its June 2, 2006 submission to this Court. This Court squarely rejected that request during the June 5th scheduling conference and warned Carlson that such discovery would not be allowed. Amazingly, Carlson ignores the Court's instructions and again asks for the very same types of documents. While a very limited number of the fifty-two types of documents may actually be relevant to the limited issues before the Court at this time, clearly Carlson is overreaching in an attempt to obtain "free discovery" to be used in its next lawsuit challenging any follow-on contract to the DTS or to disseminate misleadingly on Capitol Hill as it continues to bad mouth a system for which it was unwilling to compete. The Court specifically advised Carlson that discovery aimed at future collateral litigation was not to be countenanced, yet Carlson persists, not in "pushing," but in ignoring the discovery "envelope" previously defined by the Court. To borrow the title of a 1977 film, Carlson's latest ploy is simply "*A Bridge Too Far*."

6 This is a conference conducted to discuss the contents of a draft solicitation for Commercial Travel Offices – a draft solicitation that was cancelled. See, e.g., Deposition Transcript of Paul Joyce, June 30, 2006, at 40.

- "Documents reflecting the decision process regarding the April 2006 cancellation of the DTS Worldwide CTO Solicitation originally issued in November 2004."

The above identified requests are merely examples but, plainly, these examples demonstrate Carlson's absolute refusal to contain its discovery and actions to those permitted by this Court. Carlson's overreaching and flouting of this Court's rulings should not be allowed and its continued desperate requests for additional discovery should be denied.

In fact, leaving aside the question of its relevance to the limited issues on which the impending hearing will focus, most of Carlson's discovery is not even relevant to any of the issues framed by this action as a whole, which involves a claim for a permanent injunction against the performance of effort that Carlson contends constituted a cardinal change. Virtually all of the information being sought relates to Carlson's efforts to impugn and malign the DTS as whole, to mount an attack on the underlying DoD travel policies that DTS was designed to – and does – implement (e.g., the use of the so-called "City Pairs" airfare program negotiated between the Government and the airlines); to tout its E-Solutions program irrespective of its admitted inability to interface with the underlying legacy systems utilized by DoD; to gain access to cost information that is unavailable to other CTOs or other competitors for follow on DTS work; and needlessly to prolong a legal action for the purposes of sustaining its parallel assault on the wisdom of the DTS on Capitol Hill. Lost in Carlson's stream of consciousness discovery request are:

(1) The extraordinary burden that a request of this breadth and depth will place not only on the Government, but on all parties in digesting and assimilating it in advance of any hearing;

(2) The numerous motions with which the Court will need to deal concerning the admissibility of the many attenuated facts on which Carlson belatedly seeks discovery;

(3) Its likely impact on the postponement of the July 26th hearing;

(4) Its likely impact on the duration of the hearing; and

(5) Its likely impact on the focus of the hearing as Carlson continually seeks to bash its ever-expanding concept of "relevance" into the limited mold that the Court properly fashioned in structuring these proceedings.

As the expiration date for the Contract approaches, these facts are – in the specific context of a challenge to the final 90 days of an eight year contract – as relevant to the public interest as any others under consideration.

When Carlson's "discovery" request is dispassionately reviewed, it becomes abundantly clear that Carlson's objective is <u>not</u> to discover facts germane to the limited purposes identified by the Court in connection with the upcoming evidentiary hearing. Rather, Carlson's purposes are transparently more far-reaching, <u>i.e.</u>,

(1) To gather facts to use in support of an already threatened challenge to an as yet consolidated follow-on, transitional one-year contract;

(2) To gain facts to use in advancing its individualized ability to compete for that transitional work;

(3) To gather facts for use in challenging any procurement relating to DTS beyond that transitional period;

(4) To position itself, uniquely through unwarranted and inappropriate discovery, to advance its competitive strategy in any such competition; and

(5) To advance its collateral efforts on Capitol Hill literally to kill the DTS Program, which threatens Carlson's core CTO business and the ability of its technologically limited eSolutions product to penetrate the DoD market.

None of these are proper bases for the untimely and unconstrained discovery that Carlson seeks, which is unrelated to the narrow issues for which discovery was authorized by this Court.

**CONCLUSION**

For the foregoing reasons, Northrop Grumman respectfully requests that Carlson's latest request be denied.

Additionally, in light of Carlson's continuing conduct in re-raising issues on which this Court has clearly already spoken, Northrop Grumman respectfully requests, pursuant to U.S. Court of Federal Claims Rules 11(c) and 26(g), reimbursement of costs and attorneys fees associated with responding to Carlson's latest wasteful and frivolous request.

DATED: July 10, 2006

Respectfully submitted,

*s/ John W. Chierichella*

John W. Chierichella
Anne B. Perry
Sheppard, Mullin, Richter & Hampton
1300 I Street, NW, 11th Floor East
Washington, DC 20005
202-218-0000
202-218-0020, fax

**PROOF OF SERVICE**

I hereby certify, under penalty of perjury, that on July 10, 2006, I caused a true and correct copy of the foregoing NORTHROP GRUMMAN'S OPPOSITION TO CARLSON'S REQUEST FOR FURTHER DISCOVERY to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/ David S. Gallacher*